# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC., CUSTOMER DATA SECURITY BREACH LITIGATION<br><br><br>*This Document Relates To:*<br>*Quest/Optum360 Track* | Case No.: 2:19-MD-02904-MCA-MAH<br><br>MDL 2904<br><br>**SPECIAL DISCOVERY MASTER ORDER** |

**WHEREAS**, this matter between Plaintiffs and Defendants Quest Diagnostic Incorporated ("Quest") and Optum360, LLC ("Optum") (collectively, "Defendants" and together with Plaintiffs, the "Parties") having come before the undersigned Special Discovery Master, appointed by Order entered on July 19, 2023, to address a series of written discovery disputes (ECF No. 550); and the Special Discovery Master having considered the fully briefed discovery disputes set forth in the Parties' Joint Letter dated February 22, 2023 (ECF No. 474); and the Special Discovery Master having considered the arguments of counsel during the November 1, 2023, discovery dispute hearing, which was transcribed by a Certified Court Reporter, the transcript of which is attached hereto;[1] and the Special Discovery Master having considered the competing proposed orders submitted by the Parties on December 4, 2023; and for the reasons stated on the record; and for other good cause shown;

---

[1] References to the transcript are to the November 1, 2023 Special Discovery Master Hearing and will be described as "Tr."

**IT IS** on this 18th day of December 2023,

**A. Method & Manner of Transmission of Quest Patient Data to AMCA (RFPs 36-40).**

 **ORDERED** that Defendants shall produce documents responsive to Plaintiffs' Request for Production of Documents Nos. 36-40 related to the transmission of Quest Patient Data to AMCA. [See Tr. 18:15-25:2]

**B. Defendants' Internal Policies & Procedures Related to Data Security & the Protection of PHI and/or PII (RFPs 44, 45; ROGs 5, 8).**

 **ORDERED** that the Parties shall continue to meet and confer and, to the extent Defendants have not already done so, Defendants shall (i) produce documents responsive to Plaintiffs' Request for Production of Documents Nos. 44 and 45, and (ii) provide information responsive to Plaintiffs' First Set of Interrogatories Nos. 5 and 8. [For RFPs 44-45, see Tr. 27:4-28:6, 31:18-32:24, 35:2-13; For ROGs 5, 8, see Tr. 37:12-38:16]

**C. Sale of Quest Patient Data on the Dark Web (RFPs 47, 48).**

 **ORDERED** that Defendants shall identify the custodial and non-custodial data sources likely to contain Documents and Communications responsive to Plaintiffs' Request for Production of Documents Nos. 47 and 48. Defendants shall also provide a sample of 25 documents to Plaintiffs and the Special Discovery Master for in camera review. The Parties shall continue to meet and confer on this discovery dispute. [See Tr. 53:9-17, 61:4-62:7]

**D. Compensation Paid to AMCA & Other Medical Billing Agencies (RFPs 24, 25); Revenue Received from AMCA's Services & Related Expenses (RFPs 26-29).**

 **ORDERED** that the Parties shall continue to meet and confer and, to the extent Defendants have not already done so, Defendants shall produce documents responsive to Plaintiffs' Request for Production of Documents Nos. 24-29 related to financial information. [See Tr. 66:5-6, 68:8-69:20]

**E.  Data Security & Information Technology Expenses (RFPs 30, 31).**

ORDERED that Defendants shall produce Documents responsive to Plaintiffs' Request for Production of Documents Nos. 30 and 31 after the Parties further meet and confer as to the proper scope of production. [See Tr. 71:4-74:5]

**F.  Volume or Percentage of Sales Sent to Collection Agencies (RFP 32).**

ORDERED that the Parties shall meet and confer and, to the extent Defendants have not already done so, Defendants shall produce documents responsive to Plaintiffs' Request for Production of Documents No. 32, and amend their responses to identify same. [See Tr. 76:9-12]

**G.  Risk Assessments & Remediation of AMCA' Systems (ROGS 1, 3, 4); Format of Quest Patient Data (ROG 6); Defendants' Training of Employees (ROG 9)**

ORDERED that Quest shall supplement its narrative response to Plaintiffs' First Set of Interrogatories Nos. 1, 3, 4, 6, and 9. [For ROGS 1, 3, 4, Tr. 83:18-23-85:7, 88:10-89:20; For Rog 6, Tr. 91:22-94:2; For ROG 9, Tr. 104:14-105:9]

ORDERED that Optum360 shall supplement its narrative responses to Plaintiffs' First Set of Interrogatories No. 9.  [Tr. 104:14-105:9]

**H.  Notification of the Data Breach (ROGs 11, 12)**

ORDERED that Defendants shall provide a narrative response to Plaintiffs' First Set of Interrogatories Nos. 11 and 12; however, if Defendants still maintain their claim of privilege, then Defendants shall immediately forward to the Special Discovery Master a privilege log and the relevant documents/communications for in camera review. [See Tr.  99:2-101:5]

**I.  Quest's Assignment of Contract to Optum (ROG 7)**

**ORDERED** that the Parties shall continue to meet and confer and, to the extent Optum has

not already done so, Optum shall identify Documents and Communications responsive to Plaintiffs'

First Set of Interrogatories No. 7. [See Tr. 101:5-22]

**Mark Falk, Special Master**

1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEW JERSEY

3                CASE NO. 19-MD-02904

4

5

6 IN RE:  AMERICAN MEDICAL

7 COLLECTION AGENCY, INC.,

8 CUSTOMER DATA SECURITY BREACH

9 LITIGATION

10 -----------------------------

11            WEDNESDAY, NOVEMBER 1, 2023

12         SPECIAL DISCOVERY MASTER HEARING

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1  A P P E A R A N C E S
2
3  BEFORE:  THE HONORABLE MARK FALK (ret.)
4
5
6  ALSTON & BIRD LLP
7  BY:  DONALD HOUSER, ESQ.
8       ERIN EDWARDS, ESQ.
9  1 Atlantic Center
10  1201 West Peachtree Street
11  Atlanta, Georgia 30309
12
13
14  SIDLEY AUSTIN LLP
15  BY:  HEATHER SULTANIAN, ESQ.
16  1 South Dearborn
17  Chicago, Illinois 60603
18  (312) 853-7000
19
20
21  SIDLEY AUSTIN LLP
22  BY:  LAURA SORICE, ESQ.
23  787 7th Avenue
24  New York, New York 10019
25  (212) 839-5599

Page 4

1  Washington, D.C. 20004
2  (202) 637-5600
3
4
5  LIEFF CABRASER HEIMANN & BERNSTEIN
6  BY:  JASON LICHTMAN, ESQ.
7  250 Hudson Street
8  New York, New York 10013
9  (212) 355-9500
10
11
12  STUEVE SIEGEL HANSON
13  BY:  NORMAN SIEGEL, ESQ.
14  460 Nichols Road, Suite 200
15  Kansas City, Missouri 64112
16  (816) 714-7112
17
18
19  SEEGER WEISS LLP
20  BY:  CHRISTOPHER AYERS, ESQ.
21  55 Challenger Road
22  Ridgefield Park, New Jersey 07660
23  (973) 639-9100
24
25

Page 3

1  CARLTON FIELDS
2  BY:  MICHAEL HENSLEY, ESQ.
3  180 Park Avenue, Suite 106
4  Florham Park, New Jersey 07932
5  (973) 828-2600
6
7
8  O'TOOLE SCRIVO, LLC
9  BY:  THOMAS SCRIVO, ESQ.
10       YOUNG YU, ESQ.
11  14 Village Park Road
12  Cedar Grove, New Jersey 07009
13  (973) 239-5700
14
15
16  LEWIS BRISBOIS BIDGAARD & SMITH LLP
17  BY:  ARIADNE PANAGOPOULOU, ESQ.
18  77 Water Street, Suite 2100
19  New York, New York 10005
20  (212) 232-1300
21
22
23  HOGAN LOVELLS
24  BY:  ALICIA PALLER, ESQ.
25  555 13th Street NW

Page 5

1  CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, PC
2  BY:  JAMES CECCHI, ESQ.
3  5 Becker Farm Road
4  Roseland, New Jersey 07068
5  (973) 994-1700
6
7
8  WALSH PIZZI O'REILLY FALANGA LLP
9  BY:  PATRICK SALAMEA, ESQ.
10       ERIC PADILLA, ESQ.
11  3 Gateway Center
12  100 Mulberry Street, 15thv Floor
13  Newark, New Jersey 07102
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1  SPECIAL DISCOVERY MASTER FALK:  Good
2  morning.  I haven't met many of you.  I'm Mark Falk,
3  and I was appointed as Special Discovery Master in
4  this case by Judge Arleo and Judge Hammer, and I look
5  forward to working with you all.  We're starting a
6  little slowly today.  We're only dealing with one
7  issue.  Plaintiffs are asking not to handle those
8  issues because there have been further production.
9  I've read your stuff.  It's very helpful.  In the
10 future, if there is a future, if you have further
11 disputes, I'm going to ask that we do it in double
12 space.  I'm in my 70s.  My eyes are getting a little
13 weak.  We managed to read everything.
14     So I would -- if you don't mind, I'd
15 like to go around the room so I know who everyone is.
16     MR. HOUSER:  Donald Houser with Alston &
17 Bird and on behalf of Optum360.
18     MS. EDWARDS:  Erin Edwards from Alston &
19 Bird also on behalf of Optum360.
20     MS. SULTANIAN:  Good morning.  Heather
21 Sultanian on behalf of Quest.
22     MS. SORICE:  Laura Sorice on behalf of
23 Quest.
24     MR. HENSLEY:  Mike Hensley on behalf of
25 Quest.

Page 7

1     MR. SCRIVO:  Thomas Scrivo for Optum360.
2     MR. YU:  Good morning.  Young Yu on
3  behalf of Optum360.
4     MS. PANAGOPOULOU:  Ariadne Panagopoulou
5  from Lewis Brisbois.
6     MS. PALLER:  Alicia Paller on behalf of
7  Laboratory Corporation of America Holdings.
8     MR. LICHTMAN:  Jason Lichtman on behalf
9  of plaintiffs.
10    MR. SIEGEL:  Normal Siegel from Kansas
11 City for plaintiffs.
12    MR. AYERS:  Chris Ayers from Seeger
13 Weiss for plaintiffs.
14    MR. CECCHI:  Jim Cecchi on behalf of
15 plaintiffs.  Thank you, judge.
16    SPECIAL DISCOVERY MASTER FALK:  Thank
17 you.  Thank you very much.
18    So who will dive right in?  I did say --
19 so today, we're dealing with 474, but my intention --
20 and the other one they asked to put off, which makes
21 sense, but I just want to assure everyone that we're
22 going to pick up the pace, and we'll resolve all your
23 discovery disputes, and if you have ongoing discovery
24 disputes, well, while I'm special master, don't
25 hesitate to call me, and the number to call, I'm

Page 8

1  going to give it to you right now.  201-341-3629, and
2  you can call the numbers that they have here, but it
3  really -- we're using cell phones these days.
4     MR. CECCHI:  Should I give them Lisa's
5  cell phone too?
6     SPECIAL DISCOVERY MASTER FALK:  I have
7  it, but I don't think she needs that.
8     MR. CECCHI:  I'm kidding.
9     SPECIAL DISCOVERY MASTER FALK:  I'm new
10 to the case, obviously relatively new.  I've done a
11 lot of reading.  I may ask more questions than
12 someone who had been with the case from the start
13 would know.  I intend to deal with the discovery
14 disputes, and I have very strong views on discovery.
15    So before we even start, I'm just going
16 to give you what you heard before and know before and
17 you quoted, et cetera, but I'd like to put it on the
18 record anyway, which is that we're dealing with the
19 scope of discovery, and it's all set forth in rule 26
20 and basically any matter that's relevant to the claim
21 or defense of any party in the pending action and is
22 proportional to the needs of the case is discoverable
23 because it's all privileged.  Obviously, you all know
24 that.  It was even cited in Mike Hammer's decision.
25 Relevant is not defined by the rules, but it's

Page 9

1  extremely broad, and courts have defined relevant to
2  encompass any matter that bears on or that reasonably
3  could lead to other matters that could bear on any
4  issue that is or may be in the case.  It's also been
5  defined as germane.  Of course, you know, and I'm
6  just putting this on the record that evidence -- that
7  discovery need not be admissible to be relevant.  It
8  still can be discoverable.  Of course, admissible
9  evidence is always discoverable.  Proportionality,
10 it's funny thing about proportionality.  That's
11 something that has always been in the rules, but
12 in -- it's not even recent anymore.  It's sort of
13 underlined it.  So discovery has to be proportional
14 to the needs of the case, meaning the expected
15 benefits of discovery must be in line with the cost
16 and burden of the discovery and the value of the
17 case.  Rule 26(b)(1), which I have here, contains a
18 list of factors for evaluating proportionality.  No
19 one factor is dispositive.  So that is the importance
20 of the issues at stake in the action, the amount in
21 controversy.  The parties relevant access to relevant
22 information, to parties resources, the importance of
23 the discovery in resolving the issues, and whether
24 the burden or expense of the proposed discovery
25 outweighs its likely benefit, and that's as much as I

3 (Pages 6 - 9)

Page 10

1  put the rule down there I have. You're all familiar
2  with this, all excellent lawyers, and I just thought
3  I'd put it on the record. And now let's proceed.
4          So we're doing -- and I appreciate the
5  way you've presented this to me with binders and
6  everything. It's excellent. We'll deal with issue
7  474, and that is described as the method and manner
8  of transmission of Quest of patient data to AMCA, and
9  there are four requests for production. So the first
10  one is the method and manner of transmission of Quest
11  patient data to AMCA, and there are several requests
12  for admissions on that. Does anyone want to be heard
13  on that? Does anyone want to say anything?
14          MR. CECCHI: Sure, judge. Thank you.
15          SPECIAL DISCOVERY MASTER FALK: Sure.
16          MR. CECCHI: And thank you for setting
17  the parameters under the rules. And you also
18  mentioned Judge Hammer.
19          SPECIAL DISCOVERY MASTER FALK: Yes, I
20  did.
21          MR. CECCHI: I just briefly want to
22  touch upon Judge Hammer's earlier decision regarding
23  other data breach incidents. I would credit the
24  defendants for bringing that to the court's
25  attention. In my judgment, it's really a creative

Page 11

1  and artful dodge because in order to understand where
2  we are today, it's important to put Hammer's ruling
3  in context. It was at the beginning of the case,
4  approximately four years ago. It was in the context
5  of a motion to stay discovery by the defendants in
6  the context of a proposal that I made to the
7  defendants to a limited batch of discovery, which we
8  could do while the motions to dismiss were pending.
9  We made a proposal to the defendants vis-a-vis that
10  limited batch of discovery, government investigation
11  records, and some other limited discovery. We also
12  asked for other data breach incidents. Judge Hammer
13  ruled on that request and found that it was beyond
14  the scope of the pleading. Now, it's important to
15  know that was two decisions ago. It was before Judge
16  Arleo motion to dismiss decision and her second
17  motion to dismiss decision. It was before the
18  amended complaint and the operative complaint, which
19  guides the framework under which I think the
20  relevancy determination should be made here today.
21  And I also want to mention to the court that it is
22  just a practical issue vis-a-vis that ruling, which
23  has no relevance to these requests that if they
24  believed it was preclusive of these requests, Judge
25  Hammer would let us know that if it was law of the

Page 12

1  case. So I just want to put that in perspective that
2  the touchstone today is the operative pleading. And
3  the final point I'll make about Hammer's decision
4  is -- my good friend, Donald Houser, quotes it, but
5  Hammer quoted the Labcorp complaint at that time, not
6  the Quest complaint. Today, these requests go to the
7  operative Quest complaint. Each of the requests that
8  we make are relevant to the pleading that we make in
9  that operative complaint, negligence per se, and the
10  California Medical Information Act claim, and that
11  will be, with your Honor's guidance, our framework
12  for showing the relevance of each of these requests.
13          SPECIAL DISCOVERY MASTER FALK: Good and
14  I'll take them one-by-one. Thank you.
15          MR. CECCHI: Thank you.
16          SPECIAL DISCOVERY MASTER FALK: Does
17  anyone want to respond to that? It's not necessary,
18  but if you want to.
19          MR. HOUSER: Sure. I think it's
20  important to level set where -- from the defendants
21  perspective, where we view the case and where we
22  stand right now. As your Honor knows, this involves
23  a AMCA data breach. The defendants have produced
24  30,000 documents and depositions of Optum and Quest
25  current and former witnesses. From our view, and I

Page 13

1  think one piece that's framing all of the
2  discussions, is the fact that we believe we've
3  produced everything that the plaintiffs need and are
4  relevant to their claims. They have a lot of the
5  information, and some of the documents that they
6  claim they don't have, they actually have that
7  information. We feel that we're kind of playing at
8  the extreme margins with respect to these discovery
9  requests. In our view, we're kind of off the page.
10  I'm happy to go through and talk about the
11  transmission issue in more detail, but we'll defer to
12  you.
13          MR. CECCHI: Judge, in terms of what has
14  been produced, we prepared a chart, and we'll tie to
15  defendants and your Honor to reflect the number of
16  documents produced. In this case, the plaintiffs
17  produced far more documents than the defendants,
18  which is unusual. Quest has produced 700 documents
19  pre-breach. The normal and usual database case of
20  this magnitude, the second largest in the history of
21  the United States, Mr. Seeger, my co-counsel, has
22  done many of those cases. Tens of thousands of
23  documents are produced. Why? Because they're
24  relevant to the claims at issue here. Getting to the
25  nub of the case, the method and manner of

4 (Pages 10 - 13)

Page 14

1  transmission of the data to AMCA goes directly to the
2  heartland of proving that case.  To give you an
3  analogy, these are medical records, the most
4  sensitive medical records that these people possess.
5  You give blood to these people, and they have
6  information about your health.  Very sensitive and
7  valuable information.  If I had paper copies of this
8  and brought it to a warehouse, right, and put it on
9  the front door of the warehouse or in the warehouse,
10  but turned off the video cameras, all of that is
11  relevant to proving that Quest and Optum should
12  secure those paper records in an accurate and
13  confidentiality manner.  I can quote to your Honor
14  that count one, two, and six directly speaks to how
15  the records were kept, how they're disseminated, and
16  how they're treated.  They have to maintain
17  confidentiality.  When I say it's nondelegable, just
18  because they gave it to AMCA, they can't wash their
19  hands of their obligation to make sure sensitive
20  pieces of information about your health are
21  protected.  It was foreseeable because had they done
22  their due diligence about AMCA, they would know that
23  only were the systems inadequate, they were totally
24  inadequate.  Their one tech guy said, "Yeah, I was
25  complaining about this for years.  I knew that we had

Page 15

1  inadequate systems."  The fact that it's AMCA is
2  another dodge.  They had a duty to secure it, whether
3  it was a paper record in a warehouse or an electronic
4  file delivered to a debt collector.  The method and
5  manner goes to ensure that medical information
6  regarding patient information is not disclosed or
7  disseminated and to protect and preserve medical
8  records in a manner that protects the confidentiality
9  of the information.  That's count six.  Count one and
10  count two, failing to exercise adequate security
11  systems, protocols, and practices sufficient to
12  protect plaintiffs and class members personal
13  information, failing to comply with industry
14  standards, i.e., not securing that information,
15  transmitting it in an insecure and unsafe manner from
16  Quest and Optum to AMCA.  It's the heartland of our
17  negligence claim.  You know, this case is not about a
18  snapshot in time.  It's about the continuum of time
19  vis-a-vis their negligence from when they took my
20  medical information, ingested it, and then gave it
21  insecurely to AMCA and could foreseeably see that it
22  could be breached.  By the way, not only included
23  medical records, it also included financial
24  information, which was in AMCA's files as well.  We
25  think it's squarely in the heartland of the

Page 16

1  negligence claim and the CMI claim.
2  MR. HOUSER:  This is a third-party
3  breach, so it's not surprising that it's another
4  company's data security and that there are not a ton
5  of documents as there were as many as Mr. Cecchi
6  thinks there should be.  I don't think the volume of
7  documents.  I want to take a step back on what
8  Mr. Cecchi was hitting.  He was hitting on the data.
9  We agree it's relevant to the case.  He mentioned
10  that oversight of AMCA's security is relevant.  We
11  agree it's relevant, and we've agreed to produce
12  documents that bear on the AMCA's data security, the
13  oversight of AMCA's data security.  That's not in
14  dispute with respect to the transmission issue.  I
15  think a conflation of a lot of different pieces
16  moving on.
17  The second piece is we're talking about
18  the transmission and the method of transmission.  If
19  that's what we're talking about, how is the data
20  transmitted?  They know how the data was transmitted.
21  Its in the interrogatory responses.  They've had
22  deposition testimony.  It's not something that we're
23  trying to hide or a secret.  It's not that
24  complicated.  There were two methods by which it went
25  to AMCA.  They know how it was transmitted to AMCA.

Page 17

1  This idea that too much information was sent, more
2  than minimally necessary.  We have produced and Quest
3  has produced essentially the database file.  They
4  know for every single plaintiff whose data was
5  transmitted, when it was transmitted, and elements
6  that were transmitted.  So they have all that
7  information.  I think if we then take a further step
8  back, what they're asking for here in these discovery
9  requests is every document that relates ever to PII
10  and then PHI, and it not at the tethered to data
11  security.  The first request just says 36, RFP 36,
12  every document that relates to translation of
13  information.  Full stop.  It doesn't matter if it's
14  related to any other vendors.  We want it all.  They
15  seem to narrow in on their actual responses about the
16  security of transmission, but the data wasn't
17  captured or stolen during the transmission of the
18  file.  The security transmission doesn't relate to
19  their claims.  I think it's important to take a quick
20  step back and look at the allegations that they point
21  to.  They point to the duties that Mr. Cecchi
22  referenced and other alleged duties relating to our
23  internal policies and procedures at Quest and Optum
24  and how we secure data.  Our security policies and
25  procedures about how we secure data, that does not

5 (Pages 14 - 17)

Page 18

1  bear on the plaintiffs claims. They don't arise from
2  the safeguarding of data on our systems or the
3  transmission. They're linked to the AMCA data
4  breach. They don't allege that they have suffered an
5  injury if a defendant has failed to secure data in a
6  completely separated location on the defendant's own
7  systems. It's the alleged insecurity with respect to
8  AMCA. So they know how it was transmitted. They had
9  deposition testimony on it. They have all the data
10  that was transmitted. The need for every single
11  document in transmission, including how data was
12  internally transmitted with each defendant, is
13  facially not relevant to the claims that are at issue
14  here.
15          SPECIAL DISCOVERY MASTER FALK: Okay.
16  Thank you. I mean, let me just make some comments.
17  I guess in a way you've both made arguments that sort
18  of run through a lot of the disputes. I certainly
19  have read Judge Hammer's opinion, and I've spoken to
20  him and Judge Arleo, but that doesn't matter. I'm
21  focused on the relevance of the claims and defenses
22  in this case, and I'm certainly not -- I agree with
23  Judge Hammer's opinion, but it was -- it's a little
24  different from what's being asked now. That was
25  really relating -- first of all, it was without

Page 19

1  prejudice, he said several times in the opinion. It
2  was an earlier time, and it's sort of distinguishable
3  from some of the claims now. In the opinion, he was
4  relating to -- I mean, I think he was focusing on
5  breaches in the defendant systems that had nothing to
6  do with this particular case -- not case, but the
7  allegation of the AMCA. As to some of the issues
8  there, rather than a broad request for documents, it
9  could be more easily done, perhaps with a request for
10  admission or an interrogatory.
11          But what we're doing here and what I'm
12  doing here, and in no way -- I respect that opinion
13  and I agree with it, but I don't think that covers
14  what we're talking about here. So I'm going to deal
15  with request for production No. 36, and I'm going to
16  grant plaintiff's request on that because it's
17  discoverable. You have very different views on what
18  this case is about, and they're legitimate in a
19  certain way. The plaintiffs are saying -- they're
20  alleging negligence in terms of how the defendants
21  handled this kind of information, and the defendants
22  are saying we should only be talking about the AMCA
23  incident, and I think it's true. That's what this
24  case is about, but if you're doing discovery, I think
25  you're able to go a little further.

Page 20

1          But having said that, Judge Hammer
2  considered a broader issue request for documents
3  concerning any cyber security incidents on Quest's
4  system, and his ruling did come at an early point in
5  the case, and since then, plaintiffs have filed an
6  amended complaint on, I think, March 31, 2022, which
7  contains the following allegations. I'm not getting
8  to -- these are actual claims and from the complaint,
9  and I will say that the complaint, in broad terms,
10  has been sustained twice. Maybe different people
11  making the claims. But in other words, Judge Arleo
12  has already allowed certain claims to proceed and
13  other claims not to proceed. There's been no motion
14  to strike as to specific claims that were alleged.
15  That is something that you can do as well. In other
16  words, you could move 12(b)(6) -- I mean, most
17  opinions really dealt with standing, which in
18  database cases of course is the big issue, in my
19  view. The point is there have been -- there's been
20  no striking of allegations. So as to this issue, I'm
21  going through the allegations in the complaint, which
22  haven't been stricken and are still there, and I
23  can't imagine how you deny discovery in that case.
24          So paragraph 339 quotes the methods of
25  transmission of information between Quest and AMCA

Page 21

1  varied by Quest division.
2          "For example, from 2014 through 2019,
3  Solstas Lab Partners, a diagnostic lab company
4  acquired by Quest in 2014, e-mailed Excel files to
5  AMCA that included hundreds of patient names,
6  addresses, dates of birth, and Social Security
7  numbers. Security protocols were lax as often times
8  the password needed to access the file was listed in
9  the body of the e-mail. These files were then
10  forwarded without passwords and stored on AMCA
11  servers, which AMCA referred to as live files."
12          I'm quoting from my notes, but it's
13  pretty darn close. I can pull out the complaint.
14  Paragraph 343 goes further.
15          "Other Quest divisions had access to
16  AMCA's network, which allowed Quest and Optum to
17  upload files directly onto folders, stored on AMCA's
18  ODrive. This transfer method was extremely
19  un-secure, and AMCA internally acknowledged it posed
20  a serious security risk. Nevertheless, Quest
21  resisted adopting a more secure file transfer method
22  because of the ease of the data transfer process."
23          Paragraph 341.
24          "In many instances, Quest and Optum360
25  employees would simply e-mail patient account

6 (Pages 18 - 21)

Page 22

1  information directly to AMCA, including by default
2  patient names, addresses, billing codes, physician
3  names, and ICD codes, among other highly sensitive
4  information."
5        Paragraph 408.
6        "Defendants fail to maintain the privacy
7  and security of their patients PHI and failed to
8  inform patients that their personal information was
9  disclosed.  Indeed, defendants violated HIPAA by
10  failing to, A, maintain an adequate data security
11  system to reduce the risk of data breaches and cyber
12  attacks, B, adequately protect personal information,
13  C, ensure the confidentiality and integrity of
14  electronically protected health information created,
15  received, maintained, or transmitted in violation of
16  45 CFR 164.306(A) and (1), et cetera."
17        Paragraph 508.
18        "Defendants knew the manner in which
19  they way they maintained and transmitted patients
20  personal information violated plaintiffs and class
21  members by disregarding industry standard security
22  protocols to ensure confidential information was
23  securely transmitted and stored."
24        Paragraph 529.
25        "Defendants transmitted patients

Page 23

1  confidential medical information in an unencrypted
2  and un-redacted format to defendant's associates,
3  which was then accessed, viewed, and exfiltrated by
4  an unauthorized third party or parties, and thus,
5  defendants negligently released medical information
6  concerning plaintiff and California subclass
7  members."
8        I mean, I've just read that to you, and
9  these are -- you know, I gave you the parameters or
10  guardrails of discovery, which are broad.  These are
11  actual claims that are in the complaint, and they're
12  making claims that the defendants were negligent in
13  the transmission and other things, of course, how it
14  was maintained, but the transmission of information.
15  It's right from the complaint.  So there's no
16  question in my mind that it is discoverable.
17        Now, I'll go through each of the
18  requests for production under this section.  I think
19  I answered the fact that it's discoverable.  I don't
20  know about issues with respect to time and that kind
21  of thing.  I mean, I think I saw somewhere that there
22  was an agreement, and you were going to have to tell
23  me as to a five-year relevant time period, which is
24  ECF 47414.  Is that what governs everything or does
25  that just govern this particular thing?  You know,

