# EXHIBIT C

Page 1

1      UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
2         Case No. 2:19-md-02904-MCA-MAH
3   - - - - - - - - - - - - - - - - -x
                                      :
4   IN RE:  AMERICAN MEDICAL COLLECTION:
    AGENCY, INC., CUSTOMER DATA        :
5   SECURITY BREACH LITIGATION         :
                                       :
6                                      :
    - - - - - - - - - - - - - - - - -x
7
8                              March 13, 2023
                               10:07 a.m.
9                              Norwich, NY
10
11
12
13
14
15
16
17
18
19
20        VIDEOTAPED VIRTUAL AND REMOTE
21  DEPOSITION UPON ORAL EXAMINATION OF JENNIFER
22  KAIN, held at the above-mentioned time and place,
23  before Randi Friedman, a Registered Professional
24  Reporter, within and for the State of New York.
25

```
                                                       Page 2

 1     APPEARANCES:
 2              SEEGER WEISS, LLP
                Attorneys for Plaintiffs
 3
                550 Broad Street, Suite 920
 4              Newark, New Jersey 07102
 5              BY:  CHRISTOPHER AYERS, ESQ.
                     HILLARY FIDLER, ESQ.
 6
 7
                SIDLEY AUSTIN, LLP
 8              Attorneys for Defendant, Quest
                Diagnostics, Incorporated
 9
                One South Dearborn
10              Chicago, Illinois 60603
11              BY:  HEATHER SULTANIAN, ESQ.
                     LAUREN KEANE, ESQ.
12
13
                HOGAN LOVELLS, LLP
14              Attorneys for Defendant, Laboratory
                Corporation of America Holdings
15
                555 Thirteenth Street, NW
16              Washington, D.C. 20004
17              BY:  ADAM A. COOKE, ESQ.
18
19              ALSTON & BIRD, LLP
                Attorneys for Defendant, Optum360, LLC
20
                90 Park Avenue, 12th Floor
21              New York, New York 10016
22              BY:  TROY STRAM, ESQ.
23
24
25     (Appearances continued.)
```

Page 3

1  (Appearances continued.)
2
                LEWIS BRISBOIS BISGAARD & SMITH, LLP
3               Attorneys for Defendant, Sonic
                Healthcare USA, Clinical Pathology
4               Laboratories, Inc., Aurora Diagnostics
                LLC, and Austin Pathology Associates
5
                77 Water Street, Suite 211
6               New York, New York 10005
7               BY:  JEFF SPIEGEL, ESQ.
                     BRAD BARTOLOMEO, ESQ.
8
                          * * *
9
10
11
12
13
14
15
16
17
18
19
20  ALSO PRESENT:
21            Nathaniel Armstrong - Videographer
              Alexa Pastor - Concierge
22            Steve Overturf, Esq.
23
24
25

```
                                                          Page 6
 1      related to any party in this action, nor am     10:08:39
 2      I financially interested in the outcome.        10:08:41
 3              If there are any objections to          10:08:43
 4      proceeding, please state them at the time of    10:08:44
 5      your appearance.                                10:08:47
 6              Counsel and all present, including      10:08:48
 7      remotely -- are we representing on the          10:08:51
 8      stenographic record or reading in -- will       10:08:55
 9      now state their appearance and affiliation      10:08:58
10      for the record, beginning with the noticing    10:09:02
11      attorney.                                       10:09:03
12              MR. AYERS:  Chris Ayers from            10:09:04
13      Seeger Weiss, on behalf of plaintiffs.          10:09:08
14              MR. VIDEOGRAPHER:  All counsel          10:09:22
15      will be noted on the stenographic record.       10:09:23
16              Would the court reporter please         10:09:25
17      swear or affirm the witness.                    10:09:26
18                      * * *                           10:09:26
19              JENNIFER KAIN, the witness herein,      10:09:26
20      having been duly sworn, was examined and        10:09:26
21      testified as follows:                           10:09:26
22                      * * *                           10:09:26
23                   EXAMINATION                        10:09:39
24   BY MR. AYERS:                                      10:09:39
25      Q    Good morning, Ms. Kain.  How are you?      10:09:40
```

```
                                                        Page 16
 1    stop sending medical information to AMCA?         10:19:00
 2         A    Well, they stopped placing altogether,  10:19:04
 3    and I assume it was because of the data breach.   10:19:06
 4         Q    Okay.  So they stopped sending          10:19:08
 5    placement files altogether?                       10:19:10
 6         A    Yeah.                                   10:19:15
 7         Q    Was there any time period when Quest    10:19:15
 8    stopped sending medical information in its        10:19:17
 9    placement files?                                  10:19:19
10         A    No.                                     10:19:21
11              MS. SULTANIAN:  Object to form.         10:19:21
12              THE WITNESS:  I think it came the       10:19:23
13         entire time.                                 10:19:24
14    BY MR. AYERS:                                     10:19:24
15         Q    And the services that AMCA provided to  10:19:25
16    Quest were collection services; correct?          10:19:30
17         A    Correct.                                10:19:33
18         Q    And AMCA didn't provide any             10:19:34
19    administrative services to Quest?                 10:19:37
20              MS. SULTANIAN:  Object to form.         10:19:40
21              THE WITNESS:  There were                10:19:43
22         administrative services, but we did put      10:19:43
23         together insurance claim forms, hence the    10:19:46
24         reason for needing this data.                10:19:49
25
```

