# EXHIBIT G

Page 1

```
 1        UNITED STATES DISTRICT COURT
            DISTRICT OF NEW JERSEY
 2       CASE NO. 2:19-MD-02904-MCA-MAH
 3
 4
    IN RE:  AMERICAN MEDICAL     :  VIDEOTAPED
 5  COLLECTION AGENCY, INC.,
    CUSTOMER DATA SECURITY       :  DEPOSITION OF:
 6  BREACH LITIGATION
                                 :  DAVID ULRICH
 7  This Document Relates To:
    All Actions                  :  (VIA ZOOM)
 8  _____X
 9
10
11
12
13      TRANSCRIPT of the stenographic notes of
14  the proceedings in the above-entitled matter, as
15  taken remotely by and before SEVA FLICSTEIN,
16  Certified Court Reporter (New Jersey License
17  No. 30XI000141300, California Certificate
18  No. CSR 8727), Registered Merit Reporter,
19  Certified Realtime Reporter, witness located in
20  Yorktown Heights, New York, on Tuesday,
21  March 21, 2023, commencing at 9:04 in the
22  forenoon.
23
24
25
```

```
 1     A P P E A R A N C E S:
 2
 3          CARELLA BYRNE CECCHI
            OLSTEIN BRODY & AGNELLO PC
 4          BY:  LINDSEY H. TAYLOR, ESQ.
            5 Becker Farm Road, 2nd Floor
 5          Roseland, New Jersey  07068
            ltaylor@carellabyrne.comm
 6          Attorneys for Plaintiffs
 7
 8
            LITE DEPALMA GREENBERG & AFANADOR, LLC
 9          BY:  CATHERINE B. DERENZE, ESQ.
            570 Broad Street, Suite 1201
10          Newark, NJ 07102
            cderenze@litedepalma.com
11          Attorneys for Plaintiffs
12
13
            ALSTON & BIRD, LLP
14          BY:  TROY STRAM, ESQ.
            One Atlantic Center
15          1201 West Peachtree Street
            Suite 4900
16          Atlanta, Georgia 30309-3424
            troy.stram@alston.com
17          Attorneys for Optum360
18
19
            SIDLEY AUSTIN, LLP
20          BY: MARLOW SVATEK, ESQ.
                HEATHER SULTANIAN, ESQ.
21          One South Dearborn
            Chicago, Illinois 60603
22          msvatek@sidley.com
            hsultanian@sidley.com
23          Attorneys for Quest Diagnostics
24
25
```

```
 1    A P P E A R A N C E S   (Cont'd.):
 2
 3          HOGAN LOVELLS US, LLP
            BY:  ALICIA J. PALLER, ESQ.
 4          21 Columbia Square
            555 13th Street NW
 5          Washington, DC 20004
            alicia.paller@hoganlovells.com
 6          Attorneys for Defendant Laboratory
            Corporation of America Holdings and
 7          Laboratory Corporation of America
            (collectively, LabCorp)
 8
 9
10
            LEWIS BRISBOIS BISGAARD & SMITH, LLP
11          BY:  BRADLEY BARTOLOMEO, ESQ.
                 ABAIGEAL FRANSON
12          77 Water Street
            Suite 2100
13          New York, New York 10005
            Bradley.Bartolomeo@lewisbrisbois.com
14          Abaigeal.Franson@lewisbrisbois.com
            Attorneys for Sonic
15
16
17
18          GORDON REES SCULLY MANSUKHANI LLP
            BY:  ANDREW M. SCHWARTZ, ESQ.
19          1717 Arch Street, Suite 610
            Philadelphia, Pennsylvania  19103
20          (215) 717-4023
            amschwartz@grsm.com
21          Attorneys for the Witness and
            The CCS Companies
22
23
24
25
```

```
                                                          Page 4

 1    A P P E A R A N C E S   (Cont'd.):
 2
 3
          KRAFT LAW FIRM
 4        BY:  MICHAEL KRAFT, ESQ.
          30 Coach Lane
 5        Westwood, Massachusetts  02090
          michael@kraftlawfirm.com
 6        Attorneys for the Witness and
          The CCS Companies
 7
 8
 9
10
     A L S O   P R E S E N T:
11
12        JOE RAGUSO, Legal Video Specialist
13        GREGG HOLDERMAN, Technical Concierge
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                          Page 10
```

