# EXHIBIT H
# REDACTED

# ECF No. 43-8

Page 1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
 2
       IN RE:   AMERICAN MEDICAL    ) No.10-MD-2904
 3     COLLECTION AGENCY, INC.      ) (MCA)(MAH)
       CUSTOMER DATA SECURITY       )
 4     BREACH LITIGATION            )
       _____
 5
       This Document Relates to:
 6     Quest/Optum Track

 7

 8             DEPOSITION OF JUAN PABLO LAKE
 9          Taken in the law offices of Hogan Lovells,
10     1735 Market Street, Philadelphia, Pennsylvania,
11     on Thursday, March 16, 2023, commencing at
12     9:00 a.m., by Leandra M. Stoudt, RPR, CBC, CCP,
13     CRR, Notary Public.
14     APPEARANCES:
15     SEEGER WEISS LLP
       By:  Frazar Thomas, Esq.
16     1515 Market St. Suite 1380
       Philadelphia, PA 19102
17     fthomas@seegerweiss.com
18     And
19     SEEGER WEISS LLP
       By:  Christopher Ayers, Esq.
20     55 Challenger Road
       Ridgefield Park, NJ 07660
21     CAyers@seegerweiss.com
       -- For Plaintiff AMCA
22

23

24

25
```

```
 1      APPEARANCES (Continued):
 2      ALSTON & BIRD, LLP
        By:  Troy Stram, Esq.
 3      One Atlantic Center 1201 West Peachtree Street,
        Suite 4900
 4      Atlanta, GA 30309
        troy.stram@alston.com
 5      404-881-7256
 6      And
 7      ALSTON & BIRD, LLP
        By:  Donald Houser, Esq.
 8      One Atlantic Center 1201 West Peachtree Street,
        Suite 4900
 9      Atlanta, GA 30309
        donald.houser@alston.com
10      404-881-7000
11      And
12      SIDLEY AUSTIN LLP
        By:  Eamon P. Joyce, Esq.
13      787 Seventh Ave
        New York, NY 10019
14      ejoyce@sidley.com
        212-839-8555
15      -- For Quest/Optum
16      And
17      Brian W. Thomson, Esq.
        Senior Associate General Counsel - Optum360
18      1-952-205-7871
19
20
21          ALSO PRESENT:  Philip Leaf, Videographer
                           and Alexa Pastor, Concierge
22
23
24
25
```

Page 5

```
 1              MR. JOYCE:  Eamon Joyce of Sidley
 2     Austin LLP on behalf of Quest Diagnostics and the
 3     witness in his capacity as a Quest Diagnostics
 4     employee.
 5              MR. THOMAS:  Frazier Thomas from
 6     Seeger Weiss for the Plaintiffs.
 7              MR. ERS:  Chris Ers from Seeger Weiss
 8     on behalf of the Plaintiffs.
 9              THE VIDEOGRAPHER:  Court reporter,
10     please swear in the witness.
11                 JUAN PABLO LAKE, having been
12     duly sworn, was examined and testified as follow:
13                          * * *
14                       EXAMINATION
15     BY MR. THOMAS:
16     Q.         All right.  Hello, Mr. Lake.  I know
17     we met earlier, but my name is Frazier Thomas.
18     Like I just said, I'm from the law firm of Seeger
19     Weiss, and I represent the Plaintiffs.
20              Thank you for your sacrifice in being
21     here today.
22     A.         (Witness nods head.)
23     Q.         Could you just tell me your name for
24     the record?
25     A.         Juan Pablo Lake.
```

1      A.          No.

2      Q.          So you just logistically, not this

3      one, just in general, logistically, do you have an

4      understanding of how a Clarity request would work?

5      A.          No.

6      Q.          Do you also, do you have any

7      understanding of why -- well, here, let me first

8      ask this.  Is 2009 ten years before 2019?

9      A.          Yes.

10     Q.          Do you have -- sometimes they're

11     easy.

12                 Do you have an understanding of why,

13     if the practice of allowing vendors to submit

14     CMS-1500 claims ceased in 2009 or earlier, why an

15     ITF or ITRFS asking them to stop transmission of

16     diagnosis data was not submitted until 2018?

17                 MR. STRAM:  Object to form.

18     Foundation.  Instruct the witness not to answer to

19     the extent he has information learned through

20     counsel in this topic.

21                 MR. JOYCE:  Same objections.

22     A.          So diagnosis code was a data element

23     that was frequently discussed with patients when

24     they called collection agencies or internally to

25     the 500 customer service agents that I had at the

```
                                                    Page 142
 1      time.  So diagnosis and procedure code data
 2      basically explained why they were getting a bill
 3      in many circumstances.
 4      ████████████████████████████████████████████████
 5      ████████████████████████████████████████████████
 6      ████████████████████████████████████████████████
 7      ████████████████████████████████████████████████
 8              MR. JOYCE:  Objection.  Asked and
 9      answered.
10      ████████████████████████████████████████████████
11      ████████████████████████████████████████████████
12      ████████████████████████████████████████████████
13      ████████████████████████████████████████████████
14      Q.           And I think you just mentioned that
15      -- well, here.  You believe AMCA may have
16      continued submitting CMS-1500 claims forms after
17      Quest no longer allowed you to do so?  Is that
18      correct?
19              MR. JOYCE:  Objection.
20              MR. STRAM:  Object to form.
21      Foundation.
22              MR. JOYCE:  And misstates the
23      testimony.  I think the witness said he didn't
24      know.
25      A.           I didn't know.  But, I know that
```

```
                                                    Page 146
 1      only submit the minimum necessary data to perform
 2      collections?
 3               MR. JOYCE:  Objection.  Foundation
 4      and form.  If you're asking for Mr. Lake's
 5      individual testimony, that's one thing.  But I
 6      don't know that he can testify to what Quest
 7      understood.
 8               MR. THOMAS:  You can answer.
 9      A.       From my perspective, we were seeking
10      to provide the minimal -- minimum amount necessary
11      for them to perform their job.
12      ███████████████████████████████████████████████
13      ███████████████████████████████████████████████
14      ███████████████████████████████████████████████
15      ███████████████████████████████████████████████
16               MR. JOYCE:  Objection.  Form.
17               MR. STRAM:  Same objections.
18      ███████████████████████████████████████████████
19      ███████████████████████████████████████████████
20      Q.       And then at your number two you
21      write, procedure test data.  Well, let me first
22      ask you this.  What is the difference between
23      procedure test data and diagnosis data?
24      A.       Diagnosis data indicates why a
25      patient was having lab work.  Procedure or test
```

Page 147

1     data indicates what is the lab work that was
2     performed.
3         Q.          Got it.  So the diagnosis data came
4     from whoever referred them to Quest?
5         A.          Both items required an ordering
6     clinician to determine why a service is needed,
7     that's diagnosis.  And what service is needed,
8     that's the procedure.  But ordering clinician
9     provides both.
10        Q.          Got it.  And diagnosis data, would
11    that be a T code?
12        A.          No.
13        Q.          What would the code related to
14    diagnosis be?
15        A.          ICD 9 or ICD 10 is the common
16    terminology for diagnosis data.
17        Q.          That's what I meant.  And CPT would
18    refer to the procedure?
19        A.          Yes.
20    ████████████████████████████████████████████████
21    ████████████████████████████████████████████████
22    ████████████████████████████████████████████████
23    ████████████████████████████████████████████████
24        Q.          Okay.  And again, do you know what
25    you meant by both major agencies here?