FILED UNDER SEAL[1]

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC., CUSTOMER DATA SECURITY BREACH LITIGATION<br><br><br>*This Document Relates To:*<br>*Quest/Optum360 Track* | Case No.: 2:19-MD-02904-MCA-MAH<br><br>MDL No. 2904<br><br><br>**OPINION & ORDER**<br>**REGARDING DISPUTES ECF NOS. 511 & 512** |

Before the Special Master are two discovery disputes between Plaintiffs and Defendants Quest Diagnostic Incorporated ("Quest") and Optum360, LLC ("Optum") (collectively, "Defendants"). Plaintiffs seek to compel the production of certain documents that Defendants have either withheld or clawed back under claims of attorney-client privilege and work-product doctrine.[2] The Special Master has considered the parties' submissions, including their joint discovery dispute letters (ECF Nos. 511, 512), and the arguments of counsel made during the hearing held on July 26, 2024, during which the Special Master also conducted an *in camera* review of the documents at issue.[3] For the reasons set forth below, Plaintiffs' requests are denied in part and granted in part.

---

[1] The Special Master has temporarily sealed this Opinion because the documents at issue were submitted only for *in camera* review. To the extent any party wishes to seal any portion of this Opinion, that party shall make an appropriate motion in accordance with Local Civil Rule 5.3(c)(3), within fourteen days of this Opinion. If no party timely files such a motion, or otherwise moves to extend the deadline by which to file the same, the temporary seal will be lifted.

[2] As to Quest, Plaintiffs also moved to compel Quest to provide a corporative representative for deposition or, in the alterative, to preclude Quest from asserting a certain defense. As discussed during the July 26, 2024 hearing, the Special Master will take no action as to these requests at this time.

[3] The hearing was divided into two parts: a joint portion during which the parties presented oral argument; and an *ex parte* portion during which the Special Master reviewed the documents at issue

## I.    <u>BACKGROUND</u>

As the Special Master writes principally for the benefit of the parties, the Special Master will only briefly address those facts relevant to the resolution of this matter.

This is a multidistrict litigation in which Plaintiffs allege that they are among the 11 million individuals who had their protected information compromised in a data breach suffered by American Medical Collection Agency ("AMCA"), a debt collections agency. Plaintiffs are current or former patients of Quest, a healthcare company that retained AMCA as a collections vendor and provided AMCA with sensitive patient information to facilitate collections. In September 2016, Quest outsourced its revenue services operation to Optum and, as part of that agreement, assigned its existing contract with AMCA to Optum.

The AMCA data breach allegedly occurred between late 2018 and March 2019. After being notified of the data breach on May 14, 2019, Quest and Optum each conducted their own internal investigation into the incident.  About two weeks later, the first of several lawsuits were filed against Quest and Optum.

Documents related to certain aspects of the post-breach investigations conducted by Quest and Optum are at the center of these discovery disputes.

### A.    **Quest's Dark Web Investigation**

According to Quest, after learning of the AMCA data breach, its in-house counsel directed an internal security team at Quest (the IT and Security Incident Team) to investigate the incident. (ECF No. 511, at 8). That team has responded to security incidents at Quest since 2016, including by

---

in camera and allowed Defendants to make supporting proffers. Both portions were transcribed by a Certified Court Reporter. The transcript of the joint portion is attached hereto as Exhibit A. Due to the confidential nature of the discussions held during the *ex parte* portion of the hearing, the transcript for that portion is not included, but is available to the Court upon request.

conducting dark web searches for patients' information. (*Id.* at 4). Quest also engaged ████████ ████████████████████████ to assist in the investigation.[4]

Through one of their present motions, Plaintiffs seek to compel Quest to produce 38 documents pertaining to its dark web investigation.[5] As discussed more fully below, these documents primarily consist of email communications among individuals from Quest's IT department, legal department, and/or ████████. There is also a draft incident report.[6]

Plaintiffs assert that they seek to uncover facts revealed to Quest during its post-breach investigation, including whether Quest found its patients' protected information on the dark web in connection with the AMCA data breach and what steps it took to reach that conclusion. (ECF No. 511, at 1). Plaintiffs contend that the information they are seeking is not protected by privilege because the investigation conducted by Quest's security team was carried out as part of its regular business operations. (*Id.*, at 2). For its part, Quest argues that the information is privileged because the investigation was performed at the direction of counsel. (*Id.*, at 11-13; *see* Joint Hearing Tr. 25:17:22 ("it's Quest's position that the steps taken in that investigation were directed by counsel and were privileged"). Quest also represents that it "did not find personal information associated with *any* of its patients on the dark web, let alone for the named Plaintiffs, that appeared to be connected to the

---

[4] During the July 26, 2024 hearing, Plaintiffs commented that they learned about ████████████ involvement in the investigation for the first time earlier this year, after Quest produced certain documents in connection with an earlier decision in which the Special Master ordered that Quest produce a sample set of documents responsive to Request for Production No. 48, which requested: "Documents and communications related to the sale of PII and PHI, including price for PII and PHI on the dark web." (*See* Joint Hearing Tr. 10:24-11-24).

[5] Plaintiffs originally moved to compel the production of an unspecified number of documents. After meeting and conferring, the parties were able to narrow the number of documents in dispute to 38.

[6] Apparently, ████████████████████████████. (*See* Joint Hearing Tr. 25:2-7).

AMCA data breach." (ECF No. 511, at 8). Thus, Quest argues, Plaintiffs already have the facts they seek. (*Id.*; *see* Joint Hearing Tr. 22:5-16).

**B.    Optum's Risk Assessments of its Third-Party Vendors**

According to Optum's Deputy General Counsel at the time, Mitchell W. Granberg, after being notified of the AMCA data breach, he assembled and led a response team that included in-house counsel to investigate the incident "for purposes of assessing legal risk and providing legal advice to Optum360." (Decl. of Mitchell W. Granberg ("Granberg Decl.") ¶ 3). Mr. Granberg further asserts that "[i]n addition to the investigation into the AMCA Data Breach, ███████████████████ ████████████████████████████████████████████████ for purposes of assessing legal risk and providing legal advice to Optum360." (*Id.* ¶ 7). Mr. Granberg explains that ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████," pointing out that "by August 1, 2019, more than 34 class action lawsuits had been filed."[7] (*Id.*).

Through their other motion, Plaintiffs seek to compel Optum to reproduce 13 clawed back documents that relate to Optum's risk assessments of its third-party vendors. (*See* ECF No. 512). As further discussed below, these documents consist of email communications and risk assessments attached thereto. Plaintiffs argue that these documents are not protected from disclosure because Optum prepared risk assessments of its vendors as part of its normal course of business. (*Id.*, at 2). Optum, on the other hand, contends that these risk assessments and related communications are

---

[7] In a separate discovery dispute, Plaintiffs sought information relating to Optum's risk assessments of its other debt collection vendors; Optum opposed, arguing that "[r]isk assessments performed of third-party debt collection vendors other than AMCA are irrelevant to Plaintiffs' claims." (ECF No. 513, at 2).  On March 6, 2024, the Special Master granted Plaintiffs' request. (*See* ECF No. 660). That decision was appealed and is currently still pending.

protected because they were created "for purposes of facilitating the rendition of legal advice concerning ███████████████." (Granberg Decl. ¶¶ 8-9).

## II.    <u>LEGAL STANDARDS</u>

### A.    **Attorney-Client Privilege**

The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991). The privilege protects a client's right to refuse to disclose "confidential communications between attorney and client made for the purpose of obtaining legal advice." *Genetech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997). Even where the privilege protects attorney-client communications, the facts underlying the communications are always discoverable. *See Upjohn*, 449 U.S. at 395-96 ("Protection of the privilege extends only to communications not to facts.").

Whether the privilege applies is decided on a case-by-case basis, and the party asserting the privilege bears the burden to show it applies. *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986). Because the attorney-client privilege obstructs the truth-finding process, however, it is construed narrowly. *Westinghouse*, 951 F.2d at 1423-24 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). A party asserting the privilege must show "(1) that it submitted confidential information to a lawyer, . . . (2) that it did so with the reasonable belief that the lawyer was acting as the parties' attorney," *Montgomery Acad. v. Kohn*, 50 F. Supp. 2d 344, 350 (D.N.J. 1999), and (3) the purpose of the communications was to secure legal, as opposed to business, advice. *In re Ford Motor Co.*, 110 F.3d 954, 965 (3d Cir. 1997). The touchstone of the privilege, therefore, is that the communications between client and attorney were both made and maintained in

confidence. *See Republic of Philippines v. Westinghouse Elec. Corp.*, 132 F.R.D. 384, 388 (D.N.J. 1990) (stating "a litigant who wishes to assert confidentiality must maintain genuine confidentiality").

The attorney-client privilege applies to both individuals and corporations. *See Upjohn*, 449 U.S. at 390. Corporations, as inanimate entities, must act through agents. *Bevill*, 805 F.2d at 124 (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). However, the privilege does not cease to exist solely because a client is a corporation. *Id.* Instead, the attorney-client privilege extends to communications of a corporation's management and employees where doing so would effectuate or enable legal advice. *See Upjohn*, 449 U.S. at 391, 394-95. Advice concerning a corporation's business affairs, technical issues, or public relations is not protected by the attorney-client privilege. *Dejewski v. Nat'l Beverage Corp.*, Civ. No. 19-14532, 2021 WL 118929, at *1-2 (D.N.J. Jan. 12, 2021). Where communications contain both legal and business advice, courts must ascertain whether "the communication is designed to meet problems which can be fairly characterized as predominantly legal." *Leonen v. Johns-Manville*, 135 F.R.D. 94, 99 (D.N.J. 1990) (quoting *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 204 (E.D.N.Y. 1988)).

### B.    Work Product Doctrine

The work product doctrine is a qualified privilege which precludes disclosure of "materials prepared by an attorney, or an attorney's agent, in anticipation of or for litigation," as well as "[a]n attorney's mental impressions, conclusions, opinions or legal theories." *In re Diet Drugs Prods. Liab. Lit.*, MDL No. 1203, 2001 WL 34133955, at *4 (E.D. Pa. April 19, 2001) (citing *In re Ford Motor Co. v. Kelly*, 110 F.3d 954, 967 (3d Cir. 1997), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)); *see also* Fed. R. Civ. P. 26(b)(3). The work product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661-63 (3d Cir. 2003).

The party asserting the protection of the work product doctrine carries the burden of demonstrating that the doctrine applies. *In re Gabapentin Litig.*, 214 F.R.D. 178, 183 (D.N.J. 2003).

