**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br><br>This Document Relates To: *Quest/Optum Track* | Civil Action No. 19-md-2904(MCA)(MAH) |

--------------------------------------------------------------------------------------------------------------

**BRIEF IN SUPPORT OF QUEST PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

--------------------------------------------------------------------------------------------------------------

James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Jason L. Lichtman
Sean A. Petterson
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
250 Hudson St., 8th Floor
New York, NY 11013
(212) 355-9500

Christopher A. Seeger
Christopher Ayers
**SEEGER WEISS, LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100

Norman E. Siegel
J. Austin Moore
**STUEVE SIEGEL HANSON, LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
(816) 714-7100

*Quest Track Co-Lead Counsel*

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1 |
| II. | LEGAL STANDARD | 3 |
| III. | THE PROPOSED CLASS AND SUBCLASS | 4 |
| IV. | FACTUAL BACKGROUND | 4 |
|  | A. AMCA cybersecurity was essentially non-existent. | 5 |
|  | B. Quest and Optum's failed oversight of AMCA. | 7 |
|  | 1. In 2014, ▮▮▮▮▮ | 7 |
|  | 2. Quest ▮▮▮▮▮ | 9 |
|  | 3. In late 2016, Quest ▮▮▮▮▮ | 9 |
|  | 4. Optum ▮▮▮▮▮ | 10 |
|  | 5. By 2018, AMCA ▮▮▮▮▮ | 12 |
|  | C. Threat actors ultimately entered AMCA's systems, exploiting the non-existent security discussed above. | 13 |
| V. | PLAINTIFFS HAVE ESTABLISHED THE SEVEN PREREQUISITES FOR CLASS CERTIFICATION | 14 |
|  | A. Plaintiffs satisfy numerosity because there are millions of members in the nationwide Class and at least tens of thousands in the Subclass. | 14 |
|  | B. There is at least one issue common to members of the proposed Class. | 15 |
|  | C. The proposed Class Representatives' claims are typical. | 16 |
|  | D. The proposed Class Representatives will adequately represent the Classes. | 16 |
|  | E. The Class and Subclass are ascertainable because they are defined using objective criteria: specific, previously identified members of the CHAMP database. | 17 |
|  | F. Common issues predominate for all questions of liability. | 18 |
|  | 1. Plaintiffs' nationwide negligence claims will turn predominately on the common answers to common questions. | 19 |
|  | a. New Jersey law applies to all negligence claims. | 19 |
|  | b. Quest and Optum will be liable to all Class Members or none. | 21 |

**TABLE OF CONTENTS**
**(continued)**

Page

2.    Plaintiffs' CMIA claims will turn predominately on the common answers to common questions. ............................................................. 23

G.    Plaintiffs' damages models are consistent with their theories of liability, and common damages issues predominate over individual ones. ............................. 26

a.    A jury does not need to consider individual evidence to award statutory damages under the CMIA. ................................. 26

b.    Nominal damages are similarly uniform under Plaintiffs' negligence claim. ......................................................... 27

c.    Plaintiffs are entitled to compensatory damages under their negligence claim, and these damages are formulaic and consistent with their liability theory. ...................................... 27~~28~~

H.    A class action is superior to alternative methods of resolving these controversies. ........................................................................ 29

VI.    A CLASS SHOULD ALSO BE CERTIFIED FOR INJUNCTIVE RELIEF UNDER RULE 23(B)(2). ............................................................... 31

VII.    PLAINTIFFS ASK THAT THEIR COUNSEL BE APPOINTED UNDER RULE 23(G). ...................................................................................... 32

VIII.    CONCLUSION .......................................................................................... 33

TABLE OF AUTHORITIES

**Page**

**Cases**

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ................................................................................31

*In re AMCA, Inc. Customer Data Sec. Breach Litig.*,
2021 WL 5937742 (D.N.J. Dec. 16, 2021) ..........................................................................21

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................16, 29

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ..........................................................................................................3, 18

*Aquino v. Subaru of Am., Inc.*,
2024 WL 124627 (D.N.J. Jan. 11, 2024) ............................................................................19

*Arbitrage Fund v. Toronto-Dominion Bank*,
2023 WL 5550198 (D.N.J. Aug. 29, 2023) .........................................................................16

*Attias v. CareFirst, Inc.*,
346 F.R.D. 1 (D.D.C. 2024) ................................................................................................27

*Baby Neal for and by Kanter v. Casey*,
43 F.3d 48 (3d Cir. 1994) ....................................................................................................32

*Boley v. Universal Health Servs., Inc.*,
36 F.4th 124 (3d Cir. 2022) .................................................................................................16

*In re Brinker Data Incident Litig.*,
2021 WL 1405508 (M.D. Fla. Apr. 14, 2021) *vacated in part on other
grounds by Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883 (11th Cir. 2023) ....................23

*Brooks v. Trans Union LLC*,
--- F. Supp. 3d ---, 2024 WL 3625142 (E.D. Pa. Aug. 1, 2024) ..........................................26

*C.P. v. New Jersey Dep't of Educ.*,
2022 WL 3572815 (D.N.J. Aug. 19, 2022) .........................................................................15

*Chiang v. Veneman*,
385 F.3d 256 (3d Cir. 2004) ................................................................................................15

*In re Conduent Inc. Sec. Litig.*,
2022 WL 17406565 (D.N.J. Feb. 28, 2022) ....................................................................26, 32

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Erica P. John Fund, Inc. v. Halliburton, Co.*,
   563 U.S. 804 (2011)..................................................................................................18

*Ferreras v. Am. Airlines, Inc.*,
   946 F.3d 178 (3d Cir. 2019)........................................................................................3

*Forsythe v. Teva Pharm. Indus. Ltd.*,
   102 F.4th 152 (3d Cir. 2024) ....................................................................................26

*Giroux v. Essex Prop. Tr., Inc.*,
   2018 WL 2463107 (N.D. Cal. June 1, 2018).............................................................21

*Haney v. Charter Foods N., LLC*,
   --- F. Supp. 3d ---, 2024 WL 4054361 (E.D. Tenn. Aug. 28, 2024).........................19

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
   293 F.R.D. 21 (D. Me. 2013).....................................................................................30

*Hargrove v. Sleepy's LLC*,
   974 F.3d 467 (3d Cir. 2020).......................................................................................17

*Huber v. Simon's Agency, Inc.*,
   84 F.4th 132 (3d Cir. 2023) .......................................................................................15

*Immediata Health Grp. Corp,*
   501 F. Supp. 3d 898 (S.D. Cal. 2020).......................................................................25

*Kelly v. RealPage Inc.*,
   47 F.4th 202 (3d Cir. 2022) .......................................................................................18

*Lewis v. Govt. Emps. Ins. Co.*,
   98 F.4th 452 (3d Cir. 2024) .......................................................................................18

*Mackey v. Belden, Inc.*,
   2021 WL 3363174 (E.D. Mo. Aug. 3, 2021)........................................................19, 21

*Marcus v. BMW of N. Am, LLC*,
   687 F.3d 583 (3d Cir. 2012).......................................................................................17

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   341 F.R.D. 128 (D. Md. 2022), *rev'd on other grounds*, 78 F.4th 677 (4th Cir.
   2023) *reinstated* 345 F.R.D. 137 (D. Md. 2023) ....................................................30

*Mills v. Ethicon, Inc.*,
   406 F. Supp. 3d 363 (D.N.J. 2019) ............................................................................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016) ................................................................................15

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
  2013 WL 6839093 (S.D.N.Y. Dec. 27, 2013) .......................................................27

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015) ................................................................................26

*Opperman v. Path, Inc.*,
  2016 WL 3844326 (N.D. Cal. July 15, 2016) .......................................................27

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  198 F. Supp. 3d 1183 (D. Or. 2016) ....................................................................25

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  2019 WL 3410382 (D. Or. July 29, 2019) ..............................................19, 20, 21

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ................................................................................29

*Robinson v. Vivirito*,
  217 N.J. 199 (N.J. 2014) .....................................................................................21

*Rodriguez v. Nat'l City Bank*,
  726 F.3d 372 (3d Cir. 2013) ................................................................................15

*Savidge v. Pharm-Save, Inc.*,
  --- F. Supp. 3d ----, 2024 WL 1366832 (W.D. Ky. Mar. 29, 2024) ............... *passim*

