**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To: Other Labs Track | Civil Action No. 19-md-2904(MCA)(MAH) |

---

**BRIEF IN SUPPORT OF SONIC PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

---

James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

*Lead Counsel for Plaintiffs*

Amy E. Keller
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900

Joseph J. DePalma
**LITE DePALMA GREENBERG &**
**AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000

*Other Labs Track Co-Lead Counsel*

1012773.2

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

CHART OF ABBREVIATIONS ........................................................................................ ix

I.        PRELIMINARY STATEMENT ................................................................................1

II.      FACTUAL BACKGROUND ....................................................................................2

       A.     Sonic transmitted patient data to AMCA ....................................................2

       B.     SHUSA and Aurora failed to maintain the safety and security of patient data that it sent to AMCA .......................................................................7

            1.     SHUSA performed no oversight of AMCA's data security ................7

            2.     Aurora performed no oversight of AMCA's data security ................10

       C.     AMCA lacked adequate data security practices ......................................12

       D.     Sonic's response to the Data Breach showed little concern about its patients' information ...................................................................................13

III.     THE PROPOSED CLASS CLAIMS .....................................................................16

IV.     LEGAL ARGUMENT ...........................................................................................18

       A.     Legal Standard ..........................................................................................18

       B.     Plaintiffs satisfy the requirements of Rule 23(a) .....................................19

            1.     Plaintiffs have satisfied numerosity because there are millions of members in the proposed Classes ...................................................19

            2.     There is at least one issue common to members of the proposed classes ..20

            3.     Plaintiffs' claims are typical of the Class's claims .................................22

            4.     Plaintiffs are adequate representatives for the Class and Class Counsel fairly and adequately represents the interests of the Class ........................23

       C.     The Class is ascertainable because it is defined with reference to objective criteria….. ..................................................................................................25

       D.     A Rule 23(b)(3) damages class should be certified ...................................25

1012773.2

1. Common issues predominate over individual ones ...................................25

    a. Common legal questions predominate concerning Plaintiffs' negligence claims.........................................................................................26

    b. Common evidence will be used to adjudicate Plaintiffs' claims ...26

    c. Plaintiffs' Damages Satisfy Rule 23(b) .........................................29

2. A class action is superior to any other type of action ...............................32

E. The Court Should Certify A Class For Injunctive Or Declaratory Relief .............34

V. CONCLUSION................................................................................................................36

1012773.2

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019)....................................................................36

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .........................................................................................18, 25

*Arbitrage Fund v. Toronto-Dominion Bank*,
2023 WL 5550198 (D.N.J. Aug. 29, 2023) .............................................................22

*Baby Neal for & by Kanter v. Casey*,
43 F.3d 48 (3d Cir. 1994) ......................................................................................36

*Barnes v. American Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) .............................................................................34, 35

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006) ...................................................................................23

*Bedoya v. Am. Eagle Express, Inc.*,
2022 WL 3443983 (D.N.J. Aug. 17, 2022) .............................................................18

*Brinker Int'l, Inc. v. Steinmetz*,
2024 WL 1839101 (U.S. Apr. 29, 2024) ......................................................... *passim*

*Cormier v. Boys Town La., Inc.*,
381 So. 3d 938 (La. App. 3 Cir 03/06/24)...............................................................17

*Demoney v. Gateway Rescue Mission*,
304 So. 3d 652 (Miss. App. 2020)...........................................................................17

*Dzielak v. Whirlpool Corp.*,
No. CV 2:12-89 (KM)(JBC), 2017 WL 6513347 (D.N.J. Dec. 20, 2017) ...............29

*Forsythe v. Teva Pharm. Indus. Ltd.*,
102 F.4th 152, 159 (3d Cir. 2024) ..........................................................................29

*Giroux v. Essex Prop. Tr., Inc.*,
2018 WL 2463107 (N.D. Cal. June 1, 2018).............................................................26

*Green-Cooper v. Brinker Int'l, Inc.*,
73 F.4th 883 (11th Cir. 2023)............................................................................20, 31

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ...........................................................................27

iv

*In re Brinker Data Incident Litigation*,
  2021 WL 1405508, at *8 (M.D. Fla. Apr. 14, 2021) ........................................................ *passim*

*In re Conduent Inc. Sec. Litig., No. CV198237SDWAME*,
  2022 WL 17406565 (D.N.J. Feb. 28, 2022) ........................................................................29

*In re Lamictal Direct Purchaser Antitrust Litig.*,
  957 F.3d 184 (3d Cir. 2020) ............................................................................................19

*In re Marriott Int'l, Inc.*,
  78 F.4th 677 (4th Cir. 2023) ............................................................................................33

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  345 F.R.D. 137 (D. Md. 2023) ........................................................................................33

*In re Mercedes-Benz Antitrust Litig.*,
  213 F.R.D. 180 (D.N.J. 2003) ........................................................................................26

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016) ............................................................................................19

*In re Niaspan Antitrust Litig.*,
  67 F.4th 118 (3d Cir. 2023) .................................................................................. 24-25, 25

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  Case No. 3:15-MD-2633-SI, 2019 WL 3410382 (D. Or. July 29, 2019) ......................... 27-28

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ......................................................................................22, 32

*In re Remicade Antitrust Litig.*,
  2022 WL 3042766 (E.D. Pa. Aug. 2, 2022) ...................................................................22, 23

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ......................................................................................18, 23

*In re Sonic Corp.*,
  2021 WL 6694843 (6th Cir. Aug. 24, 2021) ...................................................................22, 31

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) ............................................................................................23

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  309 F.R.D. 482 (D. Minn. 2015) ......................................................................................27

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
  325 F.R.D. 136 (D.S.C. 2018) ......................................................................................33, 34

v

*In re Telectronics Pacing Sys., Inc.*,
  172 F.R.D. 271 (S.D. Ohio 1997)..................................................................................27

*In re U.S. Foodservice Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ..........................................................................................25

*In re Valsartan, Losartan, & Ibesartan Products Liab. Litig.*,
  2023 WL 1818922 (D.N.J. Feb. 8, 2023) ...............................................................17, 18

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ..........................................................................................20

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
  644 F.3d 604 (8th Cir. 2011) .........................................................................................27

*JLB Builders, L.L.C v. Hernandez*,
  622 S.W.3d 860 (Tex. 2021) ....................................................................................17, 26

*Kelly v. RealPage Inc.*,
  47 F.4th 202 (3d Cir. 2022) ...........................................................................................25

*Kilpatrick v. Bryant*,
  868 S.W.2d 594 (Tenn. 1993) ........................................................................................17

*Koeller v. Numrich Gun Parts Corp.*,
  2023 WL 3591176 (N.D.N.Y. May 23, 2023) ...............................................................27

*Lewis v. Govt. Empls.' Ins. Co.*,
  98 F.4th 452 (3d Cir. 2024).............................................................................................25

*McCoy v. GEICO Indemn. Co.*,
  2023 WL 2923454 (D.N.J. Apr. 13, 2023) ...............................................................23, 26

*McNair v. Synapse Grp. Inc.*,
  672 F.3d 213 (3d Cir. 2012) ...........................................................................................34

*Moore Charitable Found. v. PJT Partners, Inc.*,
  217 N.E.3d 8 (2023).......................................................................................................17

*Navelski v. Int'l Paper Co.*,
  244 F. Supp. 3d 1275 (N.D. Fla. 2017) .........................................................................26

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 & n.10 (3d Cir. 2015) ...............................................................................29

*Phillips Petroleum v. Shutts*,
  472 U.S. 797 (1985).......................................................................................................17

*PHWLV, LLC v. House of CB USA, LLC*,
  554 P.3d 715 (Nev. 2024)...............................................................................................17

vi

*Rand v. Travelers Indem. Co.*,
  2022 WL 15523722 (S.D.N.Y. Oct. 27, 2022)................................................................27

*Reyes v. Netdeposit, LLC*,
  802 F.3d 469 (3d Cir. 2015) ..........................................................................................19

*Rodriguez v. Nat'l City Bank*,
  726 F.3d 372 (3d Cir. 2013) ..........................................................................................21

*Roofer's Pension Fund v. Paper*,
  333 F.R.D. 66 (D.N.J. 2019) ..........................................................................................22

*Russell v. Educ. Comm'n for Foreign Med. Graduates*,
  15 F.4th 259 (3d Cir. 2021) ......................................................................................19, 23

*Savidge v. Pharm-Save, Inc.*,
  2024 WL 1366832 (W.D. Ky. Mar. 29, 2024) .......................................................... *Prudential*

*Smith v. Merck & Co.*,
  2019 WL 3281609 (D.N.J. July 29, 2019) ......................................................................24

*Sullivan v. DB Investments*,
  667 F.3d 273 (3d Cir. 2011) ......................................................................................17, 26

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ..................................................................................................25, 32

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
  226 F.R.D. 207 (D.N.J. 2005) .........................................................................................26

*Wachtel ex. Rel. Jesse v. Guardian Life Ins. Co. of Am.*,
  453 F.3d 179 (3d Cir. 2006) ...........................................................................................34

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................................................20

*Watson v. Shell Oil Co.*,
  979 F.2d 1014 (5th Cir. 1992) ........................................................................................27

*Williams v. Jani-King of Philadelphia Inc.*,
  837 F.3d 314 (3d Cir. 2016)............................................................................................18

**RULES**

Fed. R. Civ. P. 23(a) ......................................................................................... 18-19

Fed. R. Civ. P. 23(a)(1)............................................................................................19

Fed. R. Civ. P. 23(a)(2)............................................................................................20

Fed. R. Civ. P. 23(b)(3)........................................................................................ 25, 32

