**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | No. 2:19-md-2904 |
| | **JAMEL K. SEMPER, USDJ** |
| | **MICHAEL A. HAMMER, USMJ** |
| This Document Relates To: All Cases | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

James E. Cecchi
Caroline Fabend Bartlett
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

*Interim Lead Counsel for Plaintiffs*

*(Additional co-lead counsel listed on signature page)*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................ 1

I.    FRAMEWORK APPLICABLE TO CLASS CERTIFICATION ........................ 2

    A.    Plaintiffs restate the Rule 23 factors for convenience. ......................... 2

    B.    Courts have several tools at their disposal to manage complex class litigation. .......................................................................................... 4

II.    PROPOSED CLASSES ..................................................................................... 4

ARGUMENT ............................................................................................................ 7

I.    Plaintiffs have established standing for all proposed class members. ............... 7

    A.    At class certification, Plaintiffs need only show that all class members' data was exfiltrated from AMCA's servers. ..................................... 8

    B.    Plaintiffs have presented overwhelming common evidence that threat actors accessed and exfiltrated all class members' personal information. ........... 10

        1.    AMCA's lack of security allowed threat actors to access all of its systems. ...................................................................................... 10

        2.    The forensic analyses undertaken by AMCA's and Defendants' forensic investigators show that threat actors likely accessed all of AMCA's systems. .................................................................. 12

        3.    Numerous independent sources confirm that ███████████ ████████████████████████████ ................................ 15

    C.    Defendants' attacks on standing do not overcome the common proof. ............... 20

    D.    All Sonic Plaintiffs and class members have standing to sue the various Sonic Defendants. ................................................................................ 23

II.    Only a few states' laws are relevant to any particular Defendant, and it would be no obstacle to class certification if it were otherwise. ........................ 23

    A.    The substantive law of the Defendant's home state applies under the most significant relationship test. ............................................... 25

        1.    Under the most significant relationship test, a plaintiff must sue under the law of each Defendant's home state. ......................... 25

        2.    Most other Plaintiffs in the LabCorp matter are from states that also require the application of North Carolina law. ................... 28

    B.    For the LabCorp New York Multi-State Negligence Class, the place of the wrong leads to the uniform application of New York law. ............................. 29

    C.    For the Georgia LabCorp Plaintiffs, Georgia law applies. ............................ 29

**TABLE OF CONTENTS**
**(continued)**

| | | | Page |
|---|---|---|---|
| | D. | None of Defendants' arguments undermine the above choice of law analysis, and it would be irrelevant to class certification if they did. | 31 |
| | | 1. New Jersey applies the same most significant relationship test as every other state. | 31 |
| | | 2. The location of the breached servers is irrelevant under the most significant relationship test. | 32 |
| | | 3. LabCorp cannot avoid New York law under the *lex loci delicti* test. | 33 |
| | | 4. Even if each class member's home state law applied, class certification would remain appropriate. | 33 |
| III. | | Plaintiffs meet the requirements of Rule 23(a). | 34 |
| | A. | Each of the proposed classes are sufficiently numerous. | 34 |
| | B. | There is at least one question common to each of the proposed classes, the answer to which will advance resolution of this litigation. | 35 |
| | C. | The proposed named Plaintiffs' claims are typical of all class members' claims. | 35 |
| | D. | Plaintiffs are adequate class representatives. | 37 |
| IV. | | Common questions predominate over individual ones. | 40 |
| | A. | Plaintiffs' negligence claims turn entirely on common evidence. | 40 |
| | | 1. Defendants do not dispute that they owed a uniform duty. | 41 |
| | | 2. Defendants breached the obligation to safeguard class members' data. | 42 |
| | | 3. Causation is a common question. | 43 |
| | | 4. Common evidence will prove that Plaintiffs suffered "actual damages" from the theft of their data. | 46 |
| | B. | Plaintiffs have measured damages on a classwide basis, consistent with their theory of injury. | 49 |
| | | 1. Compensatory damages are calculable on a classwide basis. | 49 |
| | | 2. Common questions also predominate for nominal damages. | 56 |
| | C. | Common questions predominate for the LabCorp Plaintiffs' consumer protection claims. | 57 |
| V. | | Class treatment is the superior method for resolving these claims. | 59 |
| | A. | All of the Rule 23(b)(3) superiority factors are met. | 59 |

## TABLE OF CONTENTS
### (continued)

**Page**

B.     Defendants' recycled superiority arguments fail. ............................................... 60

VI.    Class membership is ascertainable. ...................................................................... 62

VII.   The injunctive relief class satisfies Rule 23(b)(2). .............................................. 63

    A.     The class shares uniform exposure to Defendants' inadequate security practices. ......................................................................................................... 64

    B.     Defendants' ongoing data practices create continuing risk requiring prospective relief that will benefit all class members equally. ........................... 64

    C.     The injunctive relief operates independently from any damages claim. ............. 66

VIII.  A bellwether approach is the most efficient way to resolve this multidistrict litigation. ............................................................................................................... 66

CONCLUSION ............................................................................................................... 67

APPENDIX 1: OTHER CHOICE OF LAW TESTS RELEVANT TO LABCORP ................. 70

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*,
2021 WL 3612155 (3d Cir. Aug. 16, 2021)..............................................................66

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ....................................................................48

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)...........................................................................................43, 47

*Aspinall v. Philip Morris Cos.*,
813 N.E.2d 476 (Mass. 2004) ..................................................................................58

*Attias v. CareFirst, Inc.*,
344 F.R.D. 38 (D.D.C. 2023)....................................................................................45

*Bank of La. v. Marriott Int'l, Inc.*,
438 F. Supp. 3d 433 (D. Md. 2020)..........................................................................33

*Baranco v. Ford Motor Co.*,
294 F. Supp. 3d 950 (N.D. Cal. 2018) .....................................................................58

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) .....................................................................................64

*Benedict v. Altria Grp., Inc.*,
241 F.R.D. 668 (D. Kan. 2007) ................................................................................57

*Berni v. Barilla S.P.A.*,
964 F.3d 141 (2d Cir. 2022) .....................................................................................65

*Bohnak v. Marsh & McLennan Cos.*,
79 F.4th 276 (2d Cir. 2023) ......................................................................................48

*Brooks v. Peoples Bank*,
732 F. Supp. 3d 765 (S.D. Ohio 2024) .....................................................................32

*Brown v. Am. Airlines, Inc.*,
285 F.R.D. 546 (C.D. Cal. 2011)..............................................................................51

*Carriuolo v. Gen. Motors Corp.*,
823 F.3d 977 (11th Cir. 2016) ..................................................................................58

*Cervantes v. CRST Int'l, Inc.*,
2022 WL 22836508 (N.D. Iowa. Aug. 16, 2022)...............................................46, 47

*Clemens v. ExecuPharm Inc.*,
48 F.4th 146 (3d Cir. 2022) ...............................................................................passim

**TABLE OF AUTHORITIES**
(continued)

Page

*Clemens v. ExecuPharm, Inc.*,
   678 F. Supp. 3d 629 (E.D. Pa. 2023) ...................................................................... 48

*Comcast Corp. v Behrend*,
   569 U.S. 27 (2013)..................................................................................... 49, 51

*Compound Prop. Mgmt. LLC v. Build Realty, Inc.*,
   343 F.R.D. 378 (S.D. Ohio 2023) .......................................................................... 39

*Covachuela v. Jersey Firestop, LLC*,
   2024 WL 4826054 (D.N.J. Nov. 19, 2024) .............................................................. 2

*Craig & Bishop, Inc. v. Piles*,
   2005 WL 3078860 (Ky. Ct. App. Nov. 18, 2005), *aff'd in relevant part,
   rev'd in part on other grounds*, 247 S.W.2d 897 (Ky. 2008) ................................... 58

*Dare To Be Great, Inc. v. Com. ex rel. Hancock*,
   511 S.W.2d 224 (Ky. Ct. App. 1974) ..................................................................... 58

*Dew v. Hronjak*,
   673 S.E.2d 415, 2006 WL 4882628 (N.C. Ct. App. 2006)....................................... 46

*Drummond v. Progressive Specialty Ins. Co.*,
   142 F.4th 149 (3d Cir. 2025) ..................................................................... 41, 42, 49

*Ehling v. Monmouth-Ocean Hosp. Service Corp.*,
   872 F. Supp. 2d 369 (D.N.J. 2012) ........................................................................ 41

*Erny v. Est. of Merola*,
   171 N.J. 86 (2002) ................................................................................................. 52

*Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
   174 F.R.D. 332 (D.N.J. 1997)................................................................................ 38

*Forsythe v. Teva Pharm. Indus. Ltd.*,
   102 F.4th 152 (3d Cir. 2024) .......................................................................... 49, 50

*Gardner v. Health Net, Inc.*,
   2010 WL 11579028 (C.D. Cal. Sept. 13, 2010) ..................................................... 36

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011) .................................................................................. 64

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)............................................................................................ 2, 4

*Gilmore v. City of Paterson*,
   694 F. Supp 3d 561 (D.N.J. 2023) ......................................................................... 47

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Gonzalez v. Corning,*
 317 F.R.D. 443 (W.D. Pa. 2016) ............................................................................. 38

*Green-Cooper v. Brinker Int'l, Inc.,*
 73 F.4th 883 (11th Cir. 2023) ................................................................................. 22

*Gunaratna v. Dennis Gross Cosmetology LLC,*
 2023 WL 5505052 (C.D. Cal. Apr. 4, 2023) ........................................................... 51

*Hacker v. Elec. Last Mile Sols. Inc.,*
 722 F. Supp. 3d 480 (D.N.J. 2024) .......................................................................... 59

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.,*
 2023 WL 7285167 (E.D. Pa. Nov. 3, 2023) ............................................................. 49

*Hedges Enters., Inc. v. Cont'l Grp., Inc.,*
 81 F.R.D. 461 (E.D. Pa. 1979) ................................................................................. 47

*Honeycutt v. United States,*
 581 U.S. 443 (2017) ................................................................................................. 52

*Huber v. Simon's Agency, Inc.,*
 84 F.4th 132 (3d Cir. 2023) ........................................................................... 8, 10, 40

*In re Accellion, Inc. Data Breach Litig.,*
 2025 WL 2799102 (N.D. Cal. Sept. 30, 2025) ................................................. passim

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.,*
 2021 WL 5937742 (D.N.J. Dec. 16, 2021) ....................................................... passim

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.,*
 2023 WL 8540911 (D.N.J. May 5, 2023) ................................................................. 62

*In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.,*
 410 F. Supp. 3d 1350 (J.P.M.L. 2019) ..................................................................... 61

*In re Anthem Data Breach Litig,,*
 162 F. Supp. 3d 953 (N.D. Cal. 2016) ......................................................... 44, 53, 54

*In re Anthem, Inc. Data Breach Litig.,*
 327 F.R.D. 299 (N.D. Cal. 2018) ................................................................. 34, 42, 43

*In re Arris Cable Modem Consumer Litig.,*
 327 F.R.D. 334 (N.D. Cal. 2018) ............................................................................. 55

*In re Blackbaud, Inc., Customer Data Breach Litigation,*
 2024 WL 5247287 (D.S.C. Dec. 30, 2024) .............................................................. 65

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Blackbaud, Inc., Customer Data Sec. Breach Litig.*,
2022 WL 2314714 (D.S.C. June 28, 2022) ........................................................ 24, 29

*In re Blood Reagents Antitrust Litig.*,
2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) .......................................................... 55

*In re Cinfed Fed. Credit Union Data Breach Litig.*,
2025 WL 1637686 (S.D. Ohio June 10, 2025) ...................................................... 34

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
795 F.3d 380 (3d Cir. 2015) ................................................................................. 35

*In re Domestic Drywall Antitrust Litig.*,
322 F.R.D. 188 (E.D. Pa. 2017).......................................................................... 10

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
362 F. Supp. 3d 1295 (N.D. Ga. 2019) .................................................... 24, 29, 33, 41

*In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*,
2023 WL 4551435 (D.N.J. July 13, 2023)............................................................ 38

*In re Generic Pharms. Pricing Antitrust Litig.*,
2024 WL 4989070 (E.D. Pa. Dec. 5, 2024)........................................................... 4

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
934 F.3d 316 (3d Cir. 2019) ................................................................................. 3

*In re Human Tissue Prods.*,
2010 WL 743922 (D.N.J. Mar. 2, 2010)................................................................ 37

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
553 F. Supp. 3d 211 (D.N.J. 2021)....................................................................... 25

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ............................................................................. 44, 49

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
341 F.R.D. 128 (D. Md. 2022),
*vacated and remanded on other grounds*, 78 F.4th 677 (4th Cir. 2023) ........................... passim

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
603 F. Supp. 3d 1183 (S.D. Fla. 2022) ................................................... 26, 27, 28, 32

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
209 F.R.D. 323 (S.D.N.Y. 2002) ........................................................................ 38

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016) ........................................................................ 45, 52, 61

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re MOVEit Customer Data Sec. Breach Litig.*,
  2025 WL 2176590 (D. Mass. July 31, 2025)............................................................... 24, 26, 32

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  2019 WL 3410382 (D. Or. July 29, 2019)....................................................................... *passim*

*In re Samsung Data Security Breach Litigation*,
  761 F. Supp. 3d 781 (D.N.J. 2025), *appeal filed*, No. 25-1895 (3d Cir. May 12, 2025).......... 45

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ............................................................................................ 35

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
  2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ................................................................. 24, 34

*In re Sonic Corp.*,
  2021 WL 6694843 (6th Cir. Aug. 24, 2021) ............................................................... 44, 47

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) ............................................................................................ 49

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  309 F.R.D. 482 (D. Minn. 2015) ..................................................................................... 42

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
  325 F.R.D. 136 (D.S.C. 2018) ......................................................................................... 60

*In re Valsartan, Losartan & Ibesartan Prods. Liab. Litig.*,
  2023 WL 1818922 (D.N.J. Feb. 8, 2023) ........................................................................ 51

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
  119 F.3d 1070 (3d Cir. 1997) .......................................................................................... 42

*Lamie v. LendingTree, LLC*,
  2023 WL 1868198 (W.D.N.C. Feb. 9, 2023) ............................................................... 24, 29

*Lebegern v. Forman*,
  471 F.3d 424 (3d Cir. 2006) ............................................................................................ 31

*Lewis v. Gov't Emps. Ins. Co.*,
  98 F.4th 452 (3d Cir. 2024) ...................................................................................... 3, 7, 62

*MacDonald v. Cashcall, Inc.*,
  333 F.R.D. 331 (D.N.J. 2019).......................................................................................... 43

*Mackey v. Belden, Inc.*,
  2021 WL 3363174 (E.D. Mo. Aug. 3, 2021)............................................................. 26, 27, 28

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Malik v. Cooper Tier & Rubber Co.*,
 59 F. Supp. 3d 686 (D.N.J. 2014) ................................................................................. 31

*Mays v. Tenn. Valley Auth.*,
 274 F.R.D. 614 (E.D. Tenn. 2011) ............................................................................... 38

*McDonough v. Toys R Us, Inc.*,
 638 F. Supp. 2d 461 (E.D. Pa. 2009) ........................................................................... 37

*McGlenn v. Driveline Retail Merch., Inc.*,
 2021 WL 165121 (C.D. Ill. Jan. 19, 2021) ................................................................. 46

*McNair v. Synapse Grp. Inc.*,
 672 F.3d 213 (3d Cir. 2012) ......................................................................................... 65

*Midland Pizza, LLC v. Sw. Bell Tel. Co.*,
 2010 WL 4622191 (D. Kan. Nov. 5, 2010) ................................................................. 57

*Miller v. Eagle Pharms., Inc.*,
 2024 WL 3858124 (D.N.J. Aug. 19, 2024) ................................................................. 36

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*,
 2015 WL 3905018 (S.D. Fla. June 25, 2015) .............................................................. 32

*Neale v. Volvo Cars of N. Am., LLC*,
 794 F.3d 353 (3d Cir. 2015) .................................................................................... 7, 51

*Nieberding v. Barnette Outdoor Living, Inc.*,
 302 F.R.D. 600 (D. Kan. 2014) ................................................................................... 57

*NL Indus, Inc. v. Com. Union Ins. Co.*,
 65 F.3d 314 (3d Cir. 1995) ........................................................................................... 10

*P.V. ex rel. T.V. v. Camp Jaycee*,
 197 N.J. 132 (2008) ............................................................................................... 25, 31

*Paoletto v. Beech Aircraft Corp.*,
 464 F.2d 976 (3d Cir. 1972) ......................................................................................... 29

*Patel v. Coinbase Global, Inc.*,
 2022 WL 17582549 (D.N.J. Dec. 12, 2022) ................................................................ 39

*Perdue v. Hy-Vee, Inc.*,
 455 F. Supp. 3d 749 (C.D. Ill. 2020) ..................................................................... 32, 33

*Powers v. Lycoming Engines*,
 328 F. App'x 121 (3d Cir. 2009) .................................................................................. 23

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Reinig v. RBS Citizens, N.A.*,
   2024 WL 5349241 (W.D. Pa. Sept. 25, 2024)................................................................ 4

*Resolution Tr. Corp. v. KMPG Peat Marwick*,
   1992 WL 245705 (E.D. Pa. Sept. 23, 1992) ................................................................ 61

*Rodriguez v. Nat'l City Bank*,
   726 F.3d 372 (3d Cir. 2013) ........................................................................................ 35

*Rowe v. E.I. DuPont De Nemours & Co.*,
   262 F.R.D. 451 (D.N.J. 2009)...................................................................................... 63

*S. Indep. Bank v. Fred's Inc.*,
   2019 WL 1179396 (M.D. Ala. Mar. 13, 2019)............................................................ 33

