# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To: *Quest/Optum360 Track* | Civil No. 2:19-md-02904-JKS-MAH<br><br>Judge Jamel K. Semper |

## <u>OPTUM360, LLC'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 5

III.   ARGUMENTS AND CITATIONS TO AUTHORITY ..................................... 7

       A.    Plaintiffs Bear the Burden of Satisfying Rule 23's Requirements ............... 7

       B.    Plaintiffs Do Not Satisfy Rule 23(b)(3)'s Requirements. ........................... 7

             1.    Plaintiffs Cannot Prove that Common Issues Predominate. ............... 8

                   a.    There Is No Common Evidence that Putative Class Members'
                         Information Was Accessed or Exfiltrated. ............................... 9

                   b.    Individual Questions of Article III Standing Preclude
                         Certification. ....................................................................... 18

                   c.    Variations in State Law Preclude Certification of Plaintiffs' Proposed
                         Nationwide Class. ................................................................ 21

                         (i)    Plaintiffs' Failure to Perform the Required "Extensive
                                Analysis" Precludes Certification of a Nationwide Class ....... 22

                         (ii)   New Jersey's Choice of Law Rules Do Not Lead to the
                                Nationwide Application of New Jersey Law. ....................... 23

                         (iii)  Application of New Jersey Law to Optum360 Violates Due
                                Process. .................................................................... 27

                   d.    Individualized Liability and Damages Issues Predominate and
                         Preclude Class Certification. ................................................. 28

                         (i)    Plaintiffs' Bare Assurances Do Not Establish that Plaintiffs'
                                Negligence-Based Claims Can Be Proven with Common
                                Evidence. .................................................................. 28

                         (ii)   Plaintiffs' Experts Do Not Establish Common Evidence of
                                Injury and Proximate Causation. ..................................... 29

                         (iii)  Plaintiffs' Damages Model is Inconsistent with the Injury
                                Theories Remaining in the Case. ..................................... 35

                         (iv)   Plaintiffs Cannot Rely on Their Request for Nominal
                                Damages. .................................................................. 37

                         (v)    Individualized Evidence is Required to Prove the California
                                Subclass's CMIA Claim. ............................................... 37

             2.    Plaintiffs Have Not Established Superiority. ................................. 41

       C.    Plaintiffs Fail to Meet the Rule 23(a) Requirements ................................ 43

             1.    Plaintiffs' Proposed California Subclass is Not Ascertainable. ......... 43

2. Plaintiffs Cannot Establish Typicality or Adequacy. ........................................45

    a. Plaintiffs Fail to Establish Typicality....................................................45

    b. Plaintiffs Fail to Establish Adequacy....................................................46

3. Plaintiff Klein Fails to Establish Typicality or Adequacy for the California Subclass...........................................................................................................47

D. Plaintiffs Do Not Satisfy the Requirements for a Rule 23(b)(2) Class. ........................48

IV. CONCLUSION ............................................................................................................50

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*,
  2021 WL 3612155 (3d Cir. Aug. 16, 2021)................................................................................50

*Adkins v. Facebook, Inc.*,
  424 F. Supp. 3d 686 (N.D. Cal. 2019).....................................................................................37

*In re Am. Fin. Res., Inc. Data Breach Litig.*,
  2023 WL 3963804 (D.N.J. Mar. 29, 2023) ..............................................................................23

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................................................................8

*Arch v. Am. Tobacco Co.*,
  175 F.R.D. 469 (E.D. Pa. 1997)...............................................................................................43

*Attias v. CareFirst, Inc.*,
  344 F.R.D. 38 (D.D.C. 2023) ...................................................................................................35

*Attias v. CareFirst, Inc.*,
  346 F.R.D. 1 (D.D.C. 2024) .....................................................................................................37

*Beck v. Maximus, Inc.*,
  457 F.3d 291 (3d Cir. 2006).....................................................................................................48

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
  2024 WL 2155221 (D.S.C. May 14, 2024)...............................................................................45

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
  2024 WL 5247287 (D.S.C. Dec. 30, 2024) ................................................................................9

*Blood v. Labette Cnty. Med. Ctr.*,
  2022 WL 11745549 (D. Kan. Oct. 20, 2022) ...........................................................................20

*Bond v. Johnson & Johnson*,
  2021 WL 6050178 (D.N.J. Dec. 21, 2021) ..................................................................23, 25, 26

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996)......................................................................................................43

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..................................................................................................................18

*Comcast Corp. v Behrend*,
  569 U.S. 27 (2013)........................................................................................................ 7, 8, 36

*Cordoba v. DIRECTV, LLC,*
    942 F.3d 1259 (11th Cir. 2019) ...................................................................................19

*DiPierro v. Fla. Health Scis. Ctr., Inc.,*
    737 F. Supp. 3d 1314 (M.D. Fla. 2024)......................................................................20

*Doe v. Kaiser Found. Health Plan, Inc.,*
    2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) ............................................................44

*Doe v. Lyft, Inc.,*
    756 F. Supp. 3d 1110 (D. Kan. 2024) ........................................................................23

*Doe v. Regents of Univ. of Cal.,*
    672 F. Supp. 3d 813 (N.D. Cal. 2023)........................................................................40

*Dzielak v. Whirlpool Corp.,*
    2017 WL 6513347 (D.N.J. Dec. 20, 2017) .................................................................22

*Feit v. Great-W. Life & Annuity Ins. Co.,*
    2007 WL 275980 (D.N.J. Jan. 26, 2007) ....................................................................17

*Fenwick v. Ranbaxy Pharms., Inc.,*
    353 F. Supp. 3d 315 (D.N.J. 2018) ............................................................................22

*Ferreras v. Am. Airlines, Inc.,*
    946 F.3d 178 (3d Cir. 2019) ....................................................................................1, 7

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,*
    174 F.R.D. 332 (D.N.J. 1997)........................................................................22, 23, 41

*Franco v. Conn. Gen. Life Ins. Co.,*
    299 F.R.D. 417 (D.N.J. 2014)....................................................................................37

*Gardner v. Health Net Inc.,*
    2010 WL 11579028 (C.D. Cal. Sept. 13, 2010) .........................................................45

*Garrett v. Young,*
    109 Cal. App. 4th 1393 (2003) ..................................................................................48

*Gates v. Rohm & Haas Co.,*
    655 F.3d 255 (3d Cir. 2011) ......................................................................................49

*Ginsberg ex rel. Ginsberg v. Quest Diagnostics, Inc.,*
    441 N.J. Super. 198 (App. Div. 2015) ........................................................................25

*Green-Cooper v. Brinker Int'l, Inc.,*
    73 F.4th 883 (11th Cir. 2023) ....................................................................................18

*Greenstein v. Noblr Reciprocal Exch.*,
   585 F. Supp. 3d 1220 (N.D. Cal. 2022)................................................................20

*Gutierrez v. Johnson & Johnson*,
   467 F. Supp. 2d 403 (D.N.J. 2006) .......................................................................46

*Harnish v. Widener Univ. Sch. of L.*,
   833 F.3d 298 (3d Cir. 2016) .................................................................................36

*Hayes v. Playtex Fam. Prods. Corp.*,
   168 F.R.D. 292 (D. Kan. 1996)............................................................................23

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013) ........................................................................... 43, 44

*Huber v. Simon's Agency, Inc.*,
   84 F.4th 132 (3d Cir. 2023)....................................................................... 18, 19, 21

*Huddell v. Levin*,
   537 F.2d 726 (3d Cir. 1976) ..................................................................................17

*In re Hum. Tissue Prods. Liab. Litig.*,
   2010 WL 743922 (D.N.J. Mar. 2, 2010)...............................................................46

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ..............................................................................8, 41

*Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.*,
   2014 WL 3578748 (D.N.J. July 18, 2014).............................................................37

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   2024 WL 111069 (D.N.J. Jan. 10, 2024)...............................................................23

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004) .............................................................................21

*In re LifeUSA Holding Inc.*,
   242 F.3d 136 (3d Cir. 2001)..................................................................................41

*In re Lincoln Nat'l COI Litig.*,
   620 F. Supp. 3d 230 (E.D. Pa. 2022)....................................................................47

*Looper v. Cook Inc.*,
   20 F.4th 387 (7th Cir. 2021) .................................................................................23

*Mann v. TD Bank, N.A.*,
   2010 WL 4226526 (D.N.J. Oct. 20, 2010)............................................................41

*Marcus v. BMW of N.A., LLC,*
    687 F.3d 583 (3d Cir. 2012) ........................................................................................... 41, 45

*Mays v. Tenn. Valley Auth.,*
    274 F.R.D. 614 (E.D. Tenn. 2011) ........................................................................................46

*McCombs v. Delta Grp. Elecs., Inc.,*
    676 F. Supp. 3d 1064 (D.N.M. 2023) ...................................................................................20

*McGlenn v. Driveline Retail Merch., Inc.,*
    2021 WL 165121 (C.D. Ill. Jan. 19, 2021) ...........................................................................35

*McNair v. Synapse Grp. Inc.,*
    672 F.3d 213 (3d Cir. 2012) ...................................................................................................49

*Mielo v. Steak 'n Shake Operations, Inc.,*
    897 F.3d 467 (3d Cir. 2018) ........................................................................................... 28, 29

*Miller v. Eagle Pharms., Inc.,*
    2024 WL 3858124 (D.N.J. Aug. 19, 2024) ...........................................................................45

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    259 F.3d 154 (3d Cir. 2001) ...................................................................................................42

*Norwood v. Raytheon Co.,*
    237 F.R.D. 581 (W.D. Tex. 2006) .........................................................................................23

*Oetting v. Heffler,*
    2015 WL 9190629 (E.D. Pa. Dec. 17, 2015) ......................................................................37

*Opperman v. Path, Inc.,*
    2016 WL 3844326 (N.D. Cal. July 15, 2016) ......................................................................37

*In re Paoli R.R. Yard PCB Litig.,*
    113 F.3d 444 (3d Cir. 1997) ...................................................................................................43

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985) ................................................................................................................27

*Powers v. Lycoming Engines,*
    328 F. App'x 121 (3d Cir. 2009) ..........................................................................................22

*In re Premera Blue Cross Customer Data Sec. Breach Litig.,*
    198 F. Supp. 3d 1183 (D. Or. 2016) .....................................................................................40

*In re Processed Egg Prods. Antitrust Litig.,*
    312 F.R.D. 124 (E.D. Pa. 2015) ...........................................................................................42

*Quiles v. Wal-Mart Stores, Inc.*,
   2020 WL 1969940 (D.N.J. Apr. 24, 2020) ..................................................................7

*Reilly v. Ceridian Corp.*,
   664 F.3d 38 (3d Cir. 2011) ..................................................................18

*Reinig v. RBS Citizens, N.A.*,
   912 F.3d 115 (3d Cir. 2018) ..................................................................2, 7, 8

*In re Rhone-Poulenc Rorer Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ..................................................................43

*S. Indep. Bank v. Fred's, Inc.*,
   2019 WL 1179396 (M.D. Ala. Mar. 13, 2019) ..................................................................35

*Salem Grp. v. Oliver*,
   128 N.J. 1 (1992) ..................................................................32

*Savidge v. Pharm-Save, Inc.*,
   727 F. Supp. 3d 661 (W.D. Ky. 2024) ..................................................................34

*In re Schering Plough Corp. ERISA Litig.*,
   589 F.3d 585 (3d Cir. 2009) ..................................................................45, 48

*In re Sonic Corp.*,
   2020 WL 6701992 (N.D. Ohio Nov. 13, 2020) ..................................................................34, 35

*In re Sonic Corp.*,
   2021 WL 6694843 (6th Cir. Aug. 24, 2021) ..................................................................34

*Spence v. Glock, Ges.m.b.H.*,
   227 F.3d 308 (5th Cir. 2000) ..................................................................22

*Stasi v. Immediata Health Grp. Corp.*,
   501 F. Supp. 3d 898 (S.D. Cal. 2020) ..................................................................40

*Stromberg v. Midland Funding, LLC*,
   2024 WL 1673360 (D.N.J. Apr. 18, 2024) ..................................................................19

*Sutter Health v. Super. Ct.*,
   227 Cal. App. 4th 1546 (2014) ..................................................................38

*P.V. ex rel. T.V. v. Camp Jaycee*,
   197 N.J. 132 (2008) ..................................................................24

*Tasion Commc'ns, Inc. v. Ubiquity Networks, Inc.*,
   308 F.R.D. 630 (N.D. Cal. 2015) ..................................................................47