Page 24

1  maybe I don't even need to take that on.  Maybe this
2  is something that after my ruling, if appealed or
3  sustained on appeal, you would work out with the
4  defendants.
5        MR. CECCHI:  Thank you, judge.  I think
6  we can do that because I'm not 100 percent sure.  I
7  think that sounds right about caveating the time
8  frame, but I'll work with Donald and everyone else.
9        SPECIAL DISCOVERY MASTER FALK:  I think
10  you should.  That's coming up through a lot of the
11  things we're dealing with here.
12        MR. CECCHI:  Right.
13        SPECIAL DISCOVERY MASTER FALK:  And the
14  requests are very broad.  Maybe that's okay and maybe
15  it's not.  I'm new to the case, and when it comes to
16  the time frame, I made a little chronology as to when
17  things happened.
18        MR. CECCHI:  My colleague, Chris Ayers,
19  we agreed to go back to '14, a five-year time frame.
20  The case started in '19, and they used AMCA during
21  that entire time period.
22        SPECIAL DISCOVERY MASTER FALK:  But
23  Optum got involved in 2016?
24        MR. HOUSER:  2016.
25        SPECIAL DISCOVERY MASTER FALK:  Work it

Page 25

1  out and you have my number if there's a dispute and
2  I'll decide it on the spot, you know, after hearing.
3        MR. CECCHI:  Thank you, judge.
4        SPECIAL DISCOVERY MASTER FALK:  Issue
5  No. 2 of the first one is defendants internal
6  policies and procedures related to the detection of
7  PHI and/or PII, and there are requests for
8  productions and two interrogatories request for
9  production.  44 are communications between you and
10  AMCA related to discovery security protocols.  I don't
11  know if you want to say anything about this.  I think
12  I think that Optum said they would produce.
13        MR. HOUSER:  Can I speak to the policy
14  issue?
15        SPECIAL DISCOVERY MASTER FALK:  Yes.
16        MR. HOUSER:  I want to be clear on the
17  friction point here.  Third-party vendors, oversight
18  of third-party vendors, how you should deal with
19  sending data to third-party vendors.  We've produced
20  those policies, and we've agreed to produce those
21  policies, and we've agreed to produce communications
22  about policies and requirements with respect to data
23  security.  Those have been produced.  The friction
24  point I think here, your Honor, is that the
25  plaintiffs are asking for our own internal policies,

7 (Pages 22 - 25)

Page 26

1　how Optum360 handled employee data.  We don't think
2　our internal policies are relevant at all with
3　respect to how we treated third-party vendors, the
4　requirements with respect to third-party vendors.  We
5　think they have what they need here, and they have
6　all the relevant policies, and I think they point to
7　these cases, but those cases are focused on where the
8　alleged injury arises out of a failure to follow a
9　policy.  If there's an employee that's injured in a
10　forklift accident, that plaintiff may sue the
11　employer and ask, "Show me your policies on how to
12　operate that forklift."  Those are relevant in that
13　situation.  That's not what they're asking for here.
14　We produced the policies that say -- tell me how you
15　handle third-party vendors.  We've produced that.
16　They're asking for these internal policies that don't
17　relate at all to third parties or AMCA's data
18　security.
19　　　　　Again, I think they have what they need.
20　We produced all the documents related to AMCA
21　security, and we've produced some of our own internal
22　policies as well.  So they even have our internal
23　privacy policies.  Again, they have the relevant
24　policies.  We produced some of the policies that they
25　say that they don't have, and I don't think this

Page 27

1　discovery and all of our internal policies that don't
2　relate at all to third parties or the security of
3　AMCA are relevant here.
4　　　　　SPECIAL DISCOVERY MASTER FALK:  Okay.
5　I'll be happy to hear from the other side, if you
6　have something to say.  There seems to be a
7　fundamental disagreement as to what the case is
8　about.  In other words, the plaintiffs seem to be --
9　and it's pleaded that you, forgetting about AMCA,
10　were negligent and perhaps negligent per se.  I heard
11　what you just said.  I don't know what's been
12　produced or not produced.  There's no question that
13　your policies about data security of personal or
14　private information are relevant to the case.  You
15　say you've already given them that.  I mean, if
16　you're talking about policies that talk about someone
17　injured on a forklift, you know, I don't see where it
18　harms anything, but I don't know that's what's being
19　asked for.  In other words, the general request about
20　data security protocols, there's nothing more
21　relevant to the case, as far as I'm concerned -- no
22　matter how you look at it.  I don't think it's just
23　third party.  That's not the way the case is pleaded.
24　Do you understand what I'm saying about that part or
25　not?  I know you disagree with it.  Your client is

Page 28

1　negligent sort of in a broader sense of managing
2　private information, but I don't know.  And I'll hear
3　from the other side.  I'm not sure.  Has this stuff
4　been produced?  If it's been produced, that's
5　something that you have to talk about and bring back
6　to me if you have a real issue.
7　　　　　MR. AYERS:  What ECF 474 is about it's
8　about the defendants objections and responses.  We
9　get to some of the later disputes are about the
10　sufficiency of testimony or the sufficiency of
11　documents that they actually agreed to produce, but
12　these are their objections.  So the material at issue
13　in 474 in this dispute letter have not been produced.
14　This is what the defendants have objected to.  They
15　object to do producing these materials.  We do not
16　have their policies and procedures to the scope and
17　to the extent of that, and this is to their
18　objections and responses.  So it's not clear that
19　this material has been produced.  We're here today
20　because it hasn't been produced.
21　　　　　Mr. Houser said we will get what we
22　need.  That may be great that the defendants will get
23　what we need.  It's based on how we pled the case.  I
24　just want to note that they haven't produced the
25　policies and procedures that go to how they secured

Page 29

1　plaintiff's information in brick and mortar and how
2　they oversaw third parties.  They want to look third
3　parties separate.  They have a nondelegable duty.  We
4　are entitled to policies and procedures of how they
5　secure their own home and how they secure their
6　garage.  If they put a box of documents in a
7　plaintiff's garage, they can't say, "Leave the doors
8　unlocked.  We're only going to give you policies and
9　procedures of how we secure our garage, but not our
10　home because we're treating that differently."  We
11　get to understand how they holistically protect
12　patient data from the time that the patient enters
13　Quest.  The case arose at the time of the data breach
14　incident.  The cause of that database occurred years
15　before from their retention of AMCA, their
16　transmittal of protected data to AMCA, their
17　oversight of AMCA, and it all generates from their --
18　what we contend is negligent and entirely deficient
19　policies and procedures of the protection of
20　protected information.
21　　　　　MR. CECCHI:  Just one other comment, and
22　paragraph 408 of the operative pleading, which is
23　captioned "Defendants Violated HIPAA's Requirements
24　to Safeguard Data and Regulatory Guidelines."
25　　　　　SPECIAL DISCOVERY MASTER FALK:  I'll

8 (Pages 26 - 29)

Page 30

1  take it.
2        MR. CECCHI:  Subpart B and E.  E is
3  implement adequate policies and procedures to detect
4  and protect security violations in violation of the
5  CFR, implement technical policies and procedures for
6  electronic information systems that maintain
7  electronically protected health information.
8        SPECIAL DISCOVERY MASTER FALK:  I see
9  it.
10       MR. HOUSER:  Can I respond briefly?
11       SPECIAL DISCOVERY MASTER FALK:  Of
12  course.
13       MR. HOUSER:  Communications between you
14  and AMCA about data security protocols.  We are
15  not -- we've produced our e-mails with AMCA that
16  pertain to AMCA data security.  We've done it.
17       SPECIAL DISCOVERY MASTER FALK:  Okay.
18       MR. HOUSER:  Similarly, with respect to
19  45, we have negotiated a search term protocol.  We
20  agreed to custodians.  It includes words and terms,
21  like transmit, transfer.  We've negotiated those
22  search terms, and we've reviewed documents and we
23  produced documents.  On interrogatory No. 5, identify
24  the individuals responsible for the policies and
25  procedures.  We identified for those individuals who

Page 31

1  had a role.  They know this information, your Honor.
2  So I think that they're drawing the circle very
3  broadly when, in fact, we've produced a lot of this
4  information.  To the extent they're saying when
5  someone walked in the door, that they need to know
6  about what happened and the taking in of their data
7  in every communication about how that data is handled
8  when someone walks through the door divorced entirely
9  from what happens to that data with respect to a
10  third-party vendor, for instance.  I think that's
11  what Judge Hammer was getting at.  If prior breaches
12  are not relevant, then certainly the handling of data
13  and all communications about policies that are wholly
14  internal would not be relevant either, and I don't
15  think the core allegations in this case have really
16  changed as to what it relates to on data security and
17  AMCA.
18       SPECIAL DISCOVERY MASTER FALK:  I
19  appreciate what you have said and what you folks have
20  said.  There seems to be a difference of opinion as
21  to what the real claims are, but I'm going by the
22  claims that are extant and pleaded.  I don't think
23  you can read Judge Hammer's -- I know you can't read
24  Judge Hammer's opinion too broadly.  I think things
25  like policies are -- policies for data security are

Page 32

1  relevant.  You know, it may be that a policy about
2  when someone walks into the defendant's building when
3  the maintenance people put up and it's raining and
4  they put up a yellow sign, that kind of thing is not
5  what we're talking about.  If defendants -- because
6  you're the defendants.  AMCA is not here.  I
7  understand that they were responsible on a certain
8  level, but if defendants have policies regarding how
9  they handle confidential sensitive information,
10  whether it's related to AMCA or not, those are the
11  policies of the defendant, and it's pleaded.  It's
12  there, and I think it should be produced.
13       Now, you say that it was produced.
14  First of all, you said that they have that.  The fact
15  that an adversary or an adverse party has something
16  does not mean that it shouldn't be produced in
17  discovery.  That's a basic discovery point.  If they
18  have it, because you've given it to them, that's a
19  whole different point, but that's not something that
20  was put before me yet.  I suggest that you and all
21  the fine lawyers around the table talk to each other
22  and find out if it has been given.  I haven't heard
23  from the plaintiffs side yet -- you'd have to look at
24  it.  I don't know.
25       MR. CECCHI:  We'll report back.  Our

Page 33

1  understanding, as Mr. Ayers articulated, is that it
2  has not been.  I don't think it's not right.  It now
3  has been determined relevant, so we will go back and
4  assess whether it has been produced and fully
5  responded to.
6        MR. SIEGEL:  Donald, just so we're clear
7  and we know what we're looking for, are you saying
8  that you have produced the internal policies that
9  govern data security with respect to patient data at
10  Quest?
11       MR. CECCHI:  Optum?  Well, both.
12       MR. AYERS:  It's for both defendants.
13       MR. HOUSER:  Sure.  I'm answering.
14       MR. SIEGEL:  You say things have been
15  produced.  What the judge just said with respect to
16  the internal procedures with respect to internally at
17  Quest and Optum, are you saying that's a category
18  that has been produced?
19       MR. HOUSER:  I believe our internal
20  policies have been produced.  We did not agree that
21  they're relevant.  I can read you the Bates number,
22  which has an enormous number of policies about
23  internal policies with respect to data security, so.
24       MR. SIEGEL:  We can do it off the
25  record.

9 (Pages 30 - 33)

Page 34

1    MR. HOUSER: I think these have been
2  produced.
3    MS. SULTANIAN: We identified in the
4  letter response the policies we produced. I have
5  a box of them here if anybody wants to look at them,
6  but they are all produced, and they are Quest
7  security management policy. I truly don't think that
8  there's actually a dispute here. I believe we've
9  produced.
10    SPECIAL DISCOVERY MASTER FALK: Great.
11  I hear you. I don't know.
12
13    (Whereupon, a brief recess was taken off
14  the record.)
15
16    SPECIAL DISCOVERY MASTER FALK: So we're
17  still dealing with issue two.
18    MR. CECCHI: I think we finished two.
19    MR. AYERS: I just wanted to just
20  address the defendants discussion of how they have
21  already produced these materials.
22    SPECIAL DISCOVERY MASTER FALK: Yes.
23    MR. AYERS: There were certain things
24  produced related to policies and procedures. They
25  would produce policies and procedures to vendors,

Page 35

1  such as AMCA.
2    SPECIAL DISCOVERY MASTER FALK: Right.
3    MR. AYERS: Obviously, the request goes
4  broader as judge had ruled. The policies and
5  procedures at issue is the policies and procedures
6  during the entire frame from 2014 to cover the
7  operative time frame that were in place. So
8  obviously, the parties can discuss what documents and
9  materials are responsive that have been withheld and
10  that would be produced in accordance with the court's
11  ruling.
12    SPECIAL DISCOVERY MASTER FALK: Okay.
13  That sounds good to me.
14    MR. CECCHI: Thank you.
15    SPECIAL DISCOVERY MASTER FALK: I'm
16  seeing where we are now. So we're done with the
17  entire thing or issue two?
18    MR. CECCHI: I think so as to what has
19  been produced, and we'll bring that to ground. I
20  think there might be some clarity vis-a-vis Donald.
21  Maybe they produced vendors, but as Chris pointed
22  out, it's a broader request. We'll hopefully not
23  have to come back to your Honor. We'll do our best.
24    SPECIAL DISCOVERY MASTER FALK: Yes. We
25  have two interrogatories in this, and I guess one is

Page 36

1  interrogatory No. 5. Identify all individuals
2  responsible for the development and implementation of
3  your policies and procedures, et cetera, et cetera.
4  I'm not sure. You tell me as to the level of dispute
5  about that. It seems reasonable.
6    MR. AYERS: Just to be clear about the
7  record is that the defendants did not respond to
8  those and stood on its objections to the
9  interrogatories.
10    MS. SULTANIAN: That's not correct. We
11  responded that during the relevant time period that
12  Carl Landorno and Joseph Adronetto were primarily
13  responsible for developing and revising such as
14  policies.
15    MR. AYERS: And I believe we're talking
16  about different interrogatories. Judge, you're
17  talking about interrogatory No. 5?
18    SPECIAL DISCOVERY MASTER FALK: Right.
19    MR. AYERS: And you were talking
20  about --
21    MS. SULTANIAN: Interrogatory five.
22    MR. HOUSER: And the same goes with
23  Optum. We identified those individuals in our
24  interrogatory response.
25    SPECIAL DISCOVERY MASTER FALK: I think

Page 37

1  that's true. Those two names were given.
2    MR. CECCHI: Respectfully, Heather, does
3  that response encompass, let's call it, the vendor
4  distinction or a broader response vis-a-vis policies
5  protecting health information more broadly?
6    MS. SULTANIAN: My understanding is that
7  it is the policies we produced.
8    MR. CECCHI: Which would be limited
9  potentially to vendors?
10    MS. SULTANIAN: I'm not sure there's
11  actually a dispute here.
12    MR. CECCHI: To the extent that it
13  encompasses the broader request we made, okay. To
14  the extent it does not, we will meet and confer
15  whether there are any further individuals that the
16  defendants have to identify to encompass the broader
17  request.
18    MS. SULTANIAN: That's fair.
19    SPECIAL DISCOVERY MASTER FALK: Got you.
20  And then there's interrogatory No. 8. Identify all
21  documents concerning your policies and procedures
22  related to the protection of plaintiffs PHI and PII,
23  including, but not limited to your business
24  associates protection of patients PHI and PII. This
25  includes the dates, the policies and procedures were

10 (Pages 34 - 37)

Page 38

1 created, and any amendments thereto. I don't know if
2 there's an argument over relevance there. It seems
3 to have been -- I think Quest said they already
4 identified the information to the extent that the
5 request includes policies pursuant to AMCA or made to
6 the general public.
7        MR. HOUSER: Your Honor, I think this is
8 a rehash of identifying the policies, and we
9 identified policies in our supplemental responses
10 consistent with our discussion to confer about the
11 rest of them. I think that's part of the discussion.
12        SPECIAL DISCOVERY MASTER FALK: Okay.
13 And Optum says they used 33(d). Is that something
14 that you're going to talk about? I'm not in a
15 position to look at the 33(d) issues myself. Okay.
16 That's fine.
17        Now, we get to an issue I'm going to
18 have a lot of questions about because of my age and
19 lack of familiarity with computer stuff. Issue No. 3
20 seems to have been sale of Quest patient data on the
21 dark web, and I guess the plaintiffs say that the
22 defendants unilaterally, which was actually used in
23 the argument, determined what relates to the AMCA
24 breach. I really would like to hear from you on
25 this, the sale of Quest patient data on the dark web,

Page 39

1 and I almost need a little -- you know how you do in
2 patent cases. They do a little tutorial for the
3 judge, and I'm a former judge. What is plaintiff
4 seeking and how do you get this stuff? Just give me
5 a little basis. If there's a dispute, I'd be happy
6 to go over it. They're looking for information on
7 the sale of Quest patient data on the dark web.
8        MR. CECCHI: Well, we think from the
9 plaintiffs perspective, judge, the defendant's
10 awareness that there is Quest and/or Optum patient
11 data on the web goes to the foreseeability of the
12 risk here, and by the same argument, their negligence
13 in not protecting the information. How you go about
14 assessing whether information is on the dark web,
15 maybe, Jason, you would speak to how our experts go
16 about doing that. Before you do that, we want to
17 know is what Quest and Optum knew about it.
18        MR. LICHTMAN: Understanding how our
19 experts look at this I do think can help the court in
20 understanding why it is we'd like to know what the
21 defendants knew. Our experts will go on to the dark
22 web and use essentially fake identification. It's
23 legal to do this, but they will use fake
24 identification, and they will go and pose as criminal
25 buyers on the dark web and use the identifications

Page 40

1 they developed through the years to look through the
2 dark web and see if they can find traces of the data.
3 The dark web is not similar to the internet that we
4 use. You can't go in and type in "Google the dark
5 web." You go into these forums, for lack of a better
6 word. So you might see a message board where
7 Mr. Ayers. If he's a criminal, they will post, "Hey,
8 I'm selling this data. Here's a sample of the data
9 I'm selling and you. Other criminals can buy this
10 from me." You have to infiltrate these message
11 boards, and that's what our experts do. Because we
12 can't ask for an index of the dark web, we need to
13 know what is it that the defendants knew about this
14 data going to the dark web because we can never see
15 conclusively every single that took place. Does that
16 answer --
17        SPECIAL DISCOVERY MASTER FALK: When I
18 started practicing law, and most of the time we
19 didn't have a computer -- we didn't have electric
20 typewriters. We didn't have nothing. I know how to
21 do basic stuff. This is just educating me. In other
22 words, we have computers here, and we have the
23 internet in this office. Can we get to the dark web?
24        MR. LICHTMAN: No, unless there's
25 something that they haven't mentioned to me. Someone

Page 41

1 who knew what they were doing, they would have to
2 download some programs that probably most of us do
3 not have on our computers, but it would be possible
4 to access the dark web if we knew what we were doing.
5 I doubt any of us in this room --
6        SPECIAL DISCOVERY MASTER FALK: Young
7 people don't know.
8        MR. LICHTMAN: That's very flattering to
9 call me young, your Honor.
10        SPECIAL DISCOVERY MASTER FALK: You're
11 welcome. So this is something that you need an
12 expert to do?
13        MR. LICHTMAN: Yes.
14        MR. SIEGEL: Let me just add this. Very
15 high level, just generally speaking, a couple other
16 things. It's not static either. So when you think
17 about people selling fake purses in Manhattan and you
18 see the police roll up and they move from 5th to 6
19 Street. That's what happens on the dark web. It is
20 not static, and things can affect it, like the war in
21 Russia and where these marketplaces are for data.
22 It's constantly shifting. That's the first part.
23        The second part is a significant
24 component to transacting acting on the dark web,
25 buying and selling information, is based on trust

11 (Pages 38 - 41)

Page 42

1  that you are a criminal.  If you show up and you
2  manage to get to the dark web through a tour browser
3  as Judge Falk, my guess is you would have few takers
4  for inquiries about stolen medical information.  In
5  other words, the experts that do this and test what
6  is out there develop over time identities that allow
7  them to engage with obviously a criminal element.
8        I think as we're talking about this case
9  and these questions, we do know, and there's no
10 dispute, that this data was compromised for over
11 seven months before it was at least made public,
12 longer perhaps until it was made public, but until
13 there was some sort of remediation.  I think given
14 that long period of time and knowing what the
15 defendants knew about what was out there, because
16 many corporations do have the wherewithal
17 sophistication, resources to monitor what is out
18 there in these marketplaces.  That's the gist of what
19 we're seeking in these requests.
20       MR. LICHTMAN:  When Mr. Siegel was
21 speaking, I came up with an analogy that I hope may
22 help.  Imagine this is a criminal marketplace, but in
23 a virtual space, not in a building.  So when I lived
24 on the lower east side, they just moved it three
25 doors down, and it's the same kind of a concept,

Page 43

1  except virtual space rather than physical space.
2        SPECIAL DISCOVERY MASTER FALK:  Who pays
3  for it?
4        MR. LICHTMAN:  I should be able to
5  answer your question, and I can't.
6        SPECIAL DISCOVERY MASTER FALK:  This is
7  like crypto or something?
8        MR. CECCHI:  No.
9        MR. LICHTMAN:  No.
10       MR. CECCHI:  You can access the dark web
11 if you have the right software and programs, and you
12 know where to go, as Mr. Siegel and Jason also
13 identified.  We just can't go on there and get
14 visibility into it.  What we want to know because
15 Quest and Optum are sophisticated and large
16 corporations, we want to know what they knew what was
17 out there vis-a-vis this data and their data.  Maybe
18 they don't do that at all, but we doubt it.
19       MR. AYERS:  What we do know is they do
20 have an entire department and team as Quest does and
21 Optum may as well, which is dedicated to responding
22 to concerns about patient data and looking at the
23 dark web.  So this isn't something that they do
24 solely in response to AMCA breach or anything.  This
25 is a team that they have in place all the time that

Page 44

1  looks at patient data on the dark web, and so they
2  refuse to produce anything related to what they have,
3  or they indicated what they will turn over, this is
4  Quest, is what they determined to be related to the
5  AMCA database, which is really unclear of what they
6  have, what they're withholding, and what they've
7  turned over, and what they know.  That's what the
8  request is getting at, what did they know about the
9  actual Quest patients at issue, what information do
10 they know about their information being on the dark
11 web, not what they determined to be related to the
12 AMCA database or some determination that we have no
13 insight into, what information do they possess about
14 the patients at issue and their information available
15 on the dark web.
16       SPECIAL DISCOVERY MASTER FALK:  We're
17 going to talk about that.  So you go on with a
18 different name.  Right?
19       MR. AYERS:  You can.
20       SPECIAL DISCOVERY MASTER FALK:  When I
21 was young, I had a stage name, Tony Madison.  I'll
22 just put that out there.  I didn't do anything wrong.
23 Tony Madison was my stage name.
24       Defendants, I don't really understand
25 this stuff.

Page 45

1        MS. SULTANIAN:  What I heard plaintiff's
2  counsel collectively talking about over here is two
3  different sets of information.  One is the
4  information at issue.  The Quest patients, that we
5  have already searched for logged or already produced,
6  and that's the subject of a separate dispute in an a
7  different letter.
8        SPECIAL DISCOVERY MASTER FALK:  We will
9  get there.
10       MS. SULTANIAN:  So really all that's at
11 issue here is whether Quest has to do a search for
12 anything about patient information for sale on the
13 dark web unrelated to the Quest patients potentially
14 impacted by the breach.
15       SPECIAL DISCOVERY MASTER FALK:  When you
16 say, and I apologize not really knowing about this,
17 but if you use the analogy that they used that if
18 they're on whatever, Delancey Street or whatever and
19 they moved to Mulberry Street or whatever, can they
20 do a search to see what was happening on the dark web
21 back when the database occurred or not?
22       MS. SULTANIAN:  That's what has been
23 searched for and logged or produced, and that's the
24 subject of the separate dispute.
25       SPECIAL DISCOVERY MASTER FALK:  Okay.

12 (Pages 42 - 45)

Page 46

1    MS. SULTANIAN:  What we're talking about
2  now is whether Quest has to search for about patient
3  data for sale on the dark web not related to the
4  patients that were potentially impacted by the
5  breach.  Mr. Cecchi said that the reason that they
6  need that is to prove that Quest knew that this could
7  happen, right, knew that there was a risk of patient
8  information being for sale on the dark web.  So the
9  burden of doing a very broad custodial review to
10  reconfirm what they already have testimony on, I
11  think it's not proportionable.
12    SPECIAL DISCOVERY MASTER FALK:  But I
13  think the statement was made that you do this as a
14  regular matter of business.
15    MS. SULTANIAN:  There's an internal
16  team.  They occasionally search the dark web to
17  determine if there's any Quest patient information
18  for sale, but again, we've searched for and/or
19  produced or logged what is related to the breach.
20  They're looking for, say, in 2014, if we ran some
21  search.
22    MR. CECCHI:  Yes, and we don't think
23  there's any showing of any burden vis-a-vis if
24  they've been doing that, we're entitled to know that
25  because, again, it goes to their knowledge of their

Page 47

1  duty to protect this information and take every step
2  under the statutes, under the privacy rules, and the
3  common law to protect this information.  Yes, that's
4  what we're looking for.
5    MR. AYERS:  And it goes to the value of
6  the knowledge of the data.  So patient diagnosis
7  codes, they know that this stuff can be sold on the
8  dark web, and they know the value of it, and it goes
9  to damages.
10    SPECIAL DISCOVERY MASTER FALK:  But
11  there's an agreement that it has been done.  I don't
12  know if it's 2014.  Are the specifics required?  I'm
13  not sure I --
14    MR. AYERS:  They haven't turned over the
15  documents at all.  There's been some general
16  testimony admissions that we got there.  They do this
17  work, but they haven't turned over the documents.
18    SPECIAL DISCOVERY MASTER FALK:  How
19  about a sample of it, or do you really want to see
20  everything?  What does a document look like that
21  someone went on this dark web and they printed
22  something out or made a note of it or what?
23    MR. CECCHI:  I think there would be
24  internal business records which reflect what the team
25  does, what they did, and how -- what they concluded.