Page 17

| | | |
|---|---|---|
| 1 | BY MR. AYERS: | 10:19:50 |
| 2 | Q    What was the time period when Quest | 10:19:51 |
| 3 | would provide -- when AMCA provided medical | 10:19:52 |
| 4 | claims forms? | 10:19:56 |
| 5 | A    My expire employment. | 10:19:57 |
| 6 | Q    So your understanding is that Quest | 10:19:59 |
| 7 | provided -- submitted medical claims forms for -- | 10:20:01 |
| 8 | A    No, they gave us the data and we | 10:20:05 |
| 9 | submitted the medical claim forms. | 10:20:07 |
| 10 | Q    When did you submit the medical claims | 10:20:09 |
| 11 | forms? | 10:20:11 |
| 12 | A    Upon -- | 10:20:16 |
| 13 |           MS. SULTANIAN:  Object to form. | 10:20:16 |
| 14 | A    When the patient requested a health | 10:20:16 |
| 15 | insurance claim form, we would populate the data | 10:20:19 |
| 16 | based on their placement file, including the PHI, | 10:20:22 |
| 17 | and send it off to the consumer for their | 10:20:24 |
| 18 | insurance. | 10:20:29 |
| 19 | Q    So if I understand correctly, there | 10:20:31 |
| 20 | were circumstances that arise with a Quest | 10:20:35 |
| 21 | patient which AMCA was collecting money for; | 10:20:38 |
| 22 | correct? | 10:20:41 |
| 23 | A    Yes. | 10:20:43 |
| 24 | Q    Would AMCA submit the claim to medical | 10:20:46 |
| 25 | insurance? | 10:20:49 |

|     |                                                          | Page 18   |
|-----|----------------------------------------------------------|-----------|
| 1   | A     Yes.                                               | 10:20:50  |
| 2   | MS. SULTANIAN: Object to form.                           | 10:20:51  |
| 3   | THE WITNESS: We would either bill                        | 10:20:52  |
| 4   | directly or mail it off to their insurance               | 10:20:55  |
| 5   | company.                                                 | 10:20:57  |
| 6   | BY MR. VIDEOGRAPHER:                                     | 10:20:58  |
| 7   | Q     And you completed these forms on a                 | 10:20:58  |
| 8   | regular basis?                                           | 10:20:59  |
| 9   | A     Yes.                                               | 10:21:00  |
| 10  | Q     What percentage of patients would you              | 10:21:04  |
| 11  | say you completed these for?                             | 10:21:06  |
| 12  | A     I can't say.                                       | 10:21:10  |
| 13  | MS. SULTANIAN: Object to form.                           | 10:21:11  |
| 14  | BY MR. AYERS:                                            | 10:21:11  |
| 15  | Q     Five percent, 10 percent?                          | 10:21:11  |
| 16  | A     Probably less.                                     | 10:21:14  |
| 17  | Q     Less than 10 percent?                              | 10:21:14  |
| 18  | A     Yeah.                                              | 10:21:15  |
| 19  | Q     Probably less than 5 percent?                      | 10:21:16  |
| 20  | A     Probably.                                          | 10:21:18  |
| 21  | MS. SULTANIAN: Objection.                                | 10:21:19  |
| 22  | BY MR. AYERS:                                            | 10:21:20  |
| 23  | Q     So --                                              | 10:21:21  |
| 24  | A     The idea was that these were already              | 10:21:22  |
| 25  | billed out to insurance. So it was just a few            | 10:21:23  |