1    noted on the stenographic record.
2    D A V I D    U L R I C H,
3            residing at 757 Wildwood Court,
4            Yorktown Heights, New York 10598, having
5            been duly sworn by the Certified Court
6            Reporter, testifies as follows:
7                        -----
8                      EXAMINATION
9                        -----
10   BY MR. STRAM:
11           Q.   Good morning, Mr. Ulrich.
12           A.   Good morning.
13           Q.   My name is Troy Stram.  I
14   represent Optum360 in this matter.  Thank you
15   for taking some time to speak with us this
16   morning.
17                Have you ever been deposed before,
18   Mr. Ulrich?
19           A.   No.
20           Q.   So I will go over just a few
21   ground rules before we jump in, mainly to make
22   sure things run smoothly today.
23                So the first is that our court
24   reporter is going to be taking down everything
25   for the stenographic record, which means that

Page 22

1   correct.
2       Q.   And so if those codes were
3   received as an alphanumeric code with no
4   description added, someone viewing that code
5   would need to look up what each individual code
6   meant on a code-by-code basis to understand what
7   it was saying; correct?
8       A.   Yes.
9            MR. TAYLOR:   Object to form.
10      Q.   And you had the ability to log in
11  to Champ; correct?
12      A.   Yes.
13      Q.   How frequently would you access
14  the Champ database?
15      A.   Very infrequently.  Because I
16  didn't migrate well over to it, so I was mainly
17  a mainframe user.
18      Q.   When you did log in to the Champ
19  database and pull up a patient profile, what
20  information did you see?
21      A.   For myself, I would see the
22  patient name, I could see the address, I could
23  see the balance owed, I could see if it was paid
24  or not.  Again, I used it for very basic
25  information.

Page 23

1            Q.     Medical information would not come
2      up on that initial page with the name, address,
3      balance owed; correct?
4                   MR. TAYLOR:  Object to form.  You
5      can answer.
6            A.     Say that again.
7            Q.     Medical information would not come
8      up on the page that would be initially viewable
9      on your screen along with the name, address,
10     balance owed; correct?
11           A.     Correct.
12           Q.     You would have to navigate to a
13     separate page in order to be able to view that
14     type of information?
15           A.     Correct.
16           Q.     Throughout your time at AMCA, did
17     the company always hold itself out to clients as
18     being fully compliant with applicable security
19     standards and regulations?
20           A.     Yes.  Based on my understanding,
21     yes.
22           Q.     And prior to the data breach, was
23     it your understanding that AMCA was, in fact,
24     fully compliant with all applicable security
25     standards and regulations?

Page 83

1    says, "Some examples include preparing HCFA
2    requests."
3            Do you see that?
4        A.  Yes.
5        Q.  What is a HCFA request?
6        A.  I think back at that time, if a
7    patient requested proof of the debt, we would be
8    able to print very basic HCFA form with the
9    information for the patient.
10       Q.  Do you know, is that referring to
11   the HCFA 1500 or now known as the CMS 1500
12   form?
13       A.  Yes.
14       Q.  And is that a form used to file a
15   health insurance claim?
16       A.  Yes.
17       Q.  So when AMCA said to prepare HCFA
18   requests, what did that entail?
19       A.  Again, at that time, we had HCFA
20   forms that, again, if the patient requested
21   proof of the debt, we were able to print minimal
22   information on that form to send to the patient.
23       Q.  So AMCA would complete the HCFA
24   form and then provide the completed form to the
25   patient.  Is that right?

```
 1            A.   Not a completed form, but a form
 2   with some basic information, yes.
 3            Q.   But HCFA requests were part of the
 4   collection services that AMCA was providing to
 5   Quest; correct?
 6            A.   Yes.
 7            Q.   And AMCA was preparing HCFA
 8   requests for Quest patients in 2014 when it
 9   submitted these RFP responses; correct?
10            A.   Yes.
11            Q.   In that same box, the 2.2.2 box,
12   it goes on to mention the Medicare program.
13                 What's the Medicare program?
14            A.   I don't remember.
15            Q.   Do you recall whether AMCA had
16   different practices or policies for interacting
17   with Quest's Medicare patients?
18            A.   You know, I don't remember, but I
19   think we did have a separate client code for
20   Medicare accounts.  But I really don't remember.
21            Q.   Okay.  That's fair.  It was a long
22   time ago.
23                 So this description of AMCA's
24   distinguishing services in this box also
25   mentions reducing patient complaints a few
```