Courts in this Circuit have traditionally applied a two-step inquiry in deciding whether a document is protected under the work product doctrine. *Id.* at 183-84. First, courts look at whether the document was created "in anticipation of litigation," and second, whether the document was created "primarily for the purpose of litigation." *Id.* A party must show more than the "remote prospect" of litigation in satisfying the anticipation of litigation prong. *Id.* at 183. Instead, the party must show the "existence of an identifiable specific claim or impending litigation at the time the materials were prepared." *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 473 (E.D. Pa. 2005). "The mere involvement of, or investigation by an attorney does not, in itself, evidence the 'anticipation of litigation.'" *In re Gabapentin Litig.*, 214 F.R.D. at 183. In determining whether a document was created primarily for the purpose of litigation, courts look to the motive behind the document's creation. *Id.* at 184. "The proper inquiry is whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* "Documents created for other purposes that prove useful in subsequent litigation are not attorney work product; similarly, documents that are routinely prepared in the ordinary course of business are outside the scope of work product protection." *Id.*

## III.    DISCUSSION

As a preliminary matter, the Special Master notes that in recent years there have been several data breach cases that have implicated similar issues concerning attorney-client privilege and the work-product doctrine. The most recent one is *In re Samsung Customer Data Security Breach*

*Litigation*, No. 23-3055, 2024 WL 3861330 (D.N.J. Aug. 19, 2024), where former Chief Judge Freda L. Wolfson issued a well-reasoned and highly instructive opinion that warrants discussion here first.

In *In re Samsung Customer Data Security Breach Litig.*, after suffering a data breach, Samsung retained the law firm of Hunton Andrews Kurth LLP ("Hunton") to provide legal advice regarding the incident. *Id.* at *2. Hunton in turn retained Stroz Friedberg LLC ("Stroz"), a third-party cybersecurity firm, and directed Stroz to conduct a forensic investigation into the data breach incident. *Id.* "According to Hunton, a forensic investigator was necessary to provide its attorneys technical background and knowledge for rendering informed legal advice to Samsung." *Id.* The engagement letter between Hunton and Stroz indicated that Stroz was retained to assist Hunton in rendering legal advice to Samsung.[8] *Id.*

During its investigation, Stroz prepared several PowerPoint presentations ("Stroz PowerPoint") that it used to provide investigative updates to both Hunton and select Samsung personnel, including in-house counsel and senior security and data executives. *Id.* Stroz also prepared a "draft one-page Cloud and Host Analysis," which outlined "Stroz's conclusions regarding the background and potential scope of the data breach incident ('Stroz Analysis')." *Id.* As with the Stroz PowerPoint, Stroz shared the analysis with Hunton and Samsung personnel, including in-house counsel and senior security and privacy executives. *Id.* In addition, after completing its investigation, and at Hunton's request, Stroz prepared a draft memorandum that summarized its investigative findings and conclusions ("Stroz Draft Memorandum"). *Id.* at *3. Unlike the other two documents, Stroz only showed Hunton—not Samsung—portions of the Stroz Draft Memorandum. *Id.* Finally,

---

[8] Specifically, the engagement letter stated: "The purpose of the Engagement is to enable Counsel to render legal advice to Client regarding a potential security issue and/or, where applicable, in anticipation of litigation, a regulatory inquiry, or an internal investigation." *Id.* at *2.

at Hunton's request, Stroz prepared a document to help explain certain issues related to the breach to government authorities, including the Federal Bureau of Investigations ("FBI Update"). *Id.*

During an early phase of discovery, the plaintiffs sought production of the above documents. *Id.* at *1. In response, Samsung moved to shield the documents from disclosure based on assertions of the attorney-client privilege and work product doctrine. *Id.* In general terms, the plaintiffs argued that the documents were not protected from disclosure because Stroz's investigation was conducted for business purposes rather than legal purposes, while Samsung argued the opposite. *Id.* at *2-3.

Judge Wolfson began her analysis by surveying data breach cases across the nation that also dealt with attorney-client and work-product issues, including this case. *Id.* at *7-11 (collecting cases).[9] From these cases, Judge Wolfson distilled six non-exhaustive factors that she found helpful in reaching her decision. *Id.* at *11-12. Those factors are:

1. Type of services rendered by the third-party consulting firm to outside counsel;

2. The purpose and scope of the investigation as evidenced by the investigative materials or the services contract between outside counsel and third-party consulting firm;

3. Existence of a two-track investigation[, one for business purposes and the other for legal purposes,] commissioned by the impacted company;

4. The extent of a preexisting relationship between the impacted company and the third-party consulting firm;

---

[9] *In re Experian Data Breach Litig.*, No. 15-01592, 2017 WL 4325583 (C.D. Cal. May 18, 2017); *Wengui v. Clark Hill, PLC*, No. 19-3195, 2021 WL 106417 (D.D.C. Jan. 12, 2021); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-2522, 2015 WL 6777384 (D. Minn. Oct. 23, 2015); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp. 3d 1230 (D. Or. 2017); *Maldondo v. Solara Med. Supplies, LLC*, No. 20-12198, 2021 WL 8323636 (D. Maa. June 2, 2021); *In re Am. Med. Collection Agency, Inc.*, 2023 WL 8595741 (D.N.J. Oct. 16, 2023); *In re Dominion Dental Servs.*, 429 F. Supp. 3d 190 (E.D. Va. 2019); *Leonard v. McMenamins Inc.*, No. 22-0094, 2023 WL 8447918, at *5 (W.D. Wash. Dec. 6, 2023).

5. The extent to which the third-party consulting firm's investigative materials were shared with members of the impacted company and/or any other outside entities, including the government; and

6. Whether the third-party consulting firm's investigative services assisted the law firm in providing legal advice to the impacted company; put differently, whether the purported privileged materials would not have been created in the ordinary course of business irrespective of litigation.

*Id.* at *12. After considering the above factors and reviewing the documents *in camera*, Judge Wolfson determined that the Stroz PowerPoint, Stroz Analysis, and FBI Update (together, "Stroz Materials") were not protected from disclosure, but that the Stroz Draft Memorandum was protected by attorney-client privilege.

Judge Wolfson first discussed her finding concerning the Stroz Material. Citing Judge Michael A. Hammer's recent decision in this case, Judge Wolfson explained that the attorney-client privilege inquiry focuses on "whether the Stroz Materials were intrinsic to the attorney client communication and the understanding of legal advice being rendered to Samsung, as opposed to some other business purpose." *Id.* at *11 (citing *In re Am. Med. Collection Agency*, 2023 WL 8595741, at *8). Judge Wolfson found that although Hunton retained Stroz and their engagement letter stated that Stroz was retained for legal purposes, the record revealed that the investigation performed by Stroz was done for business purposes. *Id.* at 12-13.

In reaching that conclusion, Judge Wolfson recognized that "discovering how [a] breach occurred [is] a necessary business function regardless of litigation or regulatory inquiries." *Id.* at *13 (citing *Wengui*, 338 F.R.D. at 10; *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp 3d at 1245). She observed that in the few cases where a court has upheld assertions of privilege over materials generated from a data breach investigation, the impacted company had employed a two-track approach involving two separate investigations into the breach—one for

10

business purposes and a separate one for legal purposes; but Samsung had failed to demonstrate it had done so. *Id.* at *15. Judge Wolfson noted the fact that the Stroz PowerPoint presentations were shared not just with Hunton, but also Samsung personnel, "cast[ed] doubt on Samsung's position that the outside investigation was not for a business purpose." *Id.* at *14. She also noted that "[t]he breadth of Samsung's involvement or participation in Stroz's process and the wide dissemination of the Stroz Analysis undermine[d] Samsung's assertion that Stroz was only retained to provide technical interpretation for the benefit of Hunton." *Id.* Judge Wolfson concluded:[10]

> while Samsung maintains that Hunton directed and controlled Stroz's investigation, the mere delegation of certain business functions to an attorney is insufficient to shield otherwise unprotected factual investigation from discovery. Here, Samsung has not provided sufficient evidence that Hunton retained Stroz to create the Stroz Materials in order to either translate or interpret attorney client communications between Samsung and Hunton; rather, the fact that Hunton hired Stroz to perform that particular business function does not shield the Stroz Materials from production based on attorney client privilege.

*Id.* at *16 (citation omitted). For substantially the same reasons, Judge Wolfson found that the Stroz Materials also did not qualify as work product; that is, the materials were created primarily for a business purpose. *Id.*

Next, Judge Wolfson discussed her finding concerning the Stroz Draft Memorandum. She noted that after the investigation was complete and five months after litigation began, Hunton asked Stroz to prepare a memorandum that it could rely on to provide legal advice to Samsung. *Id.* Judge Wolfson found it significant that, unlike the other documents, the memorandum was only shared with

---

[10] Judge Wolfson further pointed out that "another indicator that the Stroz Materials, particularly the FBI Update, were prepared for business reasons—even if also to advise counsel—[was] that the conclusion, manner and scope of Stroz's investigation were used to draft the FBI Update." *Id.* at *14. Had Samsung conducted its own investigation, Judge Wolfson reasoned, then it could have utilized those findings to address the FBI's inquiry rather than relying on Stroz to prepare the response. *Id.* "This further belie[d] Samsung's position that Stroz's investigation served no business purpose." *Id.*

Hunton and not with any Samsung personnel. *Id.* Consequently, Judge Wolfson found that the Stroz Draft Memorandum was prepared to assist Hunton in providing legal advice to Samsung. *Id.*

The Special Master agrees with Judge Wolfson's well-reasoned analysis and, accordingly, will utilize the same set of factors that Judge Wolfson considered in reaching her decision.

### A.    Documents Related to Quest's Dark Web Investigation

#### 1.    Documents at Issue

The 38 documents in dispute (Exhibits 1 through 38) can be divided into the following five categories.

The first category consists of Exhibits 1, 3 through 14, 18 and 33. These are all internal email communications involving Quest personnel, including in-house counsel, that were exchanged (with the exception of Exhibit 33) between May 16 and May 22, 2019. Exhibit 1 is an email dated May 16 from Anthony Cusano, Quest's Director of IT Security, to Donna Salerno, Quest's Privacy Officer, regarding the AMCA data breach. According to Quest, this is a draft email that Mr. Cusano prepared to send to counsel and sought Ms. Salerno's input. (Sealed Tr. 4:8-13). Mr. Cusano appears to have later sent a revised version of the email to two other members of Quest's security team, copying in-house counsel. And that revised email serves as the starting point for Exhibits 3 through 14, and 18, all of which are different iterations of the same internal email thread. (*See id.* at 9:2-13:9). Quest argues that these emails are privileged and reflect Quest's legal department's need to be involved in these discussions to understand the information being presented so that they can render legal advice. (*Id.* at 13:4-16). Lastly, Exhibit 33 is a June 18, 2019 email exchange between Mr. Cusano and Paul Kattas, Quest's in-house counsel, in which Mr. Kattas requested an update on the investigation.