*In re Sept. 11 Litig.*,
  802 F.3d 314 (2d Cir. 2015) ................................................................................28

*In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,
  613 F. Supp. 3d 1284 (S.D. Cal. 2020) ................................................................23

*In re Sonic Corp.*,
  2021 WL 6694843 (6th Cir. Aug. 24, 2021) ...................................................16, 23

*Stillmock v. Weis Mkts., Inc.*,
  385 F. App'x 267 (4th Cir. 2010) ........................................................................26

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) ................................................................................17

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011)..........................................................................................18

*Sutter Health v. Super. Ct.*,
   174 Cal. Rptr. 3d 653 (Cal. Ct. App. 2014)...................................................................23

*Sykes v. Mel. S. Harris & Assocs., LLC*,
   780 F.3d 70 (2d Cir. 2015)............................................................................................27

*In re Target Corp. Customer Data Sec. Breach Litig.*,
   309 F.R.D. 482 (D. Minn. 2015)....................................................................................21

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
   325 F.R.D. 136 (D.S.C. 2018) .......................................................................................30

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016)..................................................................................................18

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021)....................................................................................................27

*Veridian Credit Union v. Eddie Bauer, LLC*,
   295 F. Supp. 3d 1140 (W.D. Wash. 2017).................................................................19, 20

*Vigil v. Muir Med. Grp. IPA, Inc.*,
   84 Cal.App.5th 197 (Cal. Ct. App. 1st Div. 2022) ......................................................25, 26

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).................................................................................................15, 31

**Statutes**

Cal. Civ. Code §§ 56.36, 56.101(a) ...................................................................................23

Cal. Civ. Code § 56.36(b)(1) ...........................................................................................26

Cal. Civ. Code § 56.50(j)..................................................................................................23

Fed. R. Civ. P. 23(a)(1)....................................................................................................14

Fed. R. Civ. P. 23(a)(2)....................................................................................................15

Fed. R. Civ. P. 23(a)(3)....................................................................................................16

Fed. R. Civ. P. 23(a)(4)....................................................................................................16

Health Insurance Portability and Accountability Act (HIPAA) ............................................ *passim*

**TABLE OF AUTHORITIES**
**(continued)**

Page

Rule 23(b)(2)................................................................................................3, 31, 32

Rule 23(b)(3)............................................................................................18, 27, 29, 30

Rule 23(g) ....................................................................................................................32

**Treatises**

Restatement (Second) of Conflict of Laws..............................................................19, 20

**Regulations**

45 C.F.R. § 164.105 .........................................................................................................7

45 C.F.R. § 164.304 .........................................................................................................7

45 C.F.R. §§ 164.308-16.................................................................................................7

45 C.F.R. § 164.530 .........................................................................................................7

## I.    PRELIMINARY STATEMENT

Quest Diagnostics and Optum360 failed to protect the sensitive personal and medical information of millions of Quest patients, causing a massive data breach that was as foreseeable as it was preventable (the "Breach"). Quest chose to transfer its patients' highly sensitive medical and personal information to a company called Retrieval-Masters Creditor's Bureau, Inc., d/b/a American Medical Collection Agency ("AMCA"), a debt collector with virtually no cybersecurity. Having done that, neither Quest nor Optum (assigned by Quest to manage AMCA midway through the class period) exercised any meaningful oversight of AMCA. So it should not have been a surprise to Defendants when hackers took that unprotected sensitive information from AMCA.

Defendants' lack of oversight violated prevailing industry standards, the Health Insurance Portability and Accountability Act ("HIPAA"), and common sense. Had Quest or Optum provided such oversight, they would have found the same thing that threat actors did when making off with intensely private health information: AMCA's cybersecurity was essentially non-existent, ██████

████████████████████████████████████████.[1]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████    Perhaps most bafflingly, AMCA's network was configured ██████

████████████████████████████████████████

████████████████████████████████████████

---

[1] *See* Declaration of James E. Cecchi ("Cecchi Decl."), Ex. 1 (Declaration of Mary T. Frantz), ¶¶ 83-89; Ex. 6 (Z. Raxter Dep. 18, 48-49). ████████████████████████ ██████    Ex. 7 (R. Fuchs Dep. 23); Ex. 8 (J. Wollman Dep. 29-30). "Ex. __" refers to exhibits to the Declaration of James E. Cecchi in support of this motion.

). Ex. 1 (Frantz Decl.

¶¶ 55, 57, 73, 95-96). AMCA also ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ *Id*. ¶¶ 66-138.

Plaintiffs' experts Mary Frantz and Sharon Anolik have submitted expert reports that confirm Defendants' oversight failures and AMCA's cybersecurity failures in much greater detail. *See* Ex. 1 (Frantz Decl.); Ex. 2 (Anolik Decl.). Ms. Frantz concludes that had Quest and Optum ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮." Ex. 1 (Frantz Decl.) ¶ 277. But one need not have a background in cybersecurity to understand that a company holding sensitive health information should require ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮. Or to understand the readily foreseeable, catastrophic consequences of failing to do so.

So, this an unusually straightforward case despite its size: it either was or was not reasonable for Quest to send highly sensitive information that was unnecessary for debt collection to a debt collector with no cybersecurity, and it either was or was not reasonable for both Defendants to elect not to provide meaningful oversight once Quest did so. And these issues are not merely straightforward, they are uniform for all Class Members. To be sure, Defendants are likely to dispute the extent of their failures (although it is unclear exactly how they will defend the choice to send millions of patients' medical diagnoses to a debt collector *at all*, much less a debt collector with this little security). But what matters for class certification is simply that all proposed

- 2 -

Class Members' claims hinge on Defendants' uniform alleged failures, which Plaintiffs will prove with the same common evidence to determine both liability and damages.

Accordingly, Plaintiffs respectfully ask this Court to grant class certification under Rule 23(b)(3) for past damages and Rule 23(b)(2) to prevent additional harm from Quest's and Optum's essentially non-existent oversight of Plaintiffs' sensitive information.

## II.    LEGAL STANDARD

Plaintiffs seeking class certification for money damages must prove seven prerequisites:

1.    **Numerosity**. Class certification is only appropriate if it is not practical to join all potential claimants in one litigation. Fed. R. Civ. P. 23(a)(1).

2.    **Commonality**. At least one legal or factual question must be common to every member of the class. Fed. R. Civ. P. 23(a)(2).

3.    **Typicality**. The named plaintiffs must have the same type of claim as other class members. Fed. R. Civ. P. 23(a)(3).

4.    **Adequacy**. The named plaintiffs and their counsel must represent the interests of absent class members. Fed. R. Civ. P. 23(a)(4).

5.    **Ascertainability**. Within the Third Circuit, classes must be "currently and readily ascertainable based on objective criteria." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020) (citation omitted).

6.    **Predominance**. Legal and factual issues that can be resolved on a classwide basis must be more important than those that could only be resolved on an individual basis. Fed. R. Civ. P. 23(b)(3).

7.    **Superiority**. A class action must be superior to many individual lawsuits. Fed. R. Civ. P. 23(b)(3).

*See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (articulating class certification standards). A court can only certify a class if it "is satisfied, after a rigorous analysis that all of the necessary Rule 23 requirements have been fulfilled." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019) (cleaned up).

- 3 -

## III.    THE PROPOSED CLASS AND SUBCLASS

Plaintiffs seek to certify a nationwide negligence and negligence *per se* class under New Jersey law and a California subclass (which would be tried in California). Plaintiffs respectfully propose that all Plaintiffs serve as class representatives for the nationwide class, and that California resident Breanna Klein serve as the subclass representative for the California subclass.

*Nationwide Negligence and Negligence Per Se Class (against Quest and Optum)*

> All natural persons residing in the United States who were sent a letter from Quest or Optum notifying them of the Breach.

*California CMIA Subclass (against Quest and Optum)*

> All natural persons residing in California whose Personal Health Information was stored in the CHAMP database and who were sent a letter from Quest or Optum notifying them of the Breach.

The proposed Class and Subclass exclude Defendants, any entity in which any Defendant has a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. They also exclude any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

## IV.    FACTUAL BACKGROUND

Quest used AMCA to collect its debts, but rather than simply transfer limited information necessary for this task, ████████████████████████████ *See* Ex. _ (Lee Report ¶ 45-46, Table 7); Ex. 2 (Anolik Decl. ¶¶ 26(f), 133, 140-48) (explaining Defendants' failure to follow minimum necessary standard). This included: ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ . Ex. 9 (D. Howard Dep. 148-58).