1012773.2

Fed. R. Civ. P. 23(a)(4)...........................................................................................................23

**OTHERS**

45 C.F.R. § 160.103 ...............................................................................................................9

45 C.F.R. Parts 160 ................................................................................................................7

*Annual Survey*, 270 Am. J. Comp. L. 318 .............................................................................17

1012773.2

**CHART OF ABBREVIATIONS**

| Abbreviation | Full Name |
|---|---|
| AMCA | Retrieval Masters Creditors Bureau, Inc. d/b/a American Medical Collection Agency |
| Anderson Decl. | Excerpts from the Declaration of Plaintiff Gwendolyn Anderson |
| Anolik | Sharon Anolik, Plaintiffs' HIPAA Expert |
| Anolik Decl. | Declaration of Sharon Anolik |
| Aurora | Defendant Aurora Diagnostics LLC |
| Aurora First Admissions | Defendant Aurora Diagnostics LLC's Responses and Objections to Plaintiffs' First Set of Requests for Admission |
| Aurora Third Admissions | Defendant Aurora Diagnostic LLC's Responses and Objections to Plaintiffs' Third Revised Set of Requests for Admission |
| Aurora Divisions | Collectively, Defendant Austin Pathology Associates, Laboratory Medicine Consultants, Ltd., South Texas Dermatology Lab, PLLC, Pathology Solutions, LLC, Seacoast Pathology, Inc., Arizona Dermatopathology, Western Pathology Consultants, Ltd., and Laboratory of Dermatology ADX, LLC |
| Austin Path | Defendant Austin Pathology Associates |
| Austin Path First Admissions | Defendant Austin Pathology Associates' Responses and Objections to Plaintiffs' First Set of Requests for Admission |
| BAA | HIPAA Business Associate Agreement |
| Cecchi Decl. | Declaration of James E. Cecchi in Support of Sonic Plaintiffs' Motion for Class Certification |
| Charles River | Charles River Associates, AMCA's forensic investigator |
| Conformance | Conformance Technology |
| CPL | Defendant Clinical Pathology Laboratories, Inc. |
| CPL First Admissions | Defendant Clinical Pathology Laboratories, Inc.'s Responses and Objections to Plaintiffs' First Set of Requests for Admission |
| Data Breach | Data security breach at AMCA allegedly occurring from at least August 2018 to March 2019 |
| DePalma Decl. | Declaration of Joseph J. DePalma in Support of Sonic Plaintiffs' Motion for Class Certification |
| End Point | End Point Corporation, AMCA's IT vendor |
| Ex. __ | Exhibits to the Cecchi Decl. |
| Frantz | Mary T. Frantz, Plaintiffs' Data Security Expert |
| Frantz Decl. | Declaration of Mary T. Frantz |
| Ford | Lisa Ford, Accounts Receivable Manager of Defendant Sonic Healthcare USA |
| Ford 30(b)(6) Dep. | Excerpts from Rule 30(b)(6) Deposition of Lisa Ford |
| Fuchs Dep. | Excerpts from Deposition of Russell Fuchs |
| Gemini | Gemini Advisory, a company that monitors the Dark Web for financial institutions |
| HIPAA | Health Insurance Portability and Accountability Act of 1996 |
| HIPAA Security Rule | 45 CFR Parts 160 and 164, Subparts A and C |

ix

1012773.2

| Abbreviation | Full Name |
|---|---|
| HIPAA Privacy Rule | 45 CFR Parts 160 and 164, and Subparts A and E |
| HITRUST | A comprehensive and certifiable security framework used by healthcare organizations and their business associates to efficiently approach regulatory compliance and risk management. |
| Howley | Tom Howley, Chief Security Officer of Defendant Sonic Healthcare USA |
| Howley 30(b)(6) Dep. | Excerpts from Rule 30(b)(6) Deposition of Tom Howley |
| IT | Information Technology |
| Lange | Carolyn Lange, Regional Billing Director of Defendant Aurora Diagnostics LLC |
| Lange Dep. | Excerpts from Deposition of Carolyn Lange |
| Lee | Dr. Jonathan F. Lee, Plaintiffs' Database Expert |
| Lee Report | Expert Report of Jonathan F. Lee, Ph.D. |
| Nuvei | Nuvei Corporation, a payment processing company |
| PCI | Payment Card Information |
| PCI DSS | Payment Card Industry Data Security Standards |
| PHI | Protected Health Information |
| PII | Personally Identifiable Information |
| R. Fuchs | Russell Fuchs, AMCA's Founder and Chief Executive Officer |
| Raxter | Zachary Raxter, AMCA's Director of IT and Security |
| Rieder | Christopher Rieder, Chief Information Officer of Defendant Aurora Diagnostics LLC |
| Rieder Dep. | Excerpts from Deposition of Christopher Rieder |
| Reynolds | Julie Reynolds, Vice President of Revenue Cycle Management of Defendant Aurora Diagnostics LLC |
| Reynolds 30(b)(6) Dep. | Excerpts from Rule 30(b)(6) Deposition of Julie Reynolds |
| Senters | Barbara Senters, Chief Compliance and Ethics Officer of Defendant Sonic Healthcare USA |
| Senters Dep. | Excerpts from Deposition of Barbara Senters |
| SHUSA | Defendant Sonic Healthcare USA |
| SHUSA First Admissions | Defendant Sonic Healthcare USA's Responses and Objections to Plaintiffs' First Set of Requests for Admission |
| SHUSA Third Admissions | Defendant Sonic Healthcare USA's Responses and Objections to Plaintiffs' Third Revised Set of Requests for Admissions |
| SHUSA Divisions | Collectively, Defendant Clinical Pathology Laboratories, Inc., American Esoteric Laboratories, CBLPath, Inc., Sunrise Medical Laboratories, Inc., and Defendant Aurora Diagnostics LLC |
| Sonic | Collectively, Defendant Sonic Healthcare USA, and its subsidiaries, Defendant Clinical Pathology Laboratories, Inc., American Esoteric Laboratories, CBLPath, Inc., Sunrise Medical Laboratories, Inc., and Defendant Aurora Diagnostics LLC as well as Defendant Aurora Diagnostics LLC's subsidiaries, Defendant Austin Pathology Associates, Laboratory Medicine Consultants, Ltd., South Texas Dermatology Lab, PLLC, Pathology Solutions, |

x

| Abbreviation | Full Name |
| --- | --- |
|  | LLC, Seacoast Pathology, Inc., Arizona Dermatopathology, Western Pathology Consultants, Ltd., and Laboratory of Dermatology ADX, LLC |
| Tate Decl. | Excerpts from the Declaration of Plaintiff Tonda Tate |
| T. Fuchs | Todd Fuchs, AMCA's Chief Operating Officer |
| VRA | Vendor Risk Assessment |
| VRM | Vendor Risk Management |
| Witt | Scott J. Witt, FSA, MAAA, Plaintiffs' actuarial and damages expert |
| Witt Am. Report | Amended Expert Report of Scott J. Witt |
| Wollman | Jeffrey Wollman, AMCA's Chief Financial Officer |
| Wollman Dep. | Excerpts from Deposition of Jeffrey Wollman |
| Worley | Amy Worley, Plaintiffs' Mitigation Product Expert |
| Worley Decl. | Declaration of Amy Worley |
| Worley Suppl. Report | Supplemental Expert Report of Amy R. Worley |

1012773.2

## I.     **PRELIMINARY STATEMENT**

Sonic handed its most sensitive patient information to a debt collector. However, that debt collector, American Medical Collection Agency "AMCA", was a "fly-by-night" operation when it came to data security. Even a minimal investigation by Sonic would have uncovered AMCA's woefully inadequate data security protocols. But Sonic performed virtually no oversight of AMCA at any point during the entire course of its relationship with its debt collection vendor, thereby allowing a catastrophic data breach of Sonics' patients' data. Millions of Sonic patients saw their personal information, including sensitive health-related information, stolen. This Court has already held that Plaintiffs stated viable claims against Sonic for negligence based on these events. Plaintiffs now ask that the Court allow them to pursue this claim on behalf of all Sonic patients whose personal information was stolen in the Data Breach.

This case is especially well-suited for class treatment. Sonic's liability is based upon several common and core questions that should be answered for the entire class, *e.g.*: (1) Did Sonic have a duty to safeguard its patients' personal information? (2) Did Sonic breach that duty by *admittedly* doing *nothing* to oversee AMCA's data security? (3) Did Sonic's failure cause the exfiltration of personally identifiable information? Each of these questions will be answered with common evidence or expert testimony, since Sonic's liability stems from conduct equally applicable to all class members.

A class action is the only practicable method here to adjudicate these claims and remedy these wrongs. Sonic's conduct injured millions of patients and, although individual damages calculations are not a bar to class certification, Plaintiffs' experts will, in any event, show that an appropriate damages method can be applied classwide. Both liability and damages questions are common and predominate thus supporting class treatment.

1012773.2

## II.    FACTUAL BACKGROUND

Sonic provides patients with clinical laboratory services and in the process acquires highly sensitive PII and PHI.[1] Despite recognizing the importance and value of this information—and its widely-recognized appeal to data thieves[2]—Sonic was entirely disinterested in protecting it. Sonic performed no due diligence or oversight with respect to its vendor (AMCA's) data security, either before or after retaining AMCA, and, in failing to do so, violated its legal obligations to protect the sensitive data of its patients.