*S.R. ex rel. Rosenbauer v. Pa. Dep't of Hum. Servs.*,
   325 F.R.D. 103 (M.D. Pa. 2018).................................................................................... 3

*Savidge v. Pharm-Save, Inc.*,
   727 F. Supp. 3d 661 (W.D. Ky. 2024)............................................ 43, 47, 48, 59

*Sheenan v. Mortg. Elec. Registration Sys., Inc.*,
   2011 WL 3501883 (D.N.J. Aug. 10, 2011) ................................................................ 10

*Smith v. Gen. Motors Corp.*,
   979 S.W.2d 127 (Ky. Ct. App. 1998) .......................................................................... 58

*Somogyi v. Freedom Mortg. Corp.*,
   495 F. Supp. 3d 337 (D.N.J. 2020)............................................................. 3, 34, 35, 37

*Stafford v. Bojangles' Rests., Inc.*,
   123 F.4th 671 (4th Cir. 2024) ........................................................................................ 2

*Tershakovec v. Ford Motor Co.*,
   79 F.4th 1299 (11th Cir. 2023) .................................................................................... 57

*Thornburg v. Ford Motor Co.*,
   2022 WL 4348475 (W.D. Mo. Sept. 19, 2022) ........................................................... 39

*Tignor v. Dollar Energy Fund, Inc.*,
   745 F. Supp. 3d 189 (W.D. Pa. 2024).......................................................................... 50

*Title Ins. Co. of Minn. v. Smith, Debnam, Hibber & Pahl*,
   459 S.E.2d 801 (N.C. Ct. App. 1995).......................................................................... 56

*Trunzo v. Citi Mortg.*,
   2014 WL 1317577 (W.D. Pa. Mar. 31, 2014) ............................................................. 66

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ............................................................................................. 3

*United Steel Workers Int'l Union v. ConocoPhillips Co.*,
  2011 WL 13176142 (C.D. Cal. Oct. 27, 2011) ......................................................... 30

*Veridian Credit Union v. Eddie Bauer, LLC*,
  295 F. Supp. 3d 1140 (W.D. Wash. 2017) ......................................................... 26, 27

*Villa v. Cargill Meat Sols. Corp.*,
  2024 WL 4374958 (M.D. Pa. Oct. 2, 2024) ......................................................... 35

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................... 35, 63, 66

*Yocham v. Novartis Pharms. Corp.*,
  736 F. Supp. 2d 875 (D.N.J. 2010) ..................................................................... 31

**Statutes**

28 U.S.C. § 1407(a) ................................................................................................ 60

Ky. Rev. Stat. § 367.170(1) ..................................................................................... 58

Mass. Gen. Laws ch. 93A, § 2(a) ............................................................................. 58

**Rules**

Fed. R. Civ. P. 23(a)(1) ........................................................................................... 34

Fed. R. Civ. P. 23(b)(2) ........................................................................................... 63

Fed. R. Civ. P. 23(b)(3) ........................................................................................... 59

Fed. R. Civ. P. 23(c)(5) ........................................................................................ 4, 23

**Treatises**

Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*,
  82 Tulane L. Rev. 2323 (2008) ............................................................................... 4

Restatement (Second) of Conflict of Laws § 145(2) ....................................... 25, 29, 31

William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:38
  (6th ed. June 2025 update) ................................................................................... 66

## PRELIMINARY STATEMENT

Millions of Americans entrusted their sensitive personal information to Defendants: medical records, credit card numbers, Social Security numbers, financial information, and more.[1] They felt confident doing so because Defendants are among the largest medical diagnostic companies in the country, mandated by both statute and industry standards to keep that information secure. Defendants did not do that. Instead, they passed the information to the American Medical Collection Agency ("AMCA"), a fly-by-night (and now bankrupt) debt collector with essentially non-existent data security. And Defendants' lack of care had predictable consequences when threat actors exfiltrated every piece of personal information sent to AMCA.

For present purposes, however, what matters is not Defendants' degree of culpability, but whether it is appropriate to adjudicate that question on a classwide basis. Plaintiffs' opening briefs demonstrated that it is: each case involves a common course of conduct where each Defendant acted uniformly in material respects as to all affected individuals.

Defendants object vociferously to this proposition. They first say that absent class members don't have Article III standing, even though their injury is well-recognized, concrete, and particularized (courts have recognized a right to keep one's personal information private for centuries). They next seek to create individualized issues where none exist, arguing primarily that Plaintiffs cannot show every class member's personal information was exfiltrated. Defendants are simply wrong: there is overwhelming evidence that threat actors exfiltrated all class members'

---

[1] There are four defendant entities: Quest Diagnostics ("Quest"), Optum360 ("Optum"), Laboratory Corporation of America ("LabCorp"), and Sonic Healthcare USA and its affiliates ("Sonic"). Plaintiffs moved for class certification separately as to each Defendant, but with leave of the Court are submitting one omnibus reply. *See* Dkt. 790 (order).

information.[2] For example, a reputable Dark Web intelligence company, Gemini Advisory, found

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████. (At one point

the FBI even ███████████████████████████████████████.)

At bottom, none of Defendants' arguments undermine the core point established in

Plaintiffs' opening briefing: these matters are each appropriate for classwide resolution. Plaintiffs

respectfully ask the Court to certify the proposed classes.

## I.    FRAMEWORK APPLICABLE TO CLASS CERTIFICATION

Class actions are intended to "advance the efficiency and economy of litigation." *Gen. Tel.
Co. of Sw. v. Falcon*, 457 U.S. 147, 159 (1982) (cleaned up); *Stafford v. Bojangles' Rests., Inc.*,
123 F.4th 671, 678 (4th Cir. 2024) (noting same). Plaintiffs demonstrate that a particular proposed
class action will do so by proving each of the prerequisites to class certification by a preponderance
of the evidence. *See, e.g., Covachuela v. Jersey Firestop, LLC*, 2024 WL 4826054, at *5 (D.N.J.
Nov. 19, 2024).

### A.    Plaintiffs restate the Rule 23 factors for convenience.

Any proposed class must satisfy **Rule 23(a)**, which contains four requirements: (1) the
class is so numerous that joinder would be impracticable ("numerosity"); (2) there is at least one
merits question common to every class member and the answer to that question will advance the

---

[2] Plaintiffs have met this burden even setting aside the fact that Defendants' so-called Dark Web
expert, Matteo Tomasini, has not met the standard for admissibility because, for example, he relies
on ████████████████████████████████████████████████████████
████████████████████████████████████████████████. *See*
Declaration of James E. Cecchi ("Reply Cecchi Decl."), Ex. 62 (Tomasini Dep.) at 326:20-328:4,
394:3-396:18. Exhibits numbered 1-61 refer to exhibits attached to the Declaration of James E.
Cecchi in Support of Quest Plaintiffs' Motion for Class Certification. Exhibits numbered 62-85
refer to exhibits attached to the Reply Cecchi Decl. and submitted herewith.

resolution of the litigation ("commonality"); (3) the proposed class representative has claims that are typical of (though not necessarily identical to) the rest of the class ("typicality"); and (4) the class representative and her proposed class counsel will fairly and adequately represent the interests of the absent class members ("adequacy"). *Somogyi v. Freedom Mortg. Corp.*, 495 F. Supp. 3d 337, 346 (D.N.J. 2020).

Classes must also satisfy a subpart of Rule 23(b), two of which are relevant here. First, a class that seeks money damages may be certified under **Rule 23(b)(3)** if questions of law or fact common to all class members predominate over individualized ones ("predominance") and a class action is the superior method for adjudication ("superiority"). *Id.*[3] The class must also be "defined with reference to objective criteria" such that there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition" ("ascertainability"). *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 462 (3d Cir. 2024).

Second, **Rule 23(b)(2)** applies when a plaintiff seeks "a single, 'indivisible' injunctive or declaratory remedy against the defendant [that] will provide relief to all class members equally." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 328 (3d Cir. 2019) (cleaned up). Although classes seeking to proceed under Rule 23(b)(2) need not satisfy predominance, superiority, or ascertainability, the class must be sufficiently "cohesive" such that it can be said that the defendant "has acted or refused to act on grounds generally applicable to the class." *S.R. ex rel. Rosenbauer v. Pa. Dep't of Hum. Servs.*, 325 F.R.D. 103, 111 (M.D. Pa. 2018).

---

[3] The predominance requirement is satisfied if "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). And when common questions predominate, a court grants Rule 23(b)(3) certification "even though other important matters will have to be tried separately." *Id.*

        **B.**       **Courts have several tools at their disposal to manage complex class litigation.**

Due to the "flexibility . . . of the class-action device," courts have several tools at their disposal to manage complex class litigation. *See Falcon*, 457 U.S. at 160. Two merit particular mention here. *First*, a court always maintains the power to "divide[]" the class "into subclasses." Fed. R. Civ. P. 23(c)(5). The point of Rule 23(c)(5) is this: even if the Rule 23(a) and (b) requirements are not met with respect to the entire class (or classes) plaintiffs originally proposed, the case can still proceed as a class action if certification is appropriate for sub-groups of class members. *See, e.g.*, *Reinig v. RBS Citizens, N.A.*, 2024 WL 5349241, at *3 (W.D. Pa. Sept. 25, 2024) (applying Rule 23(c)(5)).

*Second*, in a case with numerous proposed classes, the court may focus class certification or trial on certain "bellwether" classes. These "smaller" bellwether trials can be the most efficient way to resolve complex litigation by allowing the parties to "evaluate the strengths and weaknesses of their arguments and evidence, and understand the risks and costs associated with the litigation." Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tulane L. Rev. 2323, 2338 (2008). For instance, one recent MDL court overseeing a nationwide data breach litigation prioritized only certain states. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 138 (D. Md. 2022), *vacated and remanded on other grounds*, 78 F.4th 677 (4th Cir. 2023); *see also In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4989070, at *1 (E.D. Pa. Dec. 5, 2024) (discussing use of bellwether process for two of the numerous drugs at issue in pharmaceutical antitrust litigation).

**II.**     **PROPOSED CLASSES**

Each of the proposed classes consists of people who were sent a letter from a particular Defendant notifying them that their data was breached. Plaintiffs ask the Court to certify the following classes and appoint the associated named Plaintiffs as class representatives.

-4-

1. **Quest Class (New Jersey common law)**. All natural persons residing in the United States who were sent a letter from Quest or Optum notifying them of the Breach.

    a. **Quest Pre-Assignment Subclass.** All members of the Quest Class who provided information to Quest prior to December 1, 2016, when Quest assigned its contract with AMCA to Optum.

        Class representatives: Noel Benadom, John Briley, Nancy Infield, Ria Jairam, Breanna Klein, Brittney Petitta, Joyce Rosselli, Darlane Saracina, Annie Mae Smith, Deanna Taylor, Shannon Walden[4]

    b. **Quest Post-Assignment Subclass.** All members of the Quest Class who provided information to Quest on or after December 1, 2016, when Quest assigned its contract with AMCA to Optum.

        Class representatives: Jo Ann Buck, Elizabeth Holloway, Naomi Jaworowski, Karli Parker, Rose Marie Perry, LaTease Rikard, Michael Rutan

2. **Optum Class (Minnesota common law)**. All natural persons residing in the United States who were sent a letter from Quest or Optum notifying them of the Breach and who provided information to Quest on or after December 1, 2016, when Quest assigned its contract with AMCA to Optum.

        Class representatives: Jo Ann Buck, Elizabeth Holloway, Naomi Jaworowski, Karli Parker, Rose Marie Perry, LaTease Rikard, Michael Rutan

3. LabCorp

    a. **North Carolina Multi-State Negligence Class (North Carolina common law).** All natural persons residing in AK, AZ, CO, CT, DE, DC, FL, HI, ID, IL, IN, IN, IA, KY, LA, ME, MA, MI, MN, MS, MO, MT, NE, NV, NJ, NY, ND, OH, OK, OR, PA, RI, SD, TN, TX, UT, VT, WA, and WI who were sent a letter notifying them of the Breach.

        Class representatives: Gina Allende, Tracey Buhr, Rosaria Gadero, Sheera Harris, Timothy Judelson, Sandra Lassiter, Holly Laufenberg, Aleksandr Nazemnikov, Justin Nelson-Carter, Sherrie Palmer, Martha Cuvillier Sanchez, Tatyana Shulman, Cameron Spencer, Kristopher Thomas, Edith Thrower, Wendy Wallach

---

[4] Plaintiffs hereby withdraw Ashley Finch as a putative class representative.

b. **New York Multi-State Negligence Class (New York common law).** All natural persons residing in AL, KS, MD, NM, NC, SC, VA, WV, and WY who were sent a letter notifying them of the Breach.

Class representatives: David Finch, Carol Kaplan, Melanie Vazquez, Debra Wrenn

c. **Georgia Negligence Class (Georgia common law).** All natural persons residing in Georgia who were sent a letter notifying them of the Breach.

Class representative: Valerie Scott

d. **State-specific Statutory Classes.**

i. **California's Consumer Legal Remedies Act Class.** All natural persons residing in California who were sent a letter notifying them of the Breach.

Class representatives: Sandra Lassiter, Aleksandr Nazemnikov

ii. **Kansas Consumer Protection Act Class.** All natural persons residing in Kansas who were sent a letter notifying them of the Breach.

Class representative: David Finch

iii. **Kentucky Consumer Protection Act Class.** All natural persons residing in Kentucky who were sent a letter notifying them of the Breach.

Class representative: George Rothwell

iv. **Maryland Consumer Protection Act Class.** All natural persons residing in Maryland who were sent a letter notifying them of the Breach.

Class representative: Carol Kaplan

v. **Massachusetts Chapter 93A Class.** All natural persons residing in Massachusetts who were sent a letter notifying them of the Breach.

Class representative: Tatyana Shulman

4. Sonic

a. **SHUSA/CPL Class (Texas common law).** All natural persons residing in the United States who provided information to Clinical Pathology Laboratories

-6-

("CPL"), which in turn provided that data to Sonic Healthcare USA ("SHUSA") who were sent a letter notifying them of the Breach.

Class representative: Tonda Tate

b. **Aurora/Austin Path Class (Florida common law)**. All natural persons residing in the United States who provided information to Austin Pathology Associates ("Austin Path"), which in turn provided that data to Aurora Diagnostics LLC who were sent a letter notifying them of the Breach.

Class representative: Gwendolyn Anderson

## **ARGUMENT**

In their opening briefs, Plaintiffs demonstrated that each of their proposed classes satisfies "the threshold requirements of Federal Rule of Civil Procedure 23(a) and the predominance and superiority requirements of Rule 23(b)(3)." *Lewis*, 98 F.4th at 458. Plaintiffs also established that they are entitled to certification of injunctive relief classes under Rule 23(b)(2). Defendants' kitchen-sink responses challenge standing, choice-of-law, and every applicable Rule 23 requirement, save for conceding that the proposed classes are sufficiently numerous under Rule 23(a)(1). The voluminousness of Defendants' responses do not make them any less mistaken.

## I.      **Plaintiffs have established standing for all proposed class members.**

The class certification analysis ordinarily does not address standing because the requirements of Article III are "satisfied so long as a class representative has standing." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015); *see id.* at 368 ("[A] properly formulated Rule 23 class should not raise standing issues."). Earlier in this litigation, Judge Arleo rejected Defendants' challenge to the putative class representatives' Article III standing on the pleadings. *E.g.*, *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.* ("*AMCA I*"), 2021 WL 5937742, at *6-9 (D.N.J. Dec. 16, 2021). And after *AMCA I*, the Third Circuit weighed in, holding that a plaintiff whose information was stolen in a data breach need not

"wait until she has experienced actual identity theft or fraud before she can sue." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 159 (3d Cir. 2022).

Given this, it is unsurprising that Defendants have largely stopped challenging the named Plaintiffs' standing.[5] They have, however, pivoted to the unnamed class members, and now assert that individualized questions of their standing will overwhelm common ones. Although a defendant can challenge class certification on the ground that "unnamed class members would have to submit individualized evidence of their standing" and it would be unduly "burdensome" for the court and the parties to make that showing, *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 157 (3d Cir. 2023), that exception to the normal course of affairs does not apply here because every putative class member was injured when their data was exfiltrated. Common evidence demonstrates this exfiltration, thereby resolving Article III standing for all proposed class members in one swoop. *See* Ex. 63 (Strebe Decl.), ¶¶ 82-186; Ex. 1 (Frantz Decl.), ¶¶ 329-63.

A.    <u>**At class certification, Plaintiffs need only show that all class members' data was exfiltrated from AMCA's servers.**</u>

Judge Arleo held correctly that standing in this litigation is satisfied if a patient's information "has actually been accessed, disseminated, *or* misused by an unauthorized party." *AMCA I*, 2021 WL 5937742, at *7 (emphasis added). This creates a binary common question: either the AMCA servers containing all class members' personal information were accessed or they were not. Plaintiffs readily satisfy this standard.

Defendants, however, argue that each class member must present proof that their individual data appeared on specific Dark Web sites. Quest Opp. 27-30; Optum Opp. 14; LabCorp Opp. 12-

---

[5] Sonic argues that the Sonic Plaintiffs lack standing because they have not proven their stolen information "was found anywhere on the dark web." Sonic Opp. 10. As discussed below, *Clemens* resolved conclusively that data breach plaintiffs need not make that showing to establish Article III standing. Sonic does not so much as mention *Clemens* in its opposition.