*Theus v. Brinker Int'l, Inc.*,
    2025 WL 1786346 (M.D. Fla. June 27, 2025) ..............................................................30, 31, 35

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).......................................................................................................................18

*In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*,
    2019 WL 2521958 (D.N.J. June 18, 2019).................................................................................36

*Tsao v. Captiva MVP Rest. Partners, LLC*,
    986 F.3d 1332 (11th Cir. 2021) ..................................................................................................18

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
    2021 WL 307486 (D.N.J. Jan. 29, 2021) ...................................................................................27

*Vigil v. Muir Med. Grp. IPA, Inc.*,
    84 Cal. App. 5th 197 (2022)...........................................................................................3, 38, 39

*Vuocolo v. Diamond Shamrock Chems. Co.*,
    240 N.J. Super. 289 (App. Div. 1990) ........................................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).....................................................................................................................8, 49

*Wharton v. Danberg*,
    854 F.3d 234 (3d Cir. 2017) ........................................................................................................28

*Yocham v. Novartis Pharms. Corp.*,
    736 F. Supp. 2d 875 (D.N.J. 2010) ....................................................................................24, 25

**Statutes**

Cal. Civ. Code § 56 *et seq.*....................................................................................................38, 39, 43

Cal. Civ. Code § 1431 ....................................................................................................................42

N.J. Stat. § 2A:15-5.3......................................................................................................................42

**Other Authorities**

45 C.F.R. § 164.308(b)(3)..................................................................................................................5

45 C.F.R. § 164.502(e)(2) .................................................................................................................5

Fed. R. Civ. P. 23 .....................................................................................................................*passim*

Restatement (Second) of Torts § 907 cmt. a (1965) ................................................................37

# I.     INTRODUCTION

Plaintiffs seek to hold Defendant Optum360, LLC ("Optum360") liable for a criminal cyberattack on Optum360's former debt collection vendor—American Medical Collection Agency ("AMCA," and the "AMCA Cyberattack"). Plaintiffs approach class certification as if it is a foregone conclusion when in fact no court has ever certified a class under similar facts. Rather than proving why this Court should be the first, Plaintiffs attempt to bulldoze their way through the mountain created by Rule 23 with proclamations that this is an "unusually straightforward case" and unsupported assurances that Rule 23's requirements are met. *See* Brief in Support of Quest Plaintiffs' Motion for Class Certification ("Motion" or "Mot.") at 2; *see also id.* at 22.

But to prevail on their Motion, Plaintiffs must do more than proclaim and declare—they must prove by a preponderance of the evidence that Rule 23's requirements are satisfied. *See Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019). Plaintiffs do not come close to carrying their Rule 23 burden. For starters, the foundation upon which Plaintiffs build their Motion is defective. Plaintiffs' claims require proof that their information stored in AMCA's CHAMP database (the only data repository at issue here) was accessed or exfiltrated in the AMCA Cyberattack. And at the class certification stage, Plaintiffs must demonstrate that access or exfiltration can be proven with common evidence, meaning the same evidence Plaintiffs claim proves access or exfiltration for one Plaintiff must prove access or exfiltration for all 11.5 million alleged members of the putative class. Plaintiffs hired an expert, Mary Frantz, in an attempt to generate this evidence, but her analysis is completely flawed and scientifically unreliable as outlined below. But defects aside, ████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████ This is the antithesis of Rule 23 and is just one of the numerous deficiencies highlighting that Plaintiffs' Motion crumbles when Rule 23 is applied with the rigor Supreme Court and Third Circuit precedent demands.

1

*First*, Plaintiffs have not carried their burden of satisfying Rule 23(b)(3)'s predominance requirement. This requirement is met only if the Court is "convinced that the essential elements" of Plaintiffs' claims "are capable of proof at trial through evidence that is common to the class . . . ." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (citation modified). There is no evidence common to the putative classes here that can prove their claims. The opposite is true—each putative class member's claims can only be resolved with individualized, class-member-specific evidence that requires layer upon layer of individualized analysis. More specifically:

- As noted above, there is no common evidence that can prove whether any putative class members' information was accessed or exfiltrated in the AMCA Cyberattack. In many data breach cases there is a single evidentiary source that identifies the individuals whose personal information was accessed or exfiltrated. Here there is no such proof, much less common proof as required by Rule 23. The need for individualized inquiry to determine what, if any, information was accessed or exfiltrated for each putative class member swamps any common issues and precludes a finding of predominance.

- There likewise is no common evidence capable of proving Article III standing, much less the injury, proximate cause, and damages elements of the putative nationwide class's negligence claims. Even if a putative class member could establish access or exfiltration (through individualized evidence to be sure), that is only the beginning of the inquiry, because they then must prove injury—an element that again requires individualized proof. And then, each putative class member must prove that any such injury was proximately caused by the AMCA Cyberattack. Proximate causation cannot simply be presumed in a world in which data breaches are constantly occurring, and Optum360's expert has established ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. A, Decl.

2

of Kristine M. Brown, Ex. 2,[1] Decl. of Matteo Tomasini ("Tomasini") App'x 4.  Indeed, many Plaintiffs acknowledged in their sworn deposition testimony that they have been involved in other data breaches.  Even if a particular putative class member could establish the fact of injury and proximate cause (and this is all but an impossibility on the facts of this case), Plaintiffs' Motion should still be denied because the only damages model Plaintiffs propose is based on a theory of harm that the Court has previously rejected.

- Material variations in state law only compound the individualized issues here.  Plaintiffs' claims against Optum360 have virtually no connection to New Jersey.  Optum360 is a Delaware company with its principal place of business in Minnesota, and Plaintiffs' claims arise from a cyberattack on the systems of AMCA, a now defunct New York company.  Plaintiffs sidestep this issue when they argue that New Jersey law applies nationwide.  But Plaintiffs bear the burden of performing an extensive analysis to show that there are no material variations among the various states' laws, and they do not even attempt to undertake that analysis.  That deficiency alone warrants denial of their Motion.  When choice of law is analyzed properly, it is clear that numerous states' laws will apply, and those laws differ in material respects.

- With respect to the proposed California subclass, Plaintiffs' CMIA claim requires proof that an unauthorized third party actually viewed each putative class member's confidential medical information.  There is no common evidence capable of proving those essential elements across the subclass in one fell swoop.  Indeed, the California Court of Appeals has held the individualized inquiry necessary to prove the actually-viewed element precludes class certification.  *See Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 217–18 (2022).  The same analysis requires denial of class certification here.

---

[1] "Ex. __" refers to an exhibit to the declaration of Kristine Brown unless specifically stated otherwise.

***Second,*** Plaintiffs fail to meet their burden of establishing Rule 23(b)(3)'s superiority requirement for numerous reasons, including:

- The same individualized issues that defeat predominance also demonstrate that resolving class members' claims would devolve into millions of mini-trials and that a class action is therefore not a superior vehicle for adjudicating the putative classes' claims.

- Many putative class members had their information sent to AMCA by more than one Defendant. Plaintiffs do not propose a plan or mechanism for how any liability or damages would be apportioned amongst the Defendants.

- Plaintiffs' proposal to bifurcate the case, with a California jury deciding the CMIA claim, violates Optum360's Seventh Amendment right against re-examination because it would lead to different juries adjudicating Optum360's alleged liability for the same alleged conduct.

Plaintiffs also fail to establish numerous other Rule 23 requirements. For instance, Plaintiffs are not adequate class representatives because, in their bid to certify a class, they jettison numerous theories of harm supposedly experienced by members of the putative class.

***Finally,*** the proposed California subclass suffers from a host of additional problems. To start, the proposed subclass is not ascertainable because there is no reliable and administratively feasible mechanism for determining whether the putative subclass members resided in California at the time of the AMCA Cyberattack, and only those that did can conceivably have standing to assert a CMIA claim. Moreover, the sole named Plaintiff for the subclass, Breanna Klein, suffers from individualized issues that make her an inadequate class representative and her claims atypical. Specifically, the evidence is clear that ███████████████████████████████████████ ██████████████ gutting any argument that this information is confidential under the CMIA. These same facts mean that Klein is subject to unique defenses that further preclude her from representing the proposed subclass.

4

For these reasons and those below, the Court should deny Plaintiffs' Motion.

## II.     **BACKGROUND**



█████████████████████████ *See* Ex. 4, OPTUM360_AMCA_0000111. ████

█████████████████████████ *See id.* █████████████████████████

█████████████████████████ *See id.* █████████████████████████

Ex. 5, OPTUM360_AMCA_0001954. ████████████████████████████

█████████████████████████ Ex. 4, OPTUM360_AMCA_0000111.

Ex. 5, OPTUM360_AMCA_0001954. This is the only diligence of AMCA that Optum360 was required to perform. *See* 45 C.F.R. § 164.502(e)(2); 45 C.F.R. § 164.308(b)(3); Ex. 3, Decl. of Jeffrey B. Miller ¶ 30. ████████████████████████████

███ █ ██████ ████ *See* Ex. 6, OPTUM360_AMCA_0006971; Ex. 7, OPTUM360_AMCA_0006972. ████████████████████████████

█████████████████████████ *See* Ex. 7, OPTUM360_AMCA_0006972 ████████████; Ex. 8, OPTUM360_AMCA_0026938 ████████████

███      Ex. 9, OPTUM360_AMCA_0006991 ███ █████; Ex. 10, OPTUM360_AMCA_0049455 ██████████. Although Plaintiffs take shots at Optum360's diligence, ████████████████████████████



Ex. 11, Dep. of Mary T. Frantz ("Frantz Dep.") at 358:12–359:19, 362:13–19.

*See* Ex. 4, OPTUM360_AMCA_0000111. *Id.*

Ex. 12, OPTUM360_AMCA_0000028. *Id.* *Id.* *Id.*

Ex. 4, OPTUM360_AMCA_0000111.

Plaintiffs have litigated their claims for nearly six years on the unsupported (and incorrect) assumption that all information in AMCA's CHAMP database—the database AMCA used to store patient information and the only one at issue in this litigation—was accessed and exfiltrated in the breach. But there is no evidence *any* information in the CHAMP database was accessed or exfiltrated—and not one Plaintiff has established that they have experienced any harm that resulted from the AMCA Cyberattack. Indeed, many Plaintiffs allege harm based on the misuse of information that, as it turns out, was not even in the CHAMP database. Undeterred, Plaintiffs have pressed forward, and with their Motion, seek to certify a putative nationwide class asserting negligence-based claims, and a California subclass asserting a single CMIA claim.

### III.    ARGUMENTS AND CITATIONS TO AUTHORITY

#### A.    Plaintiffs Bear the Burden of Satisfying Rule 23's Requirements.

Plaintiffs gloss over—and misinterpret—the standard at class certification, which is the foundation for the Court's resolution of their Motion. Far from being an inevitable rubberstamp, "[t]he class action is an *exception* to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 124 (3d Cir. 2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)) (emphasis added). To meet this exception, Plaintiffs must prove by a preponderance of the evidence—not merely plead—compliance with Rule 23(a)'s requirements. *See Quiles v. Wal-Mart Stores, Inc.*, 2020 WL 1969940, at *2 (D.N.J. Apr. 24, 2020) (citing *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 484 (3d Cir. 2018)). In addition, because Plaintiffs move to certify classes under Rule 23(b)(3) and 23(b)(2), Plaintiffs also must prove by a preponderance of the evidence that they satisfy the requirements of those provisions. *See id.*

The Court, in turn, must conduct a "rigorous analysis" to determine whether Plaintiffs have carried their burden. *Ferreras*, 946 F.3d at 183 (quoting *Dukes*, 564 U.S. at 350–51). This rigorous analysis requires the Court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on the elements of the [plaintiffs' claims]." *Reinig*, 912 F.3d at 125 (quoting *Marcus v. BMW of N.A., LLC*, 687 F.3d 583, 591 (3d Cir. 2012)). That is, if a question of fact or law is relevant to that determination, the Court has a duty to decide the issue of fact or law, rather than merely accept it as true or construe it in any party's favor. *See Comcast Corp. v Behrend*, 569 U.S. 27, 33–34 (2013).

#### B.    Plaintiffs Do Not Satisfy Rule 23(b)(3)'s Requirements.

To certify their nationwide and California Rule 23(b)(3) classes, Plaintiffs must establish "through evidentiary proof" that: (1) common factual and legal questions predominate over individual ones, and (2) the proposed class action is superior to other means of adjudicating the controversy.