Page 48

1  Yes, there is patient data.  We have to do this
2  better with our vendors.  We have to shore up this
3  piece of our protocol.
4    MR. AYERS L one of the things that
5  counsel talked about was custodial files, and the
6  objection to the production wasn't limited to running
7  search terms over custodial files.  It was objection
8  to production of these materials.  I have no doubt
9  that there are repositories that contain information.
10  One way to go about this, because it is relevant, it
11  goes to our claims and actual showing of damages, is
12  we can meet and confer to understand the
13  repositories, where they keep this information, and
14  what's in there, and then we can discuss how
15  burdensome it would be to produce this material.
16  They don't have to do complicated stuff to do these
17  stuff.  These are billion dollar companies, and they
18  know where to obtain this information.
19    SPECIAL DISCOVERY MASTER FALK:  I
20  apologize for needing to do this, but I think that in
21  some of the papers think saw.  Defendants or Quest,
22  I'm not sure about Optum, admitted that there were
23  Quest's patients information on the dark web.  Is
24  that true?
25    MS. SULTANIAN:  The relevant part of the

Page 49

1  question is, so you are aware, that on the dark web
2  that individuals PII and PHI are sold.  That was the
3  question to a Quest 30(b)(6) witness.  She answered
4  that, "Yes, that is an activity that occurs on the
5  dark web."  So they have the information that this
6  can happen on the dark web.
7    SPECIAL DISCOVERY MASTER FALK:  I got
8  you, and I appreciate that answer.  I want to go a
9  little further.  It impacts not only this, but other
10  questions that we'll deal with later.  For example,
11  and this is expert stuff, I think, but I don't know.
12  Quest is a gigantic company.  There's a lot of
13  customers.  I don't know what you call them.  But if
14  their information is on the dark web, can you tell
15  where it came from?  In other words, can you tell and
16  how that the information on the dark web came from
17  the AMCA data breach or just from somewhere else,
18  which I think the plaintiffs would say you're still
19  responsible for and you'd deny that.  How do you find
20  that out?
21    MS. SULTANIAN:  Sometimes you can, and
22  sometimes you can't.  Sometimes they indicate the
23  source of that data.  Often, they do not.
24    SPECIAL DISCOVERY MASTER FALK:  So that
25  if the question is, and I think somewhere the

13 (Pages 46 - 49)

Page 50

1  question is, was Quest's clients or customers on the
2  dark web?  That needs to be answered then because you
3  don't know where that is coming from.
4        MS. SULTANIAN:  And the 30(b)(6) witness
5  was asked about that as well.  I would certainly want
6  to know about it.  I'm not aware of that.  So that
7  was also answered in the 30(b)(6) deposition.  I can
8  try to find the exact quote.
9        MR. AYERS:  Generally, judge, we get
10 documents and take depositions.
11       SPECIAL DISCOVERY MASTER FALK:  I agree.
12       MR. AYERS:  And without the objection of
13 counsel shows that it's relevant and germane to the
14 issue.  We probably want documents on it.  One of the
15 things that counsel said that I think really goes to
16 the heart of this dispute, she said that sometimes
17 you can determine the source of the information, but
18 many times you can't, and what they've agreed to
19 produce is information related to patient information
20 on the dark web that they have determined to be part
21 of the AMCA as a result of the data beach.  We're
22 only getting what they can.  We're not getting
23 anything else.  And obviously, the dark web is vast.
24 They have a team that's dedicated doing this every
25 day.  They have this information, and if they don't,

Page 51

1  just say so, but they don't.  This is obviously a
2  live dispute because there is information that
3  they're withholding that they have.  The reality is,
4  judge, is most likely they've already looked at this
5  issue, and they're sitting likely on the document.
6  They don't have to go out and do complicated searches
7  and all that.  A lot of the stuff is available for
8  them, and they're resting on an objection to its
9  production.  It doesn't just go to the fact that they
10 know information is for sale on the dark web.  It
11 goes to the type of information available on the dark
12 web, their knowledge, and the information they have
13 about the value of that information because that goes
14 exactly to the damages.  They're going to get up and
15 have an expert and it's going to say, "Birthdays,
16 Social Security numbers, that's not valuable.  That's
17 worth pennies," but they may be sitting on and likely
18 have information about the value of pieces of
19 information, diagnosis codes, and something like
20 that.  That's germane to proving the claims, but also
21 determining the damages related to our claims.
22       SPECIAL DISCOVERY MASTER FALK:  I hear
23 you.  Did you give them a list of names?  Are you
24 asking that they produce anything that they have ever
25 found on the dark web or just, you know, customers of

Page 52

1  the labs specifically?  I'm not sure I understand it.
2  Do you know what I mean?
3        MR. AYERS:  We're asking for the
4  information that they have related to the sale of
5  this type of data.
6        SPECIAL DISCOVERY MASTER FALK:  This
7  type of data, not specific people?
8        MR. AYERS:  Which encompasses the
9  plaintiffs here, not to the exclusion of them.  It's
10 broader than simply our plaintiffs that we allege,
11 but it definitely encompasses the plaintiffs that we
12 hear.  If they have information related to any
13 plaintiff, that should be produced and is responsive
14 to this request.  It's more.  We don't have -- they
15 haven't been willing to provide everything on the
16 plaintiff that happened here or broader the value of
17 that information that is on the dark web.
18       MR. CECCHI:  One other narrow point,
19 when the breach was discovered, no doubt they did an
20 investigation or they should have done an
21 investigation and try to understand the impact
22 vis-a-vis their patients, vis-a-vis the dark web.
23       MR. HOUSER:  Can I respond quickly?
24 We're talking about a couple of things flying around.
25 You have the AMCA breach, and the dark web search is

Page 53

1  information out there based on the AMCA breach and
2  Mr. Ayers is -- we've told him that, and he knows it.
3  I think it's important to look to the time period
4  pre-breach.  They're saying if there's any patient
5  information on the dark web for this multiple-year
6  period, we need to know about it, because that will
7  tell us that there was a risk to data.  Everyone
8  knows there's a risk to data --
9        SPECIAL DISCOVERY MASTER FALK:  Agreed.
10 And I'll let you go on.  They're asking for
11 documents.  This is a request for production of
12 documents.  They can question your 30(b)(6) or other
13 witnesses.  Do you have documents that would be
14 responsive to this?  Because I think they should be
15 turned over.  If you want to do it for attorneys eyes
16 only to start or if you want me to do it an in-camera
17 review.  I don't see the harm in doing that stuff.
18       MS. SULTANIAN:  It would be immensely
19 burdensome.  I can assure you we're not just sitting
20 on it.  We would have to do a custodial review based
21 on search terms.  We would be more than 7,000
22 documents, which if you compute attorney time, that's
23 around 150 hours of attorney time for privilege as
24 well.
25       MR. CECCHI:  This is an 11 million

14 (Pages 50 - 53)

1 person data breach.

2      MS. SULTANIAN: Can I finish?

3      MR. CECCHI: I apologize.

4      MS. SULTANIAN: And it's for just the

5 pre-breach period, and it would be just to prove this

6 simple point that Quest was aware that patient data

7 could be sold on the dark web. It's not

8 proportional.

9      SPECIAL DISCOVERY MASTER FALK: So could

10 you propound a request for admission that would get

11 you the same information?

12      MR. AYERS: We know they have the

13 information. We know they have the information. We

14 don't know what the information is. We don't have

15 access to that information to do a request for

16 admission. 7,000 is nothing. We've all been a part

17 of major litigation. There's an MDL involving 11

18 million people. 7,000 is really a drop in the

19 bucket. There's hundreds of thousands of documents

20 that are generally produced. Generally, the

21 defendants produce more documents than the plaintiff.

22 We're talking about the defendant's conduct and what

23 the defendants did. All the plaintiffs did was they

24 used their service. They went there to get stuff --

25 here we have -- it's not disproportionate. Quest has

1 produced less than 5,000. They're talking about

2 producing -- it's really not burdensome. What we

3 haven't discussed is that there is noncustodial

4 sources of this information as well. The idea that

5 this is all sitting in e-mails is not realistic given

6 the scope and size of Quest. They would this stuff

7 sitting in basically a variety of sources that aren't

8 e-mails. It would be up on the document management

9 systems and things like that.

10      MR. CECCHI: We can definitely -- as

11 Chris said, we can meet and confer where it is stored

12 and where the non-custodials are. We can also take

13 the damage piece off if we knew it was valuable, and

14 they're not going to contest damages. We can do that

15 too.

16      MR. HOUSER: You're saying to prove

17 what? You're saying that there was a knowledge that

18 information was out there on the dark web and that

19 thieves wanted to steal data.

20      MR. AYERS: That's one component.

21      MR. HOUSER: What's the other?

22      MR. AYERS: We wanted to establish that

23 you're not only aware that it sold, but the value

24 that Quest and Optum put on this data.

25      MR. HOUSER: Let's talk about value for

1 a second because value of how a criminal would pay

2 for it, how does it tie into it?

3      MR. LICHTMAN: This is something that

4 came up in another case that Norm and I have

5 together. Plaintiffs, we presented our damages

6 theory, and we said this information has value, and

7 one way we calculate the value is looking at the case

8 of Marriott, black market transactions, and this

9 information has inherent value, and Marriott

10 responded that no, no, no, it has no value. What do

11 we find out as it comes back from the fourth circuit

12 that Marriott has its own calculation of the value

13 that we're claiming. If you have done a valuation,

14 it is for expert discovery to determine whether the

15 valuation that defendants has done applies to

16 plaintiffs as well. So the idea being that a

17 valuation that defendants have placed on the data --

18 I understand that the defendants will claim that the

19 data is not relevant to damages, and we may have just

20 a different view. Mr. Siegel and I just went through

21 this in another case. Their expert says that model

22 is ridiculous, and lo and behold, that was actually a

23 model that they had been using all the time that they

24 didn't produce to us. They've got these numbers --

25      MR. HOUSER: I'm not saying that we have

1 the numbers, Jason. That's literally not what we're

2 saying. That's a misstatement.

3      SPECIAL DISCOVERY MASTER FALK: What's

4 the objection? What's your primary objection to

5 producing all this?

6      MS. SULTANIAN: It's proportionality,

7 your Honor.

8      SPECIAL DISCOVERY MASTER FALK: It's a

9 big case.

10      MS. SULTANIAN: I understand it's a big

11 case. We have done months of document review. So we

12 had to look at what is the value of what they're

13 seeking from this particular request as compared to

14 the burden that it would impose.

15      SPECIAL DISCOVERY MASTER FALK: What is

16 the burden? Give me a number. I don't mean right

17 now. It's a big case, and I don't know. How much

18 work does it take? How much effort does it take?

19 The issue is how relevant and what will it be. In a

20 case of this size, I'm not -- I hear that there might

21 be 7,000 documents. I'm not persuaded that it's

22 disproportional.

23      MS. SULTANIAN: So the back of the

24 envelope, we're looking at 100 to 150 hours of

25 attorney time for this one thing to say that we were

1  aware that patient could be on the dark web. That's
2  a separate dispute, our privilege analysis after the
3  data breach. But this is, you know -- anything
4  unrelated to the data breach to prove that it could
5  be on the dark web.
6      SPECIAL DISCOVERY MASTER FALK: What
7  about -- I'm just throwing this out -- I'll confess,
8  in 47 years of practice and being a magistrate judge,
9  I haven't come across this before. The point being,
10  what about some random sampling? Would that help or
11  would you be satisfied with that on the plaintiffs
12  side or do you want to know every single one of the
13  things they have on the dark web? Or are you going
14  to take this information and see if they were Quest
15  customers? Is that part of what we're talking here?
16  Maybe I don't understand the whole thing. Sometimes
17  you know how it got on the dark web, and sometimes
18  you don't, and you're asking what they have seen on
19  the dark web or did they do and what have they seen.
20      MR. AYERS: There's different layers to
21  their knowledge and the documents that they have. As
22  Mr. Lichtman indicated in another matter, defendants
23  do this type of analysis -- so one thing is we could
24  meet and confer about our sources of the data, where
25  this information is stored, and what information they

1  have. We can talk about it and determine. We're not
2  asking for necessarily every last shred of paper that
3  they have on the dark web. Certain information is
4  going to be more relevant than other information.
5  What we have is a back of the envelope analysis that
6  wasn't included in any of the papers. They objected
7  based on proportionality. We briefed this issue, and
8  not once did the defendants ever decide to take up
9  burden of the defense. We have a bunch of search
10  terms that defendants say they kind of created on
11  their own unilaterally without any disclosure to the
12  plaintiffs and assessment of attorney time without
13  any discussion or input from the plaintiffs. All in
14  and all, even at some of the inflated -- at the
15  hourly rates, we're talking about $150,000 in a case
16  with many more zeros, and I don't even know they
17  should just produce the stuff based on their own
18  representation of burden.
19      SPECIAL DISCOVERY MASTER FALK: What
20  does it prove? I hear you. I agree. The numbers
21  are de minimus -- not de minimus at all. But the
22  point is what is this going to prove having every one
23  of these documents?
24      MR. AYERS: Again, I can't tell you what
25  every last document --

1      SPECIAL DISCOVERY MASTER FALK: Okay.
2      MR. AYERS: Let's assume it's 7,000
3  based on these back of the envelope search terms. We
4  do know that their information of the knowledge of
5  this type of information being on the dark web and
6  the value -- and their estimations of the value and
7  knowledge of the value of this type of information.
8  Each different data element on the dark web is
9  incredibly valuable because not only does it go to
10  their -- the negligence of their failure to safeguard
11  the information, knowing the value of it, but then it
12  goes to calculation of damages on the back end to
13  understand that this is how our plaintiffs have been
14  injured and damaged and to help refute some of the
15  anticipated expert testimony, which they'll say no,
16  no, no. This information is worthless and valueless,
17  and it's -- it has no value. So it's very germane
18  and very material. Again, if your Honor wants, we
19  can discuss with the defendants to go through where
20  it's stored and what type of information it is, et
21  cetera, and then we can come back if we have any
22  disputes after that.
23      MS. SULTANIAN: Can I be clear? What
24  they're seeking is not Quest internal valuations of
25  data, but what they're talking about now is not what

1  their request is. I just want to be clear on that.
2      MR. AYERS: It would be encompassed with
3  it.
4      SPECIAL DISCOVERY MASTER FALK: I don't
5  know. I'm being very honest with you. Yes, I think
6  you should meet and confer. Two, defendants should
7  produce, you know, 25 of such documents, something
8  like randomly sample, just to aid the discussion, and
9  then you should come back to me, and I want to look
10  through and do an in-camera review, and when you come
11  back to me, if the objection is just proportionality,
12  I'm going to want specifics, and then we'll talk
13  about it. It may be something that we split the
14  costs or it may be something we just order. I'm not
15  impressed by 7,000 documents. I don't know. Is
16  there privilege involved? Are you reviewing it for
17  privilege?
18      MS. SULTANIAN: We would need to review
19  before.
20      SPECIAL DISCOVERY MASTER FALK: I don't
21  know how it works.
22      MR. CECCHI: In terms of your Honor's
23  ruling, the random sampling, we'll obviously need
24  those 25 documents.
25      SPECIAL DISCOVERY MASTER FALK: Yes,

16 (Pages 58 - 61)

Page 62

1 that's what I'm suggesting.
2          MR. CECCHI: Thank you.
3          SPECIAL DISCOVERY MASTER FALK: I don't
4 think we can talk about this too much further, at
5 least I can't without knowing -- having some idea
6 what we're talking about here, and I just don't --
7 and I think it will help you as well.
8
9          (Whereupon, a discussion takes place off
10 the record.)
11
12          MR. CECCHI: Revenue received from
13 AMCA --
14          MS. SULTANIAN: You skipped an issue.
15          MR. CECCHI: Compensation paid to AMCA
16 and other medical billing agencies.
17          SPECIAL DISCOVERY MASTER FALK: RFP 24,
18 Quest says they will produce. So I guess that's not
19 a dispute. And Optum will not produce documents
20 sufficient to identify all amounts you paid to AMCA
21 for its services for the period of 2012 to the
22 present, including total amounts by amounts and
23 quantities, number of patients, tests, et cetera.
24 Quest will produce pursuant to Rule 34, and Optum
25 will not produce. So what's there to say about this,

Page 63

1 folks?
2          MR. HOUSER: There are a couple things
3 to say about this. One, I just want to take
4 relevancy to start. The compensation paid to a
5 vendor does not bear on if there was adequate data
6 security of the vendor or if the defendants exercise
7 reasonable oversight. That's point one. There's no
8 link, other than the plaintiffs saying it's relevant.
9 So therefore, it's relevant, so produce the
10 documents. They don't cite any cases and so on and
11 so forth. The other point is they know the
12 compensation structure. Our 30(b)(6) witness
13 testified that the compensation gets paid to vendors.
14 All of the vendors get paid the same. It's a
15 percentage. One is called a primary and a secondary,
16 and there's a percentage of the recovery for those
17 that get paid as compensation. So they know the
18 compensation that's paid. They have that. We've
19 also produced documents that show on a monthly basis
20 the amount of gross placements, which means how much
21 debt went to the vendor. AMCA and other vendors were
22 both primary and secondary. Gross and primary were
23 both primary and secondary. And Quest did too. One,
24 I think these were produced. I don't think that
25 compensation is relative to data security. If your

Page 64

1 Honor wants to see these, because you're kind of
2 looking at a whole record there. To the extent that
3 even is -- your Honor, if you keep going, that's just
4 the cover e-mail. Do you see there it's teeny print?
5 It says a month-to-month basis, and if you look at
6 the top, you will see AMCA month, year, gross
7 placements. Right? CCS, that's another vendor.
8 Placements, primary, recovery, and that's the amount
9 recovered on the debt.
10          SPECIAL DISCOVERY MASTER FALK: No, it's
11 very helpful.
12          MR. HOUSER: It's month-by-month. I
13 don't mean to beat a dead horse on this. The
14 financial information in connection to the data
15 security, I disagree with this, but they have a lot
16 of this data.
17          SPECIAL DISCOVERY MASTER FALK: It's
18 interesting that Quest that will produce it, but
19 Optum won't.
20          MR. HOUSER: That's Optum. We both
21 produced it.
22          SPECIAL DISCOVERY MASTER FALK: Then we
23 don't have a dispute.
24          MR. HOUSER: There's a pre-time period
25 and a post-time period.

Page 65

1          SPECIAL DISCOVERY MASTER FALK:
2 Plaintiffs, is there a dispute here?
3          MR. CECCHI: Just one second, your
4 Honor. I'm just a little confused because Quest
5 indicated or Optum indicated that they would not
6 produce, but they handed us documents that have been
7 produced. We can take a look at this and assess
8 whether -- we might just have some questions, and we
9 can confer about what it is.
10          MR. AYERS: So are you saying that this
11 document is responsive in answering these requests,
12 request 24 and 25?
13          MR. HOUSER: I'm saying that --
14          MR. AYERS: You didn't object.
15          MR. CECCHI: Optum is Bates 5326 at the
16 end.
17          MR. AYERS: So you produced the
18 responsive documents. So you're not standing on your
19 objection. Correct?
20          MR. HOUSER: Those have been produced,
21 and they were produced because they're relevant.
22          MR. AYERS: But you're not withholding
23 documents based on your objection?
24          MR. HOUSER: I don't believe that we
25 are. We can go back and talk about it. To the

17 (Pages 62 - 65)

1  extent that you need data, that's the data that
2  you're asking for.
3          MR. CECCHI:  Donald, quick question on
4  the Optum document.  This is for '15 through 2019?
5          SPECIAL DISCOVERY MASTER FALK:  Yes.  I
6  think you can meet and confer on this one.
7          MR. SIEGEL:  These are placements.
8  Right?  These were the amounts that Quest and Optum
9  are placing with these debt collectors?
10         MR. CECCHI:  That's the next one.
11         MR. SIEGEL:  That was the amount of
12  money paid to the debt collectors?
13         SPECIAL DISCOVERY MASTER FALK:  Go
14  ahead.
15         MS. SULTANIAN:  So we handed you the
16  documents that show placements, realization rates,
17  that kind of figure.
18         MR. CECCHI:  For Quest?
19         MS. SULTANIAN:  For Quest.  I'm not
20  speaking for Optum.
21         MR. CECCHI:  Okay.
22         MS. SULTANIAN:  And there's very clear
23  testimony in the record that all the collections
24  agencies were paid a percentage of their collections,
25  so, you know.

1          MR. CECCHI:  And the Quest production
2  you contend, which is Bates 22553, has the
3  realization rate as well?
4          MS. SULTANIAN:  It does.  We can meet
5  and confer.
6          MR. CECCHI:  Does the Optum document
7  have the realization as well?
8          MR. HOUSER:  I believe it does.
9          MS. SULTANIAN:  That's a native
10  document, and I included this.
11         MR. CECCHI:  This was helpful.  Thank
12  you.
13         MR. AYERS:  Just so the record is clear,
14  the defendants are not standing on its objection --
15         MR. HOUSER:  I told you this before.
16  I'm not agreeing that compensation is relevant.
17         MR. AYERS:  But you're not standing on
18  your objection.
19         MR. HOUSER:  You're literally holding
20  documents that are responsive.
21         MR. AYERS:  So you're --
22         MR. HOUSER:  I don't want to agree to
23  anything.  I don't know what kind of gotcha you're
24  trying to get.
25         MR. CECCHI:  He's not going to agree to

1  whatever you say.
2          MR. HOUSER:  We can meet and confer on
3  it.
4          MR. AYERS:  I want to understand if we
5  have any ripe dispute.
6          MR. HOUSER:  I don't think we do.
7          MR. CECCHI:  Revenue.
8          SPECIAL DISCOVERY MASTER FALK:  These
9  all relate to that same issue.  In other words -- and
10  I'm not going to say one way or the other in terms of
11  relevancy.  I guess the argument from the plaintiffs
12  side could be, you know, if Quest was for Optum -- so
13  much more successful than other agencies, and two, if
14  Quest or Optum knew of the -- that they weren't
15  protecting the data that would be like a motivation
16  for using Quest or Optum.  That could be one
17  argument.  I could make a lot of other arguments.
18         MR. SIEGEL:  Using AMCA.  You're exactly
19  right.
20         MR. AYERS:  It also -- there's a
21  potential for a damage model based upon the
22  compensation that's paid to AMCA and the amount of
23  revenues and money that the defendants recouped
24  versus what they potentially wrote off as bad debt.
25  The potential of those revenues by using a deficient

1  debt collection company in their revenues, they
2  continued to use this company that they knew was
3  deficient.  So their revenues and profits off of that
4  could be used to calculate damages.
5          SPECIAL DISCOVERY MASTER FALK:  I
6  understand why plaintiffs want it, but it's probably
7  to the outer reaches.  We'll talk about it further if
8  you have a dispute.
9          MR. CECCHI:  We may not.
10         SPECIAL DISCOVERY MASTER FALK:  There's
11  no reason to keep it secret, as far as I'm concerned.
12  That's what you seem to be saying too when I'm
13  pointing to the Quest/Optum side.  You'll do it.  I'm
14  not doing much more on this until you discuss it, and
15  then I'll be happy to make a finding in terms of
16  relevance for discovery.  There's whole other topic
17  if it's admissible at trial, and that's up to Judge
18  Arleo.  I could argue it other ways as well.  It's
19  stuff that the jury may be interested in, if you get
20  to a jury.
21         Okay.  Are we on data security and
22  information technology expenses?
23         MR. HOUSER:  I think so.
24         SPECIAL DISCOVERY MASTER FALK:  And both
25  Quest and Optum.  So the documents sufficient to show

18 (Pages 66 - 69)

Page 70

1 all information technology expenses, including detail
2 of account by account level of data from 2012 to the
3 present. Both the defendants are not going to
4 produce that.
5          MR. CECCHI: And this is something our
6 experts definitely would want to see in assessing and
7 issuing reports vis-a-vis our negligence claims and
8 our CMIA claim, what they're doing, what they're
9 spending to protect the data because there are
10 comparator, industry comparators that we can utilize,
11 as an extreme example. If they're spending $5, but
12 the industry standard say it's $20, our experts would
13 want to know.
14          MR. HOUSER: Your Honor, they're asking
15 for every single internal IT expense and every data
16 security expense on our internal systems. So Quest
17 or Optum's purchase of a copier, of a mouse. They
18 want to know on an item-by-item detail. That's what
19 they're requesting right free. It's this free
20 floating negligence to say that if I could say they
21 should have spent more on security for internal
22 systems. It had nothing to do with AMCA. I think
23 that's relevant to their oversight of AMCA or AMCA
24 security. They're not connected. Their damages,
25 there has to be a duty, a breach, and a cause for

Page 71

1 damages. It does not arise from an alleged failure
2 to spend enough money internally on IT expenses for
3 the defendants.
4          SPECIAL DISCOVERY MASTER FALK: But
5 that's what you say, and they will say something
6 different. In the briefing, the reliance was on
7 Judge Hammer's decision. I totally agree with your
8 initial statement. It's overbroad. In other words,
9 I think you should discuss it and narrow it. I'm
10 sure you have a budget or a line item for security.
11 I don't know if you do, but I certainly think that
12 would be relevant to this kind of a claim. The whole
13 claim is that the defendants didn't have the proper
14 security. You know, that really is the claim; isn't
15 it?
16          MR. HOUSER: AMCA had the breach. It's
17 not about whether Optum or Quest systems, did they
18 spend enough money on their firewall at Quest or
19 Optum.
20          SPECIAL DISCOVERY MASTER FALK: Maybe
21 not, but this may be helpful to you, actually. I'm
22 not saying one way or the other -- I don't know. But
23 my point is the individual line item thing is a
24 little rough. I think that's too much. But on the
25 other hand, you know, how much Quest or Optum was

Page 72

1 spending on security, if that can be, you know -- if
2 there was, say, a line item on a budget or a few line
3 items, you're right, and you can say this didn't have
4 anything to do with AMCA. But it's all part of --
5 first of all, they don't agree that there's really
6 the defining claim being made by the pleading. Judge
7 Hammer has weighed in and certainly said it can't get
8 discovery on the breaches on your own systems, and of
9 course it's AMCA, but the claim in this case the
10 defendants, the named defendants, are negligent in
11 that area, and they're to be held responsible for
12 what happened at AMCA. I'm going to suggest on this
13 one that you do meet and confer. I think that the
14 subject is relevant. It's like counsel said. You
15 know, that the cost of every mouse purchased or every
16 computer, that's not the way to go. But I got to
17 believe that the defendants have some kind of
18 analysis or breakout of how much they spend on
19 security, and I can see that being relevant. It may
20 even be helpful, as I say, to the defendants. Why is
21 it not relevant though, other than Judge Hammer's
22 opinion?
23          MR. HOUSER: Because AMCA was
24 responsible for its security, and their claims relate
25 to allegations that we did not properly oversee

Page 73

1 AMCA's data security. That's where their claims
2 arise out of. That's what they're arguing, is with
3 respect to their negligence claim and the core
4 negligence and negligence per se claim and security
5 related. If it's talking about security, it's about
6 AMCA security and about our oversight of security.
7 That's the nub there.
8          MR. CECCHI: It's a nondelegable duty.
9 It arises long before the breach. It's from the
10 beginning when they take the blood and they produce
11 the records and give it to AMCA. When AMCA has it,
12 it's just as much their duty as AMCA. All this
13 information goes to prove a continuum of negligence,
14 including how much they spent.
15          SPECIAL DISCOVERY MASTER FALK:
16 Understood. And I'm going by the pleadings, and
17 that's in the pleadings. They're saying that you
18 were negligent there, and there's all kinds of other
19 things, punitive damages and intentional stuff.
20 That's all in the case, as far as I'm aware. I read
21 both of Judge Arleo's opinions. I think you should
22 talk to one another. Every single document that had
23 to do with a computer or your own internal security
24 is not going to be helpful, and I think that is not
25 proportionate. I think sort of the amount that you

19 (Pages 70 - 73)

Page 74

1 spent on security, if you have that, if that can be
2 done, that should be done. There's no reason not to.
3 On the other hand, if that doesn't work, if you can't
4 work this out, you come back to me, and I'll make a
5 more specific decision.
6          Now, the next one is issue four --
7 sorry, volume or percentage of sales sent to
8 collection agencies. I need clarification on this.
9 The questions seem to all again go to -- and I could
10 be wrong, and I'll be happy to hear from anyone on
11 the plaintiff's side. Sort of the motivation of why
12 use AMCA. I don't know. Or comparing AMCA to other
13 collection agencies. I had trouble really
14 determining the relevance of that. Once again, I
15 think it goes to the motivation. In other words --
16 if AMCA was brutally successful in collecting in
17 comparing to other agencies, that might be a reason
18 to go there and to close your eyes, assuming you knew
19 or they knew or Quest knew that their security was
20 weak. I don't know.
21          MR. SIEGEL: You put your finger on the
22 theory.
23          SPECIAL DISCOVERY MASTER FALK: I
24 thought so.
25          MR. SIEGEL: Notwithstanding the

Page 75

1 knowledge of subpar security, they nonetheless
2 continued to use AMCA as opposed to other debt
3 collectors because AMCA was more successful in
4 recouping bad debt. That's the theory. I don't
5 think there's any doubt that that is a relevant area
6 of inquiry.
7          SPECIAL DISCOVERY MASTER FALK: We're
8 already there.
9          MR. SIEGEL: We have the first part of
10 it.
11          SPECIAL DISCOVERY MASTER FALK: Yes, you
12 did.
13          MR. SIEGEL: That the data security was
14 bad. We've had this meet and confer and some
15 information about volume that they sent to AMCA, and
16 this is just another continuum of that to flush out
17 this concept that they continued to use AMCA despite
18 what were known data security failures.
19          SPECIAL DISCOVERY MASTER FALK: I hear
20 you. Do we all agree as to what I've seen in the
21 papers that all the collection agencies charge the
22 same amount, 15 percent on the first placement and 30
23 percent on the second placement? Is that agreed to
24 or not?
25          MR. HOUSER: We agreed to it.