|   |   | Page 38 |
|---|---|---|
| 1 | You're aware that patient information | 10:47:08 |
| 2 | was stored on CHAMP; correct? | 10:47:10 |
| 3 | A    Yes. | 10:47:13 |
| 4 | Q    And that was both PII as well as PHI; | 10:47:14 |
| 5 | correct? | 10:47:18 |
| 6 | MS. SULTANIAN:  Object to form. | 10:47:19 |
| 7 | THE WITNESS:  Correct. | 10:47:21 |
| 8 | BY MR. AYERS: | 10:47:22 |
| 9 | Q    And you know -- are you familiar with | 10:47:23 |
| 10 | the purpose of CHAMP?  Was it used for the call | 10:47:25 |
| 11 | center? | 10:47:27 |
| 12 | A    Yes, it was. | 10:47:30 |
| 13 | Q    And how was it used? | 10:47:31 |
| 14 | A    I didn't work in the call center.  I | 10:47:35 |
| 15 | believe they pulled the information up on the | 10:47:37 |
| 16 | screen when speaking to patients so they can have | 10:47:39 |
| 17 | the information right in front of them as far as | 10:47:42 |
| 18 | date of service, what doctor they saw, what tests | 10:47:44 |
| 19 | were performed. | 10:47:46 |
| 20 | Q    Okay.  Do you know if AMCA used CHAMP | 10:47:48 |
| 21 | to distinguish itself from competitors? | 10:47:53 |
| 22 | MR. COOKE:  Object to form. | 10:47:56 |
| 23 | THE WITNESS:  I don't know. | 10:47:58 |
| 24 | BY MR. AYERS: | 10:47:58 |
| 25 | Q    Do you know if CHAMP was designed to | 10:48:01 |

```
                                                          Page 132
 1    AMCA have needed insurance information about the    13:37:04
 2    patient?                                            13:37:07
 3              MR. AYERS:  Objection.                    13:37:08
 4              THE WITNESS:  Yes.                        13:37:09
 5    BY MS. SULTANIAN:                                   13:37:10
 6         Q    Okay.  And that includes both a policy    13:37:11
 7    number and the insurance name; is that right?       13:37:15
 8              MR. AYERS:  Objection.                    13:37:20
 9              THE WITNESS:  Yes.                        13:37:20
10    BY MS. SULTANIAN:                                   13:37:21
11         Q    Okay.  And if you go down a few lines     13:37:22
12    below that, there are two lines there that say      13:37:28
13    383.5 and 388.8.  Do you see that?                  13:37:31
14         A    Yes.                                      13:37:35
15         Q    And the smaller type right above that     13:37:37
16    in the document says Diagnosis or Nature of         13:37:40
17    Illness or Injury.  Do you see that?                13:37:44
18         A    I do.                                     13:37:46
19         Q    Okay.  Are those diagnosis codes, to      13:37:48
20    your knowledge?                                     13:37:51
21         A    They are.                                 13:37:53
22         Q    So AMCA needed diagnosis codes -- the     13:37:56
23    diagnosis codes in order to fill out the HCFA       13:38:00
24    form?                                               13:38:03
25              MR. AYERS:  Objection.                    13:38:03
```

```
                                                           Page 133

1              THE WITNESS:  Yes.                          13:38:04
2    BY MS. SULTANIAN:                                     13:38:05
3         Q    Okay.  And then if you look in the          13:38:06
4    next box down from that, you'll see six rows that     13:38:10
5    are filled in that start here 032614.  Do you see     13:38:16
6    those rows?                                           13:38:24
7         A    I do.                                       13:38:25
8         Q    And if you go over kind of a third of       13:38:26
9    the way, there are a number of rows that start        13:38:29
10   with the digit 8?                                     13:38:33
11        A    Yes.                                        13:38:35
12        Q    And those are procedures, services or       13:38:37
13   supply codes; do you see that?                        13:38:42
14        A    I do.                                       13:38:44
15             MR. AYERS:  Objection.                      13:38:45
16   BY MS. SULTANIAN:                                     13:38:45
17        Q    So did AMCA need procedure codes            13:38:47
18   pertaining to patients to fill out HCFA forms?        13:38:52
19             MR. AYERS:  Objection.                      13:38:57
20             THE WITNESS:  Yes.                          13:38:57
21   BY MS. SULTANIAN:                                     13:38:58
22        Q    And if you go all the way to the            13:38:58
23   bottom of that page, it says -- it has two boxes      13:39:00
24   that have Quest Diagnostics in them.  Do you see      13:39:06
25   that?                                                 13:39:10
```

```
                                                          Page 147
 1    the O Drive was separate from CHAMP?                 13:55:56
 2         A    Yes.                                       13:56:00
 3         Q    I'm going to show you Tab 9, which         13:56:06
 4    will be Exhibit 17.                                  13:56:14
 5              (Exhibit 17 was marked.)                   13:56:15
 6              To circle back on that for one moment,     13:56:29
 7    you said that the files were on the O Drive and     13:56:32
 8    that's where they stayed.  Is it your                13:56:35
 9    understanding that the placement files themselves    13:56:38
10    were never loaded to CHAMP?                          13:56:40
11              MR. AYERS:  Objection.                     13:56:42
12              THE WITNESS:  I don't know.  I             13:56:46
13         assume that the mainframe sent over             13:56:47
14         mainframe data to CHAMP, which is a             13:56:50
15         derivative of each placement, so I'm not        13:56:52
16         sure where that would come from.                13:56:55
17    BY MS. SULTANIAN:                                    13:56:57
18         Q    Okay.  I think I'm following, but I        13:56:59
19    want to make sure I understand.  I'm asking about    13:57:04
20    the files themselves and not the data that was       13:57:07
21    contained on the files.  If I understand             13:57:09
22    correctly --                                         13:57:12
23         A    Sorry about that.  Yeah, files             13:57:13
24    themselves were never sent to CHAMP.                 13:57:14
25         Q    Okay.  Great.                              13:57:18
```