In the second category is Exhibit 2, a document entitled "Incident Report: QINC-19-012 AMCA Security Incident" that is stamped "DRAFT," and dated May 16, 2019 (the "Draft Incident

Report"). Quest asserts that the draft report was prepared by Mr. Cusano at the direction of counsel and it follows the investigation into the AMCA incident. (*Id.* at 5:5-8). The draft report appears to reflect ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████. According to Quest, this document was prepared to facilitate legal advice. (*Id.* at 5:14-15).

Exhibits 15 through 17, 19, 20, and 23 through 32 comprise the third category; these are primarily email communications between Mr. Cusano and ███████████████████████████

██████████████████████████████████████████████████████. (*See id.* at 13:17-16:2). Quest argues that these emails are privileged because Mr. Kattas directed the investigative steps to be taken and producing these documents would necessarily disclose legal advice. (*Id.* at 14:21-25).

Of note, among these exhibits is █████████████████████████████████████

███████████ It states in part that ████████████████████████████████████████

██████████████████████████████████████ (*See* Exhibit 29).

The fourth category consists of Exhibits 21 and 22, which are Quest communications involving or relating to Optum. Exhibit 21 is an email dated May 23, 2019, that Mr. Cusano sent to an Optum employee in the information risk management division, copying Mr. Kattas, in which Mr. Cusano ████████████████████████████████████. Exhibit 22 is another email in which Mr. Cusano forwarded the email in Exhibit 21 to the Chief Information and Digital Officer at Quest.

The last category consists of Exhibits 34 through 38. These are email communications from June 21 to June 22, 2019, between Mr. Cusano and Terri Cetera, Quest's Senior Director of IT

Security, discussing requests from counsel for certain information and supplying such information. Quest argues that these documents are protected both by attorney-client privilege and the work-product doctrine.

In sum, Quest contends that all 38 Exhibits are protected by attorney client privilege and that Exhibits 34 through 38 are also protected by the work product doctrine.

### 2.    Application of the Attorney Client Privilege

Quest's primary argument appears to be that all 38 documents in dispute, and its investigation in general, are protected by attorney-client privilege because the investigation was directed by and performed on the advice of counsel. (*See* Joint Hearing Tr. 25:17:22 ("it's Quest's position that the steps taken in that investigation were directed by counsel and were privileged"); *see also id.* at 31:9-12 (same)). As more fully set out below, the Special Master disagrees in large part.

It seems settled that "discovering how [a] breach occurred [is] a necessary business function regardless of litigation or regulatory inquires." *In re Samsung*, 2014 WL 3861330, at *13 (*citing Wengui*, 338 F.R.D. at 11; *In re Premera*, 296, F. Supp. 3d at 1245). Quest does not appear to dispute this point. As Quest acknowledges, Quest has had a security team in place since 2016 that investigates security incidents in the ordinary course of business.[11] Nevertheless, Quest maintains that although its security team investigated the AMCA security breach, and was generally tasked with investigating security incidents in the normal course, this investigation is different because it was performed at the direction of counsel. (*See* ECF No. 511 ("That the Security Team may *at times* perform certain actions without direction from counsel does not mean that *this time*—in response to a high-profile data breach

---

[11] (*See* ECF No. 511, at 4 (quoting from the deposition transcript of Donna Salerno, Quest's former Privacy Officer: Q. "Okay. Are you aware of a Quest IT and Security Incident Team was in place prior to the data breach incident; correct?" A. "Yes." Q. "And their function was to response to, in the normal course of business, security incidents correct?" A. "Generally. Yes." Q. And that's what they did in response to the AMCA data breach?" A. "Yes.")).

for which notice was provided to millions of Quest patients, and where both in-house and outside counsel took a direct role in breach response immediately upon learning of the breach—their investigation was not directed by counsel"). But as Judge Wolfson and courts have found, "the mere delegation of certain business functions to an attorney is insufficient to shield otherwise unprotected factual investigation from discovery." *See In re Samsung*, 2014 WL 3861330, at *7.

Again, the AMCA investigation was conducted by Quest's security team – the same team that since 2016 has investigated security incidents in the normal course of business, including by conducting dark web searches for patients' information. (ECF No. 511, at 4-5). Quest has failed to show how this investigation was materially different than any of its prior investigations. The mere involvement of counsel is not sufficient. *See In re Samsung*, 2014 WL 3861330, at *7. Thus, to the extent that Quest argues its investigation is entirely privileged because it was directed by counsel, the Special Master disagrees.

The same is true with respect to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Quest, "as it bears the burden of showing the privilege applies, must demonstrate that ▇▇▇▇▇▇ served some specialized purpose facilitating the attorney client communications and was essentially indispensable in that regard." *In re Samsung*, 2014 WL 3861330, at *11. Statedly differently, the question is whether ▇▇▇▇▇▇▇▇▇ "were intrinsic to the attorney client communication and the understanding of legal advice being rendered to [Quest], as opposed to some other business purpose." *Id.* Having considered the relevant factors and reviewed the documents at issue *in camera*, the Special Master finds that Quest engaged ▇▇▇▇▇ primarily for a business, rather than legal, purpose.

First, there appears to be no dispute that Quest had a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ Second, and relatedly, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

15

███████████████████████████████████████████████. (*See* Exhibit 29). There is no indication in that document that ████████ was engaged for the purpose of assisting counsel in providing legal advice to Quest.

Next, and more importantly, nothing in the record suggests that Quest conducted a two-track investigation—one as a business response and a separate one to assist counsel in the rendering of legal advice. To the contrary, the Special Master's *in camera* review revealed that ████████████████████████████████████████████████████████████████████████████████ (*See* Exhibits 15-17, 19, 20, and 23-32). This would undermine any assertion from Quest that ████████ was engaged to assist counsel in providing legal advice. *See In re Samsung*, 2024 WL 3861330, at *14 ("The breadth of Samsung's involvement or participation in Stroz's process and the wide dissemination of the Stroz Analysis undermine Samsung's assertion that Stroz was only retained to provide technical interpretation for the benefit of Hunton."). The fact the counsel was involved—*jointly* with Quest's security team—in instructing ████████████████████████ does "not shield otherwise unprotected factual investigation from discovery." *See In re Samsung*, 2024 WL 3861330, at *7.  Thus, to the extent that Quest argues that ████████████████████████ are also privileged because they were directed by counsel, the Special Master rejects that argument.

That brings us to the documents in dispute. As the party asserting attorney client privilege, Quest must show "(1) that it submitted confidential information to a lawyer, . . . (2) that it did so with the reasonable belief that the lawyer was acting as the parties' attorney," *Montgomery Acad.,* 50 F. Supp. 2d 344 at 350, and (3) the purpose of the communications was to secure legal, as opposed to business, advice. *In re Ford Motor Co.*, 110 F.3d 954 at 965.

Beginning with the Draft Incident Report (Exhibit 2), Quest argues that this document is privileged because it was prepared at the direction of counsel to furnish information to lawyers in order to render informed legal advice. (Sealed Tr. 5:15-18). The Special Master's *in camera* review, however, revealed that much of this document contains investigative facts, and those facts are not privileged. *See In re Samsung*, 2024 WL 3861330, at *13 (finding privilege did not apply to documents that contained investigative facts; recognizing that discovering how a breach occurred, including its scope and the information extracted, is a necessary business function); *see also Leonard*, 2023 WL 8447918, at *5 (rejecting an impacted company's argument that an investigation report was privileged "because it was 'created at the request of counsel, by a third party engaged to assist in the provision of legal advice' and the report note[d] that it [was] confidential and privileged," since the report was not related to legal advice).

For example, the first paragraph of the draft report states that  (Exhibit 2, at 1). These are facts. The next two paragraphs indicate that . (*See id.*). These, too, are facts. The same is true with respect to the portions of the draft report that relate to . (*See e.g., id.* at 3). That said, as Quest points out, the draft report does contain (*See e.g., id.* at 5 (last paragraph, dated May 21, 2019)). Those portions can be redacted. Accordingly, Quest is directed to produce a redacted version of the Draft Incident Report consistent with the guidance set forth herein.

The rest of the documents in dispute are email communications and the two copies of the ███████████████████████████████████████. As noted, to be protected by the attorney-client privilege, "the communications with employees, counsel, and ████████ must be related to legal advice." *Leonard*, 2023 WL 8447918, at \*5. Where communications contain both legal and business advice, courts must ascertain whether "the communication is designed to meet problems which can be fairly characterized as predominantly legal." *Leonen,* 135 F.R.D. at 99.

Beginning with the first category, Exhibits 1, 3 through 14, 18 and 33, the Special Master finds that the communications in these documents are privileged. These are the internal email communications involving Quest personnel, including in-house counsel, regarding the AMCA data breach.  These communications can be fairly characterized as predominantly legal and need not be produced.

As to the next category, Exhibits 15 through 17, 19, 20, and 23 through 32, which are the email exchanges between Mr. Cusano and ████████ as well as the ██████████████, the Special Master finds that Quest has failed to meet its burden of showing that the privilege applies. Having already found that ████████ was engaged primarily for a business, rather than legal, purpose, the Special Master further finds that the communications in question are predominantly business in nature. *See Leonard*, 2023 WL 8447918, at \*5 (finding that "communications involving [a third-party cybersecurity firm] concerning facts of the attack and McMenamins's response, investigation(s), and remediation are not privileged," where "neither the engagement letter nor the scope of work identifie[d] any work by [the firm] related to the provision of legal advice" and the "evidence demonstrate[d] that [the firm] was providing a business service, by seeking and providing factual information to McMenamins and their counsel."). Accordingly, Quest is directed to produce these documents in their entirety.

As to Exhibits 21 and 22, which concern the communications between Mr. Cusano and Optum regarding ███████████████████████████, Quest is directed to produce these documents in their entirety. Although Mr. Kattas is copied on the emails, the communications are between Mr. Cusano and an Optum employee—not a confidential communication between an attorney and a client. And in the emails, Mr. Cusano is ███████████████████████████████████ ████████████████████████ which, for reasons already discussed, was primarily conducted for business purposes. Accordingly, these documents are not privileged and shall be produced.

The remaining documents, Exhibits 34 through 38, are privileged. These are the internal communications where, ███████████████████████████████████ ██████████████████████. As Quest points out, these communications took place well after litigation began and reflect specific information sought on counsel's behalf. These communications can be characterized as predominately legal in nature and need not be produced.[12]

## B. Documents Related to Optum's Risk Assessments of its Third-Party Vendors

### 1. Documents at issue

With respect to Optum, there are 13 documents at issue, Exhibits A through M, which can be divided into three separate categories.

The first consists of Exhibit A. It is an internal email thread that begins with a May 29, 2019 email from Carl Stevens, Optum's Associate Director of Privacy, to Delmar Howard, Optum's Vendor Liaison, and Ed Balu, Optum's VP of Vendor Management, copying Lenie Hermanson, Senior Associate General Counsel, and Sharon Rogers, a privacy officer at Optum. In the email, Mr.