- 4 -

Optum's corporate representative

*Id.* at 157-58.

Ex. 10 (M. Harkins Dep. 180-81).[2]

Ex. 10 (M. Harkins Dep. 167-68); Ex. 9 (D. Howard 166-67).

### A.     AMCA cybersecurity was essentially non-existent.

Quest and Optum's poor decision to send Quest's patients' medical information to AMCA for no business purpose was made vastly worse by the fact that AMCA was not equipped to take even the most basic steps to protect that information. To the contrary, AMCA's cybersecurity was out-of-date, non-compliant with either Payment Card Industry Data Security Standards ("PCI DSS") or HIPAA.

Ex. 6 (Z. Raxter Dep. at 18, 48-49).

Ex. 1 (Frantz Decl. ¶¶ 83-89); Ex. 6 (Z. Raxter Dep. at 44, 89).

Ex. 6 (Z. Raxter Dep. at 155, 244).

---

[2]

Ex. 11 (P. Lake Dep. 126-28; 273-74).

███████████████████████████████. *Id.* at 40-42. ███████████████

How bad was it at AMCA?

- AMCA did not █████████████████████████████████████████████
  ████████████████████████████████████████████████. Ex. 1
  (Frantz Decl. ¶¶ 83-89).

- AMCA did not ████████████████████████████████████████. *Id.* ¶¶ 90-
  93.

- AMCA did not █████████████████████████████████████████████
  █████████████████████████████████████████████████████
  █████████████████████████████████████████████████████
  █████████████████████████████████████ *Id.* ¶¶ 96, 115-
  25.

- ████████████████████████████████████████████████████
  █████████████████████████████████████████████████████
  █████████████████████████████████████████████████████
  █████████████████ *Id.* ¶¶ 97-103.

- AMCA also did not ██████████████████████████████████████
  █████████████████████████████████████████████████████
  █████████████ *Id.* ¶¶ 104-08.

- AMCA's network and production systems lacked ██████████████████
  █████████████████████████████████████████████████████
  ███████████████████████████████████ *Id.* ¶¶ 109-14.

- AMCA failed to ████████████████████████████████████████████
  ███████████████████████████████
  ███████ *Id.* ¶¶ 126-32.

- In March 2019, ████████████████████████████████████████████
  █████████████████████████████████████████████████████
  █████████████████████████████████████████████████████

---

[3] In March 2019, ████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████ Ex. 12 (AMCAPROD00142515) (emphasis added).

████████████████████████████████████. *Id.* ¶¶ 52, 57, 116, 126-27, 132.

These security failures are as basic as they come. Quest and Optum knowingly ignored many of these failures, and to the extent they were unaware of others, it only demonstrates their failure to conduct even the most minimal oversight. *Id.* ¶¶ 198, 200.

### B.     Quest and Optum's failed oversight of AMCA.

Quest, and later Optum, entered into a Business Associate Agreement ("BAA") with AMCA. *See* Ex. 13 (relevant BAAs). AMCA was their "business associate" as defined by HIPAA, and Quest and Optum are "covered entities." Ex. 2 (Anolik Dec. ¶ 14). ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ (Anolik Decl. ¶¶ 14-31, 52-148).

1.     **In 2014,** ███████████████████████████████████
█████████████████████:

In 2014, ████████████████████████████████████████ Ex. 15 (Quest_MDL_0012693), ██████████████████████████████. Ex. 11 (P.

---

[4] *See* Ex. 2 (Anolik Decl. ¶¶ 14-31); 45 C.F.R. § 164.105 and 45 C.F.R. § 164.530 (under the Privacy Rule), and 45 C.F.R. § 164.304 and 45 C.F.R. §§ 164.308-16 (under the Security Rule).

Lake Dep. 123); Ex. 14 (A. Hynes Dep. 154, 264-66).[5] At the time, ███████████████

██████████████████████████████████ Ex. 14 (A. Hynes Dep. 37). ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ Ex. 17 (Quest_MDL_0000653 at -58); Ex. 14 (A. Hynes Dep. 158-59, 317-

18). ████████████████████████████████████████████

██████████████████████ Ex. 14 (A. Hynes Dep. 264-66). ████████████

████████████████████████████████████████████████████

████████████████████ Ex. 17 (Quest_MDL_0000653 at -60); Ex. 14 (A.

Hynes Dep. 264-65, 319). As such, ████████████████████████

████████████████████████████████████████████████████

████████████████████████ Ex. 14 (A. Hynes Dep. 262-63, 321); Ex. 18 (A.

Hynes Dep. Ex. 3).

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ Ex. 11 (P. Lake Dep. 170-71). ██████████

████████████████ Ex. 16 (R. Breindel Dep.144-45). ████████████████

█████████████████████████████████████████████



---

**2.    Quest** ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Ex. 14 (A. Hynes Dep. 321); Ex. 18 (A. Hynes Dep. Ex. 3).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Ex. 19 (T. Cetera Dep. 572-73). ████████████████████████████

████████████████████████████████ *Id.* at 644-45. █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ *See*

*generally* Ex. 1 (Frantz Decl. ¶ 241).

**3.    In late 2016, Quest assigned oversight of AMCA to Optum,** ████████
██████████████████████████████████████

In November 2016, Quest assigned its contract with AMCA to Optum. Ex. 13 (Optum_AMCA_0001954). As part of this assignment, ██████████████████████

████████████ Ex. 11 (P. Lake Dep. Dep. 28-35). ███████████████████

████████████████████████████ *Id*. 30. While Optum assumed Quest's contract with AMCA and took over handling the day-to-day details of the relationship, ██████████ ████████████████████████████████████████████ Ex. 19 (T. Cetera Dep. 513-14). ████████████████████████████████ ████████ Ex. 19 (T. Cetera Dep. 514); Ex. 20 (B. Troen Dep. 160-61).

Prior to accepting assignment of Quest's contract with AMCA, ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 20 (B. Troen Dep. 57); Ex. 13 (Optum360_AMCA_0001954). ██████████████

- 9 -



Ex. 20 (B. Troen Dep. 117-18).

*Id.* at 53, 56.

4.

In March 2017, four months after being assigned Quest's contract, Optum

*Id.* 137-38; Ex. 21 (Optum360_AMCA_0006971). But because AMCA handled PHI, "PCI DSS compliance," which relates only to payment cards, was insufficient.

Ex. 20 (B. Troen Dep. 90); Ex. 22 (Optum360_AMCA_0026911, at -14).

On April 27, 2017,

Ex. 23 (J. Redman Dep. 18).

Ex. 20 (B. Troen Dep. at 169-70); Ex. 24 (Optum360_AMCA_0006990). Among other things,

- 10 -



Ex. 24 (Optum360_AMCA_0006990, at -96, -98, -7001, -7003, -7011); Ex. 23 (J. Redman Dep. 59-60, 117, 127, 160); Ex. 20 (B. Troen Dep. 230-33, 238-40, 247-49).

Ex. 24 (Optum360_AMCA_0006900); Ex. 23 (J. Redman Dep. 136).

Ex. 23 (J. Redman Dep. 145); Ex. 25 (Optum360_AMCA_0049901).

Ex. 23 (J. Redman Dep. 140-41).

Ex. 20 (B. Troen Dep. 183-84).

*Id.* 185-86.

- 11 -



5.    **By 2018,** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In February 22, 2018, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 22 (Optum360_AMCA_0026911 at -12-13). A month later, on March 27, 2018, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Despite this, Optum had no contact with AMCA for the following three months. *Id.* ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 20 (B. Troen Dep. 204-05); Ex. 9 (D. Howard Dep. 72-75).[6]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 22 (Optum360_AMCA_0026911). For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 26 (Optum360_AMCA_0027670 at -72). Rather than validating AMCA's evidence, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[6] ▮▮▮▮▮▮▮▮▮▮▮▮ The Special Master ordered Optum to produce the security risk assessments of the other debt collection companies and Optum's objection to that order is pending before the Court. *See* Dkt. 667.