### A.    Sonic transmitted patient data to AMCA.

Sonic Healthcare Limited ("Sonic Limited"), based in Australia, is one of the largest medical diagnostic laboratory companies in the world and the third largest in the United States.[3] In 2005, Sonic Limited acquired Defendant CPL, "the largest privately owned regional pathology laboratory" in the United States.[4] Following this acquisition, Sonic Limited's subsidiary SHUSA was formed in 2007 and given "the authority and responsibility for planning, directing and controlling [Sonic Limited's] US operations."[5] Sonic Limited grew its U.S. operations and acquired regional laboratories American Esoteric Laboratories and Sunrise Medical Laboratories in 2007, as well as CBLPath, Inc. in 2010.[6] SHUSA entered into a binding agreement to acquire

---

[1] PII includes a person's name, address, date of birth, Social Security number, credit card and bank account information, phone numbers, and similar information unique to that person. (First Amended Complaint, ECF No. 321, ¶ 4). PHI includes the names of physicians, health insurance information, dates of service, and similar health-related information. (*Id.*)

[2] *See generally* Worley Decl. ¶¶ 93-145 (Ex. 4).

[3] *See* Sonic Healthcare, *Our Divisions*, https://www.sonichealthcare.com/our-services/our-divisions/#:~:text=Since%20its%20establishment%20in%202007,CPL)%20of%20Austin%2C%20Texas.

[4] *See* Sonic Healthcare, *Who We* Are, https://www.sonichealthcareusa.com/about-us/who-we-are/history-detail/; *see also* SONIC PROD.0000001 (Ex. 5).

[5] *Id.*

[6] *See* https://www.sonichealthcareusa.com/about-us/who-we-are/history-detail/; *see also* SONIC PROD.0000001 (Ex. 5).

2

Aurora Diagnostics, LLC, as well as its eight subsidiaries Defendant Austin Path, Laboratory Medicine Consultants, Ltd., South Texas Dermatology Lab, PLLC, Pathology Solutions, LLC, Seacoast Pathology, Inc., Arizona Dermatopathology, Western Pathology Consultants, Ltd., and Laboratory of Dermatology ADX, LLC, in December 2018.[7]

Sonic operates as a federated entity.[8] SHUSA Divisions and Aurora Divisions provide patients with clinical laboratory and pathology services, collecting their patients' highly sensitive PII and PHI in the process. ███████████████████████████████ ███████████████[9] █████████████████████████████████████████████[10] ████████████████████████████████████████████████████ ███████████████████████.[11]

As with most medical providers, Sonic's patients are sometimes late or delinquent in paying charges incurred for Sonic's services. Sonic used a debt collector, AMCA, to assist in collecting those debts and transmitted their patients' highly sensitive PII and PHI to AMCA to facilitate the collection process.



████████████████████████████████████████████████████ █████[12] ███████████████████████████████████████████████ ████████████████████.[13] █████████████████████████████████

---

[7] *See* Rieder Dep. at 15:17 (Ex. 6); *see also* https://investors.sonichealthcare.com; SONIC PROD.0000001 (Ex. 5).

[8] Howley Dep. at 34:23-35:11 (Ex. 7); *see also* Sonic Healthcare, *Our Federated Model*, https://www.sonichealthcare.com/the-sonic-difference/our-federated-model/ (last accessed Sept. 10, 2024).

[9] SONIC PROD. 0003152-0003203 (Ex. 8).

[10] Howley Dep. at 54:13-22 (Ex. 7); Rieder Dep. at 61:4-7 (Ex. 6); SONIC PROD. 05775 (Ex. 9).

[11] Aurora First Admissions Nos. 14-17, 67-70, 80-83, 93-96, 106-09, 119-22, 132-35, 145-48 (Ex.10); SHUSA First Admissions Nos. 1, 3-4, 27, 29-30, 41, 43-44, 54, 56-57 (Ex. 11).

[12] SONIC PROD. 0006774 (Ex. 12).

[13] RMCB-AG-00001411-1414 (Ex. 83).

3



.[14] Discovery has revealed

Despite

[15]

For SHUSA and its divisions,

---

[14] SONIC PROD. 002192-99 (Ex. 13); SONIC PROD. 000700-09 (Ex. 14); SONIC PROD. 000691 (Ex. 15).

[15] *See* SHUSA First Admissions Nos. 1, 27, 41, 54 (Ex. 11); CPL First Admissions Nos. 7-8 (Ex. 16); *see also, e.g.*, AMCAPROD00663666 (Ex. 17); AMCAPROD00664055 (Ex. 18); AMCAPROD00664225 (Ex. 19); SONIC PROD. 0010127 (Ex. 20).

[16] Ford Dep. at 39:17, 66:18-24 (Ex. 21).

[17] Ford Dep. at 66:11-24 (Ex. 21); *see also* SONIC PROD. 0005815-16 (Ex. 22).

[18] *See* Ford Dep. at 66:21-24 (Ex. 21); SONIC PROD. 0012596 (Ex. 23); *see also, e.g.*, AMCAPROD00672763 (Ex. 24); AMCAPROD00672633 (Ex. 25); AMCAPROD00672878 (Ex. 26).

[19] SONIC PROD. 0003403-0003404 (Ex. 27); Lange Dep. at 21:8-11 (Ex. 28).

4

1012773.2

███████████████████████████████████████████

Aurora and its divisions also utilized AMCA. ████████████████████

█████████████████████ █████████████████████████████████

██████████████████████████████████████████████ Like

SHUSA and its divisions, ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ *See infra*.

For Aurora and its divisions, ███████████████████

████████████████████████████████████████████

███████ ███████████████████████████████████

██████████████████████████████████████ ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ ███████████████

████████████████████████████████████████████

███████ █████████████████████████████████████

---

[20] Fuchs Dep. at 201:22-202:7 (Ex. 29).
[21] Lange Dep. at 18:5-8 (Ex. 28).
[22] Lange Dep. at 18:2-18 (Ex. 28).
[23] Lange Dep. at 13:2-23 (Ex. 28).
[24] Lange Dep. at 15:10-24 (Ex. 28).
[25] *See* Lange Dep. at 21:1-3 (Ex. 28); *see also* AMCAPROD00046263 (Ex. 30).
[26] *See* Reynolds Dep. at 33:23-34:5 (Ex. 31).

5

1012773.2



---

[27] *See, e.g.*, AMCAPROD00693755 (Ex. 32), AMCAPROD00663442 (Ex. 33), AMCAPROD00693995 (Ex. 34), AMCAPROD00694003 (Ex. 35), AMCAPROD00808620 (Ex. 36).

[28] *See, e.g.*, AMCAPROD00663443 (Ex. 37), AMCAPROD00693756 (Ex. 38), AMCAPROD00693996 (Ex. 39), AMCAPROD00694004 (Ex. 40), AMCAPROD00808621 (Ex. 41).

[29] SONIC PROD. 0003403 -0003404 (Ex. 27); Lange Dep. at 21:8-11 (Ex. 28).

[30] Fuchs Dep. at 201:22-202:7 (Ex. 29).

[31] *See, e.g.*, AMCAPROD00000814 (Ex. 42).

[32] *See, e.g.*, AMCAPROD00000814-15 (Ex. 42); AMCAPROD00001934 (Ex. 43); AMCAPROD00235217-20 (Ex. 44); AMCAPROD00235201-04 (Ex. 45).

1012773.2

**B.      SHUSA and Aurora failed to maintain the safety and security of patient data that it sent to AMCA.**

SHUSA and Aurora were responsible for overseeing AMCA's data security on behalf of their respective divisions because ███████████████████████████████████

███████████████████████[33] Indeed, HIPAA's Security and Privacy Rules[34] required SHUSA and Aurora to "inspect the facilities, systems, books and records of [AMCA] to monitor its compliance"[35] of HIPAA, including the "use [of] appropriate safeguards to prevent use or disclosure of [PHI] … appropriate to the size and complexity of [AMCA's] operations and the nature and scope of its activities."[36] Despite their legal obligations, SHUSA and Aurora failed to determine whether AMCA had appropriate safeguards to prevent the disclosure of their patients' PII and PHI.

**1.   SHUSA performed no oversight of AMCA's data security.**

SHUSA ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[33] SHUSA First Admissions Nos. 1, 27, 41, 54 (Ex. 11); Aurora First Admissions at Nos. 25, 78, 91, 104, 117, 130, 143, 156 (Ex. 10); *see also* CPL First Admissions Nos. 7-8 (Ex. 16); Frantz Decl. ¶¶ 284-85 (Ex. 46); Anolik Decl. ¶¶ 207-09, 217-19, 222 (Ex. 47).

[34]    45 CFR Parts 160 and 164, Subparts A and C (Security Rule), and Subparts A and E (Privacy Rule).

[35]    *Id.* at 14. Indeed, "[w]hile a business associate must agree to comply with HIPAA Rules and is responsible for ensuring the confidentiality, integrity, and availability of PHI in its possession, ***it is the responsibility of a covered entity to ensure that all business associates are complying with HIPAA Rules***." *What are the Differences Between a HIPAA Business Associate and HIPAA Covered Entity*, THE HIPAA J. (Mar. 6, 2022), https://www.hipaajournal.com/differences-hipaa-business-associate-hipaa-covered-entity/.

[36]    *Id.* at 12; *see also* Anolik Decl. ¶¶ 209, 217-22 (Ex. 47).