13; Sonic Opp. 9-10. This is wrong. Even without public posting, "hackers have that information and could use it at any time." *In re Accellion, Inc. Data Breach Litig.*, 2025 WL 2799102, at *8 (N.D. Cal. Sept. 30, 2025). It is no surprise then that the Third Circuit holds specifically that "misuse is not necessarily required" to demonstrate standing: a person whose personal information was stolen need not actually locate their individual stolen information within the Dark Web. *Clemens*, 48 F.4th at 154.[6]

Since this case is not a close question under the Third Circuit's standard, Defendants resort to rewriting Judge Arleo's opinion largely denying their initial motion to dismiss. There, she explained that if a plaintiff could allege "facts to support an inference that their particular information was accessed, stolen, or misused," that individual could claim injury. *AMCA I*, 2021 WL 5937742, at *9. On the pleadings, the named class members were able to meet that burden by showing that some of their information was on the Dark Web. *See id.* Now, following fact and expert discovery, Plaintiffs can show uniformly that class members' personal information was not merely "accessed" (all the *Clemens* standard requires), but stolen.

Moreover, Defendants contend that Judge Arleo held that evidence of "economic injuries[] resulting from identity theft or fraudulent charges" or "injuries to their privacy interests [] as allegedly reflected by attempted identity theft, phishing communications, or dark-web postings" is *necessary* to show standing, but they are wrong. Quest Opp. 2. Rather, Judge Arleo merely held that such evidence is *sufficient* to demonstrate standing. *AMCA I*, 2021 WL 5937742, at *8-9. But even assuming Defendants were right that the earlier *AMCA* opinions mandated more than evidence of access (and theft), that view was superseded by *Clemens*, which held in no uncertain

---

[6] This also makes sense as a *factual* matter because there is no way to search the Dark Web comprehensively. *See, e.g.*, Ex. 63 (Strebe Decl.) ¶¶ 48-64, 187-226; Ex. 64 (Frantz Reply Decl.) ¶¶ 46-47, .

terms that "misuse is not necessarily required." 48 F.4th at 154.[7] To the extent Judge Arleo's initial ruling is inconsistent with the Third Circuit's later decision in *Clemens*—Plaintiffs do not believe it is, Defendants describe it as such—binding appellate precedent controls. *See NL Indus, Inc. v. Com. Union Ins. Co.*, 65 F.3d 314, 324 n.8 (3d Cir. 1995); *Sheenan v. Mortg. Elec. Registration Sys., Inc.*, 2011 WL 3501883, at *4 n.3 (D.N.J. Aug. 10, 2011).

**B.    Plaintiffs have presented overwhelming common evidence that threat actors accessed and exfiltrated all class members' personal information.**

Having clarified the actual standing theory at issue in this case, Plaintiffs now turn to the key question: does the evidence establish that it is more likely than not that every class member's personal information was accessed and exfiltrated from AMCA's servers? *See In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 222 (E.D. Pa. 2017) (granting class certification after concluding plaintiffs "carried their burden to show, by a preponderance of the evidence," common questions predominated). (If so, then standing is no bar to class certification. *See Huber*, 84 F.4th at 156-57.) It unquestionably does.

**1.    AMCA's lack of security allowed threat actors to access all of its systems.**

Plaintiffs' experts demonstrated that AMCA's cybersecurity was woefully deficient, a point which Defendants (and their experts) do not dispute. Ex. 1 (Frantz Decl.) ¶¶ 46-138. In particular, AMCA violated a core tenet of cybersecurity: access to one part of a system should not

---

[7] Quest's "mismatched injury" argument is off-point for similar reasons. In this case, Plaintiffs show that every class member suffered the same injury when AMCA's servers were accessed and exfiltrated: "access" to their private information through an "intentional" breach in which hackers stole data that "could subject a [class member] to a risk of identity theft." *Clemens*, 48 F.4th at 153-54. By contrast, Quest cites cases in which plaintiffs asserted injuries they never suffered. *See* Quest Opp. 27-28. In *Hochendoner v. Genzyme Corp.*, 823 F.3d 724 (1st Cir. 2016), the plaintiffs could not show they took or received a contaminated dose. *Id.* at 732. And in *Blum v. Yaretsky*, 457 U.S. 991 (1982), the plaintiff challenged conduct that never affected them. *Id.* at 999.

permit access to all of it. This is particularly true here, because █████████████

████████████████████████████████████████████████████████████

███████████████████████████. *Id.* ¶¶ 78-79.[8] AMCA's IT Director, Zachary Raxter,

admitted in his deposition that ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████." Ex. 65 (Z. Raxter Dep.) 363:3-

13.

███████████████████████ Raxter explained that ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ *Id.* at 363:14-18; Ex. 1 (Frantz Decl.) ¶¶ 110-13. This is the

cybersecurity equivalent of a bank robber being able to enter the main door of a bank (the public-

facing Internet portal) only to find that every door in the bank from the front door to the back room

to the bank's vault is open (the CHAMP database housing all class members' information). Based

on these findings, Plaintiffs' expert Mary Frantz concluded that ████████████████

████████████████████████████████████████████████████████████

internet." Ex. 1 (Frantz Decl.) ¶ 79; *see also* Ex. 63 (Strebe Decl.) ¶¶ 86-90. Plaintiffs' evidence

---

[8] ████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Ex. 1 (Frantz Decl.) ¶¶ 78-
79; Ex. 63 (Strebe Decl.) ¶ 83; Ex. 66 (CRA Dep.) 199:9-24.

establishes that threat actors could access millions of class members' PII and PHI, and no defense expert disagrees.

        2.     **The forensic analyses undertaken by AMCA's and Defendants' forensic investigators show that threat actors likely accessed all of AMCA's systems.**

Three separate analyses were conducted of AMCA's systems relevant to this motion, two by firms retained by AMCA (End Point and Charles River Associates ("CRA")) and one by a firm retained by Defendants (Mandiant). ██████████████████████████████

██████████████████████████ [9] Ex. 63 (Strebe Decl.) ¶¶ 88-102, 141-62, 164-70; Ex. 68 (EP_009055).

*First*, End Point gave ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Ex. 68 (EP_009055) at -60, -63. Its findings also included ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Ex. 69 (RMCB-AG-00001526) at -28. Again, this is a basic cybersecurity failure.

*Second*, in late March 2019, CRA's forensic investigation found that ██████████

████████████████████████████. Ex. 34 (RMCB-AG-00000195).

---

[9] These findings were limited by yet another AMCA security failure: ████████████

████████████████████████████████████████████████████

*See, e.g.*, Ex. 1 (Frantz Decl.) ¶¶ 100, 102, 128-32; Ex. 63 (Strebe Decl.) ¶¶ 92, 99-100, 146-47, 153, 169; Ex. 66 (CRA Dep.) 100:21-101:6, 171:18-172:8, 208:15-18, 213:15-22, 229:20-230:10; Ex. 67 (CRA Dep. Ex. 13) at -70. Nevertheless, despite that certain evidence was unavailable to investigators, the results are uniform, damning, and consistent with threat actors accessing the entire AMCA system.

As Plaintiffs' experts explained, ██████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████ Ex. 63 (Strebe Decl.) ¶¶ 141-62.

CRA first found that ██████████████████████████████████████████

██████. Ex. 34 (RMCB-AG-00000195). ███████████████████████████████

███████████████████████████████████████████████████████████████████

█████████ *Id.*; Ex. 63 (Strebe Decl.) ¶¶ 94-95. The evidence also shows that ████████

███████████████████████████████████████████████ Ex. 34 (RMCB-AG-

00000195); Ex. 63 (Strebe Decl.) ¶¶ 88, 148. In other words, ████████████████

██████████████████████████████ *Id.* Naturally, given the poor state of

AMCA's cybersecurity, they found them that very same day. *Id.* In fact, CRA found evidence that

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Ex. 63 (Strebe Decl.)

¶ 151. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ¶ 157; Ex. 34

(RMCB-AG-00000195).

From there, the threat actors continued to traverse across and download from AMCA's

systems without detection. CRA determined that ████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

-13-

████████.[10] Ex. 34 (RMCB-AG-00000195). Further, CRA found evidence that the ████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████. *Id.*; Ex. 66 (CRA Dep.) 191:15-192:7. ████████

████████████████████. *Id.* In fact, the limited evidence that CRA found showed that

████████████████████████████████████████

████████████████ Ex. 34 (RMCB-AG-00000195); Ex. 63 (Strebe Decl.) ¶¶ 153-62.

In its 30(b)(6) deposition, CRA did not mince words: ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ Ex. 66 (CRA Dep.) 196:4-21 (emphasis added).[11]

*Third*, in May 2019, Defendants retained Mandiant, a leading forensic investigator, to

████████████████. While AMCA did not provide full access to Mandiant, Mandiant

conducted ████████████████████████████████████. Ex.

33 (Quest_MDL_0000324). Namely, Mandiant found that ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ *Id.* According to Plaintiffs' experts, that ████████████████

---

[10] CRA also found that ████████████████████████████

████████████████████████████████████████

████████ Ex. 66 (CRA Dep.) 229:14-19.

[11] CRA agreed ████████████████████████

████████████████████████ Ex. 66 (CRA Dep.) 196:4-21.

-14-



Ex. 63 (Strebe Decl.) ¶ 168; *see also* Ex. 1 (Frantz

Decl.) ¶ 99. Further, ██████████████████████████████████

████████████████████████████████████████ Ex. 34 (RMCB-AG-

00000195). (Again: no Defense expert says otherwise.)

**3.    Numerous independent sources confirm that the** ████████████

████████████████████████

The evidence in this case is not simply a battle of Plaintiffs' experts versus Defendants' experts. Defendants proffer no experts on cybersecurity or breach remediation. Instead, Defendants ask the Court, without evidence, to believe the implausible—that threat actors could do whatever they wanted and go wherever they wanted in AMCA's systems without detection, but simply chose not to. The Court should not credit these illogical and unsupported assertions.

This is particularly true because at least five pieces of contemporaneous evidence found by third parties, ***including companies that Defendants hired and the FBI***, are all consistent with each other and show that data was exfiltrated from AMCA and sold on the Dark Web. Defendants argue that "[o]nly two pieces of evidence remotely bear on whether any data was exfiltrated from AMCA ████████████." Quest Opp. 3. This is both factually incorrect and also mischaracterizes ██████████████████.

*1.* ██████████████████████████████████████

████████████ In November 2018, Conformance, a company that works with card networks to provide common point of purchase (CPP) alerts of fraudulent activity, first ████████████

████████████████████████████████████. Ex. 29 (RMCB-AG-

00000002). From November 2018 to March 2019, Conformance ████████████

██████████████████████████████████████████



███████ Ex. 70 (RMCB-AG-00000085); Ex. 31 (RMCB-AG-00000087); Ex. 63 (Strebe Decl.) ¶¶ 105-23; Ex. 1 (Frantz Decl.) ¶¶ 335-39. ████████████████

████████████████████████████████████████ *See* Ex. 63 (Strebe Decl.) ¶¶ 115-18; Ex. 83 (Lee Reply Rep.) ¶¶ 11, 40. ███████████████████

███████████████████████████ Ex. 1 (Frantz Decl.) ¶¶ 335-39; Ex. 63 (Strebe Decl.) ¶¶ 119-22.

*2. A Dark Web intelligence analyst* ████████████████████████████████

███████████████████████ On February 28, 2019, Gemini Advisory, a Dark Web signal intelligence company that trawls the Dark Web looking for breached data, ███████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ Ex. 32 (GEMINI001) at -02. Gemini explained that ████████████████████████████████████████

█████████████████████████ Ex. 71 (Gemini Dep.) 60:10-18. Notably, this Flash Alert found that the ████████████████████████████████████

██████████████████████████ Ex. 32 (GEMINI001) at -02.

Gemini ████████████████████████████████████████

█████████████████████████████████████████████████

Ex. 72 (GEMINI013). ████████████████████████████████████

█████████████████████████████████████████████████

████ *Id.* at -13.

In May 2019, Gemini █████████████████████████████████████████████
█████████████████████████████████████████████████████████████ Ex. 73

(GEMINI004). █████████████████████████████████████████████████████

███████████████████ *Id.* at -05. Two of Plaintiffs' experts reviewed this evidence and concluded

that █████████████████████████████████████████████████████████████

██████████████. Ex. 1 (Frantz Decl.) ¶¶ 330-34; Ex. 63 (Strebe Decl.) ¶¶ 131-38.

     *3. LabCorp's* ████████████████████████████████████████████

████████████████████████████████████████. Defendants' arguments

that information was not for sale on the Dark Web are particularly disingenuous because

Flashpoint, ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████. Ex.

74 (LC0158530). In fact, Flashpoint found ██████████████████████████████

████████████████, Flashpoint emailed ██████████████████████████████████

████████████████████████████████████████████████████████████████████

Ex. 75 (LC0158535) at -31 (emphasis added). This is entirely consistent with ███████████

██████████ that Conformance found and █████████████ that CRA found. Ex. 63

(Strebe Decl.) ¶ 183. Likewise, Flashpoint saw ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ Ex. 75 (LC0158535).[12] As Plaintiffs' expert explains (and as

---

[12] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ LabCorp Opp. 7 (citing
Nelms Dep. 114:17-116:18).

Gemini also found), ███████████████████████████████████████

███████████████████████. Ex. 63 (Strebe Decl.) ¶¶ 75-78, 226, 242. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████ *Id.* ¶¶ 75-77.

4. ████████████████████████████████████████

███████████████████████████████████ Defendants ignored yet another highly

credible source of evidence that class members' information was for sale on the Dark Web—██

██. Specifically, in June 2019 ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ Ex. 76 (LC0158580). In other words, ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 63 (Strebe Decl.)

¶¶ 171-78.

5. ████████████████████████████████████████ As detailed above,

CRA found evidence that ███████████████████████████████████████

█████████████████████████████ Ex. 77 (CRA007334) at -36. Defendants argue

that the evidence CRA found shows that ████████████████████████████████

██████████████████████████████. *E.g.* Quest Opp. 8. This argument, not

supported by any of their experts, is completely inconsistent with ███████████████

███████████████████████████████████████████████████████

-18-

███████████████████ Ex. 63 (Strebe Decl.) ¶¶ 87, 91, 96-99, 141-62. Further, any limitations of CRA's findings are due to ███████████████████████████

███████████████ Ex. 1 (Frantz Decl.) ¶¶ 100, 102, 128-32; Ex. 63 (Strebe Decl.) ¶¶ 92, 99-100, 146-47; Ex. 66 (CRA Dep.) 100:21-101:6, 171:18-172:8, 208:15-18, 213:15-22, 229:20-230:10; Ex. 67 (CRA Dep. Ex. 13) at -70. In other words, rather than defend AMCA's cybersecurity practices, Defendants' (lack of) oversight of AMCA, or giving millions of class members' information to such a company, Defendants seek to weaponize AMCA's failure to retain evidence against certification. The Court should not countenance such an unjust result, particularly because, as Plaintiffs' expert explains, █████████████████████

████████████████████ Ex. 63 (Strebe Decl.) ¶¶ 97-98.

\*    \*    \*

In practice, cybersecurity professionals would not view the evidence discussed above (called "signals" in the field) along with the other signals discussed in Ms. Frantz's and Mr. Strebe's expert reports in isolation. *Id.* ¶ 103; Ex. 64 (Frantz Reply Decl.) ¶ 16. Rather, these signals are additive, and taken together clearly and coherently show ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████ Defendants' unsupported argument in briefing that, at most, AMCA's online payment portal was compromised is contrary to the available evidence and illogical: ████████████████████████

███████████████ *Id.* ¶ 98.

-19-

**C.     Defendants' attacks on standing do not overcome the common proof.**

Defendants' scattershot arguments against standing (and predominance which overlap in this instance) misstate the law, the evidence, and Plaintiffs' theories of harm.

*First*, as explained above, Plaintiffs are not required to show that every single class members' information was for sale on the Dark Web to establish standing or predominance.

*Second*, Defendants' argument that, at most, ███████████████████████████ ████████████████ is contrary to the evidence. Optum Opp. 14-16; Quest Opp. 13-14. As detailed above, undisputed technical evidence ████████████████████████ ████████████████████████████ Compromise of one meant compromise of both.

Further, ████ that Gemini ██████████████████████████ ████████████████████████████████████ ████████████████████████████████████████. Ex. 32 (GEMINI001) at -02; Ex. 71 (Gemini Dep.) 55:1-56:5. ████████████████████ ████████████████████████ *Id.* Only database access explains this combination.

Defendants misread Gemini's reference ████████████████ as limiting the breach's scope. Optum Opp. 16. But Gemini is a Dark Web intelligence firm, not a forensic investigator. Ex. 71 (Gemini Dep.) 15:17-16:1. ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████ *Id.* at 81:5-23, 82:18-21, 109:12-111:24; Ex. 73 (GEMINI004). What Gemini could not ████████████████████████ ████████████████. The forensic evidence, not Gemini's limited Dark Web observations, proves complete database access.

*Third*, Defendants wholly misstate the testimony of CRA's corporate representative and CRA's conclusion that ████████████████████████████████████████████ ████████████████████████████████████ Ex. 34 (RMCB-AG-00000195) at -95. Defendants argue that CRA simply ████████████████ ████████████████████████ 105:11-18). CRA's deponent explained that, ████████████████████████████████████████████ ████████████████████, Ex 63 (CRA Dep.) 105:6-10, and that ████████████████ ████████████████████████████████ *Id.* at 230:17-24. CRA's witness elaborated on ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ *Id.* at 229:20-230:17. He said that ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ *Id.* (emphasis added). Defendants' attempts to draw conclusions from lawyer-crafted, hedged language runs wholly contrary to the evidence and CRA's corporate representative's testimony.