7

*Comcast*, 569 U.S. at 33; Fed. R. Civ. P. 23(b)(3).  Plaintiffs do not come close to meeting their burden as to either requirement, and the Court should deny their Motion as a result.[2]

### 1.    *Plaintiffs Cannot Prove that Common Issues Predominate.*

Plaintiffs' burden to establish predominance is met only if the Court "is convinced that the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members." *Reinig*, 912 F.3d at 127 (citation modified).  The predominance requirement incorporates Rule 23(a)'s commonality requirement but is "far more demanding" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310–11 (3d Cir. 2008) (quoting *Amchem*, 521 at 623–24); *Reinig*, 912 F.3d at 127.  Put another way, "the raising of common questions—even in droves," is not enough.  *Dukes*, 564 U.S. at 350 (citation modified).  Rather, the relevant focus is on "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation modified).  To assess predominance, "a district court must formulate some predication as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (citation modified).  And "[i]f proof of the essential elements of the cause of action requires individual treatment, then **class certification is unsuitable**." *Id.* (citation modified) (emphasis added).

Plaintiffs' predominance problems are endless, but they all lead to the same inescapable conclusion—resolution of Plaintiffs' claims would require a highly individualized analysis that precludes any showing of predominance and makes class certification impossible.

---

[2] Optum360 first addresses Rule 23(b) because its requirements are "far more demanding," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), and therefore Plaintiffs' failure to clear Rule 23(b)'s hurdle easily disposes their certification bid.  For the reasons set forth below in Section III.C, *infra*, Plaintiffs also fail to satisfy multiple Rule 23(a) requirements.

a.    <u>There Is No Common Evidence that Putative Class Members' Information Was Accessed or Exfiltrated.</u>

Plaintiffs build their case for class certification on a faulty foundation—that the AMCA Cyberattack resulted in the access and exfiltration of personal information for each of the 11.5 million Quest patients whose information was allegedly stored in the CHAMP database. *See, e.g.*, Mot. at 22. If this assumption is wrong (and as set forth below it certainly is), Plaintiffs' arguments for class certification crumble. Without common evidence of class-wide access or exfiltration, each putative class member would have to individually prove their own information was accessed or exfiltrated to proceed with their claims.

Putative class members whose information was not accessed or exfiltrated cannot establish injury in fact or Article III standing.[3] *See* Section III.B.1.b, *infra.* Access or exfiltration is also required for Plaintiffs to establish the merits of their claims given that Plaintiffs' negligence claims require each putative class member to prove injury and damages proximately caused by the AMCA Cyberattack. While Plaintiffs assert that they are entitled to damages because they allegedly face an increased risk of harm, each putative class member must tie those alleged damages to the AMCA Cyberattack, and a requisite first step is providing evidence that each putative class member's information was accessed or exfiltrated by the criminals who allegedly breached AMCA's systems. *See* Section III.B.1.d.(ii), *infra.* Likewise, for the proposed California subclass to prevail on their CMIA claim, each putative California subclass member must prove that his or her confidential medical information was actually viewed by an unauthorized third party. As set forth below, this case is unlike many others because there is no

---

[3] Plaintiffs define the putative nationwide class to include "[a]ll natural persons . . . who were sent a letter from Quest or Optum notifying them of the Breach." Mot. at 4. The fact that an individual was sent a letter does not prove their information was accessed or exfiltrated, much less that they have Article III standing. ██████████████████████████████ ███████ ███ ███ ███ ██ Ex. 12, OPTUM360_AMCA_0000028. ██████████████████████████████████████████ *See In re Blackbaud, Inc., Customer Data Breach Litig.*, 2024 WL 5247287, at *8 (D.S.C. Dec. 30, 2024).

evidence that establishes what information was accessed or exfiltrated, and that alone precludes certification of both putative classes. The Court should deny Plaintiffs' Motion.



(i) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

Plaintiffs rely on the declaration of Mary Frantz ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Mot. at 24–25;

Mot. Ex. 1, Decl. of Mary Frantz ("Frantz"). ▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉ Nor is there any evidence from third parties that a criminal actor accessed or exfiltrated information from the CHAMP database. *See* Section III.B.1.a.(ii), *infra*. ▉▉▉

▉▉▉▉▉ But Frantz's declaration and deposition testimony show her analysis is fraught with problems and incapable of establishing class-wide access or exfiltration.

As discussed in detail below, Plaintiffs' reliance on Frantz to establish access or exfiltration of the CHAMP database dooms their predominance arguments because ▉▉▉▉▉▉



███████████████████████████████████████████████████████

████████████████████

████████████████████████ *See* Ex. 2, Tomasini § V.B. ██████████████

███████████████████████████████████████████████ Mot. Ex. 1, Frantz ¶¶ 344, 360. █████████████████████████████████

████████████████████████████████ *Id.* ¶ 360. This is not surprising because Frantz did not document any of the searches that she performed and, █████████████

████████████████████████████████████████ *See* Ex. 11, Frantz Dep. at 77:3–14, 89:19–22 ████████████████████████████████

█████████████████████████████████, 118:20–119:3, 163:2–24. On top of this, Frantz did not even search for Plaintiffs using the correct information. ██████████████

████████████████████████████████████████████

████████████████████ *Id.* at 81:5–10; Mot. Ex. 1, Frantz ¶ 360. ███████████████

████████████████████████████████████████████

████████████████████ *See* Ex. 11, Frantz Dep. at 81:5–25; Ex. 2, Tomasini ¶ 114. ███████

████████████████████████████████ Ex. 11, Frantz Dep. at 113:14–114:8, 116:2–15. For instance, as Frantz herself explained, ██████████████

████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 111:9–12, 113:20–114:8. █████████████████████████

████████████████████████████████████████ *See* Ex. 2, Tomasini ¶¶ 81–90. ██████████████████████████

██████ *See id.* ¶ 87. ████████████████████████

████████████████████████████████████████████

11



*See id.* ¶¶ 165–74, 183–87.

*Id.*

§ V.B.  And there is certainly no basis for Plaintiffs' and Frantz's claim that these searches are class-wide evidence of access or exfiltration for all 11.5 million individuals.

Mot. Ex. 1, Frantz Ex. C ¶ 5; Ex. 11, Frantz Dep. at 119:23–120:19.

*See* Ex. 11, Frantz Dep. at 155:4–15, 159:15–160:6.

*Id.* at 155:4–15.

The problems do not stop there.

*See* Mot. Ex. 1, Frantz Ex. C ¶¶ 1, 10; *id.* ¶ 360.

Ex. 11, Frantz Dep. at 73:2–23; Ex. 2, Tomasini ¶ 75.

Ex. 11, Frantz Dep. at 163:2–24, 164:19–165:16.

Plaintiffs seek to attribute Frantz's dark web findings to AMCA.  Mot. at 24.

12

████████████████████████████████████████████████

Ex. 11, Frantz Dep. at 59:11–14, 129:19–20.    ██████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████    *Id.* at 56:14–20, 57:6–13, 129:21–130:5    █████████

████████████████████████████████████████████████

█████████████████████████████████████[4]██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████[5]

████████████████████████████████████████████

████████████████████████████████████████████████

██████    *See generally* Mot. Ex. 1, Frantz.  Without this evidence, Plaintiffs cannot certify a California subclass asserting a CMIA claim because the CMIA requires that an unauthorized individual actually viewed each putative class member's confidential medical information.  *See* Section III.B.1.d.(v), *infra*.

In sum, ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[4] ██████████████████████████████████████████████████████████████████ Mot. at 24; Mot. Ex. 1, Frantz ¶¶ 360–61. ███████████████████████████████████████████████ Ex. 11, Frantz Dep. at 129:19–20. Moreover, Plaintiffs' request that the Court make this huge inferential leap is not based on evidence or any expert's scientific, technical, or specialized knowledge—it is a request for the Court to join in on Plaintiffs' own speculation.  *See* Ex. 2, Tomasini ¶ 108 ███████████████ ; *see also id.* ¶¶ 105–108. Ex. 2, Tomasini ¶¶ 115–17 ██████████████████████████████████████████████████████████████ .



██████████████████████. This is far from class-wide evidence of access or exfiltration because

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

Mot. Ex. 1, Frantz Ex. C ¶ 2; Ex. 11, Frantz Dep. at 89:6–24. ████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████ For all these reasons, ██████████████████ are

not proof that there is common evidence capable of resolving whether *all* the information in the

CHAMP database for *all* 11.5 million Quest patients has been "release[d]" and is available on the dark

web. Mot. at 24.

(ii) ████████████████████████████████████

Plaintiffs also attempt to show common evidence of access or exfiltration by pointing to alerts

and communications from ██████████████████████████████████

██████████████████████████████ *See* Mot. at 24.

But the materials Plaintiffs rely on fall far short of showing that the information of all 11.5 million

putative class members was accessed or exfiltrated in the AMCA Cyberattack. ████████████

---

[6] Ex. 11, Frantz Dep. at 105:10–16.



███████████████████████████████ *See* Mot. at 24; Ex. 13, GEMINI004. ███████

██████████████████████████ [7] As a preliminary matter, these third-party materials are not capable of resolving access or exfiltration on a class-wide basis because, █████████████████████ ████████████████████████████████████ Moreover, although Plaintiffs allege (incorrectly) that the criminal threat actor had access to 26 different categories of information for all 11.5 million putative class members, ████████████ ████████████████████████████████████████ *See* Ex. 13, GEMINI004; Mot. Ex. 59, Expert Report of Jonathan F. Lee ("Lee") App'x D, Table 6 ███████████████ None of these materials reference any of ███████ ████████████████████████████████████ Plaintiffs ask the Court to take a huge and unsupported leap to conclude that ██████████████████ are common evidence that all categories of information for all 11.5 million putative class members were accessed or exfiltrated. But Plaintiffs do not provide any justification for doing so.[8] Far from

---

[7] *See also* Ex. 14, RMCB-AG-00000002; Ex. 15, AMCAPROD00141123; Ex. 16, AMCAPROD01117103; Ex. 17, RMCB-AG-00000085; Ex. 18, RMCB-AG-00000087.

[8] ███████████████████████████ Ex. 11, Frantz Dep. at 19:14–16, 45:10–13. There is no valid

common evidence of access or exfiltration, ███████████████████████ actually underscore the need for individualized analysis.

There is an even more fundamental problem with Plaintiffs' reliance on ███████ ████████████. Plaintiffs do not offer any evidence connecting the information at issue to any named Plaintiffs, any putative class members, or to the CHAMP database—the database that purportedly stored Plaintiffs' and putative class members' information and the only data repository relevant to Plaintiffs' claims. To the contrary, ██████████████████ █████████████████████████████. Ex. 19, 30(b)(6) Dep. of Andrei Barysevich at 134:4–16 ████████████████

██████████████████████████████████████████████████

█████████ (emphasis added); *see also id.* at 142:18–143:3 █████████████████

██████████████████████████████; *id.* at 143:4–8 ████████

██████████████████████████████████████████████████

█████████████████████████████████████; Mot. Ex. 1, Frantz ¶ 26 n.12 ████████████████████████████; *see* Ex. 2, Tomasini ¶¶ 53–54.

(iii) █████████████████████████

AMCA hired its own expert, CRA, to investigate the breach. Plaintiffs contend that ████

██████████████████████████████████████████████████

███████████████████████ is common evidence of access or exfiltration. Mot. at 14 (citation modified) (emphasis added). ████████████████

██████████████████████████████████████████████████

---

basis for her ██████████████████████████████████████. *See* Ex. 2, Tomasini ¶¶ 47–52.



████ Ex. 20, 30(b)(6) Dep. of Bill Hardin ("CRA Dep.") at 230:4–6. In other words, ████ Ex. 2, Tomasini ¶¶ 30–33. But case law is clear that where plaintiffs must meet their burden by a preponderance of the evidence, "[p]roof of 'possibility' is not enough." *Vuocolo v. Diamond Shamrock Chems. Co.*, 240 N.J. Super. 289, 293 (App. Div. 1990); *see also Huddell v. Levin*, 537 F.2d 726, 740 (3d Cir. 1976) (explaining that "proof of a 'substantial possibility' . . . does not comport" with meeting a preponderance of the evidence burden); *Feit v. Great-W. Life & Annuity Ins. Co.*, 2007 WL 275980, at *7 (D.N.J. Jan. 26, 2007) ("Possibilities, of course, do not create a preponderance."). Moreover, ████. Mot. at 14. Plaintiffs support this statement by citing ████. *See id.* But as Plaintiffs' own expert explained, ████ *See* Ex. 11, Frantz Dep. at 298:19–25, 339:13–20; Ex. 2, Tomasini ¶ 35–36. ████ Mot. at 14. In reality, ████ *See* Ex. 20, CRA Dep. at 70:9–13; Ex. 2, Tomasini ¶ 37. Last, ████. Ex. 2, Tomasini ¶¶ 39–40. ████ Ex. 11, Frantz Dep. at 288:20–289:5, 303:12–20; Ex. 2, Tomasini ¶ 39.