Page 76

1          SPECIAL DISCOVERY MASTER FALK: Do you
2 know?
3          MR. SIEGEL: I don't know. We can rely
4 on --
5          MR. HOUSER: And there was testimony at
6 a deposition of our corporate representative.
7          MR. SIEGEL: I don't think we'll dispute
8 what they testified to.
9          SPECIAL DISCOVERY MASTER FALK: I'll
10 allow you to have your meet and confer on the issue
11 already addressed, and we'll see where you get with
12 that, and then I'll be happy to make a ruling.
13
14          (Whereupon, a brief recess was taken off
15 the record.)
16
17          SPECIAL DISCOVERY MASTER FALK: I think
18 we're up to defendants -- issue one, risk assessment
19 and remediation of AMCA systems. There was an
20 interrogatory.
21          "Identify each instance in which you (or
22 any third party on your behalf) reviewed or examined
23 AMCA's data and information security. For example,
24 you should identify valuations, risks, analysis, and
25 audits of AMCA's data and information security, and

Page 77

1 in particular, you should state the scope of the
2 review, the dates of the service, and the -- the
3 dates of the review, the names of those reviewing or
4 examining AMCA's data security and the names who
5 provided information or otherwise participated."
6          Quest responded that it conducted an IT
7 supplier of AMCA B/W approximately October and
8 November of 2014, and then refers to rule 33(d) for
9 citations to documents that can answer remaining
10 portions, and Optum has ruled 33(d) with citations,
11 and I didn't go beyond that. Is that where you are?
12 Is there a dispute about this or no?
13          MR. HOUSER: From Optum's perspective,
14 we have provided literally everything we have. The
15 only issue is that they don't like the 33(d). The
16 33(d), they weren't a broad range of irrelevant
17 documents. They were to the risk assessment, the
18 internal notes of the risk assessment, the
19 remediation, and the actual risk assessment itself.
20 So they have literally everything about our risk
21 assessment of AMCA, and that risk assessment
22 identifies all the individuals involved in that risk
23 assessment, the contract expert. So we have
24 literally all of the documents, and then they deposed
25 an expert for seven hours and other data security

20 (Pages 74 - 77)

Page 78

1 issues. They deposed other people on this. From our
2 position, we've given everything, so I don't believe
3 we should have an issue. On our most recent meet and
4 confer, which goes back to December of 2022, that the
5 plaintiff thought we were good to go. I don't think
6 there's an issue from Optum's perspective.
7        SPECIAL DISCOVERY MASTER FALK:
8 Plaintiffs, is there an issue there or not?
9        MR. AYERS: I think the interrogatory
10 response obviously, that doesn't cull itself that
11 there isn't a document production. That said,
12 Optum's production and identification of those
13 documents I guess is helpful. But there's -- the
14 main -- so I would say that while a narrative
15 response is preferred because it would be responsive
16 to the actual rog, the real issue is with Quest.
17        SPECIAL DISCOVERY MASTER FALK: Okay.
18        MR. AYERS: Quest has not produced all
19 of the materials. It's come to light. I'm not sure
20 at the time of the letter, but through subsequent and
21 various depositions that certain documents related to
22 their oversight and assessments are no longer
23 accessible to them or exist. So a narrative response
24 would be absolutely necessary, because they have not
25 produced documents to tell the whole story in

Page 79

1 response to those interrogatories.
2        MS. SULTANIAN: Your Honor, if I could
3 respond to that.
4        SPECIAL DISCOVERY MASTER FALK: Sure.
5        MS. SULTANIAN: We provided a formal
6 assessment of when it was conducted. We pointed to
7 all the documents that were available to us that were
8 produced that themselves identify the scope and the
9 time period of the review. I actually -- we put
10 together a booklet of the documents we pointed to, in
11 case it's helpful to your Honor to look at them. For
12 example, the first document behind the tab labeled
13 "First Rog Response."
14        SPECIAL DISCOVERY MASTER FALK: Right.
15        MS. SULTANIAN: Is the final risk
16 assessment memo. If you look at the second page,
17 there's a column labeled "Details," and next to that
18 it identifies the things that were looked at. There
19 are also e-mails where Tony Heinz, who was the
20 individual that conducted the review, describes the
21 process. The e-mails identify Mr. Heinz as the
22 reviewer for the assessment. They identify the
23 individuals at AMCA, David Ulrich, who were
24 responsible for providing information. These
25 documents identify all of the information that

Page 80

1 plaintiffs are requesting in this interrogatory.
2        SPECIAL DISCOVERY MASTER FALK: Looks
3 pretty good.
4        MR. AYERS: Your Honor, there's
5 information that Quest has advised us subsequent or
6 during discovery that they don't have available to
7 them that are responsive to this request. They
8 certainly haven't produced all of the documents.
9 Certainly, they produced some stuff responsive to
10 this request, but this isn't fully responsive to this
11 interrogatory request. If your Honor wants, we are
12 happy to continue to meet and confer in light of the
13 direction that your Honor has provided to make sure
14 that we have everything in one shape or form. There
15 are a number of documents that they claim because of
16 shifting between document systems that have been lost
17 and don't have access to. Answering a 33(d) wouldn't
18 provide us with that information or information
19 related to those materials that they don't have. If
20 they have that information, then a narrative response
21 would be suitable in that circumstance.
22        MS. SULTANIAN: How could we possibly
23 create a narrative response on documents that we
24 don't have access to? We don't have that information
25 to provide.

Page 81

1        MR. AYERS: The interrogatories aren't
2 about documents. It's about information. Often
3 times -- it's numerous when documents don't exist.
4 You respond substantively in a narrative response.
5 We're not asking for an information on the documents
6 that weren't produced. We're asking for the
7 information we haven't received in the documents.
8 Corporations have a variety of different means not
9 solely within the documents. So that's why a
10 narrative response is provided. Rule 33(d) is only a
11 response where there's documents that actually answer
12 the question. It's not the default. It's the
13 exception. You can respond to 33(d) that has
14 documents that answer it. If you don't have
15 documents, you have to provide a narrative. The idea
16 that they don't have documents to use doesn't get
17 them out of answering the interrogatory
18 substantively. They represented these people at the
19 various depositions, both former and current
20 employees. So they can answer the interrogatories
21 substantively. We can meet and confer about this to
22 find out what they have access to. We do know that
23 there are key documents they have not produced
24 because they claim that they're no longer accessible
25 in the form that they used to be maintained in a

21 (Pages 78 - 81)

Page 82

1  certain database they can't access anymore or things
2  have been corrupted or things like that. We know the
3  information hasn't been turned over, and this is why
4  the narrative response to the extent that they can --
5         SPECIAL DISCOVERY MASTER FALK: It
6  doesn't sound like. You took two depositions on this
7  subject, and you couldn't get an answer to this
8  question or they just don't have it or what?
9         MS. SULTANIAN: Your Honor, so we
10 provided the information that Quest has. As
11 Mr. Ayers is alluding to, there's a separate dispute
12 about the documents in the repository that we no
13 longer have access to. We don't have access to the
14 information in those documents or in any of the
15 individuals that are actually involved in this review
16 because they have left the company long before we
17 prepared these interrogatory responses. So we just
18 don't have any other information that Quest can
19 verify and provide.
20        SPECIAL DISCOVERY MASTER FALK: I
21 suppose you can put that in a sentence.
22        MR. AYERS: Right.
23        SPECIAL DISCOVERY MASTER FALK: I assume
24 the 30(b)(6) deps must have said this.
25        MS. SULTANIAN: That's the other thing,

Page 83

1  your Honor. They deposed all of these people now.
2  They have all the information that they're possibly
3  going to get about this.
4         MR. AYERS: And those representatives
5  were unprepared, which is another dispute to put
6  before the court for depositions that they weren't
7  prepared for, and also documents -- you don't always
8  get everything that you ask fulsome answers at
9  depositions. On Day 1, just say, "All right.
10 Corporate rep, take a seat," and you just ask him
11 questions. That's not how it works. You need the
12 documents, the interrogatories responses, and the
13 admissions. We're entitled to these various things
14 and we're entitled to a response, and if they claim
15 that they don't know it, they can so state in a
16 response, but resting on 33(d) when they claim they
17 don't have the documents any longer doesn't cut it.
18        SPECIAL DISCOVERY MASTER FALK: This is
19 a handy thing to have. I order that you provide a
20 further -- an amendment or additional narrative
21 response. It's an interrogatory. You can state what
22 you just state here. What's the difference? I mean,
23 I think we're arguing over nothing.
24        MS. SULTANIAN: I never provided -- it's
25 just not how we prepare interrogatory responses. We

Page 84

1  provided what they have.
2         MR. AYERS: You generally answer
3  substantively, and you provide the information. If
4  you're going to refer to something, you either refer
5  to the complete record and explain --
6         MS. SULTANIAN: And we referred to the
7  complete records that we had access to and could
8  produce. There's no other way to say it.
9         SPECIAL DISCOVERY MASTER FALK: I don't
10 see this as a big issue. I can see adding a sentence
11 saying that we did this security assessment, and we
12 provided two witnesses for deposition, and we
13 provided this thing, whatever it is, and at this time
14 that's the best we can do. I just gave you the
15 answer.
16        MS. SULTANIAN: Thank you, your Honor.
17        SPECIAL DISCOVERY MASTER FALK: You
18 don't have to do it, but that's what you could do. I
19 mean, the form that you provide discovery is more
20 important maybe at a trial stage. If there was a
21 trial, they could just read the interrogatory in or
22 the deposition, which binds -- I'm just talking off
23 the top of my head. We're past that.
24        MR. CECCHI: When you say they don't
25 have to do it, they don't have to like you did, but

Page 85

1  they have to give an answer?
2         SPECIAL DISCOVERY MASTER FALK: Yes.
3  They don't usually put on the last half of the
4  sentence, which is we don't have anything else. I'll
5  order in this case at this time given what you said
6  that you provide a further narrative answer to it.
7  You decide what it is.
8         Case rog No. 2.
9         "Identify each security threat that you
10 identified when examining or doing due diligence of
11 AMCA's data and information security. For example,
12 you should identify network and computer-based
13 attacks, malicious software upload, and unauthorized
14 access to PHI."
15        MS. SULTANIAN: The final risk
16 assessment memo that I pointed you to in this binder
17 identify the findings of that assessment. It does
18 not identify anything as a security threat. I'm not
19 sure what plaintiffs means from that. It identifies
20 the findings from the assessment.
21        SPECIAL DISCOVERY MASTER FALK: Okay.
22 Put that as an answer to the question.
23        MS. SULTANIAN: And we did refer to the
24 documents as our response.
25        SPECIAL DISCOVERY MASTER FALK: Okay. I

22 (Pages 82 - 85)

Page 86

1  haven't reviewed this, nor do I intend to.  I thought
2  you didn't have any other documents?
3        MS. SULTANIAN:  Each of these documents
4  is a produced document.
5        SPECIAL DISCOVERY MASTER FALK:  Okay.
6        MS. SULTANIAN:  And we referred to those
7  documents in our response.
8        SPECIAL DISCOVERY MASTER FALK:  I think
9  we can leave it there.  Rog three.
10        MS. SULTANIAN:  Again, your Honor, the
11  final risk assessment memo identifies security
12  recommendations.  I -- you know, it doesn't identify
13  any remediation.  That's not how Quest referred to
14  these things.  It identifies security
15  recommendations, and so again, the documents answer
16  this interrogatory.
17        MR. AYERS:  They don't.
18        SPECIAL DISCOVERY MASTER FALK:  They
19  don't?
20        MR. AYERS:  No.  So the document that
21  they claim to produce in here, it does identify
22  problems that they found, and then despite those
23  problems, they then signed a contract with AMCA and
24  continued shipping over protected information of
25  clients over to it.  What's is missing is what is

Page 87

1  done in between.  Did they rubber stamp it despite
2  the problems they found?  What did they do in between
3  finding problems and continuing to send information?
4  That's what's missing.  It's not in these documents.
5        SPECIAL DISCOVERY MASTER FALK:  Wouldn't
6  it be more effective to answer that in a deposition?
7        MR. AYERS:  If they answer that in a
8  deposition, but they didn't.  We don't have a
9  complete understanding of what they did, and it's not
10  in the documents.  So a narrative response is
11  typical.  It's what's every party does.  It's not
12  burdensome.  What did you do?  If you didn't do
13  anything and you rubber stamped the contract, then
14  you can so state it.  We found problems.  We flagged
15  that there was, you know, facilities that were a
16  problem, but we didn't do anything about it.  Then
17  they can say that.  But this document does not talk
18  about that or address that.  So it's nonresponsive.
19        MS. SULTANIAN:  If I may respond, your
20  Honor.
21        SPECIAL DISCOVERY MASTER FALK:  Sure.
22        MS. SULTANIAN:  First of all, we dispute
23  that the risk assessment memo finds problems.  That's
24  not what it did.  To respond to the point, as you
25  said, they deposed these witnesses.  They deposed

Page 88

1  Tony Heinz who did the risk assessment, and they
2  deposed Christie Boone.  She was in charge of
3  reviewing the contract with AMCA.  They both
4  testified that these security recommendations are
5  things you would resolve contractually.  And if you
6  compare them to the contract that was signed after
7  the assessment was completed, those things were
8  implemented in the contract.  So those are the
9  answers.
10        SPECIAL DISCOVERY MASTER FALK:  I hear
11  you.  Just to move this along, I'm being presented
12  with an interrogatory.  You can answer the
13  interrogatory the way you did here or any way, and if
14  there's a problem, it's a problem.  Rule 33(d) says
15  that one way of answering interrogatories is by
16  referral to business records, which would be equal to
17  each side finding the answer.  I think it's kind of
18  crazy to have me read through these and say that
19  would be equal to each side.  In other words, you can
20  put a paragraph together and answer it the way you
21  just answered it.  If they don't like it, they can
22  argue about it.
23        MS. SULTANIAN:  Your Honor, Quest can
24  only argue its position in its custody and control
25  and that it can verify.

Page 89

1        SPECIAL DISCOVERY MASTER FALK:
2  Absolutely.
3        THE VIDEOGRAPHER:  And the people that
4  did this, they were no longer employees.
5        SPECIAL DISCOVERY MASTER FALK:  That's
6  your answer.
7        MR. AYERS:  But they did represent them
8  at their depositions.
9        SPECIAL DISCOVERY MASTER FALK:  If you
10  want, that's fine.  As far as I'm concerned, provide
11  a response, and then if you feel insufficient, come
12  back and I'll decide it like that.
13        MR. AYERS:  Thank you, your Honor.
14        MS. SULTANIAN:  Okay, your Honor.
15        SPECIAL DISCOVERY MASTER FALK:  Well,
16  it's more of the same, the security threats.  I think
17  this should be answered.  I don't know if it is.  Who
18  is the person or persons that oversaw the
19  relationship with AMCA?  So why wouldn't you answer
20  something like that?
21        MS. SULTANIAN:  Because the risk
22  assessment memos identifies the business owners of
23  AMCA.  All of them have now been deposed, and
24  plaintiffs were able to ask them any questions that
25  they had about their responsibilities.

23 (Pages 86 - 89)

1        SPECIAL DISCOVERY MASTER FALK: Help me
2   understand from the plaintiff side -- its like
3   putting three people's names there. Well, they're
4   interrogatories. I'm curious, what is the strategy
5   of this? Why do you want this in an interrogatory,
6   if --
7        MR. AYERS: There are certain names in
8   documents that I guess we could assume that those are
9   the people responsible for it.
10        SPECIAL DISCOVERY MASTER FALK: Don't
11   assume.
12        MR. AYERS: I want to know who's
13   responsible, and they can put that name in the
14   responsibilities --
15        SPECIAL DISCOVERY MASTER FALK: Or names
16   if it's more than one person.
17        MR. AYERS: Or their names so we know
18   each person and what their responsibility is for.
19        SPECIAL DISCOVERY MASTER FALK: I think
20   it's a legitimate question.
21        MR. HOUSER: Just to be clear, we've
22   been going through all of this. This is not with
23   respect to Optum360. You guys are not taking issue
24   with Optum360's responses.
25        MR. AYERS: No one pops up at trial and

1   says, "Oh, no. This is the person that we were told
2   was responsible." It wouldn't be burdensome than any
3   lawyers traveling here to fight this dispute.
4        SPECIAL DISCOVERY MASTER FALK: I hear
5   you. No one is going to pop up at trial if they're
6   not included in the initial disclosures, which the
7   parties have a duty to update and amend. It's not in
8   dispute.
9        MR. AYERS: You can amend those -- so we
10   ask for an interrogatory. We'll get their response.
11        MR. HOUSER: This is not relating to
12   Optum360. I think you confirmed that earlier. He
13   confirmed it earlier.
14        MR. AYERS: You asked me a question.
15   I'm just looking to confirm. I believe this talks
16   about Quest.
17        MR. HOUSER: Yes, it does.
18        MR. AYERS: I believe that this dispute
19   is with respect to Quest.
20        MR. HOUSER: Yes.
21        MR. SIEGEL: We answer your questions.
22        SPECIAL DISCOVERY MASTER FALK: This is
23   the format of Quest patient data of customer
24   information shared with AMCA, including a description
25   of each category, the format in which it was stored,

1   the time periods from which it was transmitted, and
2   the method of transfer. We dealt with that too. The
3   total number of individual records sent to AMCA. So
4   Quest provided categories of patient information and
5   rule 33(d), and Optum responded that types of patient
6   information was transmitted varied over time and
7   depended on whether AMCA was the primary or secondary
8   placement and cites to documents as examples, and I
9   guess plaintiffs complains that defendants use coded
10   abbreviations to describe the categories, and
11   defendants should explain what those abbreviations
12   mean, and I mean, I agree with that.
13        MS. SULTANIAN: So, your Honor, I might
14   be able to cut through this dispute. After these
15   were served and answered, Quest produced the database
16   of patient information. That gives plaintiffs not
17   only the categories of information, but the
18   information itself. So they've got one. They have
19   the description of the categories. They have the
20   time periods during which each advertiser customer
21   information was transmitted. We produced it in a
22   really usable format. Actually, I have here the
23   headers of the database that was produced that you
24   can see them. It's really easy to understand. They
25   have the date on which the patient received Quest

1   services, the date on which it was received by AMCA,
2   the state in which patient lived, the specific data
3   fields that were transferred for each patient. They
4   can sort and sum and query this database for Suzy Q
5   patient, and X, Y, and Z was sent for her on this
6   date. They can do that to get the answers to these
7   questions. So the interrogatory responses in some
8   respect is a little bit stale because they actually
9   now have all the data and can get that information.
10        SPECIAL DISCOVERY MASTER FALK: That
11   sounds pretty good to me.
12        MR. AYERS: Many months after the
13   dispute was briefed, they did turn over this file. I
14   would suggest that the interrogatory response needs
15   to be updated to reflect the production of these
16   materials so it's encapsulated within their response.
17        SPECIAL DISCOVERY MASTER FALK: I don't
18   have a problem with that.
19        MR. AYERS: Not a narrative response.
20        SPECIAL DISCOVERY MASTER FALK: Right.
21        MR. AYERS: This is the information that
22   was wanted and was briefed, but it needs to be
23   updated.
24        MS. SULTANIAN: So supplement to add the
25   Bates number and production?

24 (Pages 90 - 93)

Page 94

1    SPECIAL DISCOVERY MASTER FALK:  That's
2  all you need.
3        Now, we come to the notification of the
4  data breach.  I want to hear from you.  The plaintiff
5  is asking the manner in which you identified and
6  determined which individuals can notify in connection
7  with the data breach, and Quest says attorney-client
8  privilege and work product.  Optum says -- they
9  assert the privileges.  They say it's a 33(d)
10  response for the process by which Optum360 identified
11  and determined which Quest patients to notify.  So
12  really, I'm not sure that I understand the privilege
13  concept here.  First of all, there's no log.  I don't
14  know if there's a document or not, but you need to
15  have logs on privilege things for me, and I'm also
16  going to want to see the documents, if they're
17  documents.  If you're saying it's an oral thing, we
18  can talk about that.  I don't understand this.  In
19  other words, they're asking you why you did it, and I
20  guess your answer for Quest is we relied on counsel.
21  Is this a reliance on counsel thing?
22        MS. SULTANIAN:  Your Honor, I'm not sure
23  what you mean by "reliance on counsel."
24        SPECIAL DISCOVERY MASTER FALK:  We're
25  going to debate that.  That obviously has

Page 95

1  significance.  When you assert relying on some
2  counsel, there's often a waiver of your privilege,
3  not always.  There's law on that.  I know the law
4  well.  I did ask a lot of questions because I didn't
5  really understand it.
6        MS. SULTANIAN:  To kind of back up a
7  second.  Quest and Optum learned of the data breach.
8  Immediately, both inside and outside counsel got
9  involved in directing the investigation of that
10  breach, which included identifying which patients
11  needed to be notified of that breach under applicable
12  laws.  So there's legal analysis intensely tied up in
13  that, and both inside counsel -- so for Quest, that
14  would be Paul Kattas, Dina Mack, and Keena Hausmann.
15  Outside counsel at Sidley got involved immediately,
16  and they directed that process of how to investigate
17  how to determine which individuals needed to be
18  notified under applicable laws.  That began in May.
19        SPECIAL DISCOVERY MASTER FALK:  For
20  example, those names, I don't know if they were
21  provided to me or who they are.
22        MS. SULTANIAN:  They're in-house
23  counsel.
24        SPECIAL DISCOVERY MASTER FALK:  But it
25  would be helpful to know A, B, and C are in-house

Page 96

1  counsel.  Keep going.  I appreciate it.
2        MS. SULTANIAN:  So the process of
3  identifying who should be notified was
4  attorney-client privileged because it involved that
5  legal analysis.  It's work product because as of the
6  point that Quest publicly announced this breach, we
7  certainly anticipated litigation.
8        SPECIAL DISCOVERY MASTER FALK:  Work
9  product, there's documents.  When you're talking
10  about work product, you're usually talking about
11  documents.  Do you disagree with there?
12        MS. SULTANIAN:  Agreed, your Honor.  We
13  got the law of the documents, but we understood this
14  to be focused on the interrogatory response, and
15  plaintiffs want a narrative response, and the reason
16  we cannot give it to them is because it is
17  privileged.
18        SPECIAL DISCOVERY MASTER FALK:  It's an
19  interesting question.  As you know, underlying facts
20  are never privileged.  Never privileged.  The
21  communication between an attorney and client is
22  privileged and work product.  So in other words,
23  there's no way they can find out how you did this?
24        MS. SULTANIAN:  Well, the fact of who
25  was notified, they've got that, but they want the

Page 97

1  process of how we determined who should be notified.
2  That's privileged.
3        SPECIAL DISCOVERY MASTER FALK:  I don't
4  know.  I'm not sure.  It's an interesting question.
5  I'll ask the plaintiffs.  What's the relevance?  Why
6  is it important that you know the manner in which
7  they chose who to select?  You know who selected or
8  notified.
9        MR. AYERS:  They also then notified that
10  the people that they provided notice to are not
11  necessarily representative of the people that had
12  their data impacted during -- you know, during the
13  data breach and that maybe it's different.  So
14  understanding how they got to the people that they
15  gave notice to is helpful to understand the class
16  that we're talking about of injured consumers of
17  patients.
18        SPECIAL DISCOVERY MASTER FALK:  Yeah.
19        MR. AYERS:  But it's resting upon this
20  idea that the people they did give notice to are not
21  necessarily directly representative of the people
22  that had their data implicated.
23        SPECIAL DISCOVERY MASTER FALK:  So how
24  many people were notified?
25        MR. AYERS:  Roughly in total, between

25 (Pages 94 - 97)

Page 98

1  AMCA and the defendants?  Over 11 million.
2        MR. CECCHI:  No.  Quest is 11 million
3  itself.
4        MS. SULTANIAN:  So to be clear,
5  plaintiffs have the set of data that was transferred
6  to AMCA, so they have the names of those people and
7  the number of them.  They have what came back from
8  AMCA after the breach to the defendants identifying
9  the scope of people who were potentially impacted,
10  and so they have the full 360 view of the facts.
11  What they're asking for is for us to disclose our
12  legal analysis and attorney directed process.
13        SPECIAL DISCOVERY MASTER FALK:  And you
14  think that that's privileged?
15        MS. SULTANIAN:  Yes.
16        SPECIAL DISCOVERY MASTER FALK:  And
17  that's based on an oral communication from counsel or
18  there are documents as well?
19        MS. SULTANIAN:  There are documents that
20  were logged.
21        SPECIAL DISCOVERY MASTER FALK:  Oh,
22  there isn't?
23        MS. SULTANIAN:  I don't understand there
24  to be a dispute about the logged communications.
25        SPECIAL DISCOVERY MASTER FALK:  It

Page 99

1  sounds to me -- I'm sorry.  It's just an
2  interrogatory.  I'm not ready to rule on this right
3  now.  It doesn't mean it's automatically not
4  privileged, but there's cases on it.  I happen to
5  have written a lengthy opinion on an MDL when you
6  relied on counsel's opinion.  I'm not saying look at
7  my opinion, but I know the subject.  I'd be happy to
8  hear from you.
9        MR. CECCHI:  Judge, we think that's a
10  good way to go about this because, as you pointed
11  out, the underlying facts are not privileged.
12        SPECIAL DISCOVERY MASTER FALK:  They're
13  not.
14        MR. CECCHI:  And in data breach cases,
15  we run into this issue, the business function that
16  they have to take irrespective of anticipated
17  litigation.  They attempt to shield or cloak it with
18  privilege by having an attorney involved.  But Quest
19  and Optum had to do this irrespective of litigation.
20  They have to determine how many customers were
21  exfiltrated.  I think we can both put a finer point
22  on this.
23        SPECIAL DISCOVERY MASTER FALK:  That's
24  very relevant to work product for sure.
25        MR. HOUSER:  Can I get some factual

Page 100

1  background in terms of notifications in that it was a
2  third-party breach?  We were reliant upon information
3  that AMCA provided back.  They provided us
4  information on who was potentially impacted.  The
5  plaintiffs have all that.  They have the data that
6  AMCA sent to us.  Right?  These people's -- the
7  plaintiffs have those files.  So there is a little
8  bit of a black box of information given that AMCA was
9  the one that did the investigation into the literal
10  breach itself and then was reporting back out.
11        MR. CECCHI:  Right, and we have an
12  ongoing dispute about a vendor's report, which is now
13  being appealed by AMCA.
14        MR. AYERS:  And they also hired a
15  vendor.
16        MR. CECCHI:  That's what I was going to
17  say.  There's another vendor involved here.
18        MR. HOUSER:  Our vendor did not have
19  access to AMCA systems.
20        MR. AYERS:  But you did engage the
21  vendor?
22        MR. HOUSER:  You know it.  We put it in
23  responses.  It wasn't launching the kind of analysis
24  that Charles River was doing.
25        MR. CECCHI:  So Mandiant -- it's

Page 101

1  Mandiant.  Mandiant.  We'll try to put a finer point.
2        SPECIAL DISCOVERY MASTER FALK:  Put a
3  finer point and bring it back.  I'll be happy to
4  decide it.  Just on what I have here, it's kind of
5  hard.  Quest assignment of contract to Optum.  Is
6  this moot?
7        MR. HOUSER:  I think it's moot.  We've
8  searched for everything that we have -- the
9  plaintiff's theory, they want to know, did they look
10  at what documents are out there about AMCA's data
11  security, and they've asked us for those documents
12  and information about that.  We've produced
13  everything that we have.  We've done an exhaustive
14  search.  There's nothing left to give.  We've given
15  it all.
16        MR. AYERS:  And did you identify all the
17  responses --
18        MR. HOUSER:  I did.  Yep.
19        SPECIAL DISCOVERY MASTER FALK:  If
20  there's something further on that, you'll raise it
21  the next time we're together?
22        MR. CECCHI:  Yes.
23        SPECIAL DISCOVERY MASTER FALK:  There's
24  the question of training of employees.  You're
25  talking about basically training of employees?