Page 153

| | | |
|---|---|---|
| 1 | would have fresh information in the morning.  So | 14:03:23 |
| 2 | the next day we would check CHAMP just to make | 14:03:25 |
| 3 | sure there was a phone number there and that the | 14:03:28 |
| 4 | name was there and everything was okay with that. | 14:03:30 |
| 5 | We didn't check anything else.  We just wanted to | 14:03:32 |
| 6 | make sure that they had a phone number and a | 14:03:35 |
| 7 | name. | 14:03:37 |
| 8 | Q    Okay.  So it's your understanding that | 14:03:40 |
| 9 | there was an automatic process overnight to pull | 14:03:44 |
| 10 | data from the mainframe into CHAMP; is that | 14:03:47 |
| 11 | right? | 14:03:49 |
| 12 | A    Yes. | 14:03:50 |
| 13 | Q    And to your knowledge, was all of the | 14:03:54 |
| 14 | information that was stored in mainframe loaded | 14:03:56 |
| 15 | to CHAMP, or only a subset of it? | 14:03:59 |
| 16 | A    Only a subset. | 14:04:07 |
| 17 | MR. AYERS:  Objection to form. | 14:04:08 |
| 18 | BY MS. SULTANIAN: | 14:04:09 |
| 19 | Q    So there might be information on the | 14:04:09 |
| 20 | mainframe that never made it to CHAMP; is that | 14:04:11 |
| 21 | correct? | 14:04:12 |
| 22 | MR. AYERS:  Objection, form. | 14:04:13 |
| 23 | THE WITNESS:  Yes, that's correct. | 14:04:14 |
| 24 | BY MS. SULTANIAN: | 14:04:14 |
| 25 | Q    And if the data in the mainframe was | 14:04:24 |