---

[12] Having found Exhibits 34 through 38 are privileged, the Special Master does not address whether the documents are also protected by the work-product doctrine.



Stevens indicates that ████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████. The rest of the email thread is Ms. Rodgers forwarding herself certain information.

In his declaration, Mr. Granberg states that this email chain "reflects employees and counsel acting in response to a request from the counsel-led Incident Response Team to collect relevant information regarding Optum360's ██████████████████." (Granberg Decl. ¶ 5). According to Mr. Granberg, "[t]his information was requested so that Optum360's in-house team could provide legal advice to the company in response to anticipated litigation regarding Optum360's vendor oversight in relation to the AMCA Data Breach." (*Id.*).

The second category consists of Exhibits B and C. Exhibit B is an internal email thread from August 16 to August 23, 2019, that involves several Optum personnel, including Mr. Granberg, Brian Troen, Optum's Director of Enterprise Information Security, and Robert Booker, Senior VP & Chief Information Security Officer. ████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████, which is Exhibit C. This document is a PowerPoint titled Optum360 Vendor Analysis, which contains risk analysis and outstanding remediation tasks. Of note, Optum's privilege log indicates that this document was originally created in December 2016.

The third category consists of Exhibits D through M; these are internal email communications from August 15 to August 18, 2019, which attach risk assessments in the form of excel spreadsheets. The email communications are primarily between Mr. Brian and Megan Trafton, A Senior IT Security Consultant at Optum, and Susan Maxim, a Sourcing & Procurement Consultant and Quest. (*See*

Exhibits D, F, H, J). In the emails, ███████████████████████████████████████ ███████████████████████████████. (*See* Exhibits E, G, I, K, L, M).

With respect to Exhibits B through M, Mr. Granberg asserts that counsel directed Optum employees to "gather, compile, and analyze" the information therein ████████████████ ████████████████████████████████████████████████████████████ (Granberg Decl. ¶ 8).

### 2.    Application of the Attorney Client Privilege & Work Product Doctrine

Optum argues that all 13 documents are protected by both attorney client privilege and the work product doctrine. (ECF No. 512, at 3-7; *see* Optum's Supplemental Privilege Log). At bottom, Optum contends that the documents are protected because, as part of Optum's investigation, counsel directed the employees to prepare the attached risk assessments to facilitate legal advice and in anticipation of litigation regarding Optum's oversight of debt collection vendors. (*See id.*) Conversely, Plaintiffs contend that the documents are not protected because Optum would have prepared the risk assessments regardless of litigation, pointing out that Optum normally does so in its regular course of business. (Joint Hearing Tr. 38:18-40:25).

Based on the Special Masters's *in camera* review, the declaration of Mr. Granberg, and the arguments of counsel, the Special Master finds that the emails (Exhibits A, B, D, F, H, J) are protected by attorney client privilege and the excel spreadsheets (Exhibits E, G, I, K, L, M) are work product. Plaintiffs' argument that these documents would have been generated regardless of litigation is misplaced; as part of a separate discovery dispute, Optum was already ordered to provide Plaintiffs with information concerning the risk assessments of its other debt collection vendors that were prepared in the ordinary course of business. These documents are different. The email communications at issue took place immediately before (Exhibit A), or weeks after (Exhibits B, D,

F, H, J) lawsuits were filed against Optum alleging that "Optum360 failed to maintain adequate oversight of its third-party vendors." (ECF No. 512, at 4 n.3).  Mr. Granberg avers that he directed Optum employees to ████████████████████████████████████ to advise Optum regarding same. On these facts, the Special Master finds that these email communications are predominantly legal in nature.  For this same reason, the Special finds that the excel risk assessments (Exhibits E, G, I, K, L, M), which were prepared for the first time after litigation began, are work product and need not be produced.

That leaves us with Exhibit C, the PowerPoint titled Optum360 Vendor Analysis. The Special Master finds that this document is neither privileged nor work product. Critically, unlike the excel risk assessments, the PowerPoint was created years before litigation, in 2016. While Optum describes the PowerPoint as a living document, (Sealed Tr. 26:11-13), the Special Master's *in camera* review revealed that this document contains only facts, and it is unclear to what extent the document was updated in response to the AMCA data breach and any potential litigation. Regardless, considering that the PowerPoint was originally created in 2016, and that Optum performs risk assessments in the normal course of business, it seems apparent that this particular document was, and would continue to have been, modified regardless of litigation. That said, the PowerPoint appears to contain information concerning ████████████████████████████████████████████ ██████. Having previously ruled that Optum need only provide risk assessment information concerning its other debt collection vendors, Optum may redact the portions in the PowerPoint that relate to its ███████████████. Accordingly, Optum is directed to produce a redacted version of the PowerPoint consistent with the guidance set forth herein.

22

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs' requests are denied in part and granted in part as follows:

- Quest is directed to produce Exhibit 2 with appropriate redactions, and Exhibits 15, 16, 17, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 32 in their entirety; Quest need not produce Exhibits 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 18, 33, 34, 35, 36, 37, and 38.

- Optum is directed to produce Exhibit C with appropriate redactions; Optum need not produce Exhibits A, B, D, E, F, G, H, I, J, K, L, and M.

_____

**Mark Falk, Special Master**

Page 1

1

2    IN RE:                              )
                                         )
3                                        ) 2:19-MD-02904-
         AMERICAN MEDICAL COLLECTION  ) MCA-MAH
4        AGENCY - QUEST                   )
                                         )
5                                        )

   _____

6

7                Walsh Pizzi O'Reilly Falanga
                 100 Mulberry Street, 15th Floor
8                Three Gateway Center
                 Newark, New Jersey
9                Friday, July 26, 2024
                 10:20 a.m.

10

11

   B E F O R E:

12

13       HONORABLE JUDGE MARK FALK (Ret.)

14

15

16

17

18

19

20

   Reported by:
21   Lydia Fucci-McDonnell, CSR
     Job No. NJ6826087

22

23

24

25

Page 2

1  A P P E A R A N C E S:
2  SEEGER WEISS LLP
   BY:  HILLARY FIDLER, ESQ.
3        -and-
        CHRISTOPHER AYERS, ESQ.
4  55 Challenger Road
   Ridgefield Park, New Jersey 07660
5  973-639-9100
   hfidler@seegerweiss.com
6  cayers@seegerweiss.com
   Attorneys for the Plaintiff,
7  Optum360
8
   SIDLEY AUSTIN LLP
9  BY:  HEATHER BENZMILLER SULTANIAN, ESQ.
   One South Dearborn
10 Chicago, Illinois 60603
   312-853-7883
11 hsultanian@sidley.com
   Attorneys for the Defendant,
12 Quest
13      -and-
14 SIDLEY AUSTIN LLP
   BY:  LAURA SORICE, ESQ.
15 787 Seventh Avenue
   New York, New York 10019
16 212-839-5861
   lsorice@sidley.com
17 Attorneys for the Defendant,
   Quest
18
19 ALSTON & BIRD LLP
   BY:  DONALD HOUSER, ESQ.
20 One Atlantic Center
   1201 West Peachtree Street, Suite 4900
21 Atlanta, Georgia 30309
   404-881-4749
22 donald.houser@alston.com
   Attorneys for the Defendant,
23 Quest
24      -and-
25

Page 3

1  A P P E A R A N C E S:  (Cont'd)
2  ALSTON & BIRD LLP
   BY:  LEILA KNOX, ESQ.
3  90 Park Avenue, 15th Floor
   New York, New York 10016
4  212-210-9400
   leila.knox@alston.com
5  Attorneys for the Defendant,
   Quest
6
7  CARLTON FIELDS, P.A.
   BY:  MICHAEL T. HENSLEY, ESQ.
8  180 Park Avenue, Suite 106
   Florham Park, New Jersey 07932
9  973-604-2600
   mhensley@carltonfields.com
10 Attorneys for the Defendant,
   Quest
11
12 HOGAN LOVELLS US LLP
   BY:  COURTNEY E. HELT, ESQ.
13 Columbia Square
   555 Thirteenth Street, NW
14 Washington, D.C.  20004
   202-637-5600
15 courtney.helt@hoganlovells.com
   Attorneys for the Defendant,
16 Quest
17 ALSO PRESENT:
   Eric S. Padilla, Esq. - Walsh Pizzi
18 Patrick S. Salamea, Esq. - Walsh Pizzi
19
20
21
22
23
24
25

Page 4

1                    I N D E X
2
3
4
5             E X H I B I T S
6
   NUMBER          DESCRIPTION          PAGE
7
   Exhibit 1      Email........................  18
8
   Exhibit 2      Email........................  19
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1           JUDGE FALK:  Okay.  Good morning.  So
2  we're here today to deal with disputes of 511, and
3  then 512, which, I think, are kind of some of the
4  last, or the last that I have.
5           MR. AYERS:  We hope so.
6           JUDGE FALK:  Yeah.  I guess.
7           I got another letter from Sonic -- the
8  Sonic people, but I think they may have worked it
9  out.  I'm not sure.
10          MR. AYERS:  Yeah.  I'm not sure.  I
11 think the Sonic track has a couple of outstanding
12 disputes, but I'm not --
13          JUDGE FALK:  Sure.
14          MR. AYERS:  I'm not on the....
15          JUDGE FALK:  Yeah.  I didn't -- that's
16 it, but....
17          So let me give you the day, the way I
18 see it, which, I think, won't -- will not be long.
19          Obviously, we've read everything, but I
20 guess -- let me just see what we've got here.  This
21 is....
22          (Pause.)
23          JUDGE FALK:  Okay.  So we're gonna start
24 with 511, and I want to just discuss the issues that
25 were raised in the letters.