███████████████████████████████, Quest and Optum continued

sending AMCA sensitive customer PHI until AMCA told them about the Breach.[7]

C.      **Threat actors ultimately entered AMCA's systems, exploiting the non-existent security discussed above.**

In November 2018, Conformance, a fraud monitoring company, contacted AMCA ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ Exs. 30 & 31

(RMCB-AG-0000025 & RMCB-AG-0000087). By February 2019, it was not "just" fraudulent

transactions; a company that monitors the dark web notified AMCA ██████████████

████████████████████████████████████████████████████

██████ Ex. 32 (GEMINI002).

Nearly four months later, on June 3, 2019, Quest announced that AMCA had suffered a

data breach exposing its customers' personal payment information.[8]

In the wake of the Breach, two third parties—████████████████ and Charles

River (retained by AMCA)—conducted cursory forensic investigations that identified numerous

security failures and breaches. Ex. 33 (Quest_MDL_00000324) ████████; Ex. 34 (RMCB-AG-

---

[7] By way of other examples, ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ Ex. 20 (B. Troen Dep. 231-36).

[8] Quest Form 8-K, June 3, 2019, available at
https://www.sec.gov/Archives/edgar/data/1022079/000094787119000415/ss138857_8k.htm.

0000195) (Charles River).  Ex. 1 (Frantz Decl.

¶¶ 62, 76, 99). Charles River, granted some access to AMCA's systems,

*Id.* ¶ 64 (discussing Ex. 34 (RMCB-AG-00000195)).

Because neither Quest nor Optum had ever mandated that AMCA

. Ex. 1 (Frantz Decl. ¶ 64).

## V. PLAINTIFFS HAVE ESTABLISHED THE SEVEN PREREQUISITES FOR CLASS CERTIFICATION

### A. Plaintiffs satisfy numerosity because there are millions of members in the nationwide Class and at least tens of thousands in the Subclass.

Plaintiffs easily satisfy the requirement that the class be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). The proposed Class and California Subclass each contain no less than tens of thousands of class members; indeed, Quest and Optum sent notice to approximately 11.5 million Quest patients. Ex. 59 (Lee Report ¶ 13, 27, Tables 2 and 27).[9] Thus,

---

[9] *See also* Quest Diagnostics Statement on the AMCA Data Security Incident, https://newsroom.questdiagnostics.com/AMCADataSecurityIncident (last visited Sept. 19, 2024) ("approximately 11.9 million Quest patients").

joinder is impracticable. Indeed, plaintiffs can typically satisfy numerosity with as few as 41 class members. *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016).

### B.   There is at least one issue common to members of the proposed Class.

Plaintiffs also readily can show that there is at least one question of fact or law common to the Class such that "a class-wide proceeding [can] generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up); Fed. R. Civ. P. 23(a)(2). For example, Defendants had the same obligation (or lack thereof) to every Class Member to exercise oversight of AMCA—it is not plausible for Defendants to claim that they might have been required to protect some Class Members' medical information but not others. This is all commonality requires. *See, e.g.*, *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 155 (3d Cir. 2023) (commonality satisfied in a data breach where each class member alleged that "form collection letter they all received violates [law]").[10]

A jury can determine in one fell swoop questions such as whether: (1) Defendants owed a duty to their patients; (2) Defendants breached that duty through their transmission of Personal Information to AMCA and/or subsequent lack of oversight; and (3) whether Defendants' breach harmed Class Members. *See Dukes*, 564 U.S. at 359 ("Even a single common question will do.") (cleaned up). Plaintiffs thus readily satisfy their "not onerous" burden to show commonality. *See Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380 (3d Cir. 2013).

---

[10] *See also, e.g.*, *C.P. v. New Jersey Dep't of Educ.*, 2022 WL 3572815, at *6 (D.N.J. Aug. 19, 2022) (commonality met where "claims implicate[d] a 'uniform course of conduct common to all class members subject to common proof in a single trial'") (quoting *Chiang v. Veneman*, 385 F.3d 256, 266 (3d Cir. 2004)); *Savidge v. Pharm-Save, Inc.*, --- F. Supp. 3d ----, 2024 WL 1366832, at *23 (W.D. Ky. Mar. 29, 2024) (commonality satisfied in data breach by common questions about whether defendant was negligent and whether it caused the breach).

C.    **The proposed Class Representatives' claims are typical.**

Plaintiffs must also show that the proposed Class Representatives' claims are typical. *See* Fed. R. Civ. P. 23(a)(3). Typicality "seeks to ensure the interests of the class and the class representatives are aligned so that the latter will work to benefit the entire class through the pursuit of their own goals." *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 133 (3d Cir. 2022) (quotations omitted). Plaintiffs establish typicality when "the named plaintiff has (1) suffered the same injuries as the absent class members, (2) as a result of the same course of conduct by defendants, and (3) their claims are based on the same legal issues." *Arbitrage Fund v. Toronto-Dominion Bank*, 2023 WL 5550198, at *4 (D.N.J. Aug. 29, 2023).

Typicality is met here because the proposed Class Representatives: (1) suffered the same injuries as absent Class Members, the unlawful disclosure of their Personal Information; (2) through the same course of conduct by Defendants, providing Personal Information to AMCA and then failing to oversee it; that are (3) based on the same legal issues, whether Defendants satisfied their duty of care with respect to protecting Plaintiffs' Personal Information. Put another way, typicality is met for the same reason that commonality is met: Defendants either breached their duty as to all proposed Class Members, including the Class Representatives, or none.[11] This satisfies the typicality requirement for the same reason that courts in several other "data breach cases . . . have found the typicality requirement satisfied." *See, e.g.*, *Savidge*, 2024 WL 1366832, at *25 (citing *In re Sonic Corp.*, 2021 WL 6694843, at *3 (6th Cir. Aug. 24, 2021)).

D.    **The proposed Class Representatives will adequately represent the Classes.**

Plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy "serves to

---

[11] The same analysis as to Defendants negligently handling Subclass Members' PHI is also true for the California Subclass representative.

- 16 -

uncover conflicts of interest between named parties and the class they seek to represent." *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (citations omitted). Plaintiffs and their counsel clear this bar easily.

First, there is no conflict between the proposed Class Representatives and other Class Members. Each proposed Class Representatives attests that they "know of no reason that I would gain as a result of this litigation while other proposed class members would lose, and no reason I would lose while other proposed class members would gain." *See, e.g.*, Ex. 44 (Declaration of Plaintiff Ria Jairam ¶ 9); *see also* Exs. 37-55 (Class Representative declarations). Put another way, Class Members' and proposed Class Representatives' interests are entirely aligned because they were affected by Defendants' same course of conduct and rely on identical legal theories. *See, e.g.*, *Savidge*, 2024 WL 1366832, at *27 (adequacy satisfied in data breach).

Second, there can be no serious doubt that the proposed Class Representatives or their counsel have or will continue to vigorously pursue the claims of the Class. Each proposed Class Representative attests that they "recognize that, if [they] are appointed as representative of the Class, [their] obligations will lie to the Class a whole, and not just to [themselves], individually" and "I intend to vigorously pursue the interests of all class members, and to take seriously my responsibilities as a class representative." *See* Exs. 37-55 (Class Representative declarations). Court-appointed counsel have similarly demonstrated that they are committed to this litigation.

E. **The Class and Subclass are ascertainable because they are defined using objective criteria: specific, previously identified members of the CHAMP database.**

The proposed Class and Subclass satisfy the Third Circuit's requirement that the class is "currently and readily ascertainable based on objective criteria." *Hargrove*, 974 F.3d at 477 (quoting *Marcus v. BMW of N. Am, LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). The proposed Class and Subclass are defined by objective criteria: people who were notified by Quest and Optum that

- 17 -

their Personal Information was exposed to threat actors. These people are not merely identifiable (the test): Defendants have already identified them. *Cf. Lewis v. Govt. Emps. Ins. Co.*, 98 F.4th 452, 462 (3d Cir. 2024) ("'[A] straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources'") (quoting *Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022)). Accordingly, Plaintiffs have shown that the Class and Subclass are ascertainable.

### F.    Common issues predominate for all questions of liability.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This "inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). It requires only "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459. Put another way, "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011).[12]

---

[12] A court "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton, Co.*, 563 U.S. 804, 809 (2011). This "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (cleaned up) (emphasis in original).