7

1012773.2

███████████████████"[37] Indeed, "[w]hile a business associate [such as AMCA] must agree to comply with HIPAA Rules and is responsible for ensuring the confidentiality, integrity, and availability of PHI in its possession, it is the responsibility of a covered entity to ensure that all business associates are complying with HIPAA Rules"[38] ██████████

████████████████████████████████████████████

████████████████████████[39]

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████ ██

████████████████████████████████████████████

████████████████████████████████████████████

██████ Indeed, SHUSA performed ████████████████████

██████████ ██████████████████████████████████

████████████ ██████████████████████████████████

████████████████████████████████ SHUSA also ████████████████████

████████████████████████ SHUSA ██████████████████████

---

[37] Anolik Decl. ¶ 17 (Ex. 47).

[38] *What are the Differences Between a HIPAA Business Associate and HIPAA Covered Entity*, HIPAA J. (Mar. 6, 2022), https://www.hipaajournal.com/differences-hipaa-business-associate-hipaa-covered-entity/.

[39] Anolik Decl. ¶ 19 (Ex. 47) (citing Dept. of Health & Human Servs., *Guidance on HIPAA Covered Entities' responsibility to require that Business Associates comply with HIPAA regulations* (Mar. 22, 2022), https://www.cms.gov/files/document/guidance-letter-business-associate.pdf).

[40] Anolik Decl. ¶¶ 217-22 (Ex. 47).

[41] Ford Dep. at 99:8-14 (Ex. 21).

[42] SHUSA First Admissions No. 163 (Ex. 11).

[43] Howley Dep. at 117:22-118:1 (Ex. 7).

[44] *See* Frantz Decl. at ¶¶ 291-309 (Ex. 46); Anolik Decl. ¶¶ 223-36 (Ex. 47).

1012773.2



The evidence shows

SHUSA's

---

[45] *Id.* at 149:15-150:2, 156:15-24; *see also* Frantz Decl. at ¶¶ 291-309 (Ex. 46); Anolik Decl. ¶¶ 223-36 (Ex. 47).

[46] Under HIPAA, a business associate is a person or organization, other than a member of a covered entity's workforce, that performs certain functions or activities on behalf of, or provides certain services to, a covered entity that involve the use or disclosure of individually identifiable health information." 45 C.F.R. § 160.103.

[47] SONIC PROD. 0011425-30 (Ex. 48); *see also* Howley Dep. at 179:14-25, 184:12-25 (Ex. 7).

[48] Howley Dep. at 179:14-20 (Ex. 7).

[49] SONIC PROD. 0012418-19 (Ex. 49).

[50] Senters Dep. at 104:6-15 (Ex. 50).

[51] SONIC PROD. 0011301-02 (Ex. 51); *see also id.* ██████████ Senters Dep. at 104:6-15 (Ex. 50)

1012773.2

██████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ Further, there is no evidence █████████████

████████████████████████████████████████████████████████████

██████

As for AEL, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████ ██████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ ████

████████████████████████████████████████████████████████████

████████████████████████████

## 2. Aurora performed no oversight of AMCA's data security.

Aurora took ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[52] SONIC PROD. 000407 (Ex. 52); SONIC_PROD. 001011-31 (Ex. 53); SONIC PROD. 0011666 (Ex. 54) ; SONIC PROD. 002192-99 (Ex. 13); SONIC PROD. 000700-09 (Ex. 55); SONIC PROD. 000691 (Ex. 15).

[53] *See* Senters Dep. at 133:12–135:10, 138:5–139:6 (Ex. 50); *see also* Frantz Decl. at ¶¶ 301, 305 (Ex. 46); Anolik Decl. ¶¶ 237-41 (Ex. 47).

[54] Anolik Decl. ¶ 49 (Ex. 47).

[55] *Id.* at ¶¶ 219-20.

[56] SONIC PROD. 0003409 (Ex. 56); SONIC PROD. 0010073 (Ex. 57).

[57] SONIC PROD. 000442–000450 (Ex. 58).

1012773.2

████████████████████████████████████████████ █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

As the signatory of Aurora's BAA with AMCA, Aurora's Regional Director of Revenue Cycles, Carolyn Lange, testified ███████████████████████████████

████████████████████████████████████████████████

██████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ ████████████████████

██████████████ ██████████████████████████████████

██████████████ ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

Aurora too ████████████████████████████████████████

---

[58] *Id.*

[59] *Id.*

[60] Lange Dep. at 43:25-45:25, 47:5-13 (Ex. 28).

[61] *Id.* at 34:1-3

[62] Reynolds Dep. at 41:7-42:9 (Ex. 31).

[63] Aurora First Admissions No. 163 (Ex. 10).

[64] Aurora First Admissions No. 164 (Ex. 10).

[65] Reynolds Dep. at 71:4-73:15 (Ex. 31).

1012773.2

████████████████████████████████████████████████████ For example, Aurora's former Chief Information Officer, Christopher Rieder, testified ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ However, Aurora's Vice President of Revenue Cycle Management, Julie Reynolds, ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.

## C.    AMCA lacked adequate data security practices.

AMCA, for its part, maintained out-of-date and out-of-compliance data security practices. The company's sole IT employee (Zachary Raxter) was ████████████████████████████ ████████████████████████████████████████████████████[68] Given the scope of his responsibilities and lack of support, Raxter's focus was primarily on █████████ ████████████████████████████████████████ Even worse, Raxter had █████████ ████████████████████████████████████████████████████ ████████████████ Despite his ███████████, Raxter still was able to recognize █████ ████████████████████████████████████████████████████ ███████ █ a result, Raxter ████████████████████████████████████ ████████████████████████████████████████████████ In fact,

---

[66] Rieder Dep. at 70:7-71:3 (Ex. 6).

[67] Reynolds Dep. at 39:11-18 (Ex. 31).

[68] ██████████████████████████████████████ Fuchs Dep. at 23:5-22 (Ex, 29); Wollman Dep. at 29:22–30:8 (Ex. 59).

[69]    Raxter Dep. at 18:13–19, 48:22–49:10 (Ex. 60) ███████████████████ ███████████████████████

[70]    Frantz Decl. ¶¶ 85, 91 (Ex. 46); Raxter Dep. at 44:11-21, 89:9-24 (Ex. 60).

[71]    Raxter Dep. at 155:1–6, 244:15–24 (Ex. 60).

[72]    *Id.* at 40:15–42:22.

12

1012773.2

after AMCA had its Data Breach and retained top forensic and data security experts at Charles River, AMCA's Chief Financial Officer Jeffrey Wollman ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████

The effects were obvious. HIPAA requires, for example, ████████████████████ ████████████████████████████.[74] Raxter did not ██████████████████████████ ████████████████████████ ██████████████████████████████████████ ████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ This echoed all data security work at AMCA. ████████████████████████████████████████ ████████████████████████

### D.    Sonic's response to the Data Breach showed little concern about its patients' information.

Unknown to AMCA, the Data Breach appears to have begun at least as early as August 2018, lasting through March 2019. In November 2018, AMCA received notice from Conformance,

---

[73]  RMCB-PRIV0002220 (Ex. 61); RMCB-PRIV0001244 (Ex. 62).
[74]  Frantz Decl. ¶ 35 (Ex. 46).
[75]  Raxter Dep. at 59:22–60:13 (Ex. 60).
[76]  Frantz Decl. ¶¶ 129-32 (Ex. 46).
[77]  Raxter Dep. at 63:2–21 ████████████████████████████████ ██████████████████████████, 233:10–20 ██████████████████████████████. Raxter told Wollman that there were ████████████████████████████████████████████████████████████████████ AMCAPROD00149458 (Ex. 63). On August 1, 2017, Raxter lamented, ████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████ AMCAPROD00119499 (Ex. 64).
[78]  Raxter Dep. at 63–64, 67, 123–24 (Ex. 60).

13

1012773.2

a credit card processor, █████████████████████████████████████████

████████████████████████████████ Even though Raxter ██████████████████

██████████████████████████████████████████████████████████████████

In March 2019, AMCA ███████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████

Following this discovery, AMCA engaged the expertise of Charles River to conduct an investigation of the Data Breach that resulted in only two reports that were produced in this litigation. Those reports, ████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Charles

River's ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Charles

River ██████████████████████████████████████████████████████████████

---

[79] RMCB-AG-00000002 (Ex. 65).
[80] Raxter Dep. at 295:12 – 298:8 (Ex. 60).
[81] *Id.* at 283:15 to 285:24
[82] A "webshell" is "a tool that bad actors may use to interact with and maintain access to a system, after an initial compromise. It takes the form of a web script (a piece of code) which is then uploaded to a vulnerable system. Afterwards, it can be used to interact with the underlying operating system. . . . The point of this is to establish a foothold to gain persistent access to a system. Imagine you've built a secret door that no one else knows about – you have the key, so you can return as often as you like." Hazel Burton, *What is a web shell?*, Cisco (May 26, 2023), https://blog.talosintelligence.com/what-is-a-web-shell/; *see also* Worley Decl. ¶ 35 (Ex. 4). ████

██████████████████████████████████████████████████████ Frantz Decl.
¶ 65(b) (Ex. 46).

14

1012773.2

███████████

AMCA notified Sonic about the Data Breach on May 15, 2019.[84] Sonic, however, did not issue any public announcement about the AMCA Data Breach until July 15, 2019, and then only in a PR Newswire announcement which simply noted the PII and PHI of certain patients had been disclosed.[85] █████████████████████████████████████████████

---

[83]  *See* MAG-RM00034893 at 896-917 (Ex. 66); RMCB-PRIV0000062 (Ex. 67).

[84]  Ford Dep. at 177:4-16 (Ex. 21); SONIC PROD. 0003251 (Ex. 68); SONIC PROD. 0003630 (Ex. 69); SONIC PROD. 0003317-19 (Ex. 70).