*Fourth*, Defendants misstate the scope and import of Ms. Frantz's ████████████ ████. *See* Quest Opp. 3, 27-31; Optum Opp. 10-14; LabCorp Opp. 12-13; Sonic Opp. 10. As Plaintiffs established above, they do not need to show that every single class members' information was posted for sale on the Dark Web in order to establish standing (or predominance). Ms. Frantz's ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ —



. Ex. 1 (Frantz Rep.) ¶¶ 329-63. In any event, Ms. Frantz's initial Dark Web evidence is not the foundation of standing at this stage of litigation: it simply corroborates what other technical evidence already proves.[13]

*Fifth*, Defendants argue that their expert ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ LabCorp Opp. 7. As Plaintiffs will detail in their motion to exclude Mr. Tomasini's testimony, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 62 (Tomasini Dep.) 95:11-13, 101:24-103:21, 211:9-16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 332:3-333:3. Mr. Tomasini ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 103:24-106:7, 326:11-328:4, 333:4-14, 335:5-337:9. Instead, Mr. Tomasini ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ *Id.* at 102:21-106:8, 333:4-14. Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 88:19-97:25.

Far from being extensive, Prescient ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 394:12-22. Prescient ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[13] Plaintiffs need only "state a claim to relief that is plausible" on the pleadings, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and the individual plaintiffs did that with evidence from the Dark Web. The voluminous discovery since that time establishes with common evidence that all Plaintiffs' and class members' data was exfiltrated from AMCA's servers: it is routine for Plaintiffs to prove standing for all class members with different evidence than they used to show that their own individual standing was plausible. *See, e.g.*, *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 895 n.3 (11th Cir. 2023) (Branch, J., concurring) ("The district court and the parties on appeal rely on post-pleading litigation developments—like the motion for class certification and the class certification hearing—for their standing arguments.").



Ex. 78 (Tomasini Dep. Ex. 7). Further, Prescient ███

Ex. 79 (Tomasini Dep. Ex. 22). Despite asserting that ████████

████ Ex. 80 (Tomasini Decl. ¶ 9), Mr. Tomasini ████████

████ had any involvement in this case. Ex. 62 (Tomasini Dep.) 345:4-11, 351:6-7, 369:24-370:2. ████████

████ *Id.* at 351:8-25. As Plaintiffs' experts explain, Mr. Tomasini's ████

████ *See, e.g.*, Ex. 63 (Strebe Decl.) ¶¶ 103, 163; Ex. 64 (Frantz Reply Decl.) ¶¶ 26-31.

**D.**    **All Sonic Plaintiffs and class members have standing to sue the various Sonic Defendants.**

Finally, as discussed above, Plaintiffs propose to narrow their Sonic Class to two classes separated by Defendant: one against SHUSA and CPL, and another against Aurora and Austin Path. *See* Fed. R. Civ. P. 23(c)(5). All relevant Plaintiffs and class members indisputably have standing to sue the two applicable Defendants. This structure thus resolves all of the defendant-specific standing-related concerns Sonic raised in its opposition brief. Sonic Opp. 16-18.

**II.**    **Only a few states' laws are relevant to any particular Defendant, and it would be no obstacle to class certification if it were otherwise.**

Before determining whether class certification is appropriate, a court must examine what law applies to the claims in the litigation. *Powers v. Lycoming Engines*, 328 F. App'x 121, 124 (3d Cir. 2009). Plaintiffs assert almost exclusively the claim that Defendants were negligent with their data (the exception is discussed below), so the choice-of-law analysis is more straightforward than in other litigation. In particular, Plaintiffs ask the Court to certify eight common-law

negligence classes: two against Quest (New Jersey law), one against Optum (Minnesota law), two against Sonic (Texas and Florida law), and three against LabCorp (North Carolina, New York, and Georgia law). While Plaintiffs in these cases hail from around the country, every applicable choice of law test points to one of these jurisdictions:

- Most states use a choice of law test that indicates that this Court should apply the law of the place of the allegedly negligent conduct. *See, e.g.*, *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2176590, at *6-7 (D. Mass. July 31, 2025); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2019 WL 3410382, at *13 (D. Or. July 29, 2019). To Plaintiffs' knowledge, no court evaluating a contested motion has ever held otherwise in these jurisdictions.

- Some states use the "*lex loci delicti*" (law of the place of the wrong) test. In a data breach, "the place of the wrong" is the place where the servers were located. *See Lamie v. LendingTree, LLC*, 2023 WL 1868198, at *2 (W.D.N.C. Feb. 9, 2023); *In re Blackbaud, Inc., Customer Data Sec. Breach Litig.*, 2022 WL 2314714, at *4 (D.S.C. June 28, 2022). Here, that is New York for all Defendants.

- Plaintiffs agree that Georgia follows the law of the forum for common-law claims filed in Georgia. *See, e.g.*, *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1311-12 (N.D. Ga. 2019).

While the above makes trial more streamlined than in most other multidistrict litigations, Plaintiffs note that Defendants' attempt to apply the law of each Plaintiff's home state would not alter the class certification analysis. If it were true that each Plaintiff's home state law applied, this would lead to the creation of state-specific classes and sequential, state-specific trials. *See, e.g.*, *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 2016 WL 772785, at *2 (N.D. Ill. Feb. 29, 2016) (noting the court certified several different states but set trial for Illinois only). But in any event, Defendants are mistaken: only the Georgia-based LabCorp Plaintiffs must apply home state law.

A.    **The substantive law of the Defendant's home state applies under the most significant relationship test.**

The "most significant relationship test" determines the choice of law for the Quest, Optum, and Sonic classes.[14] It also applies to Plaintiffs in the LabCorp track who hail from a jurisdiction that follows the most significant relationship test. *See* Dkt. 301 at 4 (stipulating that the choice of law rules of each LabCorp Plaintiff's home state apply). Across all classes, this test leads to the same answer: the application of the substantive common law of the given Defendant's home state. *Premera,* 2019 WL 3410382, at *13.

1.    **Under the most significant relationship test, a plaintiff must sue under the law of each Defendant's home state.**

As a general rule, courts determine the state with the "most significant relationship" to the plaintiff's claims by examining four factors: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 141 (2008) (quoting Restatement (Second) of Conflict of Laws § 145(2)). If those factors are in balance, the court may also consider "general principles" outlined in section 6 of the Restatement. *See id.*[15]

---

[14] No party disputes that New Jersey choice of law rules apply to the claims against Quest, Optum, and Sonic. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021). (There was initially one Quest plaintiff, Ashley Finch, who filed suit elsewhere. Plaintiffs hereby withdraw Ms. Finch as a putative class representative to promote efficiency.)

[15] Those principles are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee*, 197 N.J. at 136, 147.

Every court to consider this question when the parties contest it has concluded that a data breach plaintiff must assert negligence claims under the law of a defendant's home state. *See, e.g.*, *MOVEit*, 2025 WL 2176590, at *6-7. A brief review of the relevant factors reveals why.

**a.    The place of injury is a plaintiff's home state, but data breach courts give this factor only minimal weight.**

The first factor asks where each class member was injured by Defendants' negligence. *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1153 (W.D. Wash. 2017). In data breach cases, courts do not give this factor much weight, because the place of the injury (i.e. each class member's home state, spread out across the country) is "fortuitous." *Premera*, 2019 WL 3410382, at *13; *see also, e.g.*, *MOVEit*, 2025 WL 2176590, at *6-7; *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1199 (S.D. Fla. 2022); *Mackey v. Belden, Inc.*, 2021 WL 3363174, at *3 (E.D. Mo. Aug. 3, 2021).

**b.    A defendant's home state is where the conduct causing the injury occurred, and this factor is given "more weight" in a data breach.**

The second factor asks "where the defendant's conduct occurred." *Mackey*, 2021 WL 3363174, at *3. This factor "should be given more weight" in the context of a large-scale data breach. *Id.* Put another way, because the place of injury (factor a) "is less important," the place where a defendant's conduct occurred "becomes more important." *Premera*, 2019 WL 3410382, at *14-15. In short, this is "the most substantive contact." *Id.* at 15.

In a data breach, this is a defendant's home state. This is so because this factor focuses on where the defendant "orchestrated and implemented" the decisions that led to the data breach, including where "its failure to employ adequate data security measures emanated from." *Veridian*, 295 F. Supp. 3d at 1153; *see Mednax*, 603 F. Supp. 3d at 1199 (applying Florida law because, among other things, Florida was where "Defendants' security protocols allegedly broke down");

*Mackey*, 2021 WL 3363174, at *3 (applying Missouri law in part because "Belden is headquartered in Missouri" and "the allegedly negligent actions by Belden resulting in the Data Breach occurred in Missouri"). There should be no serious dispute that the allegedly negligent conduct occurred in each Defendants' home state.[16]

          **c.**      <u>**The third factor is neutral because Defendants are located in their home states and Plaintiffs are located around the country.**</u>

While the third factor (the location of the parties) may be significant if all parties are located in the same state, here Plaintiffs are spread across the country and Defendants are located in their home states. Accordingly, "[t]here is no grouping of contacts," *Veridian*, 295 F. Supp. 3d at 1154, and "[t]he residence factor is neutral," *Premera*, 2019 WL 3401382, at *14. It is thus "of minimal significance to [the] choice of law analysis." *Veridian*, 295 F. Supp. 3d at 1154.

          **d.**      <u>**The Parties' relationship is centered around each Defendant's provision of inadequate data security, making the fourth factor either neutral or in favor of Defendant's home state.**</u>

Courts are split on the application of the final factor in data breach litigation, with some finding it neutral (as stated in the Quest and LabCorp opening briefs), *see Veridian*, 295 F. Supp. 3d at 1154, and others concluding that it points to each Defendant's home state because Plaintiffs' claims center on the "provision of inadequate data security," *Premera*, 2019 WL 3401382, at *14.

---

[16] One brief word about the Aurora/Austin Path Class. Although all members of this class sought medical services from Texas corporation Austin Path, these class members' claims are governed by the law of Florida, where Aurora is based. This is because the "alleged negligent conduct" largely occurred in Florida. *Premera*, 2019 WL 3410382, at *14. Aurora, not Austin Path, had direct dealings with AMCA. Ex. 2 (Anolik Rep.) ¶ 50 ("Aurora entered into a BAA with AMCA on behalf of the Aurora Labs[, including Austin Path,] in 2017."); *see id.* ¶ 51 (Aurora's BAA with AMCA "formed the basis" of Austin Path's "relationship with AMCA"). All relevant oversight of AMCA (or failure thereof) occurred through Aurora's headquarters in Florida. *See id.* ¶¶ 207-16 (detailing Aurora's failure of oversight). In *Mednax*, the court applied Florida law because that is where most (but not all) defendants "were domiciled" and where the defendants' "alleged security protocols broke down." 603 F. Supp. 3d at 1199. The same outcome applies here.

All that matters for present purposes is that this factor does *not* point to a plaintiff's home state: "[a]lthough there is some contact with Plaintiffs' various home states because Plaintiffs reside there, suffered injury there, and some provided [personal information] from there, that contact is more attenuated with the claim of [Defendants'] inadequate provision of data security." *Id.*

\* \* \*

In sum, the "most important" factor—where the injury occurred—strongly supports applying the law of each Defendant's home state. *Mednax*, 603 F. Supp. 3d at 1199; *accord Premera*, 2019 WL 3410382, at \*14; *Mackey*, 2021 WL 3363174, at \*3. The place of injury factor is not important to the analysis, and the other two factors are at the least neutral (and one may even reinforce applying the law of where Defendants are located). Thus, the state with the most significant relationship for all of Plaintiffs' claims is the relevant Defendant's home state.[17]

### 2.    Most other Plaintiffs in the LabCorp matter are from states that also require the application of North Carolina law.

While all proposed class representatives who bring suit against Quest, Optum, and Sonic filed their lawsuits in New Jersey and thus fall under the most significant relationship test (discussed above), several LabCorp Plaintiffs filed suit in states that apply tests that are slightly different from the most significant relationship test, but that still point to the application of North Carolina law. Plaintiffs analyze these tests in Appendix 1.

---

[17] While the Court need not expressly consider the factors under Section 6 of the Second Restatement because the four primary factors clearly point to each Defendant's home state, Plaintiffs note that the Section 6 factors further support such a finding. Each Defendant's home state has a superior interest in having Defendants comply with those states' "tort principles governing cybersecurity" as compared to "the interest of each Plaintiff's home state in seeing their residents compensated for injuries allegedly caused by a foreign corporation's misconduct." *MOVEit*, 2025 WL 2176590, at \*7; *see Mackey*, 2021 WL 3363174, at \*3 (application of defendant's home state law was "particularly appropriate" in light of the Section 6 factors); *Premera*, 2019 WL 3410382, at \*15 (same); *Veridian*, 295 F. Supp. 3d at 1155 (same).

-28-

**B.** **For the LabCorp New York Multi-State Negligence Class, the place of the wrong leads to the uniform application of New York law.**

LabCorp Plaintiffs also propose a multistate class composed of the states not included in the North Carolina Multi-State Negligence Class other than Georgia, all of which follow the *lex loci delicti* (place of the wrong) test for choice of law.[18] The *lex loci delicti* test "defines the 'place of the wrong' as 'the state where the last event necessary to make an actor liable for an alleged tort takes place.'" *Paoletto v. Beech Aircraft Corp.*, 464 F.2d 976, 979 n.7 (3d Cir. 1972) (quoting Rest. (2d) Conflict of Laws §§ 377, 378). In data breach cases, the best reasoned opinions hold "that the last act necessary in which the defendant could potentially be liable for the common law torts to be in the state in which the servers were located, noting that the injury occurs when the data is stolen." *Lamie v. LendingTree, LLC*, 2023 WL 1868198, at *3 (W.D.N.C. Feb. 9, 2023); *see In re Blackbaud, Inc., Customer Data Sec. Breach Litig.*, 2022 WL 2314714, at *4 (D.S.C. June 28, 2022) (applying law of state where servers were located and breached).

Here, that state is New York, where AMCA's servers were located and breached by threat actors. Thus, for the states that use the *lex loci delicti* test, New York law applies uniformly.

**C.** **For the Georgia LabCorp Plaintiffs, Georgia law applies.**

As indicated above, Plaintiffs agree that, as a practical matter, Georgia applies the law of the forum to common law claims filed in Georgia. *See Equifax*, 362 F. Supp. 3d at 1311-12. Here, the Georgia LabCorp Plaintiffs' only claims are for common-law negligence. Accordingly, Georgia law applies for the Georgia LabCorp Plaintiffs.

\*        \*        \*

---

[18] Alabama, Kansas, Maryland, New Mexico, North Carolina, South Carolina, Virginia, West Virginia, and Wyoming. *See* LabCorp Mot. 12.

-29-

Plaintiffs respectfully note that the above discussion implicitly concedes certain arguments made by Defendants, primarily to reduce the scope of disputes before the Court. They list those concessions here for the Court's convenience:

- Quest argues that there are material differences between claims against it that accrued prior to the assignment of certain obligations to Optum on December 1, 2016 and claims after that date. While Plaintiffs believe that Judge Arleo's ruling on the motion to dismiss makes this possibility remote, Plaintiffs agree that it would also be appropriate to create subclasses at this time rather than to wait for summary judgment to determine whether this is truly a material issue. *See, e.g.*, *United Steel Workers Int'l Union v. ConocoPhillips Co.*, 2011 WL 13176142, at *10 (C.D. Cal. Oct. 27, 2011) (creating subclasses where the relevant policy changed midway through the class period).[19]

- Optum argued that New Jersey law should not apply to it because it is a Minnesota corporation. While there are strong arguments to the contrary because Optum is acting as Quest's assignee, Plaintiffs agree that Minnesota law is also appropriate and so accept Optum's arguments on this point.

- Sonic argued that Texas law should not apply uniformly because one of the entities at issue is a Florida corporation. While there are strong arguments to the contrary because these entities all operate under a Texas umbrella corporation, Plaintiffs agree that it is also appropriate to apply Florida law to the Florida corporation and so accept Sonic's arguments on this point.

- LabCorp notes that Plaintiffs miscategorized three LabCorp states in Plaintiffs' initial briefing discussing negligence. In particular, LabCorp is correct that: (1) North Dakota applies the choice-influencing factors test, (2) Wyoming applies *lex loci delicti*, and (3) Georgia applies its own law.

- Quest makes strong arguments about the propriety of class certification of a claim for negligent violation of the California Medical Information Act and so Plaintiffs withdraw their request to certify that claim.

---

[19] The practical consequences of this subclassing are minimal. The jury will return two verdicts against Quest: (1) did Quest breach a duty of care it owed to all class members who provided their personal information before December 1, 2016; and (2) did Quest breach a duty of care it owed to all class members who provided their personal information on or after December 1, 2016? (Quest's patient records determine the membership for each subclass.)

**D.** **None of Defendants' arguments undermine the above choice of law analysis, and it would be irrelevant to class certification if they did.**

Ignoring the above, Defendants argue that each Plaintiff and class member's home state law should apply, regardless of the applicable test. (Somewhat confusingly, they also argue that a host of other states' laws could apply uniformly under the most significant relationship test.) Defendants are mistaken, but even if they were right, that would not affect class certification, since every class member's claim would still be governed by the same substantive test.

**1.** **New Jersey applies the same most significant relationship test as every other state.**

One Defendant (Quest) argues that this Court should ignore every other data breach case that has applied the most significant relationship test because New Jersey law is different (Quest Opp. 23 n.11). Quest is wrong. The New Jersey Supreme Court expressly follows the Restatement (Second) of Conflict of Laws § 145(2), the exact same section of the Restatement applied by every other state to apply the most significant relationship test. *See Camp Jaycee*, 197 N.J. at 141.