For the reasons above, Plaintiffs' attempt to repackage limited and disparate information as common evidence of access or exfiltration fails. Without this evidence, and as discussed below, an individualized analysis is required to resolve Article III standing and the merits of each putative class

---

[9] ████ Ex. 2, Tomasini ¶ 35. ████ *See id.*

member's claims.  This is fatal to class certification, and the Court should deny Plaintiffs' Motion.

                b.               <u>Individual Questions of Article III Standing Preclude Certification.</u>

The Supreme Court has held that every class member must have Article III standing to recover damages in a class action.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  This requires a showing of both (1) injury in fact and (2) fair traceability.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  At the class certification stage, Plaintiffs bear the burden of demonstrating that Article III standing can be established for absent class members with class-wide evidence as part of the predominance analysis.  *See Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 157 (3d Cir. 2023) (vacating grant of class certification because plaintiffs did not meet their burden of demonstrating that common evidence could resolve Article III standing); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1344 (11th Cir. 2021) ("Evidence of a mere data breach does not, standing alone, satisfy the requirements of Article III standing."); *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 892 (11th Cir. 2023) (vacating class certification and requiring on remand the determination of whether each absent class member had standing).  In their Motion, Plaintiffs do not address Article III standing at all, and as a result, do not even attempt to meet their burden.  The Court should deny Plaintiffs' Motion for this reason alone.  *See Huber*, 84 F.4th at 157.

When considered, the required standing analysis presents yet another individualized issue that precludes class certification.  This Court previously held that Plaintiffs failed to establish their own standing where they "alleged no facts to support an inference that their particular information was accessed, stolen, or misused."  ECF 283 ("2021 MTD Order") at 17; *see also Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (holding that with "no misuse of the information" allegedly obtained in a data breach, there was "no harm" sufficient to establish standing).  This same shortcoming dooms Plaintiffs' attempt at class certification.  Under the Court's prior holding, only putative class members whose information was "accessed, stolen, or misused" can establish standing.  2021 MTD Order at

17. As set forth in Section III.B.1.a, *supra*, there is no common evidence that could make this showing on a class-wide basis; individualized analysis would be required. Courts consistently deny class certification where, as here, assessing Article III standing of the putative class is highly individualized. *See Huber*, 84 F.4th at 157; *see also Stromberg v. Midland Funding, LLC*, 2024 WL 1673360, at *9 (D.N.J. Apr. 18, 2024) (denying class certification for lack of predominance because plaintiff did not submit "any evidence to establish that standing can be evaluated on a class-wide basis"); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019) (vacating certification where plaintiffs failed to show that common evidence could be used to establish standing). The Court should do the same here.

Further, Plaintiffs cannot manufacture Article III standing with novel injury and damages theories. Plaintiffs initially offered the opinions of two experts who attempted to put forth class-wide injury theories despite the lack of common evidence of access or exfiltration—Gary Olsen and Amy Worley. Defendants deposed Olsen, and his deposition went so poorly for Plaintiffs that Plaintiffs' counsel subsequently withdrew Olsen as an expert. *See* ECF 767. Indeed, Mr. Olsen's deposition confirmed that his analysis consisted of little more than performing Google searches; that he plagiarized portions of his declaration; and that a significant amount of his declaration was copied and pasted from reports he had authored in other data breach cases. Ex. 21, Dep. of Gary Olsen at 147:1–7, 210:2–5, 215:16–25, 217:16–225:25, 281:5–9. Plaintiffs' remaining expert—Worley—does not solve Plaintiffs' standing problem. █████████████████████████████████ ████████████████████████████████ Mot. Ex. 4, Decl. of Amy R. Worley ("Worley") ¶¶ 63–67. █████████████████████████████████████ █████████████████████████ There is no basis for this assumption for the reasons set forth in Section III.B.1.a, *supra*. In fact, as explained above, ██████████████████████████ ████████████████████████████████████████ █████████████ Put differently, ████████████████████████

19

██████████████████████████████████████  Ex. 2, Tomasini § VIII.

Plaintiffs also cannot meet their burden of proving on a class-wide basis through common evidence that the injuries alleged are fairly traceable to the AMCA Cyberattack. That is because, as described in Section III.B.1.d.(ii), *infra*, Plaintiffs cannot prove a common connection or nexus between the data allegedly impacted in the breach and their alleged injuries. *See Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1231 (N.D. Cal. 2022) (explaining that there must be a "specific connection" between the information compromised in the data breach and the information used to cause the alleged harm).[10] For any putative class member, the fair traceability requirement is not satisfied when the data allegedly compromised for them could not have resulted in the injury they allege. *See id.* at 1231–32. There is thus layer upon layer of individualized inquiry necessary simply to assess fair traceability, including:

1) What data elements were allegedly impacted for each putative class member?

2) What specific injuries does the putative class member allege? And

3) Could the alleged compromise of the specific data element at issue cause the specific injuries alleged?

There is no formulaic way to establish these answers across the proposed class. Plaintiffs do not even attempt to demonstrate that fair traceability can be established with common evidence. In fact, the named Plaintiffs' allegations of injuries alone prove the point that assessing fair traceability is highly individualized. That is because multiple Plaintiffs allege injuries that ***could not have resulted from***

---

[10] *See also McCombs v. Delta Grp. Elecs., Inc.*, 676 F. Supp. 3d 1064, 1074 (D.N.M. 2023) (finding no fair traceability in data breach case where plaintiff alleged increased spam calls, emails, and texts because plaintiff did not establish "a nexus between the data breach and the listed unwanted communications"); *DiPierro v. Fla. Health Scis. Ctr., Inc.*, 737 F. Supp. 3d 1314, 1330–31 (M.D. Fla. 2024) (finding no fair traceability in data breach case where plaintiff's "alleged injuries could have resulted from a different data breach"); *Blood v. Labette Cnty. Med. Ctr.*, 2022 WL 11745549, at *6 (D. Kan. Oct. 20, 2022) (finding no fair traceability because the data breach did not involve the type of information that would have been necessary to cause the plaintiff's alleged harm).

*the AMCA Cyberattack.*  For example, Plaintiff Shannon Walden claims ███████████

████████████████████████████████████████████████████████

██████. Mot. Ex. 53, Decl. of Shannon Walden ¶ 7. ████████████████████

██████████████ Walden could not possibly prove (nor has she tried to) that the allegedly

fraudulent account is fairly traceable to the AMCA Cyberattack, much less any conduct of Optum360.

Moreover, answering the question of fair traceability for Walden does not answer the question for any

other Plaintiff or putative class member.  For example, Plaintiff Ria Jairam alleges a different sort of

injury and fair traceability fails for a different reason.  Specifically, Jairam ██████████████

████████████████████████ Mot. Ex. 44, Decl. of Ria Jairam ("Jairam") ¶ 6, ████

████████████████████████████████████████████████████

██████████████████████████ These are just some of the individualized traceability

issues that permeate the putative class.

For all these reasons, the analysis required to determine whether each putative class member

has Article III standing requires "a great deal of individualized proof" and precludes a finding of

predominance. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004); *see also Huber*, 84 F.4th at

157 (vacating order certifying class because plaintiffs did not carry burden of demonstrating that

common evidence could resolve Article III standing).

          c.       <u>Variations in State Law Preclude Certification of Plaintiffs' Proposed Nationwide Class.</u>

Plaintiffs acknowledge the Court must assess choice of law at the class certification stage, but

they fail to provide the extensive analysis Rule 23 requires, which alone is fatal to their bid to certify

the nationwide class.  Plaintiffs simply assume New Jersey law applies globally to their claims against

Optum360.  A choice of law analysis makes clear it does not.  Instead, Plaintiffs' negligence claims are

---

[11] Ex. 1, Decl. of Lorin Hitt ("Hitt") ¶ 74 n.137 (Workbook 10); *see* Mot. Ex. 59, Lee Table 13.
[12] Ex. 1, Hitt ¶ 74 n.137 (Workbook 10).

likely governed by numerous states' laws that vary materially.  Moreover, applying New Jersey law globally to the claims against Optum360 would violate due process.  For these reasons, the countless individualized issues required to perform a proper choice of law analysis—which results in the application of numerous states' laws that create additional individualized issues—defeat predominance and make any certified class entirely unmanageable.

      (i)       *Plaintiffs' Failure to Perform the Required "Extensive Analysis" Precludes Certification of a Nationwide Class.*

Plaintiffs' proposed nationwide class implicates the laws of all fifty states, and therefore Third Circuit precedent requires Plaintiffs to "credibly demonstrate, through an 'extensive analysis' of state law variances, that class certification does not present insuperable obstacles." *Powers v. Lycoming Engines*, 328 F. App'x 121, 124 (3d Cir. 2009) (vacating and remanding grant of class certification for failure to perform adequate choice of law analysis) (citation modified); *Dzielak v. Whirlpool Corp.*, 2017 WL 6513347, at *15 (D.N.J. Dec. 20, 2017) ("When a multi-state class is sought, a choice-of-law determination is required at the certification stage.").  Plaintiffs do not provide the requisite extensive analysis and barely address choice of law at all as it relates to their claims against Optum360. *See* Mot. at 19–21.  Plaintiffs—not the Court or Optum360—bear the burden of performing an extensive analysis, and their failure to do so is fatal to their bid to certify a nationwide class. *See Fenwick v. Ranbaxy Pharms., Inc.*, 353 F. Supp. 3d 315, 331 (D.N.J. 2018) (denying class certification where "[p]laintiff has not provided any extensive analysis of the state law variances . . . and whether or how these variances may impact predominance"); *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 316 (5th Cir. 2000) (decertifying class because lack of proper choice of law analysis meant plaintiffs "failed to meet their burden of demonstrating that common questions of law predominate").[13]

---

[13] Plaintiffs also wholly ignore the impact of an MDL on the choice of law analysis and the threshold question of which state's choice of law rules apply in the first instance. *See, e.g., In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997) (denying class certification and

          *(ii)*        *New Jersey's Choice of Law Rules Do Not Lead to the Nationwide Application of New Jersey Law.*

Plaintiffs assume that New Jersey's choice of law rules govern. *See* Mot. at 18–21. Even if New Jersey's choice of law rules applied, they do not result in the global application of New Jersey law. The first step is to examine whether there is an actual conflict between the potentially applicable states' laws. *See Bond v. Johnson & Johnson*, 2021 WL 6050178, at *4 (D.N.J. Dec. 21, 2021). As Plaintiffs acknowledge, actual conflicts exist here. *See* Mot. at 19 n.13 ("Of course, the four factors are only applied where, as here, there is a conflict between various state laws.");[14] *see also Norwood v. Raytheon Co.*, 237 F.R.D. 581, 596–97 (W.D. Tex. 2006) ("[T]here are substantial variations in negligence law from one jurisdiction to the next."); *Hayes v. Playtex Fam. Prods. Corp.*, 168 F.R.D. 292, 294 (D. Kan. 1996) (denying class certification of a negligence claim because variations in state law made negligence claim "not well suited for class certification"). Because actual, outcome determinative conflicts exist between potentially applicable states' laws, the Court must determine the state with the most significant relationship to the claim by weighing the four factors in the Restatement. *Bond*, 2021 WL 6050178, at *4. Plaintiffs claim "New Jersey law thus applies" after a cursory discussion of the four Restatement factors. Mot. at 19–20. But a closer analysis shows that Plaintiffs' conclusion is incorrect.

The first Restatement factor examines the place where the alleged injury occurred. *See Bond*, 2021 WL 6050178 at *4. Plaintiffs allege in the Complaint they were injured in a variety of ways,

---

explaining that the choice of law rules of the forum typically apply to cases pending in the district prior to MDL creation and the choice of law rules of the transferor court typically apply to cases transferred into an MDL); *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2024 WL 111069, at *4 (D.N.J. Jan. 10, 2024) (applying the choice of law rules of the originating jurisdiction to cases filed directly into the MDL); *see also Looper v. Cook Inc.*, 20 F.4th 387, 390–93 (7th Cir. 2021) (collecting cases regarding same).