26 (Pages 98 - 101)

Page 102

1    MR. SIEGEL: With respect to PHI and
2 PII?
3    SPECIAL DISCOVERY MASTER FALK: Yes.
4 Quest will not produce. Optum provided a 33(d)
5 response, limiting response to training on its HIPAA
6 policies when the breach occurred and to the extent
7 that training was in connection with third-party
8 vendors. Plaintiffs assert that it's relevant to the
9 negligence claims. Here you have the issue of
10 security. I can imagine there are training
11 requirements somewhere. I don't know --
12    MR. CECCHI: In HIPAA.
13    SPECIAL DISCOVERY MASTER FALK: Perhaps
14 in HIPAA. So I don't know. I don't see this being
15 any -- I mean, I think it fits within the outer
16 margins of the relevance situation. I would provide
17 an answer. Unless you tell me why you don't want to
18 provide an answer, I guess Quest primarily or Optum.
19    MR. HOUSER: Your Honor, on training, we
20 have identified documents, right, in terms of
21 training. As it relates to data security, if they're
22 asking for training of the defendant's employees, for
23 instance, on don't click on a phishing e-mail when
24 you should click on an e-mail. Training employees on
25 those types of things internally, we didn't train

Page 103

1 AMCA employees, but if we're talking about -- if
2 they're asking for training on phishing e-mails or
3 anything like that, clean desk policy, don't leave
4 documents that are sensitive on your desk. We don't
5 think that those types of trainings are relevant to
6 AMCA's data security or our oversight of AMCA's data
7 security.
8    MR. AYERS: Would you like a response?
9    SPECIAL DISCOVERY MASTER FALK: Sure.
10 It's kind of not a big issue.
11    MR. AYERS: I think it does -- it is
12 very relevant and germane information to go into this
13 negligence and negligence per se request. It's kind
14 of like their objections to certain discovery is
15 based upon this concept that they want a firewall or
16 separation between what AMCA did and what it does.
17 It's not. AMCA by law is essentially an extension of
18 Quest and Optum. Once they bring it in by contract
19 and trusting their patient information with them,
20 they are now responsible for AMCA, and its policies,
21 to the extent that they differ from the policies from
22 AMCA, are relevant to show how it just completely was
23 negligent and just asleep at the switch when it came
24 to once they shift out their patients data to an
25 external vendor, knowing how they train -- the

Page 104

1 policies and procedures of how they train their
2 employees at Quest and knowing that they then sent
3 the patient data to a vendor that they knew didn't
4 have that security and stuff just goes to show how
5 asleep at the switch they really were.
6    SPECIAL DISCOVERY MASTER FALK: I'll let
7 you answer. I think some kind of a narrative
8 answer -- I'm not sure how deeply I go deeply down
9 that road. I bet the plaintiffs would like the --
10    MR. HOUSER: It's very hyperbolic. A
11 clean desk policy, I'd like to know how that relates
12 whether or not we exercise reasonable security over
13 AMCA.
14    SPECIAL DISCOVERY MASTER FALK: I agree.
15 Looking at the case, the more training you list in
16 your answer, the better for you. Do you disagree?
17 You don't need to answer that question. This is on
18 the outer limits, I think, of relevancy in this case,
19 but the question should be answered. I think it's --
20 with the liberal standard of relevance, and you can
21 hear what counsel just said that that could be
22 something that would be important for a finder of
23 fact to know, if there was no training, because
24 there's this big view -- it's all through the papers,
25 and I think it stems from Judge Hammer's decision,

Page 105

1 which I think is probably right for what was being
2 asked there. The plaintiffs are pleading the
3 defendant's negligence in this case, putting aside
4 AMCA, and I think when you look at it that way and
5 what's pleaded, I think it's relevant. You know,
6 maybe marginally relevant, but it's relevant. So I
7 ask that the defendants provide an answer to this.
8 That's all I have. Is there anything else that you
9 want to talk about?
10    MR. CECCHI: Judge, what I was going to
11 suggest is some of the remaining issues, and there's
12 a couple of letters going back and forth. Maybe what
13 we should do is meet and confer to see if we can
14 narrow those before the next hearing. We might not
15 be able to.
16    SPECIAL DISCOVERY MASTER FALK: Okay.
17    MR. CECCHI: Some of it might overlap
18 with the rulings today.
19    SPECIAL DISCOVERY MASTER FALK: I think
20 it would be a good idea.
21    MR. CECCHI: We'll let you know,
22 obviously.
23    SPECIAL DISCOVERY MASTER FALK: There's
24 no shortage of requirements in all courts in this
25 country right now to meet and confer and meet and

27 (Pages 102 - 105)

Page 106

1  confer.

2      MR. SIEGEL:  You've given us guidance

3  that is really helpful.

4      SPECIAL DISCOVERY MASTER FALK:  I did

5  want to say I think there were privileged disputes

6  mentioned in some of those later things.  If we're

7  talking about privileged disputes, I'd like to see a

8  log and probably the documents themselves.  I take

9  privilege pretty seriously.

10      MR. HOUSER:  We provided logs.

11      SPECIAL DISCOVERY MASTER FALK:  You did?

12      MS. SULTANIAN:  And we didn't bring it

13  today.

14      SPECIAL DISCOVERY MASTER FALK:  You

15  didn't need it for today.

16      MS. SULTANIAN:  We'll provide our logs.

17      MR. AYERS:  What I would say, and we

18  can -- we're planning to provide a substantive or

19  letter in response to the declaration that was

20  provided because a log wasn't just provided.  It was

21  a declaration with very conclusory statements.  I

22  think that when we're talking about some of these

23  issues that would involve privilege, a log isn't

24  going to really answer the question, and then

25  ultimately I think, judge, you're going to need to

Page 107

1  take these documents for in-camera review.

2      SPECIAL DISCOVERY MASTER FALK:  I agree

3  with that.

4      MR. AYERS:  It may just cut to the chase

5  and suggest that the documents be submitted to you

6  for in-camera review.  Seeing is believing, so to

7  speak.  And just what we saw from the declaration

8  that was submitted, we obviously take issue with the

9  declaration.  We don't believe it's accurate, and the

10  documents itself will show that the date is in the

11  declaration and not conclusory.  I ask you --

12      SPECIAL DISCOVERY MASTER FALK:  I agree

13  with that.  I think I sent out a e-mail.  That's the

14  way I decide privilege issues.  I don't know how many

15  documents you're talking about either.  If there's

16  10,000, I'm --

17      MR. HOUSER:  It's one letter.  It's not

18  that many documents.

19      SPECIAL DISCOVERY MASTER FALK:  Good.

20      MR. HOUSER:  We sent Stephanie --

21      SPECIAL DISCOVERY MASTER FALK:  We have

22  some of it.  That's for the clawback issue.

23      MR. HOUSER:  Yes.

24      MR. AYERS:  There's another issue

25  related to the dark web investigation.  As we

Page 108

1  discussed, there's a team that exists, and they're

2  cloaking them now in the attorney-client privilege.

3      MR. HOUSER:  That's not true as to

4  Optum360, and I want to get that on the record.

5  Everything that we say this team that's in there we

6  dispute.  It's on the record that these last minute

7  allegations are not conceded.

8      THE WITNESS:  I don't think any of it is

9  conceded.  It's in a dispute letter that's before

10  your Honor.

11      SPECIAL DISCOVERY MASTER FALK:  If there

12  are privilege issues, I would like to see a log and

13  the documents for in-camera review, please.

14      MR. HOUSER:  Understood.

15

16      (Whereupon, the hearing was adjourned at

17  1:30 p.m.)

18

19

20

21

22

23

24

25

Page 109

1      CERTIFICATE

2

3

4      I, JOMANNA DEROSA, a Certified Court

5  Reporter and Notary Public of the State of New

6  Jersey, do hereby certify that the foregoing is a

7  true and accurate transcript of the testimony as

8  taken stenographically and digitally at the time,

9  place, and on the date hereinbefore set forth, to the

10  best of my ability.

11

12

13      I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or counsel,

17  and that I am not financially interested in the

18  action.

19

20      _Jomanna DeRosa_

21  JOMANNA DEROSA, C.C.R.

22  License No. 30XI00188500

23  Notary Public of the

24  State of New Jersey

25

28 (Pages 106 - 109)

Page 110

1  American Medical Collection Agency Inc., et al.

2  Special Discovery Master Hearing (#6152560)

3          E R R A T A  S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____  _____

24  Special Discovery Master Hearing      Date

25

Page 111

1  American Medical Collection Agency Inc., et al.

2  Special Discovery Master Hearing (#6152560)

3          ACKNOWLEDGEMENT OF DEPONENT

4    I, Special Discovery Master Hearing, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  Special Discovery Master Hearing      Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

29 (Pages 110 - 111)

**[& - 7th]**                                                    Page 1

| & |
|---|
| **&**   2:6 3:16 4:5 5:1 6:16,18 |

| 0 |
|---|
| **02904**   1:3 |
| **07009**   3:12 |
| **07068**   5:4 |
| **07102**   5:13 |
| **07660**   4:22 |
| **07932**   3:4 |

| 1 |
|---|
| **1**   1:11 2:9,16 9:17 22:16 83:9 |
| **10,000**   107:16 |
| **100**   5:12 24:6 57:24 |
| **10005**   3:19 |
| **10013**   4:8 |
| **10019**   2:24 |
| **106**   3:3 |
| **11**   53:25 54:17 98:1,2 |
| **12**   20:16 |
| **1201**   2:10 |
| **13th**   3:25 |
| **14**   3:11 24:19 |
| **15**   66:4 75:22 |
| **150**   53:23 57:24 |
| **150,000**   59:15 |
| **15thv**   5:12 |
| **164.306**   22:16 |

**180**   3:3
**19**   1:3 24:20
**1:30**   108:17

| 2 |
|---|
| **2**   25:5 85:8 |
| **20**   70:12 111:15 |
| **200**   4:14 |
| **20004**   4:1 |
| **201-341-3629**   8:1 |
| **2012**   62:21 70:2 |
| **2014**   21:2,4 35:6 46:20 47:12 77:8 |
| **2016**   24:23,24 |
| **2019**   21:2 66:4 |
| **202**   4:2 |
| **2022**   20:6 78:4 |
| **2023**   1:11 |
| **2100**   3:18 |
| **212**   2:25 3:20 4:9 |
| **22553**   67:2 |
| **232-1300**   3:20 |
| **239-5700**   3:13 |
| **24**   62:17 65:12 |
| **25**   61:7,24 65:12 |
| **250**   4:7 |
| **26**   8:19 9:17 |

| 3 |
|---|
| **3**   5:11 38:19 |
| **30**   49:3 50:4,7 53:12 63:12 75:22 82:24 |
| **30,000**   12:24 |
| **30309**   2:11 |
| **30xi00188500**   109:22 |
| **31**   20:6 |
| **312**   2:18 |
| **33**   38:13,15 77:8,10,15,16 80:17 81:10,13 83:16 88:14 92:5 94:9 102:4 |
| **339**   20:24 |
| **34**   62:24 |
| **341**   21:23 |
| **343**   21:14 |
| **355-9500**   4:9 |
| **36**   17:11,11 19:15 |
| **360**   98:10 |

| 4 |
|---|
| **408**   22:5 29:22 |
| **44**   25:9 |
| **45**   22:16 30:19 |
| **460**   4:14 |
| **4656**   109:20 |
| **47**   58:8 |
| **474**   7:19 10:7 28:7,13 |

**47414**   23:24

| 5 |
|---|
| **5**   5:3 30:23 36:1,17 70:11 |
| **5,000**   55:1 |
| **508**   22:17 |
| **529**   22:24 |
| **5326**   65:15 |
| **55**   4:21 |
| **555**   3:25 |
| **5th**   41:18 |

| 6 |
|---|
| **6**   20:16 41:18 49:3 50:4,7 53:12 63:12 82:24 |
| **60603**   2:17 |
| **6152560**   110:2 111:2 |
| **637-5600**   4:2 |
| **639-9100**   4:23 |
| **64112**   4:15 |

| 7 |
|---|
| **7,000**   53:21 54:16,18 57:21 60:2 61:15 |
| **700**   13:18 |
| **70s**   6:12 |
| **714-7112**   4:16 |
| **77**   3:18 |
| **787**   2:23 |
| **7th**   2:23 |

| 8 |
| --- |

**8**  37:20
**816**  4:16
**828-2600**  3:5
**839-5599**  2:25
**853-7000**  2:18

| 9 |
| --- |

**973**  3:5,13 4:23
5:5
**994-1700**  5:5

| a |
| --- |

**abbreviations**
92:10,11
**ability**  109:10
**able**  19:25 43:4
89:24 92:14
105:15
**above**  111:7
**absolutely**
78:24 89:2
**access**  9:21
21:8,15 41:4
43:10 54:15
80:17,24 81:22
82:1,13,13
84:7 85:14
100:19
**accessed**  23:3
**accessible**
78:23 81:24
**accident**  26:10
**accordance**
35:10

**account**  21:25
70:2,2
**accurate**  14:12
107:9 109:7
**acknowledged**
21:19
**acknowledge...**
111:3
**acquired**  21:4
**act**  12:10
**acting**  41:24
**action**  8:21
9:20 109:15,18
**activity**  49:4
**actual**  17:15
20:8 23:11
44:9 48:11
77:19 78:16
**actually**  13:6
28:11 34:8
37:11 38:22
56:22 71:21
79:9 81:11
82:15 92:22
93:8
**add**  41:14
93:24
**adding**  84:10
**additional**
83:20
**additions**  111:6
**address**  34:20
87:18
**addressed**
76:11

**addresses**  21:6
22:2
**adequate**  15:10
22:10 30:3
63:5
**adequately**
22:12
**adjourned**
108:16
**admissible**  9:7
9:8 69:17
**admission**
19:10 54:10,16
**admissions**
10:12 47:16
83:13
**admitted**  48:22
**adopting**  21:21
**adronetto**
36:12
**adversary**
32:15
**adverse**  32:15
**advertiser**
92:20
**advised**  80:5
**affect**  41:20
**age**  38:18
**agencies**  62:16
66:24 68:13
74:8,13,17
75:21
**agency**  1:7
110:1 111:1

**agnello**  5:1
**ago**  11:4,15
**agree**  16:9,11
18:22 19:13
33:20 50:11
59:20 67:22,25
71:7 72:5
75:20 92:12
104:14 107:2
107:12
**agreed**  16:11
24:19 25:20,21
28:11 30:20
50:18 53:9
75:23,25 96:12
**agreeing**  67:16
**agreement**
23:22 47:11
**ahead**  66:14
**aid**  61:8
**al**  110:1 111:1
**alicia**  3:24 7:6
**allegation**  19:7
**allegations**
17:20 20:7,20
20:21 31:15
72:25 108:7
**allege**  18:4
52:10
**alleged**  17:22
18:7 20:14
26:8 71:1
**alleging**  19:20
**allow**  42:6
76:10

**allowed**  20:12
  21:16
**alluding**  82:11
**alston**  2:6 6:16
  6:18
**amca**  10:8,11
  12:23 14:1,18
  14:22 15:1,16
  15:21 16:25,25
  18:3,8 19:7,22
  20:25 21:5,10
  21:11,19 22:1
  24:20 25:10
  26:20 27:3,9
  29:15,16,17
  30:14,15,16
  31:17 32:6,10
  35:1 38:5,23
  43:24 44:5,12
  49:17 50:21
  52:25 53:1
  62:13,15,20
  63:21 64:6
  68:18,22 70:22
  70:23,23 71:16
  72:4,9,12,23
  73:6,11,11,12
  74:12,12,16
  75:2,3,15,17
  76:19 77:7,21
  79:23 86:23
  88:3 89:19,23
  91:24 92:3,7
  93:1 98:1,6,8
  100:3,6,8,13,19

103:1,16,17,20
  103:22 104:13
  105:4
**amca's**  15:24
  16:10,12,13
  21:16,17 26:17
  73:1 76:23,25
  77:4 85:11
  101:10 103:6,6
**amend**  91:7,9
**amended**  11:18
  20:6
**amendment**
  83:20
**amendments**
  38:1
**america**  7:7
**american**  1:6
  110:1 111:1
**amount**  9:20
  63:20 64:8
  66:11 68:22
  73:25 75:22
**amounts**  62:20
  62:22,22 66:8
**analogy**  14:3
  42:21 45:17
**analysis**  58:2
  58:23 59:5
  72:18 76:24
  95:12 96:5
  98:12 100:23
**announced**
  96:6

**answer**  40:16
  43:5 49:8 77:9
  81:11,14,20
  82:7 84:2,15
  85:1,6,22
  86:15 87:6,7
  88:12,17,20
  89:6,19 91:21
  94:20 102:17
  102:18 104:7,8
  104:16,17
  105:7 106:24
**answered**
  23:19 49:3
  50:2,7 88:21
  89:17 92:15
  104:19
**answering**
  33:13 65:11
  80:17 81:17
  88:15
**answers**  83:8
  88:9 93:6
**anticipated**
  60:15 96:7
  99:16
**anybody**  34:5
**anymore**  9:12
  82:1
**anyway**  8:18
**apologize**  45:16
  48:20 54:3
**appeal**  24:3
**appealed**  24:2
  100:13

**appended**
  111:7
**applicable**
  95:11,18
**applies**  56:15
**appointed**  6:3
**appreciate**  10:4
  31:19 49:8
  96:1
**approximately**
  11:4 77:7
**area**  72:11 75:5
**argue**  69:18
  88:22,24
**arguing**  73:2
  83:23
**argument**  38:2
  38:23 39:12
  68:11,17
**arguments**
  18:17 68:17
**ariadne**  3:17
  7:4
**arises**  26:8 73:9
**arleo**  6:4 11:16
  18:20 20:11
  69:18
**arleo's**  73:21
**arose**  29:13
**artful**  11:1
**articulated**
  33:1
**aside**  105:3
**asked**  7:20
  11:12 18:24

27:19 50:5
91:14 101:11
105:2
**asking**   6:7 17:8
25:25 26:13,16
51:24 52:3
53:10 58:18
59:2 66:2
70:14 81:5,6
94:5,19 98:11
102:22 103:2
**asleep**   103:23
104:5
**assert**   94:9 95:1
102:8
**assess**   33:4
65:7
**assessing**   39:14
70:6
**assessment**
59:12 76:18
77:17,18,19,21
77:21,23 79:6
79:16,22 84:11
85:16,17,20
86:11 87:23
88:1,7 89:22
**assessments**
78:22
**assignment**
101:5
**associates**   23:2
37:24
**assume**   60:2
82:23 90:8,11

**assuming**   74:18
**assure**   7:21
53:19
**atlanta**   2:11
**atlantic**   2:9
**attacks**   22:12
85:13
**attempt**   99:17
**attention**   10:25
**attorney**   53:22
53:23 57:25
59:12 94:7
96:4,21 98:12
99:18 108:2
109:14,16
**attorneys**   53:15
**audits**   76:25
**austin**   2:14,21
**automatically**
99:3
**available**   44:14
51:7,11 79:7
80:6
**avenue**   2:23 3:3
**aware**   49:1
50:6 54:6
55:23 58:1
73:20
**awareness**
39:10
**ayers**   4:20 7:12
7:12 24:18
28:7 33:1,12
34:19,23 35:3
36:6,15,19

40:7 43:19
44:19 47:5,14
48:4 50:9,12
52:3,8 53:2
54:12 55:20,22
58:20 59:24
60:2 61:2
65:10,14,17,22
67:13,17,21
68:4,20 78:9
78:18 80:4
81:1 82:11,22
83:4 84:2
86:17,20 87:7
89:7,13 90:7
90:12,17,25
91:9,14,18
93:12,19,21
97:9,19,25
100:14,20
101:16 103:8
103:11 106:17
107:4,24

---

**b**

**b**   9:17 20:16
22:12 30:2
49:3 50:4,7
53:12 63:12
77:7 82:24
95:25
**back**   16:7 17:8
17:20 24:19
28:5 32:25
33:3 35:23
45:21 56:11

57:23 59:5
60:3,12,21
61:9,11 65:25
74:4 78:4
89:12 95:6
98:7 100:3,10
101:3 105:12
**background**
100:1
**bad**   68:24 75:4
75:14
**based**   28:23
41:25 53:1,20
59:7,17 60:3
65:23 68:21
85:12 98:17
103:15
**basic**   32:17
40:21
**basically**   8:20
55:7 101:25
**basis**   39:5
63:19 64:5
**batch**   11:7,10
**bates**   33:21
65:15 67:2
93:25
**beach**   50:21
**bear**   9:3 16:12
18:1 63:5
**bears**   9:2
**beat**   64:13
**becker**   5:3
**began**   95:18

**beginning** 11:3
73:10
**behalf** 6:17,19
6:21,22,24 7:3
7:6,8,14 76:22
**behold** 56:22
**believe** 13:2
33:19 34:8
36:15 65:24
67:8 72:17
78:2 91:15,18
107:9
**believed** 11:24
**believing** 107:6
**benefit** 9:25
**benefits** 9:15
**bernstein** 4:5
**best** 35:23
84:14 109:10
**bet** 104:9
**better** 40:5
48:2 104:16
**beyond** 11:13
77:11
**bidgaard** 3:16
**big** 20:18 57:9
57:10,17 84:10
103:10 104:24
**billing** 22:2
62:16
**billion** 48:17
**binder** 85:16
**binders** 10:5
**binds** 84:22

**bird** 2:6 6:17
6:19
**birth** 21:6
**birthdays**
51:15
**bit** 93:8 100:8
**black** 56:8
100:8
**blood** 14:5
73:10
**board** 40:6
**boards** 40:11
**body** 21:9
**booklet** 79:10
**boone** 88:2
**box** 29:6 34:5
100:8
**breach** 1:8
10:23 11:12
12:23 13:19
16:3 18:4
29:13 38:24
43:24 45:14
46:5,19 49:17
52:19,25 53:1
53:4 54:1,5
58:3,4 70:25
71:16 73:9
94:4,7 95:7,10
95:11 96:6
97:13 98:8
99:14 100:2,10
102:6
**breached** 15:22

**breaches** 19:5
22:11 31:11
72:8
**breakout** 72:18
**brick** 29:1
**brief** 34:13
76:14
**briefed** 59:7
93:13,22
**briefing** 71:6
**briefly** 10:21
30:10
**bring** 28:5
35:19 101:3
103:18 106:12
**bringing** 10:24
**brisbois** 3:16
7:5
**broad** 9:1 19:8
20:9 23:10
24:14 46:9
77:16
**broader** 20:2
28:1 35:4,22
37:4,13,16
52:10,16
**broadly** 31:3
31:24 37:5
**brody** 5:1
**brought** 14:8
**browser** 42:2
**brutally** 74:16
**bucket** 54:19
**budget** 71:10
72:2

**building** 32:2
42:23
**bunch** 59:9
**burden** 9:16,24
46:9,23 57:14
57:16 59:9,18
**burdensome**
48:15 53:19
55:2 87:12
91:2
**business** 37:23
46:14 47:24
88:16 89:22
99:15
**buy** 40:9
**buyers** 39:25
**buying** 41:25
**byrne** 5:1

| c |
|---|

**c** 2:1 22:13
95:25
**c.c.r.** 109:21
**cabraser** 4:5
**calculate** 56:7
69:4
**calculation**
56:12 60:12
**california**
12:10 23:6
**call** 7:25,25 8:2
37:3 41:9
49:13
**called** 63:15
**camera** 53:16
61:10 107:1,6

108:13
**cameras** 14:10
**captioned**
  29:23
**captured** 17:17
**carella** 5:1
**carl** 36:12
**carlton** 3:1
**case** 1:3 6:4
  8:10,12,22 9:4
  9:14,17 11:3
  12:1,21 13:16
  13:19,25 14:2
  15:17 16:9
  18:22 19:6,6
  19:18,24 20:5
  20:23 24:15,20
  27:7,14,21,23
  28:23 29:13
  31:15 42:8
  56:4,7,21 57:9
  57:11,17,20
  59:15 72:9
  73:20 79:11
  85:5,8 104:15
  104:18 105:3
**cases** 13:22
  20:18 26:7,7
  39:2 63:10
  99:4,14
**categories** 92:4
  92:10,17,19
**category** 33:17
  91:25

**cause** 29:14
  70:25
**caveating** 24:7
**ccs** 64:7
**cecchi** 5:1,2
  7:14,14 8:4,8
  10:14,16,21
  12:15 13:13
  16:5,8 17:21
  24:5,12,18
  25:3 29:21
  30:2 32:25
  33:11 34:18
  35:14,18 37:2
  37:8,12 39:8
  43:8,10 46:5
  46:22 47:23
  52:18 53:25
  54:3 55:10
  61:22 62:2,12
  62:15 65:3,15
  66:3,10,18,21
  67:1,6,11,25
  68:7 69:9 70:5
  73:8 84:24
  98:2 99:9,14
  100:11,16,25
  101:22 102:12
  105:10,17,21
**cedar** 3:12
**cell** 8:3,5
**center** 2:9 5:11
**certain** 19:19
  20:12 32:7
  34:23 59:3

78:21 82:1
  90:7 103:14
**certainly** 18:18
  18:22 31:12
  50:5 71:11
  72:7 80:8,9
  96:7
**certificate**
  109:1
**certified** 109:4
**certify** 109:6,13
**cetera** 8:17
  22:16 36:3,3
  60:21 62:23
**cfr** 22:16 30:5
**challenger** 4:21
**change** 110:4,7
  110:10,13,16
  110:19
**changed** 31:16
**changes** 111:6
**charge** 75:21
  88:2
**charles** 100:24
**chart** 13:14
**chase** 107:4
**chicago** 2:17
**chose** 97:7
**chris** 7:12
  24:18 35:21
  55:11
**christie** 88:2
**christopher**
  4:20

**chronology**
  24:16
**circle** 31:2
**circuit** 56:11
**circumstance**
  80:21
**citations** 77:9
  77:10
**cite** 63:10
**cited** 8:24
**cites** 92:8
**city** 4:15 7:11
**claim** 8:20
  12:10 13:6
  15:17 16:1,1
  56:18 70:8
  71:12,13,14
  72:6,9 73:3,4
  80:15 81:24
  83:14,16 86:21
**claiming** 56:13
**claims** 13:4,24
  17:19 18:1,13
  18:21 19:3
  20:8,11,12,13
  20:14 23:11,12
  31:21,22 48:11
  51:20,21 70:7
  72:24 73:1
  102:9
**clarification**
  74:8
**clarity** 35:20
**class** 15:12
  22:20 97:15

**clawback**
  107:22
**clean**  103:3
  104:11
**clear**  25:16
  28:18 33:6
  36:6 60:23
  61:1 66:22
  67:13 90:21
  98:4
**click**  102:23,24
**client**  27:25
  94:7 96:4,21
  108:2
**clients**  50:1
  86:25
**cloak**  99:17
**cloaking**  108:2
**close**  21:13
  74:18
**cmi**  16:1
**cmia**  70:8
**coded**  92:9
**codes**  22:2,3
  47:7 51:19
**colleague**  24:18
**collecting**
  74:16
**collection**  1:7
  69:1 74:8,13
  75:21 110:1
  111:1
**collections**
  66:23,24

**collectively**
  45:2
**collector**  15:4
**collectors**  66:9
  66:12 75:3
**column**  79:17
**come**  20:4
  35:23 58:9
  60:21 61:9,10
  74:4 78:19
  89:11 94:3
**comes**  24:15
  56:11
**coming**  24:10
  50:3
**comment**  29:21
**comments**
  18:16
**common**  47:3
**communication**
  31:7 96:21
  98:17
**communicati...**
  25:9,21 30:13
  31:13 98:24
**companies**
  48:17
**company**  21:3
  49:12 69:1,2
  82:16
**company's**
  16:4
**comparator**
  70:10

**comparators**
  70:10
**compare**  88:6
**compared**
  57:13
**comparing**
  74:12,17
**compensation**
  62:15 63:4,12
  63:13,17,18,25
  67:16 68:22
**complaining**
  14:25
**complains**  92:9
**complaint**
  11:18,18 12:5
  12:6,7,9 20:6,8
  20:9,21 21:13
  23:11,15
**complete**  84:5
  84:7 87:9
  111:8
**completed**  88:7
**completely**
  18:6 103:22
**complicated**
  16:24 48:16
  51:6
**comply**  15:13
**component**
  41:24 55:20
**compromised**
  42:10
**compute**  53:22

**computer**
  38:19 40:19
  72:16 73:23
  85:12
**computers**
  40:22 41:3
**conceded**  108:7
  108:9
**concept**  42:25
  75:17 94:13
  103:15
**concerned**
  27:21 69:11
  89:10
**concerning**
  20:3 23:6
  37:21
**concerns**  43:22
**concluded**
  47:25
**conclusively**
  40:15
**conclusory**
  106:21 107:11
**conduct**  54:22
**conducted**  77:6
  79:6,20
**confer**  37:14
  38:10 48:12
  55:11 58:24
  61:6 65:9 66:6
  67:5 68:2
  72:13 75:14
  76:10 78:4
  80:12 81:21

[confer - d]                                                                    Page 8

105:13,25
106:1
**confess**  58:7
**confidential**
22:22 23:1
32:9
**confidentiality**
14:13,17 15:8
22:13
**confirm**  91:15
**confirmed**
91:12,13
**conflation**
16:15
**confused**  65:4
**connected**
70:24
**connection**
64:14 94:6
102:7
**considered**
20:2
**consistent**
38:10
**constantly**
41:22
**consumers**
97:16
**contain**  48:9
**contains**  9:17
20:7
**contend**  29:18
67:2
**contest**  55:14

**context**  11:3,4
11:6
**continue**  80:12
**continued**  69:2
75:2,17 86:24
**continuing**
87:3
**continuum**
15:18 73:13
75:16
**contract**  77:23
86:23 87:13
88:3,6,8 101:5
103:18
**contractually**
88:5
**control**  88:24
**controversy**
9:21
**copier**  70:17
**copies**  14:7
**core**  31:15 73:3
**corporate**  76:6
83:10
**corporation**
7:7
**corporations**
42:16 43:16
81:8
**correct**  36:10
65:19 111:8
**corrections**
111:6
**corrupted**  82:2