2 (Pages 2 - 5)

Page 6

1    Of course, these letters were sent in a
2 long time ago. It's not your fault. I got into it a
3 little later and time has passed.
4        I guess Judge Arleo just came out, or
5 recently came out, with her decision on the Charles
6 River appeal, which sort of relates to some of this
7 in a way, but my thought is to discuss, generally,
8 511.
9        I have some questions; I may want to
10 hear from you folks, if you want to be heard from,
11 and then -- and, I mean, sort of the general
12 questions because different things were asked for.
13       And then we have in camera review of
14 documents, and I'm gonna want to run through those
15 and allow Quest to make any proffer supporting the
16 documents, and the -- the Plaintiffs will be asked to
17 leave the room for that because you can't see the
18 documents. That's the way we do it, right?
19       And then we have 512, which really is
20 clawback issues with respect to -- how many documents
21 are there?
22       MR. PADILLA: Thirteen.
23       JUDGE FALK: -- 13 documents, and I'm
24 gonna go through those one by one. And I guess it's
25 up to Optum, you know, whether you want the

Page 7

1 Plaintiffs present or not.
2        The only reason I say this -- not that
3 you should, but presumably they've already seen these
4 documents. Whether they read them, you know,
5 obviously, if you come into possession of privileged
6 documents, you're supposed to stop right there. I
7 don't know what happened, if you didn't, but.... So
8 it may be a very short day for some of the
9 Plaintiffs. I doubt the Plaintiffs are not gonna
10 be -- I don't mean "not." I mean, the Plaintiffs are
11 not gonna be sticking around for that.
12       And then it's my decision to quickly
13 issue a -- a short opinion on the issues, which will
14 include charts that deal with a decision on each of
15 the documents, with a little explanation.
16       It seems that everything is appealed in
17 this case. I'm actually fine with that. And the
18 first two things that I did, I did just on the
19 record, and I think that's harder for whoever's
20 deciding it, whether it's Judge Hammer or Judge
21 Arleo, on appeal, not to have something written, so I
22 decided to do it that way. So that's the day, okay,
23 folks?
24       So we'll get started with 511. These
25 are all based on, I think, joint letters that were

Page 8

1 sent in. That was May of 2023, more than a year ago,
2 but the dispute arises out of the Plaintiff's request
3 for documents and information relating to an
4 investigation conducted by Quest's IT security
5 incident team and, perhaps, others into the
6 availability of Quest patient information on the dark
7 web following the AMCA data breach.
8        And the Plaintiffs, in this letter,
9 request that I, as special master -- special
10 discovery master, enter an order compelling Quest to
11 produce all documents pertaining to the
12 investigation, compelling Quest to produce a
13 corporate representative to testify regarding the
14 facts obtained by the investigation, and Quest's
15 response to the AMCA breach, or alternatively
16 precluding Quest from asserting a defense that
17 Plaintiffs' information is not available on the -- on
18 the dark web.
19       And I -- I guess I will foreshadow, I
20 don't plan to issue that kind of an order. I don't
21 have enough involvement in the case, and
22 understanding, as to precluding people from bringing
23 defenses, depending on what happens. I think that's
24 really for the trial judge, or it could be the
25 magistrate judge, you know. It could be an in limine

Page 9

1 motion. Things that aren't disclosed are not usually
2 permitted to be raised.
3        So I guess I'll turn to Plaintiffs'
4 counsel first on -- on this issue, not any specific
5 document necessarily, but if you have anything that
6 you want to say?
7        MS. FIDLER: Yeah. Absolutely. Thank
8 you.
9        JUDGE FALK: Okay.
10       MS. FIDLER: You know, Plaintiffs'
11 information being available on the dark web has
12 always been highly relevant to this litigation. It's
13 one of our core injury theories. Quest knows this.
14       You know, in the motion that they
15 brought for sanctions, they argued that without the
16 dark web allegation, Plaintiffs have no injuries at
17 all, so Plaintiffs have repeatedly requested to get
18 discovery on Quest's knowledge of information being
19 available on the dark web after the AMCA data breach.
20       We served requests for production
21 No. 48, which was subject to a prior letter dispute,
22 letter dispute 474, and that -- and then we also
23 reserved requests for production -- or excuse me --
24 requests for admission, 106 through 108, where we
25 sought admissions on Quest's knowledge of information

3 (Pages 6 - 9)

Page 10

1 on the dark web.
2        Quest never once argued that those
3 documents were privileged.  It largely argued that
4 the documents were irrelevant or that they had
5 searched the documents and had not had -- and could
6 not locate any responsive documents.
7        The parties jointly noticed the Gemini
8 Advisory deposition, which is the original firm that
9 published that Quest patient data -- or data related
10 to the AMCA data breach was found on the dark web.
11 We went to this, and in the letter brief 474 that was
12 submitted to this Court, Quest argued that if we
13 wanted to investigate Quest's knowledge of
14 information on the dark web, the appropriate place to
15 do so was a deposition.
16        We didn't have any documents, but we
17 took that to heart, and so we went to the 30(b)(6)
18 deposition, and we learned for the very first time
19 that Quest has an IT security team that was
20 established in 2016, well before this data breach,
21 and ████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.  The Court
25 subsequently ordered -- issued that Quest should

Page 11

1 submit 25 documents for in camera review on that and,
2 shortly thereafter that, Quest filed an objection.
3        Quest kind of walked back and said
4 that -- it acknowledged that it's possible that some
5 responsive documents may exist, existing from the ███
████████████████████████, then the parties continued to
8 meet and confer and -- hopefully, to resolve the
9 disputes of this issue so we wouldn't have to come
10 before Your Honor again.
11        JUDGE FALK:  Great.  Sure.
12        MS. FIDLER:  Quest ultimately produced
13 some documents, but withheld others on the basis of
14 privilege, which it had not ever asserted to
15 Plaintiffs before.  So in those documents, we learned
16 for the very first time, after the -- after the close
17 of discovery, that the ████████████████████████
████████████████████████████████████████████
████████████████████; also, we learned that Quest
21 had a ████████████████████████████████████
████████████████████████████████████████████
██████████.
25        We found from the documents that were

Page 12

1 produced, which I have, if you would like a copy of,
2 that ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████
██████.  So Plaintiffs -- upon looking at those
7 documents, Plaintiffs requested that Quest produce
8 all documents related to the ████████
██████████.  Quest refused to do so, claiming that
10 it was too late for Plaintiffs to do so because
11 discovery had closed a year ago and that it was
12 privileged.
13        You know, Quest has, in their responses
14 to our -- or to requests for admission 106 through
15 108, we specifically sought Quest's knowledge of
16 information was available on the dark web after the
17 data breach.  Quest denied that knowledge and said it
18 would supplement its answers.  It never did.
19        Quest said in response to document 48 in
20 this meet -- in meet and confers, in letter 474 to
21 the Court, in its objection to Your Honors' order,
22 and in this letter brief, that it had searched for
23 documents and it had no responsive documents. ███
        They produced those documents to us that
25 explicitly related to ██████████████████████

Page 13

1 ████████████████████████████████████████████
██████ they never objected to it on privilege
3 grounds.
4        And, in fact, in this letter before the
5 Court, in footnote 13, they disclaim work product --
6 work product privilege over the entire subject
7 matter, so we know that Quest, this entire time, have
8 responsive documents.  The documents that Quest
9 offered to produce were never logged, they were
10 withheld until a year after the close of discovery,
11 and that is nothing more than bad faith.
12        You know, they denied knowledge of the
13 dark web.  They sought sanctions against Plaintiffs,
14 claiming that we have no viable injury theory.  The
15 entire time, ████████████████████████████████
████████████████████████████████ and at the very
17 basis, they disclaimed work product being work
18 product privilege over its own investigation, ██████
████████████████████████████████, and they claimed that
20 attorney-client privilege covers everything because
21 it was directed at counsel.
22        We know that communications -- we know
23 that communications are covered by the work product
24 privilege; facts are not.  We are seeking facts that
25 underlie Quest's knowledge of the extent and scope of

Page 14

1 dark web -- or information being available on the
2 dark web, and the 30(b)(6) witness testified at the
3 deposition that this was done in the ordinary course
4 of business, not at the direction of counsel and that
5 it -- it would have undertaken this regardless.
6        You know, Quest says that investigations
7 that are directed at the -- directed by counsel are
8 privileged.  The cases that they cite for that are
9 work product claims.  Quest disclaimed work product
10 privilege, so it has no basis to assert that that's
11 the case.
12        You know, they -- they had no good faith
13 basis to withhold these documents based on privilege
14 and, you know, we followed up with Quest after the
15 ███████████, you know, telling them that
16 they had not disclosed ███████ in their Rule 26(f)
17 disclosures or in their -- in their Rule 26
18 disclosures.  They said they weren't -- they didn't
19 have to because ███████████████████████████.  That
20 ███████████████████████████████.  That
21 seems not to be the case.
22        And they also have said that they were
23 not intending to rely on that -- on those kinds of
24 documents for its offenses -- or excuse me -- for its
25 defenses.  Well, either ████████████ Quest

Page 15

1 ██████████████████████████████████████
2 ██████████████████ and Quest has withheld
3 those documents, or ████████████████, and
4 Quest is relying on those.  At any rate, it should
5 have been disclosed.
6        And, you know, they argue a lot that --
7 that the -- when we argue that they did not claim
8 privilege, that they said some of these ███████
9 documents were logged on the privilege log, you know,
10 a year ago and that Plaintiffs should have been aware
11 of it, Rule 26(b)(5) requests that -- or requires
12 that Quest expressly state the claim that it is
13 withholding documents based on privilege, and Quest
14 never did that.  They never told us the documents
15 were privileged, and we had no reason to believe that
16 Quest was withholding documents based on privilege.
17 And so, you know, we believe that
18 because they have never asserted privilege on the
19 grounds that they have, one, likely waived that.  You
20 know, the failure to timely object to documents
21 responsive to an RFP as privileged is a -- is a
22 waiver, and they have never once done that.  They --
23 you know, we think that they have withheld highly
24 relevant and highly adverse material despite, you
25 know, repeated requests for such material, despite

Page 16

1 this Court -- or being in front of this Court before
2 on the issues of documents responsive to RFP 48, and
3 we think that conduct is -- is sanctionable.
4        You know, there's a case in New Jersey,
5 a recent case from 2023, called O'Reilly vs. Home
6 Depot.  There, Plaintiff had not produced 81 photos
7 and videos that were related to the incident at hand.
8 Defendant brought a motion after that revealed that
9 those photos existed in a deposition.  They ordered
10 sanctions by allowing Defendant to redepose the
11 Plaintiff regarding the pictures and videos withheld
12 and ordered the production of withheld documents, and
13 we argue that that relief is more than appropriate
14 here.
15        In sum, there's no work product claim at
16 issue here; they've waived that.  There's -- they're
17 not protected by attorney-client privilege.  We are
18 seeking the facts, not communications.  And to the
19 extent that some of the communications have lawyers
20 on them, and to say the ones that we know about, of
21 the 32 logged entries that Quest provided to us, only
22 eight of those communications actually have attorneys
23 on them.  Over, I think, 12 of them are between
24 Quest's ██████████████████████████████
25 This was not to seek legal advice; it was strictly to

Page 17

1 assess the impact of Quest.
2        We have a document right here where
3 Terri Cetera, the....
4        JUDGE FALK:  Thank you.
5        MS. SULTANIAN:  Could I have a copy of
6 that?
7        MS. FIDLER:  Yes.  Absolutely.
8        JUDGE FALK:  So, Senior Director of IT
9 Security at Quest, Terri Cetera.  Is that correct?
10        MS. FIDLER:  Yes.  You know, she sent an
11 email to Anthony Cusano asking him █████████████
12 ████████████████████████████████  At that --
13
14        MS. SULTANIAN:  Counsel, I'm sorry to
15 interrupt, but I don't think it's the same email.
16        MS. FIDLER:  It's not the same email?
17        MS. SULTANIAN:  No.  I just want to make
18 sure I have what you're looking at.
19        MS. FIDLER:  Oh, I apologize.  You're
20 right.  It's this one.
21        MS. SULTANIAN:  Okay.
22        MS. FIDLER:  Thank you.  Sorry.
23        JUDGE FALK:  Can I cut you off for one
24 second?
25        MS. FIDLER:  Yes.