Because all the evidence that Plaintiffs will present to establish Defendants' liability and damages for each claim applies equally to Plaintiffs and the Class and Subclass, common issues predominate.

### 1. Plaintiffs' nationwide negligence claims will turn predominately on the common answers to common questions.

Plaintiffs respectfully ask this Court to first certify a nationwide class asserting that Quest and Optum were negligent under New Jersey law. This is appropriate because New Jersey law applies to all negligence claims, and the evidence proving Defendants' negligence is uniform to the Class.

### a. New Jersey law applies to all negligence claims.

Under New Jersey choice-of-law rules, the Court applies the "'most significant relationship' test of the Restatement (Second) of Conflict of Laws." *Aquino v. Subaru of Am., Inc.*, 2024 WL 124627, at *6 (D.N.J. Jan. 11, 2024). In a data breach such as this one, the four factors of that test point clearly to the home state of the Defendant whose decisions led to the breach. *See, e.g.*, *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2019 WL 3410382, at *13 (D. Or. July 29, 2019).[13] Here, that is New Jersey, where Quest is headquartered:

- **Factor 1: The place where the injury occurred.** Here, Defendants' conduct caused harm in every state. Where the state in which the injury occurred is "fortuitous," it is not "given particular weight" in the court's analysis. *Premera*, 2019 WL 3410382, at *13; *see also Veridian*, 295 F. Supp. 3d at 1153 (similar).

- **Factor 2: The place where the conduct causing the injury occurred.** This is a "more important" factor than the first factor. *Premera*, 2019 WL 3410382, at *14.

---

[13] *See also, e.g.*, *Haney v. Charter Foods N., LLC*, --- F. Supp. 3d ---, 2024 WL 4054361, at *6 (E.D. Tenn. Aug. 28, 2024); *Mackey v. Belden, Inc.*, 2021 WL 3363174, at *2 (E.D. Mo. Aug. 3, 2021); *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1153 (W.D. Wash. 2017). Of course, the four factors are only applied where, as here, there is a conflict between various state laws. *See Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 373 (D.N.J. 2019) ("If no conflict exists, the law of the forum state applies.") (quotation omitted).

Here, New Jersey is where the conduct causing the injury occurred because it is where Quest "orchestrated and implemented" the decisions that led to the Breach; its "failure to employ adequate data security measures emanated from its headquarters." *Veridian*, 295 F. Supp. 3d at 1153 (cleaned up); *see also Premera*, 2019 WL 3410382, at *14 (same). Specifically, New Jersey is where: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████[14]

- **Factor 3: The location of the parties.** This factor is "neutral" because Quest and Optum are incorporated in New Jersey and Minnesota, respectively, and Plaintiffs reside in other states. *Veridian*, 295 F. Supp. 3d at 1154 ("Because there is no grouping of contacts in this instance, the court finds this factor of minimal significance to its choice of law analysis."); *Premera*, 2019 WL 3410382, at *14 (same).

- **Factor 4: The center of the parties' legal relationship.** New Jersey is ███████████████████████████████████████████ Nevertheless, this factor is also neutral because the parties' relationship is not clearly centered in one location. Quest's patients received Quest's services in states across the country, including New Jersey. "[W]hen the relationship is not clearly centered in one location, this factor bears little weight." *Premera*, 2019 WL 3410382, at *15; *see also Veridian*, 295 F. Supp. 3d at 1154 (relationship not centered in any place where parties did not contact with one another).

In sum, two of the four factors are neutral, and the "more important" of the remaining two factors point to New Jersey. *Premera*, 2019 WL 3410382, at *14. New Jersey law thus applies. *See id*.

But even if the contacts were relatively balanced, the result would be no different. That is because a court conducting the most significant relationship test also considers "the interests and policies of the potentially concerned jurisdictions by applying the factors set forth in *Restatement Conflict of Laws* § 6." *Premera*, 2019 WL 3410382, at *13. Here, that points to New Jersey because

---

[14] Ex. 14 (A. Hynes Dep. 161) ██████████████████████████████████████ ██████ Ex. 11 (P. Lake Dep. 192-93) (Lake ███████████████████████████████████ ██████████████████████████████████ ); Ex. 19 (T. Cetera Dep. 7, 19-22, 24).

a state "has a strong interest in deterring tortious conduct by its resident corporations" and that interest is stronger than the interest other states have in "seeing their residents compensated for injury committed by another's negligence." *Premera*, 2019 WL 3410382, at \*15-16; *Mackey*, 2021 WL 3363174, at \*3 ("[A defendant] should not be surprised by the application of the law of the state where it is located.").

### b.     Quest and Optum will be liable to all Class Members or none.

The legal and factual questions within the negligence class are uniform: Quest and Optum's conduct was either negligent as to all Class Members or as to none. *See, e.g.*, *Giroux v. Essex Prop. Tr., Inc.*, 2018 WL 2463107, at \*4 (N.D. Cal. June 1, 2018) (certifying class where defendant's "negligence and breach were uniform as to all class members"); *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 487 (D. Minn. 2015) (similar). Or to put it more formally: all four elements of negligence (duty, breach, causation, and injury, *see, e.g.*, *Robinson v. Vivirito*, 217 N.J. 199, 208 (N.J. 2014)) will be answered with common proof.

**Element 1: Duty**. Quest and Optum owed all Class Members the same duty because "[o]nce Defendants collected Plaintiffs' information, they had a duty to protect Plaintiffs from foreseeable harm by taking reasonable precautions to safeguard that information." *In re AMCA, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at \*14 (D.N.J. Dec. 16, 2021). This duty is uniform to all Class Members because Quest and Optum collected each Class Members' Personal Information. The necessary factual proof related to these duties will focus on Quest and Optum (and AMCA's) conduct, not individualized facts relating to Class Members.

**Element 2: Breach**. Plaintiffs will present common evidence of Defendants' failed oversight of AMCA, AMCA's deficient cybersecurity, and the standard of care under HIPAA between Covered Entities like Quest and Optum and their Business Associate, AMCA. Specifically, Plaintiffs' expert Mary Frantz will testify that Defendants failed to oversee AMCA

through both inaction and deficiently addressing the glaring red flags regarding AMCA's cybersecurity. She will likewise testify that AMCA's security was wholly deficient and minimal oversight would have revealed that it could not be entrusted with Class Members' Personal Information.

Beyond Ms. Frantz' testimony, Plaintiffs' expert Sharon Anolik will explain ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Ex. 2 (Anolik Decl. ¶¶ 17-18).

In sum, because Quest and Optum sent all Class Members' Personal Information to AMCA, where it was uniformly exposed to threat actors, whether Defendants should have sent that information to AMCA and whether Defendants failed to oversee AMCA as their Business Associate are common, predominating questions that will be answered the same way for each Class Member.

**Elements 3 & 4: Causation and Injury**. Common evidence also supports causation and the fact of injury. Whether Defendants' inadequate security and oversight caused the Breach and harmed Plaintiffs is a common question with a common answer. Put differently, an individual Plaintiff in an individual trial would use precisely the same information about Defendants' actions (or inactions) to prove causation and injury.

Two recent opinions certifying similar negligence claims are instructive. In *Savidge v. Pharm-Save, Inc.*, the court certified a negligence class in a data breach case holding that common questions include whether defendant owed a duty, whether defendant breached that duty, and the fact of damages, notwithstanding the possibility of different damages for individual class members

because of things like being involved in other breaches. 2024 WL 1366832, at *30.[15] Likewise, in *Sonic*, the Sixth Circuit affirmed certification of a data breach negligence class holding that "duty, breach, and causation. . . all arise from common questions: whether Sonic's internal data security measures and its remote access policy caused the data breach, leading to the issuance of the alerts and actions by the plaintiffs to limit or reimburse harms." *Sonic*, 2021 WL 6694843 at *3. The same analysis applies here.