[85]  *Clinical Pathology Laboratories, Inc. Notifies Patients of Data Security Incident*, PR Newswire, (July 15, 2019), https://www.prnewswire.com/news-releases/clinical-pathology-laboratories-inc-notifies-patients-of-data-security-incident-300885218.html; PR Newswire, *Austin Pathology Associates Notifies Patients of Data Security Incident* (July 19, 2019), https://www.prnewswire.com/news-releases/austin-pathology-associates-notifies-patients-of-data-security-incident-300888265.html; PR Newswire, *American Esoteric Laboratories Notifies Patients of Data Security Incident*, (July 15, 2019), https://www.prnewswire.com/news-releases/american-esoteric-laboratories-notifies-patients-of-data-security-incident-300885206.html; PR Newswire, *Sunrise Medical Laboratories, Inc. Notifies Patients of Data Security Incident* (July 15, 2019), https://www.prnewswire.com/news-releases/sunrise-medical-laboratories-inc-notifies-patients-of-data-security-incident-300885210.html; PR Newswire, *CBLPath, Inc. Notifies Patients of Data Security Incident* (July 15, 2019), https://www.prnewswire.com/news-releases/cblpath-inc-notifies-patients-of-data-security-incident-300885213.html; PR Newswire, *Laboratory Medicine Consultants, Ltd. Notifies Patients of Data Security Incident* (July 19, 2019), https://www.prnewswire.com/news-releases/laboratory-medicine-consultants-ltd-notifies-patients-of-data-security-incident-300888273.html; PR Newswire, *South Texas Dermatopathology, PLLC Notifies Patients of Data Security Incident* (July 19, 2019), https://www.prnewswire.com/news-releases/south-texas-dermatopathology-pllc-notifies-patients-of-data-security-incident-300888271.html; PR Newswire, *Pathology Solutions, LLC Notifies Patients of Data Security Incident* (July 19, 2019), https://www.prnewswire.com/news-releases/pathology-solutions-llc-notifies-patients-of-data-security-incident-300888268.html; PR Newswire, *Seacoast Pathology, Inc. Notifies Patients of Data Security Incident* (July 19, 2019), https://www.prnewswire.com/news-releases/seacoast-pathology-inc-notifies-patients-of-data-security-incident-300888267.html; PR Newswire, *Arizona Dermatopathology Notifies Patients of Data Security Incident* (July 19, 2019), https://www.prnewswire.com/news-releases/arizona-dermatopathology-notifies-patients-of-data-security-incident-300888270.html; PR Newswire, *Western Pathology Consultants, Ltd. Notifies Patients of Data Security Incident* (July 19, 2019), https://www.prnewswire.com/news-releases/western-pathology-consultants-ltd-notifies-patients-of-data-security-incident-300888272.html; PR Newswire, Laboratory of Dermatopathology ADX, LLC Notifies Patients of Data Security Incident (July 19, 2019), https://www.prnewswire.com/news-releases/laboratory-of-dermatopathology-adx-llc-notifies-patients-of-data-security-incident-300888266.html.

15

1012773.2

███████████████████████████████████████████████████████████████████

SHUSA coordinated Sonic's response to the AMCA Data Breach. ████████

███████████████████████████████████████████████████████████████████

████████████ ██████████████████████████████████████████████████████

## III.     THE PROPOSED CLASS CLAIMS

Plaintiffs propose certifying a nationwide class. The class is to be defined as:

> All natural persons who were sent a letter from Clinical Pathology Laboratories, American Esoteric Laboratories, CBLPath, Inc., Sunrise Medical Laboratories, Inc., Austin Pathology Associates, Laboratory Medicine Consultants, Ltd., South Texas Dermatology Lab, PLLC, Pathology Solutions, LLC, Seacoast Pathology, Inc. Arizona Dermatopathology, Western Pathology Consultants, Ltd., and Laboratory of Dermatology ADX, LLC notifying them of the Data Breach.

Plaintiffs seek certification of their negligence claim for damages arising from Sonic's failure to safeguard Plaintiffs' personal information, in accordance with the law that would be applicable under Texas' choice-of-law rules.[89] Plaintiffs also seek injunctive and other equitable relief that safeguards their information, requires SHUSA, Aurora, CPL, and Austin Path to improve their data security practices, and provides independent, expert oversight of their vendor risk management program. These are all necessary, uniform, and common-sense measures that warrant

---

[86] SONIC PROD. 0000391 (Ex. 71); SONIC PROD. 0000394 (Ex. 72); SONIC PROD. 0009802 (Ex. 73); SONIC PROD. 0009786 (Ex. 74).

[87] Senters Dep. at 125:15-126:6; 160:1-24; 172:16-19 (Ex. 50).

[88] SONIC PROD. 0007759 (Ex. 75); SONIC PROD. 0009595 (Ex. 76).

[89] The most significant relationship test in the Restatement (Second) of Conflict of Laws to determines choice of law issues here. *See Aquino v. Subaru of Am., Inc.*, 2024 WL 124627, at *6 (D.N.J. Jan. 11, 2024) (finding courts apply choice of law test of the forum state and New Jersey, the forum state, follows the most significant relationship test). This test would lead to the application of Texas law because Plaintiffs are domiciled in Texas; with the exception of Aurora, Defendants SHUSA, CPL, and Austin Path are headquartered in Texas; the parties' relationship is centered in Texas as Plaintiffs furnished their PHI to Defendants in Texas; and Defendants, with the exception of Aurora, transmitted Plaintiffs' PHI to AMCA and failed to oversee AMCA's data security from Texas. Additionally, in their Motion to Dismiss, SHUSA, Aurora, CPL, and Austin Path took the position that Texas law "governs [Plaintiffs'] common law claims." (*See* ECF No. 347-4 at 19.)

16

certification on a classwide basis, using common proof.

Alternatively, Plaintiffs propose certifying a multi-state negligence class under Texas negligence law. The class is to be defined as:

> All natural persons who were residing in the States of Texas, New York, Nevada, Louisiana, Tennessee, and Mississippi[90] who were sent a letter from Clinical Pathology Laboratories, American Esoteric Laboratories, CBLPath, Inc., Sunrise Medical Laboratories, Inc., Austin Pathology Associates, Laboratory Medicine Consultants, Ltd., South Texas Dermatology Lab, PLLC, Pathology Solutions, LLC, Seacoast Pathology, Inc. Arizona Dermatopathology, Western Pathology Consultants, Ltd., and Laboratory of Dermatology ADX, LLC notifying them of the Data Breach.[91]

Since there are no material differences between the elements of a negligence claim for each state,[92] manageability issues will not arise. It is also of no moment that the named Plaintiffs are all from Texas. It is appropriate to group together class members from different states with materially identical legal standards. *See Sullivan v. DB Investments*, 667 F.3d 273, 302 (3d Cir. 2011); *see also In re Valsartan Losartan & Irbesartan Prods. Liab. Litig.*, 2021 WL 121402025, at *5 (D.N.J. Oct. 7, 2021) ("There thus appears to be no reason any a named plaintiff from state X could not serve as a class representative for unnamed plaintiffs from state Y where the laws of both states are not in conflict." (citing *Phillips Petroleum v. Shutts*, 472 U.S. 797, 816 (1985)). Since the

---

[90] Coyle, Dodge, Simowitz, *Choice of Law In the American Courts in 2021: Thirty-Fifth Annual Survey*, 270 Am. J. Comp. L. 318, 319 Table 1 (2022) (listing which choice-of-law test applies to what types of claim in each state).

[91] ██████████████████████████████████████████████████ it does not matter that each of these labs are not named defendants. ███████████████████

[92] The elements of negligence are the same under Texas, New York, Nevada, Louisiana, Tennessee, and Mississippi law: (1) duty; (2) breach of duty; (3) causation; and (4) damage. *JLB Builders, L.L.C v. Hernandez*, 622 S.W.3d 860, 864 n.2 (Tex. 2021); *Moore Charitable Found. v. PJT Partners, Inc.*, 217 N.E.3d 8, 14 (2023); *PHWLV, LLC v. House of CB USA, LLC*, 554 P.3d 715, 719 (Nev. 2024); *Cormier v. Boys Town La., Inc.*, 381 So. 3d 938, 944 (La. App. 3 Cir 03/06/24); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993); *Demoney v. Gateway Rescue Mission*, 304 So. 3d 652, 657 (Miss. App. 2020).

17

elements of negligence for each state are the same, the law to be applied to the claims of class members from state X and from state Y is the same because the choice-of-law rules of each state lead to the application of Texas law.[93]

For the multi-state class, Plaintiffs also seek certification of a negligence claim for damages arising from SHUSA's, Aurora's, CPL's, and Austin Path's failure to safeguard Plaintiffs' personal information. Plaintiffs also seek injunctive and other equitable relief that safeguards their information, requires SHUSA, Aurora, CPL, and Austin Path to improve their data security, and provides independent, expert oversight of the vendor risk management program of SHUSA, Aurora, CPL, and Austin Path.

## IV.    LEGAL ARGUMENT

### A.    Legal Standard

"It is well established that a class may be certified only if the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 595-96 (3d Cir. 2009) (cleaned up). Where the merits are probed, they may be so only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). That is to say, "[a]lthough the court must undertake a rigorous analysis at the certification stage and consider some merits-related issues, the class certification stage is not the place for a decision on the merits." *Bedoya v. Am. Eagle Express, Inc.*, 2022 WL 3443983, at *5 (D.N.J. Aug. 17, 2022) (quoting *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 322 (3d Cir. 2016)).

When seeking class certification, a plaintiff must satisfy the requirements of Fed. R. Civ.