And Quest's citations do not say otherwise: they are personal injury cases, for which "the place where the injury occurred" is the paramount consideration. Rest. (2d) Conflict of Laws § 145(2) cmt. e. Notably, Quest cites two cases involving automobile accidents where the plaintiffs "cho[se] to travel across state lines" and thus could not conceivably argue it was "a fortuity that they found themselves" on the roadways of the state at issue.[20] Exactly the opposite principle

---

[20] *Lebegern v. Forman*, 471 F.3d 424, 433 (3d Cir. 2006); *Malik v. Cooper Tier & Rubber Co.*, 59 F. Supp. 3d 686, 693 (D.N.J. 2014) (plaintiff was injured in auto accident in Illinois, where he had been living for several months); *accord Yocham v. Novartis Pharms. Corp.*, 736 F. Supp. 2d 875, 882 (D.N.J. 2010) (Texas resident was prescribed drug in Texas and was injured there; i.e., nearly all of the relevant conduct occurred in Texas even setting aside the distinct nature of personal injury cases).

applies in a data breach, where the place where the injury occurred receives little weight. *E.g.*, *Premera*, 2019 WL 3410382, at \*14.

### 2. The location of the breached servers is irrelevant under the most significant relationship test.

Both Quest and Optum seem to argue that the most significant relationship test should lead to the application of New York law because that was the place of the breach itself. While Plaintiffs would have no objection to New York law applying, they do not know of a good faith basis for its application because "the location of the compromised servers" is "afforded little weight" under the most significant relationship test. *MOVEit*, 2025 WL 2176590, at \*5. This is so because "where data was physically stored is largely a matter of fortuity that has scant bearing on the standards and/or expectations that govern companies' handling of sensitive data." *Id.*

Defendants' primary citation in this section of their briefing, *Mednax*, is not to the contrary. There, the breached data was indeed stored in Florida, but that is also the state where most of the defendants were based and where their "security protocols allegedly broke down." 603 F. Supp. 3d at 1199. Indeed, the *Mednax* court cited approvingly another case that applied Florida law to a burglary that occurred in Connecticut because, in relevant part, the defendant's "'pertinent departments' were located in Florida, and 'a substantial portion of [its] IT and cybersecurity operations [were] based in Florida.'" *Id.* (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Tyco Integrated Sec., LLC*, 2015 WL 3905018, at \*13 (S.D. Fla. June 25, 2015)). That same analysis—focusing on where the defendant's substandard cybersecurity oversight occurred, not the location of the stolen data—clearly compels the application of the law of a defendant's home state.[21]

---

[21] LabCorp's other cites that purportedly point to the location of AMCA's servers under the most significant relationship test are even further afield. In *Brooks v. Peoples Bank*, 732 F. Supp. 3d 765 (S.D. Ohio 2024), "at the time of the alleged data breach" the relevant defendant entity was a Kentucky corporation. *Id.* at 778. In *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749 (C.D. Ill. 2020),

### 3. LabCorp cannot avoid New York law under the *lex loci delicti* test.

LabCorp half-heartedly disputes that the *lex loci delicti* analysis leads to the application of New York law by briefly citing cases that involved a data breach and did not apply the law of the location of the servers. LabCorp Opp. 31. But those cases were materially different from this one because the plaintiffs were banks who alleged economic losses stemming from the fallout from a data breach. *S. Indep. Bank v. Fred's Inc.*, 2019 WL 1179396, at *1 (M.D. Ala. Mar. 13, 2019); *Bank of La. v. Marriott Int'l, Inc.*, 438 F. Supp. 3d 433, 437 (D. Md. 2020). Those decisions recognized that the *lex loci delicti* test applies differently in the case of immediate financial loss, where the choice-of-law rules focus on where "the plaintiff suffered the economic impact." *S. Indep. Bank*, 2019 WL 1179396, at *13 n.7; *see Bank of La.*, 438 F. Supp. 3d at 442 (recognizing that the analysis may be different in cases of "pecuniary injury resulting from fraud, negligent misrepresentation or commercial negligence").

This case, by contrast, is not about immediate financial loss from economic fraud, but rather is about the duty to safeguard personal information. The *Equifax* court articulated exactly this distinction when confronted with the same argument there that LabCorp makes here. *See Equifax*, 362 F. Supp. 3d at 1321. LabCorp's cases simply do not apply.

### 4. Even if each class member's home state law applied, class certification would remain appropriate.

Out of an abundance of caution, Plaintiffs note that even if the Defendants were correct that the Court should apply "non-identical state negligence laws" based on each class member's residence, that would not change the Court's ultimate class certification analysis for two reasons. First, data breach cases like this one "do[] not implicate any of the state-specific issues that can

---

no party asked the court to apply the law of Hy-Vee's home state, so the court did not have occasion to consider this argument. *See id.* at 759.

sometimes creep into the negligence analysis." *Premera*, 2019 WL 3410382, at *18 n.6; *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 314 (N.D. Cal. 2018). This is because, at its heart, in this case "the same actions by a single actor wrought the same injury on all [class members] together." *Premera*, 2019 WL 3410382, at *18 n.6; *Anthem*, 327 F.R.D. at 314.[22]

Second, when an MDL court is faced with the application of many different state laws, it does not simply deny class certification—MDLs by definition frequently involve the law from dozens of different states. Instead, it issues state-specific class certification decisions to the extent necessary and orders trial of one (or a few) states at a time. *See, e.g.*, *Sears*, 2016 WL 772785, at *2.

## III.    Plaintiffs meet the requirements of Rule 23(a).

As recounted above, Rule 23(a) contains four prerequisites to class certification that must be applied in all cases: numerosity, commonality, typicality, and adequacy. Defendants contest all but the first.

### A.    Each of the proposed classes are sufficiently numerous.

In their opening briefing, Plaintiffs established that each of the proposed classes are so numerous that joinder would be impracticable. Fed. R. Civ. P. 23(a)(1); *Somogyi*, 495 F. Supp. at 346. Defendants do not disagree.

---

[22] Sonic points to several alleged differences in state law, but these are all insignificant. Sonic Opp. 30-32. Different statutes of limitations are irrelevant because (1) all class members' claims accrued at or around the same time, when their data was exfiltrated from AMCA's servers, and (2) regardless, "the Court can mechanically determine whose claims are time-barred" with reference to the data about each class member's personal information storage and exfiltration that was produced in discovery. *Marriott*, 341 F.R.D. at 158. States' differing approaches to comparative fault are irrelevant because Sonic does not actually allege any contributory fault "[s]o that potential difference does not impact the Court's analysis." *In re Cinfed Fed. Credit Union Data Breach Litig.*, 2025 WL 1637686 at *5 n.6 (S.D. Ohio June 10, 2025).

**B.    There is at least one question common to each of the proposed classes, the answer to which will advance resolution of this litigation.**

Commonality is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class," *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013), the answer to which will advance the resolution of the litigation, *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 at 359 (2011) ("*Dukes*"). The focus is "'not on the strength of each class member's claims but instead on whether the defendant's conduct was common as to all of the class members.'" *Villa v. Cargill Meat Sols. Corp.*, 2024 WL 4374958, at *5 (M.D. Pa. Oct. 2, 2024) (quoting *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 397 (3d Cir. 2015)). Here, there is at least one common question: whether a defendant owed a duty to each class member to keep their information secure. (Put another way, it would not be possible for a jury to find that Defendants owed some patients a duty of care, but not others.)

Plaintiffs discuss the prevalence of common questions more fully below when addressing predominance. *Cf. Somogyi*, 495 F. Supp. 3d at 347 ("Where, as here, the action proceeds under Rule 23(b)(3), the commonality requirement is subsumed by Rule 23(b)(3)'s predominance requirement.").

**C.    The proposed named Plaintiffs' claims are typical of all class members' claims.**

Typicality is satisfied when "the individual factual circumstances underlying [Plaintiffs'] legal theory and legal claims" are "sufficiently similar to those of the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) (emphasis omitted); *Somogyi*, 495 F. Supp. 3d at 347 ("The typicality requirement is satisfied where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." (quotation marks omitted)).

Here, typicality is met because a common course of conduct gave rise to all claims subject to this litigation, whether asserted by Plaintiffs or absent class members: Defendants negligently

entrusted data to an inadequately secured vendor, and every Plaintiff and class member had their sensitive personal information stolen in the data breach. Quest Mot. 16. Given that Plaintiffs "(1) suffered the same injuries as the absent class members, (2) as a result of the same course of conduct by defendants, and (3) their claims are based on the same legal issues," typicality is satisfied. *Miller v. Eagle Pharms., Inc.*, 2024 WL 3858124, at \*3 (D.N.J. Aug. 19, 2024) (Semper, J.); *see also, e.g.*, *Premera*, 2019 WL 3410382, at \*10 (in data breach case, named plaintiffs' claims were "reasonably co-extensive with those of the absent class members" because "[t]hey all allegedly suffered the same or similar injury from the same alleged conduct by" the defendant).

Defendants' arguments to the contrary depend on their mischaracterization of Plaintiffs' case. Plaintiffs need not establish that each particular class member's data is somewhere on the Dark Web, *contra* LabCorp. Opp. 45; Optum Opp. 45: the alleged harm in this case is the access and theft of Plaintiffs' personal and health information. *See Accellion*, 2025 WL 2799102, at \*6 (allegations of "exposure of personal data due to breach . . . suffices for typicality"). That correct understanding of Plaintiffs' theory of the case distinguishes Optum's sole cited case, where it was not clear "whether each class member's personal information was actually exposed." *Gardner v. Health Net, Inc.*, 2010 WL 11579028, at \*4 (C.D. Cal. Sept. 13, 2010). It also disposes of Quest's point that not all Plaintiffs can demonstrate their financial information was in the payment portal-related data Gemini ████████████████. Quest Opp. 13-14. As discussed above in the section on standing, Plaintiffs have shown by a preponderance of the evidence that hackers accessed and stole all class members' sensitive information. That holistic view of the evidence is what matters, rather than Defendants' self-serving focus on individual sources or types of data.

In their attack on typicality, Defendants also point to a handful of facts that vary among class members, but none is relevant to typicality (and none creates a "unique defense" that bears on class certification):

- That "[s]ome Plaintiffs utilized credit monitoring services before and after the Cyberattack, while others did not," LabCorp Opp. 45, has nothing to do with whether a particular class member was injured when Defendants permitted hackers to access and steal every class member's private information. *See, e.g.*, Ex. 81 (Worley Reply Rep.) ¶¶ 9, 11.

- LabCorp hypothesizes that some Plaintiffs' stolen data may have been "outdated." LabCorp Opp. 45. That is untrue for patients who fit into Tranche 2 (discussed in more detail below, in Part IV.B), which ███████████████ ████████████████████████████████████████████ ████████████████████████████ Ex. 81 (Worley Reply Rep.) ¶ 38 n.37. Regardless, far from "undercutting any alleged risk of harm associated with misuse of that data," LabCorp Opp. 45, ███████████████████████████████ ████████████████████████ Ex. 81 (Worley Reply Rep.) ¶ 38.

- Optum argues that typicality is impacted by the fact that Quest only assigned certain obligations to Optum in 2016. Optum is wrong—its sole cite in this section of its briefing is to a mass tort where there was no common "practice or course of conduct" among defendants, *In re Human Tissue Prods.*, 2010 WL 743922, at *3 (D.N.J. Mar. 2, 2010)—as indicated above Plaintiffs propose subclasses so that the Parties do not expend judicial resources dealing with ancillary issues related Quest's December 1, 2016 assignment.

In sum, all Plaintiffs and class members "complain of identical misconduct based on the same legal theory," which satisfies typicality. *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009).

### D.    Plaintiffs are adequate class representatives.

The last of the Rule 23(a) factors, "adequacy," has two prongs: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Somogyi*, 495 F. Supp. at 346 (cleaned up). Defendants do not contest the appropriateness of proposed lead or co-lead counsel,

but they do assert two arguments that the proposed named Plaintiffs themselves are inadequate.[23] Neither has merit.

*First*, Defendants argue that Plaintiffs should have chosen to pursue additional damages theories. Optum Opp. 47; Quest Opp. 16. But class representatives "are authorized to decide matters of litigation strategy, such as which claims to assert or drop." *Accellion*, 2025 WL 2799102, at *10. Among other things, "[t]he decision to pursue, or not, certain remedies falls squarely within that authorization." *Id.* Indeed, Defendants' own authority recognizes class plaintiffs can seek to "reduce or simplify the case by dropping those causes of action deemed less important." *Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J. 1997). There simply is no "obligation upon class representatives to assert every possible claim and remedy no matter how far-fetched or unlikely they are to succeed;" and "courts have routinely rejected that position" when defendants have attempted to assert it. *Accellion*, 2025 WL 2799102, at *10.

Defendants' cases are not to the contrary. Those matters involved what is known as "imprope[r]… claims splitting," which occurs when a plaintiff abandons an entire category of claims at class certification (usually "relief for physical injury or property damage") while purportedly asserting the right to assert those claims in the future. *See Gonzalez v. Corning*, 317 F.R.D. 443, 501-02 (W.D. Pa. 2016) (defining improper claims splitting).[24] That is entirely distinct

---

[23] Plaintiffs therefore respectfully reiterate their request that the Court appoint their proposed Interim Lead Counsel and Co-Lead Counsel pursuant to Rule 23(g). *See, e.g.*, *In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, 2023 WL 4551435, at *11 (D.N.J. July 13, 2023) (analyzing Rule 23(a)(4) and (g) together and granting motion to appoint class counsel).

[24] *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 338-39 (S.D.N.Y. 2002) (plaintiffs sought certification of "merely 'injunctive relief'" while seeking "to preserve their right to maintain later actions for damages"); *Mays v. Tenn. Valley Auth.*, 274 F.R.D. 614, 633-34 (E.D. Tenn. 2011) (plaintiffs sought certification of claims "based solely on property ownership" while seeking to preserve uncertified "medical monitoring claims, emotional distress

from this case, where Plaintiffs have simply refined their damages theories based on what discovery will support, a routine occurrence in data breach litigation that is "squarely within" their rights as proposed class representatives. *Accellion*, 2025 WL 2799102, at *10.

*Second*, Defendants again argue that certain Plaintiffs allegedly spoliated evidence. Special Master Falk has already rejected that argument with respect to most Defendants. Dkt. 659; *cf.* Sonic Opp. 47 (inexplicably describing a pending motion substantially similar to the ones Special Master Falk has already rejected as "meritorious"). And it is black letter law that spoliation accusations are only relevant to a class representative's adequacy if a defendant actually prevails on a spoliation motion. *Patel v. Coinbase Global, Inc.*, 2022 WL 17582549, at *5 (D.N.J. Dec. 12, 2022). This case, indeed, is an even clearer call than *Patel.* There, the question of spoliation had not yet been adjudicated. Here, Special Master Falk specifically rejected Defendants' arguments.

Out of an abundance of caution, Plaintiffs stress that the allegedly deleted texts have no relevance to this litigation in any event. Those texts were purportedly relevant because they would have allowed Defendants to argue that Plaintiffs' total amount of unwanted texts (i.e., "spam") had not increased following the data breach. But Plaintiffs are no longer pursuing any claims based on "increased spam." Plaintiffs assert simply that every class member was injured when AMCA's servers were exfiltrated by bad actors. Texts that any Plaintiff or class member received have nothing to do with proving (or defending against) that claim. *See Compound Prop. Mgmt. LLC v. Build Realty, Inc.*, 343 F.R.D. 378, 402-03 (S.D. Ohio 2023) (holding alleged spoliation defense

---

claims, and personal injury claims"); *Thornburg v. Ford Motor Co.*, 2022 WL 4348475, at *7 (W.D. Mo. Sept. 19, 2022) (plaintiffs did not seek certification of viable personal injury claims while purportedly maintaining the right to bring such claims).

did not make named plaintiffs inadequate class representatives where the evidence alleged to be lost did not implicate class members' claims).[25]

## IV.      **Common questions predominate over individual ones.**

Plaintiffs assert three nationwide class claims for common-law negligence: one each against LabCorp and Sonic, and one against Quest and its assignee Optum. Plaintiffs also assert five single-state consumer protection claims against LabCorp. Although these claims and their associated classes vary slightly in the operative law and defendant-specific facts, they all arise out of materially identical course of conduct. In short, Plaintiffs allege that: (1) every defendant breached a duty it owed to every class member by transferring personal information to AMCA despite the absence of reasonable (or, really, any) cybersecurity safeguards; and (2) every class member was injured when, predictably, a malicious actor stole their personal information for nefarious purposes. All class members will be able to "prove their claims with 'evidence that is common to the class rather than individual to its members.'" *Huber* 84 F.4th at 156. Defendants' arguments to the contrary are mistaken.

### A.      **Plaintiffs' negligence claims turn entirely on common evidence.**

Plaintiffs' common-law negligence claims all contain the same elements: (1) duty; (2) breach; (3) causation; and (4) damages. *AMCA I*, 2021 WL 5937742, at *14 ("As Defendants recognize, the basic elements of negligence are the same in every state: duty, breach, causation,

---

[25] In all of the cases Defendants cite, the allegedly spoliated evidence was core to the claims at issue. *Arris*, 327 F.R.D. at 357-58 (plaintiffs sold allegedly defective product without allowing defendant to inspect it); *Pagan v. Abbott Lab'ys, Inc.*, 287 F.R.D. 139, 150 (E.D.N.Y. 2012) (same); *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 257 (N.D. Cal. 2012) (plaintiff allegedly engaged in unauthorized copying of corporate records and "attempt[ed] to conceal his wrongdoing").

and damages.").[26] Class certification is proper because "common issues predominate over individual issues with respect to proving the elements" of these claims. *Drummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149, 156 (3d Cir. 2025).