[14] To name just one, an actual conflict exists for Finch's negligence per se claim because Kansas law (Finch's home state) bars negligence per se claims based on statutes that do not provide for a private right of action, *see Doe v. Lyft, Inc.*, 756 F. Supp. 3d 1110, 1127–28 (D. Kan. 2024), but New Jersey law does not, *see In re Am. Fin. Res., Inc. Data Breach Litig.*, 2023 WL 3963804, at *7 (D.N.J. Mar. 29, 2023). It is undisputed that neither statute Plaintiffs allege Optum360 violated (Section 5 of the FTC Act and HIPAA) provides a private right of action. *See* ECF 317 ("FAC") ¶¶ 485, 491.

including by receiving spam calls, spending time addressing fraudulent charges, and because they face an alleged increased risk of harm. *See, e.g.*, FAC ¶¶ 35, 57, 59, 69, 70, 100. An individualized inquiry is required to determine where Plaintiffs and putative class members experienced those alleged injuries, but typically, as Plaintiffs acknowledge, it is each Plaintiff's and putative class member's home state.[15] *See* Mot. at 19 ("Defendants' conduct caused harm in every state."). Plaintiffs attempt to minimize this factor by arguing that "the state in which the injury occurred is 'fortuitous.'" *Id.* They are wrong. The place of the injury is fortuitous only where "that state has no relationship to the parties, and the only relationship to the occurrence is mere chance." *Yocham v. Novartis Pharms. Corp.*, 736 F. Supp. 2d 875, 882 (D.N.J. 2010) (location of injury not fortuitous where plaintiff was injured in state of residence); *see also P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 146 (2008) (plaintiff's "injury [at summer camp] in Pennsylvania was not a fortuity" because Pennsylvania was "not an unanticipated detour on the way to another location," but rather where plaintiff resided in the summer).

Here, Plaintiffs' home states have a strong relationship to the Parties because that is where virtually all Plaintiffs' respective relationships with Quest were centered. *See, e.g.*, Ex. 25, Dep. of Karli Parker at 101:16–19 (Parker never visited a Quest facility outside of her home state of New York); Ex. 26, Dep. of Ashley Finch at 102:2–23, 259:13–18 (Finch visited Quest lab "in Kansas," her home state at the time). Furthermore, it is not "mere chance" that Plaintiffs were allegedly injured in their home states because that is generally where Plaintiffs provided the personal information to Quest they

---

[15] *See e.g.*, Ex. 22, Dep. of Darlane Saracina ("Saracina Dep.") at 40–44 (Pennsylvania resident Saracina received notification of a fraudulent claim for unemployment in Pennsylvania and subsequently spent time dealing with the unemployment office in Pennsylvania); Ex. 23, Dep. of Jo Ann Buck at 83:15–84:1 (Buck lives in Tennessee and received suspicious phishing phone calls and emails "[m]aybe every other day"); Ex. 24, Dep. of Joyce Rosselli at 166–169 (New York resident Rosselli monitored all her credit card accounts for fraud "once a week" since her information was potentially exposed on the dark web). Based on the types of injuries alleged—*e.g.*, increase in spam, fraud, increased risk of harm, lost time—Plaintiffs and putative class members likely experienced those alleged injuries in their home states. But Plaintiffs (not Optum360) must prove the requirements for class certification are met. Yet Plaintiffs do not even attempt to prove common evidence exists that can resolve the location where each putative class member was injured.

24

allege was compromised in the AMCA Cyberattack, received laboratory services from Quest, received notice of the AMCA Cyberattack, and allegedly experienced harm. *See Yocham*, 736 F. Supp. 2d at 882. Accordingly, the place of injury is not fortuitous, and the first factor points to applying each Plaintiff's home state's law to their negligence-based claims.

The second factor looks to the place where the conduct causing Plaintiffs' alleged injury occurred. *Bond*, 2021 WL 6050178, at *4. Plaintiffs conclude this factor points to New Jersey, but their analysis does not even consider Optum360. *See* Mot. at 19–20. This is an error for the obvious reason that Plaintiffs' claims against Optum360 require proof that *Optum360's* conduct caused their alleged injuries. By ignoring the location of Optum360's alleged conduct, Plaintiffs misapply New Jersey's rules, which require choice of law to be determined on a "defendant-by-defendant" basis. *Ginsberg ex rel. Ginsberg v. Quest Diagnostics, Inc.*, 441 N.J. Super. 198, 230, 245 (App. Div. 2015) ("[I]mposing the law of [one state] across the board to all of the defendants . . . indiscriminately would not be a sound or fair result."). Plaintiffs do not argue, nor could they, that Optum360's alleged conduct causing their supposed injuries occurred in New Jersey. *See* Mot. at 19–20. Plaintiffs' claims against Optum360 are based on their assertion that Optum360 failed to adequately oversee AMCA's data security. *Id.* at 1–2. But Optum360's oversight of AMCA had no connection to New Jersey. Optum360 is a Delaware company headquartered in Minnesota. Ex. 27, Off. of Minn. Sec. of State Bus. Filings. ███████████████████████████████████████

██████████ *See* Ex. 28, 30(b)(6) Dep. of Brian Troen ("Troen 30(b)(6) Dep.") at 145:11–14. ███

████████████████████████████████████████████████████ Ex. 29,

OPTUM360_AMCA_0006990. ████████████████████████████

████████████████████████████████████████

*See* Ex. 28, Troen 30(b)(6) Dep. at 185:7–22 ████████████████████

██████████. Thus, the second factor—the only factor Plaintiffs affirmatively argue weighs in favor

of applying New Jersey law—does not in any way support applying New Jersey law to Plaintiffs' claims against Optum360.

As for the third factor, Optum360 agrees with Plaintiffs that it is neutral. *See* Mot. at 20.

The fourth factor examines the place where the relationship between the parties is centered. *Bond*, 2021 WL 6050178, at *4. Plaintiffs claim this factor is neutral (*see* Mot. at 20), but their argument is flawed because they strategically choose to focus on "where Quest implemented its 'oversight' of AMCA," as opposed to where Plaintiffs' relationships with Optum360 and Quest were centered. *See id.* Plaintiffs have no relationship with Optum360,[16] but as noted above, each Plaintiff's relationship with Quest was centered in the state where that Plaintiff received laboratory services from Quest. An individualized analysis is required to assess what that state is for each member of the putative class, but in most instances, it is the Plaintiff's home state.[17] Thus, this factor also weighs in favor of applying different laws to each Plaintiff's and each putative class member's claims.

New Jersey's most significant relationship test also considers the factors set forth in Section 6 of the Restatement. *See Bond*, 2021 WL 6050178, at *4. Plaintiffs only address factor 5, "the competing interests of the states," *id.*, and argue that factor supports applying New Jersey law because "a state has a strong interest in deterring tortious conduct by its *resident corporations.*" Mot. at 21 (citation modified) (emphasis added). But that interest has no bearing on Plaintiffs' claims against Optum360 because Optum360 is not a resident of New Jersey—it is a Delaware corporation, headquartered in Minnesota. Ex. 27, Off. of Minn. Sec. of State Bus. Filings. Moreover, the District of New Jersey has

---

[16] *See e.g.*, ECF 578 at 6, n.18 ("[The] Court previously dismissed misrepresentation-based claims because . . . Optum[360] did not make any statements or have any relationship with Plaintiffs prior to their lab services."); Ex. 30, Dep. of Rose Marie Perry at 174:19–175:1 (Perry was not very familiar with Optum360, other than Optum360's name on the Notice Letter, but Perry was "just paying attention to Quest, because that was the [entity] she was associated with"); Ex. 31, Dep. of John Briley at 241–243 (Briley never provided information to Optum360 and had no direct relationship with Optum360).

[17] *See, e.g.*, Ex. 32, Dep. of Nancy Infield at 143:16–18 (Infield visited Quest facilities in her home state of Florida); Ex. 22, Saracina Dep. at 267:22–268:10 (Saracina visited the closest Quest lab to her home address in Pennsylvania).

26

recognized that "each plaintiffs' home state has [a] greater interest in protecting its consumers from in-state injuries by foreign corporations . . . than any other state." *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, 2021 WL 307486, at *8 (D.N.J. Jan. 29, 2021).

### (iii)  *Application of New Jersey Law to Optum360 Violates Due Process.*

Finally, applying New Jersey law to Plaintiffs' claims against Optum360 would violate due process. Due process requires a state to have significant contacts "creating state interests" to a plaintiff's claims to ensure that choice of law is not arbitrary. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985). Applying the law of a state with "little or no relationship" to the claims violates due process. *Id.* at 821. New Jersey has **no** relationship to the non-New Jersey Plaintiffs' claims against non-resident Optum360. For example, Plaintiff Hollway received lab work from Quest in Florida, had her information stored and allegedly compromised in New York (AMCA's headquarters), and experienced alleged harms in her home state of Minnesota. *See* Ex. 33, Dep. of Elizabeth Hollway at 165:25–166:5, 170:2–11, 171:4–11, 188:12–189:12. Plaintiffs would nonetheless have this Court apply New Jersey law to Hollway's claims against Optum360—an approach that is both arbitrary and unfair, given these claims' lack of any connection to the State. A similar individualized analysis would be required to determine whether applying New Jersey law to each Plaintiff's and putative class member's claims against Optum360 would be consistent with due process.

For all these reasons, Plaintiffs fail to meet their burden of performing an extensive choice of law analysis. A proper choice of law analysis demonstrates that New Jersey law does not apply globally and that Plaintiffs' negligence claims are likely governed by numerous states' laws that vary materially. The individualized issues swirling around the choice of law analysis preclude Plaintiffs from establishing Rule 23's predominance requirement, and the Court should deny Plaintiffs' Motion.

27

d.   Individualized Liability and Damages Issues Predominate and Preclude Class Certification.

(i)   *Plaintiffs' Bare Assurances Do Not Establish that Plaintiffs' Negligence-Based Claims Can Be Proven with Common Evidence.*

Plaintiffs move to certify a nationwide class asserting claims for negligence and negligence per se. Mot. at 4. Both claims require Plaintiffs to prove, among other things, that they have been injured and that the injury was caused by the AMCA Cyberattack. *See id.* at 22. As a result, to certify the putative nationwide class, Plaintiffs must "affirmatively demonstrate . . . by a preponderance of the evidence" that there is common evidence capable of proving these elements on a class-wide basis. *See Wharton v. Danberg*, 854 F.3d 234, 241 (3d Cir. 2017) (citation modified). This means that Plaintiffs must show that the same evidence they will use to establish one Plaintiff's negligence-based claims will prove the negligence-based claims for the remaining 11.5 million members of the putative nationwide class. In their Motion, Plaintiffs group the injury and causation elements of their claims together and declare that "[w]hether Defendants' inadequate security and oversight caused the Breach and harmed Plaintiffs is a common question with a common answer." Mot. at 22. Plaintiffs do not identify the evidence they will use to establish injury and causation, saying only that they will use "precisely the same information about Defendants' actions (or inactions) to prove causation and injury" that "an individual Plaintiff in an individual trial would use." *Id.* But setting forth facts about Optum360's oversight of AMCA tells the Court nothing about whether any named Plaintiff or particular putative class member suffered an injury that was proximately caused by the AMCA Cyberattack. And Plaintiffs do not identify what evidence "an individual Plaintiff in an individual trial would use," much less demonstrate how that evidence would establish any element of their negligence-based claims across the entire putative class. *Id.* Plaintiffs' conclusory assurances that common evidence supports their negligence-based claims do not come close to meeting the burden imposed by Rule 23. The Motion should be denied. *See Mielo*, 897 F.3d at 483, 491 (reversing grant of class

28

certification and noting that "Rule 23 does not set forth a mere pleading standard") (citation modified).

> (ii)    *Plaintiffs' Experts Do Not Establish Common Evidence of Injury and Proximate Causation.*

Although Plaintiffs do not indicate in their Motion that they intend to rely on expert testimony to prove injury or causation on a class-wide basis, Optum360 anticipates that Plaintiffs will argue that their experts' declarations satisfy Rule 23's predominance requirement. Plaintiffs rely on a trio of experts—Jonathan Lee, Amy Worley, and Scott Witt—whose declarations and opinions are interrelated. ███████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████ Mot. Ex. 60, Supp. Expert Report of Amy Worley ("Worley Supp.") ¶¶ 5–7. █████████

███████████████████████████████████████████████████

█████████████████████ *Id.* ¶¶ 8, 10; Mot. Ex. 59, Lee ¶¶ 24–27. ████████

███████████████████████████████████████████████████

█████████████████████████████████ Mot. Ex. 60, Worley Supp. ¶ 7. ████

██████████████████████████████████████████████████ *Id.*

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████ Mot. Ex. 60, Worley Supp. ¶ 6. ████████████████████

████████ Mot. Ex. 4, Worley ¶ 167. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████ *See* Ex. 34, Dep. of Amy Worley ("Worley Dep.") at 94:4–7. ████████

███████████████████████████████████████████████████

 Mot. Ex. 4, Worley ¶¶ 4, 192.  Based on that

*See id.* ¶¶ 175–90.  Witt builds on top of

by purporting to calculate damages for durations of three, five, seven, and ten years.  Mot. Ex. 61, Am. Decl. of Scott Witt ("Witt Am.") ¶¶ 12–14.  But as set forth below, Plaintiffs' trio of experts is but a mirage of simplicity aimed at avoiding the highly individualized analysis that plagues any attempt to resolve putative class members' claims through class proceedings.