**cost**  9:15 72:15
**costs**  61:14
**counsel**  13:21
45:2 48:5
50:13,15 72:14
94:20,21,23
95:2,8,13,15,23
96:1 98:17
104:21 109:14
109:16
**counsel's**  99:6
**count**  14:14
15:9,9,10
**country**  105:25
**couple**  41:15
52:24 63:2
105:12
**course**  9:5,8
20:18 23:13
30:12 72:9
**court**  1:1 11:21
39:19 83:6
109:4
**court's**  10:24
35:10
**courts**  9:1
105:24
**cover**  35:6 64:4
**covers**  19:13
**crazy**  88:18
**create**  80:23
**created**  22:14
38:1 59:10
**creative**  10:25

**credit**  10:23
**criminal**  39:24
40:7 42:1,7,22
56:1
**criminals**  40:9
**crypto**  43:7
**cull**  78:10
**curious**  90:4
**current**  12:25
81:19
**custodial**  46:9
48:5,7 53:20
**custodials**
55:12
**custodians**
30:20
**custody**  88:24
**customer**  1:8
91:23 92:20
**customers**
49:13 50:1
51:25 58:15
99:20
**cut**  83:17 92:14
107:4
**cyber**  20:3
22:11

### d

**d**  38:13,15 77:8
77:10,15,16
80:17 81:10,13
83:16 88:14
92:5 94:9
102:4

**d.c.** 4:1
**damage** 55:13
  68:21
**damaged** 60:14
**damages** 47:9
  48:11 51:14,21
  55:14 56:5,19
  60:12 69:4
  70:24 71:1
  73:19
**dark** 38:21,25
  39:7,14,21,25
  40:2,3,4,12,14
  40:23 41:4,19
  41:24 42:2
  43:10,23 44:1
  44:10,15 45:13
  45:20 46:3,8
  46:16 47:8,21
  48:23 49:1,5,6
  49:14,16 50:2
  50:20,23 51:10
  51:11,25 52:17
  52:22,25 53:5
  54:7 55:18
  58:1,5,13,17,19
  59:3 60:5,8
  107:25
**darn** 21:13
**data** 1:8 10:8
  10:11,23 11:12
  12:23 14:1
  16:4,8,12,13,19
  16:20 17:4,10
  17:16,24,25

18:2,3,5,9,11
21:22 22:10,11
25:10,19,22
26:1,17 27:13
27:20 29:12,13
29:16,24 30:14
30:16 31:6,7,9
31:12,16,25
33:9,9,23
38:20,25 39:7
39:11 40:2,8,8
40:14 41:21
42:10 43:17,17
43:22 44:1
46:3 47:6 48:1
49:17,23 50:21
52:5,7 53:7,8
54:1,6 55:19
55:24 56:17,19
58:3,4,24 60:8
60:25 63:5,25
64:14,16 66:1
66:1 68:15
69:21 70:2,9
70:15 73:1
75:13,18 76:23
76:25 77:4,25
85:11 91:23
93:2,9 94:4,7
95:7 97:12,13
97:22 98:5
99:14 100:5
101:10 102:21
103:6,6,24
104:3

**database** 13:19
  17:3 20:18
  29:14 44:5,12
  45:21 82:1
  92:15,23 93:4
**date** 92:25 93:1
  93:6 107:10
  109:9 110:24
  111:12
**dates** 21:6
  37:25 77:2,3
**david** 79:23
**day** 50:25 83:9
  111:15
**days** 8:3
**de** 59:21,21
**dead** 64:13
**deal** 8:13 10:6
  19:14 25:18
  49:10
**dealing** 6:6
  7:19 8:18
  24:11 34:17
**dealt** 20:17
  92:2
**dearborn** 2:16
**debate** 94:25
**debt** 15:4 63:21
  64:9 66:9,12
  68:24 69:1
  75:2,4
**december** 78:4
**decide** 25:2
  59:8 85:7
  89:12 101:4

107:14
**decision** 8:24
  10:22 11:16,17
  12:3 71:7 74:5
  104:25
**decisions** 11:15
**declaration**
  106:19,21
  107:7,9,11
**declare** 111:4
**dedicated**
  43:21 50:24
**deemed** 111:6
**deeply** 104:8,8
**default** 22:1
  81:12
**defendant** 18:5
  18:12 19:5
  32:11
**defendant's**
  18:6 23:2 32:2
  39:9 54:22
  102:22 105:3
**defendants**
  10:24 11:5,7,9
  12:20,23 13:15
  13:17 19:20,21
  22:6,9,18,25
  23:5,12 24:4
  25:5 28:8,14
  28:22 29:23
  32:5,6,8 33:12
  34:20 36:7
  37:16 38:22
  39:21 40:13

42:15 44:24
48:21 54:21,23
56:15,17,18
58:22 59:8,10
60:19 61:6
63:6 67:14
68:23 70:3
71:3,13 72:10
72:10,17,20
76:18 92:9,11
98:1,8 105:7
**defense** 8:21
59:9
**defenses** 18:21
**defer** 13:11
**deficient** 29:18
68:25 69:3
**defined** 8:25
9:1,5
**defining** 72:6
**definitely** 52:11
55:10 70:6
**delancey** 45:18
**delivered** 15:4
**deny** 20:23
49:19
**department**
43:20
**depended** 92:7
**deponent** 111:3
**deposed** 77:24
78:1 83:1
87:25,25 88:2
89:23

**deposition**
16:22 18:9
50:7 76:6
84:12,22 87:6
87:8
**depositions**
12:24 50:10
78:21 81:19
82:6 83:6,9
89:8
**deps** 82:24
**derosa** 109:4
109:21
**describe** 92:10
**described** 10:7
**describes** 79:20
**description**
91:24 92:19
**desk** 103:3,4
104:11
**despite** 75:17
86:22 87:1
**detail** 13:11
70:1,18
**details** 79:17
**detect** 30:3
**detection** 25:6
**determination**
11:20 44:12
**determine**
46:17 50:17
56:14 59:1
95:17 99:20
**determined**
33:3 38:23

44:4,11 50:20
94:6,11 97:1
**determining**
51:21 74:14
**develop** 42:6
**developed** 40:1
**developing**
36:13
**development**
36:2
**diagnosis** 47:6
51:19
**diagnostic** 21:3
**differ** 103:21
**difference**
31:20 83:22
**different** 16:15
18:24 19:17
20:10 32:19
36:16 44:18
45:3,7 56:20
58:20 60:8
71:6 81:8
97:13
**differently**
29:10
**digitally** 109:8
**diligence** 14:22
85:10
**dina** 95:14
**directed** 95:16
98:12
**directing** 95:9
**direction** 80:13

**directly** 14:1,14
21:17 22:1
97:21
**disagree** 27:25
64:15 96:11
104:16
**disagreement**
27:7
**disclose** 98:11
**disclosed** 15:6
22:9
**disclosure**
59:11
**disclosures**
91:6
**discoverable**
8:22 9:8,9
19:17 23:16,19
**discovered**
52:19
**discovery** 1:12
6:1,3 7:16,23
7:23 8:6,9,13
8:14,19 9:7,13
9:15,16,23,24
10:15,19 11:5
11:7,10,11
12:13,16 13:8
17:8 18:15
19:24 20:23
23:10 24:9,13
24:22,25 25:4
25:15 27:1,4
29:25 30:8,11
30:17 31:18

| | | | |
|---|---|---|---|
| 32:17,17 34:10 | 94:24 95:19,24 | 34:8 36:4 | 73:22 78:11 |
| 34:16,22 35:2 | 96:8,18 97:3 | 37:11 39:5 | 79:12 80:16 |
| 35:12,15,24 | 97:18,23 98:13 | 42:10 45:6,24 | 86:4,20 87:17 |
| 36:18,25 37:19 | 98:16,21,25 | 50:16 51:2 | 94:14 |
| 38:12 40:17 | 99:12,23 101:2 | 58:2 62:19 | **documents** |
| 41:6,10 43:2,6 | 101:19,23 | 64:23 65:2 | 12:24 13:5,16 |
| 44:16,20 45:8 | 102:3,13 103:9 | 68:5 69:8 76:7 | 13:17,18,23 |
| 45:15,25 46:12 | 103:14 104:6 | 77:12 82:11 | 16:5,7,12 19:8 |
| 47:10,18 48:19 | 104:14 105:16 | 83:5 87:22 | 20:2 26:20 |
| 49:7,24 50:11 | 105:19,23 | 91:3,8,18 | 28:11 29:6 |
| 51:22 52:6 | 106:4,11,14 | 92:14 93:13 | 30:22,23 35:8 |
| 53:9 54:9 | 107:2,12,19,21 | 98:24 100:12 | 37:21 47:15,17 |
| 56:14 57:3,8 | 108:11 110:2 | 108:6,9 | 50:10,14 53:11 |
| 57:15 58:6 | 110:24 111:2,4 | **disputes**  6:11 | 53:12,13,22 |
| 59:19 60:1 | 111:12 | 7:23,24 8:14 | 54:19,21 57:21 |
| 61:4,20,25 | **discuss**  35:8 | 18:18 28:9 | 58:21 59:23 |
| 62:3,17 64:10 | 48:14 60:19 | 60:22 106:5,7 | 61:7,15,24 |
| 64:17,22 65:1 | 69:14 71:9 | **disregarding** | 62:19 63:10,19 |
| 66:5,13 68:8 | **discussed**  55:3 | 22:21 | 65:6,18,23 |
| 69:5,10,16,24 | 108:1 | **disseminated** | 66:16 67:20 |
| 71:4,20 72:8 | **discussion** | 14:15 15:7 | 69:25 77:9,17 |
| 73:15 74:23 | 34:20 38:10,11 | **distinction**  37:4 | 77:24 78:13,21 |
| 75:7,11,19 | 59:13 61:8 | **distinguishable** | 78:25 79:7,10 |
| 76:1,9,17 78:7 | 62:9 | 19:2 | 79:25 80:8,15 |
| 78:17 79:4,14 | **discussions** | **district**  1:1,2 | 80:23 81:2,3,5 |
| 80:2,6 82:5,20 | 13:2 | **dive**  7:18 | 81:7,9,11,14,15 |
| 82:23 83:18 | **dismiss**  11:8,16 | **division**  21:1 | 81:16,23 82:12 |
| 84:9,17,19 | 11:17 | **divisions**  21:15 | 82:14 83:7,12 |
| 85:2,21,25 | **dispositive**  9:19 | **divorced**  31:8 | 83:17 85:24 |
| 86:5,8,18 87:5 | **disproportional** | **document**  17:9 | 86:2,3,7,15 |
| 87:21 88:10 | 57:22 | 17:12 18:11 | 87:4,10 90:8 |
| 89:1,5,9,15 | **disproportion...** | 47:20 51:5 | 92:8 94:16,17 |
| 90:1,10,15,19 | 54:25 | 55:8 57:11 | 96:9,11,13 |
| 91:4,22 93:10 | **dispute**  16:14 | 59:25 65:11 | 98:18,19 |
| 93:17,20 94:1 | 25:1 28:13 | 66:4 67:6,10 | 101:10,11 |

[documents - exfiltrated]

Page 12

| | e | employees | 5:10 |
|---|---|---|---|
| 102:20 103:4 | | 21:25 81:20 | **essentially** 17:3 |
| 106:8 107:1,5 | **e** 2:1,1 21:4,9 | 89:4 101:24,25 | 39:22 103:17 |
| 107:10,15,18 | 21:25 30:2,2 | 102:22,24 | **establish** 55:22 |
| 108:13 | 30:15 55:5,8 | 103:1 104:2 | **estimations** |
| **dodge** 11:1 | 64:4 79:19,21 | **employer** 26:11 | 60:6 |
| 15:2 | 102:23,24 | **encapsulated** | **et** 8:17 22:16 |
| **doing** 10:4 | 103:2 107:13 | 93:16 | 36:3,3 60:20 |
| 19:11,12,24 | 110:3,3,3 | **encompass** 9:2 | 62:23 110:1 |
| 39:16 41:1,4 | **earlier** 10:22 | 37:3,16 | 111:1 |
| 46:9,24 50:24 | 19:2 91:12,13 | **encompassed** | **evaluating** 9:18 |
| 53:17 69:14 | **early** 20:4 | 61:2 | **evidence** 9:6,9 |
| 70:8 85:10 | **ease** 21:22 | **encompasses** | **exact** 50:8 |
| 100:24 | **easily** 19:9 | 37:13 52:8,11 | **exactly** 51:14 |
| **dollar** 48:17 | **east** 42:24 | **engage** 42:7 | 68:18 |
| **donald** 2:7 6:16 | **easy** 92:24 | 100:20 | **examined** |
| 12:4 24:8 33:6 | **ecf** 23:24 28:7 | **enormous** | 76:22 |
| 35:20 66:3 | **educating** | 33:22 | **examining** 77:4 |
| **door** 14:9 31:5 | 40:21 | **ensure** 15:5 | 85:10 |
| 31:8 | **edwards** 2:8 | 22:13,22 | **example** 21:2 |
| **doors** 29:7 | 6:18,18 | **enters** 29:12 | 49:10 70:11 |
| 42:25 | **effective** 87:6 | **entire** 24:21 | 76:23 79:12 |
| **double** 6:11 | **effort** 57:18 | 35:6,17 43:20 | 85:11 95:20 |
| **doubt** 41:5 | **either** 31:14 | **entirely** 29:18 | **examples** 92:8 |
| 43:18 48:8 | 41:16 84:4 | 31:8 | **excel** 21:4 |
| 52:19 75:5 | 107:15 | **entitled** 29:4 | **excellent** 10:2,6 |
| **download** 41:2 | **electric** 40:19 | 46:24 83:13,14 | **except** 43:1 |
| **drawing** 31:2 | **electronic** 15:3 | **envelope** 57:24 | **exception** |
| **drop** 54:18 | 30:6 | 59:5 60:3 | 81:13 |
| **due** 14:22 | **electronically** | **equal** 88:16,19 | **exclusion** 52:9 |
| 85:10 | 22:14 30:7 | **eric** 5:10 | **exercise** 15:10 |
| **duties** 17:21,22 | **element** 42:7 | **erin** 2:8 6:18 | 63:6 104:12 |
| **duty** 15:2 29:3 | 60:8 | **esq** 2:7,8,15,22 | **exfiltrated** 23:3 |
| 47:1 70:25 | **elements** 17:5 | 3:2,9,10,17,24 | 99:21 |
| 73:8,12 91:7 | **employee** 26:1 | 4:6,13,20 5:2,9 | |
| | 26:9 109:14,16 | | |

| exhaustive | f | 41:6,10 42:3 | 102:3,13 103:9 |
|---|---|---|---|
| 101:13 | | 43:2,6 44:16 | 104:6,14 |
| **exist** 78:23 81:3 | **facially** 18:13 | 44:20 45:8,15 | 105:16,19,23 |
| **exists** 108:1 | **facilities** 87:15 | 45:25 46:12 | 106:4,11,14 |
| **expected** 9:14 | **fact** 13:2 15:1 | 47:10,18 48:19 | 107:2,12,19,21 |
| **expense** 9:24 | 23:19 31:3 | 49:7,24 50:11 | 108:11 |
| 70:15,16 | 32:14 51:9 | 51:22 52:6 | **familiar** 10:1 |
| **expenses** 69:22 | 96:24 104:23 | 53:9 54:9 57:3 | **familiarity** |
| 70:1 71:2 | **factor** 9:19 | 57:8,15 58:6 | 38:19 |
| **expert** 41:12 | **factors** 9:18 | 59:19 60:1 | **far** 13:17 27:21 |
| 49:11 51:15 | **facts** 96:19 | 61:4,20,25 | 69:11 73:20 |
| 56:14,21 60:15 | 98:10 99:11 | 62:3,17 64:10 | 89:10 |
| 77:23,25 | **factual** 99:25 | 64:17,22 65:1 | **farm** 5:3 |
| **experts** 39:15 | **fail** 22:6 | 66:5,13 68:8 | **feel** 13:7 89:11 |
| 39:19,21 40:11 | **failed** 18:5 22:7 | 69:5,10,24 | **fields** 3:1 93:3 |
| 42:5 70:6,12 | **failing** 15:10,13 | 71:4,20 73:15 | **fight** 91:3 |
| **explain** 84:5 | 22:10 | 74:23 75:7,11 | **figure** 66:17 |
| 92:11 | **failure** 26:8 | 75:19 76:1,9 | **file** 15:4 17:3 |
| **extant** 31:22 | 60:10 71:1 | 76:17 78:7,17 | 17:18 21:8,21 |
| **extension** | **failures** 75:18 | 79:4,14 80:2 | 93:13 |
| 103:17 | **fair** 37:18 | 82:5,20,23 | **filed** 20:5 |
| **extent** 28:17 | **fake** 39:22,23 | 83:18 84:9,17 | **files** 15:24 21:4 |
| 31:4 37:12,14 | 41:17 | 85:2,21,25 | 21:9,11,17 |
| 38:4 64:2 66:1 | **falanga** 5:8 | 86:5,8,18 87:5 | 48:5,7 100:7 |
| 82:4 102:6 | **falk** 2:3 6:1,2 | 87:21 88:10 | **final** 12:3 79:15 |
| 103:21 | 7:16 8:6,9 | 89:1,5,9,15 | 85:15 86:11 |
| **external** 103:25 | 10:15,19 12:13 | 90:1,10,15,19 | **financial** 15:23 |
| **extreme** 13:8 | 12:16 18:15 | 91:4,22 93:10 | 64:14 |
| 70:11 | 24:9,13,22,25 | 93:17,20 94:1 | **financially** |
| **extremely** 9:1 | 25:4,15 27:4 | 94:24 95:19,24 | 109:17 |
| 21:18 | 29:25 30:8,11 | 96:8,18 97:3 | **find** 32:22 40:2 |
| **eyes** 6:12 53:15 | 30:17 31:18 | 97:18,23 98:13 | 49:19 50:8 |
| 74:18 | 34:10,16,22 | 98:16,21,25 | 56:11 81:22 |
| | 35:2,12,15,24 | 99:12,23 101:2 | 96:23 |
| | 36:18,25 37:19 | 101:19,23 | |
| | 38:12 40:17 | | |

| | | | |
|---|---|---|---|
| **finder** 104:22 | **folders** 21:17 | **fourth** 56:11 | **georgia** 2:11 |
| **finding** 69:15 | **folks** 31:19 | **frame** 24:8,16 | **germane** 9:5 |
| 87:3 88:17 | 63:1 | 24:19 35:6,7 | 50:13 51:20 |
| **findings** 85:17 | **follow** 26:8 | **framework** | 60:17 103:12 |
| 85:20 | **following** 20:7 | 11:19 12:11 | **getting** 6:12 |
| **finds** 87:23 | **foregoing** | **framing** 13:1 | 13:24 20:7 |
| **fine** 32:21 | 109:6 111:5 | **free** 70:19,19 | 31:11 44:8 |
| 38:16 89:10 | **foreseeability** | **friction** 25:17 | 50:22,22 |
| **finer** 99:21 | 39:11 | 25:23 | **gigantic** 49:12 |
| 101:1,3 | **foreseeable** | **friend** 12:4 | **gist** 42:18 |
| **finger** 74:21 | 14:21 | **front** 14:9 | **give** 8:1,4,16 |
| **finish** 54:2 | **foreseeably** | **full** 17:13 98:10 | 14:2,5 29:8 |
| **finished** 34:18 | 15:21 | **fully** 33:4 80:10 | 39:4 51:23 |
| **firewall** 71:18 | **forgetting** 27:9 | **fulsome** 83:8 | 57:16 73:11 |
| 103:15 | **forklift** 26:10 | **function** 99:15 | 85:1 96:16 |
| **first** 10:9 17:11 | 26:12 27:17 | **fundamental** | 97:20 101:14 |
| 18:25 25:5 | **form** 80:14 | 27:7 | **given** 27:15 |
| 32:14 41:22 | 81:25 84:19 | **funny** 9:10 | 32:18,22 37:1 |
| 72:5 75:9,22 | **formal** 79:5 | **further** 6:8,10 | 42:13 55:5 |
| 79:12,13 87:22 | **format** 23:2 | 17:7 19:25 | 78:2 85:5 |
| 94:13 | 91:23,25 92:22 | 21:14 37:15 | 100:8 101:14 |
| **fits** 102:15 | **former** 12:25 | 49:9 62:4 69:7 | 106:2 111:9 |
| **five** 23:23 | 39:3 81:19 | 83:20 85:6 | **gives** 92:16 |
| 24:19 36:21 | **forth** 8:19 | 101:20 109:13 | **go** 6:15 12:6 |
| **flagged** 87:14 | 63:11 105:12 | **future** 6:10,10 | 13:10 19:25 |
| **flattering** 41:8 | 109:9 | | 23:17 24:19 |
| **floating** 70:20 | **forums** 40:5 | **g** | 28:25 33:3 |
| **floor** 5:12 | **forward** 6:5 | | 39:6,13,15,21 |
| **florham** 3:4 | **forwarded** | **garage** 29:6,7,9 | 39:24 40:4,5 |
| **flush** 75:16 | 21:10 | **gateway** 5:11 | 43:12,13 44:17 |
| **flying** 52:24 | **found** 11:13 | **general** 27:19 | 48:10 49:8 |
| **focused** 18:21 | 51:25 86:22 | 38:6 47:15 | 51:6,9 53:10 |
| 26:7 96:14 | 87:2,14 | **generally** 41:15 | 60:9,19 65:25 |
| **focusing** 19:4 | **four** 10:9 11:4 | 50:9 54:20,20 | 66:13 72:16 |
| | 74:6 | 84:2 | 74:9,18 77:11 |
| | | **generates** | |
| | | 29:17 | |

78:5 99:10
103:12 104:8
**goes**   14:1 15:5
21:14 35:3
36:22 39:11
46:25 47:5,8
48:11 50:15
51:11,13 60:12
73:13 74:15
78:4 104:4
**going**   6:11 7:22
8:1,15 19:14
19:15 20:21
23:22 29:8
31:21 38:14,17
40:14 44:17
51:14,15 55:14
58:13 59:4,22
61:12 64:3
67:25 68:10
70:3 72:12
73:16,24 83:3
84:4 90:22
91:5 94:16,25
96:1 100:16
105:10,12
106:24,25
**good**   6:1,20 7:2
12:4,13 35:13
78:5 80:3
93:11 99:10
105:20 107:19
**google**   40:4
**gotcha**   67:23

**govern**   23:25
33:9
**government**
11:10
**governs**   23:24
**grant**   19:16
**great**   28:22
34:10
**gross**   63:20,22
64:6
**ground**   35:19
**grove**   3:12
**guardrails**
23:10
**guess**   18:17
35:25 38:21
42:3 62:18
68:11 78:13
90:8 92:9
94:20 102:18
**guidance**   12:11
106:2
**guidelines**
29:24
**guides**   11:19
**guy**   14:24
**guys**   90:23

**h**

**h**   110:3
**half**   85:3
**hammer**   6:4
10:18 11:12,25
12:5 20:1
31:11 72:7

**hammer's**   8:24
10:22 11:2
12:3 18:19,23
31:23,24 71:7
72:21 104:25
**hand**   71:25
74:3
**handed**   65:6
66:15
**handle**   6:7
26:15 32:9
**handled**   19:21
26:1 31:7
**handling**   31:12
**hands**   14:19
**handy**   83:19
**hanson**   4:12
**happen**   46:7
49:6 99:4
**happened**
24:17 31:6
52:16 72:12
**happening**
45:20
**happens**   31:9
41:19
**happy**   13:10
27:5 39:5
69:15 74:10
76:12 80:12
99:7 101:3
**hard**   101:5
**harm**   53:17
**harms**   27:18

**hausmann**
95:14
**head**   84:23
**headers**   92:23
**health**   14:6,20
22:14 30:7
37:5
**hear**   27:5 28:2
34:11 38:24
51:22 52:12
57:20 59:20
74:10 75:19
88:10 91:4
94:4 99:8
104:21
**heard**   8:16
10:12 27:10
32:22 45:1
**hearing**   1:12
25:2 105:14
108:16 110:2
110:24 111:2,4
111:12
**heart**   50:16
**heartland**   14:2
15:16,25
**heather**   2:15
6:20 37:2
**heimann**   4:5
**heinz**   79:19,21
88:1
**held**   72:11
**help**   39:19
42:22 58:10
60:14 62:7

90:1
**helpful**  6:9
  64:11 67:11
  71:21 72:20
  73:24 78:13
  79:11 95:25
  97:15 106:3
**hensley**  3:2
  6:24,24
**hereinbefore**
  109:9
**hereto**  111:7
**hesitate**  7:25
**hey**  40:7
**hide**  16:23
**high**  41:15
**highly**  22:3
**hipaa**  22:9
  102:5,12,14
**hipaa's**  29:23
**hired**  100:14
**history**  13:20
**hitting**  16:8,8
**hogan**  3:23
**holding**  67:19
**holdings**  7:7
**holistically**
  29:11
**home**  29:5,10
**honest**  61:5
**honor**  12:22
  13:15 14:13
  25:24 31:1
  35:23 38:7
  41:9 57:7

60:18 64:1,3
65:4 70:14
79:2,11 80:4
80:11,13 82:9
83:1 84:16
86:10 87:20
88:23 89:13,14
92:13 94:22
96:12 102:19
108:10
**honor's**  12:11
61:22
**honorable**  2:3
**hope**  42:21
**hopefully**  35:22
**horse**  64:13
**hourly**  59:15
**hours**  53:23
  57:24 77:25
**house**  95:22,25
**houser**  2:7 6:16
  6:16 12:4,19
  16:2 24:24
  25:13,16 28:21
  30:10,13,18
  33:13,19 34:1
  36:22 38:7
  52:23 55:16,21
  55:25 56:25
  63:2 64:12,20
  64:24 65:13,20
  65:24 67:8,15
  67:19,22 68:2
  68:6 69:23
  70:14 71:16

72:23 75:25
76:5 77:13
90:21 91:11,17
91:20 99:25
100:18,22
101:7,18
102:19 104:10
106:10 107:17
107:20,23
108:3,14
**hudson**  4:7
**hundreds**  21:5
54:19
**hyperbolic**
  104:10

**i**

**i.e.**  15:14
**icd**  22:3
**idea**  17:1 55:4
  56:16 62:5
  81:15 97:20
  105:20
**identification**
  39:22,24 78:12
**identifications**
  39:25
**identified**
  30:25 34:3
  36:23 38:4,9
  43:13 85:10
  94:5,10 102:20
**identifies**  77:22
  79:18 85:19
  86:11,14 89:22

**identify**  30:23
  36:1 37:16,20
  62:20 76:21,24
  79:8,21,22,25
  85:9,12,17,18
  86:12,21
  101:16
**identifying**
  38:8 95:10
  96:3 98:8
**identities**  42:6
**illinois**  2:17
**imagine**  20:23
  42:22 102:10
**immediately**
  95:8,15
**immensely**
  53:18
**impact**  52:21
**impacted**  45:14
  46:4 97:12
  98:9 100:4
**impacts**  49:9
**implement**  30:3
  30:5
**implementati...**
  36:2
**implemented**
  88:8
**implicated**
  97:22
**importance**
  9:19,22
**important**  11:2
  11:14 12:20

17:19 53:3
84:20 97:6
104:22
**impose** 57:14
**impressed**
61:15
**inadequate**
14:23,24 15:1
**incident** 19:23
29:14
**incidents** 10:23
11:12 20:3
**included** 15:22
15:23 21:5
59:6 67:10
91:6 95:10
**includes** 30:20
37:25 38:5
**including** 18:11
22:1 37:23
62:22 70:1
73:14 91:24
**incredibly** 60:9
**index** 40:12
**indicate** 49:22
**indicated** 44:3
58:22 65:5,5
**individual**
71:23 79:20
92:3
**individuals**
30:24,25 36:1
36:23 37:15
49:2 77:22
79:23 82:15