5 (Pages 14 - 17)

Page 18

1    JUDGE FALK: I wonder if I could ask you
2 to mark this as Plaintiffs' Exhibit 1.
3        (P-1, Email, marked for identification.)
4    JUDGE FALK: Go ahead. I'm sorry.
5    MS. FIDLER: Yes. So in that email,
6 you'll see that Terri Cetera -- I think she -- her
7 title is the Director of IT -- emailed another IT
8 employee and asked them █████████████████████
█████████████████████████████████████████
█████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████
██████████████████.
15    If you look at this email as Exhibit 2,
16 it's an email that is from one day before that. In
17 that email, Anthony Cusano, a Quest IT employee, ██
████████████████████████████████████████████
█████████████████████████████████████
████████████████████████████████. This
22 investigation was not at the direction of counsel; it
23 was done in the ordinary course of business. It
24 would have been done regardless if the lawyers were
25 cc'd on an email or were included on an email in

Page 19

1 which a report was attached. The purpose of the
2 investigation was not to obtain legal advice; it was
3 to assess the business impact to Quest.
4    And all that Quest can offer in that is
5 because the 30(b)(6) witness testified that the IT
6 security team performed these investigations in the
7 routine course of business is just because they had
8 done it previously doesn't mean they did it without
9 the direction of counsel now. That is insufficient
10 to meet the burden for them to prove specific facts
11 that each and every document on a
12 document-by-document basis is a privileges, and it --
13 they're not privileged at the end of the day.
14 thank you.
15    JUDGE FALK: All right. Thank you very
16 much.
17    Just make that Exhibit 2 for us.
18    (Exhibit 2, Email, marked for
19 identification.)
20    JUDGE FALK: Does anyone from Quest want
21 to respond, generally?
22    MR. HOUSER: I'll have some specific
23 questions after that, but....
24    MS. SULTANIAN: Yes, Your Honor.
25 Heather Sultanian from Sidley on behalf of Quest.

Page 20

1    JUDGE FALK: Yes. Go ahead.
2    MS. SULTANIAN: I want to start just by
3 saying the scope of this dispute has fundamentally
4 changed when this letter was -- was submitted. We
5 met and conferred with Plaintiffs, we narrowed the
6 category of documents, we voluntarily produced some
7 maintaining our assertion of privilege, and the
8 waiver of the 502 Agreement. So we've done our best
9 to narrow this to the documents we -- that are --
10 they were all privileged, but the -- you know, the
11 ones that we think are most critical.
12    And so there's a small set of documents
13 remaining at issue that were submitted to Your Honor.
14 We'll -- we'll discuss them, you know, document by
15 document.
16    JUDGE FALK: We'll go through them
17 document by document.
18    MS. SULTANIAN: Yeah. But at a more
19 general level, Plaintiffs' arguments here are really
20 based on two completely and factually incorrect
21 arguments. One is that they argue that, because the
22 Quest IT team sometimes performs some dark web
23 monitoring without the direction of counsel, that
24 means that this time they must have as well; but
25 as -- as the documents that we submitted in camera

Page 21

1 show, that's not correct.
2    Terri Cetera, Quest's 30(b)(6) witness,
3 she testified that the IT Security Incident Response
4 Team performed some monitoring in the ordinary
5 course. █████████████████████████████████████
██████████████████████████████████████████.
7 Just kind of ordinary course. But there's a
8 distinction between that ordinary monitoring that the
9 security team did and the specific steps they took to
10 investigate whether patient information was on the
11 dark web after Quest learned of the breach, which
12 were directed by counsel.
13    You know, at the -- at the time this was
14 kind of a rapidly evolving situation, May 14, 15, 16,
15 around then, and at that time, Quest understood ██████
████████████████████████████████████████████ but
18 it made sense given that, to bring legal counsel in
19 right away and immediately begin directing an
20 investigation of what could be such a high-profile
21 breach. This wasn't kind of ordinary-course stuff,
22 this was a five-alarm fire.
23    Counsel was brought in right away, and
24 the privilege documents show that regardless of what
25 the IT security team was doing in the ordinary

6 (Pages 18 - 21)

Page 22

1 course, they deviated this time and sought direction
2 from counsel as to specific steps that were going to
3 be taken to search the dark web. They were different
4 than that ordinary coursework.
5        The second main argument I heard from
6 Plaintiffs is that the facts of what the security
7 team learned during the investigation are not
8 privileged, including whether they found Quest
9 patient data on the dark web, but the facts have
10 already been disclosed. The fact is that Quest
11 found, as -- as shown in, I think it was Exhibit 1,
12 found a dark web post that was alluded to in the
13 Gemini Advisory report, but as Ms. Cetera testified,
14 Quest never was made aware that Quest patient data
15 was on the dark web. They never found it; so they
16 have the facts.
17        I'll leave kind of the more, you know,
18 specific description of documents to a later stage,
19 but one final thing I want to respond to is the
20 accusations of bad faith and -- and hiding things. I
21 want to be very clear that documents have been logged
22 on the privilege log that are, on their face, ████
23
24        There's a November 21st, 2022 letter
25 that was attached as Exhibit B, Plaintiffs'

Page 23

1 Exhibit B, to Docket 511 that is specifically about
2 the RFP 48, which was the -- the requests for
3 documents about the dark web, and we said "Defendants
4 will produce non-privileged documents identified
5 after a reasonable search." It has never been hidden
6 that we were asserting privilege over portions of the
7 dark -- over this dark web investigation.
8        And the -- the case that Counsel cited,
9 O'Reilly v. Home Depot, where -- where sanctions
10 were, apparently, imposed, there was no reference in
11 the privilege log to those documents at issue. That
12 is not the case here. So, you know, I won't -- I
13 won't belabor that unless Your Honor has a need for
14 further questions, but I -- I want to be clear that
15 this has been aboveboard and fully disclosed. Things
16 have been in the privilege log. That's -- that's all
17 I have on that.
18        JUDGE FALK: Okay. That's fine. So I
19 just want to ask a few questions, but I guess from
20 the letter -- and I don't know how this is -- well,
21 Quest is saying that some investigation -- well,
22 information -- none of Quest's patient information on
23 the dark web. Is that true?
24        MS. SULTANIAN: Yes. As -- as far as
25 Quest is aware, and from its investigation, it has

Page 24

1 not found any data on the dark web that it could
2 identify as having been Quest data -- Quest patient
3 data.
4        JUDGE FALK: Right. And, I mean,
5 assuming you're at a trial and you're asked, Well,
6 what did you do to make that decision? Who's gonna
7 testify?
8        MS. SULTANIAN: I'm sorry. I -- I want
9 to make sure --
10        JUDGE FALK: In other words, you know,
11 there's a jury there --
12        MS. SULTANIAN: Yeah.
13        JUDGE FALK: -- let's just say. Hey, we
14 didn't find any -- none there. Plaintiffs, of
15 course, say they have information from, you know,
16 different places. They put that right in the letter
17 that there's information of Quest patients, but
18 someone's gonna get on the stand and say, We didn't
19 find any. And then the question might be, Well, what
20 did you do to find out? How did you come to this
21 determination? Who's gonna testify and say what?
22        And I know I'm not -- I'm not putting
23 you in a trial. I know we're not.
24        MS. SULTANIAN: Yeah.
25        JUDGE FALK: But there's -- there's

Page 25

1 something that is bugging me, I guess, and that is --
2 well, I'll keep going, and then I'll let you go. I
3 mean, first of all, was there ever a report of the
4 investigation that was done, and was that report
5 provided to the Plaintiffs?
6        MS. SULTANIAN: Your Honor,
7 ██████████████████████████████████████████
8        JUDGE FALK: All right. ████████████
██████. And then you have a 30(b)(6) witness who's
10 asked -- who says, Ms. Cetera, that she's -- she does
11 this. It's a regular thing. One of the things they
12 do is monitor the dark web. They do it all.
13        And what you do here, and then there's
14 an objection -- and I can read the very specific
15 stuff I'm dealing with, but there's an objection of
16 privilege; don't answer the question.
17        So, in other words, is it Quest's
18 position that they don't have to disclose what was
19 done in the investigation?
20        MS. SULTANIAN: It's -- it's Quest's
21 position that the steps taken in that investigation
22 were directed by counsel and were privileged.
23        JUDGE FALK: So -- and when you say it
24 was directed by counsel, who are we talking about?
25        MS. SULTANIAN: So, specifically --

7 (Pages 22 - 25)

Page 26

1 and -- and I don't want to get into the details of a
2 specific document first, but there --
3         JUDGE FALK:  Well, it's the lawyers, I
4 think you said.
5         MS. SULTANIAN:  Yeah, the lawyers.
6 So -- yes.  Paul Kattas was involved in that, and
7 he's in-house counsel for Quest.
8         JUDGE FALK:  So an in-house counsel was
9 involved in the investigation, and -- so that makes
10 everything non-discoverable after that.
11        MS. SULTANIAN:  Well, not just involved;
12 there's -- there's emails where it specifically says
13 Paul made the decision, right?  It's directed by
14 counsel.
15        JUDGE FALK:  And -- and how about just
16 what was done in the investigation?  Is that not --
17 are they not facts?
18        MS. SULTANIAN:  I don't believe so, Your
19 Honor.  I -- I believe that the steps taken in the
20 investigation are directed -- are counsel-directed.
21 So the facts are what was found, and that has been
22 disclosed.
23        JUDGE FALK:  Okay.  I hear what you're
24 saying.
25        Ms. Cetera goes a long way to say that,

Page 27

1 you know, obviously they're security experts, they --
2 well, let me just read some of it.  And there's more
3 things here that I can refer to, but....
4         So I'm reading from, actually, page 4 of
5 the letter, May 9th.
6         "QUESTION:  Are you aware of any Quest
7 IT Security Incident team that was in place prior to
8 the data breach?
9         "ANSWER:  Yes.
10        "QUESTION:  And their function was to
11 respond to, in the normal course of business,
12 security incidents, correct?
13        "ANSWER:  Generally, yes.
14        "QUESTION:  And that's what they did in
15 response to the AMCA data breach?
16        "ANSWER:  Yes."
17        I think that's -- that's kind of just
18 information.  And then later we have another witness
19 on page 6:
20        "QUESTION:  And monitoring the dark web
21 and identifying if there's -- following an incident
22 or data breach is part of the day-to-day
23 normal-course functions of Quest's threat incident
24 team?
25        "ANSWER:  Yes, it is.