### 2. Plaintiffs' CMIA claims will turn predominately on the common answers to common questions.

As relevant here, the CMIA prohibits health care providers like Quest and Optum from negligently releasing individuals' PHI and requires them to treat PHI in a "manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code §§ 56.36, 56.101(a). So, a defendant violates the CMIA if it: (1) negligently causes the release of "individually identifiable information…regarding a patient's medical history, mental or physical condition, or treatment;" and (2) an unauthorized third party viewed or otherwise accessed the confidential information. Cal. Civ. Code § 56.50(j). In the context of the CMIA, a "release" need **not** be an affirmative, communicative act, but can be accomplished by "negligently allowing information to end up in the possession of an unauthorized person." *Sutter Health v. Super. Ct.*, 174 Cal. Rptr. 3d 653, 659 (Cal. Ct. App. 2014); *see also In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*,

---

[15] While Defendants may challenge proximate cause by asserting, for example, that other data breaches break any causal link between the Breach and Plaintiffs' and Class Members' subsequent injuries, the concurrent cause doctrine prevents such a harsh result and, in any event, that relates to calculating damages—not liability. *See, e.g.*, *In re Brinker Data Incident Litig.*, 2021 WL 1405508, at *12 (M.D. Fla. Apr. 14, 2021) *vacated in part on other grounds by Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883 (11th Cir. 2023) (certifying negligence class and holding that "the multiple breach issue is not a disqualifying causation issue, but rather to be determined at the damages phase"); *Savidge*, 2024 WL 1366832, at *30 (potential that class member was "a victim of another unrelated data breach. . . go[es] to individual variations in damages" which do not preclude certification).

- 23 -

613 F. Supp. 3d 1284, 1299 (S.D. Cal. 2020) ("The plain text of the statute does not require an affirmative disclosure by the medical provider to create liability but in fact creates a remedy for those who store records negligently.").

Determining whether Defendants negligently caused the release of PHI is a common issue that predominates over individual issues for the same reasons as Plaintiffs' negligence claim.[16] And Plaintiffs can satisfy the CMIA's "actually viewed" requirement on a classwide basis—and in the exact same way they would satisfy it in multiple individual actions—because their PHI was published for sale on the dark web and numerous factors indicate that this data was actually sold. Indeed, as detailed in the expert report of Mary Frantz, ███████████████████

██████████████████████████

- ████████████████████████████ Ex. 1 (Frantz Decl. ¶¶ 330-34); Ex. 32 (GEMINI002).

- ████████████████████████████ Ex. 1 (Frantz Decl. ¶¶ 335-39); Ex. 30 (RMCB-AG-00000025); Ex. 36 (AMCAPROD00282701); Ex. 31 (RMCB-AG-00000087).

- ████████████████████████████ Ex. 1 (Frantz Decl. ¶¶ 340-43); Ex. 34 (RMCB-AG-00000195).

- ████████████████████████████ Ex. 1 (Frantz Decl. ¶¶ 344-63, Ex. C).

There is, accordingly, overwhelming evidence that the threat actors intended to and did sell Plaintiffs' Personal Information to other criminals on the dark web.

---

[16] This Subclass consists only of those who had their PHI stored within AMCA's systems.

For CMIA claims, this record (particularly with evidence of sale) satisfies the "actually viewed" requirement. For example, in *Stasi v. Immediata Health Grp. Corp.*, the Southern District of California held that the plaintiff pled a CMIA claim after a healthcare data breach where information was "posted on the Internet" and "searchable and findable by anyone with access to an internet search engine[.]" 501 F. Supp. 3d 898, 905 (S.D. Cal. 2020). Given these facts, the Court held plaintiff satisfied the actually viewed requirement because "it was reasonable to infer the information could have been viewed or copied once available on the Internet." *Id.* at 909-10. Likewise, in *Doe v. Regents of University of California*, the Northern District of California recently held that the "actually viewed" requirement was met where Meta had "code embedded" within defendant's website that allows it to track the user and Meta allegedly "tailor[ed] advertisements to her based on her medical condition." 672 F. Supp. 3d 813, 816, 819 (N.D. Cal. 2023). Here, Plaintiffs and Class Members can demonstrate not only that their information was "viewed" by hackers, but that "it already has been misused in a variety of ways to harm class members . . . ." *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 198 F. Supp. 3d 1183, 1202 (D. Or. 2016); *see also* Exs. 37-55 (Class Representative declarations).

Plaintiffs anticipate that Defendants will respond by citing *Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal.App.5th 197 (Cal. Ct. App. 1st Div. 2022), which denied certification of a CMIA claim. But it is readily distinguishable. There, an employee took a spreadsheet containing 5,000 individuals' PHI as she was fired from a job. *Id.* at 204. The Court held that individualized issues predominated because "[t]here [was] no evidence suggesting that other unauthorized parties viewed the information in the patient spreadsheet or that it was posted or disclosed in a public forum like the information at issue in *Stasi*[.]" *Id.* at 221. This is the opposite: here, ████

████████████████████████████

████████████████████████████                                    Ex. 1

(Frantz Decl. ¶¶ 333-46, Ex. C); Ex. 32 (GEMINI002); Ex. 30 (RMCB-AG-0000025); Ex. 36 (AMCAPROD00282701); Ex. 31 (RMCB-AG-0000087); and Ex. 34 (RMCB-AG-00000195). This information was not taken by a rogue employee who perhaps never shared the information as in *Vigil*. In this case, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ Ex. 1 (Frantz Decl. 333-46, Ex. C). This evidence is uniform to Subclass Members and supports certification.

### G. Plaintiffs' damages models are consistent with their theories of liability, and common damages issues predominate over individual ones.

There should be little question that Plaintiffs' proposed damages models are consistent with their theories of liability—each seeks compensation solely for Defendants' alleged misconduct. *See Forsythe v. Teva Pharm. Indus. Ltd.*, 102 F.4th 152, 159 (3d Cir. 2024). Similarly, these models are applicable on a classwide basis, as explained more fully below.[17]

#### a. A jury does not need to consider individual evidence to award statutory damages under the CMIA.

The California Subclass is entitled to statutory damages of $1,000 per violation. Cal. Civ. Code § 56.36(b)(1) (entitling individual to "nominal damages of one thousand dollars"). This means damages for Plaintiffs' CMIA claim can easily be calculated on a classwide basis using simple arithmetic. *See, e.g.*, *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010); *Brooks v. Trans Union LLC*, --- F. Supp. 3d ---, 2024 WL 3625142, at *20 (E.D. Pa. Aug. 1, 2024). And these are the exact damages each Subclass Member would seek in hypothetical individual

---

[17] Of course, even if this were not true, it would not bar class certification because "'individual damages calculations do not preclude class certification[.]'" *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374-75 & n.10 (3d Cir. 2015) (citation omitted); *see also, e.g.*, *In re Conduent Inc. Sec. Litig.*, 2022 WL 17406565, at *5 (D.N.J. Feb. 28, 2022) ("damages model is not required at class certification.") (citation omitted).

trials. *See, e.g.*, *Sykes v. Mel. S. Harris & Assocs., LLC*, 780 F.3d 70, 87 (2d Cir. 2015). Such damages are, of course, also consistent with Plaintiffs' CMIA liability theory. *N.J. Carpenters Health Fund v. Residential Cap., LLC*, 2013 WL 6839093, at *5 (S.D.N.Y. Dec. 27, 2013) (finding it appropriate to certify a class "where damages reflect liability by statutory formula").

### b. Nominal damages are similarly uniform under Plaintiffs' negligence claim.

Plaintiffs are also entitled to nominal damages for their negligence claim. Nominal damages are "awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800 (2021). Such damages, of course, involve *no* individual questions or expert testimony and thus are not controversial for class treatment. For example, Judge Cooper in the D.C. District Court recently certified a breach of contract class in a data breach that sought nominal damages. *Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 12 (D.D.C. 2024). The Court noted that "[a]ggregating smaller claims that are not worthwhile to pursue individually is class action's raison d'être." *Id.*; *see also Opperman v. Path, Inc.*, 2016 WL 3844326, at *15-16 (N.D. Cal. July 15, 2016) (certifying Rule 23(b)(3) class seeking nominal damages for privacy tort because "problems of proof which attend Plaintiffs' claims for compensatory damages are absent in regard to their claim for nominal damages").

### c. Plaintiffs are entitled to compensatory damages under their negligence claim, and these damages are formulaic and consistent with their liability theory.