---

[93] *See supra* Coyle, Dodge, Simowitz, *Choice of Law In the American Courts in 2021: Thirty-Fifth Annual Survey*.

P. 23(a) and at least one of the requirements of Rule 23(b), depending upon the class sought to be certified. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 482 (3d Cir. 2015). The "rigorous analysis" required at the class-certification stage has "three key aspects":

> First, the court must find that the requirements of Rule 23 are met and any factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence. Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits. Third, the court must consider all relevant evidence and arguments, including expert testimony, whether offered by a party seeking class certification or by a party opposing it.

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020) (cleaned up).

Here, Plaintiffs satisfy their burden under Rule 23, such that certification of the proposed Class is the proper and efficient outcome.

**B.      Plaintiffs satisfy the requirements of Rule 23(a).**

Rule 23(a) sets forth the prerequisites for a class and requires that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*See also Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 265-66 (3d Cir. 2021).[94]

**1.   Plaintiffs have satisfied numerosity because there are millions of members in the proposed Classes.**

The proposed nationwide and multistate classes have enough members that "joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). This requirement is met even with forty class members. *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016); *see also Savidge v. Pharm-Save, Inc.*, 2024 WL 1366832, at *23 (W.D. Ky. Mar. 29, 2024) (finding in data

---

[94]   Citations, internal quotations, and footnotes omitted and emphasis added unless otherwise noted.

breach case that numerosity "is satisfied . . . based on the sheer number of data breach victims alone"). Here, Sonic notified approximately ████████████████—including Plaintiffs—that ██████████████████████████████████[95] Thus, the numerosity requirement is easily satisfied.

### 2. There is at least one issue common to members of the proposed classes.

The Class shares common "questions of law or fact[.]" Fed. R. Civ. P. 23(a)(2). This commonality requirement is satisfied, "if the Named Plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do."). For example, in *Savidge v. Pharm-Save, Inc.*, the court certified a negligence claim in a data breach case, finding commonality easily satisfied where:

> common issues relating to Pharm-Save's liability include (but are certainly not limited to) whether and to what extent Pharm-Save owed a duty to the class members and whether it breached that duty[.] Stated another way, there exist common questions of whether Pharm-Save's conduct was negligent . . . and whether it caused a data security breach that resulted in theft of employees' data and reasonably prompted employees to take mitigation measures or expend time to deal with the fallout of the breach. These questions all arise from the 2016 data breach. As such, the questions of facts necessary to resolve these questions are common to the class, or identical for each potential class member.

__ F. Supp. 3d __, 2024 WL 1366832, at *23 (W.D. Ky. Mar. 29, 2024) (cleaned up). The Court in *In re Brinker Data Incident Litigation*, made similar findings. 2021 WL 1405508, at *8 (M.D. Fla. Apr. 14, 2021) *vacated in part on other grounds sub nom. Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883 (11th Cir. 2023), *cert. denied sub nom. Brinker Int'l, Inc. v. Steinmetz*, 2024 WL

---

[95] Lee Report ¶ 27 (Ex. 77); *see also* SONIC_Anderson_Gwendolyn_00001-04 (Ex. 78); SONIC_Tonda_Tate_00032 (Ex. 79).

1839101, at *1 (U.S. Apr. 29, 2024) (concluding "several questions that are common to the class and capable of classwide resolution, including whether Brinker had a duty to protect customer data, whether Brinker knew or should have known its data systems were susceptible, and whether Brinker failed to implement adequate data security measures to protect customers' data. In particular, the final question is common to every claim in . . . the proposed Nationwide Class.…").

Similarly here, because Sonic engaged in a universal course of inaction, there are many common questions, including:

- Whether Sonic negligently failed to ensure that AMCA—its HIPAA Business Associate—provided adequate data security for Class members' PII and PHI that Sonic transmitted to AMCA;

- What action (if any) Sonic took to monitor or oversee AMCA's data security;

- Whether Sonic's oversight complied with industry norms and applicable regulations;

- Whether Sonic owed a common law, regulatory, or statutory duty to adequately safeguard Plaintiffs' and the Class's PII and PHI;

- Whether Sonic breached those duties; and

- Whether Sonic knew or should have known that AMCA's data security practices were inadequate or otherwise violated industry standards and regulations, including those prescribed by PCI-DSS and HIPAA.

Since these questions are based on a "common contention" that is "capable of classwide resolution" such that a "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *Dukes*, 564 U.S. at 350, nothing more is needed to satisfy commonality, *see Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 381 (3d Cir. 2013) ("That burden is not onerous.").

Sonic's inaction, moreover, produced the same fundamental injury. Like the Class, Plaintiffs' PII or PHI was exposed by the Data Breach. Like the Class, ███████████████

███████████████████████████████████████████████

1012773.2

███████████████████████ [96] As a result, commonality is satisfied. *See In re Remicade Antitrust Litig.*, 2022 WL 3042766, at *5 (E.D. Pa. Aug. 2, 2022); *Roofer's Pension Fund v. Paper*, 333 F.R.D. 66, 75 (D.N.J. 2019).

### 3. Plaintiffs' claims are typical of the Class's claims.

The typicality predicate under Rule 23(a)(3) requires that each Class member's claim arises from the same course of events and each Class member makes similar legal arguments to prove the defendant's liability. Plaintiffs establish typicality when "the named plaintiff has (1) suffered the same injuries as the absent class members, (2) as a result of the same course of conduct by defendants, and (3) their claims are based on the same legal issues." *Arbitrage Fund v. Toronto-Dominion Bank*, 2023 WL 5550198, at *4 (D.N.J. Aug. 29, 2023). "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where this is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 312 (3d Cir. 1998).

Plaintiffs' and Class members' claims here arise from Sonic's failure to properly protect their PII or PHI. Plaintiffs and Class members were injured in the same way, by the unlawful disclosure of their PII or PHI.[97] And Plaintiffs and Class members face an imminent and continuing risk of harm and out-of-pocket mitigation costs. This satisfies the typicality requirement. *See, e.g.*, *Savidge*, 2024 WL 1366832, at *25 (noting that, "in several data breach cases, courts have found the typicality requirement satisfied") (citing *In re Sonic Corp.*, 2021 WL 6694843, at *3 (6th Cir. Aug. 24, 2021) (rejecting argument that commonality, typicality, predominance, and superiority

---

[96] *See* Lee Report ¶¶ 12-27 (Ex. 77); Worley Decl. ¶¶ 166-92 (Ex. 4); Worley Suppl. Report ¶¶ 1-15 (Ex. 84); Witt Am. Report at 4-9 (Ex. 80).

[97] *See* Lee Report ¶¶ 12-27 (Ex. 77); Worley Decl. ¶¶ 166-92 (Ex. 4); Worley Suppl. Report ¶¶ 1-15 (Ex. 84); Witt Am. Report at 4-9 (Ex. 80).

1012773.2

requirements were not satisfied, noting that the alleged elements of the negligence claim "all arise from common questions," despite individual damages questions); *Brinker*, 2021 WL 1405508, at *8 (finding typicality met where "all Plaintiffs' injuries arise out of the same series of events, the Data Breach[,]" "all allege the same claims, and like each other class member they must show that [the defendant] was negligent . . . and that [the defendant's] conduct caused their damages, which are alleged to be similar. Because the only difference between Named Plaintiffs and putative class members is the amount of damages, typicality is satisfied."); *see also generally McCoy v. GEICO Indemn. Co.*, 2023 WL 2923454, at *5 (D.N.J. Apr. 13, 2023) ("Plaintiff's claim is based on the same legal theory and challenge the same uniform conduct.); *In re Remicade*, 2022 WL 3042766, at *7 ("Here, because the Named Plaintiffs and Class Members 'claims arise out of the same conduct and are based on the same legal theories[] ... the Court concludes the typicality factor is satisfied."); *Russell*, 15 F.4th at 271, n. 4 ("We have set a low threshold for typicality.").

### 4. Plaintiffs are adequate representatives for the Class and Class Counsel fairly and adequately represents the interests of the Class.

Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement requires the Court to consider: (1) whether there are "conflicts of interest between named parties and the class they seek to represent," *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 602; and (2) whether "the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class," *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006). "Only 'fundamental' conflicts 'will defeat the adequacy requirement.'" *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020).

First, the proposed Class representatives meet the adequacy requirement. Plaintiffs have no conflict of interests with the Class for the same reasons that Plaintiffs are typical of the Class.

23

1012773.2

*See Smith v. Merck & Co.*, 2019 WL 3281609, at *3 (D.N.J. July 29, 2019) (holding that adequacy and typicality often overlap). The interests of Class members and Plaintiffs are entirely aligned for three reasons: (1) they were affected by the same course of conduct by Sonic; (2) they rely on identical legal theories; and (3) individual Plaintiffs are not subject to any unique defenses. *See, e.g., Savidge*, 2024 WL 1366832, at *27 ("find[ing] that the named plaintiffs . . . share common interests and injuries with the unnamed class members" where, among other things, they "have sufficiently demonstrated that they suffered a future risk of harm that is both imminent and concrete[,] . . . will share this injury with the unnamed class members[, and] seek compensation for the same injuries that the class members seek to address, specifically for injuries associated with the 2016 data breach").