### 1.    Defendants do not dispute that they owed a uniform duty.

All Defendants owed all class members "the same duty" to safeguard their personal information. Quest Mot. 21; Sonic Mot. 28; *accord* LabCorp. Mot. 30. That duty, as Judge Arleo recognized at the outset of this case, was the "duty to take reasonable care by, for example, reasonably ensuring that the third-party collection agency they contracted with [AMCA] had adequate data security." *AMCA I*, 2021 WL 5937742, at *15. This duty, which does not vary by the type of information each patient provided to Defendants, *see id.* at *14-15, is grounded in "traditional negligence principles," which provide that a defendant "owe[s] a legal duty to [its customers] to take reasonable precautions due to the reasonably foreseeable risk of danger of a data breach incident." *Equifax*, 362 F. Supp. 3d at 1326.

Sonic does argue in passing that "duty" differs by state, but the case they point to is entirely inapposite. Sonic Opp. 33. In *Ehling v. Monmouth-Ocean Hosp. Service Corp.*, 872 F. Supp. 2d 369 (D.N.J. 2012), the court held that states differ in their approach to whether a communication is confidential "just because it is accessible to a number of people." *Id.* at 373. The communication in question there was a "Facebook posting," *id.*, not sensitive information disclosed in confidence

---

[26] Plaintiffs also assert claims for negligence per se. Defendants do not address this separately, with two exceptions, arguing that: (1) some states do not recognize claims for negligence per se (an argument suited only for summary judgment); and (2) whether Defendants complied with HIPAA is not a common question (the same argument they make in the context of breach of a duty for their negligence claim). Accordingly, Plaintiffs' arguments for why common questions predominate with respect their negligence claims apply equally to negligence per se.

to a medical provider, for which every state imposes the same duty. *Premera*, 2019 WL 3410382, at *18.[27]

### 2.    Defendants breached the obligation to safeguard class members' data.

Defendants breached the duty of care "by, among other things, providing information to AMCA when they 'knew or should have known that AMCA's web payments page was vulnerable to unauthorized access by third parties', and failing to implement measures to monitor, audit, or evaluate AMCA's data security practices." *AMCA I*, 2021 WL 5937742, at *15. Whether this duty existed and whether Defendants breached it are thus uniform inquiries that will be determined by evidence common to every class member. *See, e.g.*, *Anthem*, 327 F.R.D. at 308; *Premera*, 2019 WL 3410382, at *18; *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 487 (D. Minn. 2015) (conceding "that classwide proof is available as to the existence of a duty and breach of that duty").

Defendants' sole counter is that they did not breach such a duty because entering BAAs with AMCA constituted HIPAA's requisite "satisfactory assurances." Quest Opp. 19 n.7; LabCorp Opp. 35 n.26. Defendants waived this argument by raising it in passing through footnotes. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997). In any event, this has nothing to do with the propriety of class certification because Defendants do not and cannot claim that evidence relevant to these agreements "varies from member to member." *Drummond*, 142 F.4th at 159. If Quest and LabCorp are right that the BAAs demonstrate they did not breach their duties—they are not, *see generally* Ex. 2 (Anolik Decl.); Ex. 82 (Anolik Reply Decl.)—this

---

[27] In any event, it would not matter if states *did* impose different standards for duty both in the sense that: (1) every class proposed by Plaintiffs is under the law of a single state; (2) if Defendants were correct that "home state" law applied for each Plaintiff (they are not) *and* that duty varied so much that it was impracticable to try many states together (also inaccurate), there would simply be state-specific trials.

means that they will ultimately prevail at a class trial, not that the trial should never occur. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *accord MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 349 (D.N.J. 2019) ("[C]ourts should endeavor not to address merits-based issues beyond what is necessary to determine whether certain elements may be shown through common or individualized proof.").[28]

### 3.     Causation is a common question.

Common questions also predominate for the third element of negligence (causation): "[w]hether Defendants' inadequate security and oversight caused the Breach and harmed Plaintiffs is a common question with a common answer." Quest Mot. 22. This question "boils down to the common factual contention of whether [Defendants'] data security levels were reasonable." *Anthem*, 327 F.R.D. at 314. Because that is a common question, "Plaintiffs' negligence claims would not get bogged down in the individualized causation issues that sometimes plague products-defect cases." *Id.*; *accord Accellion*, 2025 WL 2799102, at *12. To the extent Defendants wish to use "causation" to launch another broadside against Plaintiffs' damages model, *see, e.g.*, LabCorp Opp. 21-24, that effort is misguided. *See Savidge v. Pharm-Save, Inc.*, 727 F. Supp. 3d 661, 706-07 (W.D. Ky. 2024) (stating with respect to similar arguments that "causation determinations go to individual variations in damages, and, as already explained, such variations in damages do not

---

[28] Quest also makes arguments related to its December 1, 2016 assignment to Optum. While Plaintiffs do not believe these arguments are meritorious, as indicated above Plaintiffs have proposed creating two subclasses to avoid bogging the Court and parties down in ancillary issues. And any merits defenses Quest may wish to assert regarding its duties to members of the post-assignment subclasses must be resolved later; what matters now is that those arguments will apply equally to all members of the subclass. *See Amgen*, 568 U.S. at 459.

typically prohibit class certification"); *In re Sonic Corp.*, 2021 WL 6694843, at *3 (6th Cir. Aug. 24, 2021) (similar).

### a.  Every class member's sensitive personal information was exfiltrated from AMCA's servers.

As explained above in the section on standing, hackers accessed and stole all class members' information. *See, e.g.*, Ex. 63 (Strebe Decl.) ¶ 241 ███████████████

████████████████████████████████████████████

████ And at this stage, the question is only whether Plaintiffs have demonstrated "by a preponderance of the evidence that [their] claims are capable of common proof at trial." *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020). For the reasons articulated in Plaintiffs' above discussion of standing, Plaintiffs have done so. *See, e.g.*, Ex 66 (CRA Dep.) 229:20-230:17 ████████████████████████

████████████████████████████████████████████

██████████████ (emphasis added).

### b.  Whether or not a class member was the victim of a past data breach is irrelevant.

Defendants say that because some class members' information was divulged in other cyberattacks, causation is impossible to prove classwide, but "[t]hat obviously cannot be true." *Accellion*, 2025 WL 2799102, at *11. As the *Accellion* court recently observed, this "absurd" argument would mean "no defendant will ever have the duty to safeguard" the data of any individual whose "data has ever been exposed before . . . because no subsequent breach could ever cause damage." *Id.*; *see also In re Anthem Data Breach Litig,*, 162 F. Supp. 3d 953 at 988 (N.D. Cal. 2016) ("This would, in turn, create a perverse incentive for companies: so long as enough data breaches take place, individual companies will never be found liable."). Perhaps more importantly, Defendants' argument also "misunderstands the harm at issue[,]" which is that "[t]he more often

individuals' personal data is exposed, the more readily available it will be to bad actors, and the greater the risk that those individuals will eventually suffer negative consequences like identity theft." *Accellion*, 2025 WL 2799102, at *12; *see also* Ex. 4 (Worley Decl.) ¶¶ 112, 129-31; Ex. 81 (Worley Reply Rep.) ¶¶ 13, 19, 42 (testifying to same); Ex. 63 (Strebe Decl.) ¶¶ 227-39.[29]

Defendants' cases do not undermine class certification. In *Attias v. CareFirst, Inc.*, 344 F.R.D. 38 (D.D.C. 2023), the plaintiffs alleged common injury based only on whether class members had already undertaken mitigation measures. *Id.* at 53-54. That theory gave rise to individualized causation issues and is narrower than what Plaintiffs allege here. For good reason: in *Attias*, there was no "realistic risk of identity theft, tax fraud, or credit card fraud stemming from the . . . breach" and the plaintiffs provided no explanation of "how the compromised information [at issue] could lead to such forms of identity theft." *Id.* at 54. Same for *In re Samsung Data Security Breach Litigation*, 761 F. Supp. 3d 781 (D.N.J. 2025), *appeal filed*, No. 25-1895 (3d Cir. May 12, 2025), which held that the disclosure of "non-sensitive information" like "names, addresses, other contact and demographic information, and device information," does not confer standing without more. *Id.* at 796-98.

Here, by contrast, AMCA's breached systems included a host of extremely sensitive information, including ███████████████████████████████████████████. Ex. 1 (Frantz Decl.) ¶ 26; Ex. 59 (Lee Rep.) ¶ 24; Ex. 4 (Worley Decl.) ¶ 31. Significantly, *all* class members have at the very least had ███████████████████████████████

---

[29] All of these arguments apply equally to the "defense" that some Plaintiffs and class members may have received medical services from several Defendants. *See* Sonic Opp. 45. That fact that some people may also have additional claims against additional entities does not somehow implicate a person's individual claim against one defendant. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262-63 (3d Cir. 2016) (common questions predominated for class damages theory premised on joint and several liability).

████████████. Ex. 81 (Worley Reply Rep.) ¶¶ 34-40. And Plaintiffs show how the uniform disclosure of this sensitive significantly increased the likelihood of identity theft or fraud. *See id.* The exfiltration of *sensitive* information, unlike the "mundane and/or readily available online" data at issue in the cases Defendants cite, *Samsung*, 761 F. Supp. 3d at 798, gives rise to a concrete injury. *See Accellion*, 2025 WL 2799102, at *13 (predominance satisfied for injury element of negligence claim in data breach case that exposed sensitive health and financial information).

There are also dispositive factual distinctions between this case and *McGlenn v. Driveline Retail Merch., Inc.*, 2021 WL 165121 (C.D. Ill. Jan. 19, 2021). There, the plaintiffs' own expert testified that class members were under "no imminent threat of identity theft." *Id.* at *9. Indeed, the plaintiffs in *McGlenn* presented little evidence that the class members' identities were at risk beyond the fact "that some putative class members may have suffered suspicious credit activity. . . while others did not." *Id.* Here, by contrast, Plaintiffs' expert opined that ████████████

████████████████████████████████

████████████████████████████████

████████████████████████ Ex. 4 (Worley Decl.) ¶ 192.

### 4.    Common evidence will prove that Plaintiffs suffered "actual damages" from the theft of their data.

The final element of negligence is damages. While Plaintiffs demonstrate how they will prove damages in the next section of their briefing, what matters primarily for class certification is that whether Plaintiffs have suffered "actual damages" will be answered with exclusively common evidence, making class certification proper.[30] *See, e.g.*, *Cervantes v. CRST Int'l, Inc.*,

---

[30] As discussed below in further detail, North Carolina does not require actual damages for negligence actions. *See, e.g.*, *Dew v. Hronjak*, 673 S.E.2d 415, 2006 WL 4882628, at *3 (N.C. Ct. App. 2006) (affirming trial verdict where "court instructed the jury that, because defendant

2022 WL 22836508, at *8-10 (N.D. Iowa. Aug. 16, 2022); *Hedges Enters., Inc. v. Cont'l Grp., Inc.*, 81 F.R.D. 461, 475-76 (E.D. Pa. 1979). In *Cervantes*, for instance, the court explained that a failure to prove damages would be a failure of proof at summary judgment or trial, not a barrier to class certification:

> Plaintiffs need not show that a plaintiff in fact suffered actual damages for certification to be appropriate. Even if the defendant was correct that class members did not suffer actual damages, failure of proof is properly addressed at trial or in a ruling on a summary-judgment motion and should not be resolved in deciding whether to certify a proposed class.

*Id.* (cleaned up) (quoting *Amgen*, 568 U.S. at 470). The court in *Hedges* reached the same conclusion, granting class certification under the Clayton Act—which requires actual damages—because "the fact of damage" was provable by common evidence. 81 F.R.D. at 472, 475. These cases support class certification here because the jury's finding as to whether exfiltration constitutes actual damages will resolve this element for all class members, even if damages must be calculated "with a common formula or formulaic calculation." *Cervantes*, 2022 WL 22836508, at *8; *see also Gilmore v. City of Paterson*, 694 F. Supp 3d 561, 567 n.2 (D.N.J. 2023) (denying summary judgment and noting that whether a plaintiff suffered "actual damages" is a matter for the finder of fact).

For similar reasons, courts certify data-breach class actions where, as here, "the fact of damages is a question common to the class even if the amount of damages sustained by each individual class member varie[s]." *Sonic Corp.*, 2021 WL 6694843, at *3 (; *see Savidge* 727 F. Supp. 3d at 706 ("[T]he fact of damages is a question common to the class . . . ."). Defendants mischaracterize the class in *Savidge* as consisting only of people who "incurred costs or lost time

---

admitted negligence, then plaintiff was entitled to recover nominal damages without proof of actual damages").

mitigating the risk of future harm *resulting from* [the] data breach." Quest Opp. 43. On the contrary, the *Savidge* class included anybody "who suffered an actual, present injury from the breach, **or** who otherwise incurred costs or lost time mitigating the risk of future harm." 727 F. Supp. 3d at 696 (emphasis added).

Defendants' argument is also nearly impossible to square with *Clemens*, which held in the context of Article III standing that Plaintiffs need only show the "unauthorized exposure of personally identifying information that results in an increased risk of identity theft or fraud." 48 F.4th at 154; *accord Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 288 (2d Cir. 2023) (holding a plaintiff establishes a substantial risk of future injury by demonstrating "some part of the compromised dataset has been misused—even if a plaintiff's own data has not"). Indeed, on remand in *Clemens*, the district court concluded plaintiffs stated a claim for common-law negligence (under Pennsylvania law), including the element of "actual damages." *Clemens v. ExecuPharm, Inc.*, 678 F. Supp. 3d 629, 636 (E.D. Pa. 2023).

In response, Defendants largely rely on *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686 (N.D. Cal. 2019). But the breach in *Adkins* concerned generally public information such as "name, date of birth, phone number, gender, and hometown." *Id.* at 691-92. Plaintiffs' expert testimony recognizes ██████████████████████████████████████████████████████████████████████████ ██████ Ex. 4 (Worley Decl.) ¶ 43, but Plaintiffs do not seek redress for disclosure of these bare categories of identifying information alone, *see id.* ¶ 169 (Tranche 1 includes ████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████. The *Adkins* holding is not in tension with Plaintiffs' motion or the above cases because *Adkins* simply

did not involve the same types of information. And "the nature of the information accessed through the data breach" matters. *Clemens*, 48 F.4th at 154.

> **B.** **Plaintiffs have measured damages on a classwide basis, consistent with their theory of injury.**

In their opening briefs, Plaintiffs demonstrated that "damages stemming from" the data breach are "measurable on a class-wide basis by a 'common methodology.'" *Drummond*, 142 F.4th at 156 (quoting *Comcast Corp. v Behrend*, 569 U.S. 27, 20 (2013)). This requirement "poses a low bar to class certification." *Forsythe v. Teva Pharm. Indus. Ltd.*, 102 F.4th 152, 159 (3d Cir. 2024). To satisfy it, Plaintiffs need only "demonstrate that there is a reliable methodology for measuring damages with reasonable accuracy." *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2023 WL 7285167, at *19 (E.D. Pa. Nov. 3, 2023). But "damages need not be susceptible of measurement across the entire class for purposes of Rule 23(b)(3)," *Lamictal*, 957 F.3d at 195, and even if there are "differences among the class members concerning the precise damages they suffered," that is "of no consequence in determining whether" common questions predominate over individualized ones, *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020).

Here, Plaintiffs seek damages based on the market value of insurance for class members to protect against the risk of identity theft. They also seek nominal damages for certain claims. Common questions predominate for both theories.

> **1.** **Compensatory damages are calculable on a classwide basis.**

Plaintiffs propose to calculate damages for every class member with a straightforward methodology. First, economist and experienced data analyst Dr. Jonathan Lee will determine the identity of each class member whose data was stolen and the personal information that was exfiltrated. Ex. 59 (Lee Rep.) ¶¶ 19-25. He will then divide class members into two "tranches"

provided by data breach remediation expert Amy Worley, which are based on ███████████

████████████████████████████. *See id.* ¶¶ 22-27.[31] Ms. Worley, in turn, has

identified ████████████████████████████████████████████████████

██████████████████████████. *See* Ex. 4 (Worley Decl.) ¶¶ 172-90. The present

value of Tranche 1 damages are $8.99 per month, whereas the present value of Tranche 2 damages

are $12.27 per month. Ex. 5 (Witt Decl.) ¶¶ 12-13.

This proposed model for calculating damages is "consistent with [Plaintiffs'] theory of

liability." *Forsythe*, 102 F.4th at 159. Defendants breached their duty to safeguard class members'

personal information. As a consequence of that breach, class members' sensitive data has been

exposed to criminals. Damages to mitigate against future identity theft and related harms "are a

sufficient form of damages for a negligence claim." *Tignor v. Dollar Energy Fund, Inc.*, 745 F.

Supp. 3d 189, 203 (W.D. Pa. 2024). The mitigation products on which Plaintiffs base their

damages model will redress "the intrusion upon [Plaintiffs'] privacy interests following the alleged

wrongful access and misuse of their Personal Information," *AMCA*, 2021 WL 5937742, at *9, by

████████████████████████████████, Ex. 4 (Worley Decl.) ¶¶ 172-

90.

---

[31] Tranche 2 includes ████████████

████████████████████████████████████████████████

████████████████████ Ex. 4 (Worley Decl.) ¶¶ 167, 169; Ex. 59 (Lee Rep.) ¶¶ 22-27.

████████ Rep.) ¶ 27. ████████████

████████████████████████████████████████████████

████████████████████ Ex. 4 (Worley Decl.) ¶ 175. ████████

###### a.      Plaintiffs' complaint stated their compensatory damages theory.

Quest argues that Plaintiffs' request for damages to protect them from the increased risk of harm they face is a "new legal theor[y]" that was "unpled." Quest Opp. 34. This is bewildering. In the Quest Track Plaintiffs' operative complaint, they request "compensatory, consequential, and general damages in an amount to be determined at trial." Dkt. 317 at 134; *see also* Dkt. 319 at 121 (same, for LabCorp); Dkt. 320 at 87 (same, for Sonic).[32] That is exactly what they seek.