Optum360 retained Professor Lorin Hitt, Ph.D., the Zhang Jindong Professor of Operations, Information and Decisions at the University of Pennsylvania's Wharton School, Ex. 1, Hitt ¶¶ 1, 23.

*Id.* ¶¶ 34–37, 62–65, 100.

*Id.* § VI.

*First*, there is no common evidence of exfiltration.

As explained above, there is no common evidence capable of proving exfiltration on a class-wide basis, *See* Section III.B.1.a, *supra*; Ex. 1, Hitt ¶ 36, 99–100; Ex. 2, Tomasini ¶ 205; *see also Theus v. Brinker Int'l, Inc.*, 2025 WL 1786346, at *3–4 (M.D. Fla. June 27, 2025) (denying class certification for lack of predominance

30

because, among other things, individualized evidence was required to determine whether plaintiff's information was stolen and/or posted on dark web). Commonsense dictates, ███████████, that if a putative class member's information was never accessed or exfiltrated, then there is no increased risk of harm as a result of the AMCA Cyberattack. *See* Ex. 34, Worley Dep. at 294:24–295:3.



*Second,* ██████████████████████████████████

████████████████████████████████████████

███████████████████████████████ Ex. 1, Hitt ¶¶ 28, 38, 90–91, 114; Ex. 2, Tomasini

¶¶ 165, 183, 194. ████████████████████████████

███████████████████████████████████████ Ex. 2,

Tomasini ¶¶ 159–65. For instance, ████████████████████████

████████████ *Id.* ¶ 166. This includes ████████████████

████████████████████████████████████████

█████████████████████ *Id.* ¶¶ 166–67. In fact, █████████████

███████████████████████████████████ . *See id.*

¶ 167, App'x 38-A. This cements the fact that █████████████████

████████████████████████████████████████

███████████████████████ . *Id.* ¶ 167. All told, █████████

██████████████████████████ . *Id.* App'x 4. On top of this, █

██████████████████████████████ [18] *Id.* ¶¶ 183–84. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[18] ████████████████████████████████████

██████████████████████████████ Ex. 2, Tomasini ¶ 177.

in greater detail in Section III.C.3, *infra*. *Id.* ¶¶ 194–200. What this means is that in order for a jury to decide whether the AMCA Cyberattack caused an increased risk of future harm for any putative class member and if so, by what amount, the jury would be required to assess highly individualized evidence as to the extent to which the putative class member's information had been exposed in prior breaches, made available on public data broker sites, and/or shared on social media. *See* Ex. 1, Hitt ¶¶ 28, 89–96. Put differently, there is no common evidence that can answer for the entire putative class whether the AMCA Cyberattack caused an increase in the risk of future harm. ███████████

███████████████████████████████████

███████████████████████████████████

*Id.* ¶ 110. ██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████ Ex. 34, Worley Dep. at 94:4–7, 122:21–123:8.[19]

**Third**, there is significant variation across the putative class in terms of their vulnerability to scams and fraud, █████████████████████████████

████████████████ Ex. 1, Hitt ¶¶ 71–73, 115. This also varies considerably across the putative class ███████████████████████████████

████████████████ *Id.* ¶¶ 54, 71–72, 115. Take the example of email phishing: the

---

[19] Plaintiffs argue in a footnote that the Court can sidestep this hurdle by relying on "the concurrent cause doctrine." Mot. at 23 n.15. Plaintiffs are wrong. Neither of the two cases cited mentions the concurrent cause doctrine, let alone suggests that it excuses Plaintiffs from establishing one of the elements of their negligence-based claims. Moreover, to the extent that the concurrent cause doctrine has been recognized in New Jersey at all, it has only been applied in cases involving insurance coverage. *See, e.g.*, *Salem Grp. v. Oliver*, 128 N.J. 1, 6 (1992). Plaintiffs offer no authority that the concurrent cause doctrine has ever been applied in the data breach context or outside the insurance coverage context. Additionally, whether the concurrent cause doctrine is recognized and under what circumstances may differ under the various potentially applicable states' laws. *See* Section III.B.1.c.(ii), *supra*.

███████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 72. Indeed, even for the same putative class member, the risk can

vary depending on the circumstances, ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████. Ex. 34, Worley Dep. at 77:5–20; *see also* Ex. 1, Hitt

¶ 72. Put simply, ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 73. ████████████

███████████████████████████████████████████████████████

█████████████ *Id.* ¶¶ 73, 96. Instead, ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ *Id.* ¶ 64.

 *Finally*, Plaintiffs ignore that ██████████████████████████████████

██████████████████████████████████████████████. *See id.* ¶ 74. For

instance, ██████████████████████████████████████████████████████

████████████████████████████████████████. *See id.* ¶¶ 75–

76. Of the individuals whose information in CHAMP included payment card information, ████

████████████████████████. *See id.* ¶ 76. What this means is that, even assuming this information

was exfiltrated, ███████████████████████████████████████████

█████████████████████████████████████████. *Id.* ████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 77. Similar

individualized inquiries would be required to assess ██████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████. *Id.* ¶¶ 81, 84, 88. ████████████████

██████

Plaintiffs cite two cases in an attempt to convince the Court to ignore these glaring individualized issues. *See* Mot. at 22–23 (citing *Savidge v. Pharm-Save, Inc.*, 727 F. Supp. 3d 661 (W.D. Ky. 2024); *In re Sonic Corp.*, 2021 WL 6694843 (6th Cir. Aug. 24, 2021)). But these cases are not controlling and are inapposite for many reasons, including that the types of individualized issues here were not present. In *Savidge*, it was undisputed that the threat actors acquired the W-2s of the entire class. 727 F. Supp. 3d at 696. In other words, it was undisputed that an unauthorized third party was in possession of *all* of the putative class members' personal information and the personal information compromised was identical across the entire putative class. *Id.* Thus, the injury and causation inquiries in *Savidge* were much simpler than they are here because the plaintiffs in that case did not have to rely on individualized proof to demonstrate their information was stolen, and an individualized inquiry was not required to assess which types of asserted injuries could have resulted from the exposure of the class members' W-2s. Similarly, because the data taken in *Savidge* was uniform for all putative class members, the court did not have to engage in an individualized analysis to assess whether the data taken could have led to the class members' alleged injuries as it would have to do here.

Plaintiffs' other cited case, *In re Sonic Corp.*,[20] is likewise distinguishable. In *In re Sonic Corp.*, the court certified a class of financial institutions—not individuals—seeking recovery for costs the banks incurred to replace compromised payment cards and reimburse fraudulent charges resulting from a merchant data breach. 2020 WL 6701992, at *8 (N.D. Ohio Nov. 13, 2020). That class did not involve

---

[20] Plaintiffs claim "the Sixth Circuit affirmed certification of a data breach negligence class" in *Sonic*. Mot. at 23. But the Sixth Circuit did not affirm certification; it simply denied Sonic's petition for permission to appeal the district court's order. *In re Sonic Corp.*, 2021 WL 6694843, at *4. The word affirm does not appear in the decision at all. *See generally id.*

34

individualized causation inquiries because the class definition was limited to "financial institutions that received notice and took action to reissue credit or debit cards or reimbursed a compromised account." *Id.* at *4. Because all the financial institutions included in the class certified by the court had, in fact, either replaced cards or reimbursed fraudulent charges in "respon[se] to the breach," it was clear that the merchant data breach had, in fact, caused each member of the putative class to incur uniform economic loss. *Id.* As detailed above, the data here, and each putative class member's alleged individual harms, are far from certain and cannot be proven with class-wide evidence.

In cases like this one, with highly individualized injury and causation issues, courts have consistently denied motions for class certification. *See, e.g.*, *Theus*, 2025 WL 1786346, at *3–4 (denying class certification where individualized evidence was required to determine, among other things, whether plaintiff's information was stolen and/or posted on dark web); *Attias v. CareFirst, Inc.*, 344 F.R.D. 38, 54–55 (D.D.C. 2023) (denying class certification where other data breaches presented "individualized inquiries as to the causation elements of Plaintiffs' [claims]"); *McGlenn v. Driveline Retail Merch., Inc.*, 2021 WL 165121, at *9 (C.D. Ill. Jan. 19, 2021) (denying class certification because individualized inquiry into causation predominated where several purported class members "likely had been involved in other data breaches in the two to four years prior to the [breach]"); *S. Indep. Bank v. Fred's, Inc.*, 2019 WL 1179396, at *20 (M.D. Ala. Mar. 13, 2019) (denying class certification in part due to individualized causation issues presented "by something other than the [data] breach" at issue). The Court should do the same here.

> (iii) *Plaintiffs' Damages Model is Inconsistent with the Injury Theories Remaining in the Case.*

Plaintiffs propose calculating damages ██████████████████████████████████ ████████████████████████████. Mot. at 27–28. But Plaintiffs' model is based solely on an

██████████████████████████████████████████████████████████████[21]—an alleged injury theory that the Court has already rejected as insufficient to establish a cognizable injury. 2021 MTD Order at 17. The Court found that an "increased risk of future identity theft" and "expenses incurred to prevent future identity theft" were not cognizable injuries without evidence that Plaintiffs' data was accessed or exfiltrated. *Id.* The Court allowed only two injury theories to proceed: (1) "economic injuries," such as fraudulent charges, and (2) "injur[ies] arising from the intrusion upon [Plaintiffs'] privacy interests," such as attempted identity theft or an increase in spam calls.[22] *Id.* at 13–17. But ███████████████████████████████████████████████████████ ████████████████████████. *See* Ex. 34, Worley Dep. at 146:2–7. Similarly, Witt's calculation of damages measures only ██████████████████████████████████████████████ (*i.e.,* expenses to supposedly mitigate future risk of harm). Mot. Ex. 61, Witt Am. ¶¶ 13–15. Plaintiffs' damages model therefore does not provide evidence capable of "measur[ing] only those damages attributable to" the liability theories remaining in the case. *Comcast*, 569 U.S. at 35. Thus, Plaintiffs' model "cannot possibly establish that damages are susceptible of measurement across the entire class"—a conclusion that defeats predominance. *Id.*; *see also Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 313 (3d Cir. 2016) (failure to propose a cognizable theory of damages supported by class-wide evidence defeats predominance); *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, 2019 WL 2521958, at *14 (D.N.J. June 18, 2019) (denying class certification where plaintiffs' "classwide damages analysis . . . cannot demonstrate damages consistent with Plaintiff's liability theory").

---

[21] Ex. 1, Hitt ¶¶ 102–07.

[22] Plaintiffs submitted declarations purporting to identifying numerous types of injuries allegedly caused by the AMCA Cyberattack, such as an increase in spam phone calls. But Plaintiffs do not propose any class-wide injury model for calculating damages based on these alleged injuries.

        *(iv)  Plaintiffs Cannot Rely on Their Request for Nominal Damages.*

  Plaintiffs also claim that they can obtain nominal damages for negligence and negligence per se and thus avoid any individualized questions of injury, but they are wrong for at least two reasons. First, if a putative class member's data was not accessed or exfiltrated, then there is no injury (and thus no standing), meaning no claim exists. *See* Section III.B.1.b, *supra.* Nominal damages cannot give rise to an injury where none exists. Second, even applying New Jersey law—the law that Plaintiffs argue applies globally here[23]—nominal damages are not available for negligence claims. *See Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp.*, 2014 WL 3578748, at *7 (D.N.J. July 18, 2014) (because "the tort of negligence . . . requires showing both 'a breach of duty and resulting damage to prevail,'" nominal damages are not available) (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 45–46 (1984)).[24] Plaintiffs' cited cases are inapposite because they involve breach of contract claims, *see Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 12 (D.D.C. 2024), or "infraction[s] of a legal right . . . where the right is one not dependent upon loss or damage," *see Opperman v. Path, Inc.*, 2016 WL 3844326, at *16 (N.D. Cal. July 15, 2016), unlike a cause of action for negligence. Thus, Plaintiffs cannot certify a class merely upon their claim to entitlement for nominal damages for their negligence claim.[25]

        *(v)  Individualized Evidence is Required to Prove the California Subclass's CMIA Claim.*

  To prevail on their CMIA claim, Plaintiffs must prove, among other things, that an

---

[23] Because the outcome may differ under various states' laws, this is a further example of the individualized issues looming over Plaintiffs' Motion. *See* Section III.B.1.c.(ii), *supra.*

[24] *See also Oetting v. Heffler*, 2015 WL 9190629, at *6 (E.D. Pa. Dec. 17, 2015) ("[N]ominal damages are not available for . . . negligence [claims]."); Restatement (Second) of Torts § 907 cmt. a (1965) (nominal damages may not be awarded for negligence claim). *Cf. Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 695 (N.D. Cal. 2019) ("It is fundamental that a negligent act is not actionable unless it results in injury to another. California also holds that nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred.") (citation modified).