94:6 95:17
**industry** 15:13
22:21 70:10,12
**infiltrate** 40:10
**inflated** 59:14
**inform** 22:8
**information**
9:22 12:10
13:5,7 14:6,7
14:20 15:5,6,9
15:13,14,20,24
17:1,7,13
19:21 20:25
22:1,4,8,12,14
22:20,22 23:1
23:5,14 27:14
28:2 29:1,20
30:6,7 31:1,4
32:9 37:5 38:4
39:6,13,14
41:25 42:4
44:9,10,13,14
45:3,4,12 46:8
46:17 47:1,3
48:9,13,18,23
49:5,14,16
50:17,19,19,25
51:2,10,11,12
51:13,18,19
52:4,12,17
53:1,5 54:11
54:13,13,14,15
55:4,18 56:6,9
58:14,25,25
59:3,4 60:4,5,7

60:11,16,20
64:14 69:22
70:1 73:13
75:15 76:23,25
77:5 79:24,25
80:5,18,18,20
80:24 81:2,5,7
82:3,10,14,18
83:2 84:3
85:11 86:24
87:3 91:24
92:4,6,16,17,18
92:21 93:9,21
100:2,4,8
101:12 103:12
103:19
**ingested** 15:20
**inherent** 56:9
**initial** 71:8
91:6
**injured** 26:9
27:17 60:14
97:16
**injury** 18:5
26:8
**input** 59:13
**inquiries** 42:4
**inquiry** 75:6
**insecure** 15:15
**insecurely**
15:21
**insecurity** 18:7
**inside** 95:8,13
**insight** 44:13

**instance** 31:10
76:21 102:23
**instances** 21:24
**insufficient**
89:11
**integrity** 22:13
**intend** 8:13
86:1
**intensely** 95:12
**intention** 7:19
**intentional**
73:19
**interested**
69:19 109:17
**interesting**
64:18 96:19
97:4
**internal** 17:23
25:5,25 26:2
26:16,21,22
27:1 31:14
33:8,16,19,23
46:15 47:24
60:24 70:15,16
70:21 73:23
77:18
**internally**
18:12 21:19
33:16 71:2
102:25
**internet** 40:3
40:23
**interrogatories**
25:8 35:25
36:9,16 79:1

81:1,20 83:12
88:15 90:4
**interrogatory**
16:21 19:10
30:23 36:1,17
36:21,24 37:20
76:20 78:9
80:1,11 81:17
82:17 83:21,25
84:21 86:16
88:12,13 90:5
91:10 93:7,14
96:14 99:2
**investigate**
95:16
**investigation**
11:10 52:20,21
95:9 100:9
107:25
**involve**  106:23
**involved**  24:23
61:16 77:22
82:15 95:9,15
96:4 99:18
100:17
**involves**  12:22
**involving**  54:17
**irrelevant**
77:16
**irrespective**
99:16,19
**issue**  6:7 9:4
10:6 11:22
13:11,24 16:14
18:13 20:2,18

20:20 25:4,14
28:6,12 34:17
35:5,17 38:17
38:19 44:9,14
45:4,11 50:14
51:5 57:19
59:7 62:14
68:9 74:6
76:10,18 77:15
78:3,6,8,16
84:10 90:23
99:15 102:9
103:10 107:8
107:22,24
**issues**  6:8 9:20
9:23 19:7
23:20 38:15
78:1 105:11
106:23 107:14
108:12
**issuing**  70:7
**item**  70:18,18
71:10,23 72:2
**items**  72:3

**j**

**james**  5:2
**jason**  4:6 7:8
39:15 43:12
57:1
**jersey**  1:2 3:4
3:12 4:22 5:4
5:13 109:6,24
**jim**  7:14
**jomanna**  109:4
109:21

**joseph**  36:12
**judge**  6:4,4
7:15 10:14,18
10:22 11:12,15
11:24 13:13
18:19,20,23
20:1,11 24:5
25:3 31:11,23
31:24 33:15
35:4 36:16
39:3,3,9 42:3
50:9 51:4 58:8
69:17 71:7
72:6,21 73:21
99:9 104:25
105:10 106:25
**judgment**
10:25
**jury**  69:19,20

**k**

**kansas**  4:15
7:10
**kattas**  95:14
**keena**  95:14
**keep**  48:13 64:3
69:11 96:1
**kept**  14:15
**key**  81:23
**kidding**  8:8
**kind**  13:7,9
19:21 23:20
32:4 42:25
59:10 64:1
66:17 67:23
71:12 72:17

88:17 95:6
100:23 101:4
103:10,13
104:7
**kinds**  73:18
**knew**  14:25
22:18 39:17,21
40:13 41:1,4
42:15 43:16
46:6,7 55:13
68:14 69:2
74:18,19,19
104:3
**know**  6:15 8:13
8:16,23 9:5
11:15,25 14:22
15:17 16:20,25
17:4 18:8 23:9
23:20,25 25:2
25:11 27:11,17
27:18,25 28:2
31:1,5,23 32:1
32:24 33:7
34:11 38:1
39:1,17,20
40:13,20 41:7
42:9 43:12,14
43:16,19 44:7
44:8,10 46:24
47:7,8,12
48:18 49:11,13
50:3,6 51:10
51:25 52:2
53:6 54:12,13
54:14 57:17

58:3,12,17
59:16 60:4
61:5,7,15,21
63:11,17 66:25
67:23 68:12
70:13,18 71:11
71:14,22,25
72:1,15 74:12
74:20 76:2,3
81:22 82:2
83:15 86:12
87:15 89:17
90:12,17 94:14
95:3,20,25
96:19 97:4,6,7
97:12 99:7
100:22 101:9
102:11,14
104:11,23
105:5,21
107:14
**knowing**  42:14
45:16 60:11
62:5 103:25
104:2
**knowledge**
46:25 47:6
51:12 55:17
58:21 60:4,7
75:1
**known**  75:18
**knows**  12:22
53:2,8

**l**

**lab**  21:3,3
**labcorp**  12:5
**labeled**  79:12
79:17
**laboratory**  7:7
**labs**  52:1
**lack**  38:19 40:5
**landorno**  36:12
**large**  43:15
**largest**  13:20
**launching**
100:23
**laura**  2:22 6:22
**law**  11:25
40:18 47:3
95:3,3 96:13
103:17
**laws**  95:12,18
**lawyers**  10:2
32:21 91:3
**lax**  21:7
**layers**  58:20
**lead**  9:3
**learned**  95:7
**leave**  29:7 86:9
103:3
**left**  82:16
101:14
**legal**  39:23
95:12 96:5
98:12
**legitimate**
19:18 90:20

**lengthy**  99:5
**letter**  28:13
34:4 45:7
78:20 106:19
107:17 108:9
**letters**  105:12
**level**  12:20 32:8
36:4 41:15
70:2
**lewis**  3:16 7:5
**liberal**  104:20
**license**  109:22
**lichtman**  4:6
7:8,8 39:18
40:24 41:8,13
42:20 43:4,9
56:3 58:22
**lieff**  4:5
**light**  78:19
80:12
**likely**  9:25 51:4
51:5,17
**limited**  11:7,10
11:11 37:8,23
48:6
**limiting**  102:5
**limits**  104:18
**line**  9:15 71:10
71:23 72:2,2
110:4,7,10,13
110:16,19
**link**  63:8
**linked**  18:3
**lisa's**  8:4

**list**  9:18 51:23
104:15
**listed**  21:8
**literal**  100:9
**literally**  57:1
67:19 77:14,20
77:24
**litigation**  1:9
54:17 96:7
99:17,19
**little**  6:6,12
18:23 19:25
24:16 39:1,2,5
49:9 65:4
71:24 93:8
100:7
**live**  21:11 51:2
**lived**  42:23
93:2
**llc**  3:8
**llp**  2:6,14,21
3:16 4:19 5:8
**lo**  56:22
**location**  18:6
**log**  94:13 106:8
106:20,23
108:12
**logged**  45:5,23
46:19 98:20,24
**logs**  94:15
106:10,16
**lone**  48:4
**long**  42:14 73:9
82:16

**longer** 42:12
78:22 81:24
82:13 83:17
89:4
**look** 6:4 17:20
27:22 29:2
32:23 34:5
38:15 39:19
40:1 47:20
53:3 57:12
61:9 64:5 65:7
79:11,16 99:6
101:9 105:4
**looked** 51:4
79:18
**looking** 33:7
39:6 43:22
46:20 47:4
56:7 57:24
64:2 91:15
104:15
**looks** 44:1 80:2
**lost** 80:16
**lot** 8:11 13:4
16:15 18:18
24:10 31:3
38:18 49:12
51:7 64:15
68:17 95:4
**lovells** 3:23
**lower** 42:24

**m**

**mack** 95:14
**made** 11:6,9,20
18:17 24:16

37:13 38:5
42:11,12 46:13
47:22 72:6
111:5
**madison** 44:21
44:23
**magistrate**
58:8
**magnitude**
13:20
**mail** 21:9,25
64:4 102:23,24
107:13
**mailed** 21:4
**mails** 30:15
55:5,8 79:19
79:21 103:2
**main** 78:14
**maintain** 14:16
22:6,10 30:6
**maintained**
22:15,19 23:14
81:25
**maintenance**
32:3
**major** 54:17
**make** 12:3,8,8
14:19 18:16
68:17 69:15
74:4 76:12
80:13
**makes** 7:20
**making** 20:11
23:12

**malicious**
85:13
**manage** 42:2
**managed** 6:13
**management**
34:7 55:8
**managing** 28:1
**mandiant**
100:25 101:1,1
**manhattan**
41:17
**manner** 10:7
10:10 13:25
14:13 15:5,8
15:15 22:18
94:5 97:6
**march** 20:6
**marginally**
105:6
**margins** 13:8
102:16
**mark** 2:3 6:2
**market** 56:8
**marketplace**
42:22
**marketplaces**
41:21 42:18
**marriott** 56:8,9
56:12
**master** 1:12 6:1
6:3 7:16,24 8:6
8:9 10:15,19
12:13,16 18:15
24:9,13,22,25
25:4,15 27:4

29:25 30:8,11
30:17 31:18
34:10,16,22
35:2,12,15,24
36:18,25 37:19
38:12 40:17
41:6,10 43:2,6
44:16,20 45:8
45:15,25 46:12
47:10,18 48:19
49:7,24 50:11
51:22 52:6
53:9 54:9 57:3
57:8,15 58:6
59:19 60:1
61:4,20,25
62:3,17 64:10
64:17,22 65:1
66:5,13 68:8
69:5,10,24
71:4,20 73:15
74:23 75:7,11
75:19 76:1,9
76:17 78:7,17
79:4,14 80:2
82:5,20,23
83:18 84:9,17
85:2,21,25
86:5,8,18 87:5
87:21 88:10
89:1,5,9,15
90:1,10,15,19
91:4,22 93:10
93:17,20 94:1
94:24 95:19,24

96:8,18 97:3
97:18,23 98:13
98:16,21,25
99:12,23 101:2
101:19,23
102:3,13 103:9
104:6,14
105:16,19,23
106:4,11,14
107:2,12,19,21
108:11 110:2
110:24 111:2,4
111:12
**material** 28:12
28:19 48:15
60:18
**materials** 28:15
34:21 35:9
48:8 78:19
80:19 93:16
**matter** 8:20 9:2
17:13 18:20
27:22 46:14
58:22
**matters** 9:3
**md** 1:3
**mdl** 54:17 99:5
**mean** 18:16
19:4 20:16
23:8,21 27:15
32:16 52:2
57:16 64:13
83:22 84:19
92:12,12 94:23
99:3 102:15

**meaning** 9:14
**means** 63:20
81:8 85:19
**medical** 1:6
12:10 14:3,4
15:5,7,20,23
23:1,5 42:4
62:16 110:1
111:1
**meet** 37:14
48:12 55:11
58:24 61:6
66:6 67:4 68:2
72:13 75:14
76:10 78:3
80:12 81:21
105:13,25,25
**members** 15:12
22:21 23:7
**memo** 79:16
85:16 86:11
87:23
**memos** 89:22
**mention** 11:21
**mentioned**
10:18 16:9
40:25 106:6
**message** 40:6
40:10
**met** 6:2
**method** 10:7,10
13:25 15:4
16:18 21:18,21
92:2

**methods** 16:24
20:24
**michael** 3:2
**mike** 6:24 8:24
**million** 53:25
54:18 98:1,2
**mind** 6:14
23:16
**minimally** 17:2
**minimus** 59:21
59:21
**minute** 108:6
**missing** 86:25
87:4
**missouri** 4:15
**misstatement**
57:2
**model** 56:21,23
68:21
**money** 66:12
68:23 71:2,18
**monitor** 42:17
**month** 64:5,5,6
64:12,12
**monthly** 63:19
**months** 42:11
57:11 93:12
**moot** 101:6,7
**morning** 6:2,20
7:2
**mortar** 29:1
**motion** 11:5,16
11:17 20:13
**motions** 11:8

**motivation**
68:15 74:11,15
**mouse** 70:17
72:15
**move** 20:16
41:18 88:11
**moved** 42:24
45:19
**moving** 16:16
**mulberry** 5:12
45:19
**multiple** 53:5

**n**

**n** 2:1
**name** 44:18,21
44:23 90:13
**named** 72:10
**names** 21:5
22:2,3 37:1
51:23 77:3,4
90:3,7,15,17
95:20 98:6
**narrative** 78:14
78:23 80:20,23
81:4,10,15
82:4 83:20
85:6 87:10
93:19 96:15
104:7
**narrow** 17:15
52:18 71:9
105:14
**native** 67:9
**necessarily**
59:2 97:11,21

**necessary**
12:17 17:2
78:24 111:6
**need** 9:7 13:3
18:10 24:1
26:5,19 28:22
28:23 31:5
39:1 40:12
41:11 46:6
53:6 61:18,23
66:1 74:8
83:11 94:2,14
104:17 106:15
106:25
**needed** 21:8
95:11,17
**needing** 48:20
**needs** 8:7,22
9:14 50:2
93:14,22
**negligence** 12:9
15:17,19 16:1
19:20 39:12
60:10 70:7,20
73:3,4,4,13
102:9 103:13
103:13 105:3
**negligent** 23:12
27:10,10 28:1
29:18 72:10
73:18 103:23
**negligently**
23:5
**negotiated**
30:19,21

**neither** 109:13
109:15
**network** 21:16
85:12
**never** 40:14
83:24 96:20,20
**nevertheless**
21:20
**new** 1:2 2:24,24
3:4,12,19,19
4:8,8,22 5:4,13
8:9,10 24:15
109:5,24
**newark** 5:13
**nichols** 4:14
**non** 55:12
**noncustodial**
55:3
**nondelegable**
14:17 29:3
73:8
**nonresponsive**
87:18
**norm** 56:4
**normal** 7:10
13:19
**norman** 4:13
**notary** 109:5
109:23 111:13
111:19
**note** 28:24
47:22
**noted** 111:7
**notes** 21:12
77:18

**notice** 97:10,15
97:20
**notification**
94:3
**notifications**
100:1
**notified** 95:11
95:18 96:3,25
97:1,8,9,24
**notify** 94:6,11
**notwithstandi...**
74:25
**november** 1:11
77:8
**nub** 13:25 73:7
**number** 7:25
13:15 25:1
33:21,22 57:16
62:23 80:15
92:3 93:25
98:7
**numbers** 8:2
21:7 51:16
56:24 57:1
59:20
**numerous** 81:3
**nw** 3:25

**o**

**o'reilly** 5:8
**o'toole** 3:8
**object** 28:15
65:14
**objected** 28:14
59:6

**objection** 48:6
48:7 50:12
51:8 57:4,4
61:11 65:19,23
67:14,18
**objections** 28:8
28:12,18 36:8
103:14
**obligation**
14:19
**obtain** 48:18
**obviously** 8:10
8:23 35:3,8
42:7 50:23
51:1 61:23
78:10 94:25
105:22 107:8
**occasionally**
46:16
**occurred** 29:14
45:21 102:6
**occurs** 49:4
**october** 77:7
**odrive** 21:18
**office** 40:23
**oh** 91:1 98:21
**okay** 18:15
24:14 27:4
30:17 35:12
37:13 38:12,15
45:25 60:1
66:21 69:21
78:17 85:21,25
86:5 89:14
105:16

olstein  5:1
once  59:8 74:14
  103:18,24
ongoing  7:23
  100:12
operate  26:12
operative  11:18
  12:2,7,9 29:22
  35:7
opinion  18:19
  18:23 19:1,12
  31:20,24 72:22
  99:5,6,7
opinions  20:17
  73:21
opposed  75:2
optum  12:24
  14:11 15:16
  17:23 21:16
  24:23 25:12
  33:11,17 36:23
  38:13 39:10,17
  43:15,21 48:22
  55:24 62:19,24
  64:19,20 65:5
  65:15 66:4,8
  66:20 67:6
  68:12,14,16
  69:13,25 71:17
  71:19,25 77:10
  92:5 94:8 95:7
  99:19 101:5
  102:4,18
  103:18

optum's  70:17
  77:13 78:6,12
optum360  6:17
  6:19 7:1,3
  21:24 26:1
  90:23 91:12
  94:10 108:4
optum360's
  90:24
oral  94:17
  98:17
order  11:1
  61:14 83:19
  85:5
outer  69:7
  102:15 104:18
outside  95:8,15
outweighs  9:25
overbroad  71:8
overlap  105:17
oversaw  29:2
  89:18
oversee  72:25
oversight  16:10
  16:13 25:17
  29:17 63:7
  70:23 73:6
  78:22 103:6
own  18:6 25:25
  26:21 29:5
  56:12 59:11,17
  72:8 73:23
owners  89:22

**p**

p  2:1,1
p.m.  108:17
pace  7:22
padilla  5:10
page  13:9
  79:16 110:4,7
  110:10,13,16
  110:19
paid  62:15,20
  63:4,13,14,17
  63:18 66:12,24
  68:22
paller  3:24 7:6
  7:6
panagopoulou
  3:17 7:4,4
paper  14:7,12
  15:3 59:2
papers  48:21
  59:6 75:21
  104:24
paragraph
  20:24 21:14,23
  22:5,17,24
  29:22 88:20
parameters
  10:17 23:9
park  3:3,4,11
  4:22
part  27:24
  38:11 41:22,23
  48:25 50:20
  54:16 58:15
  72:4 75:9

participated
  77:5
particular  19:6
  23:25 57:13
  77:1
parties  9:21,22
  23:4 26:17
  27:2 29:2,3
  35:8 91:7
  109:15
partners  21:3
party  8:21 16:2
  23:4 25:17,18
  25:19 26:3,4
  26:15 27:23
  31:10 32:15
  76:22 87:11
  100:2 102:7
password  21:8
passwords
  21:10
past  84:23
patent  39:2
patient  10:8,11
  15:6 21:5,25
  22:2 29:12,12
  33:9 38:20,25
  39:7,10 43:22
  44:1 45:12
  46:2,7,17 47:6
  48:1 50:19
  53:4 54:6 58:1
  91:23 92:4,5
  92:16,25 93:2
  93:3,5 103:19

[patient - pointing]                                                    Page 24

104:3
**patients** 22:7,8
22:19,25 37:24
44:9,14 45:4
45:13 46:4
48:23 52:22
62:23 94:11
95:10 97:17
103:24
**patrick** 5:9
**paul** 95:14
**pay** 56:1
**pays** 43:2
**pc** 5:1
**peachtree** 2:10
**pending** 8:21
11:8
**pennies** 51:17
**people** 14:4,5
20:10 32:3
41:7,17 52:7
54:18 78:1
81:18 83:1
89:3 90:9
97:10,11,14,20
97:21,24 98:6
98:9
**people's** 90:3
100:6
**percent** 24:6
75:22,23
**percentage**
63:15,16 66:24
74:7

**period** 23:23
24:21 36:11
42:14 53:3,6
54:5 62:21
64:24,25 79:9
**periods** 92:1,20
**person** 54:1
89:18 90:16,18
91:1
**personal** 15:12
22:8,12,20
27:13
**persons** 89:18
**perspective**
12:1,21 39:9
77:13 78:6
**persuaded**
57:21
**pertain** 30:16
**phi** 17:10 22:7
25:7 37:22,24
49:2 85:14
102:1
**phishing**
102:23 103:2
**phone** 8:5
**phones** 8:3
**physical** 43:1
**physician** 22:2
**pick** 7:22
**piece** 13:1
16:17 48:3
55:13
**pieces** 14:20
16:15 51:18

**pii** 17:9 25:7
37:22,24 49:2
102:2
**pizzi** 5:8
**place** 35:7
40:15 43:25
62:9 109:9
**placed** 56:17
**placement**
75:22,23 92:8
**placements**
63:20 64:7,8
66:7,16
**placing** 66:9
**plaintiff** 17:4
23:6 26:10
39:3 52:13,16
54:21 78:5
94:4
**plaintiff's**
19:16 29:1,7
45:1 74:11
90:2 101:9
**plaintiffs** 6:7
7:9,11,13,15
13:3,16 15:12
18:1 19:19
20:5 22:20
25:25 27:8
32:23 37:22
38:21 39:9
49:18 52:9,10
52:11 54:23
56:5,16 58:11
59:12,13 60:13

63:8 65:2
68:11 69:6
78:8 80:1
85:19 89:24
92:9,16 96:15
97:5 98:5
100:5,7 102:8
104:9 105:2
**planning**
106:18
**playing** 13:7
**pleaded** 27:9
27:23 31:22
32:11 105:5
**pleading** 11:14
12:2,8 29:22
72:6 105:2
**pleadings**
73:16,17
**please** 108:13
**pled** 28:23
**point** 12:3
17:20,21 20:4
20:19 25:17,24
26:6 32:17,19
52:18 54:6
58:9 59:22
63:7,11 71:23
87:24 96:6
99:21 101:1,3
**pointed** 35:21
79:6,10 85:16
99:10
**pointing** 69:13

**police** 41:18
**policies** 17:23
17:24 25:6,20
25:21,22,25
26:2,6,11,14,16
26:22,23,24,24
27:1,13,16
28:16,25 29:4
29:8,19 30:3,5
30:24 31:13,25
31:25 32:8,11
33:8,20,22,23
34:4,24,25
35:4,5 36:3,14
37:4,7,21,25
38:5,8,9 102:6
103:20,21
104:1
**policy** 25:13
26:9 32:1 34:7
103:3 104:11
**pop** 91:5
**pops** 90:25
**portions** 77:10
**pose** 39:24
**posed** 21:19
**position** 38:15
78:2 88:24
**possess** 14:4
44:13
**possible** 41:3
**possibly** 80:22
83:2
**post** 40:7 64:25

**potential** 68:21
68:25
**potentially**
37:9 45:13
46:4 68:24
98:9 100:4
**practical** 11:22
**practice** 58:8
**practices** 15:11
**practicing**
40:18
**pre** 13:19 53:4
54:5 64:24
**preclusive**
11:24
**preferred**
78:15
**prejudice** 19:1
**prepare** 83:25
**prepared** 13:14
82:17 83:7
**present** 62:22
70:3
**presented** 10:5
56:5 88:11
**preserve** 15:7
**pretty** 21:13
80:3 93:11
106:9
**primarily**
36:12 102:18
**primary** 57:4
63:15,22,22,23
64:8 92:7

**print** 64:4
**printed** 47:21
**prior** 31:11
**privacy** 22:6
26:23 47:2
**private** 27:14
28:2
**privilege** 53:23
58:2 61:16,17
94:8,12,15
95:2 99:18
106:9,23
107:14 108:2
108:12
**privileged** 8:23
96:4,17,20,20
96:22 97:2
98:14 99:4,11
106:5,7
**privileges** 94:9
**probably** 41:2
50:14 69:6
105:1 106:8
**problem** 87:16
88:14,14 93:18
**problems** 86:22
86:23 87:2,3
87:14,23
**procedures**
17:23,25 25:6
28:16,25 29:4
29:9,19 30:3,5
30:25 33:16
34:24,25 35:5
35:5 36:3

**37:21,25 104:1**
**proceed** 10:3
20:12,13
**process** 21:22
79:21 94:10
95:16 96:2
97:1 98:12
**produce** 16:11
25:12,20,21
28:11 34:25
44:2 48:15
50:19 51:24
54:21 56:24
59:17 61:7
62:18,19,24,25
63:9 64:18
65:6 70:4
73:10 84:8
86:21 102:4
**produced**
12:23 13:3,14
13:16,17,18,23
17:2,3 25:19
25:23 26:14,15
26:20,21,24
27:12,12 28:4
28:4,13,19,20
28:24 30:15,23
31:3 32:12,13
32:16 33:4,8
33:15,18,20
34:2,4,6,9,21
34:24 35:10,19
35:21 37:7
45:5,23 46:19

52:13 54:20
55:1 63:19,24
64:21 65:7,17
65:20,21 78:18
78:25 79:8
80:8,9 81:6,23
86:4 92:15,21
92:23 101:12
**producing**
28:15 55:2
57:5
**product** 94:8
96:5,9,10,22
99:24
**production** 6:8
10:9 19:15
23:18 25:9
48:6,8 51:9
53:11 67:1
78:11,12 93:15
93:25
**productions**
25:8
**profits** 69:3
**programs** 41:2
43:11
**proper** 71:13
**properly** 72:25
**proportionable**
46:11
**proportional**
8:22 9:13 54:8
**proportionality**
9:9,10,18 57:6
59:7 61:11

**proportionate**
73:25
**proposal** 11:6,9
**proposed** 9:24
**propound**
54:10
**protect** 15:7,12
22:12 29:11
30:4 47:1,3
70:9
**protected**
14:21 22:14
29:16,20 30:7
86:24
**protecting** 37:5
39:13 68:15
**protection**
29:19 37:22,24
**protects** 15:8
**protocol** 30:19
48:3
**protocols** 15:11
21:7 22:22
25:10 27:20
30:14
**prove** 46:6 54:5
55:16 58:4
59:20,22 73:13
**provide** 52:15
80:18,25 81:15
82:19 83:19
84:3,19 85:6
89:10 102:16
102:18 105:7
106:16,18

**provided** 77:5
77:14 79:5
80:13 81:10
82:10 83:24
84:1,12,13
92:4 95:21
97:10 100:3,3
102:4 106:10
106:20,20
**providing**
79:24
**proving** 14:2
14:11 51:20
**public** 38:6
42:11,12 109:5
109:23 111:19
**publicly** 96:6
**pull** 21:13
**punitive** 73:19
**purchase** 70:17
**purchased**
72:15
**purses** 41:17
**pursuant** 38:5
62:24
**put** 7:20 8:17
10:1,3 11:2
12:1 14:8 29:6
32:3,4,20
44:22 55:24
74:21 79:9
82:21 83:5
85:3,22 88:20
90:13 99:21
100:22 101:1,2

**putting** 9:6
90:3 105:3

**q**

**quantities**
62:23
**query** 93:4
**quest** 6:21,23
6:25 10:8,10
12:6,7,24
13:18 14:11
15:16 17:2,23
20:25 21:1,4
21:15,16,20,24
29:13 33:10,17
34:6 38:3,20
38:25 39:7,10
39:17 43:15,20
44:4,9 45:4,11
45:13 46:2,6
46:17 48:21
49:3,12 54:6
54:25 55:6,24
58:14 60:24
62:18,24 63:23
64:18 65:4
66:8,18,19
67:1 68:12,14
68:16 69:13,25
70:16 71:17,18
71:25 74:19
77:6 78:16,18
80:5 82:10,18
86:13 88:23
91:16,19,23
92:4,15,25

94:7,11,20
95:7,13 96:6
98:2 99:18
101:5 102:4,18
103:18 104:2
**quest's** 20:3
48:23 50:1
**question** 23:16
27:12 43:5
49:1,3,25 50:1
53:12 66:3
81:12 82:8
85:22 90:20
91:14 96:19
97:4 101:24
104:17,19
106:24
**questions** 8:11
38:18 42:9
49:10 65:8
74:9 83:11
89:24 91:21
93:7 95:4
**quick** 17:19
66:3
**quickly** 52:23
**quote** 14:13
50:8
**quoted** 8:17
12:5
**quotes** 12:4
20:24
**quoting** 21:12

**r**

**r** 2:1 110:3,3
**raining** 32:3
**raise** 101:20
**ran** 46:20
**random** 58:10
61:23
**randomly** 61:8
**range** 77:16
**rate** 67:3
**rates** 59:15
66:16
**rather** 19:8
43:1
**reaches** 69:7
**read** 6:9,13
18:19 23:8
31:23,23 33:21
73:20 84:21
88:18 111:5
**reading** 8:11
**ready** 99:2
**real** 28:6 31:21
78:16
**realistic** 55:5
**reality** 51:3
**realization**
66:16 67:3,7
**really** 8:3 10:25
18:25 20:17
31:15 38:24
44:5,24 45:10
45:16 47:19
50:15 54:18
55:2 71:14