Page 28

1         "QUESTION:  And so following the data
2 breach in 2019, the threat and incident team would,
3 in the normal course, finding out that there was 11.5
4 million people potentially exposed, monitor the dark
5 web with respect to that activity?"
6         And then there's an objection by
7 Counsel:  "Objection.  I instruct the witness not to
8 answer on the grounds of privilege.  That team and
9 others acting at the direction of counsel in
10 anticipation of litigation" -- that's more of a work
11 product concept, I -- I agree.  From what I've seen,
12 I don't think Quest is claiming work product, but to
13 finish:  -- "in anticipation of litigation is
14 protected by privilege, and I will instruct the
15 witness not to answer."
16        And the witness testifies at other times
17 that that's what they do on a day-to-day basis.  It
18 actually says that.  So they do that, and would you
19 agree that that's a -- a business function?
20        MS. SULTANIAN:  The -- the normal-course
21 monitoring, yes, Your Honor, I agree.  The difference
22 here is that the -- the scale of what, at the time,
23 we understood this breach could potentially be meant
24 that counsel got involved right away and directed
25 specific steps.  And, again, it gets into the

Page 29

1 documents, so I don't want to be too forthcoming
2 right now.  We can -- we can discuss in more detail,
3 but there's a difference between that ordinary-course
4 monitoring, which -- which is a business function,
5 and what happens right after a breach of this
6 potential scale is learned and counsel gets involved,
7 and there were specific things that were directed
8 that are different than what the ordinary-course
9 monitoring was.
10        JUDGE FALK:  Right.  But it's these
11 people, it's that team that did the investigation.
12 Is that true?
13        MS. SULTANIAN:  Yeah.  The security team
14 actually, you know, boots on the ground, did the
15 investigation.  That's not something counsel has the
16 skills to do.
17        JUDGE FALK:  Right.
18        MS. SULTANIAN:  But it -- it was
19 directed by counsel to obtain information that would
20 allow them to give informed legal advice.
21        JUDGE FALK:  Okay.  And did -- is it
22 Paul Kattas we're talking about?
23        MS. SULTANIAN:  Yeah.  He was primarily
24 the one --
25        JUDGE FALK:  Right.

8 (Pages 26 - 29)

Page 30

1    MR. HOOPER -- involved in it.
2    JUDGE FALK: And did he stay involved
3 and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4    MS. SULTANIAN: Yes. Because he, you
5 know, through this whole couple-week, even to
6 couple-month period, was involved in these ongoing
7 discussions, and you'll see in the documents, was
8 directing specific things that were done.
9    JUDGE FALK: So, I guess to sum up --
10 and I guess I already asked this question; I don't
11 really need to ask much more -- it's Quest's position
12 that an investigation done by the -- the team that
13 has done these investigations before, et cetera,
14 is -- as soon as counsel gets involved, that makes
15 everything that they did privileged.
16    MS. SULTANIAN: But I -- I'd put a finer
17 point on it, Your Honor, in that it's not just, Oh,
18 they get involved, everything becomes privileged.
19 It's counsel got involved and directed them to do
20 specific things that they ordinarily did not do.
21    JUDGE FALK: Privilege. Okay.
22    MS. FIDLER: Can I respond?
23    JUDGE FALK: What?
24    MS. FIDLER: Can I respond?
25    JUDGE FALK: In a minute. Because I'm

Page 31

1 still -- I want to satisfy myself, but I guess I have
2 to accept it. I mean, I'm trying to figure out how
3 that plays out, you know, in a trial.
4    In other words, basically what Quest is
5 saying here is that the Plaintiffs are not permitted
6 to know what Quest did to investigate the data
7 breach. That's what this comes down to. And if
8 that's the position, I'd like to know it.
9    MS. SULTANIAN: It -- it is our position
10 that steps that were taken to investigate the breach
11 that were directed by counsel, it's -- it's
12 privileged. That -- that is our position.
13    JUDGE FALK: And were there any steps
14 that weren't taken by counsel that have been
15 disclosed?
16    MS. SULTANIAN: Well, for example,
17 these -- these emails that Ms. Fidler put in front of
18 you, they are showing things that Quest did to
19 investigate, and they've been produced, right? These
20 are not the specific things that counsel directed.
21    JUDGE FALK: Okay. I appreciate it.
22 You would like to respond?
23    MS. FIDLER: Yes. Just on that last
24 point. Heather said -- or my colleague -- said
25 that -- you know, that these documents were produced.

Page 32

1 We didn't get them until more than a year after the
2 close of discovery, so we had no opportunity to
3 investigate that further. When we tried to do so,
4 Quest told us that it was too late, so we could not
5 do that any further.
6    And to that end, I just wanted to note
7 that the documents I passed out didn't have the Bates
8 numbers them, but --
9    JUDGE FALK: No.
10    MS. FIDLER: -- they end -- I can
11 provide that after, but they end in 0024406, 0024408.
12 And those documents relating to this -- to that
13 investigation were never logged, they were never
14 asserted privilege over them, and so they were
15 withheld for the entire course of discovery.
16    But at a more broader aspect, basically
17 what Quest is trying to do here is use its privilege
18 as both a sword and a shield. It wants to shield
19 itself by saying that, you know, just because an
20 attorney may have asked someone to do something that
21 it would have done anyway in the normal course of
22 business, that it is privileged, and then it has
23 tried to use that improperly asserted privilege as a
24 sword to assert that they have no knowledge of
25 information being found on the dark web because that

Page 33

1 information is privileged.
2    That is not how discovery works. You
3 don't get to use privilege to assert claims in
4 defenses, and then withhold that privilege, and
5 that's exactly what they are asserting: that
6 information on the dark web is not available because
7 they have any -- they don't have knowledge of it, and
8 to the extent those documents and communications that
9 would be reflected of that true knowledge -- or of
10 that knowledge and the fact that they -- excuse me --
11 the fact that they found out in the investigation are
12 privileged.
13    You know, my colleague says that the
14 facts -- we have the facts. They never produced the
15 documents. We were not allowed to ask the witness
16 about what they did in response to the AMCA data
17 breach. They asserted privilege on that, and the
18 communications were shut down. The only facts that
19 we have regarding what Quest did in response to
20 information on the dark web are these documents that
21 we got a year after discovery, and that's all we
22 have.
23    And so to the extent that Quest is going
24 to claim that all of -- all of these documents are
25 privileged, then they should be precluded from having

9 (Pages 30 - 33)

Page 34

1  a defense that relies on any facts of that
2  investigation, whether it be that Plaintiffs'
3  information was not found on the dark web or whether
4  Plaintiffs' information that -- or Plaintiffs'
5  evidence that their information was found on the dark
6  web is -- is wrong. They can't shield the facts and
7  then -- and then use them against Plaintiffs.
8      JUDGE FALK: Understood. Thank you.
9      MS. FIDLER: Thank you.
10     JUDGE FALK: Mr. Ayers, do you have any
11 questions?
12     MR. AYERS: Nothing to add.
13     JUDGE FALK: Okay.
14     MR. AYERS: Ms. Sultanian handled it
15 well. Thank you.
16     JUDGE FALK: So -- and now it's my
17 intention to go through the documents and allow --
18 you know, there are many ways to decide privilege
19 disputes, as you must all know, from, actually, you
20 know, having affidavits, and things like that, to
21 having testimony, you know. I'm talking about in a
22 closed courtroom.
23     In this case, I'm gonna ask -- and it's
24 only if the party wishes to offer proffers about what
25 you would be prepared to prove, and we're going to

Page 35

1  seal that portion of the transcript in both cases.
2  But I only say that because you folks may want to
3  stick around, because with both cases -- I think with
4  Optum, we don't have any real issues to argue, unless
5  something -- has anything new come up? I don't know.
6      I mean, we have documents that were,
7  apparently, inadvertently produced and clawed back
8  and there's a dispute. That's what I have before me.
9      MR. HOUSER: Yeah. That's -- that's
10 correct. That's the 512 dispute.
11     MR. AYERS: Yes. And we've seen these
12 documents. I mean, we -- we don't believe they're
13 anything close to privilege or work product, so we
14 don't believe we have any -- any way to suspect that
15 they might have been privileged. We actually had
16 reviewed them prior to --
17     JUDGE FALK: Oh.
18     MR. AYERS: -- prior to counsel clawing
19 them back.
20     MR. HOUSER: I -- I don't know if that's
21 the case, but....
22     MR. AYERS: But more to just put it on
23 the record, we have -- we have seen them. So if that
24 influences your decision of whether we're in or out
25 of the room....

Page 36

1      MR. HOUSER: Well, definitely. I mean,
2  just -- our position is these are privileged. So, of
3  course, we -- we would expect we'd get the same
4  treatment as other documents that were withheld on
5  privilege and that Counsel would not be in the room
6  for any such proffers.
7      JUDGE FALK: Okay. And before we split
8  up, are there any other discovery disputes out there
9  that need to be decided?
10     MR. AYERS: I don't -- I don't think of
11 the issues that are still pending.
12     JUDGE FALK: Okay.
13     MR. AYERS: Do you want to -- how would
14 Your Honor want to -- how would you want to handle
15 this? Would you want to have argument on -- on this
16 Optum dispute letter and then handle both in camera
17 submissions after we leave the room, or handle --
18 finish with 512, 511, and then have us come back, or
19 are you not having oral argument at all?
20     JUDGE FALK: Well, if you feel it's
21 necessary, you know, I'm not sure. I mean, as far as
22 511, I'm done with that for today. I'm gonna issue
23 an opinion, and it's gonna be, you know, I think,
24 short, but we'll address everything we talked about
25 and we'll address the documents in a -- in a chart.