Plaintiffs and Class Members also seek compensatory damages to attempt to place them back in the position they would have been but for Defendants' negligence. *See, e.g.*, *In re Sept. 11 Litig.*, 802 F.3d 314, 328 (2d Cir. 2015) ("[A]n award of damages to a person injured by the negligence of another is designed to restore the injured party, to the extent possible, to the position

that would have been occupied had the wrong not occurred.") (cleaned up). Specifically, Plaintiffs and Class Members seek damages based on the market value of insurance for Class Members to protect against the risk of identity theft. This calculation proceeds in four steps:

1. Plaintiffs' economic expert, Mr. Lee, ██████████████████████████████████████████████████ ██████████████████ Ex. 59 (Lee Report ¶¶ 45-46, Table 7).

2. Using this information, Plaintiffs' expert Amy Worley ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 4 (Worley Decl. ¶¶ 166-71). ████████████████████████████ Ex. 4 (Worley Decl. ¶¶ 172-90). ██████████████████████████████████████████ *Id.* ¶¶ 119-31, 191-92; *see also* Ex. 60 (Worley Suppl. Report ¶¶ 1-15).

3. ██████████████████████████████████████████████████████████ Ex. 59 (Lee Report ¶¶ 12-27, Table 5).

4. Finally, Plaintiffs' actuarial expert, Scott Witt, uses standard actuarial practices based on the information available in CHAMP and identified by Mr. Lee, to determine the likelihood that Class Members ██████████████████████ ████████████████████████████████████████████████ *See* Ex. 61 (Witt Am. Report). Mr. Witt then applies that information to the Class Members identified by Mr. Lee. *Id.*, Exs. L, M, N.

Each step of the above process is rote and mechanical and can be done formulaically for each Class Member and is consistent with the negligence liability theory.

## H. A class action is superior to alternative methods of resolving these controversies.

Under Rule 23(b)(3), Plaintiffs must show that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3);

*see also In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998). To determine superiority, a court considers: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any ligation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and, (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). Courts also consider whether "a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated[.]" *Amchem*, 521 U.S. at 615.

*First*, Class Members do not have a strong individual interest in controlling the prosecution of this case. It would cost Class Members substantially more to litigate an individual case than they could recover in damages. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 165 (D. Md. 2022) (explaining that a data breach "is the classic negative value case; if class certification is denied, class members will likely be precluded from bringing their claims individually because the cost to bring the claim outweighs the potential payout."), *rev'd on other grounds*, 78 F.4th 677 (4th Cir. 2023) *reinstated* 345 F.R.D. 137 (D. Md. 2023) (citations omitted).

*Second*, "numerous putative class action lawsuits based on the same facts and containing substantively identical claims have already been filed against Defendants, [and] the Judicial Panel on Multidistrict Litigation has seen fit to consolidate the handling of those common claims in this Court." *Id*. (cleaned up). These facts "'favor[] a consolidated disposition generally.'" *Id*. at 165-66 (quoting *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 162 (D.S.C. 2018)).

*Third*, "the difficulties that would necessarily be presented by thousands upon thousands of individual actions far outweigh any difficulties the Court may encounter in managing a class

- 29 -

action in this case." *TD Bank*, 325 F.R.D. at 162. In other words, "[a] class action is the only realistic way Plaintiffs' claims can be adjudicated. Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Id*. (cleaned up).

*Fourth*, this case is manageable as a class action because the claims turn on entirely common proof. So, "class certification will likely reduce litigation costs by consolidating recurring common issues[.]" *Marriott*, 341 F.R.D. at 166. Under these circumstances, superiority is easily met. Indeed, even if "individualized issues regarding causation and damages" were present (which they are not), "those individualized issues do not predominate over the common questions affecting the class. As such, the minimal difficulties in managing this class action do not render a class action inferior under Rule 23(b)(3)." *Savidge*, 2024 WL 1366832, at *31 (citing *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 34 (D. Me. 2013)) (cleaned up).

## VI.    A Class should also be certified for injunctive relief under Rule 23(b)(2).

Certification of a claim for injunctive and declaratory relief is appropriate when, in addition the Rule 23(a)'s requirements being met, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief. . . is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). When this "indivisible injunction" is sought to benefit all class members, "there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute." *Dukes*, 564 U.S. at 362-63.

As a result of Quest and Optum's common conduct, including their failure to properly vet, monitor, and oversee AMCA's compliance with HIPAA, certification of the Rule 23(b)(2) class is appropriate. This is particularly true because Quest and Optum continue to collect Personal

Information from their patients, including Class Members,[18] and send that information to Business Associates, including other debt collectors. Thus, while AMCA is bankrupt, ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ Ex. 2 (Anolik Decl. ¶ 253). This satisfies the showing of potential future harm. *See Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 698 (N.D. Cal. 2019) (granting 23(b)(2) relief where "plaintiff seeks injunctive relief to impose a set of changes on Facebook's conduct to ensure no further harm comes to him and the class" and plaintiff showed "likelihood of future harm to warrant potential relief.").

Accordingly, Plaintiffs seek injunctive relief requiring that Quest and Optum create and maintain a proper vendor risk management program, compliant with HIPAA, and engage an independent examiner with expertise in HIPAA privacy and vendor risk management compliance, for a period of ten years, to ensure that Class Members' Personal Information is never again sent to a Business Associate incapable of protecting it. Given that uniform injunctive relief would benefit the Class in its entirety and Quest and Optum continue to maintain Class Members' Personal Information, certification of the Class under Rule 23(b)(2) is appropriate. *See Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) (Rule 23(b)(2) certification appropriate where "the relief sought [will] benefit the entire class").

## VII.    Plaintiffs ask that their counsel be appointed under Rule 23(g).

Upon certifying a class, "Rule 23(g) requires the court to appoint Class Counsel." *Conduent*, 2022 WL 17406565, at *2. Proposed Class Counsel, selected by this Court, including

---

[18] *See* Exs. 56-58 (Finch Dep. 258-59; Saracina Dep. 260; Klein Dep. 177) (Plaintiffs' continued use of Quest).

MDL Lead Counsel James Cecchi, and interim Quest Track Co-Lead Counsel Jason Lichtman, Christopher Seeger, and Norman Siegel, have thoroughly pursued this action since 2019, across multiple rounds of motion to dismiss briefing, years of party and third-party discovery, including reviewing thousands of documents, propounding interrogatories, taking and defending depositions, and raising discovery disputes to this Court and the Special Master, and key work with experts. This satisfies Rule 23(g)(1), "the work counsel has done in identifying or investigating the potential claims." Likewise, proposed Class Counsel bring extensive experience in nationwide data breaches and class actions and have funded the entirety of the litigation without guarantee of payment or recovery. This readily satisfies the Rule 23(g)(2)-(4) factors. Proposed Class Counsel respectfully request that the Court appoint them pursuant to Rule 23(g).

## VIII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to grant their Motion for Class Certification.

DATED: June 4, 2025

CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.


By: */s/ James E. Cecchi*

JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ 07068
973.994.1700
jcecchi@carellabyrne.com

*Interim Lead Counsel for Plaintiffs*

Jason L. Lichtman
Sean A. Petterson
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson St., 8th Floor
New York, NY 11013
(212) 355-9500

Norman E. Siegel
J. Austin Moore
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd., Ste. 200
Kansas City, MO 64112
(816) 714-7100

Christopher A. Seeger
Christopher Ayers
**SEEGER WEISS, LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100

*Quest Track Co-Lead Counsel*

- 33 -

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br><br>This Document Relates To: *Quest/Optum Track* | Civil Action No. 19-md-2904(MCA)(MAH) |

**DECLARATION OF JAMES E. CECCHI IN SUPPORT OF QUEST PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

- 1 -

I, James E. Cecchi, declare as follows:

1.     I was appointed by this Court to serve as Interim Lead Counsel for Plaintiffs in the above-captioned MDL on November 5, 2019. Dkt. 99. I make this Declaration in support of the Quest Plaintiffs' Motion for Class Certification.

2.     I am an attorney duly licensed to practice in the State of New Jersey and member of the law firm Carella, Byrne, Cecchi, Brody & Agnello, P.C. I have personal knowledge of the matters stated herein, and, if called upon, I could and would competently testify thereto.

3.     Attached hereto are true and correct copies of the foregoing exhibits in support of the Quest Plaintiffs' Motion for Class Certification:

4.     Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Declaration of Mary T. Frantz.

5.     Attached hereto as **Exhibit 2** is a true and correct copy of the Expert Declaration of Sharon A. Anolik.

6.     **Exhibit 3** was formerly the Declaration of Gary Olsen, which has been intentionally omitted.