Second, proposed Class counsel is adequate. The proposed Class counsel are the same counsel appointed by the Court as interim class counsel.[98] Since the beginning of the case, proposed Class counsel has vigorously litigated this case at arms' length, investigating potential claims, responding to two motions to dismiss, zealously participating in discovery and bringing various discovery disputes to the Court for resolution, and retaining experts to assist and verify data.[99]

---

[98] Proposed Class Counsel, selected by this Court, including MDL Lead Counsel James Cecchi, and interim Co-Lead Counsel Joseph DePalma and Amy Keller, have thoroughly pursued this action since 2019, across multiple rounds of motion to dismiss briefing, years of party and third-party discovery, including reviewing thousands of documents, propounding interrogatories, taking and defending depositions, and raising discovery disputes to this Court and the Special Master, and key work with experts. Justin Hawal, who was recently named a partner of DiCello Levitt LLP in 2023, has served a critical role in this litigation, conferring with experts and handling discovery disputes and taking on additional work on Ms. Keller's behalf when her brother and father passed away. Plaintiffs request that the Court also appoint Mr. Hawal or appoint him in lieu of Ms. Keller given his work on this litigation.

[99] As noted above, there is no doubt that each Plaintiff has demonstrated his or her interest in vigorously prosecuting this case, having both sat for deposition, searched for and produced documents, responded to interrogatories, responded to requests for admissions, and remained in

1012773.2

**C.     The Class is ascertainable because it is defined with reference to objective criteria**

To satisfy the ascertainability requirement, "plaintiffs must show that (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 130 (3d Cir. 2023). The class here can be defined by objective criteria: whether the person received a Data Breach notification letter from Sonic. Sonic's own records regarding the identities of patients sent a Data Breach notification letter easily answers that question because Sonic knows the names and addresses of all the class members to whom it sent Data Breach notification letters.[100] Although Plaintiffs need not "identify all class members at certification," Sonic Defendants have already done so.[101] *Niaspan*, 67 F.4th at 130. *Cf. Lewis v. Govt. Empls.' Ins. Co.*, 98 F.4th 452, 462 (3d Cir. 2024) ("'[A] straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources'") (quoting *Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022))).

**D.     A Rule 23(b)(3) damages class should be certified.**

    **1.  Common issues predominate over individual ones.**

Common questions of law or fact predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only

---

constant contact with their attorneys. *See* Exs. 1-2. Plaintiffs' counsel are also experienced and capable attorneys who possess the skills, resources, and determination to prosecute this case through trial.

[100] *See* Sonic Third Admissions No. 10 (Ex. 81); Aurora Third Admissions No. 10 (Ex. 82).

[101] *See, e.g.*, SONIC_Anderson_Gwendolyn_00001-04 (Ex. 78); SONIC_Tonda_Tate_00032 (Ex. 79).

25

1012773.2

to individualized proof." *In re U.S. Foodservice Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013); *see also, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016); Fed. R. Civ. P. 23(b)(3). While this is a "more demanding" inquiry than commonality, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469. Rather, predominance is determined by whether "the efficiencies gained by class resolution of common issues are outweighed by individual issues." *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 231 (D.N.J. 2005); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J. 2003) (finding predominance requires that "common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members"). "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011). In this case, common issues predominate over individual ones as Plaintiffs' claims do not turn on any individual issues.

### a. Common legal questions predominate concerning Plaintiffs' negligence claims.

Plaintiffs seek to certify single-state claims for negligence under Texas law. The elements of negligence under Texas law are: (1) duty; (2) breach of duty; (3) causation; and (4) resulting damage. *See JLB Builders, L.L.C v. Hernandez*, 622 S.W.3d 860, 864 n.2 (Tex. 2021). Thus, common legal questions will predominate over Plaintiffs' negligence claims.

### b. Common evidence will be used to adjudicate Plaintiffs' claims.

In a case such as this, where the corporate conduct of a defendant is uniform across all Class members, Plaintiffs' negligence claim is appropriate for class-wide resolution because Sonic's negligent conduct was common to all Class members. *See McCoy*, 2023 WL 2923454, at

26

1012773.2

*6 (quoting *Sullivan*, 667 F.3d at 299-300); *Giroux v. Essex Prop. Tr., Inc.*, 2018 WL 2463107, at *4 (N.D. Cal. June 1, 2018) (granting class certification where defendant's "negligence and breach were uniform as to all class members"); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1308-09 (N.D. Fla. 2017) ("Thus, the core factual and legal issues with respect to liability in this case—whether or not Defendant's conduct caused the Dam to fail, whether or not the Dam's failure caused flooding in the subject neighborhood, and, if so, to what extent Defendant should be held liable—are resolvable by proof that is common to all class members."); *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 487 (D. Minn. 2015) (certifying negligence class in data breach case); *see also In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) (affirming class certification of negligence class); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1023 (5th Cir. 1992) (affirming class certification for negligence claim in mass-tort litigation and noting, "this litigation differs markedly from toxic tort cases ... in which numerous plaintiffs suffer varying types of injury at different times and through different causal mechanisms, thereby creating many separate issues"); *Koeller v. Numrich Gun Parts Corp.*, 2023 WL 3591176, at *5 (N.D.N.Y. May 23, 2023) (denying defendant's motion to dismiss where plaintiffs plausibly alleged defendant had breached its duty to safeguard customer data); *Rand v. Travelers Indem. Co.*, 2022 WL 15523722, at *7 (S.D.N.Y. Oct. 27, 2022) (same); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 295 (S.D. Ohio 1997) (certifying negligence class).

Indeed, even when certifying nationwide negligence classes, courts in data breach cases have focused on the essential uniformity of the defendant's conduct that lay at the heart of each class member's negligence claim. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 314 (N.D. Cal. 2018) (certifying nationwide negligence class for settlement; "the main issue boils down to the common factual contention of whether Anthem's data security levels were

27

1012773.2

reasonable"); *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 487 (D. Minn. 2015) (certifying nationwide negligence class of financial institutions affected by the Target data breach). In a data breach case, a negligence claim primarily turns on whether the defendant provided adequate security and whether the duty to protect sensitive information "would be owed classwide and whether that duty was breached also would be a class question." *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, Case No. 3:15-MD-2633-SI, 2019 WL 3410382, at *18 (D. Or. July 29, 2019) (certifying settlement negligence class).

Sonic owed the same duty to each Plaintiff and Class member to keep their PII and PHI secure and is subject to common proof from Plaintiffs' expert.[102]  Likewise, Sonic's failure to take steps to keep its patients' PII and PHI secure while sending it to AMCA and its failure to ensure that AMCA had reasonable data security is the same with respect to all Class members and subject to common proof.[103]  There is nothing in the record to suggest that PII and PHI of any individual Class member was treated any differently than the PII and PHI of every other Class member.

Indeed, evidence of Sonic's duty to Plaintiffs and breach of that duty will apply equally to all Class members. Plaintiffs' expert Sharon Anolik, for example, will testify that ███████

---

[102] *See* Frantz Decl., ¶¶ 280-330 (Ex. 46); Anolik Decl., ¶¶ 205-50 (Ex. 47).
[103] *See id.*
[104] ███████

Anolik Decl. ¶¶ 207-10, 217-22 (Ex. 47).



Sonic's main defense is that it did not owe any duty to monitor or oversee AMCA's (or any Business Associate's) compliance with HIPAA's privacy and security regulations, and only needed to enter into a contract with AMCA under which AMCA promised to so comply. Thus, Sonic posits, it could not have breached any duty. However,

[107]

Even though Sonic's position contradicts its legal obligations, whether Sonic owed a duty to oversee and monitor AMCA's HIPAA compliance, and whether it breached that duty, are common questions that generate common answers as to each and every Class member.

    **c.**    **Plaintiffs' Damages Satisfy Rule 23(b).**[108]

Plaintiffs' proposed damages model is consistent with their theories of liability, *see Forsythe v. Teva Pharm. Indus. Ltd.*, 102 F.4th 152, 159 (3d Cir. 2024), and, although not required to calculate their damages on a classwide basis, *see infra* at n.101, they demonstrate that the issue

---

[105] *Id.* at ¶¶ 17-18.

[106] *Id.* at ¶ 22.

[107] *Id.* at 20 (quoting Centers for Medicare and Medicare Services guidance letter GL-2022-03 (Mar. 22, 2022) at 2, https://www.cms.gov/files/document/guidance-letter-business-associate.pdf).

[108] Plaintiffs incorporate by reference the Quest Track's Motion for Class Certification, *see* Section V.G.c.

1012773.2

of damages is capable of resolution on a classwide basis.[109] Plaintiffs' damages expert, Scott Witt, has done just that and applied a common formula to estimate classwide damages that is adequately tied to Plaintiffs' theories of liability.[110]

Dr. Lee has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Mr. Witt (with the help of Ms. Worley and Dr. Lee) then calculates actual damages for each Sonic Plaintiff and demonstrates that actual damages can be calculated across the entire Class using the same methodology based on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ This methodology uses well-accepted economic principles, is tested, and applies to each Class member equally.

These are the same proofs that Plaintiffs would introduce at an individual trial of a single Plaintiff. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

In *Savidge*, a data breach case, the Court certified a negligence class despite the defendant's

---

[109] The Third Circuit has held "'that individual damages calculations do not preclude class certification,'" *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374-75 & n.10 (3d Cir. 2015) (citation omitted), and that there is no requirement that class members' damages be "susceptible to a formula for classwide measurement," *id.*; *see also In re Conduent Inc. Sec. Litig.*, No. CV198237SDWAME, 2022 WL 17406565, at *5 (D.N.J. Feb. 28, 2022) ("damages model is not required at class certification.") (citation omitted). "[P]laintiffs 'must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Dzielak v. Whirlpool Corp.*, No. CV 2:12-89 (KM)(JBC), 2017 WL 6513347, at *15 (D.N.J. Dec. 20, 2017) (citations omitted).

[110] Witt Am. Report at 4-9 (Ex. 80).

[111] Lee Report ¶¶ 12-27 (Ex. 77).