###### b.      A mechanical and formulaic method will determine tranche membership.

Defendants next claim there are inaccuracies in the class member data that can only be resolved on an individual basis. Quest Opp. 38-39; LabCorp. Opp. 26-27. But Rule 23 requires only a "feasible, and not perfect," method of determining class membership. *In re Valsartan, Losartan & Ibesartan Prods. Liab. Litig.*, 2023 WL 1818922, at *24 (D.N.J. Feb. 8, 2023). Damages are even more flexible. *See Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 5505052, at *19 (C.D. Cal. Apr. 4, 2023) ("*Comcast* does not demand calculation of damages with perfection."); *see also Comcast*, 569 U.S. at 35 ("Calculations need not be exact . . . ."); *Neale*, 794 F.3d at 374 (same). Indeed, the *Accellion* court rejected this exact argument, holding that "if there is a way to generate a spreadsheet identifying the specific categories of data disclosed by class member, there are no predominance problems." 2025 WL 2799102, at *13. Besides, Defendants' concerns are particularly misplaced here, where Dr. Lee ███████████

██████████████████████████████████████████

---

[32] Quest's lone citation does not say otherwise. In that case, which asserted statutory claims under the California Labor Code, the plaintiffs sought to certify a class for injunctive relief under one particular subsection of the code. *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011). However, the complaint did not mention that subsection, even as it explicitly asserted claims under other subsections of the same statute. *Id.* That is entirely different from the situation here, where Plaintiffs seek damages under the exact theory that they asserted in their complaint.

██████ Ex. 83 (Lee Reply Rep.) ¶ 18. (Indeed, Defendants' own economist could find only a small handful of errors among nearly twenty million records. Ex. 84 (Hitt Decl.).) This is an almost unparalleled level of accuracy.

Defendants also note that some patients received services from multiple Defendants and are therefore a member of more than one class. This is immaterial: Dr. Lee has testified that ██████ ████████████████████████████████████ *generally* Ex. 83 (Lee Reply Rep.). From there, basic principles of joint and several liability ensure "that the [class member] recover only once for the full amount," even though "each defendant [can be] held liable for the entire amount of the harm." *Honeycutt v. United States*, 581 U.S. 443, 447-48 (2017); *see also, e.g.*, *Erny v. Est. of Merola*, 171 N.J. 86, 98 (2002) ("The law of joint and several liability addresses plaintiff's recovery of damages, and allows plaintiff under certain circumstances to recover the entire amount of damages from any one of several defendants, subject to that defendant's right to seek contribution."). And as discussed throughout this brief, courts frequently grant certification where multiple defendants may be jointly and several liable to class members. *See Modafinil*, 837 F.3d at 262-63.

### c. Defendants' merits-based disagreements with Plaintiffs' damages model do not impact class certification.

Apart from Quest's misplaced statement that Plaintiffs did not plead damages properly and all Defendants' misplaced demand for perfection in the data as a prerequisite to class certification, Defendants' arguments about damages are not really about class certification at all. Rather, they are the argument that Defendants will prevail on *Daubert* or persuade the jury to reject Plaintiffs' expert testimony. This is so because Ms. Worley has testified unambiguously that ██████ ████████████████████████████████████ ██████ *See* Ex. 81 (Worley Reply Rep.) ¶ 9 ████████████

-52-

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ And

none of Defendants' arguments in this section of their briefing do more than argue that they believe

Ms. Worley to be wrong.

### i.    It is irrelevant that some people have personal information available on social media.

LabCorp argues that "[s]everal Plaintiffs made public the same data allegedly affected by

the Cyberattack" so they (and others similarly situated) may be ineligible for damages. LabCorp

Opp. 24. This argument fails in three respects. First, the data that LabCorp says is public is not

nearly as sensitive as the data involved in this breach. LabCorp notes that one Plaintiff disclosed

"on social media his name, addresses, phone number, email address, and date of birth," LabCorp

Opp. 24, but Plaintiffs do not allege that any class member was injured by the exfiltration of such

less sensitive information, without more. Ex. 4 (Worley Decl.) ¶ 169 ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

Second, as discussed above in response to Defendants' argument that many people have

already been the victim of other data breaches, all class members face an incremental danger from

this hack regardless of whether some of the information was already disclosed through other

means. *Cf. Anthem*, 162 F. Supp. 3d at 988 (explaining that defendants cannot escape liability

simply by noting that information was disclosed in previous data breaches).

Finally, the information exfiltrated from AMCA's servers was not only in the same place

for each class member; AMCA also collected class members' information and organized it into

consolidated tables that can be easily sorted, manipulated, and broken out into batches. This would have enabled identity theft and related harms in a way that the publication of the phone book (for instance) does not. Ex. 63 (Strebe Decl.) ¶ 86 ████████████████████████████████

████████████████████████████████

           **ii.**    **Speculation that some class members could have received other products to mitigate their risks does not impact damages in this matter.**

Quest says that "[i]ndividualized inquiry is necessary to determine whether a particular class member obtained or could have obtained free mitigation products and whether those products were sufficiently protective, such that no further mitigation product would be required." Quest Opp. 37. This unsupported speculation has nothing to do with damages in this matter: Plaintiffs' damages model is tailored to remedy the harm each class member suffered from *this* data breach. And as Plaintiffs' expert testified, ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ Ex. 4 (Worley Decl.) ¶ 180; *see also id.* ¶ 187 (noting that ██████████████████

████████████████████████████████████████

██████████████████████████████████████.

As with Defendants' causation arguments, class certification cannot be defeated simply because some class members already purchased or received (or could have received) other identity monitoring in another context. As then-District Judge Koh held correctly: "the fact that data breaches occur all the time, against various private and public entities," does not immunize companies charged with safeguarding confidential information. *Anthem*, 162 F. Supp. 3d at 988.

> ### iii. __The argument that Ms. Worley is wrong is a _Daubert_ argument, not a _Comcast_ argument.__

Finally, Defendants argue that Plaintiffs' damages model does not appropriately apportion damages because of the supposed "varying risk levels" within each tranche, Quest Opp. 37, and failed to consider each class member's "baseline (_i.e._, without the AMCA Cyberattack) level of risk of future harm." _Id._ at 39; _see also_ LabCorp Opp. 25-26. Defendants are flat wrong: as Ms. Worley explains in her reply report, ███████████████████████████████ ███████████████████████████ _See_ Ex. 81 (Worley Reply Rep.) ¶ 13 ████ ████████████████████████████████████ ████████████████████████████████ _see also id._ ¶ 2. ██████████████████████████ █████████████████████████████ ████████████

For present purposes, however, all that truly matters is that this argument is not about "_Comcast_" as Defendants contend. It is instead an argument that Plaintiffs' compensatory damages model "overstates" the damages owed to each class member, which "is a merits argument about the proper amount of damages, not a mismatch between Plaintiffs' damages model and theory of liability." _In re Arris Cable Modem Consumer Litig._, 327 F.R.D. 334, 370 (N.D. Cal. 2018); _see also In re Blood Reagents Antitrust Litig._, 2015 WL 6123211, at *33 (E.D. Pa. Oct. 19, 2015) (granting class certification because "individual proof will predominate in calculating damages" even though defendant challenged "the reliability and fit" of expert's proposed damages methodologies).[33]

---

[33] Notably absent from Defendants' briefing is a single case endorsing their warped view of Rule 23(b)(3). _Cf._ Quest Opp. 36-40; LabCorp Opp. 25-29.

* * *

Plaintiffs have proffered expert testimony that demonstrates, for each class member, the categories of exposed information and the harm caused by that disclosure. Compensating class members for the cost of identity monitoring tailored to limiting the fallout from the exfiltration is a widely recognized method of damages that can be done with a click of a button. *See Accellion*, 2025 WL 2799102, at *13 ("Once a factfinder settles on which categories of data are offensive and which are not (a common issue not depending on individual circumstances), determining injury becomes a 'plug-and-play' exercise in matching up exposed data [] elements to those categories."). Given this, Rule 23(b)(3) is satisfied. Whatever remaining quibbles Defendants may have with the damages model must be resolved through *Daubert* motions or at trial.

### 2. Common questions also predominate for nominal damages.

Plaintiffs also seek nominal damages for their multistate class claim under North Carolina law.[34] "[B]y their nature, nominal damages do not require individualized calculation and, thus, they are consistent with a predominance finding on that score." *Marriott*, 341 F.R.D. at 164; *accord Accellion*, 2025 WL 2799102, at *14. Nominal damages are available to the North Carolina Multistate Negligence Class. *Title Ins. Co. of Minn. v. Smith, Debnam, Hibber & Pahl*, 459 S.E.2d 801, 804 (N.C. Ct. App. 1995) ("In North Carolina, a plaintiff may recover nominal damages in a negligence action."). Thus, in the alternative to the mitigation products damages theory discussed above, common questions relating to damages predominate for the multistate classes proceeding under North Carolina law.

---

[34] Plaintiffs are not pursuing nominal damages under Florida, Minnesota, New Jersey, New York, or Texas law.

### C.    **Common questions predominate for the LabCorp Plaintiffs' consumer protection claims.**

The LabCorp Plaintiffs seek certification of state-specific subclasses under five states' consumer protection statutes.[35] LabCorp violated these statutes for the same reason it is liable for common-law negligence: by failing to safeguard its patients' data, despite an obligation to do so. Thus, for all of the reasons set forth above in the negligence context, common questions predominate for the state subclasses. *See Accellion*, 2025 WL 2799102, at *14 ("The reasons for certifying the [Washington common-law] Subclass apply with equal force to the [Washington Consumer Protection Act] Subclass, so the Court certifies this subclass as well.").

LabCorp says individual questions predominate for certain elements of the state consumer protection subclasses. That is incorrect. First, LabCorp says "Plaintiffs[] must show reliance," but it fails to make any such argument with respect to the KY CPA or MA Chapter 39A. LabCorp Opp. 38 n.34. And it is wrong that the KS CPA requires reliance. *Midland Pizza, LLC v. Sw. Bell Tel. Co.*, 2010 WL 4622191, at *3 (D. Kan. Nov. 5, 2010) ("One of the important distinctions of the [KS CPA] is that reliance upon the deceptive act or practice is not required").[36]

---

[35] These are California's Consumer Legal Remedies Act ("CLRA"), the Kansas Consumer Protection Act ("KS CPA"), the Kentucky Consumer Protection Act ("KY CPA"), the Maryland Consumer Protection Act ("MD CPA"), and the Massachusetts Regulation of Business Practice and Consumer Protection Act ("MA Chapter 93A").

[36] The sole Kansas case LabCorp cites required reliance in the distinct context of affirmative misrepresentations. *Benedict v. Altria Grp., Inc.*, 241 F.R.D. 668, 677 (D. Kan. 2007). LabCorp correctly recognizes that subsequent cases held *Benedict* inapplicable in the omissions context. *See, e.g.*, *Nieberding v. Barnette Outdoor Living, Inc.*, 302 F.R.D. 600, 615 (D. Kan. 2014) ("The Court believes that the holding in *Benedict* is limited to misrepresentation cases and that suits alleging omission of a material fact present questions suited to class actions."). So LabCorp retreats to arguing the KS CPA's causation requirement is equivalent to reliance. LabCorp Opp. 39 n.40. But this "conflation overlooks relevant state law," *Tershakovec v. Ford Motor Co.*, 79 F.4th 1299, 1307 n.4 (11th Cir. 2023) (rejecting this argument with respect to other states' laws), which in the case of the KS CPA does not impose a reliance requirement despite requiring causation.

-57-

Regardless, reliance can be presumed given the undisputed materiality of LabCorp's omissions regarding its deficient data security practices. LabCorp says Plaintiffs are not entitled to a classwide presumption of reliance because some Plaintiffs and class members may not have read or been given LabCorp's privacy policy, but "in omissions cases, Plaintiffs need not plead that they actually viewed a specific [representation] to satisfy this [reliance] prong." *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018).

LabCorp also argues that the individualized inquiries will be required to demonstrate violation of the KY CPA and MA CPA. The KY CPA prohibits "[u]nfair, false, misleading, or deceptive acts or practices." Ky. Rev. Stat. § 367.170(1). These words are susceptible to a generally understood meaning, *Dare To Be Great, Inc. v. Com. ex rel. Hancock*, 511 S.W.2d 224, 227 (Ky. Ct. App. 1974), and courts generally apply them using an "objective" standard, *Craig & Bishop, Inc. v. Piles*, 2005 WL 3078860, at *4 (Ky. Ct. App. Nov. 18, 2005) (citing *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 131 (Ky. Ct. App. 1998)), *aff'd in relevant part, rev'd in part on other grounds*, 247 S.W.2d 897 (Ky. 2008). Likewise, MA Chapter 93A prohibits "unfair or deceptive acts or practices." Mass. Gen. Laws ch. 93A, § 2(a). This, too is, an "objective" standard. *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 486 (Mass. 2004). Objective consumer protections elements like this are well suited to adjudication on a classwide basis, without regard to the supposed individual, subjective elements LabCorp points to. *See Carriuolo v. Gen. Motors Corp.*, 823 F.3d 977, 986 (11th Cir. 2016). Even if LabCorp is right that the level of conduct under these laws must be "grossly negligent" or something similar, it does not identify any case law saying such a heightened standard is no longer an objective test (nor are Plaintiffs aware of any). Because the jury will be able to determine, in one fell swoop as to all class members, whether LabCorp's

-58-

uniform conduct rose to the level needed to violate the KY CPA and MA Chapter 93A, common questions predominate for these statutes too.

**V.      Class treatment is the superior method for resolving these claims.**

The final Rule 23(b)(3) requirement is that a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To determine superiority, a court considers: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any ligation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and, (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). All these factors are satisfied here. Quest Mot. 29-31; LabCorp Mot. 41-44; Sonic Mot. 32-34.

**A.      All of the Rule 23(b)(3) superiority factors are met.**

*First*, "[g]iven the size of the claims, individual class members have virtually no interest in individually controlling the prosecution of separate actions." *Savidge*, 727 F. Supp. 3d at 708; *accord Accellion*, 2025 WL 2799102, at *15; *see also Hacker v. Elec. Last Mile Sols. Inc.*, 722 F. Supp. 3d 480, 497 (D.N.J. 2024) (claims are "especially well-suited for class resolution" when they "otherwise . . . would likely not . . . be brought at all").

*Second*, "numerous putative class action lawsuits based on the same facts and containing substantively identical claims have already been filed against Defendants, [and] the Judicial Panel on Multidistrict Litigation has seen fit to consolidate the handling of those common claims in this Court." *Marriott*, 341 F.R.D. at 165. These facts "favor[] a consolidated disposition generally." *Id.* at 165-66.

*Third*, "the difficulties that would necessarily be presented by thousands upon thousands of individual actions far outweigh any difficulties the Court may encounter in managing a class

action in this case." *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 162 (D.S.C. 2018). In other words, "[a] class action is the only realistic way Plaintiffs' claims can be adjudicated. Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Id.*

**Fourth**, this case is manageable as a class action because the claims turn on entirely common questions that will be resolved with classwide proof. *Marriott*, 341 F.R.D. at 166-67 (manageability factor satisfied when common questions predominate). Contrary to Defendants' contention (LabCorp Opp. 41), there is no "*Lexecon*" problem here because Plaintiffs do not dispute that the Court will presumptively remand all cases against LabCorp to their transferor districts at the conclusion of pretrial proceedings.[37] *See* 28 U.S.C. § 1407(a). The Court has ample options for how best to effectuate that process, including by staggering the remand of these actions so that there are not overlapping class trials occurring at the same time (as discussed in further detail below in Part VIII).[38]

Under these circumstances, superiority is present.

### B. Defendants' recycled superiority arguments fail.

By and large, Defendants' superiority challenges parrot their objections to predominance. Quest Opp. 19 n.8; Optum Opp. 42; LabCorp Opp. 40-41. And "[t]hat is not a superiority argument." *Accellion*, 2025 WL 2799102, at *14; *see also Marriott*, 341 F.R.D. at 166-67. In any event, common questions predominate, so this objection is off base. Likewise, LabCorp's argument that there are "numerous, subtle distinctions between each state's negligence laws,"

---

[37] As noted above, all of the cases brought by putative class representatives against Quest, Optum, and Sonic were filed directly into this District.

[38] Plaintiffs do not propose the Court remand cases other than to the districts where the named Plaintiffs originally filed them. *Contra* LabCorp Opp. 42.

LabCorp Opp. 41, has nothing to do with superiority. (It's also wrong: as discussed above, only one state's law applies to any class, and it would not matter if it were otherwise both because the distinctions among state negligence laws do not matter in a data breach, *see Premera*, 2019 WL 3410382, at *16 n.4, and because the court could simply create single-state classes if it did.)

Optum also claims superiority is not satisfied because some class members may have had their data stored in AMCA's servers through interactions with multiple Defendants. Optum Opp. 42. Optum's argument here is unclear: the fact that certain Defendants are jointly and severally liable to some Plaintiffs does not somehow impact superiority: class treatment of such claims is quite common. *See, e.g.*, *Modafinil*, 837 F.3d at 262-63 (common questions predominated for class damages theory premised on joint and several liability); *Resolution Tr. Corp. v. KMPG Peat Marwick*, 1992 WL 245705, at *4 (E.D. Pa. Sept. 23, 1992) (joint and several liability "ensures that common questions of law predominate over any questions affecting only individual members"). Here, as discussed above, common evidence will demonstrate which class members' data was exfiltrated due to which Defendant's (or Defendants') negligence. To the extent some class members have claims against multiple Defendants, they are entitled to recover against any of those Defendants, and there is no risk of "double recovery" because common evidence indicates clearly which class members have claims against multiple labs.[39]

---

[39] The multidistrict character of these proceedings aids, not undermines, superiority. Six years ago, LabCorp (along with all other Defendants) "support[ed] centralization of all actions in a single multi-defendant MDL in the District of New Jersey." *In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, 410 F. Supp. 3d 1350, 1352 (J.P.M.L. 2019). Since then, these actions have proceeded on a coordinated basis, with Plaintiffs serving streamlined master complaints to which each Defendant served a single answer. LabCorp errs by arguing that the consolidated nature of these proceedings weighs against class certification.