[25] Even if Plaintiffs could point to a jurisdiction that permits nominal damages for negligence claims, that would not erase the requirement to establish causation through common evidence, or that named Plaintiffs and putative class members suffered harm consistent with their liability case. *See Franco v. Conn. Gen. Life Ins. Co.*, 299 F.R.D. 417, 429 (D.N.J. 2014) (explaining that "to accept a damages methodology in the abstract, without reference to the merits of the claim, would reduce Rule 23(b)(3)'s predominance requirement to a nullity") (citation modified).

37

unauthorized person "actually viewed" confidential medical information[26] of the California subclass. *See* Cal. Civ. Code § 56.36; *Sutter Health v. Super. Ct.*, 227 Cal. App. 4th 1546, 1555, 1557 (2014) (explaining that to prevail on a CMIA claim a plaintiff must prove that an unauthorized person "actually viewed" their confidential medical records). Thus, there are two elements at issue: (1) actual viewing, and (2) confidential medical information (and not simply any personal information). To obtain class certification, Plaintiffs must show that they can prove these elements on a class-wide basis with common proof. They cannot.

The California Court of Appeals has held class certification improper in a CMIA case precisely because of the inherently individualized nature of these inquiries. *See Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 204 (2022). In *Vigil*, an unauthorized third party had access to a spreadsheet containing nearly 5,500 individuals' PHI. *See id.* at 206. Even though it was undisputed that an unauthorized third party possessed PHI for the entire putative class, the court still found that predominance was not satisfied because the plaintiff in that case, just like Plaintiffs here, failed to come forward with common evidence that could be used to establish that each putative class member's PHI was "actually viewed" by an unauthorized third party. *Id.* at 217.[27] The *Vigil* court held that determining liability under the CMIA "require[s] an assessment of each putative class member's circumstances to determine whether his or her information was viewed by an unauthorized party and whether the data breach caused this breach of confidentiality." *Id.* at 222. This individualized inquiry precluded a finding of predominance in *Vigil* and it does in this case as well. *See id.* at 223.

---

[26] Medical information is defined under the CMIA as "individually identifiable information . . . regarding a patient's medical history, . . . mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j).

[27] The *Vigil* decision also clarifies that the California Legislature did not intend for defendants to be liable for millions and even billions of dollars for the mere loss of possession of medical information. Citing *Sutter Health*, the court noted that under the plaintiff's argument, the theft of a computer hard drive containing information for 4 million patients would result in liability of at least $4 billion, even if the thief never viewed the information. 84 Cal. App. 5th at 217–18. The court concluded that it did "not believe that the Legislature intended such an extreme result." *Id.* at 218.

To distinguish *Vigil*, Plaintiffs sole argument is that they have established actual viewing of confidential medical information for the entire California subclass because "threat actors exfiltrated Subclass Members' PHI, analyzed it, placed it for sale on the dark web, and other criminals viewed this information on the dark web and after purchasing it." Mot. at 26. But, once again, Plaintiffs are wrong. As previously discussed, ███████████████████████████████████████ ███████████ *See* Ex. 1, Hitt ¶¶ 84–88. Consequently, an individualized inquiry is required from the start simply to determine whether each putative subclass member had information in the CHAMP database that constitutes confidential medical information under the CMIA. Plaintiffs ignore this threshold issue and offer no mechanism for determining which California subclass members had CMIA-protected information in the CHAMP database. *See* Cal. Civ. Code § 56.05(j). ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ *See* Ex. 1, Hitt ¶ 74 n.137 (Workbook 10); 2021 MTD Order at 63 (CMIA-protected medical information "must include a patient's medical history, mental or physical condition, or treatment . . . dates of service and referring doctor . . . do[] not rise to the definition of medical information under California law.") (citation modified).

From there, the individualized inquiries required to resolve these questions only grow. There is no common evidence that would show all of the information (or any of the information) in the CHAMP database was accessed or exfiltrated in the AMCA Cyberattack. *See* Section III.B.1.a, *supra*. Similarly, ████████████████████████████████████████████ ████████████████████████████████████████. Ex. 1, Hitt ¶ 182. Instead, "each class member would have to show that his or her medical information was viewed by an unauthorized party" through individualized proof. *Vigil*, 84 Cal. App. 5th at 220.

Plaintiffs argue they can satisfy the requirement that the putative subclass members'

confidential medical information was actually viewed because putative subclass members' "PHI was published for sale on the dark web and numerous factors indicate that this data was actually sold." Mot. at 24. But this assertion misses the mark because there is zero evidence to support Plaintiffs' claim that putative subclass members' confidential medical information was sold on the dark web. Plaintiffs rely on Frantz, Mot. at 24, but in addition to all the problems with her analysis discussed above, ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████ *See* Section III.B.1.a, *supra.* What this means is that there is a wholesale failure by Plaintiffs to come forward with *any* evidence that an unauthorized person actually viewed any of the putative subclass members' confidential medical information, much less common evidence that can make this showing on a class-wide basis. Thus, as in *Vigil*, the individualized inquiry required to assess liability under the CMIA precludes a finding of predominance.

None of the cases Plaintiffs cite saves their California subclass. *See* Mot. at 23–26. Plaintiffs rely exclusively on cases that address what must be alleged to state a plausible claim under the CMIA to survive a motion to dismiss—not what is required for class certification. *See Stasi v. Immediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 909–10 (S.D. Cal. 2020) (noting that, while sufficient to survive a motion to dismiss, plaintiffs' claim that PHI had been "actually viewed" was "sketchy" and "absent ultimate proof" of actual viewing, their claim would ultimately fail); *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 819 (N.D. Cal. 2023) (finding allegations that defendant "acted upon" receiving PHI information in the context of meta pixel trafficking sufficient to "raise a plausible claim" and survive a motion to dismiss); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 198 F. Supp. 3d 1183, 1202 (D. Or. 2016) (denying defendant's motion to dismiss where plaintiff plausibly alleged PHI was "misused in a variety of ways" to support evidence of actual viewing). But whether allegations are sufficient to state a plausible CMIA claim says nothing about whether the claim should be certified at

the class certification stage.  The Third Circuit has repeatedly held that "the requirements set out in Rule 23 are not mere pleading rules." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 316; *see also Marcus*, 687 F.3d at 591.  Thus, to obtain class certification, Plaintiffs must prove, by a preponderance of the evidence, that there is evidence common to the entire subclass that can resolve the central issues of Plaintiffs' CMIA claim.  *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 321–22.  Here, there is no common evidence that confidential medical information was exfiltrated from the CHAMP database or that it was actually viewed by an unauthorized third party.  As a result, the highly individualized inquiries that would be required to resolve the California subclass's CMIA claim overwhelm any common issues and defeat predominance.

### 2.    *Plaintiffs Have Not Established Superiority.*

Plaintiffs' Motion to certify a class under Rule 23(b)(3) should also be denied because Plaintiffs have not met their burden of establishing Rule 23(b)(3)'s superiority requirement.  *See* Fed. R. Civ. P. 23(b)(3).  To meet their burden, Plaintiffs must articulate "how a trial of this controversy, if tried as a class action, could be efficiently and fairly managed." *In re LifeUSA Holding Inc.*, 242 F.3d 136, 148 (3d Cir. 2001).  This manageability inquiry "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Mann v. TD Bank, N.A.*, 2010 WL 4226526, at *18 (D.N.J. Oct. 20, 2010) (citation modified).  In the Motion, Plaintiffs simply declare that "superiority is easily met" because "the claims turn on entirely common proof."  Mot. at 30.  But Plaintiffs bear the burden of establishing that the superiority requirement is met by a preponderance of the evidence—merely stating that it is satisfied is not enough.  *See In re Ford*, 174 F.R.D. at 350 (denying motion for class certification for, among other things, lack of superiority because the plaintiffs' "mere promises" that a class action would be manageable failed to meet their burden to "design[] a workable plan for trial embracing all claims and defenses prior to class certification").  And in any event, Plaintiffs are wrong for at least the following reasons.

41

*First*, the highly individualized analysis required to assess choice of law, injury, causation, and damages discussed above also prevents Plaintiffs from meeting their burden of demonstrating that class-wide proceedings would be efficient and manageable. *See* Section III.B.1.c–d, *supra*; *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 192 (3d Cir. 2001) (affirming district court's denial of class certification where plaintiffs failed to meet the superiority and predominance requirements due to numerous issues uncommon to the putative class).

*Second*, Plaintiffs have no plan for addressing the significant apportionment issues in a trial. Many named Plaintiffs visited multiple Defendant labs, providing different Defendants with different information. For example, in the case of Plaintiff Klein—who testified that she visited both Quest and Labcorp[28]— ███████████████████████████████████████████████

████████████████████████ ■ Indeed, ████████████████████████████████████████

████████████████████████████████ ■ As a result, ██████████████████████████

█████████████████████████████████████████████████████. Ex. 1, Hitt ¶¶ 152–53. Plaintiffs do not propose any mechanism for how to manage apportioning any liability and damages awarded for these putative class members. The complexity only multiplies given that apportionment rules vary from state to state. *Compare* N.J. Stat. § 2A:15-5.3, *with* Cal. Civ. Code § 1431. Plaintiffs do not—and could not—come forward with any plan or proposal for how this highly complex issue can be managed. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 165 (E.D. Pa. 2015) (denying class certification and finding plaintiffs failed to demonstrate manageability, which would have required a "detailed plan" addressing the "significant variability in the state laws").

*Third*, Plaintiffs propose trying the CMIA claim of the California subclass to a separate jury

---

[28] *See* Ex. 35, Dep. of Breanna Klein ("Klein Dep.") at 175:9–177:15 (testifying that she went to Quest and Labcorp labs based on "[w]hichever [was] most available with [her] schedule").
[29] Ex. 1, Hitt ¶ 153 n.287 (Workbook 38).
[30] Ex. 1, Hitt ¶ 152 n.286 (Workbook 37).

in California.  *See* Mot. at 4.  Plaintiffs do not offer any explanation or legal basis for a procedure that would bifurcate this case and send a portion of it to California for trial.  But even if this were possible, Plaintiffs' proposal would violate the Seventh Amendment.  All members of the putative California subclass are also members of the putative nationwide class.  The claims of both the California subclass and the nationwide class require Plaintiffs to prove Optum360 and Quest were negligent.  *See* Cal. Civ. Code § 56.101(a); FAC ¶¶ 520, 527–33.  As a result, as proposed by Plaintiffs, two separate juries would decide the question of whether Optum360 was negligent.  This directly contravenes the Seventh Amendment's right against re-examination—specifically, Optum360's constitutional right to have only "one jury pass on" the question of whether it was negligent.  *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 n.5 (3d Cir. 1997).  Numerous courts have declined to certify classes where the proposed plan contemplates the first jury making findings concerning essential issues that would be re-examined by subsequent juries.  *See, e.g.*, *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 494 (E.D. Pa. 1997) (denying class certification and explaining that "[b]ecause the risk of reevaluation would be so high, it cannot be said with any logic that class certification is superior to individual adjudications in this case"); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996) (finding superiority lacking because the "the court will be forced to bifurcate issues in violation of the Seventh Amendment"); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995).  The Court should follow this authority and deny Plaintiffs' Motion here.

### C.     Plaintiffs Fail to Meet the Rule 23(a) Requirements.

Plaintiffs also fail to satisfy multiple of Rule 23(a)'s requirements.  More specifically, Plaintiffs' California subclass is not ascertainable, and Plaintiffs' conclusory statements do not come close to establishing Rule 23(a)'s typicality and adequacy requirements.