72:5 74:13
92:22,24 94:12
95:5 104:5
106:3,24
**reason** 46:5
69:11 74:2,17
96:15 110:6,9
110:12,15,18
110:21
**reasonable**
36:5 63:7
104:12
**reasonably** 9:2
**received** 22:15
62:12 81:7
92:25 93:1
**recent** 9:12
78:3
**recess** 34:13
76:14
**recommendat...**
86:12,15 88:4
**reconfirm**
46:10
**record** 8:18 9:6
10:3 15:3
33:25 34:14
36:7 62:10
64:2 66:23
67:13 76:15
84:5 108:4,6
**records** 11:11
14:3,4,12,15
15:8,23 47:24
73:11 84:7

88:16 92:3
**recouped** 68:23
**recouping** 75:4
**recovered** 64:9
**recovery** 63:16
64:8
**redacted** 23:2
**reduce** 22:11
**refer** 84:4,4
85:23
**referenced**
17:22
**referral** 88:16
**referred** 21:11
84:6 86:6,13
**refers** 77:8
**reflect** 13:15
47:24 93:15
**refuse** 44:2
**refute** 60:14
**regarding**
10:22 15:6
32:8
**regular** 46:14
**regulatory**
29:24
**rehash** 38:8
**relate** 17:18
26:17 27:2
68:9 72:24
**related** 17:14
25:6,10 26:20
32:10 34:24
37:22 44:2,4
44:11 46:3,19

[related - response]                                    Page 28

50:19 51:21
52:4,12 73:5
78:21 80:19
107:25
**relates**  17:9,12
31:16 38:23
102:21 104:11
**relating**  17:22
18:25 19:4
91:11
**relationship**
89:19
**relative**  63:25
109:14,16
**relatively**  8:10
**released**  23:5
**relevance**
11:23 12:12
18:21 38:2
69:16 74:14
97:5 102:16
104:20
**relevancy**
11:20 63:4
68:11 104:18
**relevant**  8:20
8:25 9:1,7,21
9:21 12:8 13:4
13:24 14:11
16:9,10,11
18:13 23:23
26:2,6,12,23
27:3,14,21
31:12,14 32:1
33:3,21 36:11

48:10,25 50:13
56:19 57:19
59:4 63:8,9
65:21 67:16
70:23 71:12
72:14,19,21
75:5 99:24
102:8 103:5,12
103:22 105:5,6
105:6
**reliance**  71:6
94:21,23
**reliant**  100:2
**relied**  94:20
99:6
**rely**  76:3
**relying**  95:1
**remaining**  77:9
105:11
**remediation**
42:13 76:19
77:19 86:13
**rep**  83:10
**report**  32:25
100:12
**reporter**  109:5
**reporting**
100:10
**reports**  70:7
**repositories**
48:9,13
**repository**
82:12
**represent**  89:7

**representation**
59:18
**representative**
76:6 97:11,21
**representatives**
83:4
**represented**
81:18
**request**  11:13
17:11 19:8,9
19:15,16 20:2
25:8 27:19
35:3,22 37:13
37:17 38:5
44:8 52:14
53:11 54:10,15
57:13 61:1
65:12 80:7,10
80:11 103:13
**requesting**
70:19 80:1
**requests**  10:9
10:11 11:23,24
12:6,7,12 13:9
17:9 23:18
24:14 25:7
42:19 65:11
**required**  47:12
111:13
**requirements**
25:22 26:4
29:23 102:11
105:24
**resisted**  21:21

**resolve**  7:22
88:5
**resolving**  9:23
**resources**  9:22
42:17
**respect**  13:8
16:14 18:7
19:12 23:20
25:22 26:3,4
30:18 31:9
33:9,15,16,23
73:3 90:23
91:19 93:8
102:1
**respectfully**
37:2
**respond**  12:17
30:10 36:7
52:23 79:3
81:4,13 87:19
87:24
**responded**  33:5
36:11 56:10
77:6 92:5
**responding**
43:21
**response**  34:4
36:24 37:3,4
43:24 78:10,15
78:23 79:1,13
80:20,23 81:4
81:10,11 82:4
83:14,16,21
85:24 86:7
87:10 89:11

91:10 93:14,16
93:19 94:10
96:14,15 102:5
102:5 103:8
106:19
**responses**
16:21 17:15
28:8,18 38:9
82:17 83:12,25
90:24 93:7
100:23 101:17
**responsibilities**
89:25 90:14
**responsibility**
90:18
**responsible**
30:24 32:7
36:2,13 49:19
72:11,24 79:24
90:9,13 91:2
103:20
**responsive** 35:9
52:13 53:14
65:11,18 67:20
78:15 80:7,9
80:10
**rest** 38:11
**resting** 51:8
83:16 97:19
**result** 50:21
**ret** 2:3
**retention** 29:15
**revenue** 62:12
68:7

**revenues** 68:23
68:25 69:1,3
**review** 46:9
53:17,20 57:11
61:10,18 77:2
77:3 79:9,20
82:15 107:1,6
108:13
**reviewed** 30:22
76:22 86:1
**reviewer** 79:22
**reviewing**
61:16 77:3
88:3
**revising** 36:13
**rfp** 17:11 62:17
**ridgefield** 4:22
**ridiculous**
56:22
**right** 7:18 8:1
12:22 14:8
23:15 24:7,12
33:2 35:2
36:18 43:11
44:18 46:7
57:16 64:7
66:8 68:19
70:19 72:3
79:14 82:22
83:9 93:20
99:2 100:6,11
102:20 105:1
105:25
**ripe** 68:5

**risk** 21:20
22:11 39:12
46:7 53:7,8
76:18 77:17,18
77:19,20,21,22
79:15 85:15
86:11 87:23
88:1 89:21
**risks** 76:24
**river** 100:24
**road** 3:11 4:14
4:21 5:3 104:9
**rog** 78:16 79:13
85:8 86:9
**role** 31:1
**roll** 41:18
**room** 6:15 41:5
**roseland** 5:4
**rough** 71:24
**roughly** 97:25
**rubber** 87:1,13
**rule** 8:19 9:17
10:1 62:24
77:8 81:10
88:14 92:5
99:2
**ruled** 11:13
35:4 77:10
**rules** 8:25 9:11
10:17 47:2
**ruling** 11:2,22
20:4 24:2
35:11 61:23
76:12

**rulings** 105:18
**run** 18:18
99:15
**running** 48:6
**russia** 41:21

**s**

**s** 2:1 110:3
**safeguard**
29:24 60:10
**safeguarding**
18:2
**salamea** 5:9
**sale** 38:20,25
39:7 45:12
46:3,8,18
51:10 52:4
**sales** 74:7
**sample** 40:8
47:19 61:8
**sampling** 58:10
61:23
**satisfied** 58:11
**saw** 23:21
48:21 107:7
**saying** 19:19,22
27:24 31:4
33:7,17 53:4
55:16,17 56:25
57:2 63:8
65:10,13 69:12
71:22 73:17
84:11 94:17
99:6
**says** 17:11
38:13 56:21

62:18 64:5
88:14 91:1
94:7,8
**scope**  8:19
  11:14 28:16
  55:6 77:1 79:8
  98:9
**scrivo**  3:8,9 7:1
  7:1
**se**  12:9 27:10
  73:4 103:13
**search**  30:19,22
  45:11,20 46:2
  46:16,21 48:7
  52:25 53:21
  59:9 60:3
  101:14
**searched**  45:5
  45:23 46:18
  101:8
**searches**  51:6
**seat**  83:10
**second**  11:16
  13:20 16:17
  41:23 56:1
  65:3 75:23
  79:16 95:7
**secondary**
  63:15,22,23
  92:7
**secret**  16:23
  69:11
**section**  23:18
**secure**  14:12
  15:2 17:24,25

18:5 21:19,21
29:5,5,9
**secured**  28:25
**securely**  22:23
**securing**  15:14
**security**  1:8
  15:10 16:4,10
  16:12,13 17:11
  17:16,18,24
  20:3 21:6,7,20
  22:7,10,21
  25:10,23 26:18
  26:21 27:2,13
  27:20 30:4,14
  30:16 31:16,25
  33:9,23 34:7
  51:16 63:6,25
  64:15 69:21
  70:16,21,24
  71:10,14 72:1
  72:19,24 73:1
  73:4,5,6,6,23
  74:1,19 75:1
  75:13,18 76:23
  76:25 77:4,25
  84:11 85:9,11
  85:18 86:11,14
  88:4 89:16
  101:11 102:10
  102:21 103:6,7
  104:4,12
**see**  15:21 27:17
  30:8 40:2,6,14
  41:18 45:20
  47:19 53:17

58:14 64:1,4,6
70:6 72:19
76:11 84:10,10
92:24 94:16
102:14 105:13
106:7 108:12
**seeger**  4:19
  7:12 13:21
**seeing**  35:16
  107:6
**seeking**  39:4
  42:19 57:13
  60:24
**seem**  17:15
  27:8 69:12
  74:9
**seems**  27:6
  31:20 36:5
  38:2,20
**seen**  58:18,19
  75:20
**select**  97:7
**selected**  97:7
**selling**  40:8,9
  41:17,25
**send**  87:3
**sending**  25:19
**sense**  7:21 28:1
**sensitive**  14:4,6
  14:19 22:3
  32:9 103:4
**sent**  17:1 74:7
  75:15 92:3
  93:5 100:6
  104:2 107:13

107:20
**sentence**  82:21
  84:10 85:4
**separate**  29:3
  45:6,24 58:2
  82:11
**separated**  18:6
**separation**
  103:16
**serious**  21:20
**seriously**  106:9
**served**  92:15
**servers**  21:11
**service**  54:24
  77:2
**services**  62:21
  93:1
**set**  8:19 12:20
  98:5 109:9
**sets**  45:3
**setting**  10:16
**seven**  42:11
  77:25
**several**  10:11
  19:1
**shape**  80:14
**shared**  91:24
**shield**  99:17
**shift**  103:24
**shifting**  41:22
  80:16
**shipping**  86:24
**shore**  48:2
**shortage**
  105:24

[show - special]                                                                        Page 31

show   26:11
  42:1 63:19
  66:16 69:25
  103:22 104:4
  107:10
showing   12:12
  46:23 48:11
shows   50:13
shred   59:2
side   27:5 28:3
  32:23 42:24
  58:12 68:12
  69:13 74:11
  88:17,19 90:2
sidley   2:14,21
  95:15
siegel   4:12,13
  7:10,10 33:6
  33:14,24 41:14
  42:20 43:12
  56:20 66:7,11
  68:18 74:21,25
  75:9,13 76:3,7
  91:21 102:1
  106:2
sign   32:4
signature
  109:20
signed   86:23
  88:6
significance
  95:1
significant
  41:23

similar   40:3
similarly   30:18
simple   54:6
simply   21:25
  52:10
single   17:4
  18:10 40:15
  58:12 70:15
  73:22
sitting   51:5,17
  53:19 55:5,7
situation   26:13
  102:16
six   14:14 15:9
size   55:6 57:20
skipped   62:14
slowly   6:6
smith   3:16
snapshot   15:18
social   21:6
  51:16
software   43:11
  85:13
sold   47:7 49:2
  54:7 55:23
solely   43:24
  81:9
solstas   21:3
sophisticated
  43:15
sophistication
  42:17
sorice   2:22 6:22
  6:22

sorry   74:7 99:1
sort   9:12 18:17
  19:2 28:1
  42:13 73:25
  74:11 93:4
sound   82:6
sounds   24:7
  35:13 93:11
  99:1
source   49:23
  50:17
sources   55:4,7
  58:24
south   2:16
space   6:12
  42:23 43:1,1
speak   25:13
  39:15 107:7
speaking   41:15
  42:21 66:20
speaks   14:14
special   1:12 6:1
  6:3 7:16,24 8:6
  8:9 10:15,19
  12:13,16 18:15
  24:9,13,22,25
  25:4,15 27:4
  29:25 30:8,11
  30:17 31:18
  34:10,16,22
  35:2,12,15,24
  36:18,25 37:19
  38:12 40:17
  41:6,10 43:2,6
  44:16,20 45:8

45:15,25 46:12
47:10,18 48:19
49:7,24 50:11
51:22 52:6
53:9 54:9 57:3
57:8,15 58:6
59:19 60:1
61:4,20,25
62:3,17 64:10
64:17,22 65:1
66:5,13 68:8
69:5,10,24
71:4,20 73:15
74:23 75:7,11
75:19 76:1,9
76:17 78:7,17
79:4,14 80:2
82:5,20,23
83:18 84:9,17
85:2,21,25
86:5,8,18 87:5
87:21 88:10
89:1,5,9,15
90:1,10,15,19
91:4,22 93:10
93:17,20 94:1
94:24 95:19,24
96:8,18 97:3
97:18,23 98:13
98:16,21,25
99:12,23 101:2
101:19,23
102:3,13 103:9
104:6,14
105:16,19,23

106:4,11,14
107:2,12,19,21
108:11 110:2
110:24 111:2,4
111:12
**specific** 20:14
52:7 74:5 93:2
**specifically**
52:1
**specifics** 47:12
61:12
**spend** 71:2,18
72:18
**spending** 70:9
70:11 72:1
**spent** 70:21
73:14 74:1
**split** 61:13
**spoken** 18:19
**spot** 25:2
**squarely** 15:25
**stage** 44:21,23
84:20
**stake** 9:20
**stale** 93:8
**stamp** 87:1
**stamped** 87:13
**stand** 12:22
**standard** 22:21
70:12 104:20
**standards**
15:14
**standing** 20:17
65:18 67:14,17

**start** 8:12,15
53:16 63:4
**started** 24:20
40:18
**starting** 6:5
**state** 77:1
83:15,21,22
87:14 93:2
109:5,24
**statement**
46:13 71:8
**statements**
106:21
**states** 1:1 13:21
**static** 41:16,20
**statutes** 47:2
**stay** 11:5
**steel** 55:19
**stems** 104:25
**stenographic...**
109:8
**step** 16:7 17:7
17:20 47:1
**stephanie**
107:20
**stolen** 17:17
42:4
**stood** 36:8
**stop** 17:13
**stored** 21:10,17
22:23 55:11
58:25 60:20
91:25
**story** 78:25

**strategy** 90:4
**street** 2:10 3:18
3:25 4:7 5:12
41:19 45:18,19
**stricken** 20:22
**strike** 20:14
**striking** 20:20
**strong** 8:14
**structure** 63:12
**stueve** 4:12
**stuff** 6:9 28:3
38:19 39:4
40:21 44:25
47:7 48:16,17
49:11 51:7
53:17 54:24
55:6 59:17
69:19 73:19
80:9 104:4
**subclass** 23:6
**subject** 45:6,24
72:14 82:7
99:7
**submitted**
107:5,8
**subpar** 75:1
**subpart** 30:2
**subscribed**
111:14
**subsequent**
78:20 80:5
**substantive**
106:18
**substantively**
81:4,18,21

84:3
**successful**
68:13 74:16
75:3
**sue** 26:10
**suffered** 18:4
**sufficiency**
28:10,10
**sufficient** 15:11
62:20 69:25
**suggest** 32:20
72:12 93:14
105:11 107:5
**suggesting** 62:1
**suitable** 80:21
**suite** 3:3,18
4:14
**sultanian** 2:15
6:20,21 34:3
36:10,21 37:6
37:10,18 45:1
45:10,22 46:1
46:15 48:25
49:21 50:4
53:18 54:2,4
57:6,10,23
60:23 61:18
62:14 66:15,19
66:22 67:4,9
79:2,5,15
80:22 82:9,25
83:24 84:6,16
85:15,23 86:3
86:6,10 87:19
87:22 88:23

89:14,21 92:13
93:24 94:22
95:6,22 96:2
96:12,24 98:4
98:15,19,23
106:12,16
**sum** 93:4
**supplement**
93:24
**supplemental**
38:9
**supplier** 77:7
**suppose** 82:21
**sure** 10:14,15
12:19 14:19
24:6 28:3
33:13 36:4
37:10 47:13
48:22 52:1
71:10 78:19
79:4 80:13
85:19 87:21
94:12,22 97:4
99:24 103:9
104:8
**surprising** 16:3
**sustained** 20:10
24:3
**suzy** 93:4
**switch** 103:23
104:5
**sworn** 111:14
**system** 20:4
22:11

**systems** 14:23
15:1,11 18:2,7
19:5 30:6 55:9
70:16,22 71:17
72:8 76:19
80:16 100:19

### t

**t** 110:3,3
**tab** 79:12
**table** 32:21
**take** 12:14 16:7
17:7,19 24:1
30:1 47:1
50:10 55:12
57:18,18 58:14
59:8 63:3 65:7
73:10 83:10
99:16 106:8
107:1,8
**taken** 34:13
76:14 109:8
**takers** 42:3
**takes** 62:9
**talk** 13:10
27:16 28:5
32:21 38:14
44:17 55:25
59:1 61:12
62:4 65:25
69:7 73:22
87:17 94:18
105:9
**talked** 48:5
**talking** 16:17
16:19 19:14,22

27:16 32:5
36:15,17,19
42:8 45:2 46:1
52:24 54:22
55:1 58:15
59:15 60:25
62:6 73:5
84:22 96:9,10
97:16 101:25
103:1 106:7,22
107:15
**talks** 91:15
**team** 43:20,25
46:16 47:24
50:24 108:1,5
**tech** 14:24
**technical** 30:5
**technology**
69:22 70:1
**teeny** 64:4
**tell** 23:22 26:14
36:4 49:14,15
53:7 59:24
78:25 102:17
**tens** 13:22
**term** 30:19
**terms** 13:13
19:20 20:9
30:20,22 48:7
53:21 59:10
60:3 61:22
68:10 69:15
100:1 102:20
**test** 42:5

**testified** 63:13
76:8 88:4
**testimony**
16:22 18:9
28:10 46:10
47:16 60:15
66:23 76:5
109:7 111:8
**tests** 62:23
**tethered** 17:10
**thank** 7:15,16
7:17 10:14,16
12:14,15 18:16
24:5 25:3
35:14 62:2
67:11 84:16
89:13
**theory** 56:6
74:22 75:4
101:9
**thereto** 38:1
**thieves** 55:19
**thing** 9:10
23:21,25 32:4
35:17 57:25
58:16,23 71:23
82:25 83:19
84:13 94:17,21
**things** 23:13
24:11,17 31:24
33:14 34:23
41:16,20 48:4
50:15 52:24
55:9 58:13
63:2 73:19

79:18 82:1,2
83:13 86:14
88:5,7 94:15
102:25 106:6
**think**   8:7 11:19
12:19 13:1
15:25 16:6,15
17:7,19 19:4
19:13,23,24
20:6 23:18,21
24:5,7,9 25:11
25:12,24 26:1
26:5,6,19,25
27:22 31:2,10
31:15,22,24
32:12 33:2
34:1,7,18
35:18,20 36:25
38:3,7,11 39:8
39:19 41:16
42:8,13 46:11
46:13,22 47:23
48:20,21 49:11
49:18,25 50:15
53:3,14 61:5
62:4,7 63:24
63:24 66:6
68:6 69:23
70:22 71:9,11
71:24 72:13
73:21,24,25
74:15 75:5
76:7,17 78:5,9
83:23 86:8
88:17 89:16

90:19 91:12
98:14 99:9,21
101:7 102:15
103:5,11 104:7
104:18,19,25
105:1,4,5,19
106:5,22,25
107:13 108:8
**thinks**   16:6
**third**   16:2 23:4
25:17,18,19
26:3,4,15,17
27:2,23 29:2,2
31:10 76:22
100:2 102:7
**thomas**   3:9 7:1
**thought**   10:2
74:24 78:5
86:1
**thousands**
13:22 54:19
**threat**   85:9,18
**threats**   89:16
**three**   42:24
86:9 90:3
**throwing**   58:7
**tie**   56:2
**tied**   95:12
**time**   12:5 15:18
15:18 19:2
23:20,23 24:7
24:16,19,21
29:12,13 35:7
36:11 40:18
42:6,14 43:25

53:3,22,23
56:23 57:25
59:12 64:24,25
78:20 79:9
84:13 85:5
92:1,6,20
101:21 109:8
**times**   19:1 21:7
50:18 81:3
**today**   6:6 7:19
11:2,20 12:2,6
28:19 105:18
106:13,15
**together**   56:5
79:10 88:20
101:21
**told**   53:2 67:15
91:1
**ton**   16:4
**tony**   44:21,23
79:19 88:1
**took**   15:19
40:15 82:6
**top**   64:6 84:23
**topic**   69:16
**total**   62:22 92:3
97:25
**totally**   14:23
71:7
**touch**   10:22
**touchstone**
12:2
**tour**   42:2
**traces**   40:2

**train**   102:25
103:25 104:1
**training**   101:24
101:25 102:5,7
102:10,19,21
102:22,24
103:2 104:15
104:23
**trainings**   103:5
**transacting**
41:24
**transactions**
56:8
**transcript**
109:7 111:5,8
**transfer**   21:18
21:21,22 30:21
92:2
**transferred**
93:3 98:5
**translation**
17:12
**transmission**
10:8,10 13:11
14:1 16:14,18
16:18 17:16,17
17:18 18:3,11
20:25 23:13,14
**transmit**   30:21
**transmittal**
29:16
**transmitted**
16:20,20,25
17:5,5,6 18:8
18:10,12 22:15

22:19,23,25
92:1,6,21
**transmitting**
15:15
**traveling** 91:3
**treated** 14:16
26:3
**treating** 29:10
**trial** 69:17
84:20,21 90:25
91:5
**trouble** 74:13
**true** 19:23 37:1
48:24 108:3
109:7 111:8
**truly** 34:7
**trust** 41:25
**trusting** 103:19
**try** 50:8 52:21
101:1
**trying** 16:23
67:24
**turn** 44:3 93:13
**turned** 14:10
44:7 47:14,17
53:15 82:3
**tutorial** 39:2
**twice** 20:10
**two** 11:15
14:14 15:10
16:24 25:8
34:17,18 35:17
35:25 37:1
45:2 61:6
68:13 82:6

84:12
**type** 40:4 51:11
52:5,7 58:23
60:5,7,20
**types** 92:5
102:25 103:5
**typewriters**
40:20
**typical** 87:11

**u**

**ulrich** 79:23
**ultimately**
106:25
**un** 21:19 23:2
**unauthorized**
23:4 85:13
**unclear** 44:5
**under** 10:17
11:19 23:18
47:2,2 95:11
95:18
**underlined**
9:13
**underlying**
96:19 99:11
**understand**
11:1 27:24
29:11 32:7
44:24 48:12
52:1,21 56:18
57:10 58:16
60:13 68:4
69:6 90:2
92:24 94:12,18
95:5 97:15

98:23
**understanding**
33:1 37:6
39:18,20 87:9
97:14
**understood**
73:16 96:13
108:14
**unencrypted**
23:1
**unilaterally**
38:22 59:11
**united** 1:1
13:21
**unlocked** 29:8
**unprepared**
83:5
**unrelated**
45:13 58:4
**unsafe** 15:15
**unusual** 13:18
**update** 91:7
**updated** 93:15
93:23
**upload** 21:17
85:13
**usable** 92:22
**use** 39:22,23,25
40:4 45:17
69:2 74:12
75:2,17 81:16
92:9
**used** 24:20
38:13,22 45:17
54:24 69:4

81:25
**using** 8:3 56:23
68:16,18,25
**usual** 13:19
**usually** 85:3
96:10
**utilize** 70:10

**v**

**valuable** 14:7
51:16 55:13
60:9
**valuation** 56:13
56:15,17
**valuations**
60:24 76:24
**value** 9:16 47:5
47:8 51:13,18
52:16 55:23,25
56:1,6,7,9,10
56:12 57:12
60:6,6,7,11,17
**valueless** 60:16
**varied** 21:1
92:6
**variety** 55:7
81:8
**various** 78:21
81:19 83:13
**vast** 50:23
**vendor** 31:10
37:3 63:5,6,21
64:7 100:15,17
100:18,21
103:25 104:3

**vendor's**
  100:12
**vendors**  17:14
  25:17,18,19
  26:3,4,15
  34:25 35:21
  37:9 48:2
  63:13,14,21
  102:8
**verify**  82:19
  88:25
**versus**  68:24
**video**  14:10
**videographer**
  89:3
**view**  12:21,25
  13:9 20:19
  56:20 98:10
  104:24
**viewed**  23:3
**views**  8:14
  19:17
**village**  3:11
**violated**  22:9
  22:20 29:23
**violation**  22:15
  30:4
**violations**  30:4
**virtual**  42:23
  43:1
**vis**  11:9,9,22,22
  15:19,19 35:20
  35:20 37:4,4
  43:17,17 46:23
  46:23 52:22,22

52:22,22 70:7
70:7
**visibility**  43:14
**visible**  43:14
**volume**  16:6
  74:7 75:15

| w |
|---|

**w**  77:7
**waiver**  95:2
**walked**  31:5
**walks**  31:8 32:2
**walsh**  5:8
**want**  7:21
  10:12,13,21
  11:21 12:1,17
  12:18 16:7
  17:14 25:11,16
  28:24 29:2
  39:16 43:14,16
  47:19 49:8
  50:5,14 53:15
  53:16 58:12
  61:1,9,12 63:3
  67:22 68:4
  69:6 70:6,13
  70:18 89:10
  90:5,12 94:4
  94:16 96:15,25
  101:9 102:17
  103:15 105:9
  106:5 108:4
**wanted**  34:19
  55:19,22 93:22
**wants**  34:5
  60:18 64:1
  80:11

**war**  41:20
**warehouse**
  14:8,9,9 15:3
**wash**  14:18
**washington**  4:1
**water**  3:18
**way**  10:5 15:22
  18:17 19:12,19
  22:19 27:23
  48:10 56:7
  68:10 71:22
  72:16 84:8
  88:13,13,15,20
  96:23 99:10
  105:4 107:14
**ways**  69:18
**we've**  13:2
  16:11 25:19,20
  25:21 26:15,21
  30:15,16,21,22
  31:3 34:8
  46:18 53:2
  54:16 63:18
  75:14 78:2
  90:21 101:7,12
  101:13,14
**weak**  6:13
  74:20
**web**  38:21,25
  39:7,11,14,22
  39:25 40:2,3,5
  40:12,14,23
  41:4,19,24
  42:2 43:10,23
  44:1,11,15

45:13,20 46:3
  46:8,16 47:8
  47:21 48:23
  49:1,5,6,14,16
  50:2,20,23
  51:10,12,25
  52:17,22,25
  53:5 54:7
  55:18 58:1,5
  58:13,17,19
  59:3 60:5,8
  107:25
**wednesday**
  1:11
**weighed**  72:7
**weiss**  4:19 7:13
**welcome**  41:11
**went**  16:24
  47:21 54:24
  56:20 63:21
**west**  2:10
**wherewithal**
  42:16
**wholly**  31:13
**willing**  52:15
**withheld**  35:9
**withholding**
  44:6 51:3
  65:22
**witness**  49:3
  50:4 63:12
  108:8
**witnesses**  12:25
  53:13 84:12
  87:25

| | |
|---|---|
| **word**  40:6 | **years**  11:4 |
| **words**  19:3 | 14:25 29:14 |
| 20:11,16 27:8 | 40:1 58:8 |
| 27:19 30:20 | **yellow**  32:4 |
| 40:22 42:5 | **yep**  101:18 |
| 49:15 68:9 | **york**  2:24,24 |
| 71:8 74:15 | 3:19,19 4:8,8 |
| 88:19 94:19 | **young**  3:10 7:2 |
| 96:22 | 41:6,9 44:21 |
| **work**  24:3,8,25 | **yu**  3:10 7:2,2 |
| 47:17 57:18 | |

|  z  |
|---|
| **z**  93:5 |
| **zeros**  59:16 |

**work** (continued)
74:3,4 94:8
96:5,8,10,22
99:24
**working**  6:5
**works**  61:21
83:11
**worth**  51:17
**worthless**
60:16
**written**  99:5
**wrong**  44:22
74:10
**wrote**  68:24

|  x  |
|---|
| **x**  93:5 |

|  y  |
|---|
| **y**  93:5 |
| **yeah**  14:24 |
| 97:18 |
| **year**  23:23 |
| 24:19 53:5 |
| 64:6 |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:
(A)  to review the transcript or recording; and
(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.
(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.