Page 37

1  But as to Optum, I don't know. That's a little
2  different situation. These are documents that were
3  inadvertently produced. Is there something general
4  that you would want to say about that before....
5      MR. AYERS: Yeah. I think we -- we
6  would like an opportunity to address -- to briefly
7  address it.
8      JUDGE FALK: Well, I mean, generally,
9  though, because I don't think that -- I think Optum
10 is is -- if these -- these are privileged documents.
11     MR. AYERS: We -- we can talk about them
12 in general terms.
13     JUDGE FALK: Yeah. I'm happy to hear
14 from you in general. We'll move on to 512.
15     MR. HOUSER: So just process-wise, do we
16 want to do that, and then we'll --
17     JUDGE FALK: Oh.
18     MR. HOUSER: -- do the splitting?
19     JUDGE FALK: I don't -- I don't care.
20     MR. HOUSER: Okay.
21     JUDGE FALK: It's more like how long do
22 you want to stick around for. I don't think it's
23 gonna be long, anyway, today.
24     MR. AYERS: I think it makes sense,
25 maybe, to have any argument that we're going to have,

10 (Pages 34 - 37)

Page 38

1  and then we can leave the room, and Defendants --
2        JUDGE FALK:  Sure.  Okay.
3        MR. AYERS:  -- can have their in camera
4  show.
5        JUDGE FALK:  That's fine.
6        MS. FIDLER:  Hillary Fidler on behalf of
7  the Plaintiffs.  Thank you.
8        You know, there are 13 documents at
9  issue that Optum has clawed back:  Six
10 communications, and seven appear to be various
11 working copies of a vendor assessment.  These
12 documents are responsive to Plaintiffs' interrogatory
13 15, 16 and 18, which sought information regarding
14 Defendants' risk assessments.  Optum largely objected
15 to producing these documents, based on relevancy.
16 Your Honor has already ruled that these are documents
17 that are relevant to Plaintiffs' negligence claim.
18       In sum, Optum has not shown that
19 these -- it can claim privilege over these, and it
20 has not done a specific demonstration of facts
21 showing that they are privileged.  At a basis, the
22 seven working copies of a vendor assessment are
23 facts, not communications and they are not covered by
24 attorney-client privilege.  That pretty much ends
25 the -- ends the dispute with that as it -- as it

Page 39

1  applies to work -- or excuse me -- as it applies to
2  an attorney-client privilege.
3        The remaining five exhibits are
4  communications.  ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
11       You know, the attorney-client privilege
12 protects only disclosures that are necessary to
13 obtain legal advice.  This was not to obtain legal
14 advice.  What is likely what happened is that the
15 AMCA data breach sounded the alarm for Optum that
16 they had been asleep at the wheel on these -- on
17 these risk assessments in making sure that their
18 vendors had adequate security.  ████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████.
24       This disclosure would have been made
25 regardless of Optum's -- of -- it would have been

Page 40

1  made regardless as it related to Optum's business
2  impact.  It was to see whether they were at risk of
3  this happening again; it was not to obtain legal
4  advice.  And the mere fact that Optum's counsel
5  was -- in-house counsel was copied on an email with
6  11 other employees doesn't make it privilege.
7  There's been case law on that for years, that
8  including an attorney on a distribution list of an
9  interoffice memo or cc'ing numerous people on an
10 ancillary discussion, one who happens to be an
11 attorney, is not privilege.
12       When in-house counsel is involved, the
13 Court must determine whether the purpose of the
14 communication was predominantly legal.  It was not
15 predominantly legal.  As it was, it was to assess the
16 business impact, and Quest tries -- or excuse me --
17 Optum argues that it -- that they were privileged
18 because the IT employees were working to provide --
19 assist with the attorney providing legal advice.
20 What that legal advice is remains unclear, but these
21 IT employees were working in their normal course of
22 business to assess the vendors that they were
23 responsible for tracking, and the vendor risk
24 assessment is -- and the working copies of it are not
25 work product.

Page 41

1        If you look at the supplemental
2  privilege log that Quest -- or excuse me, pardon
3  me -- that Optum provided, the master date of the
4  final spreadsheet is December 2016.  That's right on
5  the supplemental privilege log that they provided.
6  That's the same date that Optum took over Quest's
7  revenue management.  That -- it means that that was
8  likely a living document that Quest employees updated
9  and revised throughout the ordinary course of
10 business.  This time, it just so happened to be after
11 a data breach.
12       You know, Optum has to show that this
13 document was prepared because of reasonably
14 anticipated litigation, that it likely was prepared for
15 the prospect of litigation and for no other purpose.
16 It simply cannot do that.  Optum has spent the last
17 years arguing that this litigation is solely limited
18 to the AMCA data breach and nothing else.  All that
19 is relevant, in Optum's view, is its oversight of the
20 AMCA.  How an assessment of other vendors could have
21 been reasonably anticipated in this litigation has --
22 has not been explained.
23       You know, it's even -- it's even more
24 obvious when you consider Optum's objections to
25 Docket 513 where they were ordered to provide them

11 (Pages 38 - 41)

Page 42

1  based under the relevancy objections, and they say
2  that "The risk assessment of Optum360 performed of
3  other third-party collection agencies are irrelevant
4  to the AMCA data breach and Plaintiffs claims against
5  Optum, which turn on the reasonableness of Optum's
6  oversight of AMCA's data security.  Plaintiff's
7  negligence claims do not rise out of security
8  deficiencies or lack of oversight of other debt of
9  collection agencies."
10          ████████████████████
    ████████████████████████████████████
    ████████████████████████████████
    ████████████████████████  to the extent it was because
14  they anticipated it would be used in a litigation
15  regarding AMCA.  That has been their position this
16  entire litigation, and they can't withhold documents
17  by taking a complete 180 turn on that now.  To that
18  end, they -- Optum's assessment that was
19  conducted at the direction of counsel is inadequate
20  to confer work -- work product protections.
21          You know, if documents are created
22  through a routine business purpose by non-attorneys,
23  they do not fall within the purview of work product
24  privilege.  And just because an email -- an attorney
25  happened to be cc'ed on an email in which that work

Page 43

1  product was sent to does not make it privilege.
2          JUDGE FALK:  Okay.  Thank you very much.
3  Do you want to respond?
4          MR. HOUSER:  I would like to respond,
5  Your Honor.
6          JUDGE FALK:  Then we'll get to the
7  documents.
8          MR. HOUSER:  Sure.  And I'll try to be
9  brief.  What I would like to do is just level-set a
10  little bit about what we're talking about --
11          JUDGE FALK:  Sure.
12          MR. HOUSER:  -- and what we're not
13  talking about, because I think that's important to
14  zoom out.
15          JUDGE FALK:  Okay.
16          MR. HOUSER:  We're not talking about
17  Optum360's ordinary course of business risk
18  assessments of other vendors.  The risk assessments
19  that were at issue in prior discovery disputes, those
20  are not these.  That's not what we're talking about.
21  Those are the -- we've never claimed privilege over
22  the ordinary course of business, routine risk
23  assessments.
24          And, again, those are a -- that is a
25  different issue than what we have here.  We are

Page 44

1  addressing a limited number of documents that are not
2  routine risk assessments.  They were documents
3  created after the AMCA incident, after a lawyer
4  launched an investigation in the face of numerous
5  lawsuits that had been filed, regulator inquiries
6  that had been already initiated, and the purpose was
7  to facilitate that lawyer's legal advice ██████████
    ██████  as well as the AMCA data breach.
9          And I think, without getting into the
10  specifics, if you look at the clawed-back documents,
11  they were in the immediate wake of the incident.  It
12  was from the August time period, and it's this narrow
13  subset, Your Honor.  It is the employees are working
14  around the clock.  The dates of the emails and the
15  documents are demonstrating that they are going a
16  million miles an hour.  It is anything but ordinary
17  course.  They're working over the weekend, and it's a
18  living, breathing analysis.
19          This isn't our standard risk assessment
20  that we're performing for vendors, which, again, is a
21  totally different issue and is an issue that we were
22  here on earlier, but this is an analysis that was
23  requested by counsel.  And we've come forward with
24  evidence from the lawyer that expressly went through
25  on a document-by-document basis and makes clear that

Page 45

1  these specific documents would not have been created
2  but for this investigation.  This is not ordinary
3  course.  This would never have happened but for the
4  lawyer making this request.
5          I heard a couple of other things I'd
6  like to quickly respond to.  One is this idea that
7  there's this alleged inconsistency between our
8  position about relevancy of other vendor risk
9  assessments and whether or not a document was created
10  at the direction of counsel as part of an
11  investigation, or whether we reasonably anticipated
12  litigation.  I think that's a false equivalence.
13          Simply because we don't believe, for the
14  specific claims remaining in this case, that other
15  vendor risk assessments are relevant doesn't mean
16  that these documents created in the wake of the
17  incident were not created at the direction of
18  counsel, or were not created in reasonable
19  anticipation of litigation.  I think 34 lawsuits have
20  been filed by this time.  I mean, it is -- it is a
21  lot going on at this time, and of course, makes
22  sense that you have lawyers involved to assess --
23  assess the risk.
24          You also have a document that has an
25  initial create date of 2016.  That may be the initial

Page 46

1 create date, but that document, Your Honor, that is
2 not an ordinary-course document. It has been
3 evolving and changing, people were adding analyses to
4 it as part of this lawyer request. So if there are
5 previous, in the past, risk assessments,
6 that's -- that's a different story. Those that
7 existed, that's a different story. That's the prior
8 discovery dispute. We don't think they're relevant,
9 but we're not claiming privilege on this
10 ordinary-course risk assessment.
11         What we have here is after the
12 incident -- and we have a lawyer saying -- you know,
13 without getting into any more detail, it's -- it's
14 for purposes of legal advice, and we've come forward
15 with support for that. So, Your Honor, I mean -- I'm
16 just making sure I haven't missed anything here.
17         You know, I think that this is kind of a
18 prototypical example of something that is not
19 routine. We've come forward with evidence, the
20 limited nature of the documents, the scope, the
21 timing, you could see from the privilege log, they
22 all point to the same result, which is, you know,
23 these are done at the direction of counsel. Those
24 were the clawbacks.
25         There was one additional document that

Page 47

1 was, you know, in the immediate wake of the incident,
2 but the same thing, that was being done at the
3 direction of counsel. We've come forward with
4 evidence to support these documents wouldn't have
5 been created otherwise, and so we -- we, of course,
6 believe that these are privileged. I'm happy to walk
7 through them with you in kind of a Phase II process.
8         JUDGE FALK: Okay. Well, that's fine.
9         So I think we go in the same order and
10 do the 511 documents.
11         MR. AYERS: Your Honor, would you want
12 to hear from us again or should we just sort of pack
13 up and....
14         JUDGE FALK: I don't think so. I mean,
15 I heard from you loud and clear, and I mean that.
16 You have the papers. So I'm -- I'm not expecting
17 that.
18         MR. AYERS: Okay. Thank you. Well,
19 we'll pack up and leave. Thank you very much for
20 your time.
21         JUDGE FALK: Yeah. Thank you.
22         MS. FIDLER: Thank you.
23         JUDGE FALK: All right. You'll be
24 hearing from us, hopefully, soon.
25         (Proceedings concluded at 11:30 a.m.)

Page 48

1         C E R T I F I C A T E
2
3         I, LYDIA F. McDONNELL, a Certified
4 Shorthand Reporter and Notary Public of the State of
5 New Jersey, do hereby certify that the foregoing is a
6 true and accurate transcript of the testimony as
7 taken stenographically by and before me at the time,
8 place, and on the date hereinbefore set forth.
9         I DO FURTHER CERTIFY that I am neither a
10 relative nor employee nor attorney nor counsel of any
11 of the parties to this action, and that I am neither
12 a relative nor employee of such attorney or counsel,
13 and that I am not financially interested in the
14 action.
15
         *Lydia Ficcis-McDonnell*
16
17         Notary Public of the State of New Jersey
18         License No. 30XI00155900
19         My Commission expires June 30, 2026
20         Dated: August 12, 2024
21
22
23
24
25

13 (Pages 46 - 48)