7.     Attached hereto as **Exhibit 3** is a true and correct copy of the Expert Declaration of Gary Olsen.

8.     Attached hereto as **Exhibit 4** is a true and correct copy of the Expert Declaration of Amy Worley.

9.     Attached hereto as **Exhibit 5** is a true and correct copy of the Expert Declaration of Scott Witt.

10.    Attached hereto as **Exhibit 6** is a true and correct copy of excerpts of the January 5, 2023 deposition of Zachary Raxter.

2

11.    Attached hereto as **Exhibit 7** is a true and correct copy of excerpts of the February 8, 2023 deposition of Russell Fuchs.

12.    Attached hereto as **Exhibit 8** is a true and correct copy of excerpts of the February 19, 2023 deposition of Jeffrey Wollman.

13.    Attached hereto as **Exhibit 9** is a true and correct copy of excerpts of the February 15, 2023 Optum360, LLC Rule 30(b)(6) deposition of Delmar Howard.

14.    Attached hereto as **Exhibit 10** is a true and correct copy of excerpts of the Aril 7, 2023 deposition of Michelena Harkins.

15.    Attached hereto as **Exhibit 11** is a true and correct copy of excerpts of the March 16, 2023 deposition of Juan Pablo Lake.

16.    Attached hereto as **Exhibit 12** is a true and correct copy of AMCAPROD00142191.

17.    Attached hereto as **Exhibit 13** are true and correct copies of the Business Associate Agreements entered between Quest and AMCA and Optum and AMCA, bearing the Bates numbers Quest_MDL_0001137, Quest_MDL_0001082, Quest_MDL_0000516, and Optum360_AMCA_0001954.

18.    Attached hereto as **Exhibit 14** is a true and correct copy of excerpts of the May 2, 2023 deposition of Anthony Hynes.

19.    Attached hereto as **Exhibit 15** is a true and correct copy of Quest_MDL_0012963, which was Exhibit 1 in the deposition of Kristy Boone.

20.    Attached hereto as **Exhibit 16** is a true and correct copy of excerpts of the March 23, 2023 deposition of Ralph Breindel.

21.    Attached hereto as **Exhibit 17** is a true and correct copy of Quest_MDL_0000653, which was Exhibit 9 in the deposition of Anthony Hynes.

22.     Attached hereto as **Exhibit 18** is a true and correct copy of Quest_MDL_0000662, which was Exhibit 3 to the deposition of Anthony Hynes.

23.     Attached hereto as **Exhibit 19** is a true and correct copy of excerpts of the February 28-March 1, 2023 Quest Diagnostics LLC Rule 30(b)(6) deposition of Terri Cetera.

24.     Attached hereto as **Exhibit 20** is a true and correct copy of excerpts of the February 9, 2023 deposition of Brian Lee Troen.

25.     Attached hereto as **Exhibit 21** is a true and correct copy of Optum360_AMCA_00006971, which was Exhibit 8 to the deposition of Brian Lee Troen.

26.     Attached hereto as **Exhibit 22** is a true and correct copy of Optum360_AMCA_0026911, which was Exhibit 9 to the deposition of Brian Lee Troen.

27.     Attached hereto as **Exhibit 23** is a true and correct copy of excerpts of the April 12, 2023 deposition of James Redman.

28.     Attached hereto as **Exhibit 24** is a true and correct copy of Optum360_AMCA_0006990, which was Exhibit 13 to the deposition of Brian Lee Troen.

29.     Attached hereto as **Exhibit 25** is a true and correct copy of Optum360_AMCA_0049901, converted from Microsoft Excel to a PDF.

30.     Attached hereto as **Exhibit 26** is a true and correct copy of Optum360_AMCA_0027670.

31.     Attached hereto as **Exhibit 27** is a true and correct copy of Optum360_AMCA_0028158.

32.     Attached hereto as **Exhibit 28** is a true and correct copy of Optum360_AMCA_0028197.

33.     Attached hereto as **Exhibit 29** is a true and correct copy of RMCB-AG-0000002, which was Defendants' Exhibit 3 to the deposition of Zachary Raxter.

34.    Attached hereto as **Exhibit 30** is a true and correct copy of RMCB-AG-0000025.

35.    Attached hereto as **Exhibit 31** is a true and correct copy of RMCB-AG-0000087.

36.    Attached hereto as **Exhibit 32** is a true and correct copy of Gemini_002, which was Exhibit 5 to the April 3, 2023 Gemini Advisory Rule 30(b)(6) deposition of Andrei Barysevich.

37.    Attached hereto as **Exhibit 33** is a true and correct copy of Quest_MDL_0000324.

38.    Attached hereto as **Exhibit 34** is a true and correct copy of RMCB-AG-0000195.

39.    Attached hereto as **Exhibit 35** is a true and correct copy of MAG-RM00034974.

40.    Attached hereto as **Exhibit 36** is a true and correct copy of AMCAPROD00282701.

41.    Attached hereto as **Exhibit 37** is a true and correct copy of the Declaration of Plaintiff Noel Benadom.

42.    Attached hereto as **Exhibit 38** is a true and correct copy of the Declaration of Plaintiff Breanna Klein.

43.    Attached hereto as **Exhibit 39** is a true and correct copy of the Declaration of Plaintiff John Briley.

44.    Attached hereto as **Exhibit 40** is a true and correct copy of the Declaration of Plaintiff Jo Ann Buck.

45.    Attached hereto as **Exhibit 41** is a true and correct copy of the Declaration of Plaintiff Ashley Davis (Finch).

46.    Attached hereto as **Exhibit 42** is a true and correct copy of the Declaration of Plaintiff Elizabeth Hollway.

47.    Attached hereto as **Exhibit 43** is a true and correct copy of the Declaration of Plaintiff Nancy Infield.

48.    Attached hereto as **Exhibit 44** is a true and correct copy of the Declaration of Plaintiff Ria Jairam.

49.    Attached hereto as **Exhibit 45** is a true and correct copy of the Declaration of Plaintiff Naomi Jaworowski.

50.    Attached hereto as **Exhibit 46** is a true and correct copy of the Declaration of Plaintiff Karli Ann Parker.

51.    Attached hereto as **Exhibit 47** is a true and correct copy of the Declaration of Plaintiff Rose Marie Perry.

52.    Attached hereto as **Exhibit 48** is a true and correct copy of the Declaration of Plaintiff Brittney Petitta.

53.    Attached hereto as **Exhibit 49** is a true and correct copy of the Declaration of Plaintiff LaTease Rikard.

54.    Attached hereto as **Exhibit 50** is a true and correct copy of the Declaration of Plaintiff Joyce Rosselli.

55.    Attached hereto as **Exhibit 51** is a true and correct copy of the Declaration of Plaintiff Michael Rutan.

56.    Attached hereto as **Exhibit 52** is a true and correct copy of the Declaration of Plaintiff Darlane Saracina.

57.    Attached hereto as **Exhibit 53** is a true and correct copy of the Declaration of Plaintiff Shannon Walden.

58.    Attached hereto as **Exhibit 54** is a true and correct copy of the Declaration of Plaintiff Annie Mae Smith.

59.     Attached hereto as **Exhibit 55** is a true and correct copy of the Declaration of Plaintiff Deanna Taylor.

60.     Attached hereto as **Exhibit 56** is a true and correct copy of excerpts of the December 13, 2022 deposition of Plaintiff Ashley Davis (Finch).

61.     Attached hereto as **Exhibit 57** is a true and correct copy of excerpts of the January 20, 2023 deposition of Plaintiff Darlane Saracina.

62.     Attached hereto as **Exhibit 58** is a true and correct copy of excerpts of the December 2, 2022 deposition of Plaintiff Breanna Klein.

63.     Attached hereto as **Exhibit 59** is a true and correct copy of the Expert Report of Jonathan F. Lee.

64.     Attached hereto as **Exhibit 60** is a true and correct copy of the Supplemental Expert Report of Amy R. Worley.

65.     Attached hereto as **Exhibit 61** is a true and correct copy of the Amended Expert Report of Scott J. Witt.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4th day of June, 2025, at Roseland, New Jersey.

 _/s/ James E. Cecchi_
James E. Cecchi

7