[112] *Id.* at ¶¶ 12-27; Witt Am. Report at 4-9 (Ex. 80); *see also* Worley Decl. ¶¶ 166-92 (Ex. 4); Worley Suppl. Report ¶¶ 1-15 (Ex. 84).

1012773.2

objections. 2024 WL 1366832, at *33. There, the Court found the predominance requirement had

been met after analyzing whether "questions relating to damages and even causation" were "so

numerous or complicated as to overwhelm the common questions relating to liability." *Id.* at *28-

31 (cleaned up). The Court relied on the Sixth Circuit's class certification affirmance in *In re Sonic

Corp.*, where the Court held that predominance was met where "the alleged elements of a

negligence claim—duty, breach, and causation—all arise from common questions: whether

Sonic's internal data security measures and its remote access policy caused the data breach, leading

to the issuance of the alerts and actions by the plaintiffs to limit or reimburse harms." *Savidge*,

2024 WL 1366832, at *30 (quoting *In re Sonic Corp.*, 2021 WL 6694843 at *3). Thus, the Court

in *Savidge* determined:

> Similarly, in the present case, Pharm-Save's liability for negligence . . . arises from
> common questions. For example, with respect to negligence, common questions
> include whether Pharm-Save owed a duty to the class members and whether it
> breached that duty. Whether Pharm-Save's breach of that duty caused injury to the
> class members is also a common question, even if there also exists other
> individualized questions about causation (e.g., whether a class member was a
> victim of another unrelated data breach that might increase the risk of future harm.
> And the fact of damages is a question common to the class, as it is defined herein.
> This is true even if the specific amount of damages sustained by each individual
> class member may ultimately vary because, for example, they were involved in
> other data breaches as Pharm-Save argues. But to the extent those issues are
> relevant, they impact the calculation of damages, not the issue of liability. In other
> words, Pharm-Save's concerns do not require a causation-related determination of
> whether class members were injured at all by the defendants. Instead, the issues
> cited by Pharm-Save as causation determinations go to individual variations in
> damages, and, as already explained, such variations in damages do not typically
> prohibit class certification. Stated another way, the questions of causation in this
> case are bound up in the questions of damages, and because causation plays only a
> minor role in the larger controversy, common questions predominate in this class
> action.

2024 WL 1366832, at *30 (cleaned up).

Other courts have also rejected defendants' efforts to conflate issues of predominance with

those of damages or causation in data breach cases under Rule 23(b) standards for damages stricter

1012773.2

than those applied by the Third Circuit. For example, the Eleventh Circuit in *Brinker* rejected the defendant's "claim that individualized damages will predominate." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023), *cert. denied sub nom. Brinker Int'l, Inc. v. Steinmetz*, No. 23-648, 2024 WL 1839101 (U.S. Apr. 29, 2024). Since "plaintiffs' expert provided the District Court with a common methodology for calculating damages," which was ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *Tyson Foods*, 577 U.S. at 458 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, "the damages model was sufficient, and it would be a 'matter for the jury' to decide actual damages at trial." *Brinker*, 73 F.4th 883, 893-94 (quoting *Tyson Foods*, 577 U.S. at 459). The Eleventh Circuit thus concluded: "Any individual inquiry into particularized damages resulting from the data breach, such as damages recoverable due to uncompensated loss caused by compromised personal information, does not predominate over the three categories of common damages inquiries analyzed by the plaintiffs' expert." *Id.* at 894.

Accordingly, questions of legal duty, breach, and whether Plaintiffs were proximately injured are common issues susceptible to common proof. Likewise, there are no affirmative defenses specific to any Plaintiff or Class member that would be an obstacle to a class-wide jury trial.

> ### 2. A class action is superior to any other type of action.

Class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998). As outlined in Federal Rule of Civil Procedure 23(b)(3), this Court must consider the following factors to determine whether class certification is a superior method for adjudicating this dispute:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

1012773.2

the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and, (D) the likely difficulties in managing a class action.

Additionally, this Court should evaluate whether "a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decisions as to persons similarly situated." *Amchem*, 521 U.S. at 615 (alteration in original).

First, Class members lack a strong interest in controlling the prosecution of this case since it would cost Class members substantially more to litigate an individual case than they could recover in damages. As the Court in the *Marriott* data breach case recognized, this case "is the classic negative value case; if class certification is denied, class members will likely be precluded from bringing their claims individually because the cost to bring the claim outweighs the potential payout." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.* ("*Marriott*"), 341 F.R.D. 128, 165 (D. Md. 2022), *reversed on other grounds, In re Marriott Int'l, Inc.*, 78 F.4th 677 (4th Cir. 2023) (citations omitted); *see also In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 345 F.R.D. 137 (D. Md. 2023) (reinstating class certification after finding class action waiver did not apply). "For most class members the only realistic alternative to a class action is no action at all. In such a case, the adjudication of the matter through a class action is superior to no adjudication of the matter at all." *Id*. (cleaned up).

Second, no other cases related to this conduct are pending against Sonic outside of this MDL. Indeed, "because numerous putative class action lawsuits based on the same facts and containing substantively identical claims have already been filed against Defendants, the Judicial Panel on Multidistrict Litigation consolidated the handling of those common claims in this Court." *Id*. (cleaned up). "This decision 'favors a consolidated disposition generally.'" *Id*. (quoting *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 162 (D.S.C. 2018)).

1012773.2

Third, consolidation in this forum ensures that Sonic's patients can vindicate their rights. Indeed, "the difficulties that would necessarily be presented by thousands upon thousands of individual actions far outweigh any difficulties the Court may encounter in managing a class action in this case." *TD Bank*, 325 F.R.D. at 162. "Put simply, a class action is the only realistic way Plaintiffs' claims can be adjudicated. Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Id.* (cleaned up).

Fourth, this case is manageable as a class action because the claims turn entirely on common proof. Accordingly, "class certification will likely reduce litigation costs by consolidating recurring common issues[.]" *Marriott*, 341 F.R.D. at 166. Under these circumstances, superiority is easily met.

**E.      The Court Should Certify A Class For Injunctive Or Declaratory Relief.**

Per Rule 23(b)(2), a court may certify a class where:

> [T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. The key to a Rule 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."

*Dukes*, 564 U.S. at 361. Rule 23(b)(2) thereby applies only where a single injunction or declaratory judgment would provide relief to each member of the class. *Id.* When, as in this case, prospective relief is sought [under Rule 23(b)(2)], the plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012).

A Rule 23(b)(2) class may be certified where the class: (1) meets the requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2), *see Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998); and (3) is capable of "readily discernable, clear, and precise

34

1012773.2

statement of the parameters defining the class," *see Wachtel ex. Rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187 (3d Cir. 2006). *See also In re Valsartan, Losartan, & Ibesartan Products Liab. Litig.*, 2023 WL 1818922, at *28 (D.N.J. Feb. 8, 2023). Besides cohesiveness and a proper definition, the Rule 23(b)(2) class must also seek primarily non-monetary relief. *Id.*

A Rule 23(b)(2) class must be cohesive because:

> First, unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action. Thus, the court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' s claims present different individual issues than the claims of the absent members present. Second, the suit could become unmanageable and little value would be gained in proceeding as a class action . . . if significant individual issues were to arise consistently.

*Barnes*, 161 F.3d at 143. A class definition also must include "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Watchel*, 453 F.3d at 187-88.

Plaintiffs propose certifying a Rule 23(b)(2) class seeking injunctive relief in the form of an independent monitor with HIPAA privacy and vendor risk management compliance expertise to examine and monitor Sonic's vendor risk management ("VRM") policies and data protection measures and procedures relating to Class members' PII and PHI. This relief is necessary: (1) to address Sonic's ongoing and systemic failure to ensure its HIPAA business associates comply with Sonic's and their own duties under HIPAA; and (2) because Sonic has not given any assurance that it will expend the resources required for supervision of its business associates' data security without injunctive relief.

The proposed class is cohesive in that Sonic's data protection measures and procedures

35

related to its vendors, like AMCA, apply (or not) to the PII and PHI of all Class Members equally, and any recommended improvements in Sonic's VRM will benefit all Class members in the same way. Given that uniform injunctive relief would benefit the Class members in their entirety, certification under Rule 23(b)(2) is appropriate. *See Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) (Rule 23(b)(2) certification appropriate where "the relief sought . . . [will] benefit the entire class"); *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 698 (N.D. Cal. 2019) (granting 23(b)(2) relief where "plaintiff seeks injunctive relief to impose a set of changes on Facebook's conduct to ensure no further harm comes to him and the class" and plaintiff showed "likelihood of future harm to warrant potential relief").

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted.

DATED: June 4, 2025

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.

By: */s/ James E. Cecchi*

JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ 07068
973.994.1700
jcecchi@carellabyrne.com

*Interim Lead Counsel for Plaintiffs*

Joseph J. DePalma
Catherine B. Derenze
LITE DEPALMA GREENBERG &
AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 623-3000
Amy E. Keller

James J. Pizzirusso
Steven M. Nathan
HAUSFELD LLP
1200 17th St., NW
Suite 600
Washington, DC 20036
(202) 540-7200

36

1012773.2

Justin J. Hawal
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900

*Other Labs Track Co-Lead Counsel*

Laurence D. King
Mario M. Choi
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
(415) 772-4700

Joseph P. Guglielmo
SCOTT+SCOTT ATTORNEYS AT LAW,
LLP
The Helmsley Building
230 Park Ave, 17th Floor
New York, New York 10169
(212) 223-6444

*Other Labs Track Steering Committee*

37

1012773.2