**VI.    Class membership is ascertainable.**

As Plaintiffs explained in their class certification motions, the proposed classes satisfy Rule 23's implied ascertainability requirement because they are defined by objective criteria: people who were notified that their personal information was exposed to threat actors. This is particularly so given that Defendants have already identified them through the sending of the breach letters. *See Lewis*, 98 F.4th at 462 ("[A] straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources").

Defendants lodge two challenges that implicate ascertainability. First, they dispute the propriety of defining class membership based on who received a letter notifying them of the breach. LabCorp Opp. 15; Sonic Opp. 25. By definition, these letters did not merely inform Defendants' patients of whose "information *might* have been affected." LabCorp Opp. 15. Defendants sent these letters to all of their patients whose data was stored on AMCA's servers, and as Plaintiffs explained above, all of the patient information stored with AMCA was exfiltrated.

Sonic points to Plaintiff Tonda Tate, who received a notice letter, and attempts to use as a "gotcha" the fact that her claims were initially dismissed from the lawsuit. Sonic Opp. 25. Sonic neglects to mention that Ms. Tate's claims were later reinstated, *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2023 WL 8540911, at *3 (D.N.J. May 5, 2023) (denying renewed motion to dismiss on standing grounds), and she has standing for the same reason as everybody else whose data was exfiltrated. And unlike in the cases Sonic cites, where class membership was to be based on class member affidavits, Sonic Opp. 25, the class membership criterion in this case is not self-declaration, but an objective list of affected patients that Defendants themselves compiled.

## VII.    The injunctive relief class satisfies Rule 23(b)(2).

Plaintiffs also seek certification under Rule 23(b)(2), which provides that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Here, Plaintiffs seek classwide injunctive relief to require Defendants to build and implement an effective risk management program with independent third-party oversight, in order to protect their patients and future patients—a category that includes Plaintiffs—from future harm. Quest Mot. 31; LabCorp Mot. 45; Sonic Mot. 35-36. Defendants insist they did nothing wrong. But their failure to oversee AMCA can and will be replicated again, since Defendants continue to

███████████████████████████████████████████████████████

███████████████████████. Defendants' insistence that the existence of a BAA with a vendor satisfies their obligation to protect their patients' information underscores the need for prospective, ongoing relief. *See generally* Ex. 85 (Miller Decl.); *see also* LabCorp Opp. 4 n.2 (arguing that LabCorp satisfies its oversight obligations simply by entering a BAA with a vendor).

"[T]o merit certification under section (b)(2), Plaintiffs must show that [Defendants'] conduct or refusal to act is 'generally applicable' to the class and that the relief they seek is primarily injunctive." *Rowe v. E.I. DuPont De Nemours & Co.*, 262 F.R.D. 451, 457 (D.N.J. 2009). Plaintiffs must also "demonstrate . . . cohesiveness among the class members," as exemplified by whether the elements of the claims "are capable of proof through evidence that is common to the class rather than individual to its members." *Id.* at 457, 458 n.3. "The key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360. These requirements are satisfied here.

**A.**    **The class shares uniform exposure to Defendants' inadequate security practices.**

As explained above, every class member's data passed through the same vulnerable vendor with inadequate safeguards. The database was accessed and exfiltrated, exposing everyone's data equally. This uniform exposure to Defendants' systemic security failures creates the cohesiveness Rule 23(b)(2) requires. All members faced identical inadequate security policies and share the same risk from Defendants' continuing vendor oversight failures.

Data breach cases differ fundamentally from mass tort cases where individualized exposure may determine who needs relief. Unlike toxic exposure cases where some plaintiffs lack sufficient exposure to trigger risk, no class member escaped the breach. In *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), the court could not find all class members faced "significant risk" without considering "individual characteristics and medical histories." *Id.* at 268-69. Indeed, the court observed that medical monitoring cases like that one "often require individual proof," such as for "causation." *Id.* at 264. Not so here. Similarly, *Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998), involved plaintiffs exposed to different products for different amounts of time, in different ways, with individualized issues of addiction, causation, and affirmative defenses. *Id.* at 143.

**B.**    **Defendants' ongoing data practices create continuing risk requiring prospective relief that will benefit all class members equally.**

Defendants collect and share patient data daily through the same vendor relationships that enabled the AMCA breach. Defendants still possess class members' data, rely on vendors, and refuse independent oversight of their safeguards. Given these ongoing relationships and the attendant risk of harm to class members' private information, Plaintiffs seek an order requiring that Defendants create and maintain proper vendor risk management ("VRM") programs and engage an independent monitor with expertise in HIPAA privacy and VRM compliance to ensure

they are fulfilling their legal obligations. Without such court-ordered reforms, the systemic vulnerabilities in Defendants' systems will persist.

This injunctive relief would benefit every class member equally. Every member gains equal protection from enhanced security measures ensuring their data will not be entrusted to substandard contractors like AMCA. Whether some members already experienced identity theft is irrelevant. All benefit equally from preventing future breaches.

The medical context makes injunctive relief particularly appropriate. Health care isn't optional, and Defendants dominate the medical testing industry nationwide. Patients cannot "opt out" of necessary medical care where Defendants operate. Many class members will inevitably need Quest's (or LabCorp's or Sonic's) services again, whether directly or through their providers. Quest Mot. 31 (noting certain plaintiffs' intent to continue using Quest's services). This is not *McNair v. Synapse Grp. Inc.*, 672 F.3d 213 (3d Cir. 2012), where plaintiffs were no longer customers and did not "intend to subscribe again." *Id.* at 224; *see also Berni v. Barilla S.P.A.*, 964 F.3d 141, 147-48 (2d Cir. 2022) (past purchaser of pasta).

Defendants' assertion that AMCA is defunct misses the point. Optum Opp. 49; LabCorp Opp. 48. Separate from AMCA's own wrongdoing or status as a going concern, Defendants breached their independent duties to safeguard their patients' personal information. Defendants will continue to hold patient data and may seek to transfer it to other vendors for collection or related purposes. Unlike *In re Blackbaud, Inc., Customer Data Breach Litigation*, 2024 WL 5247287 (D.S.C. Dec. 30, 2024), where the defendant "agreed to extensive other voluntary measures with state and federal regulators" and no class member's data remained at risk, *id.* at *11, Defendants here continue to insist they did nothing wrong. And in *Marriott*, the court denied Rule 23(b)(2) certification because the plaintiffs did not "offer the basic contours of the [requested]

-65-

injunctive and declaratory relief." 341 F.R.D. at 171. Here, by contrast, Plaintiffs have described their proposed injunction with specificity and explained how it will benefit all class members, even if AMCA is out of business.

### C. The injunctive relief operates independently from any damages claim.

Finally, courts can "certify *both* a (b)(2) class for the portion of the case concerning injunctive and declaratory relief *and* a (b)(3) class for the portion of the case requesting monetary damages." William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4:38 (6th ed. June 2025 update) (emphasis added). Although Rule 23(b)(2) does not permit certification of claims for monetary damages, *see, e.g.*, *Trunzo v. Citi Mortg.*, 2014 WL 1317577, at *6 (W.D. Pa. Mar. 31, 2014) (citing *Dukes*, 564 U.S. at 360), that concern does not exist here because Plaintiffs' proposed injunction would remedy entirely different harm from the monetary relief they seek to certify under Rule 23(b)(3). That was not the case in *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, 2021 WL 3612155 (3d Cir. Aug. 16, 2021), where the plaintiffs sought to enjoin the defendants from selling and marketing a product they (and class members) had already purchased. *Id.* at *5. Here, by contrast, Defendants' continued inaction, combined with their ongoing possession of Plaintiffs' sensitive information, puts all class members at an ongoing risk of recurring harm.

### VIII. A bellwether approach is the most efficient way to resolve this multidistrict litigation.

This MDL concerns one of the largest medical data breaches ever. Defendants are the nation's leading medical testing laboratories, handling the sensitive medical information of millions of citizens every year. Determining their liability for what Plaintiffs allege to be egregious breaches of their cybersecurity obligations is of obvious importance.

The volume of briefing and expert reports before the Court reflects that import. But the volume of paper is deceiving. The core issues Defendants poke at in opposition to Plaintiffs' motions for class certification (principally standing) are, in actuality, resolved in the same

straightforward manner for each proposed class. None of them present substantive impediments to the certification of national/multistate classes or alternative single-state classes. But there is still a lot of paper on the Court's plate. So, from Plaintiffs' perspective, the threshold question is, what is the best case-management technique to most efficiently move this MDL forward?

Plaintiffs suggest that this court, like other MDL courts, use a bellwether approach by picking a single track's set of motions and deciding those first. Decisions on those motions would provide obvious insight and guidance as to the Court's thinking vis-à-vis the other tracks without necessitating immediate separate decision on those tracks' related and similar motions. Quest is the most logical choice for such an approach since Quest is located in New Jersey and a trial of claims against Quest present no remand or potential *Lexecon* issues.

Most importantly, the underlying liability and damage issues driving the Quest track's negligence claims are essentially the same across each defendant track. Put simply, a decision as to one track will surely provide invaluable guidance to the other tracks. This approach has been successfully employed in both data breach MDLs (*Fortra* as to the issue of standing),[40] and other more complex MDLs such as opioids (bellwether trials).[41] It is the approach Plaintiffs suggest here to craft the most efficient path forward toward trial or settlement.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to grant their motions for class certification.

---

[40] *In re Fortra File Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240, 1254 (S.D. Fla. 2024) (case divided into four defendant-by-defendant "tracks" with staggered motion practice, including on standing).

[41] *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio June 2, 2020) (Dkt. 3315) (order addressing several bellwether trial cases, bifurcating certain claims and ordering a consolidated trial on certain common claims).

-68-

DATED: October 22, 2025

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**


By: */s/ James E. Cecchi*

James E. Cecchi
5 Becker Farm Road
Roseland, NJ 07068
(973) 994.1700
jcecchi@carellabyrne.com

*Interim Lead Counsel for Plaintiffs*


Jason L. Lichtman
Sean A. Petterson
Gabriel A. Panek
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson St., 8th Floor
New York, NY 11013
(212) 355-9500

Norman E. Siegel
J. Austin Moore
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd., Ste. 200
Kansas City, MO 64112
(816) 714-7100

Christopher A. Seeger
Christopher Ayers
**SEEGER WEISS, LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100

*Quest Track Co-Lead Counsel*


Stuart A. Davidson
**ROBBINS GELLER RUDMAN & DOWD LLP**
225 NE Mizner Boulevard, Suite 720

Boca Raton, FL 33432
(561) 750-300

Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas
31st Floor
New York, NY 10036
(917) 438-9189

*LabCorp Track Co-Lead Counsel*


Joseph J. DePalma
Catherine B. Derenze
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

Justin J. Hawal
Amy E. Keller
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900

*Other Labs Track Co-Lead Counsel*

-69-

**Appendix 1: Other choice of law tests relevant to LabCorp**

LabCorp points out that several states in the North Carolina Multi-State Negligence Class apply slightly different tests than the most significant relationship test. But those tests still lead to the application of North Carolina law, making them properly placed into this class. Plaintiffs summarize those states and their relevant choice of law tests here.

### 1.     California, DC, New York: Government-Interest Test

California, the District of Columbia, and New York apply the "government-interest" test, which asks "which forum has the most significant contacts with the facts and parties," i.e. "which forum has a greater interest in having its policies, as reflected in the relevant law, applied?" *Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit & Tr. Co.*, 466 F. Supp. 1133, 1146 (S.D.N.Y. 1979); *accord Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, 2024 WL 4239936, at *4 (D.D.C. Sept. 19, 2024) (in data breach case, asking which is the jurisdiction with the most significant relationship to the dispute); *Int'l Petrol. Prods. & Additives Co. v. Black Gold S.A.R.L.*, 2021 WL 7448611, at *11 (N.D. Cal. Oct. 7, 2021) (where "significant interests" of two fora conflict, California law applies the law of "the state whose policies would suffer the most were a different state's law applied").

In the "unique" data breach context, the law of the state with the greatest relationship with the breaching defendant will apply under this analysis. For instance, in *Mednax*, the district court applied California's government-interest test and applied Florida law, since that is "where the data was maintained, multiple Defendants are domiciled, and Defendants' security protocols allegedly broke down." 603 F. Supp. 3d at 1199. The *Keown* court, applying D.C. law, similarly applied D.C. law where the defendant was headquartered in the District and thus "decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the Data Breach" occurred there. 2024 WL 4239936, at *6. Those same factors clearly favor

application of North Carolina law to LabCorp, which is headquartered there and made all relevant decisions relating to the decision to entrust its patients' sensitive information to AMCA there.

### 2.      Arkansas, Minnesota, North Dakota, Rhode Island, Wisconsin: Choice-Influencing Factors

Minnesota and Wisconsin apply the "choice-influencing" factors, which require the court to weigh "the predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law." *Waranka v. Wadena Ins. Co.*, 847 N.W.2d 324, 332 (Wis. 2014); *accord Sigler v. Ecolab, Inc.*, 625 F. Supp. 3d 789, 800 (D. Minn. 2022). Arkansas, North Dakota,[42] and Rhode Island also apply the choice-influencing factors, but they additionally require consideration of "which State has the most significant relationship to the action and the parties," i.e. the most significant relationship test. *See Shelby Cnty. Health Care Corp. v. S. Farm Bureau Cas. Ins. Co.*, 855 F.3d 836, 842 (8th Cir. 2017) (Arkansas); *Polensky v. Cont'l Cas. Co.*, 397 F. Supp. 2d 1164, 1169 (D.N.D. 2005); *Harodite Indus., Inc. v. Warren Elec. Corp.*, 24 A.3d 514, 534 (R.I. 2011).

The choice-influencing factors lead to the application of North Carolina law. First, because "[t]his case is not an ordinary 'accidental' tort case, like a car accident, but rather a negligence claim focusing on the decision-making conduct of [LabCorp] and its data security employees" and "[a]ll of [LabCorp's] relevant information security employees and decision-making are located in" North Carolina, "[i]t is predictable that [North Carolina] law would apply." *Greenstate Credit Union v. Hy-Vee, Inc.*, 549 F. Supp. 3d 969, 977-78 (D. Minn. 2021) (applying law of defendant's home state in data breach litigation). The second factor "heavily favors" North Carolina law

---

[42] Plaintiffs agree with LabCorp that North Dakota belongs in the North Carolina Multi-State Negligence Class.

because LabCorp "made its information security decisions in" North Carolina, "its information technology and security employees are all in" North Carolina, and "[t]he actions and omissions by [LabCorp] giving rise to [Plaintiffs'] claims—its data security decision-making and the actions of the information technology department—are based in" North Carolina." *Id.* at 978. The third factor is neutral given that "the competing laws are straightforward and the courts' interpretations of them are adequate to provide the guidance a trial court might wish to have." *See Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 8 (Minn. Ct. App. 2003). Fourth, North Carolina's "interest in having [LabCorp] comply with its own tort principles governing cybersecurity is greater than the interest of each Plaintiff's home state in seeing their residents compensated for injuries allegedly caused by a foreign corporation's misconduct." *See MOVEit*, 2025 WL 2176590, at *6-7 (applying defendant's home state's law to Minnesota plaintiffs' data breach claims because the place of a "defendant's domicile 'becomes more important' than the place of injury"). Finally, because factors one, two, and four point decidedly towards the application of" North Carolina law, the Court need not address the fifth factor. *See Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 621-22 (8th Cir. 2001) ("Courts often refrain from resolving a conflict of law question based on the better rule of law factor . . . ."); *Greenstate*, 549 F. Supp. 3d at 977 (fifth factor "not relevant").

### 3.     Oregon's Statutory Framework

Under Oregon's statutory framework, "where neither party is domiciled in the same state and the injurious conduct and injury occurred in different states, the law of the state of conduct governs unless it was both (1) foreseeable that the conduct would cause an injury in the state of injury and (2) 'the injured person formally requests the application of the state's law in a pleading.'" *R.M. v. Am. Airlines, Inc.* 338 F. Supp. 3d 1203, 1211-12 (D. Or. 2018) (citing Or. Rev. Stat. § 15.440(3)). Here, pursuant to the analysis above, the injurious conduct clearly

occurred in North Carolina, and the second exception is inapplicable since Plaintiffs do not request the application of Oregon law. Accordingly, North Carolina law governs Plaintiffs' claims.

### 4.    Michigan and Kentucky: Significant Contacts

Michigan, like other states that apply the most significant relationship test, presumes its law applies "unless another state has a greater interest in having its laws apply." *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 968 (E.D. Mich. 2022). The factors governing that analysis are identical to the most significant relationship test. *Id.* Thus, North Carolina law applies, since it has the most significant relationship with the claims at issue.

Kentucky uses a similar test, which asks "if there are significant contacts—not necessarily the most significant contacts—with Kentucky." *Eakes v. Caudill*, 655 F. Supp. 3d 616, 621 (E.D. Ky. 2023). But as discussed above, any contacts with Kentucky in this case were purely "coincidental," and the contacts with New Jersey were far more "significant." *Custom Prods., Inc. v. Fluor Daniel Can., Inc.*, 262 F. Supp. 2d 767, 773 (W.D. Ky. 2003); *see Veridian*, 295 F. Supp. 3d at 1153 ("[T]he location of the alleged harm was fortuitous, and the place of injury does not play an important role in the court's choice of law analysis here.").