#### 1.     *Plaintiffs' Proposed California Subclass is Not Ascertainable.*

Ascertainability requires that the putative class be (1) "defined with reference to objective

43

criteria" and (2) that there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013). Plaintiffs seek to certify a subclass of "[a]ll natural persons residing in California whose Personal Health Information was stored in the CHAMP database and who were sent a letter from Quest or Optum360 notifying them of the Breach." Mot. at 4.

Plaintiffs argue the California subclass is ascertainable because it is "defined by objective criteria: people who were notified by Quest and Optum that their Personal Information was exposed to threat actors." Mot at. 17–18. But Plaintiffs ignore the second element of ascertainability—*i.e.*, demonstrating that there is a "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes*, 725 F.3d at 355. Specifically, Plaintiffs do not even attempt to establish that there is a reliable and administratively feasible mechanism for determining whether putative class members **resided** in California at the time of the AMCA Cyberattack. This analysis is required because, as Plaintiffs' subclass definition recognizes, only individuals residing in California at the time of the breach can assert a claim under the CMIA. *See Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982, at *25 (N.D. Cal. Apr. 11, 2024) (dismissing CMIA claim and explaining that "only a California Plaintiff may bring a CMIA claim"). Resolving this gating issue requires inherently individualized analysis.

Plaintiffs also claim "Defendants have already identified" the subclass members through the provision of notice. Mot. at 18. That is false. ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████, foreclosing a finding that there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the [California sub]class definition." *Hayes*, 725 F.3d at 355.

44

Recently, a federal court denied class certification in a data breach case due to similar ascertainability issues. In *Blackbaud*, the court explained that address information in the compromised file was insufficient to determine state-specific subclass membership because the plaintiffs did not provide a "method through which a putative plaintiffs' state of residence at the time of the breach can be validated." 2024 WL 2155221, at *10 n.14 (D.S.C. May 14, 2024). Indeed, the court stated that "the resolution of the legal residency requirement would require individualized analysis that this Court does not believe can reasonably be undertaken."[31] *Id.* (citation modified).

### 2.    *Plaintiffs Cannot Establish Typicality or Adequacy.*

#### a.    Plaintiffs Fail to Establish Typicality.

Plaintiffs do not demonstrate that their claims are typical of the putative class they seek to represent. The typicality requirements ensure that by advancing their own interests, the named plaintiffs will advance the interests of the putative class. *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009). It requires, among other things, (1) the named plaintiffs to have suffered the same injuries as the absent class members, and (2) that those injuries arose from the same course of conduct by defendants. *Miller v. Eagle Pharms., Inc.*, 2024 WL 3858124, at *3 (D.N.J. Aug. 19, 2024).

As discussed above in Section III.B.1.a, *supra*, there is no common evidence to establish that Plaintiffs' or putative class members' information was unlawfully disclosed, which defeats Plaintiffs' claim that they have "suffered the same injuries as" the putative class. Mot. at 16. *See Gardner v. Health Net Inc.*, 2010 WL 11579028, at *4 (C.D. Cal. Sept. 13, 2010) (no typicality because individualized inquiry required to determine numerous questions including "whether each class member's personal information was actually exposed"). Plaintiffs also fail to establish that their claims arise from the

---

[31] While Plaintiffs may claim on reply that this determination could be made by asking class members whether they resided in California at the time of the Cyberattack, doing so would prevent Optum360 from being able to challenge each plaintiff on this fundamental requirement for a CMIA claim, implicating serious due process concerns. *Marcus*, 687 F.3d at 594.

same source of conduct by Defendants. In their Motion, Plaintiffs claim their injuries arise from the "same course of conduct by Defendants, providing Personal Information to AMCA and then failing to oversee it." Mot. at 16. But that is wrong. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Plaintiffs *do not even attempt* to account for these distinctions in arguing that typicality is established, nor do they cite a single case where typicality was satisfied where two defendants engaged in distinct courses of conduct. Plaintiffs have therefore failed to establish typicality. *See In re Hum. Tissue Prods. Liab. Litig.*, 2010 WL 743922, at *3 (D.N.J. Mar. 2, 2010) (finding no typicality where plaintiffs failed to establish same course of conduct among multiple defendants).

        b.        <u>Plaintiffs Fail to Establish Adequacy.</u>

Plaintiffs also fail to establish Rule 23(a)'s adequacy requirement that Plaintiffs "possess the same interest and suffer the same injury as the class members." *Gutierrez v. Johnson & Johnson*, 467 F. Supp. 2d 403, 413 (D.N.J. 2006) (citation modified). To adequately represent the interests of the class, Plaintiffs "must demonstrate a commitment to vigorously prosecute the interests of the class." *Mays v. Tenn. Valley Auth.*, 274 F.R.D. 614, 633–34 (E.D. Tenn. 2011). Plaintiffs' assertions that (1) the interests of named Plaintiffs and putative class members are "entirely aligned because they were affected by Defendants' same course of conduct and rely on identical legal theories" and (2) "there can be no serious doubt that the proposed Class Representatives or their counsel have or will continue to vigorously pursue the claims of the Class," Mot. at 17, are demonstrably false.

---

[32] Ex. 1, Hitt ¶ 78 n.150 (Workbook 12).
[33] Ex. 1, Hitt ¶ 79 n.153 (Workbook 14)████████████████

████████████████████████████████████████████████████████

In an attempt to better their odds at class certification, Plaintiffs have jettisoned many of the allegations of harm asserted in their Complaint.  In their Complaint, and even in their declarations in support of class certification, multiple Plaintiffs allege unauthorized financial charges, instances of identity theft, lost time, and other out-of-pocket expenses as a result of the AMCA Cyberattack.  *See, e.g.*, FAC ¶¶ 55–56, 98, 166–69, 171, 201–03, 215, 282, 284, 306, 308.[34]  Yet Plaintiffs do not address these alleged damages in their Motion, and ███████████████████████████████████ ████████████████████████████████████████████████████.  *See* Ex. 1, Hitt ¶¶ 98–101.  It is obvious why.  As discussed above, determining whether putative class members have experienced these alleged injuries is fraught with individualized issues that are incompatible with Rule 23's predominance requirement.  *See* Section III.B.1, *supra.*  To the extent that Plaintiffs intend to ignore these theories of harm at trial, they will not "vigorously pursue the claims of the Class" for individuals who claim to have incurred these sorts of alleged injuries and harm, Mot. at 17, and therefore cannot satisfy the adequacy of representation requirement.[35]  *See, e.g., In re Lincoln Nat'l COI Litig.*, 620 F. Supp. 3d 230, 266 (E.D. Pa. 2022) (proposed class representatives not adequate because they abandoned claims alleged in the complaint); *Tasion Commc'ns, Inc. v. Ubiquity Networks, Inc.*, 308 F.R.D. 630, 641 (N.D. Cal. 2015) (adequacy requirement not met where plaintiffs abandoned alleged harm and damages that were "all highlighted extensively in the operative complaint").

### 3.   *Plaintiff Klein Fails to Establish Typicality or Adequacy for the California Subclass.*

Plaintiff Klein—the only proposed representative for the California subclass—fails to satisfy either the typicality or adequacy requirement under Rule 23(a) because she is subject to a unique

---

[34] *See* Mot. Exs. 37–40, 42–44, 49, 51, 52–55 (named Plaintiff Declarations).

[35] Indeed, the same counsel negotiated and agreed to a settlement on the CareCentrix track which provided compensation for verifiable, unreimbursed out-of-pocket losses up to $5,000.  ECF 510-3, at 7.  While counsel considered that settlement "fair, reasonable, and adequate" to "address Settlement Class Members alleged injuries as a result of the Data Breach," (ECF 510-2, Cecchi Decl. ¶ 7), they fail to seek a similar form of compensation for putative class members here, without explanation.

47

defense due to her public disclosure of her own medical information. A necessary element of Klein's CMIA claim is that she kept her medical information *confidential*. *See Garrett v. Young*, 109 Cal. App. 4th 1393, 1408 (2003). ██████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ *See* Ex. 2, Tomasini ¶¶ 198–200; Ex. 1, Hitt ¶ 51; Ex. 35, Klein Dep. at 51:11–77:14; *see, e.g.*, *id.* at 60:1–62:6 (discussing public TikTok video posted by Klein in which she references her ███████████████); *id.* at 65:1–67:3 (addressing public TikTok video posted by Klein discussing her diagnostic laboratory test results). Because Klein "openly discussed information about . . . her medical condition with third parties," she "waive[d] [her] rights in a lawsuit against a medical provider for violation of the CMIA." *Garrett*, 109 Cal. App. 4th at 1408. Klein's own actions destroy any purported confidentiality of any medical information at issue here, thereby subjecting her to the "unique defense" that her CMIA claim fails because her medical information is *not* confidential, which "is likely to become a major focus of the litigation." *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). A proposed class representative is neither typical nor adequate when subject to such a unique defense. *See, e.g.*, *id.* at 301–02 (vacating grant of certification and instructing the district court to consider unique defense asserted against a named plaintiff as part of the typicality and adequacy inquiries); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 598, 602 (same). Without a typical or adequate representative, the proposed California subclass cannot be certified.

### D.      Plaintiffs Do Not Satisfy the Requirements for a Rule 23(b)(2) Class.

To proceed under Rule 23(b)(2), Plaintiffs must prove that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As an initial

48

matter, Plaintiffs lack Article III standing to seek prospective injunctive relief under Rule 23(b)(2) because they fail to show a "real and immediate" risk of future injury resulting from Optum360's conduct. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012). ███████████████

███████████████████████████████████████████████████████

████ █ ███ ███ ██ █ █ ███ █ █ ███ ██████, Ex. 4, OPTUM360_AMCA_0000111, and AMCA is now a "defunct entity," ECF 585 at 10.

Even if Plaintiffs had standing to seek injunctive relief (and they do not), certification of a Rule 23(b)(2) class would also be inappropriate because Plaintiffs cannot establish that the proposed class is sufficiently cohesive. Cohesiveness of a proposed class is essential because "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (citation modified). Here, for the same reasons that individualized issues predominate and preclude certification under Rule 23(b)(3), Plaintiffs' proposed class is not sufficiently cohesive to support certification under Rule 23(b)(2). *See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011) (denying certification of Rule 23(b)(2) class and noting that "a (b)(2) class may require more cohesiveness than a (b)(3) class") (citation modified).

Beyond these deficiencies, the Supreme Court and the Third Circuit have made clear that "Rule 23(b)(2) 'does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.'" *Gates*, 655 F.3d at 264 (quoting *Dukes*, 564 U.S. at 360–61). Plaintiffs undoubtedly seek primarily individualized monetary relief. Indeed, Plaintiffs' experts purport to assign individualized damages calculations to each of the named Plaintiffs. *See* Mot. Ex. 61, Witt Am. ¶ 2. In the aggregate, Plaintiffs seek monetary damages on behalf of approximately 24.42 million class members across the MDL. *See id.* Ex. N (11,465,787 for Quest-Optum360; 10,081,014 for Labcorp; and 2,869,749 for Sonic). According to Witt, Plaintiffs are seeking, *at minimum*, at least

49

$7.8 billion in damages across all three tracks, and over $3.9 billion from Quest and Optum360 alone. *See id.* And as set forth above in Section III.B.1.d, *supra*, the damages calculation for each class member would be highly individualized. Plaintiffs "have not shown how their proposed injunctive relief . . . will remedy their alleged . . . economic injuries," which is incompatible with Rule 23(b)(2). *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, 2021 WL 3612155, at \*5 (3d Cir. Aug. 16, 2021) (affirming denial of certification of Rule 23(b)(2) class).

## IV.    CONCLUSION

For all the reasons set forth above, Plaintiffs have not met their burden of proving Rule 23's requirements by a preponderance of the evidence. The Court should deny Plaintiffs' Motion.

Dated:  September 2, 2025

Respectfully submitted,

By: */s/  Reade W. Seligmann*

Reade W. Seligmann
ALSTON & BIRD LLP
90 Park Avenue, 12th Floor
New York, NY  10016
Tel.: (212) 210-9453
reade.seligmann@alston.com

Kristine M. Brown
Donald M. Houser
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309
Tel.: (404) 881-7000
kristy.brown@alston.com
donald.houser@alston.com

Thomas P. Scrivo
Young Yu
O'TOOLE SCRIVO, LLC
14 Village Park Road
Cedar Grove, NJ 07009
Tel.: (973) 239-5700
tscrivo@oslaw.com
yyu@oslaw.com

*Attorneys for Defendant*
*Optum360, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2025, I served on Plaintiffs' counsel of record via email the foregoing Opposition to Plaintiffs' Motion for Class Certification.

<u>/s/ Reade W. Seligmann</u>
Reade W. Seligmann