Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

* * * * * * * * * * * * * * * * * * * * * * *

IN RE:  AMERICAN MEDICAL COLLECTION AGENCY, INC.

CUSTOMER DATA SECURITY BREACH LITIGATION

ALL ACTIONS AGAINST: LABORATORY CORPORATION OF AMERICA HOLDINGS, QUEST DIAGNOSTICS, INC., and OPTUM360, LLC, and SONIC HEALTHCARE USA AND RELATED SUBSIDIARIES AND LABORATORIES

Case No. 19-md-2904(MCA)(MAH)

* * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF SCOTT WITT

TAKEN AT:  FOLEY & LARDNER, LLP
LOCATED AT:  777 East Wisconsin Avenue
Milwaukee, Wisconsin

July 9, 2025
9:28 a.m. to 4:14 p.m.

* * * * * * * * * * * * * * * * * * * * * * *

REPORTED BY ANNICK M. JAQUET, RMR, CRR

Page 2

A P P E A R A N C E S:

STUEVE SIEGEL HANSON, by
Mr. Austin Moore
460 Nichols Road #200
Kansas City, Missouri  64112-2003
(816) 714-7105
moore@stuevesiegel.com
Appearing on behalf of the Plaintiffs.

LEWIS BRISBOIS BISGAARD & SMITH, by
Ms. Ariadne Panagopoulou
Mr. Bradley J. Bartolomeo (remotely)
7 World Trade Center
250 Greenwich Street, 11th Floor
New York, New York  10007-2140
ariadne.panagopoulou@lewisbrisbois.com
bradley.bartolomeo@lewisbrisbois.com
Appearing on behalf of defendants in the Sonic
Healthcare USA track.

SIDLEY AUSTIN, LLP, by
Ms. Heather Benzmiller Sultanian
1 South Dearborn #900
Chicago, Illinois  60603-2323
(312) 853-7883
hsultanian@sidley.com
Appearing on behalf of Quest Diagnostics.

ALSTON & BIRD, by
Ms. Erin Edwards
1201 West Peachtree Street #4900
Atlanta, Georgia  30309-3466
(404) 881-7806
erin.edwards@alston.com
Appearing remotely on behalf of Optum360.

Page 3

A P P E A R A N C E S:

HOGAN LOVELLS US, LLP, by
Ms. Courtney E. Helt
Mr. Adam A. Cooke
555 13th Street, N.W.
Washington, D.C.  20004-1109
(202) 637-5600
courtney.helt@hoganlovells.com
adam.a.cooke@hoganlovells.com
Appearing remotely on behalf of LabCorp.

ALSO PRESENT:  John Spohnholtz, videographer
                Morgan Brasch, concierge

I N D E X

Examination by:                              Page:

Ms. Panagopoulou ........................... 6

Ms. Sultanian ............................ 210

Page 4

E X H I B I T S

Exhibit                    Description                    Page

Exhibit A ... Document labeled "Meek vs. Kansas
              City, 2023 ................... 52

Exhibit B ... Mr. Witt's 4/11/25 report .... 66

Exhibit C ... Documents from Mr. Witt's website
                                          p. 74

Exhibit D ... Expert report of Dr. Jonathan Lee
                                          p. 99

Exhibit E ... Supplemental report of Amy Worley
                                          p. 145

Exhibit F ... 11/1/24 report of Amy Worley  146

Exhibit G ... United States Life Tables, 2021
                                          p. 159

Exhibit H ... Historical S&P 500 Index
              Performance ................ 169

Exhibit I ... Article titled "The association
              between income and life
              expectancy in the United States,
              2001 to 2014" .............. 216

(The original exhibits were attached to the
original transcript.  Copies were attached to
all transcript copies.)

(The original transcript was delivered to
Attorney Panagopoulou.)

Page 5

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER:  We are officially on the record at 9:28 a.m.  Today's date is July 9, 2025.  This is Media Unit Number 1 in the deposition of Scott Witt.  This deposition is being taken in the matter in re: American Medical Collection Agency.  This matter is pending in the United States District Court for the District of New Jersey, Case Number 219-MD-2904.

This deposition is being taken at the offices of Foley and Lardner, located at 777 East Wisconsin Avenue, Milwaukee, Wisconsin.

My name is John Spohnholtz, the videographer with Veritext Legal Solutions, and the court reporter is Annick JaQuet.

Will counsel please state their appearances and whom they represent, beginning with plaintiffs' counsel, and then the reporter will swear in the witness.

MR. MOORE:  Austin Moore, Stueve Siegel Hanson, on behalf of the plaintiffs.

MS. PANAGOPOULOU:  Ariadne Panagopoulou from Lewis Brisbois Bisgaard & Smith, and I represent the defendants in the

Page 6

Sonic Healthcare USA track.

MS. SULTANIAN:  Heather Sultanian from Sidley Austin.  I represent defendant Quest Diagnostics.

MS. EDWARDS:  Erin Edwards from Alston & Bird, LLC, and I represent defendant Optum360, LLC.

MR. BARTOLOMEO:  Brad Bartolomeo from Lewis Brisbois, also representing the Sonic defendants.

MS. PANAGOPOULOU:  I believe Adam hasn't given his appearance.

MS. HELT:  This is Courtney Helt, Hogan Lovells US, LLP.  I'm here with my colleague, Adam Cooke, representing LabCorp.

MS. SULTANIAN:  I believe that's everyone.

SCOTT WITT, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

E X A M I N A T I O N

BY MS. PANAGOPOULOU:

Q   Good morning, Mr. Witt.

A   Good morning.

Q   Like I said before, I am an attorney

representing the defendants in the Sonic Healthcare USA track.  I'm here today to ask you some questions about your expert report that you provided in this case.  Before I do so, I'll be giving you some background instructions for how the deposition is going to proceed forward.  You've been deposed before, correct?

A    Yes.

Q    And you're familiar with generally how depositions work, right?

A    Yes.

Q    Okay.  I'm going to give you these instructions anyway.  You probably have heard them before, but just to be on the safe side.  So I am here to ask you a series of questions, and you have to answer them to the best of your knowledge and ability.

A    Understood.

Q    If I ask a question and you don't understand the question, you can tell me "I don't understand the question," and I'll be more than happy to rephrase.

A    Okay.

Q    If you don't hear the question or -- you can

Page 8

tell me "I haven't heard you" or, again, "Can you rephrase that?"

A    Okay.

Q    If I ask a question and though you've understood it, you don't know the answer, you can simply tell me "I don't know."

A    Okay.

Q    This is not a guessing game.  I'm not trying to get you to give answers that you have no knowledge of yourself.

A    Understood.

Q    However, if I ask a question and you provide an answer that's something other than "I don't know," I will assume that you have understood my question and you have knowledge as to the contents of the answer.  Is that fair?

A    Yes.

Q    Okay.  I would request that all your responses be verbal.  As you know, you have a court reporter to your left that takes down everything you say verbally but doesn't take down a shake of the head or a hand gesture.

A    Understood.

Q    Just so we have a clear record, let me finish my question first.  Wait for a split second in

Page 9

case your attorney has any objections to
interpose and then answer just so we can have a
clear record.

A    Understood.

Q    If at any time you need a break, just let me
know.  I'm more than happy to give you a break
as long as a question is not pending.

A    Understood.

Q    Okay.  Is there any reason you cannot provide
full, accurate, and truthful testimony today?

A    No.

Q    Are you taking any medications or are you under
the influence of any substance that would
impair your ability to testify truthfully
today?

A    No.

Q    How did you prepare for this deposition?

A    I had several calls, Zoom meetings, with
counsel.

Q    Uh-huh.  And how long did those calls last?

A    In aggregate, they were probably three or four
hours.

Q    Okay.  And I'm sorry, how many calls did you
have, you said?

A    Two or three.

Page 10

Q    Okay.  And aside from having those calls with -- with the attorneys in this case, did you do anything else to prepare for today's deposition?

A    I reviewed my notes, reviewed my report.  I reviewed Ms. Worley's reports and Dr. Lee's report.

Q    Uh-huh.  Anything else?

A    No.  I think that's it.

Q    Okay.  I just want to examine a little bit your professional background and qualifications.  So you're an actuary, right?

A    Correct.

Q    And do you have -- would you say you have a specific area of expertise?

A    I have a fellowship in the life track, so the bulk of my -- the bulk of my work and my day-to-day practice comes in the life insurance and annuities arena, but it's -- encompasses broad areas of actuarial science.

Q    Okay.  So when you say -- you said insurance, life insurance and annuities, right?

A    Correct.

Q    And when you say the bulk of your work, what -- roughly what percentage of your work has to do

Page 11

with either life insurance or annuities?

A    Probably 75 to 80 percent.

Q    And the rest -- the remaining 25 to 30 percent -- I'm sorry -- 20 to 25 percent has to do with what?

A    A variety of things.  I'm involved as an expert witness in some situations that don't directly involve life insurance or annuities.  Long-term care insurance is another area where I get involved.  There are situations where I'm doing actuarial calculations, like helping people figure out pension options.  You could almost say that those are -- fall under the annuity umbrella.  I do life insurance appraisals where I'm putting an actuarial present value on various types of life insurance policies for various purposes.

Q    Aside from life insurance, do you deal with other types of insurance?

A    Long-term care insurance.

Q    What is -- what is, exactly, long-term care insurance?

A    So long-term care insurance is insurance for people that want to protect against the risk of ending up in a nursing home.  It provides some

Page 12

financial relief for people who qualify. There's usually a certain number of activities of daily living. If you were not able to function properly to achieve those activities of daily living you can qualify for benefits from a long-term care policy. So there's a whole market, similar to the life insurance market, where people are protecting against the risk of death. The long-term care market is providing protection against needing long-term care.

Q   Uh-huh. Any other types of insurance?

A   Occasionally I will get asked about some disability income insurance, but I don't get -- I'm not really heavily involved in that. You could say that annuities are -- are insurance against living too long, certain types of annuities. So I'm heavily involved in annuities as well.

Q   Uh-huh. What about health care insurance? Are you involved in that?

A   I am not.

Q   Okay. And tell me a little bit about your educational background. What is your -- you have bachelor's and master's degrees, I

Page 13

believe, in mathematics, right?

A    I do.  I graduated in 1993 from Montana Tech
with dual degrees, bachelor's degrees in
mathematics and computer science.  And then I
attended Oregon State University where I
obtained a master's in statistics in late 1994.
I don't know if my degree says December '94 or
January '95, but it was right around that time.
That's the extent of my school education, and
then I've got -- I've done -- gone through the
self-study and the requirements to become a
fellow of the Society of Actuaries.

Q    And what are those requirements?

A    So it changes depending on the era in which you
became a fellow, but when I went through the
exam process there were approximately 22 or 23
exams that I passed over a five-year period or
so, and there's professional development
requirements as well, and you need to be
working in the industry for a certain amount of
years.  And if you meet all of those thresholds
and, you know, pass all the exams and the
professional development section, you can call
yourself a fellow of the Society of Actuaries.

Q    So you've just used the phrase "working in the

Page 14

industry" a minute ago.  What do you mean by
that?  What industry, specifically?

A    Something where you're using your actuarial
skills, I believe, is what -- is what the
threshold is.  My recollection is you needed
three years of experience to become a member of
the American Academy of Actuaries, and off the
top of my head I suspect that that minimum
requirement also applies to the Society of
Actuaries.

Q    Okay.  So as long as you're working in some
type of industry where you are applying
actuarial principles, you're eligible to join?

A    I'm not an expert in those qual- -- you know,
in those requirements, but that's my
understanding.

Q    Okay.  And in what particular industry were you
specifically working in to make sure that you
qualified?

A    I was working for Northwestern Mutual here in
Milwaukee, just behind me a few hundred yards.
And I was working there from -- starting in
1995, and I was at Northwestern Mutual when I
obtained my fellowship.

Q    And how long did you work there?

Page 15

A    I worked at Northwestern Mutual until 2005.

Q    Okay.  I want to take a step back and ask you, generally, about the types of employment you had as an actuary after having graduated from university.  So can you tell me the different jobs that you held?  Did you -- were you employed somewhere before Northwestern Mutual?

A    Just briefly.  It was an extension of an internship that I had when I was in college, so I worked there for maybe a couple months before I took the job at Northwestern Mutual.

Q    Okay.  And do you remember, just very roughly, what the internship was about?

A    Yeah.  I worked for a Department of Defense, Department of Energy subcontractor, and we were programming -- my specific job I was programming and analyzing the results of statistical models on -- basically we were melting metal and spraying it onto other pieces of metal in -- it was something that the Department of Defense wanted some advanced technology in.  So I was working on developing statistical models and testing the various, you know, if we -- if we melted -- if we did this spray at a certain temperature, these are the

Page 16

results.  If we did it at a different temperature, these were the results, and figuring out what was optimal.

Q   Uh-huh.  So Northwestern Mutual was the first place that you were employed after graduating with your master's degree, correct?

A   Aside from, like I said, just finishing up a couple of months with that Department of Energy, Department of Defense subcontractor.

Q   Uh-huh.  Was there something in particular that made you eligible for that role in Northwestern Mutual?

A   I had passed a handful of actuarial exams at that point.  So previously I mentioned I think I passed 22 or 23 exams.  I believe at the time that I became employed by Northwestern Mutual, I think I had five exams passed at that point and knew that I wanted to pursue a career as an actuary.  So even though I didn't have a degree as an -- in actuarial science, I had a background in statistics and math and I had passed a handful of actuarial exams and then I made it through the interview process and started at Northwestern Mutual in February of 2025 -- or 2000- -- 2005.  Sorry.

Page 17

Q    Sure.  Sure.  And thank you for that.  What I
was getting at --

A    Or that's wrong too.  19- -- 1995.  The years
are getting away from me here.

Q    Thank you.  I was not trying to talk over you.

So what I was getting at, was there
something that you studied at university that
made you a better candidate to work at a life
insurance company than some other actuary?

A    I think one of the things that was unique about
my application was my background in statistics,
and the very first job that they gave me at
Northwestern Mutual was something where I could
employ my statistical expertise.  And that may
have been something that gave me an edge in the
interview process, but I -- I don't know what
they were thinking -- you know, I don't know
what was in their minds, why -- why they picked
me out of all the others, but I'm grateful that
they did.

Q    Sure.  I guess what I'm getting at is you
didn't write some sort of dissertation paper on
life insurance policies that caught their eye
or study life insurance prior to that date,
correct?

Page 18

A   No.  They usually -- they usually bring in a handful of new actuaries every year.  Some of them have been interns with the company previously, so they're familiar with them. Others have degrees in actuarial science, which gives them a leg up.  So I was at a bit of a disadvantage in the application process because I didn't have a degree in actuarial science, but the fact that I had passed five of these exams on my own, despite not being in an actuarial science program, showed my aptitude for math and my interest in -- in the career. And then I apparently did well enough in the interview process that they were willing to take a shot.

Q   And you were at Northwestern Mutual for, I believe, ten years, you testified, right?

A   That's correct.

Q   And what was your role there?

A   In the course of my ten years I probably was in five or six different rotations.

Q   Uh-huh.

A   Early in your career you rotate to different areas of the company to get a broad base of experience.  Do you want me to go through each

Page 19

of the areas that I worked in?

Q    Just very broadly.

A    Okay.  So I started off in the experience studies area, which was primarily studying mortality and all the various applications within the company.  Then I moved to what they called the valuation area where you're making sure that the company has set proper reserves for the promises that it's made.  Next, I believe I went to the marketing area on a rotation outside of the actuarial department. I was specifically in what they call the competition division where we would reverse-engineer competitors' products and illustrations and try to figure out what was going on with these other companies relative to our company.  And I helped a lot of policyholders and consumers that had questions, so it was client-facing at times.  Then I moved back to the actuarial department, I believe in the corporate modeling area, which was a lot of statistical modeling at a really high level within the company to help make strategic decisions.  Then I believe I finished out and had a longer stay in the life pricing area

Page 20

within the actuarial department, and broadly that area of the department is responsible for developing new products and for determining the dividend scale for existing products.

Q    So for how many years did you work in the life pricing sector of Northwestern Mutual?

A    I think it was two to three years.

Q    And in your role, was it part of your role to determine the cost of insurance rates?

A    Not exactly.  Northwestern Mutual has far more whole life products than they do universal life products, and on a whole life product you don't technically have a cost of insurance.  There is an embedded cost of mortality, and you are determining what mortality assumption you're going to use and that gets plugged into the dividend formula.  So the life pricing area works hand in hand with the experience studies area, which was the first rotation that I described, to come up with dividend mortality assumptions that are then used within the dividend scale separately within the life pricing area.  There are some universal life products at Northwestern Mutual.  They were just dipping their toes in the water around the

Page 21

time that I was leaving, maybe those last handful of years.  They were starting to develop universal life products and, yes, those cost of insurance rates would be determined, again, in conjunction with working with the experience studies area, but there was a -- tried to have a consistency between the mortality assumptions that were used for cost of insurance rates for universal life products and mortality assumptions that were used for the dividend scale for whole life products, so complicated answer to your question.

Q   Very complicated, and I'm not sure I got 100 percent of what you said, but what I -- what I do think I understand is that for -- for each of these insurance policies that you are talking about, mortality rates play a factor, correct?

A   That's fair to say, yes.

Q   Okay.  And you spent some time at Northwestern Mutual studying mortality risks; is that fair to say?

A   Yes.

Q   Okay.  And are you familiar with the term "pricing mortality table"?

Page 22

A    I am.

Q    And what is that?

A    That would be a mortality table that was used
in pricing.  It's kind of described right in
the title.  So when you price a product you
need to make an assumption with respect to what
mortality the group of policyholders is going
to exhibit.  So that's -- at the time of
pricing, that's the assumption that you're
making for the block of policies.

Q    Okay.  And what factors go into determining
mortality rates?

A    Well, usually it's based on experience, either
from the company itself or if it's a small
company or it's a new kind of product and they
don't have experience on a similar product,
they might get assumptions from a reinsurance
company or perhaps an industry table.  So
that -- that would be the typical starting
point for a pricing mortality assumption would
be some sort of experience table.

Q    And what factors go into making that table?

A    So an experience table is a historical study of
actual mortality experience.  It looks for a
certain block of policyholders or -- or lives.

Page 23

It looks at how many people survived and how many people passed away at each age, and it can be partitioned by different factors such as sex, smoking status, things of that nature.

Q   Okay.  I guess these are the type of factors that I'm looking -- that I'm asking about.

A   Okay.

Q   So what are these factors?  You just mentioned sex, smoking status.

A   So usually -- yeah, usually mortality tables are partitioned by male versus female.  Smoking status; smoker versus nonsmoker.  Starting to be more complicated with other tobacco and legalized marijuana, like those are things that are becoming more complicated in the industry now, but for a long time it was just smoker or nonsmoker.

Q   And why is it smoker versus nonsmoker?  Why is that a valid consideration for a mortality -- for assessing mortality risk?

A   Yeah.  Generally these experience studies have shown that smokers have a higher mortality risk than nonsmokers do.

Q   Other than smoking, do -- in constructing these mortality tables, do you take into

Page 24

consideration other preexisting health
conditions that individuals may have?

MR. MOORE:  Object to form.

THE WITNESS:  Not -- not really.
There -- there can be different tables for
different assumed levels of health.  There
could be a super preferred table, for instance,
or a standard table that would reflect
different levels of health, but that's --
that -- that's not directly answering your
question, I don't think.

BY MS. PANAGOPOULOU:

Q    When you were working at Northwestern Mutual,
did Northwestern Mutual employ such -- you
know, implement such classifications?  So I
think you said substandard, preferred, did they
have such classifications?

A    They did.  When I was there I believe they
had -- they had, perhaps, 10 different risk
classifications.  We're confusing a couple
different issues here, though.  I'm not certain
that they had 10 different mortality tables.
But they had 10 -- perhaps 10 different
assumptions or 10 different -- 10 different
levels of assumed mortality within their

Page 25

product line.

Q   And those varied based on the health of the particular individual in question seeking life insurance?

MR. MOORE:  Object to form.

THE WITNESS:  Yeah.  There's -- there's an underwriting process that it's kind of a missing piece here.  There's an underwriting process that an applicant goes through where the insurance company partitions them into which risk is appropriate, and there may be a mortality table that's associated with that that the company has deemed appropriate. So if somebody is a marathon runner, nonsmoker, you know, tiptop shape, they might get what Northwestern Mutual calls the premier risk classification.

BY MS. PANAGOPOULOU:

Q   Okay.  So just to simplify things for somebody like me who doesn't work in this sector, I go to Northwestern Mutual and I seek a life insurance policy.  What factors -- what questions would they ask me to determine in which of these categories I would fall?

MR. MOORE:  Object to form.

Page 26

THE WITNESS:  So, I mean, that's really outside the scope of my expertise.  I have at least a layperson's knowledge of the types of things that are asked because I'm -- I'm involved in that tangentially on a day-to-day basis.

BY MS. PANAGOPOULOU:

Q    And can you explain that?  Can you expand on that?

A    So with a -- with a life insurance policy the insurance company is going to be interested in anything that affects the mortality risk, particularly risk of an early death.  So they're going to be very interested in risky hobbies: skydiving, scuba diving, have you had driving under the influence, you know, driving while intoxicated type of incident in your past.  That could be indicative of a risk of premature death.  They're going to be interested in a history of depression or suicidal thoughts because that could terminate a life prematurely.  They're going to be interested in your family history and specifically your history, cancer, heart attacks, things of that nature.  Of course

Page 27

smoking status is something --

Q    So my family health history, to be clear?

A    Yes.  Yup.

Q    Okay.  Continue.

A    Financial underwriting usually enters into the equation as well.  They don't want to insure -- if you're making $100,000 a year and you're applying for a $10 million policy, that's a red flag.  Insurance company's probably not going to issue that policy without some explanation.

Q    Does that bear also into mortality risk?

MR. MOORE:  Object to form.

THE WITNESS:  Not directly, no.  It's not -- they don't -- they don't -- they don't classify you based on income status or anything of that nature.

BY MS. PANAGOPOULOU:

Q    Okay.  You said "not directly," but in your experience working in life insurance and, you know, studying mortality rates and all of that, is it your experience that people with a higher income have a lower mortality risk?

MR. MOORE:  Object to form.

THE WITNESS:  It can cut both ways. I -- I -- I don't know the answer to that

Page 28

question in depth, but there are certain risk factors that move in both directions.  People on the higher end of the socioeconomic status may have better access to health care, but they also have more access to high-risk activities that can lead to premature death.  They can also have -- they can be in more stressful situations as well which can have -- can take a health toll.  So I can't say definitively one way or the other.

BY MS. PANAGOPOULOU:

Q    But in your experience, is there a correlation between income and mortality rates?

MR. MOORE:  Object to form.

THE WITNESS:  I don't have any basis for answering that because I -- I have not seen any mortality studies that correlate -- try to correlate income with mortality.  That's not something we did at Northwestern Mutual, for instance.

BY MS. PANAGOPOULOU:

Q    Are you aware of studies that correlate amount of wealth with mortality rates?

A    Not specifically.  I am aware of the amounts of insurance, but there's multiple factors that

Page 29

enter into that equation, but I am aware of situations where individuals who buy larger policies can get more favorable mortality rates sometimes than people who buy small insurance policies.

Q    Right.  But that's not a correlation, as I understand it from your testimony, to mortality risk but more towards the amount of -- you know, the insurance company be more certain that you are going to be paying your premiums, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Like I said, it's complicated.  They do more underwriting on the larger policies, and so they have more certainty with where they have slotted you into their prediction for what kind of mortality an individual is going to exhibit.  If you buy a small policy they may do very limited underwriting and there's -- there's more uncertainty about what actual health that individual is in.  So I don't know if there's a correlation there or not, but what I can attest to is that if you buy a million-dollar policy you're probably going to get lower mortality

Page 30

rates than if you buy a $100,000 policy.  Much or all of that can be explained by the additional underwriting that's done.  But I can understand how that might look like, you know, wealthier individuals have better mortality.  Wealthier individuals who qualify for the best class may have better mortality, I will agree to that.

BY MS. PANAGOPOULOU:

Q    Was that your experience at Northwestern Mutual that individuals with more funds were -- had a lower mortality risk associated with them?

MR. MOORE:  Object to form.

THE WITNESS:  No.  I can only speak to my -- my experience was that the higher policies, the higher face amount policies generally exhibited better mortality than the small face amount policies.  I don't know -- I don't know what the correlation is there with wealth.  You would think that people who -- who buy larger policies are more wealthy, but I have no basis for that conclusion.

BY MS. PANAGOPOULOU:

Q    Uh-huh.  But there was -- just to be clear, there was a correlation between health --

Page 31

health status and mortality risk, correct?

A    As -- yes, as shown by the underwriting process.  If the underwriting process revealed that somebody was in good health, they received a more favorable rating classification than somebody who was not in good health.

Q    And it's fair to say that -- and we'll get back to your employment in a minute -- but it's fair to say that for the past 30-plus years you've worked in the life insurance industry, correct?

A    Correct.

Q    Are you aware of any insurance company where -- which did not have classifications -- the classifications you mentioned previously, preferred, standard, substandard, based on health factors?

        MR. MOORE:  Object to form.

        THE WITNESS:  I mean, I can't speak for the entire industry, but I will tell you that there are certain types of policies that are called guaranteed issue, which have limited underwriting and everybody gets the same policy regardless of their health status.  So there are certain classifications of policies often -- often associated with

Page 32

employer-sponsored insurance where there may be little or no classification and everybody gets the same policy and gets the same mortality assumption.  Sometimes even males and females get the same.

BY MS. PANAGOPOULOU:

Q    Okay.  But these are very small policies, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Not necessarily.  I don't know that they're smaller or larger than the average policy that's out there that -- it's a different -- it's a different kind of underwriting that's done.

BY MS. PANAGOPOULOU:

Q    This is just one type of policy that different insurance companies provide, correct?

A    Correct.  Like Northwestern Mutual has guaranteed-issue policies.

Q    Okay.  My question to you is when you look at policies provided throughout the spectrum, are you aware of any insurance company that does not -- does not use health family status or health issues in determining mortality risk?

MR. MOORE:  Object to form.

Page 33

THE WITNESS:  With -- the only exception I can think of off the top of my head is the guaranteed-issue policies.  If we ignore those policies, I can't think of an example where an insurance company would not use those factors.

BY MS. PANAGOPOULOU:

Q    It's fair to say that health has an impact on mortality risk, correct?

MR. MOORE:  Object to form.

THE WITNESS:  I agree.

BY MS. PANAGOPOULOU:

Q    When you were working at Northwestern Mutual, do you know how Northwestern Mutual invested its reserve funds?

A    Only in -- only in a broad-brush manner.  I don't know the specifics.

Q    Okay.  Talk to me about that.

MR. MOORE:  Object to form.

THE WITNESS:  So they typically were 85 to 90 percent in bond or bond-like instruments.

BY MS. PANAGOPOULOU:

Q    Uh-huh.

A    With the other 10 to 15 percent in equity or

Page 34

equity-like instruments.

Q    So in stocks, for example?

A    Yeah.  That would be -- that would fall into that 10 to 15 percent category.

Q    Okay.  Would you say that their -- their investments were pretty diversified?

MR. MOORE:  Object to form.

THE WITNESS:  Yeah.  I would consider it to be a diversified portfolio.

BY MS. PANAGOPOULOU:

Q    Okay.  And I know this must have changed from year to year, but when you were there what was the average return that North- -- Northwestern Mutual would get on its investments?

MR. MOORE:  Object to form.

THE WITNESS:  I don't know that off the top of my head.  It wasn't necessarily something that was published readily, and what was published was always a little bit confusing because there was -- what -- there's a special accounting thing in life insurance with what to do with capital gains, and so whether you use realized or unrealized capital gains and losses you would get different numbers.  So I don't know the answer to that question.

Page 35

BY MS. PANAGOPOULOU:

Q    What was your understanding of what their average return was?

        MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q    I'm not asking you what -- what they published. As an actuary, having worked there for ten years, what was your understanding of the annual return that Northwestern Mutual received on their investments?

A    Yeah, well, it's --

        MR. MOORE:  Object to form.

        THE WITNESS:  -- it's been coming down steadily because we've been in a low interest rate environment.  So early in my career it was probably -- it was probably more along the lines of 7 or 8 percent, and then later on in my career lower than that and in recent years probably closer to 5 percent.

BY MS. PANAGOPOULOU:

Q    I mean, you don't work now at Northwestern Mutual, right?

A    No.  But I know what their dividend scale interest rate is, which is the -- what's publicly available.

Page 36

Q    So you know what -- what they publicly report?

A    Yes.  I know what -- what their dividend scale interest rate is.

Q    So let's just move back for a second to the different types of employments you held after graduating from university.  I understand you -- you left Northwestern Mutual in 2005 --

A    Correct.

Q    -- correct?  Why was that?

A    I was interested in becoming more of an entrepreneur, and a gentleman named Peter Katt approached me.  I had worked -- I had encountered Peter several times during my career at Northwestern Mutual, and he approached me to join him.  He had a business in Michigan, and that was appealing to me.  I joined him remotely.  I continued to live in Wisconsin.  And I worked with him for two years.

Q    Okay.  And what -- what did you do as part of your employment with this individual?

A    So Peter was a fee-only insurance advisor.  He was one of the pioneers in the industry.  He worked with clients only on a fee basis, so either an hourly fee or a project fee.  He

Page 37

didn't sell products.  He didn't make any commissions.  He just gave advice on things like life insurance and annuities, and I had really enjoyed my time working with consumers when I was in one of my rotations at Northwestern Mutual and always enjoyed problem-solving and I -- I had an interest in being more of an entrepreneur.  I found the longer I stayed at Northwestern Mutual the more meetings I was in and I was hearing about other people doing the work.  Like I actually liked doing the work myself rather than assigning it to somebody else.  So it was a good fit for me.

Q    And, again, when you say "fee-only insurance advisor," you mean life insurance, correct?

A    Life insurance, annuities, long-term care insurance.

Q    Okay.  Anything else?

A    No.  As I mentioned before, my practice is fairly broad and covers a number of other actuarial areas, but I wouldn't necessarily say that they're fee-only insurance advice.  Those are sort of offshooted areas.

Q    Uh-huh.  And how long did you stay in that employment?

Page 38

A    Two years.

Q    Okay.  And after that were you employed
somewhere else?

A    Pretty quickly I realized that being number two
in a two-person shop was not really being an
entrepreneur, so I looked for opportunities to
split off and start my own business.  So after
two years I founded Witt Actuarial Services,
and that was in roughly 2007.  And I've been
employed there ever since.  I own my own
company.

Q    That's the company you have now, right?

A    It is.

Q    Okay.  So aside from Northwestern Mutual, your
short employment -- and your short employment
with this individual called Peter --

A    Peter Katt.

Q    -- Peter Katt, and your own company, of course,
you weren't employed somewhere else, correct?

A    I mean, I've -- I was a varsity basketball
coach for 17 years, so I was --

Q    I'm sorry.  I meant as an actuary, yes.

A    No.  No.

Q    That's great, by the way.

Okay.  And you mentioned previously that

Page 39

you are also retained to -- as an expert witness in cases where they need actuaries, right?

A    Correct.

Q    Okay.  When did you first start becoming retained as an expert witness?

A    The first case I can recall was when I was working for Peter Katt, so that would have been -- that would have been back in 2006, roughly.

Q    Okay.  And do you remember, just very roughly, what this case was about?

A    Very roughly.  I believe -- I believe I was on plaintiff's side, and the plaintiff had purchased a variable universal life policy that did not perform well and was alleging that basically the policy was improperly sold.  And as I recall, I did some what they call Monte Carlo simulations to show what the probability of failure was for the policy and how much more the policy would have had to have in it in order to be at an acceptable level of risk.

Q    Uh-huh.  And in that case were you also retained as a testifying witness?

A    I was, but it never got that far.  I believe it

Page 40

settled before I ever had to testify.

Q    Okay.  And since 2006, in how many cases have you been retained as an expert witness?

A    Do you -- are you asking just about cases where I provided a deposition or testimony at trial or cases -- would it include cases where I was engaged but then settled before we had got to that point?

Q    Well, I was going to ask about both, but let's start with the latter first.

A    Okay.  Probably -- probably 25 or 30 during the course of my career.

Q    So you were retained as an expert in 25 or 30 cases, but without necessarily providing testimony in those cases, correct?

A    Right.  Most of them would have had a report, but not all of them proceeded to a deposition or to trial.

Q    Okay.  And in how many of those cases were you a testifying witness, whether -- whether at deposition or at trial?

A    I would say 15, give or take.

Q    And out of those 15 cases, were all those cases involving life insurance products?

A    I would have to review my case list to know for

Page 41

sure, but if there were any that did involve life insurance it probably wasn't more than one or two.

Q    Okay.  So sitting here today, out of the 15 cases that you testified as an expert in the past, can you remember any cases that didn't involve you making a determination about the cost of insurance rates?

A    Oh, sure.  Yeah.  Yeah.  I was -- I've been hired as a damages expert in other situations where there was -- were allegations of inappropriate agent conduct and the plaintiff was suing the agent or the company for either fraud or misrepresentation, and I was quantifying damages under several different theories, but I had multiple cases that proceeded to trial that did not involve cost of insurance.

Q    Okay.  But when you say "inappropriate agent conduct," that was with respect to issuing a life insurance product, correct?

A    Yeah.  But it had nothing to do with cost of insurance --

Q    Okay.

A    -- which you mentioned.

Page 42

Q    Okay.  Let me ask the question a little bit differently.  So out of the 15 cases where you were involved as a testifying witness, do you recall any cases, sitting here today, that didn't involve life insurance?

MR. MOORE:  Object to form.

THE WITNESS:  Well, I do recall a civic case.  I don't know -- it was sworn testimony, but it was about -- it was about pension calculations in a divorce and I was in a -- I don't know if it was arbitration or mediation, but I was in front of a -- in front of a judge and testifying about valuing something with respect to a pension, so that did not involve life insurance.

BY MS. PANAGOPOULOU:

Q    Okay.  Any other -- any other instance?

A    I feel like there may have been something with annuities, but I can't recall the particulars off the top of my head.

Q    Okay.  And now let's go back to your earlier statement.  I believe you stated that you were retained as an expert in a total of 25 to 30 cases, right?

A    Yes.

Page 43

Q    And those include some which settled before you got the chance to be deposed or to testify?

A    Correct.

Q    Okay.  So now to broaden my question, out of those 25 to 30 cases that you were retained as an expert, do you remember an instance of a case where you were -- where you were dealing with something other than life insurance pension or annuities?

A    I have a vague recollection of a case that was numerical in nature, and I don't think it -- I don't think that it involved life insurance, but it's too long ago that I -- I can't think of the details off the top of my head.  I remember the -- I remember the name of the client was Marks, M-A-R-K-S, but I don't -- I don't recall the particulars of the case.  It did not go to testifying, but I -- I prepared multiple reports and there was a dispute over some kind of compensation and I was -- I went through the formula and was putting a present value on -- on one side, you know, what they felt this person was owed in the dispute, so that's one I can think of that I don't think involved life insurance.

Page 44

Q    Uh-huh.

A    But the details are kind of beyond my grasp right now.

Q    When you were determining in the cases that you were retained to determine generally the cost of insurance rates and whether those were appropriate, your calculations applied retroactively, right, at the time when the individual in question purchased or made payments towards that insurance, correct?

            MR. MOORE:  Object to form.

            THE WITNESS:  Well, I don't really agree with the premise of the question.  Are you talking about the series of cases where there was a dispute about the cost of insurance and I calculated damages in those cases?

BY MS. PANAGOPOULOU:

Q    Yes.

A    So I wasn't -- I wasn't calculating a new cost of insurance.  I was simply employing plaintiff's theory that cost of insurance should not have included certain things above and beyond mortality expectations, and I was stripping the cost of insurance rates of these excess factors and then using -- using the

Page 45

mortality-only versions of those cost of insurance rates and I plugged those into a model. And, yes, it was -- it was retroactive, but there was nothing preventing that model from being used on a prospective basis as well. It could have -- it could have carried forward into the future, but for the purposes of the lawsuit there was a settlement date or a, you know, a judgment date.

Q    Yeah. But you weren't retained to provide an opinion as to what those payments or what that differential would be in the future, correct?

A    I don't -- I don't recall that I was quantifying damages into the future on those cases.

Q    Okay. Do you remember any case where you were quantifying damages not for the past but going forward looking into the future?

A    Oh, sure. Not a cost of insurance case, but other -- other damage models where, you know, we looked -- we looked over the life of the policy to see what was -- or the life of the -- the individual in question and looked at how things were going to play out over an entire lifetime.

Page 46

Q    So you did that in your capacity as an expert
witness --

A    I --

Q    -- or you did that in your capacity of -- of a
fee-only insurance advisor?

A    Well, I do that all the time in my capacity as
a fee-only insurance advisor, but I was
specifically alluding to one or more cases
that -- where I was an expert witness.  I have
to think whether or not we proceeded to
testimony.  I think that particular case that
I'm thinking of settled.

Q    Okay.  Do you recall any case where you
provided testimony either at trial or in
deposition where you were asked to opine on the
future value of damages?

        MR. MOORE:  Object to form.

        THE WITNESS:  I very well may have,
but as we sit here I can't -- I can't give you
a specific case.

BY MS. PANAGOPOULOU:

Q    Have you ever been retained before as an expert
witness in a data breach case?

A    No.

Q    Have you ever in the past been retained as an

Page 47

expert witness to -- to evaluate mitigation products that arise as a result of a data breach?

A    No.

Q    Have you ever examined mitigation costs of products to mitigate the risk of a data breach?

A    No.

Q    Not -- and you haven't done that also, to clarify, in your capacity as an advisor, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Correct.

BY MS. PANAGOPOULOU:

Q    So, in other words, you've never had clients before come to you and say, "Hey, you know, I want to protect my money; I want to protect my credit.  Can you recommend some products to make sure that I'm not subject to identity theft or fraud?"

MR. MOORE:  Object to form.

THE WITNESS:  Correct.  That's outside the scope of my expertise.

BY MS. PANAGOPOULOU:

Q    Okay.  You've never done that in your career, correct?

Page 48

MR. MOORE:  Object to form.

THE WITNESS:  I have not.

BY MS. PANAGOPOULOU:

Q   Okay.  Have you ever provided advice to anyone regarding credit monitoring services?

A   No.

Q   Okay.  In the 15 or so cases that you say that you've testified as an expert witness, was that on plaintiff's side or defense side or a mixture of both?

A   I think everything that made it to testimony, I can only think of plaintiff's side right now.

Q   And were you ever retained as an expert -- as an expert by a defendant?

A   Yes.

Q   Can you tell me the case?

A   I can't.  It didn't make it to testimony, but there was an agent who was, in his mind, wrongly accused of inappropriate replacement. Oh, and I just thought of another case that did -- I believe this did make it to sworn testimony.  It's kind of a landmark case. French versus Wachovia Bank.  I was an expert for Wachovia Bank on the defense side.

Q   Okay.  I think we were talking about two

Page 49

separate things here, so I just want to make
sure --

A    Okay.

Q    -- we don't get mixed up.  So tell me first
about the other case that you were talking
about, I think with the agent, and then you can
tell me about Wachovia Bank, just very
high-level overview of what you were retained
to opine on.

A    I can't remember the particulars of the case
with the agent other than I believe a
replacement was recommended by the agent.  The
client sued, and I was demonstrating that the
replacement actually was a good idea.  And
that -- that fact pattern is what made me
remember the Wachovia case because it had a
very similar fact pattern.

Q    Which was?

A    Client needed -- the client needed a certain
kind of insurance or needed some new insurance.
Agent recommended it.  A couple years into the
deal, the consumer got cold feet and accused
the -- everybody associated with the trust --
and the bank, I think, was the trustee of the
insurance policy -- of unfair dealing or

Page 50

self-dealing because the bank also got commissions on the insurance policy. And my job was to demonstrate that the recommendation actually was in the best interest of the client and to show that over the life of the policy the recommended policy -- over the life of the insured the recommended policy actually provided more value than the original policy, and so it didn't destroy value. It enhanced value. And that was the whole dispute of the lawsuit was did -- did Wachovia Bank provide a faulty recommendation in the course of a self-dealing transaction.

Q    Uh-huh. And, again, to determine that, you had to go back and apply calculations retroactively to see how the situation would have turned differently had plaintiff's allegations been correct?

MR. MOORE: Object to form.

BY MS. PANAGOPOULOU:

Q    Right?

A    No. I think -- I think this one we had to look over the entire life of the -- it was a prospective calculation as well because the types of policies were different, and so you

Page 51

can't -- you can't just look at a point in time

and look backwards.  You have to look at the

projected death benefits over the course of the

entire lifetime to get a sense of whether or

not a recommendation made sense.

Q    Okay.

MR. MOORE:  Counsel, we've been going

about an hour, if there's a good break point.

MS. PANAGOPOULOU:  Can I just finish

this line of questioning?

MR. MOORE:  Sure.  Of course.

BY MS. PANAGOPOULOU:

Q    Unless you --

A    I'm good.

Q    Okay.  So your damages model incorporated both

retroactive calculations and projections as to

future damages, is that what you're saying?

A    That's my recollection.

Q    Okay.  And that's something that you testified

about at trial?

A    I don't think it made it to a trial.  To the

best of my recollection, I think there was a

deposition.  But that case was many years ago.

Q    I just want to introduce an exhibit.  Let's

mark this for identification purposes as

Page 52

Defendants' Exhibit A.

(Exhibit A marked for identification.)

BY MS. PANAGOPOULOU:

Q    I'm sorry, I thought I had another one.  I will put this up also.  So can we put up as an exhibit what's marked Meek versus Kansas City, 2023?  Can you just drop that into the chat?

CONCIERGE:  Give me one second.

BY MS. PANAGOPOULOU:

Q    So, Mr. Witt, is this a case in which you were retained to provide an expert report?

A    It is.

Q    And who retained you to provide this report?

A    There was a couple different law firms.  I think back then they were Miller Schirger and Stueve Siegel Hanson.

Q    Uh-huh.  And was your expert report in support of plaintiff's allegations or defendant's defenses?

A    Plaintiff.

Q    Plaintiff.  And just as a very general broad overview, what were you retained to opine on?

A    I was retained to calculate damages in support of plaintiff's theory regarding contractual language and what Kansas City Life was -- was

Page 53

allowed to charge in their cost of insurance rates.

Q   Okay.  And in your conclusions did you find that Kansas City overcharged for cost of insurance in their cost of insurance rates?

MR. MOORE:  Object to form.

THE WITNESS:  I -- one of my conclusions was that Kansas City Life's cost of insurance rates did include amounts above and beyond the underlying level of mortality expectations.

BY MS. PANAGOPOULOU:

Q   Okay.  And when you say "mortality expectations," did you again have a look at some sort of mortality risk table in performing your calculations?

A   As I recall, all of that was provided by Kansas City Life.  Kansas City Life was asked to -- what their expectations as to future mortality experience were, and they provided a series of mortality tables associated with the various products in question.

Q   Okay.  And what sort of factors went into those mortality tables?

MR. MOORE:  Object to form.

Page 54

THE WITNESS:  Sex, age, risk class, and duration, how many years since the policy's been issued.

BY MS. PANAGOPOULOU:

Q    We've talked about risk class before, and I believe what -- what you told me, and correct me if I'm wrong, is that this is primarily based on an individual's health status, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Could you repeat the question, please?

BY MS. PANAGOPOULOU:

Q    Yeah.  Let me ask it more broadly.  You just mentioned risk class.  What is that?

A    So, for instance, Kansas City Life had, I think, two different risk classifications that we were interested in.  I can't recall the specifics, but it was basically a smoker and a nonsmoker class.

Q    Okay.  Were those valid classifications?

MR. MOORE:  Object to form.

THE WITNESS:  That wasn't -- that wasn't a topic of dispute in the lawsuit, as I recall.

Page 55

BY MS. PANAGOPOULOU:

Q    Okay.  Did you seek to challenge their risk class classifications?

MR. MOORE:  Object to form.

THE WITNESS:  No.

BY MS. PANAGOPOULOU:

Q    Okay.  And we've talked previously regarding different factors that affect mortality risk, and you've told me that health is a factor that affects mortality risk, right?

MR. MOORE:  Object to form.

THE WITNESS:  I -- I said or I think what I said was that when you go through the underwriting process they will partition you into various classes, in part based on your health, in the underwriting that they do.

BY MS. PANAGOPOULOU:

Q    Okay.  And in providing opinions as an expert witness, have you also taken health into consideration when assessing mortality risk?

MR. MOORE:  Object to form.  Vague as to health.

BY MS. PANAGOPOULOU:

Q    Health status, whether somebody's healthy or not healthy.

Page 56

MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q    Let me rephrase this so it's more clear.  When you've been retained in the past as an expert witness, have you considered an individual's health status in determining their mortality risk?

MR. MOORE:  Object to form.  Are we talking about this case or you're just talking about any case?

MS. PANAGOPOULOU:  I'm just --

MR. MOORE:  Okay.

MS. PANAGOPOULOU:  -- talking about broadly --

MR. MOORE:  Just want to clarify.

MS. PANAGOPOULOU:  -- in a case.

THE WITNESS:  Well, I don't know how to answer that question.  In these cost of insurance cases risk classification was already known, and so that was -- that was a factor that was used in my calculations implicitly because the expected mortality rate for smokers, for instance, is different than the expected mortality rate for nonsmokers.  So it was automatically taken into consideration in

Page 57

my report.

BY MS. PANAGOPOULOU:

Q    And I think you've said that you've testified in many, many cases involving cost of insurance rates, correct?

MR. MOORE:  Object to form.

THE WITNESS:  I don't know if I said that, but that is a true statement.  There have been numerous cases.

BY MS. PANAGOPOULOU:

Q    Okay.  And in all the cases that you've been retained as an expert witness, did the -- did the company in question employ risk classifications in determining mortality rates?

MR. MOORE:  Object to form.

THE WITNESS:  I can't think of any that did not.

BY MS. PANAGOPOULOU:

Q    Okay.  And did you ever challenge the risk classifications used by insurance companies?

MR. MOORE:  Object to form.

THE WITNESS:  Not to my recollection.

BY MS. PANAGOPOULOU:

Q    Okay.  So what I've marked as Defendants' Exhibit A, does this seem familiar to you?

Page 58

A    Not the format, but the -- the words do.

Q    Is this something that you've prepared in that
     litigation, in the litigation of Meek versus
     Kansas City Life Insurance Company?

A    Yes.

Q    Okay.  Do you see anything in here that strikes
     you as something that you haven't written?

A    No.  I mean, these -- these headings are not
     something I've seen before, but starting with
     qualifications and experience, everything is --
     I recognize.

Q    Okay.  Can I please have you turn your
     attention to paragraph 57 of this report?

A    Okay.

Q    So can you read for the record what you've
     stated in your report at paragraph 57?

A    You want the whole paragraph?

Q    Sure.

A    "From an actuarial perspective, I understand
     that age, sex, risk class, and policy duration
     are commonly used to determine expectations as
     to future mortality experience for insureds.
     Risk classes are developed to account for the
     health rating assigned to an insured after
     going through the underwriting process.  For

Page 59

instance, an insured with diabetes may be assigned a," quote/unquote, "substandard rating consistent with the increased mortality risk associated with that insured's particular circumstances.  I understand that an insurance company's," quote, "expectations as to future mortality experience," unquote, "is a probabilistic forecast that insureds sharing a common set of mortality characteristics will die.  This probabilistic forecast is commonly quantified as an expected mortality rate table or mortality assumption."

Q   So is this something that you've written yourself?

A   Yes.

Q   And sitting here today, do you agree with this statement?

A   I do.

Q   Okay.  And why would individuals with diabetes be assigned a substandard rate?

A   Because of the increased risk of death associated with diabetes.

Q   Okay.  Are there other health conditions also that result in an increased risk of death?  For example, that affect -- I'm sorry -- that

Page 60

affect mortality rates?

MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q    I'm sorry.  I didn't phrase my question correctly.  I'll rephrase it.

Somebody that seeks insurance that has cancer, will they also likely be assigned a substandard rating?

MR. MOORE:  Object to form.  Are we talking in the context of this insurance company in this case or are you asking for --

MS. PANAGOPOULOU:  I'm asking more broadly --

MR. MOORE:  Okay.

MS. PANAGOPOULOU:  -- as somebody who's worked in the life insurance industry for many years.

THE WITNESS:  Okay.  Well, it will depend on a lot of factors.  How long ago they had cancer, what kind of cancer, how serious did it get, what was the treatment, how many years has it been since they've had symptoms or since there was any cancer detected.  You could have a wide range of outcomes depending on the answers to those questions.

Page 61

BY MS. PANAGOPOULOU:

Q    Here when you say -- when you talk about age, sex, and risk class, those are factors that were taken into consideration when putting together mortality risk tables, correct?

A    That's what -- that's what Kansas City Life did.  They had tables that were utilizing those risk factors.

Q    Okay.  And in your experience, having worked in the life insurance industry for many, many years, are those considerations generally used by life insurance companies when forming their mortality tables?

        MR. MOORE:  Object to form.

        THE WITNESS:  That's fair to say.

BY MS. PANAGOPOULOU:

Q    Okay.  And I've asked you this previously.  Do you have an opinion as to whether income or earnings or occupation may factor into mortality risk?

        MR. MOORE:  Object to form.  It's asked and answered.

        THE WITNESS:  I really don't, other than my observation that larger policies that qualify for favorable risk classification

Page 62

typically get more favorable mortality

treatment, but as I said, they go through more

underwriting as well.

BY MS. PANAGOPOULOU:

Q   Uh-huh.  Did you ever opine as an expert

witness as to whether income has an effect on

mortality risk?

A   I can't recall.  It's -- nothing comes to mind.

Q   So can I direct you to paragraph 73 of your

report, please?

A   Okay.

Q   Can you please read this paragraph for the

record?

A   "As a general matter, future mortality rates

are expected to improve over time.  This is

primarily attributable to advances in medicine

and changes in population behavior.  Because of

my training, experience, and education as an

insurance actuary, including my knowledge of

trends in the industry, I know that this trend

is even more pronounced in the relatively

affluent population that owns life insurance

compared to the general population.  I also

know that the experience of the life insurance

industry as a whole shows that mortality

Page 63

expectations have improved over time, including in the time since the class products were priced or last repriced."

Q    So is this something that you wrote?

A    It is.

Q    And sitting here today, do you stand by this statement?

A    I do.

Q    Okay.  So I believe that what you're saying here is that mortality rates have increased over time, but there is a disparity between affluent populations and poorer populations, correct?

MR. MOORE:  Object to form. Misrepresenting what the document says.

THE WITNESS:  Mortality rates have improved over time.  They've gotten lower.

BY MS. PANAGOPOULOU:

Q    I'm sorry.  I meant to say that.  So mortality rates have become lower over time.  Why do you make a distinction between the affluent population here?  Why is that relevant?

A    I'm -- because the insured population as compared to the general population has -- generally is an employed individual, maybe has

Page 64

access to better health care, just a typical -- what's the word I'm looking for? -- I believe a common understanding within the insurance industry is that the insured population has higher life expectancies than the general population, and that's supported by looking at industry tables, that you can look at a general population mortality table and compare it with an insured population mortality table and the insured table is lower, which means a higher life expectancy.

Q    Uh-huh.

MR. MOORE:  Counsel, can we take a break?  We've been in here an hour and 45 minutes.

MS. PANAGOPOULOU:  Yeah.  Okay.

THE VIDEOGRAPHER:  We are off the record at 10:48 a.m.  This is the end of Media Unit Number 1.

(Short break was taken.)

THE VIDEOGRAPHER:  We are back on the record at 11:06 a.m.  This is the beginning of Media Unit Number 2.

BY MS. PANAGOPOULOU:

Q    So I want to go back to the cases that you

Page 65

testified to at trial.  Was your testimony ever excluded from trial?

A    No.

Q    Are you familiar with a Daubert motion?

A    I am.

Q    Was ever a Daubert motion made to exclude your testimony?

A    I assume that it was made, but it was not successful.

Q    Okay.  And do you know in how many cases?

A    In how many cases was a Daubert motion filed?

Q    Yes.

A    I don't.

Q    Okay.  Are you aware of a specific case where a Daubert motion was filed but then denied?

A    I think it was a fairly common technique in these cost of insurance cases that I was in that the defense would pursue that path, so I don't know the exact number, but I suspect it's multiple.

Q    Okay.  And were you ever disqualified as an expert?

A    No.

Q    Were you ever withdrawn as an expert following the submission of your report?

Page 66

A    No.

Q    I just want to go to your report now for a bit.
Okay.  Let's mark this for identification
purposes as Defendants' Exhibit D -- Exhibit B.

(Exhibit B marked for identification.)

CONCIERGE:  And what was the name of
that exhibit you want me to upload?

MS. PANAGOPOULOU:  AMCA Witt amended
report with exhibits, 4/11/2025.

CONCIERGE:  Got it.

BY MS. PANAGOPOULOU:

Q    So, Mr. Witt, is this the most recent report
that you provided in this case?

A    Yes.

Q    And did you author the entirety of this report?

A    Yes.

Q    Let's turn to page 11 of your report.  Here you
say, "Cases with expert testimony at deposition
or trial in the past four years."  Do you see
that?

A    I do.

Q    And you see the cases listed in bottom of page
11, page 12, and page 13, correct?

A    I do.

Q    Okay.  Is it fair to say that in all of these

Page 67

cases you were dealing with insurance companies
that issued life -- life insurance products?

A    Yes.

Q    So, in other words, within the past four years
you have not testified in any case as an expert
witness that did not involve a life insurance
policy, correct?

A    Correct.

Q    Can you point me to any -- any of these cases
listed here where you represented the
defendant?

A    No.  These are all -- these are all plaintiff
experts.

Q    So, in other words, in -- within the past four
years you did not testify either at deposition
or at trial in any case on behalf of the
defendant?

A    Correct.

Q    And at the top of page 11, I see -- you say,
"Here are the articles that I have had
published in the last 10 years."  And you list
one article.  Is this the -- your only
published article in the past 10 years?

A    I believe so.  I -- I moved to basically
self-publishing things in the form of

Page 68

newsletters and white papers on my website, so
I don't think I had -- I think that's the only
one in the last ten years that was published by
an external publication.

Q    Okay.  And do you know if it was peer-reviewed?

A    I mean, it was -- it was reviewed by the editor
of the insurance forum.  I don't know if that
constitutes a peer review, but I did not have
another actuary review it.

Q    And is this -- you say here, "Here are the
newsletters over the last ten years that I have
distributed."  Do you see that?

A    I do.

Q    Is this a comprehensive list of every
newsletter -- newsletter that you have
distributed?

A    I think there have been more since January of
2025.  Like, for instance, I just -- I just put
one out in June or July.  I think in June I put
one out.

Q    Do you remember the title?

A    It was something to the effect of "Why it --
Why is my insurance company keeping the cash
value when I die?" or something like that.

Q    Uh-huh.  And aside from that, anything -- any

Page 69

other article that wasn't published -- that was published in the past ten years that you don't see here?

A    I intended the list to be comprehensive.  If I'm missing something, it's an oversight.  I would want to check my website to see if there was anything between January and June.  But there may not have been.  I feel like I had a five- or six-month break there between newsletters.

Q    Okay.  And all of these deal with life insurance products, correct?  All of these newsletters?

A    No.  "The myth of the hot shooting hand," that's a statistical -- that's a statistical thing.  "Delaying Social Security," that -- that has nothing to do with life insurance.  "When triggering an income rider could be a disastrous outcome," that has nothing to do with life insurance.  So there -- there are several on there that don't have anything to do with life insurance.

Q    What is this first article about, "The myth of the hot shooting hand"?

A    Now we're talking.  That's about basketball.

Page 70

Q    Okay.

A    There was -- there was always a perception that you could get hot playing basketball and if you made a couple baskets you were more likely to make your next basket, but then there was this famous study that proved that it was a myth, that there was no such thing as a hot shooting hand, that it didn't matter what happened in your previous shots.  Your next shot would have the same likelihood of going in, you know, based on your true shooting ability.  But then they figured out that this landmark study was messed up and it really wasn't a myth, like there really is a hot shooting hand.

So not very hard-hitting from a life insurance standpoint, but it was something I was interested in, and with my statistics background I thought I'd write a little newsletter about it.

Q    I can tell you're more excited about this --

A    Yeah.  We can keep talking about this all day long.

Q    And what about the article you mentioned, "Delaying Social Security, an actuary's personal perspective," what was that about,

Page 71

just on very broad terms?

A    That was about looking at my own personal situation and trying to optimize when it made sense to take Social Security, and I was, you know, looking at you can -- you can take Social Security early and you get a discounted monthly payment or you can take it at your normal retirement age where you get a full payment or you can delay it and you get -- you get an increased payment for delaying.  And so I was looking, calculating basically actuarial present values with different income streams based on my own, you know, longevity expectations and figuring out what was best for me.

Q    Okay.  And what about the other article that you mentioned, "When triggering an income rider could be a disastrous outcome"?

A    So that was about an annuity that one of my clients had.  He had always intended to trigger this income rider, and he was on the verge of doing it when he hired me, but his annuity had performed so well that his accumulated value within the annuity could buy a much better income solution with a product off the shelf

Page 72

rather than triggering the income rider within the annuity.  If he triggered the income rider within the annuity, my recollection is he only would have ended up with 70 or 75 percent of the income that we could get -- that we could have gotten him by taking his money and buying a new annuity.  So kind of -- kind of an inside baseball thing there too, but it was about annuities.

Q    And are any of the -- these newsletters listed here, were any of them peer-reviewed?

A    No.

Q    In fact, have you ever published an article or a newsletter or another publication that has been peer-reviewed?

A    Yeah.  I think -- I think I had an article years ago.  I got to think about that.  I cowrote something with somebody named Paula Hogan.

THE VIDEOGRAPHER:  Sir, your microphone just dropped off.

THE WITNESS:  Oh.  I cowrote something with a woman named Paula Hogan, has to be more than 15 years ago.  I can't recall if or where we got published, but that was the

Page 73

intention when we -- when we put it together. If it did, that document would have been peer-reviewed.

BY MS. PANAGOPOULOU:

Q    And do you know the year of that document?

A    It would have been about 2010 would be my guess. I can't even really recall what -- what it was about, something -- something with annuities.

Q    And just to be clear, you've never authored any articles relating to the cost of damages arising from a data breach, correct?

A    Correct.

Q    Have you written any articles opining whatsoever about consequences of a data breach?

A    No.

Q    Or referencing data breaches?

A    No.

Q    And what about articles that discuss mitigation products?

A    No.

Q    Or credit monitoring products?

A    Same answer. No.

Q    So I just want to mark this for identification purposes as Defendants' Exhibit C. It's four

Page 74

documents, but I figured we'd mark them together.

(Exhibit C marked for identification.)

MS. PANAGOPOULOU:  Yeah, for the concierge, it's the four documents that are labeled as "Witt website."

CONCIERGE:  Thank you.

BY MS. PANAGOPOULOU:

Q   So, Mr. Witt, do you recognize the documents that are in front of you?

A   I do.

Q   Are these documents from your website?

A   They are.

Q   And did you author the text of -- did you author the text of these documents?

A   Yeah.  I mean, I've got -- I've got a marketing person who -- who I work jointly with to come up with these things.

Q   Is anything in these documents inaccurate?

A   Not to my knowledge.

Q   And do these documents accurately describe the services you provide as an actuary?

A   I mean, these are -- these are focused more on the fee-only insurance advice portion of my practice.  I don't think -- I don't know what I

Page 75

have on my website with respect to expert witness testimony or speaking engagements, but what I'm looking at here looks like it's focused on life insurance annuities and long-term care.

Q   Under the page headed "About Witt Actuarial Services" --

A   Okay.

Q   -- it says, "I am a credentialed actuary, consumer advocate, expert witness, and speaker."

A   Okay.  Yes.

Q   Do you see that?

A   Yes, I do.

Q   Does that accurately describe more or less what you do as an actuary as part of your job?

A   Yes.

Q   And when you say "consumer advocate," can you expand on that?

A   So people hire me to serve them in a fiduciary capacity, and so I help them with their existing products or get new products that help put their best foot forward.  Because I'm not selling anything, I can put myself in their shoes and give them the benefit of my

Page 76

experience and knowledge and have them get a
better outcome than they otherwise would have.

Q    But to clarify, that's your experience and
knowledge in the life insurance sector,
correct?

          MR. MOORE:  Object to form.  He was
answering the question as what's a consumer
advocate.

          THE WITNESS:  Well, I would be
serving in a fiduciary capacity for anybody
that hired me, whether it was life insurance,
annuities, long-term care, pension
calculations.  I'm not selling anything, so I'm
able to look out for their best interests
without conflict of interest.

BY MS. PANAGOPOULOU:

Q    So you've just mentioned four categories of
areas where people would hire you to provide
advice.  You said life insurance, pension,
annuities, and long-term care.  Right?

A    I did.

Q    Anything else?

A    I mean, I get -- I get hired from time to time
with calculating -- for calculating actuarial
present values, like calculating the interest

in a trust where maybe a trust is being divvied up or somebody's being bought out and we need to know -- we need to take into account future probabilities of survival and the likelihood that one sibling outlives another sibling, things of that nature, and put a value on it so that a trust can be partitioned into different pieces.  So I don't know if that would fall necessarily under any of these categories.  I would -- I would put another category broadly as just actuarial services.

Q   And when you -- when you just talked about interest rates for a trust, you mean different means for investing money that's held in a trust?

A   Not exactly.  I -- the one case I'm thinking of in particular, there were multiple siblings, I believe there were different generations, and the trust provisions governed how the money was going to be distributed, and they wanted to either separate or, like I said, it was a buyout of some kind and I needed to quantify the probabilities of which individual was going to die first and -- because depending on who died, it would trigger different -- different

Page 78

payments from the trust.

Q    Uh-huh.

A    And so it was -- it was a straight actuarial math problem.

Q    Okay.  Are you ever retained to -- to help your clients with their financial investment decisions?

A    No.

Q    Okay.  And now turning your attention to the document entitled "Articles."

A    Okay.

Q    Is this list of articles that you see here comprehensive?

MR. MOORE:  Object to form.

THE WITNESS:  When you say "comprehensive," does it include every single article I've ever written in my working lifetime?

BY MS. PANAGOPOULOU:

Q    Yes.

A    I mean, from time to time I suppose it's possible that I would remove an article if it was outdated or if something had changed.  I'm not really going back and reviewing these over time, so it wouldn't surprise me if this is

Page 79

comprehensive.  But I can't -- I can't swear to it.

Q    Uh-huh.  And out of this list of articles here, is any article in this list peer-reviewed?

A    I mean, some of them did appear in an insurance publication called The Insurance Forum with -- which is published by a gentleman named Joseph -- Joe Belth, who's no longer with us, but he was -- he's a life -- he's a retired -- or was a retired life insurance professor, and he would review my articles.

So, for instance, there's -- I see "Variable universal life, buyer beware"; "Bear market bailout for your life insurance agent." At a minimum, those two were published in The Insurance Forum.  So maybe those would -- maybe those would be considered peer-reviewed.

Q    Insurance Forum, so is that a website?

A    Near the end of his life I think he may have been putting some things out on -- on the web, but it was -- it was a paper newsletter that went out.  He had a subscription service.

Q    And do you know how many people subscribed to it?

A    I don't.

Page 80

Q    And the articles you list here are articles
primarily published on your website, right?

A    Correct.

Q    So to find these articles, I would need to go
to your website?

A    Correct.

Q    Anywhere else where I would find any -- any of
these articles, aside from the two that you've
mentioned?

A    Well, sometimes the line gets a little blurry
between -- like I get quoted in publications
like AARP or the Wall Street Journal, things
like that.  I'm trying to think.  There's
something called -- oh, I'm drawing a blank.
There's a consumer newsletter, I guess, for
lack of a better word, that they asked me to
write something.  I don't think I put -- I
don't think I've listed that on my articles.
But that got -- that got distributed.  That's
the only thing I can think of is that
occasionally I will write several sentences or
several paragraphs that then get published in
an article that somebody else writes and I
don't -- I don't have links to those on my
website.

Page 81

Q    So to be clear, these are quotations that they
take from your preexisting articles?  They
don't review them before you publish them?

A    Usually -- usually my articles spark interest
and then they interview me or ask me to write
something up specifically on -- on a topic, and
then they incorporate that unedited into their
piece.

Q    Okay.  And can you give me examples of when
you've had to do that?  Specifically mainstream
publications like the Wall Street Journal.

A    Yeah.  I can think of the one I just -- that I
couldn't remember, I recall now, I think it's
called The Bottom Line.  I've done a couple of
guest spots would be the best way to describe
it, in that -- in that publication.  But
they -- I don't think they -- they don't want
me linking that on the website or anything
because it's a distribution service, right;
they -- they sell their magazine, so I can't --
whatever was written in that I can't just put
on my website.  I don't think they would
approve of that.

Q    So what were -- what were the, quote/unquote,
guest spots that you had to write for The

Page 82

Bottom Line?  What did they concern?

A    I honestly can't remember.

Q    And for The Insurance Forum paper newsletter that you say your former professor distributed, did he distribute your articles after you had published them on your website?

A    To be clear, he was not my professor.  He was just a respected professor, retired professor within the industry.  He -- it happened a couple different ways.  He was on my newsletter and he would get it.  One time I remember he got it and he reached out to me and said, hey, I would like to publish this in my newsletter with your permission, but we need to clean it up a little bit, like we need to shorten it or we need to expand, whatever the case is, like I've got some certain questions, can we do this or that?  And I would come up with a revised draft and then that would -- that would appear in The Insurance Forum and it would be my byline.

Q    Uh-huh.

A    And that happened a couple times.  Probably both instances were something similar or maybe one time -- I feel like this might have

Page 83

happened three times and two of those three are here.  And the third one was more of him asking me specifically to write an article on something, which I can't recall what it was, and it's not listed here.  It's not available through my website.

Q   Okay.  And the two that are available through your website, do they have -- do they have to do with insurance products, life insurance products?

A   They do.

Q   So let's switch gears for a bit.  What was the scope of your retention in this particular case?

A   I was retained to provide a damage calculation about the cost of mitigating risks associated with the breach with -- with AMCA for three different defendants.

Q   Uh-huh.  And were you given material to review in drafting your report?

A   Yes.  I relied on -- I relied on information provided by Dr. Lee and -- in turn and also relied on Amy Worley.

Q   Uh-huh.  Any other documents?

A   I think any document that I would have received

Page 84

would have been part of those -- the reports of those two individuals.

Q    Did you ever read the complaint that was filed by plaintiffs in this case?

A    I may have.  I -- if I did, it was a long time ago.  I haven't seen it recently.

Q    And do you recall reading any other filing that was made in this case?

A    Not off the top of my head.

Q    Do you remember reviewing any deposition transcripts?

A    No.

Q    Did you review any material disclosed in discovery in this case?

A    Only to the extent that it was regurgitated in Dr. Lee's or Ms. Worley's reports.

Q    Okay.  So your understanding of this case is -- largely comes from or should I say exclusively comes from reviewing the reports of Dr. Lee and Amy Worley, correct?

         MR. MOORE:  Object to form.  Vague as to understanding of this case.

         THE WITNESS:  I relied on not only their reports but on conversations with counsel.

Page 85

BY MS. PANAGOPOULOU:

Q    Okay.  What is your understanding of plaintiffs' allegations in this case?

A    My understanding is -- at a high level, it's that a breach occurred in 2019, and there are costs associated with mitigating the potential damages associated with those breaches, and that's what I'm quantifying is the costs of those mitigation strategies.

Q    So what are -- from your understanding, what are the damages that have arisen from that breach?

MR. MOORE:  Object to form.  Are you asking about his analysis?

THE WITNESS:  Are you asking for a quantity?

BY MS. PANAGOPOULOU:

Q    I'm asking from your understanding of the types of damages that plaintiffs claim here to have suffered.

MR. MOORE:  I'll object.  Outside the scope, the expert's role to decide what his report --

MS. PANAGOPOULOU:  Please, no speaking objection.  You can object to form,

Page 86

and unless you want to instruct him, of course, not to answer, in which case we'll mark it for a ruling.

THE WITNESS:  Could you repeat the question, please?

BY MS. PANAGOPOULOU:

Q    Yes.  What is your understanding of the types of damages that plaintiffs allege to have suffered here as a result of the 2019 --

MR. MOORE:  Object.

BY MS. PANAGOPOULOU:

Q    -- breach?

MR. MOORE:  Object to form.  Vague and confusing.

THE WITNESS:  The extent of my understanding is that Ms. Worley identified two different types of tranches, each with its own cost of a mitigation strategy associated with that, and I quantified the value of implementing those mitigation strategies.  I didn't do anything beyond that.

BY MS. PANAGOPOULOU:

Q    And the mitigation strategy was based on what?

A    The mitigation strategy was based on Ms. Worley's analysis of what --

Page 87

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████     I'm not sure if that's the right phrase.  But these services that would help consumers whose data has been breached to help monitor and mitigate damages.

Q    Uh-huh.  And do you have an independent opinion as to the effectiveness of the products used by Amy Worley?

A    No.

Q    Did you vet these products yourself?

A    No.

Q    Do you know, in fact, whether these products even exist?

A    No.

Q    So, in other words, whatever Amy Worley had in her report, you took that for granted and made calculations based on that, correct?

        MR. MOORE:  Object to form as to took it for granted.

        THE WITNESS:  I took that as -- as a

Page 88

starting point in my analysis, whatever
Ms. Worley's definitions were for the tranches
and whatever Dr. Lee produced.  Then in terms
of the counts and the ages for the various
tranches, I used that in my report.  And then
in conjunction with the -- the cost that
Ms. Worley outlined for each of the two
tranches, in a nutshell those -- those three
pieces of information are what I used to come
up with the damages in my report.

BY MS. PANAGOPOULOU:

Q    Uh-huh.  Did you ever speak to Amy Worley?

A    I did not.

Q    Did you ever speak to Dr. Lee?

A    I did not.

MS. PANAGOPOULOU:  And I would just
ask you, Counsel, again, to limit your
objections to form and not offer explanations
following your objections because that's
leading the witness.

MR. MOORE:  What are you referring
to?

MS. PANAGOPOULOU:  I'm referring to
the objection you just made.

MR. MOORE:  I haven't objected in

Page 89

five questions.

MS. PANAGOPOULOU:  Well, no, you objected to my previous question and you -- and you --

MR. MOORE:  I objected to the word that I thought was confusing.

MS. PANAGOPOULOU:  Okay.

MR. MOORE:  I said "Object to form." I mentioned the word, which is appropriate.

MS. PANAGOPOULOU:  Again, you can object to form.  You don't need to -- or you should not be providing a further explanation other than that.  It's not permissible.

MR. MOORE:  Disagree.

BY MS. PANAGOPOULOU:

Q   Okay.  So there was a data breach from your understanding in 2019, correct?

A   Correct.

Q   Do you know the entity that was breached?

A   I -- I -- I have a limited understanding of that.  The American Medical Collection Agency, that's -- that's my knowledge of what was breached, or the entity, yeah.

Q   And do you know what the American Medical Collection Agency was doing at the time?

Page 90

A    I do not.

Q    Okay.  Would it surprise you to -- for me to tell you that it was a debt collector?

A    It would not surprise me, no.

Q    Okay.  And would it -- is it your understanding that the plaintiffs in this action had their information -- that -- I'm sorry.  Let me rephrase that.

     Do you understand that AMCA had attained plaintiffs' information in this action in the course of collecting unpaid debts?

          MR. MOORE:  Object to form.

          THE WITNESS:  I understand that.

     BY MS. PANAGOPOULOU:

Q    Okay.  Is that something that you factored into your analysis in putting together your report?

          MR. MOORE:  Object to form.

          THE WITNESS:  I chose a general population mortality table, which, as noted when you had me read something earlier, is a more conservative mortality table than using something from the insured population.

     BY MS. PANAGOPOULOU:

Q    I'm going to get to that.  I'm just asking more generally, did you consider the fact that these

Page 91

were individuals in debt when you put together your report?

MR. MOORE:  Object to form.

THE WITNESS:  I would give you the same answer that I just gave.  I -- I did consider it, and that -- that's how I reflected it.

BY MS. PANAGOPOULOU:

Q    How did you reflect it?

A    I used a general population mortality table instead of using an insured -- an insurance mortality table.

Q    And these individuals in particular had debts with respect to medical services they had received; in other words, they had sought to receive medical services or treatment or blood tests that they could not subsequently pay for. Is that something that you accounted for in drafting your report?

MR. MOORE:  Object to form.

THE WITNESS:  Only to the extent that I used a general population mortality table instead of an insured population mortality table.

BY MS. PANAGOPOULOU:

Page 92

Q   Okay.  But an average member of the general
population does -- isn't necessarily owing
money to a collection agency, correct?

          MR. MOORE:  Object to form.

          THE WITNESS:  There's a wide range
of -- I mean, the general population includes
everything.

BY MS. PANAGOPOULOU:

Q   Yeah.

A   Includes people who don't even have access to
medical testing.

Q   Okay.  So, in other words, your report didn't
differentiate for a certain segment of
population that are in debt, correct?

          MR. MOORE:  Object to form.

          THE WITNESS:  Correct.

BY MS. PANAGOPOULOU:

Q   And it did not differentiate for a certain
segment of the population that sought to
receive medical care for which they could not
pay for, correct?

          MR. MOORE:  Object to form.

          THE WITNESS:  No.  I did not
differentiate.

BY MS. PANAGOPOULOU:

Page 93

Q    Okay.  Let's go back to your report.  I think it was marked as Defendants' Exhibit A.

A    B.

Q    It was B?

MS. SULTANIAN:  In this case it's B.

BY MS. PANAGOPOULOU:

Q    So can we please turn to page 14 of your report?

A    I'm sorry.  14?

Q    Yes.

A    Okay.

Q    In here you say, "Information considered and/or relied upon in forming report."  Do you see that?

A    I do.

Q    Is that a comprehensive list of everything you considered in formulating your report?

A    I believe it is.

Q    And here you don't mention plaintiffs' complaint, right?

A    I do not.

Q    Okay.  So plaintiffs' complaint was not something that you considered in drafting this report, correct?

A    Like I said, I probably saw it in the early

Page 94

stages, but it was not -- it was not relevant to my task at hand.

Q    Okay.  And did you ever read plaintiffs' motion for class certification?

A    I can't recall.

Q    Okay.  Do you have any understanding of the class that plaintiffs seek to certify -- seek to certify in this case?

A    Only to the extent that I have the list of the number of people and different tranche counts for each of the defendants.

Q    So you know there's X number of people in Tranche 1 and X number of people in Tranche 2, and adding that would give you the total, correct?

A    Correct.

Q    But you don't know anything else about the specific characteristics of that class, right?

            MR. MOORE:  Object to form.

            THE WITNESS:  I know there -- well, when -- when it was available, I know their ages.  When it was available, I know their sexes.  I'll leave it at that.

BY MS. PANAGOPOULOU:

Q    Anything other than age and sex?

Page 95

A    Nothing that I reflected in my analysis.

Q    Okay.  And here you say, "Information considered and/or relied upon."  Do you see that?

A    I do.

Q    What does "and/or" mean in this context?

        MR. MOORE:  Object to form.

        THE WITNESS:  Well, some of it -- some of it -- some of it was considered or all of it was considered and some of it was relied upon, so that's -- that's what the "and/or" is.

BY MS. PANAGOPOULOU:

Q    What information from here did you consider but ultimately did not rely upon in forming your report?

A    I would say that I relied upon all of this.

Q    Okay.  So -- so it's fair to say that you considered and relied upon --

A    Yes.

Q    -- all these five sources?

A    Yes.

Q    Okay.  So the "or" is -- is a typo then?

        MR. MOORE:  Object to form.

        THE WITNESS:  Sure.

BY MS. PANAGOPOULOU:

Page 96

Q    Okay.  So, again, here you wanted to come up with a damages model, correct?

A    Where is "here"?

Q    In this case.

A    Correct.

Q    Okay.  And what factors did you consider in putting together your damages analysis?

MR. MOORE:  Object to form.

THE WITNESS:  Well, that's a very broad question.  I had to consider the data that was available.  I have previously described the Dr. Lee and Ms. Worley, how I relied upon their information.  ███████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

I used all of those things in my analysis.  I used the information provided by Dr. Lee with respect to ages, sexes, which ultimately I didn't use.  But ages, sexes, the counts in each tranche for each defendant, and so that -- that's the basic framework.

And then in order to come up with an actuarial present value at a high level, I

Page 97

needed to make an assumption about mortality over the next three, five, seven, and ten years, which are the time periods that counsel asked me to identify. And I needed a discount rate. So at a high level, to come up with an actuarial present value you need a mortality assumption and an interest rate assumption. And so that -- it's a quite simple framework given the basic assumptions that I had from Ms. Worley and Dr. Lee, the fact that counsel wanted three-, five-, seven-, and ten-year period, and then it's a matter of applying mortality and interest rate assumptions to come up with the actuarial present values.

BY MS. PANAGOPOULOU:

Q   The three-, five-, seven-, and ten-year period, is that something that you ever had an independent opinion on?

A   No.

Q   Okay. So -- so counsel just asked you give us what the damages would be over this -- this time period, and you just plugged those into whatever calculators or Excel spreadsheets and calculated the damages that way, right?

MR. MOORE:  Object to form.

Page 98

THE WITNESS:  Yeah.  I mean, I'd like to think it's a little bit more complicated than that, but, yes, I used an Excel spreadsheet and I looked at cutoff points of three, five, seven, and ten years based on instructions from counsel.

BY MS. PANAGOPOULOU:

Q    Okay.  But you didn't -- you didn't -- those were not time frames that you set yourself?

MR. MOORE:  Object to form.  Asked and answered.

THE WITNESS:  Correct.  I have no opinion on that.

BY MS. PANAGOPOULOU:

Q    Okay.  And just to go back again, with regard to the Lee report, I understand that you saw data relating to the age, sex, and number of people in each tranche, correct?

A    Correct.

Q    Did you rely on any other information in Dr. Lee's report in formulating your -- this report?

A    I can't think of anything.

Q    So let's pull that up for a second.

MS. PANAGOPOULOU:  Where are we?

Page 99

MS. SULTANIAN:  D, as in "dog."

MS. PANAGOPOULOU:  So let's mark this for identification purposes as Defendants' Exhibit D.

(Exhibit D marked for identification.)

MS. PANAGOPOULOU:  For the people on the Zoom, this is the -- can you pull up expert report of Jonathan Lee, please?

THE VIDEOGRAPHER:  Mr. Witt, you've done it again.

BY MS. PANAGOPOULOU:

Q    Let me know when you're ready.

A    Oh, I'm ready.  Sorry.

Q    So, Mr. Witt, have you seen this document before?

A    I have.

Q    And what is your understanding of what this document is?

A    It's Dr. Lee's expert report in the matter.

Q    Is that what you reviewed in forming your own report?

A    It is.

Q    Okay.  Can you tell me any specific pages in this report that you relied upon?

MR. MOORE:  Object to form.

Page 100

THE WITNESS:  Well, I mean, this would be an example of back to the "and/or" question.  I considered the entire report.  I relied on just portions of it.  So it's kind of semantics.

BY MS. PANAGOPOULOU:

Q    That's fair.  Can you tell me the portions of this report that you relied upon?

MR. MOORE:  Can we go paragraph to paragraph?

MS. PANAGOPOULOU:  Not paragraph to paragraph, but if there's a specific --

MR. MOORE:  Can you narrow the question then?

BY MS. PANAGOPOULOU:

Q    Is there a specific segment of this report that you remember relying on?

A    Yes.  Table 9.  This was provided to me in an electronic format.

Q    Table 9 is in what page?

A    31.  Sorry.  So Table 9 shows the LabCorp age distribution, the number of class members for each age for each tranche.

Q    Uh-huh.

A    Similarly, Table 10 shows the same information

Page 101

for Quest.  And then Table 11 shows the same information for Sonic.

Q   Okay.

A   So those were critical to my analysis.  I also -- I don't know what page it is in his report or if this was just provided electronically, but I had information on the sex distribution of the various tranche class members for each of the defendants, so I could see how many -- how many were male, how many were female, how many were either ambiguous or unknown.

Q   Uh-huh.  Anything else that you remember relying upon in this report?

A   No.

Q   Okay.  So turning to page 31.

A   Okay.

Q   So that's the -- that's a table that you considered in formulating your report, right?

A   It is.

Q   What is your understanding of what's shown in this table?

A   Well, not to sound flippant, but I guess it sort of speaks for itself.  It separates the class into two different tranches and shows how

Page 102

many people are in each category for a given age and a given tranche.

Q   Okay.  So, for example, this table appears to show that 1,140 members aged 6 were in Tranche 1, right?

A   Correct.

Q   Right.  Did you do anything to verify that those 1,140 members were 6 years old?

A   No.  I took that as a given from Dr. Lee.

Q   Okay.  And did you do anything to independently verify that -- verify that the information of those 1,140 members was somehow found in the databases of AMCA?

A   No.  That was outside the scope of my expertise, and I relied on the subject matter expert for that.

Q   Okay.  So whatever -- in other words, whatever you saw in this table you took as -- for granted as being correct, right?

           MR. MOORE:  Object to form.

           THE WITNESS:  Agreed.

BY MS. PANAGOPOULOU:

Q   Okay.  Now, for the purpose of your calculations, two individuals that belong in this same group of 1,140 individuals, let's say

Page 103

they're both male, right?  Do they have exactly the same damages?

A    In my model they do, yes.

Q    Okay.  In other words, there's no differentiation based on any other characteristics or personal circumstances, correct?

A    No.  And, in fact, a female would get the same damages as well.

Q    Okay.  So let's just pick another random group here.  So here it appears that there are 196,226 people aged 35 in Tranche 1.

A    I see that.

Q    Right?  So any one of those 196,000 people, by virtue of being in that category, would have the same damages under your model, correct?

A    Correct.

Q    So -- and that's irrespective of personal circumstances, health status, economic status, et cetera?

A    Correct.

Q    Okay.  And that's also respective [sic] of the fact that a number of these people might already own mitigation products, correct?

MR. MOORE:  Object to form.

Page 104

THE WITNESS:  I have no opinion on that.

BY MS. PANAGOPOULOU:

Q    Okay.  So as long as two people find themselves in the same categories -- let's break them down by columns.  As long as two people find themself -- themselves in the same cell in this spreadsheet, same row, same column, they have the same damages --

MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q    -- under your methodology, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Correct.

BY MS. PANAGOPOULOU:

Q    And now let's go to page 33.  So here you can see that there were actually a significant number of people that are aged 100 years old or more, right?

A    Yes.

Q    Okay.  But in calculating your damages, you had a cutoff age of 100 years, correct?

A    I did.

Q    Okay.  And, in fact, from my understanding of your report, whoever was aged to be 100 or

Page 105

older, their age was recalculated to be the average of whatever population -- the population group by defendant, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Close.  If their age was 101 or more or missing, which the missing is far and away the larger group, I went with the average age for those that were ages 1 to 100.  I used the weighted average.

BY MS. PANAGOPOULOU:

Q    Okay.  Why did you use the weighted average as opposed to the median?

A    It wasn't something I considered.  Typically an average age for an exercise like this -- they're missing.  I don't know -- I don't know where they are.  An average, I think it does it more justice.  Median is more a measure of central tendency.  If I was trying to -- if I was trying to say which age was most likely, then I would have done median, but if I wanted to do which age was most representative of the entire set as a whole, then the average is a better measure for that.

Q    Do you have a sense of how your calculation of average age compares to that of median age?

Page 106

A    I don't.

Q    Okay.  And so for every -- every single individual who -- whose age is indicated as missing, you calculated their age based on the weighted average of the global population for each defendant, correct?

A    Correct.

Q    And then you did the same thing for every member that was over 100 years old, correct?

A    I did.

Q    Okay.  Is it fair to say, though, that somebody who's 100 years old has a much higher mortality risk than somebody who's, in your calculations, the, you know, the weighted average age?

            MR. MOORE:  Object to form.

            THE WITNESS:  You're asking me to compare 100 with 40-something?

BY MS. PANAGOPOULOU:

Q    Yes.

A    Yes.  The 100-year-old would have a higher mortality risk.

Q    Okay.  So if you were to do your calculations not based on the weighted average for everybody that was 100 years and older but on their actual ages, would your damages -- would the

Page 107

overall damages increase or decrease?

MR. MOORE:  Object to form as to the actual ages.

THE WITNESS:  So my belief is that many or most of the ages above 1- -- age 100 are in error and are not actually reflective of people that are -- you know, ███████████ ███████████████████████████ ██████████████████████ that would be shocking to everybody.  So there's clearly -- there's clearly some issues with the age calculation, and so I made a simplifying assumption that above age 100, those people are not actually 101, 102, 103.  It sounds like in your question you're asking me to now assume that they actually are that age and if I did that would my damages be lower?  The answer is "yes."  If I assumed that they were actually 105 years old or 110 years old and I used a life population mortality table or any mortality table, those mortality rates are going to be higher and the damages are going to be pushed downward.

BY MS. PANAGOPOULOU:

Q    Okay.  But you did nothing to vet the ages of people that are shown in this report by

Page 108

Dr. Lee, correct?

A    I had no way of doing anything more sophisticated than what Dr. Lee did.

Q    Okay.  But did you discuss with Dr. Lee the possibility that his findings were anomalous?

A    I did not.

Q    Okay.  So using your own suspicion and your own hunch, you decided to reclassify anybody who's over 100 to -- to have an age that's simply the weighted average of the -- of the population for each defendant, correct?

MR. MOORE:  Object to form.

THE WITNESS:  I needed to do something to handle those situations.  I thought clearly it would be an error to assume that they were 110, 111, and so on years old.  So I made an informed, educated decision to treat them in a -- in a manner that would put them in the same -- as the average member of the class.

BY MS. PANAGOPOULOU:

Q    And --

A    With additional -- just a second.  If additional information comes to light, my model can easily incorporate doing something

Page 109

different with those people above 100.  Maybe
the cutoff's 105 or -- or I'm instructed to --
to assume that these people literally are
110-plus years old.  I can easily reconfigure
my model.  It's the same model, but I can
easily change the inputs to accommodate that.

Q    So on what basis -- you just said you made an
informed, educated decision.  On what basis did
you make that decision?  Did you review any --
any data on age distributions?

A    Just the common knowledge that I have from
working in the actuarial profession and how
rare it is to have people survive beyond, let's
say, age 105.  It just -- it defies all logic
that you would have -- you know, I can't
recall -- I don't know if anybody in the United
States has ever lived to age 114, ███████████

███████████████████████████████████████████

███    That just can't be.

Q    Okay.  So you're saying every single number or
according to your model every single number for
everybody who's 100 years old and over is an
error, but every single number for everybody
who's 100 years and younger is correct based on
your analysis, right?

Page 110

MR. MOORE:  Object to form.
Misstates his testimony.

THE WITNESS:  That's essentially what
my model -- I treat -- if the data's 101 or
greater I treat it as an anomaly.  I
acknowledge that those people maybe are just 1,
2, 3, 4.  They might be juveniles, in which
case assuming they're 40-some years old is
actually conservative.  So I think it is more
likely than not that these individuals are
miscoded by 100 years.

BY MS. PANAGOPOULOU:

Q    Miscoded by who?  By Dr. Lee?  By the records
of AMC?

A    By the records.

Q    Okay.  How do you know that this is not a
mistake that Dr. Lee made?

A    He calculated his dates of birth.  He
limited -- he was working with dates of birth,
he notes, ███████████████████ ██████
████████████████████████████████
████████████████████████████
████████████████████████████████

Q    So based on what you read from his report, you
assumed that Dr. Lee was right and that there

was some sort of error in the AMCA system, correct?

A    Like I said --

MR. MOORE:  Object -- object to form.

THE WITNESS:  I assume that that was more likely than not.

BY MS. PANAGOPOULOU:

Q    Okay.  But to be clear, you don't know for a fact that there aren't, you know, ██████ ████████████████████████████████████████, right?

MR. MOORE:  Object to form.

THE WITNESS:  I haven't done any analysis specifically on that point, but in my actuarial -- with my actuarial background I know how rare it is to live to these advanced ages, and these numbers in the advanced 100s defy all logic.

BY MS. PANAGOPOULOU:

Q    Okay.  But you haven't, again, reviewed any statistics in making that determination when drafting your report, right?

A    No.  It was so self-evident to me that I didn't -- I didn't investigate how many

Page 112

114-year-olds there are -- there even are in the United States.

Q    Okay.  So -- and just to be clear, everybody who mis -- who Dr. Lee found to have been reported as anywhere from 1 years old to 99 years old, you took Dr. Lee's numbers as correct and accurate in drafting your report, right?

MR. MOORE:  Object to form.  Misstates.

THE WITNESS:  I think 100 might have been included in there.

BY MS. PANAGOPOULOU:

Q    Okay.  Let's rephrase that.

A    Do you want me to check?  I'm not certain what I did with age 100 off the top of my head.  Do you want me to check?

Q    Sure.

A    So I used ages 1 to 100 as they were given.  If it was 101 or greater I treated them as the average.

Q    Okay.  So, in other words, you assumed that every single data that Dr. Lee provided you that corresponded to the ages of 1 to 100 was completely accurate, and then for every single

Page 113

data that he provided you for people that were 101 and older you determined to be completely inaccurate, right?

MR. MOORE:  Object to form.

THE WITNESS:  I had to do something with the data because there are people that are in these tranches and if it's my opinion that the data cannot possibly be true, the logical explanation is that there is a coding error in these dates of birth that is off by 100 years. So I could have also assumed that the 101-year-olds were 1 years -- 1 year old, the 102 years old were two years old, and so on.  I didn't do that.  I instead conservatively assumed that they were the weighted average age, and I should also point out that that group is absolutely dwarfed by the missing ages, so I already had to make an assumption for the missing ages.  I thought it would be most coherent and consistent for me to lump those together so the people above age 100, 101 and higher, and those that are missing all are lumped in the bucket with the average age.

BY MS. PANAGOPOULOU:

Q    Okay.  But for people that are below a certain

Page 114

age, you didn't assume that their ages were inaccurate, right?

MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q   In other words, you never assumed that a 60-year-old was, in fact, a misclassified 40-year-old, correct?

A   Correct.

Q   So, again, your damage calculations, the way you -- you put together your report, favor the assumption that anyone who's older than a certain age, in that case 100, gets reclassified to be of a younger age, but everybody -- everybody who's younger than 100, their age remains what their age is and is not reclassified?

MR. MOORE:  Object.  Asked and answered multiple times.

THE WITNESS:  I think I've described it as coherently as I can.  I can try again.

BY MS. PANAGOPOULOU:

Q   Okay.  If you were to put together a report based on Dr. Lee's findings, which I understand from your report that's what you were trying to do, your damages model would be lower, correct?

Page 115

MR. MOORE:  Object to form.

THE WITNESS:  Well, I need to make a determination about what I'm going to do with the 68,449 missing --

BY MS. PANAGOPOULOU:

Q    I'm not talking --

A    -- individuals.

Q    -- about missing individuals.  I'm talking about the individuals between 100 and 114 years old.

MR. MOORE:  Object to form. Misstates by including 100.

MS. PANAGOPOULOU:  Please, please, no speaking objections.

MR. MOORE:  You keep saying 100.

MS. PANAGOPOULOU:  Okay.  101 to 114.

MR. MOORE:  Well, it matters.

MS. PANAGOPOULOU:  Okay.  Fair.

THE WITNESS:  If I were to assume that these individuals were actually these ages above age 100, 101 up through 114, I would have lower annuity factors and therefore lower damages for those individuals.

BY MS. PANAGOPOULOU:

Q    Okay.  Thank you.  And did -- was it within the

Page 116

scope of your assignment to reclassify the ages that Dr. Lee had given you --

MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q    -- to what you considered to be the weighted average?

MR. MOORE:  Object to form.

THE WITNESS:  The scope of my assignment was to calculate damages for the class and I -- again, based on my actuarial expertise, it was my opinion that there comes a point when these numbers cannot be realistic because of the unlikelihood of individuals surviving to that age.  And so I used actuarial judgment to make an adjustment to Dr. Lee's numbers, not only above age 100, but also for all of the missing data.

BY MS. PANAGOPOULOU:

Q    Let's move on to page 7 of Dr. Lee's report.

A    Okay.

Q    Okay.  And you see here it says, "As explained above" -- paragraph 19 -- "As explained above, Ms. Worley has informed me that the following types of PI are relevant for identifying that PI tranche of class members."  Do you see that?

Page 117

A    I do.

Q    And it lists a number of different categories of information for individuals.

A    I see that.

Q    Okay.  Which categories, if any of those, did you consider in putting together your report?

MR. MOORE:  Object to form.

THE WITNESS:  Well, I didn't directly.  Indirectly Dr. Lee used the name.  I saw a document with the named plaintiffs. There's 45 of them, give or take.  He uses the date of birth, so I used that indirectly.  And then he uses -- he uses that information based on Ms. Worley's direction to come up with the different tranches, so I again used that indirectly, but I don't directly use any of these fields.  They're at best indirect usage in my report.

BY MS. PANAGOPOULOU:

Q    Okay.  What about the fields in Categories C to K?  Did you use any of those fields whether directly or indirectly in formulating your report?

A    Only to the extent that they would have affected the tranche definitions that

Page 118

Ms. Worley came up with and that Dr. Lee implemented in his analysis.

Q    Okay.  I think we previously established through your testimony that health affects mortality risk, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Underwriting -- underwriting affects mortality risk.  You go through underwriting.  They determine where you fall in the health spectrum and the risk spectrum, and then that is associated with different levels of mortality risk.

BY MS. PANAGOPOULOU:

Q    Okay.  A healthy individual is likely to live longer than an unhealthy individual.  Can we agree on that?

A    Agreed.

Q    Okay.  So if -- if -- if you extrapolate that across the population and you say, you know, you have 2,000 individuals that are healthy, 2,000 individuals that are not so healthy, it's more -- more likely that the average person in the healthy bucket will live longer than the average person in the unhealthy bucket.  Is that fair to say?

Page 119

MR. MOORE:  Object to form.

THE WITNESS:  I agree with that premise.

BY MS. PANAGOPOULOU:

Q   Okay.  And so you see here that according to Dr. Lee, one of the things that he notes ███ ████████████████████████████████ ████████████  Do you see that?

A   I do.

Q   Okay.  And was that something that you relied upon in formulating your report?

A   No.

Q   Why not?

A   I made the decision to use general population data and to use an all-male assumption, both of which are conservative relative to other options I could have pursued.

Q   Why is the general population table conservative?

A   Well, general population -- so there's lots of different mortality tables to choose from. Many of them come from the life insurance industry.

Q   Which want to sell products, right, so they want to make a profit?

Page 120

A    Yeah, but they also -- they also want to reserve -- they want to reserve appropriately. I mean, that cuts both ways. When they price -- when they come up with an industry table, it's based on actual experience. There's not intended to be a bias one direction or another for -- for an industry insured table. So that would have been one option, but I -- I did not assume that this was an insured population. I assumed that the general population would be more representative. So it was conservative to use a general population table rather than a table that was associated with an insured population, which those tables are much more common in the industry because the life insurance industry is always putting together tables.

Q    I understand that. Just before the break we had a look at your testimony in the Meek case, right?

A    Yup.

Q    And there you said that people that purchased life insurance usually have a lower mortality risk or lower mortality rates than those who don't, right?

Page 121

A    I think what I actually said was that the rate
of improvement for the relatively affluent
class of people that buy insurance as compared
to those who don't was improving faster than
the general population.

Q    And why is that?

A    Access to medical care; they're in an age where
they have survived some of the otherwise risky
behavior that's often associated with high
socioeconomic status.

Q    Okay.  And so, again, forgive me for asking
this again, when -- when an insurance company
puts together a mortality table, does it price
its products only based on that mortality
table, or are there other considerations such
as profits that go into that?

         MR. MOORE:  Object to form.

         THE WITNESS:  So an experience
mortality table or a pricing mortality table,
if you will, in many situations does not have
margin in it.  It is just simply intended to be
what they think the experience is going to be
for that particular block of business.  Some
companies choose to inject some conservatism.
Maybe they take a straight multiplier or have

Page 122

other means of injecting conservatism.  But it's certainly not unusual for a company to have a pricing mortality assumption that it's based on recent actual experience and to not add any margin into it whatsoever.

BY MS. PANAGOPOULOU:

Q    Okay.  In your years of experience testifying as an expert in -- in representing plaintiffs in cases against insurance companies, have you come across situations where insurers -- insurance companies choose to disregard -- use outdated data to put together their mortality tables?

MR. MOORE:  Object to form.

THE WITNESS:  I don't know what you mean by "outdated data."  By definition, these are often retroactive studies that -- mortality experience over the last five- or ten-year period.  They look and figure out a mortality assumption and then they may move it forward.  They look at the midpoint of that study, and if it was five years ago they may assume some rate of mortality improvement or worsening and adjust the table by moving it five years forward to account for the time lag that the

Page 123

study encompassed relative to -- to either today, or they might even look, hey, we're going to price this product for the next ten years, so we need to look out five years and we'll do, you know, a ten-year projection period, so we hit the midpoint of what the mortality assumption is.  So I'm not exactly sure what you mean by "outdated."

BY MS. PANAGOPOULOU:

Q    Mortality improves as time goes by, correct?  There's a general trend for mortality to improve?

          MR. MOORE:  Object to form.

          THE WITNESS:  It's been a mixed bag, honestly, especially over the last handful of years.

BY MS. PANAGOPOULOU:

Q    I'm not talking about post-COVID.  I'm not talking about the effects of COVID.  I'm talking about pre-2020.  Mortality rates have generally increased, right?

A    They have, but there are some weird exceptions.

Q    Okay.  And so have you come across insurance companies that use mortality tables that are outdated from ten years ago to justify charging

Page 124

higher insurance costs?

MR. MOORE:  Object to form.  Asked and answered.

THE WITNESS:  You're mixing and matching mortality tables and cost of insurance rates.  You can have a mortality table that is perfectly reflective of recent or anticipated future experience and that has nothing to do with whether or not the product's going to be profitable.  That -- that's going to be determined by where you set the cost of insurance rates relative to the underlying mortality experience.  And those cost of insurance rates often are loaded for other things for profit and expenses so that they include a mortality component, but they also significantly include things that are not related to mortality, typically.  So when we're talking about product profitability, that's more cost of insurance.  When you're talking about actual experience and the mortality tables that are used, those two things are not synonymous.

BY MS. PANAGOPOULOU:

Q    But mortality tables are at least one

Page 125

consideration that insurance companies use when determining costs of insurance, right?

A    It's an input into the pricing model.  I mean, they want -- they want their actual mortality experience to be reflected to the best extent possible.  That -- that's not a spot where they -- they're trying to deviate from what they think actual experience is going to be.  They plug in what they think it's going to be and then if they need to put in profit elsewhere in the product they would do that, but they wouldn't inject profit into the mortality table itself.

Q    I mean, I understand ethically they shouldn't do that.  In your experience, testifying on behalf of plaintiffs in a bunch of these cases, have you come across scenarios where you've seen, in fact, insurance companies use outdated mortality tables?

         MR. MOORE:  Object to form.  I'm trying to give you leeway.  I mean, you're so far outside the scope of his report at this point and you're asking the same questions over and over.

         MS. PANAGOPOULOU:  Okay.  So if

Page 126

you want --

MR. MOORE:  Well, it's going to be a standing objection on this.

MS. PANAGOPOULOU:  If you want to instruct him not to answer, we can -- you can do that and we can --

MR. MOORE:  I'm going to say it was asked and answered.

MS. PANAGOPOULOU:  Okay.

THE WITNESS:  So you're asking specifically about the cost of insurance cases that I've been testifying in?

BY MS. PANAGOPOULOU:

Q   I'm asking have you come across cases where insurance companies use outdated mortality tables?

MR. MOORE:  Same objections.

THE WITNESS:  I don't know what the definition of "outdated" is, but I have certainly come across companies that have failed to update their mortality expectations and continue to use an old table.  Yeah.

BY MS. PANAGOPOULOU:

Q   Okay.  And so are you -- just to be clear, are you saying that you're making conserve --

Page 127

you're being conservative here because you used mortality rates reflected in the U.S. life table as opposed to rates used by profit insurance companies?

A    I did say that.  And also what we haven't really gotten into yet is there's a significant injection of conservatism by me making an all-male assumption for the mortality rates despite the evidence suggesting that the class is two-thirds female.

Q    I mean, that's a separate component to that, and we can get to that later.  Should we take a break?

THE VIDEOGRAPHER:  We have to take a break.  We are off the record at 12:34 p.m. This is the end of Media Unit Number 2.

(Short break was taken.)

THE VIDEOGRAPHER:  We are back on the record at 1:14 p.m.  This is the beginning of Media Unit Number 3.

THE REPORTER:  Excuse me.

(A discussion was held off the stenographic record.)

BY MS. PANAGOPOULOU:

Q    Okay.  Can we go back to Dr. Lee's report?  I think it was Defendants' Exhibit D.  So could I

Page 128

direct your attention to page 21 of the report,
Footnote 36.

A    Okay.

Q    Can you read for the record Footnote 36 of
Dr. Lee's report?

A    "The oldest person alive in the United States
in 2024 was 115, putting her year of birth in
1909. ████████████████████████████████
████████████████████████████████████

And then he's got a citation.

Q    Did you consider this footnote when putting
together your report?

A    I did.

Q    And did you read the publication that it
references, ABC News?

A    I did not click on that.

Q    So there appears to be a direct quote here that
contradicts your assumption that ███████████
████████████████████████████████████
████████████████████████    Correct?

        MR. MOORE:  Object to form.

        THE WITNESS:  I don't see it that
way.  This is -- this is one example; one
person in the entire United States is 115. ███
████████████████████████████████████

███████████████████████████████████

███████████████     There's just no way.  If

there's only one person that's 115 in the

United States, ████████████████████████

████████████████████████

BY MS. PANAGOPOULOU:

Q   And that's an assumption that you're making,

right?

A   Yes.

Q   So Dr. Lee's nowhere in his report making this

assumption?

A   That's correct.

Q   In fact, the assumption that he is making is

that████████████████████████████████

████████████████████████████████   right?

That's what he's saying.

MR. MOORE:  Object to form.  Document

speaks for itself.

THE WITNESS:  Dr. Lee did his report

and I did mine, and I am in a better position

to opine about what is a reasonable bound for

the age, █████████████████████████████

████████████████████

BY MS. PANAGOPOULOU:

Q   Okay.  And what makes you more qualified to

Page 130

opine on this than Dr. Lee?

        MR. MOORE:  Object to the form.

        THE WITNESS:  I'm an actuary.

BY MS. PANAGOPOULOU:

Q   Have you reviewed Dr. Lee's qualifications?

A   Only to the extent that I know he's a
forensic -- he's able to do forensic work with
this, but I haven't seen anything in his
qualifications that suggests actuarial science
in his background.

Q   And, again, you haven't clicked on the link
that he cites in his report that you relied
upon in formulating your own report, correct?

        MR. MOORE:  Object.  Asked and
answered.

        THE WITNESS:  It's an ABC News
article about the oldest person dying at 115.

BY MS. PANAGOPOULOU:

Q   Did you read it?

A   No.

        MR. MOORE:  Object.

BY MS. PANAGOPOULOU:

Q   Okay.  But you agree that the statement here
contradicts your hypothesis --

        MR. MOORE:  Counsel, you're asking

Page 131

the same questions over and over.

MS. PANAGOPOULOU:  Okay.  And I'm entitled to get an answer.

MR. MOORE:  No, you're not.

MS. PANAGOPOULOU:  You can -- you can --

MR. MOORE:  You want a different answer.  He's answered your questions.

MS. PANAGOPOULOU:  No.  No.  You can --

MR. MOORE:  The first 20 questions you've asked you've been repeating every single question.  He's answered that.

MS. PANAGOPOULOU:  I have not. And -- and if you think that's the case, you can state your objection to form and it will be in the transcript.  That's it.

THE WITNESS:  Can you ask the question again, please?

MS. PANAGOPOULOU:  Can we have the question read back?

THE REPORTER:  The question was cut off, but it began, "But you agree that the statement here contradicts your hypothesis --"

BY MS. PANAGOPOULOU:

Page 132

Q   The hypothesis upon which you made your damages analysis in your report.

MR. MOORE:  Object.

THE WITNESS:  I do not agree.  This is -- again, this is one specific example -- example -- if anything, this -- this affirms that my assumption is appropriate because there's only one person in the entire United States that has ever lived to 115, ███████

████████████████████████████████████

████████████  ██████████████████████

████████████████████████████████████

████████████████████████████

██████████████████

BY MS. PANAGOPOULOU:

Q   Would you agree that Dr. Lee inserts that footnote in support of his proposition that

██████████████████████████████████

██████████████████████████████

MR. MOORE:  Object to form. Foundation.

THE WITNESS:  I think he put that in there because there was other data that had

██████████████████████████████████████

██████████████████████████████████████

Page 133

BY MS. PANAGOPOULOU:

Q    Okay.  And the people that he included in his
population is not the type of people that you
included in your calculation, correct?

            MR. MOORE:  Object to form.

            THE WITNESS:  I -- I included all of
the people that he included.

BY MS. PANAGOPOULOU:

Q    Okay.  But you did not consider ▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓ bound for age for your
calculations, right?

A    Correct.

Q    Okay.  Can I -- can you please turn to page --
page 42 of Dr. Lee's report?

A    Correct.

Q    Did you consider -- let me rephrase.  Did you
rely on this table in formulating your report?

A    Only to -- only to the extent that I picked
some named plaintiffs as examples and I tried

Page 134

to pick one -- one from each tranche and each defendant, so there would have been six representative examples if -- if they existed. I believe I picked five.

Q    Okay.  So you relied on certain parts of this table but not others, right?

A    Well, I relied on the name, the defendant, and the assigned tranche and I presume that these other qualifications are what led -- what led them to be categorized as Tranche 2 as opposed to Tranche 1, for instance.

Q    Okay.  It does say here "date of birth," right? That is something that you considered in your report?

A    I -- I didn't do anything with the date of birth.  I used the calculation that Dr. Lee used, and he noted in his footnote what date he calculated those dates of birth as of.

Q    Okay.

A    Or his ages.  Sorry.

Q    But the dates of birth of these plaintiffs are relevant in you ascertaining their alleged damages under your model, correct?

A    Yeah.  Their age as of November 1, 2024.

Q    Okay.

Page 135

A    Which is what is consistent with Dr. Lee's
calculation.

Q    But other elements of this table, so, for
example, ████████████████████████  was not
relevant in your damages model, correct?

A    Correct.

Q    Okay.  So -- and from your understanding, what
does this table show?

A    These are the named plaintiffs in the case, and
from my perspective what was relevant was the
defendant and the assigned tranche.

Q    Okay.  Do you see here that there are Xs
represented in certain rows for some
plaintiffs?

A    I do.

Q    Do you have an understanding of what this is?

A    I'm assuming the X is similar to a check mark,
but I don't -- I don't know for certain.

Q    Okay.  So, for example, if a certain
plaintiff's Social Security number was found in
AMCA's CHAMP database, there would be an X
under Social Security number?

A    That's -- that's my interpretation as well.

Q    Okay.  You see under "Health," under the Column
C entitled "Health"?

Page 136

A    I do.

Q    Do you see that every single -- every single column is indicated with an X?

A    I do.

Q    What is your understanding of the meaning of that?

A    Well, it could be any number of things.  If you look at the footnote that there was █████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████

Q    ████████████████████████████████████

A    Only to the extent that I read it in this report.

Q    ████████████████████████████████████████ ███████████

█    ████████████████████████████████████████ ████████████████████████████████████████ █    ██████    ████████████████████████████ ████████████████████████████████████████

MR. MOORE:  Object to form.

THE WITNESS:  I'm not sure.

BY MS. PANAGOPOULOU:

Q    Okay.  So like you said, like you pointed previously, under C there's the definition of

what health means.  And there are several categories there.  Did you try to understand what sort of categories of information was represented by those Xs?

MR. MOORE:  Object to form.

THE WITNESS:  Not beyond what's described here.

BY MS. PANAGOPOULOU:

Q    Okay.  But according to Dr. Lee, ███████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████

MR. MOORE:  Object to form.  "May or may not."

THE WITNESS:  I agree, everyone may or may not have --

BY MS. PANAGOPOULOU:

Q    That's -- that's what's indicated in Dr. Lee's report, right, ██████████████████████████
████████████████████████████████████████████
██████████████████████████████

MR. MOORE:  Object to form.

THE WITNESS:  It's also possible that none of them did. █████████████████████████

BY MS. PANAGOPOULOU:

Page 138

Q    Okay.  You don't know just by looking at this table, right?

A    I do not.

Q    And you didn't take any steps to ascertain whether, in fact, there were ███████████████ ████████████████████████████████

A    Other than I believe I have an understanding that ███████████████████████ █████████████

Q    How do you know that?

A    Well, for one reason, the fact that this is phrased as an "or," that these Xs, it's one of these things or at least one of these things.

Q    ████████████████████████████ ████████████████████████████ ███████████████████████████

A    ████████████████████████ ████████████████████████████ ██████████████

Q    Okay.  So that's an assumption you're making?

A    Sure.

Q    Diagnostic codes can provide you with valuable information as to somebody's health history, right?

        MR. MOORE:  Object to form.

Page 139

THE WITNESS:  Maybe.  Maybe not.

BY MS. PANAGOPOULOU:

Q   Okay.  And like we established earlier, that's a factor that at least insurance companies, in your experience, use in putting together mortality tables, right?

MR. MOORE:  Object to form. Misstates testimony.

THE WITNESS:  An insurance company is going to do a very thorough underwriting that you cannot replicate ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████   ████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████

BY MS. PANAGOPOULOU:

Q   That's fair.  But would you agree, though, that -- ██████████████████████████████████

███████████████████████████████████

████████████████████   and that this was taken into account in your analysis, how would that impact your damages model?

MR. MOORE:  Object to form.

Page 140

THE WITNESS:  Well, first off, I have no way of knowing ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  ▮▮▮▮▮

▮▮▮▮▮   I would have to see more of what you're asking about.  But I don't think there's sufficient information for me to be drawing health or mortality conclusions on a case-by-case basis for every single member of the class.

BY MS. PANAGOPOULOU:

Q  Okay.  You haven't done that at all here, right?

A  I have not.

Q  Okay.  Not even as -- in the aggregate or as a weighted average, right?

MR. MOORE:  Object to form.

THE WITNESS:  I -- I use a general population mortality table, which by definition is going to include people from all walks of life and all ranges of financial condition and

Page 141

health condition.

BY MS. PANAGOPOULOU:

Q   Okay.  But you do understand that the plaintiffs in this case are not simply members of the general population.  They're -- they're a particular segment of the population that have chosen to undertake medical exams, medical tests, even though they couldn't afford to pay for them, right?

MR. MOORE:  Object to form.  Lack of foundation.  Speculative.

MS. PANAGOPOULOU:  Please, no speaking objections.

MR. MOORE:  I'm objecting.

MS. PANAGOPOULOU:  Don't do that again.

THE WITNESS:  So there's a lot of assumptions there.  I don't know -- I don't know that -- about their financial status, about before the tests were ordered or what their health is or anything of that nature.  I would think that it could cut both ways.  You know, there is certainly a class of individuals that is not even going to see the doctor who has -- who has really -- who could have poor

Page 142

mortality experience.  So the fact that they're under a doctor's care and are proactively seeking out testing, like I said, I think it can cut both ways.

BY MS. PANAGOPOULOU:

Q   It could cut both ways that individuals that could not afford to pay for a doctor and are in debt nevertheless chose to undertake medical testing?

MR. MOORE:  Objection.  Foundation. Speculation.

THE WITNESS:  My point is that there's people in the general population that are far worse than this set of people.  So the general population has a wide spectrum.  Your implication seemed to be that this group was by definition worse than the general population. And I'm pushing back on that.  I -- I don't -- I don't have enough information to know that.

BY MS. PANAGOPOULOU:

Q   Okay.  If you were to apply your actuarial judgment in the same way you indicated to me that you did when it comes to ages, if you were to consider that at least a portion of these individuals have a poor health condition, how

Page 143

would your damages model changes?

MR. MOORE:  Objection.  Form.

THE WITNESS:  If I were to change my model, change the assumption -- as I've said a couple of times, I think, my model is the model.  You put in the inputs and you get the outputs out.  If I change the inputs, the output is going to change.  So if I change the input to have a worse mortality assumption, the damages are going to be lower.

BY MS. PANAGOPOULOU:

Q    Okay.  Now, going back to your report, going back to Exhibit B of your report.  I think it was Exhibit B?  Yeah.  So you say here that you also considered tranche definition data and mitigation costs provided by Amy Worley, right?

A    What page are you on?

Q    Page 14.

A    Yes.

Q    So what in particular did you -- did you consider when evaluating Ms. Worley's tranche definition?

A    I used her definition completely.  She defined what -- she in conjunction with Dr. Lee figured out which fields were relevant.  She

Page 144

indicated -- this is my interpretation -- but she indicated to Dr. Lee ███████████████

███████████████████████████

█████████████████████ ███████████

████████████████████████████████

████████████ ████████████████████

███████████████████████████████

██████████████████████████████

█████████████████████████████

███████████████

Q    Okay.  And did you vet or challenge her -- any of her -- her tranche definitions?

A    I did not.

Q    And what about the mitigation costs of the products that she put forth?

A    That's outside the scope of my expertise.  I had no -- no basis for debating her conclusions.

Q    Okay.

                MS. PANAGOPOULOU:  Where are we?  Are we on exhibit --

                MS. SULTANIAN:  E.

                MS. PANAGOPOULOU:  Okay.  So let's mark this for identification purposes as Defendants' Exhibit E.

Page 145

(Exhibit E marked for identification.)

MS. PANAGOPOULOU:  I'm sorry, Counsel, does that have any highlighting?  I'm sorry.  That's my copy.  And if we can pull up for the Zoom link the document called "AMCA Worley supplemental report."

BY MS. PANAGOPOULOU:

Q   Okay.  Have you seen this document that's in front of you?

A   Yes.

Q   And are there any specific segments of this report that you recall relying upon to formulate your report?

A   On page 5, she has a list of named plaintiffs and which tranche they're assigned to.  It's kind of splitting hairs whether I say I'm relying on her report or on Dr. Lee's report.  That information was -- was in both.

Q   Uh-huh.  Anything else?

A   Yeah.  Her -- I don't think it's -- it's not in this supplemental report because it didn't change, but her mitigation cost was something that I relied upon in her original report.  I don't think she repeats that here.  Yeah, I don't see that here.

Page 146

Q    So let's move to page 2 of her report.

A    Okay.

Q    So she's saying here, "I also asked Dr. Lee to
determine whether ███████████████████

███████████████████████████████

███████████████████████████████████

████████████████████

A    I see that.

Q    ██████████████████████████████

████████████████

A    I don't.

Q    Have you tried to find out?

A    I have not.

Q    Have you relied on this part of Ms. Worley's
report in formulating your analysis?

A    Only to the extent that ███████████████

███████████████████████████████

███████████████████████████████

██████████████

Q    Uh-huh.  And so let's mark this as Defendants'
Exhibit F.

     (Exhibit F marked for identification.)

          MS. PANAGOPOULOU:  For the people on
Zoom, that's Worley expert report, 11/1/2024.

BY MS. PANAGOPOULOU:

Page 147

Q    Do you recognize the document that's in front
of you?

A    I do.

Q    Is this the report by Amy Worley that you have
reviewed?

A    It is.

Q    Okay.  And can you point me specifically to any
parts of this report that you relied upon in
formulating your report?

A    So in the tail end of her report, 73 and
beyond, Ms. Worley talks about the Tranche 1
and Tranche 2 definitions.  So, again, I sort
of indirectly rely on that through Dr. Lee's
analysis.  And then page -- page 79 I see the
Tranche 2 mitigation cost of $15 per month or
$12 per month if billed annually.  So I -- when
I did my analysis I actually reflected a
discounted monthly rate for that.  And then the
Tranche 1 is on page 80 for the 8.99 per month.

Q    Okay.  Any -- any other pages?  Any other
sections?

A    I don't think so.

Q    Okay.  So let's take this one by one.  So am --
so in page 73 Ms. Worley appears to have a
definition of Tranche 2, correct?

Page 148



A    Yes.

Q    And she says, ███████████████████

A    I see that.

Q    Do you have any opinion as to whether that's a correct or incorrect statement?

A    I do not.

Q    You just take that as it is, right?

A    I do.

Q    And then on page 74 she's saying -- she appears to give a definition of Tranche 1, correct?

A    Correct.

Q    And she states here, ███████████████

A    I see that.

Page 149

Q   Do you have any opinions as to whether that's
correct or incorrect?

A   I do not.

Q   And so you just took that as -- as it was,
right?

A   I did.

Q   Okay.  And do you know what she refers to when
she says here ██████████████████████████████
██████████████████████████████

A   I do not.

Q   Okay.  And then on page 79 she's saying, ██████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
██████████████████████████

         Do you see that?

A   I do.

Q   And are these the values that you took into
consideration when formulating your damages
analysis?

A   Close.  I needed to do my calculations on a
monthly basis because I wanted to be consistent
with Tranche 1 and Tranche 2, and Tranche 1 was
expressed on a monthly basis.  I could have
used $15 per person per month, but I wanted to

Page 150

be conservative, so I assumed that these people would take advantage of the annual discount, but it's billed annually.  So I did a mathematical equivalency and $12 per person per month, if billed monthly, came out to be something like $12.27 or something.  I've got it in my report here.  I thought I could put my hands on it quickly.

Q    Take your time.

A    Yeah.  $12.27.  So that's what I used for the monthly cost.  And contrast with what she says was $15 per person per month.  So the 12.27 per month was intended to be consistent with the 144 annual billing, which would be -- you know, if billed annually.  So another way to say that it would be $144 if billed annually.

Q    Okay.  So if this -- if, in fact, you know, plaintiffs chose to be billed annually, they would be billed $144 per year, right?

A    Correct.

Q    But if -- but if we multiply 12.27 times 12, that comes out to more, right?

A    But at a 5 percent discount rate it's equivalent.  It's actuarially -- it's mathematically equivalent to -- if I were to

Page 151

give you $144 right now or I gave you $12.27 for the next 12 months at a discount rate of 5 percent, those two streams are equivalent.

Q   Why are you saying it's -- they're equivalent? On what basis?

A   Just simple math.  If I -- if I discount a stream of $12.27 over the next 12 months, if I discount it back at 5 percent to today, it's $144.

Q   Why would you discount it to 5 percent, though?

A   Because 5 percent is a -- is a reasonable rate based on the current level of interest rates. It's roughly where -- it's a conservative rate relative to where -- where treasury rates are, applicable federal rate for the IRS.  It's just indicative of the general interest environment that we're in.

Q   Did you consult any documents in coming up with that 5 percent discount?

A   Well, this 5 percent I intended to be consistent with the 5 percent that I used throughout the analysis, and I did consult the St. Louis -- what's called the St. Louis FRED, Federal Reserve Economic Data.  They have a website that updates monthly rates, and I

Page 152

looked at the three-, five-, seven-, and ten-year constant maturity yields, which I documented in my report.  I looked at some other additional -- you know, I looked at a 30-year treasury.  As I said, I looked at the applicable federal rate from the Internal Revenue Service.  So those were all supporting things that I looked at that made me conclude that 5 percent was a conservative rate.

Q    So if -- you chose to conduct your calculations in such a way so that you get differentiation from month to month, right?

MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q    In other words, you chose to break down your analysis on a month-to-month basis?

A    I did.

Q    Okay.  But, you know, you could have developed a model where your damages analysis is based on a year-to-year basis, right?

A    I could have, but for Tranche 1 that would have been arguably inappropriate because Tranche 1 is explained -- is priced on a month-by-month basis, and my model is sophisticated enough that it accounts for monthly mortality as well.

Page 153

So it accounts for people potentially dying in the middle of a year.  If I go to a yearly model it's going to push the costs higher because I'm assuming that that cost is -- is paid for every single person that's alive at the start of the year.  So it overstates for people that died during the year.

Q   But you could have considered -- you could have calculated damages for Tranche 1 members on a month-to-month basis and for Tranche 2 members on a year-to-year basis if you wanted, right?

A   I could have.

Q   In other words, it was your decision to make this a month-to-month determination?

A   Yeah.  I felt that was most appropriate given the fact pattern and I adjusted -- rather than -- I didn't use the $15 per person.  I adjusted for an annual discount.  Again, a conservative adjustment, but I put that on a monthly basis, and therefore I was able to apply the same model and mechanics to Tranche 1 and Tranche 2.

Q   Okay.  But if you were to just calculate for Tranche 2 based on the yearly rates, what you would end up with is $144 per year as opposed

Page 154

to the elevated rate that you get by multiplying 12.27 times 12?

A   But I -- I still think the damages would have been higher if I used an annual approach because every single person at the beginning of the year would have been charged $144, and so it assumes that they lived the full year. Whereas what I'm doing, it'll be equivalent -- it would be equivalent if there was no mortality reflected.  But mortality is reflected, and so what I've done by doing this on a monthly basis is slightly more conservative than doing it on an annual basis.

Q   All right.  Let's go back to your report.  So walk me through your methodology for determining damages for a particular class member.

A   Do you want to use one of the named plaintiffs as an example?

Q   Sure.  So let's, for example, focus on -- let's take the first one, Gina Allende in page 6.

A   Okay.

Q   So I see from your report that you have determined that this plaintiff is owed damages of approximately $296, 464, 612, and $799 in

Page 155

accordance with -- with if you were to calculate her damages on a three-year, five-year, seven-year, and ten-year -- and ten-year increments, right?

A     That's --

MR. MOORE:  Object to form.

THE WITNESS:  That's correct.

BY MS. PANAGOPOULOU:

Q     Okay.  So let's first of all look at the first number, $296.22.  So how do you arrive at this number?

A     So we can kind of work backwards, but that is the product of the annuity factor, 32.94 and so on, and the monthly damage of $8.99.

Q     So you multiply the two and you arrive at that number, right?

A     Correct.

Q     Okay.  So here's my understanding, and let me know if I'm correct or incorrect in stating this.  Assuming that Gina Allende was immortal and she lived forever, you would multiply 8.99, which is the monthly mitigation cost, by 36 months and you would get a number that's higher than what's stated here, right?  Correct?

A     Let me just check Exhibit G real quick.  I

Page 156

don't -- I don't think it would be 36 because the annuity factor also takes into account a 5 percent discount rate.  It would be 36 if we had no mortality and a zero percent interest rate.

Q   I see.  So -- and this is what I was trying to get into.  So that number that you multiply with 32.94946, that doesn't only take into account annuity, but it also takes into account your 5 percent discount rate is what you're saying?

A   And I actually sort of -- as a way to validate that on Exhibit G, I show how those -- how that factor of 32.94946, I show mathematically how it came to be.

Q   Okay.

A   And basically I add up 36 numbers, so over the next 36 months I add up the discounted present value of a $1 payment, which takes into account not only the interest rate but the likelihood that you're alive to receive that payment at that point in time.

Q   On a month-to-month basis?

A   Yes.

Q   So -- so those -- those numbers that you have

at the bottom of page 6 --

A     Yes.

Q     -- those are numbers that you made -- that you calculated yourself based on two things, right? Annuity values and the 5 percent discount rate, right?

          MR. MOORE:  Object to form.

          THE WITNESS:  I don't know if I'd say annuity values.  It's a probability of survival.  If that's what you mean by that, then I would agree.  But normally we would describe that a little differently.  It's a combination of two things, the -- well, think of it like this.  It's -- you've got a dollar that's going to be paid every single month. First we apply the probability of survival, so now it's not a dollar.  For instance, in the -- in the second -- in the second month it's now 99.9 cents because there's a little bit of a mortality discount, and it keeps going down. So we've got a stream of mortality discounted payments and then we discount those back to time -- to times zero by applying whatever discount rate we applied.  In this case I applied a discount rate of 5 percent.  So you

Page 158

were correct with your kind of starting premise of if there was no interest and there was no mortality, the annuity factor would be 36.  But if I apply both the mortality and the interest, it drops down to this 32.94.

BY MS. PANAGOPOULOU:

Q    Okay.  And I'm trying, again, to determine what factors go into the -- the 32.9 value that you have there.  So --

A    Okay.

Q    -- it's the 5 percent discount rate and also some sort of annuity value that you determine based on the U.S. life table that you referenced in your report, right?

A    Yeah.  I'm going -- I'm going to say again I wouldn't describe it as an annuity value.  I would describe it as the probability of survival based on the U.S. life table that I used.

Q    Okay.

A    So for -- for Gina's case she's 58 years old. I'm taking into account the likelihood that a 58-year-old, what her probability of survival is over the next three years from 58 to 61 on a month-by-month basis.

Page 159

Q    Uh-huh.

MS. PANAGOPOULOU:  Where are we on exhibits?

THE REPORTER:  G.

MS. PANAGOPOULOU:  So let's mark this for identification purposes as Defendants' Exhibit G.

(Exhibit G marked for identification.)

MS. PANAGOPOULOU:  And for the people in Zoom, can you just pull up U.S. life table?

BY MS. PANAGOPOULOU:

Q    So do you recognize the document that's in front of you?

A    I do.

Q    Is this the document that you utilize in determining -- I'm not sure how you call it -- the annuity value that you apply to your damages calculation?

A    I use this to -- to glean the mortality rates which are then used to calculate the probabilities of survival on a month-by-month basis.

Q    And can you point me out to a particular page or table or segment --

A    Sure.

Page 160

Q   -- of this report that you utilized?

A   Page 16 and 17.

Q   Any other parts?

A   No.  I mean, by reference, pages 18 and 19 are
of interest too because those are the life
table for females and I -- I worked with those
and you'll hear me make repeated reference to
the level of conservatism.  Like you can -- you
can compare certain ages and the mortality --
female likelihood of dying is sometimes half of
what the likelihood of dying is for a male.

Q   Uh-huh.  So this report makes extensive
references to life tables broken down by not
just sex and age but also Hispanic or
non-Hispanic origin and race.  Do you see that?

A   I -- yup.  I see -- I see some reference to
that.

Q   Are those considerations that you took into
account into formulating your report?

A   I did not.

Q   Okay.  And now moving on to the 5 percent
discount rate that you used -- sorry.  Before I
get to that, I just want to go to paragraph 13
of your report.

A   Okay.

Page 161

Q    Okay.  So can you just please read paragraph 13?

A    "To calculate an actuarial present value of damages for any given scenario, I needed to multiply the assumed monthly damage by an appropriate annuity factor that -- that reflected appropriate mortality, interest, and claim duration."

Q    Okay.

A    Do you want me to read the next part too?

Q    No.  So here I understand that there are four factors that go into your analysis of the damages that a plaintiff might be entitled to. There's the cost of the mitigation product. That's one.  Two, it's the annuity factor. Three, it's the interest or discount rate.  And four is the claim duration.  Right?

A    I agree.

Q    And then going back to the example of Gina Allende that we were talking about --

A    Yes.

Q    -- so here I see that you've taken an account of the monthly mitigation cost, which is $8.99, and then am I correct in saying, just to confirm again, that Factors 2 and 3, the

Page 162

annuity factor that reflected appropriate mortality and interest are combined together in the -- in the values that you indicate at the bottom of page 6 of your report?

A    That's correct.  Mortality and interest are both incorporated into the -- those annuity factors.

Q    So they're blended in together here?

A    (Nodding.)

Q    And then -- is that a "yes"?

A    It is -- I'm sorry.  Yes.  I could -- I could split them out and, in fact, you -- I did a step-by-step validation in Exhibit G and some of the later exhibits for the other named plaintiffs, but for the sake of my report and the way that it's done in the model, those are -- those are blended together.

Q    Uh-huh.  So aside from these four factors that we've just identified -- identified monthly damage, annuity factor, interest, and claim durations, there's no other factor that goes into calculating damages for a punitive class member, correct?

A    I mean, the annuity factors are different for different ages, so I would probably add age to

Page 163

that -- to that list of things, because if you look, for Gina I say it's a 58-year-old monthly annuity factor.  Those factors would be different for somebody who's a different age.

Q   So in your report the only thing that affects the annuity factor is the age, right?  You don't consider any other differentials?

A   I don't know what you mean by "differentials," but it -- it's age.  I use the U.S. life table, find the appropriate age, and then use a discount rate of 5 percent.

Q   Okay.  So the only thing that would change the annuity factor from Plaintiff A to Plaintiff B is their age, right?

A   Correct.

Q   Okay.  So assuming there's another 58-year-old that was classified as Tranche 1 by Amy Worley, just by the mere fact that she's a 50-year-old -- 58-year-old person and just by the fact that she's been classified as Tranche 1 by Amy Worley, would that automatically entitle her to the same amount of damages as Gina Allende, according to your model?

A   Yes.

Q   Okay.  By the way, how do you know that Gina

Page 164

Allende is alive?

A    I haven't done anything to verify that.  I, again, relied on the data supplied by Dr. Lee. I don't know -- I don't know about the current status of any of these individuals.

Q    Okay.  And how do you know that Gina Allende hasn't, in fact, purchased already the mitigation product that Ms. Worley recommended?

A    I don't.

Q    So, in other words, your model does nothing to differentiate between individuals that may or may have not already purchased a mitigation cost product, right?

A    I treat them all the same.

Q    Okay.  And it doesn't differentiate between individuals that may be alive or may be dead?

MR. MOORE:  Object to form.

THE WITNESS:  To the extent there are any deceased individuals in the data set, they are treated the same as those that are alive.

BY MS. PANAGOPOULOU:

Q    Do you know whether your data set includes deceased individuals?

A    I do not.

Q    I mean, these were individuals that plaintiffs

Page 165

allege six years ago their information was somewhere to be found in the AMCA database, correct?

A   Correct.

Q   Okay.  So for the purpose of your calculation, every single one of these individuals has remained alive, correct?

A   Even the 114-year-olds, yes.

Q   Okay.  I'm sorry.  I need a five-minute break.

THE VIDEOGRAPHER:  We are off the record at 2:10 p.m.

(Short break was taken.)

THE VIDEOGRAPHER:  We are back on the record at 2:16 p.m.  This is the end of Media Unit Number 3.  We're off the record at 2:16 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We are back on the record at 2:17 p.m.  This is the beginning of Media Unit Number 4.

BY MS. PANAGOPOULOU:

Q   Can you turn to paragraph 18 of your report?

A   Okay.

Q   And can you read that paragraph for the record?

A   "For interest I conservatively used a discount

Page 166

rate of 5 percent for all claim durations.
(Higher discount rates are conservative because
they produce lower calculated damages.)  Here
are the monthly U.S. Treasury constant maturity
yields for March 2025 from the Federal Reserve
Economic Data."  And then I list rates for the
one- through the ten-year treasuries.

Q    So I'm trying to understand, the values that
you have there, what do they represent?

A    They represent what you could get on a U.S.
Treasury bond in terms of expressing in terms
of constant maturity for these various
durations as of March 2025.  So if you wanted a
one-year bond at that point they would pay a
rate of 4.06 percent over the one-year period.

Q    Would it be fair to say that these rates are
the federal rates that represent the cost of
borrowing faced by the government?

A    Yeah.  I think so.

Q    Okay.  And what -- why do you ascertain or why
do you -- why are you saying that these values
are in any way relevant into calculating a
discount rate?

A    Because treasury yields are often regarded as a
risk-free rate, and in this situation where

Page 167

these damages are -- based on plaintiffs' theory, these damages are known; the cost of the risk mitigation strategy for a three-, five-, seven-, ten-year period, there is no uncertainty there.  So I'm using something that's representative of a risk-free rate and I'm using something that's higher than that, which is why I say it's conservative.

Q   Well, I mean, am I right in saying that what you're trying to do is calculate the time value for money?  In other words, what is the present value of this lump sum of money that you want defendants to pay if they paid now over paying it within the course of three, five, seven to ten years?

MR. MOORE:  Object to form.

THE WITNESS:  Potentially, but I would argue that in such a situation it would make sense to have a conservative discount rate because you wouldn't want to be investing aggressively with those funds.  From the perspective of the -- of the person who's getting compensated, this is a guaranteed coverage for the three-, five-, seven-year, and ten-year period.  So if you're going to be

Page 168

compensated on a present-value basis, my belief is that discount rate should reflect a relatively low amount of risk.

BY MS. PANAGOPOULOU:

Q    Okay.  When you worked in insurance companies, you testified previously that they would, in fact, invest in things other than bonds, correct?  They would invest more aggressively, right?

A    Correct.

Q    Okay.  And insurance companies also have an obligation to pay out claims when they're due, correct?

A    Correct.

Q    Okay.  So if an entity has a certain amount of reserve funds, they can afford to have a more diversified investment portfolio, correct?

            MR. MOORE:  Object to form.

            THE WITNESS:  I mean, there's lots of rules and regulations that govern that, but typically companies that have higher levels of surplus can be more aggressive with their investments.

BY MS. PANAGOPOULOU:

Q    Okay.  And if, in fact, this -- this certain

Page 169

sum of monies, instead of being invested in
bonds, if they were invested in the S&P 500,
they could yield much higher returns, correct?

MR. MOORE:  Object to form.

THE WITNESS:  It could also go the
other direction too, which is -- that's
inherent in the risk of an equity-type
investment.  So it could go up, it could go
down, especially over a short period of time.

MS. PANAGOPOULOU:  So let's mark this
for identification purposes as Defendants'
Exhibit...

THE REPORTER:  H.

MS. PANAGOPOULOU:  H.

(Exhibit H marked for identification.)

BY MS. PANAGOPOULOU:

Q    Have you seen this document before?

A    I mean, I haven't -- I haven't seen this
particular Western & Southern version of it,
but I've seen similar versions.

Q    Okay.  Have you seen graphs like this before
that document how the S&P 500 has been doing
historically?

A    Sure.  Yes.

Q    Okay.  So -- so, yes, there are ups and downs,

Page 170

but, you know, if you look at the historic performance of the S&P 500, it says here that your average return is 9.48 percent. Is there something that -- in here that you think is inaccurate in this document?

MR. MOORE: Object to form. Foundation.

THE WITNESS: I think this is an accurate representation of what somebody who was invested fully and continuously in the S&P 500 would have achieved over that period.

BY MS. PANAGOPOULOU:

Q Okay. And big companies that have the funds to invest, would be reasonable to state that they could achieve returns that are much higher than the 5 percent rate that you have stated in your report?

MR. MOORE: Object to form.

THE WITNESS: Yeah, but that's not the perspective that -- I'm looking at it from the perspective of these individual plaintiffs and what they would -- what they would invest in, and it's much more likely that they're on the guaranteed end of the spectrum than they are on the S&P 500 end of the spectrum. So

Page 171

it's not relevant what a big company would invest in. I believe it's relevant what these individual plaintiffs would invest in.

BY MS. PANAGOPOULOU:

Q   Oh, so you're saying if plaintiffs had the money now, what they -- from their perspective how they would invest it?

MR. MOORE:  Object to form.

BY MS. PANAGOPOULOU:

Q   Is that how you're looking at this?

MR. MOORE:  Object to form.

THE WITNESS:  That's how I'm looking at the actuarial present value is they have -- if -- if there's a mitigation, a monthly cost of mitigation is equal to, you know, $8.99 a month over the next three, five, or seven or ten years, equivalent to that would be present valuing it, and it's -- in my view it's not appropriate to present value it at what the cost of investment is for AMCA.  It's appropriate to present value it at a discount rate that reflects what's appropriate for the individual plaintiffs in question.

BY MS. PANAGOPOULOU:

Q   Okay.  Let's just take a step back.  So do you

Page 172

agree that different individuals or entities place different value to the -- to the -- to having money now versus having money in the future?

A    That's fair to say.

Q    Okay.  And plaintiffs here are plaintiffs who are in debt, right?

MR. MOORE:  Object to form. Foundation.  Speculation.

THE WITNESS:  I am -- I am aware that there is a debt collection aspect of this, yes.

BY MS. PANAGOPOULOU:

Q    So let's go back to the situation of -- to the example of Gina Allende, all right?

A    Okay.

Q    Okay.  So Gina Allende wants to have right now $799.  Let's call it $800.

A    Okay.

Q    Okay.  The value to Gina Allende of having $800 in her pocket right now would be greater than having those $800 in the course of ten years, right?

MR. MOORE:  Object to form.

THE WITNESS:  It would be actuarially equivalent at a 5 percent discount rate, that

Page 173

that's what the discount rate does.  So $799 today is actuarially equivalent to her receiving $8.99 every single month for which she survives over the next ten years.

BY MS. PANAGOPOULOU:

Q    I'm asking something different.  Forget the -- the interest rate for a second.  I'm saying let's say Gina Allende wants to have $800 in her pocket right now today.

A    Okay.

Q    Right?  Having -- having $800 in my pocket today is worth to me more than having $800 given to me within the period of ten years, right?

MR. MOORE:  For -- for you?  For the plaintiff?  Object to form.

MS. PANAGOPOULOU:  Okay.  Let's make it more general.

BY MS. PANAGOPOULOU:

Q    Okay.  What is better for me?  To have $800 in my pocket right now or $800 given to me over the course of ten years?

MR. MOORE:  Object.

BY MS. PANAGOPOULOU:

Q    What is more beneficial to me?

Page 174

MR. MOORE:  Object to form.

THE WITNESS:  Okay.  But to be clear, that's not what I'm -- this is not $800 over a ten-year period.

BY MS. PANAGOPOULOU:

Q   I understand that.  I'm asking you a different question.

A   Okay.  So I would rather have $800 today than $800 given to me over a ten-year period.

Q   And that's the principle of time value for money, right?

A   Sure.  That's, yeah, part of it.

Q   Okay.  So assuming this individual, Gina Allende, wanted to have $800 in her pocket right now and wanted to go to the bank and take a loan for this $800.  Is it your position that the bank would give her a loan with an interest rate of 5 percent or less?

MR. MOORE:  Object.

THE WITNESS:  That is not my position.

BY MS. PANAGOPOULOU:

Q   So if an individual is in debt and they go and borrow money because they need money now, the bank would charge them a higher interest rate

Page 175

than if the government wants to go and borrow money, correct?

MR. MOORE:  Object to these straight hypotheticals.

THE WITNESS:  You flipped it around from borrowing to receiving money.

BY MS. PANAGOPOULOU:

Q   Yeah.

A   My -- my calculation is based on the receipt of over the next three to ten years a guaranteed mitigation strategy, whether it's $8.99 or 12.27.  It seems like you're asking me should we get to discount those damages because of a perception that these people are in financial trouble of some sort and therefore the damages shouldn't be as great because they're in -- because they're financially impaired somehow?  Is that what you're getting at?

Q   I'm trying to ascertain the present value for -- of money for these particular plaintiffs.  A plaintiff in debt values money right now more than someone who's not in debt, correct?

MR. MOORE:  Object.  Broad. Generalization.  Speculation.  Foundation.

Page 176

THE WITNESS:  I think it's hard to say.  Again, my analysis is discounting a stream of money that they're going to be getting or an equivalent service that they're going to be getting for a three- to ten-year period and present valuing that back to a sum of money today.  I don't think it's appropriate to say just because that individual, if they went and borrowed money -- yes, all of us if we borrow money, regardless of our financial status, are going to have to pay more than the government cost of borrowing.  That's kind of the point.  The government rate is a risk-free rate.  When you borrow from a bank, there is a risk, and so the rate is higher.  I believe it's appropriate to have a discount rate in this case that is close to the risk-free rate because there is no risk from the standpoint of the people who are receiving this settlement.  They're getting -- in order to have these risks mitigated, they have a mitigation strategy for a three- to ten-year period that costs these amounts.  And so I get what you're saying about the different interest rates and different situations.  But for this particular fact

Page 177

pattern I believe that a risk-free rate is appropriate.

BY MS. PANAGOPOULOU:

Q    But to be clear, it is -- it is defendants that you expect are going to be providing the funds, right?

A    Yes.

Q    Okay.  So from defendants' perspective, if they were to invest these -- these sort of sums of money and provided that they have some, you know, excess reserves, they would be able to invest it in a way that they make more -- a return of more than 5 percent per year, right?

A    Not necessarily over a -- over a three- to ten-year period.  I mean, there is -- there's a three-year period here in the S&P that were double digit negative returns three years in a row.  Lots of people think the market is overvalued right now and we could be heading for a period of time where market returns are suppressed.  So generally speaking if you have an investment horizon of three to ten years, you're not going investing in the S&P 500.

Q    Okay.  In 2000 to 2002 you were working at Northwestern, right?

Page 178

A    Correct.

Q    Okay.  And in those years when the market was down, did Northwestern cease from investing in the S&P 500?

A    I was not in the investment area.  They don't really -- companies like that don't invest in the S&P 500.  They have private equities and airplane leases and they buy timber, you know, land and things like that and they --

Q    Right.

A    -- develop malls.  They're not just investing in the S&P 500.

Q    They have a diversified portfolio, right?

A    Sure.

Q    That's meant to maximize their return, right?

A    It's -- it's more complicated than that.  It's -- it's not just maximizing your return.  If you hold a risky asset, you have to hold additional capital as an insurance company.  So there's a strain associated with holding a risky asset.  It's a -- it's a tradeoff between swinging for higher investment returns and the drag associated with that with the additional capital you have to hold.

Q    Uh-huh.  You don't know what capital assets any

Page 179

of these defendants have, right?

A   I do not.

Q   Okay.  So the -- again, going back to the 5 percent discount rate that you have chosen here, is that -- is that discount rate something that you've applied previously in -- in formulating -- formulating expert reports in any other cases?

A   It could be.  You know, it depends on the current rate environment at the time that I'm doing the analysis.  Rates have been historically low.  I mean, especially -- and not as low if we went back four or five years, but rates are quite low now compared to the course of my working career.  So depending on when the analysis was done, it could have been 5 percent; it could have been something else.

Q   Okay.  Do you specifically remember any case that you were retained as an expert witness for where you recommended a 5 percent discount rate?

MR. MOORE:  Object.  Asked and answered.

THE WITNESS:  Well, I've been involved in cases where we've used interest

Page 180

rates as low as 3 percent in these cost of insurance cases.  The interest rate dropped down to the guaranteed levels and so we were -- we were using just 3 percent in those cases.

BY MS. PANAGOPOULOU:

Q   3 percent was the -- was interest rates for -- that the insurance company would guarantee to a plaintiff when they made payments, right?

A   Correct.

Q   Okay.  So that's not -- that's not a market assumption or something like that.  That's something that was set by the insurance company.

A   Based on market conditions.

Q   I mean, sure.  But, you know, insurance companies ultimately are profit-making companies, so --

A   You have a dim view of insurance companies.

Q   So -- so profit was a factor in that 3 percent interest rate that you're telling me about, right?

A   There's lots of things that go into it.  A universal life policy has different components that are guaranteed, and when interest rates plummeted, these policies that I'm thinking of

Page 181

had a 3 percent guarantee associated with them, so the interest rate could not fall below 3 percent. And so in my damage calculations, when I was calculating the damages that were accruing during that time period, I used the guaranteed interest rate of 3 percent.

Q   Okay. Again, these were interest rates that were guaranteed by insurance companies to their clients per their policies, right?

A   Yes.

Q   It wasn't a rate that you just came up with?

A   Correct.

Q   Okay. So how did you come up in this case with this 5 percent discount rate?

A   Didn't we cover this already?

MR. MOORE: Object. Asked and answered.

BY MS. PANAGOPOULOU:

Q   Did you look at any -- other than looking at the -- excuse me -- at the federal rates that you state in your report, did you look at any other documents that -- that made you think that that was an appropriate rate to use as a discount rate?

A   Well, I looked at the 30-year treasury, which

Page 182

is another government rate.  I looked at the applicable federal rate that the Internal Revenue Service uses for short-term, mid-term, and long-term annuity present valuing, which is exactly what I'm doing here.  And that was in the 5 percent or below neighborhood.  But more than that, it's from basic actuarial principles.  Like I said, I felt that a risk-free rate was appropriate from the perspective of the plaintiffs because these are monthly payments over a three- to ten-year period that are certain in nature.  That's what we're -- that's what we're present valuing.

We're not -- in my view the plaintiff doesn't get -- get to say like, well, we would have invested and earned 10 percent, so therefore the -- or the defendant doesn't get to say we would have invested at 10 percent, therefore when we present value this, we're going to give the plaintiff less money.  What matters is what the plaintiff -- what it's worth to the plaintiff, and if it's -- if it's a risk-free rate that is most indicative of what they're going to get over that three- to ten-year period, then I believe that's what's

Page 183

appropriate to use as a discount rate.  Given
that, I looked at these various rates from the
Federal Reserve; all of them were under 5
percent.  For the sake of simplicity and a
little bit of conservatism, I rounded up and
used 5 percent across the board.

Q   Uh-huh.  But to be clear, under your damages
model, the plaintiffs wouldn't be getting -- I
mean, I guess they could be getting money, but
they would be getting -- that money would be
earmarked for the -- to account for the cost of
the mitigation products, right?

A   And so they're going to have that money on hand
and they need to have it available to buy the
mitigation policies [sic].  They can't go in
the S&P 500.  Who knows if they're going to
have the money with the rising and falls --
falling of the market.  Who knows if they're
going to have the money.  So --

Q   Okay.

A   -- when you invest in a short three- to
ten-year horizon you're going to invest
conservatively or in a guaranteed type of
vehicle.  So, again, I think the risk-free
rates that are represented by the constant

Page 184

maturity treasury yields are more indicative of the level of risk that's appropriate from the plaintiffs' perspective.

Q   I see.  So in your damages analysis the defendants would give that money up front to all the plaintiffs with the understanding that all plaintiffs would use that money themselves to buy the mitigation products?

A   That's the thought process.

Q   I see.  Okay.  So you did not account for the alternative scenario where defendants choose to bear the expense of buying these mitigation products and offering them to plaintiffs?

A   I did not.  But what I will point out, and perhaps most important at this stage of the case, is that my model is sound and can incorporate any assumption.  So if I were instructed to discount at a higher or lower interest rate, I could do that in a matter of minutes --

Q   Okay.

A   -- with the way the model was constructed.

Q   So if -- if instead of using the 5 percent discount rate, if we were to use the historical S&P 500 performance return, which is 9.48

Page 185

percent, right?  If we were to use that instead of 5 percent, would your overall damages increase or decrease?

A    Decrease.

Q    In your analysis, have you taken into consideration the concept of supply and demand?

A    I have not.

Q    Okay.

A    I'm not even sure what you're alluding to, but...

Q    Sure.  So you may or may not be aware that as time passes by, data breaches become even more prevalent.  I don't know if that's something you were aware of.

A    Only anecdotally.

Q    Okay.  And so more and more financial institutions make to their consumers available mitigation -- mitigation products to combat those risks.

A    Okay.

Q    Okay.  So assuming more and more financial institutions offer this product, would it not be the case that the cost of the -- of those products proposed by Amy Worley would likely go down in the future?

Page 186

MR. MOORE:  Object.  Foundation.
Speculation.

THE WITNESS:  I have no basis to
dispute one way or the other.

BY MS. PANAGOPOULOU:

Q   Okay.  So in your analysis you assume that the value of the product recommended by Ms. Worley remain at the same exact price for the next ten years?

A   And I also don't factor any inflation, you know, the possibility that they could be more expensive as well.  But you're correct.  I -- I assume that they remain the same, but for the purposes of discounting, I mean, it all depends on how -- how defense is going to pay this out.  Like you said, is it going to be a lump sum?  Is it going to be in the form of purchasing their mitigation strategies directly?  If that's done, you know, I don't know that you can fund it in a way that says we're going to pay monthly but we don't know what the cost is going to be ten years from now.

Q   You haven't factored into your analysis the possibility that as you continue to use a mitigation product, your risk of identity theft

Page 187

goes down, right?

MR. MOORE:  Object.  Assumes facts.

THE WITNESS:  I haven't done anything like that.

BY MS. PANAGOPOULOU:

Q    Okay.  And you haven't calculated -- you haven't factored into your analysis the possibility that if defendants were to purchase these mitigation products in bulk that they could obtain a cheaper price, correct?

MR. MOORE:  Object.  Assumes facts.

THE WITNESS:  Again, I'm relying on what Ms. Worley said was the cost of mitigation, so I would only be reflecting that to the extent she did.

BY MS. PANAGOPOULOU:

Q    Okay.  So according to your analysis again, these products and their pricing remain the same today until ten years from today?

A    Correct.

Q    And in your analysis, you don't take into account the fact that these products may overmitigate plaintiffs for the harm that they may have suffered in other data breaches that are unrelated to the AMCA data breach?

Page 188

A   I don't understand the question.

MR. MOORE:  Object.

BY MS. PANAGOPOULOU:

Q   Okay.  Sure.  Let's take a step back.  So what is the understanding of -- what is your understanding of the purpose of the products that Ms. Worley recommends here?  What are they designed to do?

A   My understanding is that they're designed to mitigate damages associated with the breach.  So whether it's credit monitoring or identity theft, I'm not really -- I didn't really get into the weeds on that.  But it's some sort of mitigation strategy to account for the breach.

Q   When you say "the breach," do you mean specifically the AMCA data breach or any data breach?

A   My understanding is the AMCA data breach from 2019.

Q   So is it your understanding that Amy Worley's products are specifically designed to mitigate the risks from that particular breach, as opposed to other breaches?

A   That's really outside the -- outside my area of expertise, but that's my understanding.

Page 189

Q    Okay.  And your analysis, again, doesn't change
to take into account for the fact that some of
these individuals may already be enrolled or
receive mitigation products?

A    I make no accounting of that.

Q    And you make no account -- you take no account
of the fact that they might have been offered
these products for free and have rejected them,
right?

A    Correct.

Q    Okay.  And your analysis assumes, again,
that -- that plaintiffs will be the ones
purchasing these products, right, and that
every single plaintiff that's offered the
option to purchase these products goes ahead
and buys it, right?

A    I don't think I -- I don't need to make an
explicit assumption about that.  Again, it's a
calculation.  It's a concept.  So the concept
is from the plaintiffs' perspective.  There is
a three- to ten-year period where Ms. Worley
has indicated this is the cost of a risk
mitigation strategy.  So I'm placing a present
value on that risk mitigation strategy, and I
believe it's appropriate to look at it from the

Page 190

plaintiffs' perspective rather than the defendants' perspective.

MS. PANAGOPOULOU:  Sorry, read that answer back.  I just need to process that.

(The following portion of the record was read:

"ANSWER:  I don't think I -- I don't need to make an explicit assumption about that. Again, it's a calculation.  It's a concept.  So the concept is from the plaintiffs' perspective.  There is a three to ten-year period where Ms. Worley has indicated this is the cost of a risk mitigation strategy.  So I'm placing a present value on that risk mitigation strategy, and I believe it's appropriate to look at it from the plaintiffs' perspective rather than the defendants' perspective.")

BY MS. PANAGOPOULOU:

Q    And I'm sorry, when you say look at it from the plaintiffs' perspective, what do you mean here in this context?

A    That's with respect to what is the choice of a discount rate, so...

Q    Oh, so you're referring back to the discount rates?

A    Yeah.

Page 191

Q    Okay.  So you offer no opinion in your report as to whether these individuals, in fact, need these mitigation products, right?

A    I do not.

Q    You assume that they all need it and to the same extent?

A    Correct.

Q    Okay.  Have you ever been a part of a data breach?

A    I hope not.  I -- I don't know for certain, but I'm not -- I've never -- to my knowledge I've not, like, done a credit reporting thing or been offered anything like that.

Q    Okay.

A    I will admit I don't always go through our mail, though.  My wife handles a lot of that stuff, so it's possible.

Q    And do you pay for any credit monitoring service?

A    I do not.

Q    And do you know anyone who does?

A    I wouldn't -- I wouldn't know one way or the other if my acquaintances pay for that.

Q    Okay.  You haven't heard of any of your acquaintances paying for credit monitoring

Page 192

services?

A    I haven't heard anybody specifically say that, but...

Q    Okay.  Do you personally take any measures to ensure that individuals are not fraudulently using your bank accounts or credit cards?

A    My wife monitors our accounts vigilantly and looks for unusual charges and changes in balances, so it's sort of an after-the-fact monitoring, but she does a good job of that.

Q    Would you agree, generally, that different individuals place different value in -- in data security?

          MR. MOORE:  Objection.  Can't speak for the entire world.

          THE WITNESS:  Yeah, you're really outside the scope of my expertise here. I've -- I know -- I've heard of some people, some acquaintances and acquaintances of acquaintances, that had their identity stolen and it was one of the worst experiences they ever went through.

BY MS. PANAGOPOULOU:

Q    Uh-huh.  But in your personal experience, so your wife chooses to dedicate more time than

Page 193

you in monitoring your financial accounts, right?

MR. MOORE:  Objection.

THE WITNESS:  I would say that aspect of it.  I'm -- I'm not looking at our day to day, you know, looking through every single credit card charge whereas she's, you know, catching if we got double-billed for something or something along those lines.

BY MS. PANAGOPOULOU:

Q   Okay.

A   So I'm more a high level.

Q   Yeah.  So with respect to these mitigation products, do you understand the -- the time implications that an individual would have to -- to allow or to spend in order to get the benefits associated with these products?

A   I do not.

Q   Okay.  But there are people, generally, who, like your wife, are diligent in reviewing their accounts, monitoring for unusual activity, and there are people who don't care as much.  Is that fair to say?

MR. MOORE:  Object to form.  You're asking him to testify for other people, way

Page 194

outside the scope of his report.

MS. PANAGOPOULOU:  Okay.

THE WITNESS:  What you're saying sounds logical.  I -- I have no reason to dispute it.

BY MS. PANAGOPOULOU:

Q    Okay.  So if all these class members are offered these mitigation products, do you have any reason to believe that all of them would accept them?

A    I have no basis for an opinion on that.  I -- I calculated what the aggregate damages would be. The logistics of how the damages would be paid out or the mitigation strategies offered are beyond the scope of what I was asked to do.

Q    Okay.  So you have no opinion as to whether these plaintiffs would even, in fact, utilize the mitigation products --

MR. MOORE:  Object.

BY MS. PANAGOPOULOU:

Q    -- that are at issue here?

MR. MOORE:  Object.  He just answered this.

THE WITNESS:  I don't.

BY MS. PANAGOPOULOU:

Page 195

Q   Okay.  But to be clear, the -- your damages analysis is premised on the fact that someone, whether it's plaintiffs or defendants, has to buy these mitigation products?

A   Not necessarily.  Again, it's a concept, and if -- if you and I have an agreement that I'm going to pay you a certain amount of money for the next three to ten years -- let's pick something in the middle, five years.  For the next five years I'm going to pay you something.  We could then talk about, well, what -- what could I pay you today in order to make those streams equivalent, and you and I might have different perspectives on what -- what would be an appropriate discount rate, and from your perspective you might say, well, those were guaranteed payments.  Like you promised -- I believe that you have, you know, decent financial condition.  You promised that you were going to make payments to me every single month for the next five years.  I demand a low discount rate because those are guaranteed payments.

And that's what's going on here from the plaintiffs' perspective is these are monthly

Page 196

costs that are known for the next three to ten

years, and to be offered an equivalent amount

of money up front, I think a low discount rate,

something commensurate, it accounts for the

time value of money but not additional risk

factors.  So a risk-free rate, I believe, is

appropriate in that situation that I described.

Q    Again -- and that's, again, assuming that it

is -- it is the plaintiffs' responsibility to

buy the products.  It is not defendants that

are offering the products?

MR. MOORE:  Object to form.

THE WITNESS:  I -- I can't speak for

what the plaintiffs are asking for, but if --

if the plaintiffs were all given three-year,

you know, coverage, my model would suggest that

they'd be neutral between those two, getting a

lump sum of money or getting -- having the

coverage provided for them.  That's essentially

what I'm trying to quantify is what -- what sum

of money up front would they be willing to

accept in lieu of -- and it could either be in

lieu of or they could use that -- turn around

and use that sum of money to buy the monthly

coverage for the three- to ten-year period.

Page 197

Those are equivalent sums.

BY MS. PANAGOPOULOU:

Q   So your assumption is that if these plaintiffs are given this money up front, they would all go and buy these mitigation products and not choose to use the money in some other way?

MR. MOORE:  Object to form.  Counsel, he's answered this question four times.

THE WITNESS:  I don't think it's necessarily saying that, no.  Again, it's a concept, and you can do a -- you can do a present value exercise, come up with a present value that's appropriate, and then have a difference of opinion or different paths that people could go -- could go down.  Some people may choose to purchase the mitigation strategy; some people may choose not to.  But that doesn't change what -- what was the appropriate discount rate because they did have available to them -- in this calculation, the mitigation cost was known for a three- to ten-year period. So I'm discounting that back at a relatively certain risk-free rate that I bounced up a little bit conservatively to be 5 percent. That comes up with the present value.  I'm not

Page 198

saying that they have to buy the mitigation product, but I'm saying that the concept is when I did the valuation, they are being compensated for a risk mitigation strategy that lasts for three to ten years.

BY MS. PANAGOPOULOU:

Q    Okay.  So you're saying if I'm a plaintiff in this case, if I'm a class member and I get this money from the defendants and I choose to invest it in a conservative way in bonds that the -- the amount of damages that you came up with would fairly compensate me?

MR. MOORE:  Objection.  You're misstating his testimony.  He's answered your question.  Accept his answer and move on --

MS. PANAGOPOULOU:  No, no, no.

MR. MOORE:  -- Counsel.  Yes.

MS. PANAGOPOULOU:  I want -- I'm entitled to conduct my deposition the way I want to conduct my deposition.

MR. MOORE:  You're not entitled to ask the same questions.

MS. PANAGOPOULOU:  I want to understand -- I want to understand what he's trying to say.

Page 199

MR. MOORE:  You're misstating his testimony.

THE WITNESS:  If you invested -- if you were a plaintiff and you received this sum of money -- Gina, if she received $800 and she invested it conservatively for the next ten years, that sum of money would be -- the principal and the interest that it spins off would be sufficient for her to purchase the risk mitigation strategy over the ten-year period.

BY MS. PANAGOPOULOU:

Q    Okay.  And that's what your -- in fact, your -- your -- your model is based on, right?  That these plaintiffs would take the money, they would invest them in government bonds, and they would have sufficient money to pay for the mitigation products over a ten-year period?

A    I didn't factor in taxes.  If I factored in taxes on the -- I don't know about tax brackets.  If I factored in taxes on the investment, one could argue for a discount rate of something more like 3 percent, which would --

Q    Okay.

Page 200

A       -- make the damages go up even more.

Q       But generally speaking, am I correct in that assumption that your model is based on the plaintiffs receiving money, investing them wisely in government bonds, and then based on your model that would give them enough money to make sure that they have enough to purchase the mitigation products?

MR. MOORE:  Object to form.

THE WITNESS:  More or less, yeah.  I would say they would have to -- in order for them to achieve a 5 percent rate of return they would have to probably invest in something that was getting a 7 percent rate of return when you factor in taxes.

BY MS. PANAGOPOULOU:

Q       Taxes is not something that was factored into your report.

A       No.  But I'm just pointing out that if we follow this example through, if I give you a sum of money and you're going to have to -- you're going to have to purchase these mitigation products, if you earned 5 percent you're going to have to pay taxes on that 5 percent.  And so you might actually only be

Page 201

earning 3 to 4 percent. So by me using a 5 percent discount rate, that is a -- that's an after-tax rate, if you will. It's another layer of conservatism that's built into the rate. So I -- I made no attempt to tax effect my numbers, but it's another layer of conservatism that's built into it.

Q Okay. You don't know, in fact, though, if these people are, you know, what their income level is and if it's even taxable, right?

A I don't.

Q Okay. So I'm just -- I'm trying to understand your model, your model for calculating the present value of money, and your model is based on the assumption that each of these plaintiffs will take the money, will invest it the best that they can, and then they will have enough to purchase the mitigation cost products over the course of ten years. That's what it's based on, right?

MR. MOORE: Is this -- object. This is the question you just asked.

MS. PANAGOPOULOU: Please stop with these objections. Just stop.

MR. MOORE: You asked this question

Page 202

three times in a row.

MS. PANAGOPOULOU:  No.  And I'm entitled to an answer to the question that I've just asked.

MR. MOORE:  And he's answered it every time.

MS. PANAGOPOULOU:  Okay.  We're going to have to call the court if you continue this.

MR. MOORE:  Call the court.

MS. PANAGOPOULOU:  You're doing this with every single question that I'm asking.

MR. MOORE:  I'm doing it when you're asking the same question over and over and over and he's answered it over and over and over. Counsel, if you want to read back the record, you're asking the same question.  It's time to accept his answer and move on.

MS. PANAGOPOULOU:  Okay.  I'd like to hear his answer to my question.

THE REPORTER:  The last question you asked does not have the answer.  Do you want the previous one?

MS. PANAGOPOULOU:  The question I just asked.

(The following portion of the record was read:

Page 203

"QUESTION:  So I'm just -- I'm trying to understand your model, your model for calculating the present value of money, and your model is based on the assumption that each of these plaintiffs will take the money, will invest it the best that they can, and then they will have enough to purchase the mitigation cost products over the course of ten years. That's what it's based on, right?")

THE WITNESS:  You're asking me that again?

BY MS. PANAGOPOULOU:

Q    Yeah.

A    So conceptually that's not inconsistent, but whether they actually do that or not makes no difference in my damage calculation.  They don't have to do that, but in order to come up with these present value of damages, conceptually I'm discounting at a low risk rate, which, if you turn that around, yes, by way of demonstration, if one of these plaintiffs was able to invest and earn a 5 percent after-tax rate of return, the interest earnings in conjunction with the principal amount that they're being given, taking into

Page 204

account their probability of survival like in

an aggregate basis, we would have just enough

money to fund a three-, five-, seven-, or

ten-year mitigation strategy.  And then the

fund would be exhausted at the end of that

period.

Q    Okay.  Thank you.  I need another five-minute

break.  I think I'm almost done, but I need to

consult with Heather.

            THE VIDEOGRAPHER:  Counsel, you

have --

            MS. SULTANIAN:  I'm going to have a

few questions.

            THE VIDEOGRAPHER:  We're off the

record at 3:04 p.m.

            (Short break was taken.)

            THE VIDEOGRAPHER:  We are back on the

record at 3:15 p.m.

BY MS. PANAGOPOULOU:

Q    Can we go back to your report, please?

A    Sure.

Q    I think it's Exhibit B.

A    I'm there.

Q    So in paragraph 3 you state, "In forming my

opinions in this letter, I have relied on facts

Page 205

and data of a type that is reasonably relied upon by experts in my field."

When you say experts in your field, what are you referring to?

A   As an actuarial expert it is not unusual to rely on other experts to supply information from their subject matter types that are outside my scope of expertise as an actuary.

Q   The experts in your field would be actuaries in the life insurance industry, right?

A   Or more broadly testifying in a damage context.

Q   Okay.  So what particular material do you account that are frequently relied upon by experts in your field?

A   Can you repeat the question, please?

Q   Yeah.  What sort of documents or analyses are relied upon frequently by experts in your field?

A   Well, this kind of speaks to the simplifying assumptions that we talked about before.  In this case we had a set of plaintiffs that had different ages, different tranches, different tranche costs.  Those were all things.  So, I mean, every case is going to be different, but this was data that was a given for the person

Page 206

that's doing the actual present value presentations.  So I have no expertise in ascertaining what those tranche amounts should be or what the tranche definitions should be or combing through the data and figuring out, you know, who's in which tranche and how many, but my point was that it's typical of somebody who's doing a damage calculation to rely on others to supply basic foundational information.

Q    But do you know if these assumptions and calculations that you've made are typical of reports produced in data breach cases?

A    I don't know about that.

Q    Okay.  Do you know if there are assumptions that are -- have been made by other experts in data breach cases?

A    I do not.

Q    So in paragraph 10 of your report you state, "My opinions and conclusions are consistent with my training, experience, education, and judgment as an insurance actuary."
          Do you see that?

A    I do.

Q    Okay.  When you say "judgment as an insurance

Page 207

actuary," what do you mean by that?

A    Well, to the extent judgment was required, the choice of mortality, the choice of the discount rate, the treatment of the age above age 100, those are all things where I would consider that actuarial judgment was required.

Q    Anything else?

A    I mean, converting the annual cost into a monthly cost so I could reflect the discount that -- that there's an actuarial element to that.  I guess judgment is involved in choosing to use that instead of the stated monthly cost.

Q    Uh-huh.

A    Even going back, choosing to do it on a monthly basis as opposed to an annual basis, you could consider that a judgment.

Q    So those are all independent judgments that you made?

A    I think that's fair to say.

Q    Okay.  And you say, "All my opinions and conclusions stated in this report have been reached to a reasonable degree of certainty." Do you see that?

A    I do.

Q    What does "reasonable degree of certainty"

Page 208

mean?

A    Well, it's probably -- from a modeling standpoint it's probably higher than that because it's just math, but, you know, the model output is going to be a function of the model input.  And what I'm doing is a standard actuarial exercise, calculating an actuarial present value that takes into account both mortality and interest.  So that's what I was trying to convey there.

Q    Okay.  So if I have all your formulas, your report, all your formulas from your Excel files and -- and then somebody gives me a different rate for a mitigation cost product, could I easily substitute that number and then I would get a different result?

A    You could update the report in a matter of seconds.  It would take me longer than that because I'd want to double-check, but I -- I designed -- I designed the -- the report or the spreadsheet in a way that the mitigation cost can be updated and everything will update automatically.  The interest rate takes two steps, so it would take maybe minutes rather than seconds.  But either of those could be

Page 209

done easily.  Likewise for the mortality table.
If I were instructed to use a different
mortality table, that would be a very quick
updating as well.

Q    Uh-huh.  Assuming that Amy Worley were to come
back to you and say, well, I've actually made
an error and have found the exact same
mitigation products for free, so these
mitigation products, instead of 8.99 a month,
are now zero a month, then you would substitute
8.99 with zero, right?

A    That -- on the surface that sounds logical,
yes.

Q    And there would be no damages, right?

A    I think that's fair to say.  Not in my model.

Q    So, in other words, based on the assumptions
that were given to you either by counsel or by
their experts, you can within a matter of
seconds or minutes modify your calculations to
determine a different damage amount?

A    As should an expert on the other side that has
access to the Excel spreadsheets.  It's
pretty -- it's pretty self-evident.

Q    Okay.  So in your report you make reference to
Sonic, right?  So let's say in paragraph 12 of

Page 210

your report.

A    Okay.

Q    What is Sonic?

A    I -- I only know it as one of the three
defendants.

Q    So from your understanding, Sonic is one
entity?

A    I -- I don't know.  I don't know anything about
that.

Q    And what you describe or define as Sonic, is
that something that you've -- you've gotten
from Lee's report?

A    Yes.

Q    All right.  I don't have anything further.

MS. SULTANIAN:  Okay.

E X A M I N A T I O N

BY MS. SULTANIAN:

Q    All right.  Hi, Mr. Witt.

A    Hi.

Q    My name is Heather Sultanian.  I represent
Quest Diagnostics.  I'm going to ask a few more
questions, try to be efficient.  I know it's
been a long time.

So I think you said a little bit ago that
your role is to calculate the present value of

Page 211

the cost of the mitigation products that Ms. Worley opined were appropriate.  Is that fair?

A     I agree.

Q     Okay.  So you're not opining, correct, that those mitigation products actually redress any injury or harm for the class members; is that fair?

A     I have no opinion on that.

Q     Okay.  And you also have no opinion on what types of injury or harm any punitive class members suffered?

A     Agreed.

Q     Do you have any opinion that they actually suffered any injury or harm at all?

A     I do not.

Q     Okay.  And I want to drill down a little bit on damages.  You've mentioned damages several times.  Would you agree me that the damages is a legal term or a legal concept?

               MR. MOORE:  Object to form.

               THE WITNESS:  I think it can be, but, I mean, it's -- it's a term that's known within the actuarial community as well.

BY MS. SULTANIAN:

Page 212

Q   So what is your understanding of what "damages"
means?

A   Compensation for wrongdoing.

Q   And what is your basis for stating that your
calculations here are damages?

A   Well, the -- kind of the logical flow would be
that a breach occurred in 1999 -- I'm sorry --
in 2019.  I've been off by 20 years multiple
times today.  Breach occurred in 2019, and
Ms. Worley identified mitigation strategies
that would mitigate, for lack of a better word,
the -- those risks and quantified what those
costs would be, and I am quantifying that in
the form of a present value.  So I don't know
if that's a great answer, but...

Q   Let me see if I --

A   Okay.

Q   -- understand that.  So are you basing your
conclusion that what you're calculating is
damages on Ms. Worley's opinions?

A   Yes.  I mean, that's certainly -- that's
certainly a foundational piece.  My
understanding of the case is based on not only
conversations with counsel but what Ms. Worley
and Dr. Lee, what I gleaned from their reports.

Page 213

And my understanding of calculating these damages is that I am present valuing the cost of these risk mitigation strategies that are identified by Ms. Worley in her report.

Q   Okay.  What I'm trying to get to is do you have any experience or expertise that allows you to say that what you are calculating compensates for wrongdoing or harm?

MR. MOORE:  Object to form.

THE WITNESS:  Well, not specifically in a case involving a data breach, but I have experience in calculating damages, and this seems fairly straightforward in the sense that there are these risk mitigation strategies that are identified.  There's a known cost over the three- to ten-year period.  And if we're talking about a settlement or a single, you know, lump-sum figure up front, it's fairly obvious that discounting that and you're going -- you're going to need to discount with both mortality and interest.  So I would characterize it as a basic actuarial present value-type exercise, which often is used in damage situations.

BY MS. SULTANIAN:

Page 214

Q    Are you aware that Ms. Worley testified that she is not opining that the cost of mitigation products is a basis for calculating the damages?

A    I am not aware of that.

Q    I will represent to you that that is what she testified.  Does that affect your statement that what you're calculating is damages?

A    Could you repeat what --

Q    Yeah.

A    -- you said that she --

Q    So I'll just read the question and answer from her deposition.

A    Okay.

Q    The question, "And so you're not proposing to use the cost of mitigation products that you've identified, ▮▮▮▮▮▮▮▮▮▮▮▮ as a basis for calculating damages?"  And her answer was "Yeah.  So I do want to be really clear on this.  I'm not opining about damages at all."

A    Okay.  I don't necessarily have the same reading of that that you do.  You know, she's saying that she's not opining on damages, but I don't -- I don't think she's excluding the possibility that what she's using could be

Page 215

relied on to calculate damages by somebody else.

Q   Going back a few answers, I think you said that your understanding of what damages is is compensating for wrongdoing.  Is that --

A   Yeah.  I said that.

Q   Okay.  What experience or expertise do you have to say that these mitigation products are appropriate to compensate for defendants' alleged wrongdoing?

A   I don't have any experience in that particular area.  That's one of the -- one of the assumptions that I've been very clear about is relying on the fact pattern of this case and relying on the data from Ms. Worley and Dr. Lee.

Q   I want to go to another topic you testified about a little bit earlier, and it seemed that you were unsure earlier whether socioeconomic status is a factor that would affect life expectancy one way or the other.  Is that fair?

A   I -- I think it's not -- it's not quite as cut and dry as -- as to say that wealthier people are always going to have better mortality because they -- at certain ages they can be

Page 216

subject to different types of risks that less wealthy people are not subject to.

Q    I'd like to introduce what I sent to the concierge as Tab 1, and this will be Exhibit H, I believe?

THE REPORTER:  We're at Exhibit I.

MS. SULTANIAN:  Oh, I'm sorry.

Exhibit I.  Thank you.

(Exhibit I marked for identification.)

BY MS. SULTANIAN:

Q    And for the record, this is an article entitled "The association between income and life expectancy in the United States, 2001 to 2014." Mr. Witt, do you see that this is a study that was published in JAMA?

A    I do.

Q    Is that a reputable source, to your knowledge?

A    I'm not familiar.  What does that stand for? Is that journal of actuarial something?

Q    I believe it is Journal of American Medical something or other, but let me confirm that. Yes, it's a medical journal.

A    Okay.  I -- I have no expertise with it one way or the other.

Q    Okay.

Page 217

A   It looks official.

Q   All right.  And if you turn to the seventh page there's a heading titled "Results."  Do you see that?

A   I do.

Q   And this says that this study found that men in the bottom 1 percent of the income distribution had a life expectancy of almost 15 years lower than men in the top 1 percent of the income distribution.  Do you see that?

A   I must not be looking at the right place.

Q   Yeah.  Let me see if I can direct you a little bit more clearly.  I'm sorry.  It's "Results" and then the subheading under that, "National levels of life expectancy by income."

A   Okay.  Oh, okay.  I -- I see.

Q   Okay.  And it says, "Men in the bottom 1 percent of the income distribution at the age of 40 had an expected age of death of 72.7 years.  Men in the top 1 percent had an expected age of death of 87.3 years, 14.6 years higher than those in the bottom 1 percent."  Do you see that?

A   I do.

Q   Any reason to dispute the findings of that

Page 218

study?

MR. MOORE:  I'm going to object.  If he's going to opine on this study, I think he should have the chance to read the entire study.

BY MS. SULTANIAN:

Q    Please take your time.

A    So I see in one spot it says on page 2 that "However, the association between life expectancy and income varied substantially across areas."  That supports kind of my point that it's -- it's complicated.  But I -- I see -- I see their executive summary that they're saying that higher incomes are associated with longer life expectancy.  But several aspects of the relationship between income and longevity remain unclear.

Q    Are you finished?  I don't want to cut you off.

A    It says, "The sources of the longevity gap remain unclear.  The socioeconomic gradient in longevity has been variously attributed to factors such as inequality, economic and social stress, and differences in access to medical care.  These theories remain debated."

So I don't dispute their finding that the

Page 219

top 1 percent and the bottom 1 percent could
have a significant difference like that, that
that strikes me as plausible.

Q   And so it's plausible, at least to you, that a
lower socioeconomic status could be associated
with a lower life expectancy, right?

MR. MOORE:  Object to form.

THE WITNESS:  Yeah.  In the basis of
that narrow question, I don't dispute that.

BY MS. SULTANIAN:

Q   I want to next ask about the relationship
between risk classes and the mortality tables,
because I wasn't quite sure I understood how
you testified about that earlier.  So I think
you said in the life insurance industry there
are different risk classes that can be used,
correct?

A   I did.

Q   And you said sometimes there are different
mortality tables associated with those risk
classes?

A   Correct.

Q   Okay.  Is it generally the case that each risk
class is going to have its own mortality table?

A   I would say it would have its own mortality

Page 220

assumption.  Sometimes it might be a multiple of a different table, if that makes sense.

Q    I believe it does.

A    Okay.

Q    But -- so generally it's going to be the case that each risk class would have its own mortality multipliers that you're applying.  Is that fair?

A    If I was going to calculate a life expectancy for each class, it would be different for each class.

Q    Thank you.  And I -- I think earlier you testified that specific health conditions can be associated with lower life expectancy, right?

A    I don't know if I said exactly that.  But I don't dispute that.  You know, through the underwriting process a life insurance company is going to try to identify cancer, heart disease, high blood pressure, smoking, risky activities, things that are associated with higher mortality.  They use that information to stratify the insureds into different risk categories, and then based on their company experience the hope is that they have an

Page 221

appropriate mortality assumption for the risk
classification that they've used.

Q    Thank you.  That was very helpful.

So it's possible, then, to adjust
mortality assumptions based on health status
among other risk factors, correct?

A    It is.

Q    Shifting topics a little bit.  We talked
earlier about the general population mortality
table you used in this case, correct?  And I
think you said that you could use general
population, that there were mortality tables
available for insured populations?  Are there
other mortality tables that are available?

A    There are lots of mortality tables.  Many of
them would have lower mortality than the
general population mortality table, so I was
being deliberately -- what I would use, the
word "conservative" -- by using the U.S. life
table as opposed to one of these.  Now, I
understand that may be debatable from your
perspective, but in the context of available
mortality tables, the U.S. life table is
certainly more conservative than a table that
comes from the insurance industry, for

Page 222

instance.

Q    Are there any mortality tables you're aware of that had -- I'm going to get the direction wrong -- but have higher mortality assumptions than the general population?

A    There are some valuation tables that are used in the life insurance industry, but they are used specifically for calculating reserves and for things like guaranteed cost of insurance rates.  And they are very deliberately conservative.  So they're not really appropriate for calculating things like probabilities of survival and life expectancy. So if you've ever heard the term, and you're lucky if you haven't, but 1980 CSO, commissioner standard ordinary, or 2001 CSO, those are valuation tables that have very high mortality rates that are much higher than the underlying level or actual mortality.  So those mortality tables do exist but in my experience would not be appropriate for an exercise like this.  It's possible that there could be -- the Society of Actuaries -- I think it's the society or it could be -- yeah, I think the Society of Actuaries promulgates a valuation

Page 223

basic table every 7 to 15 years, and within that, in recent years, I believe they have had multiple levels of relative risk and so there -- for instance, if I were instructed to do so, I could investigate tables to see if any of them had higher mortality than the U.S. life table.  But I don't know off the top of my head if they do or not.

BY MS. SULTANIAN:

Q   I am lucky enough not to have encountered a CFO table before.

A   Okay.

Q   Aside from those valuation tables, are you aware of any other, you know, available mortality tables that are in that direction?

A   Well, for companies that issue substandard policies, they may not -- they may not have a table per se, but they might multiply an existing table they have by 150 percent, let's say, or 175 percent or 200 percent to double the risk of mortality, which, I mean, sounds like a lot but actually may not affect the life expectancy that much.  So I'm aware that companies -- there are companies that make mortality assumptions that I think are probably

Page 224

worse than the general population table that I used, but often they would be expressed as a multiplier of a basic table, if that makes sense.

Q    Uh-huh.  Within the insured tables bucket, there are tables that reflect higher risk classes, correct?

A    There are.

Q    In your sense, how would those tables compare to the U.S. general population?

A    I'd have to take a look at it, but I also want to just make a broader point here that kind of gets lost in the shuffle.  The risk of mortality is very low in a three- to ten-year period regardless of what the mortality assumption is.

So, for instance, that example with Gina that we were looking at before, I think over a three-year period the probability of survival was something like 97 or 98 percent.  So -- and that was using a male mortality assumption.  We can argue about what exactly the mortality assumption should be, but the practical impact on the discounting over a three- to ten-year period is very de minimis.

Page 225

Q   Why did you use the 2021 version of the general
population table?

A   As opposed to 2022?

Q   Or 2019.

A   Oh, I was just using what was most readily
available at the time I was doing the report.
I thought you were -- I discovered recently
that three days after my report came out the
U.S. life 2022 table was published, and so I
didn't update it for that.  I did take a look
to see that mortality had improved in the 2022
version compared to 2021.  So, again, that's
another slight area of conservatism by using
the 2021 table.

Q   If you're trying to measure from the breach,
why not use the 2019 version?

A   Well, I was -- my calculation goes from
November 2024, so I was using -- I was using
calculations based on that.  That was the age
definition, and so the three-, five-, and
seven-, ten-year periods were commencing as of
2024.

Q   Okay.

A   Again, let me say that if I were directed to
use the 2019 table, it would be a very easy --

Page 226

Q    Understood.  Now, my colleague here asked you
some questions about the ███████████
█████████████████████████████    Do you remember
that?

A    I do.

Q    It would have been possible to take the
████████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████
████████████████████████

A    I don't know.  I don't know enough about the
information that was available there.  You
would essentially be asking me to do
underwriting on every single individual to
partition them into a risk category based on a
████████████████, and I do not believe the data
was sufficient or my expertise sufficient to do
such an exercise.

Q    Yeah.  Let me clarify.  I'm not asking, like,
if you could have done it within the scope of
your expertise.  I'm talking about if somebody
with the appropriate expertise was to look at
that data, they could have used those
underwriting processes to classify those folks

Page 227

into risk classes, correct?

A    I guess what I'm unclear of still is what exactly ▮▮▮▮▮▮▮ indicate.  Is it that somebody ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q    Yeah.  So let me clarify.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A    ▮▮▮

Q    ▮▮▮▮▮▮▮▮▮▮▮▮

A    ▮▮▮▮▮▮▮▮▮▮▮▮

Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  So my question for you is could someone with the appropriate expertise take information like that and

Page 228

classify those people into risk classes?

MR. MOORE:  Object to form.

███████████████    ███████████████████

████████████████████████████████████████

Is that --

BY MS. SULTANIAN:

Q    I'm asking, like that set of people, if they
could have been classified.

A    In theory, I suppose.  You would need to know
what kind of assumption to make.  ██████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████

██████████████████████████████                    So
we're kind of talking about two different
things.  If you want to take this analysis down
to the policy-by-policy level, you'd have to --
you'd have to be able to make an assumption
about every single class member, ████████████

█████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████                    And,
frankly, I don't know how one would go about
doing that.  You'd have to independently

research what was the appropriate mortality

rate for a group of people that ██████████

██████████████████████████████████

██████████████████████████ .

Q   Let me press a little bit on the people for

whom there is not ████████████████████

It's true, correct, that of this population

there were quite a few who were missing date of

birth information, correct?

A   Yes.

Q   But you extrapolated from the data you did have

and applied a date of birth to those people,

correct?

A   In essence, yes.

Q   And same with sex, right?  There were people

for whom that data was missing, but you

extrapolated from the data you did have and

assigned them a presumed sex, correct?

A   Yeah.  Although I didn't do a blend.  I

assigned everybody male ultimately.

Q   I understand that ultimately you assigned

everyone male, but -- all right.  Let's just

forget that example.  Let's stick with date of

birth.  You extrapolated from what you had and

assigned --

Page 230

A    Correct.

Q    -- people a date of birth?  So the same thing could be done ███████████████████████, correct?  You could take the information you have and extrapolate it across the population; is that fair?

A    I don't know enough about -- I don't know enough about ███████████████████████ ███████████████████████.  I couldn't say without additional research whether that would have been appropriate.  I feel -- I feel reasonably comfortable with the date of birth just because it was -- it was missing, and it's basically a random type of variable as far as I understand.  I don't know if there could be something else at play ███████████████ ███████████████████████.

Q    But you're not aware of any circumstances that would prevent that kind of exercise from being performed, correct?

A    I am not.

Q    Okay.  Let's go off the record for just a moment so we can change tapes.

A    Okay.

            THE VIDEOGRAPHER:  We are off the

Page 231

record at 3:50 p.m.  This is the end of Media Unit Number 4.

(Short break was taken.)

THE VIDEOGRAPHER:  We are back on the record at 3:51 p.m.  This is the beginning of Media Unit Number 5.

BY MS. SULTANIAN:

Q    All right.  Mr. Witt, I want to talk about something a little bit different right now. And that is I want to talk about the time frame of your calculations.

A    Okay.

Q    So you, I think, testified that you're calculating the present value of the cost to obtain these mitigation products over three, five, seven, or ten years, correct?

A    Correct.

Q    When does the date of that period start?

A    November 1, 2024.

Q    Why did you choose November 1, 2024 as the period on which the mitigation products would begin?

A    That was the date that Dr. Lee used for his date of birth calculations, and I believe that was also the date at which -- I don't know the

Page 232

legal terminology -- but the class was defined or something was filed with respect to the case at that point.

Q    I'm going to ask about your understanding of Ms. Worley's opinion.  You're aware that Ms. Worley opined ███████████████████████ ████████████████████████.  Are you aware of that?

A    I recall seeing that.

Q    Okay.  Did you understand her to opine that the ████████████████████████████████ ████████████████████████████████?

A    I suspect that's what she meant, but I don't know with certainty.

Q    It wouldn't make any sense to say that someone is impacted in a breach, eight years pass, and then they suddenly start needing mitigation products, correct?

A    I have no expertise in that, but as a layperson what you said sounds reasonable.

Q    And if you start now, ██████████████ from now or from November 2024, that essentially offers these punitive class members protection for ██████████ out from the breach, correct?

Page 233

A    I agree.

Q    And so under Ms. Worley's opinion of ███████ ████████ from the date of the breach, these punitive class members only need at most ██████ ████████ of mitigation products from this point forward, correct?

              MR. MOORE:  Object to form.

              THE WITNESS:  I -- I can't speak for Ms. Worley, but if -- I -- if I take as a given that she meant ████████████████████████ ████████████████ if that was in 2019, then that would put us in ████████████████████████ ████████████████████████

BY MS. SULTANIAN:

Q    You mentioned a moment ago that the class was defined in November of 2024.  Are you familiar with the class definition that plaintiffs proposed?

A    I may have been at one point, but I certainly could not describe it.

Q    Do you understand that the class is defined to exclude any of the defendants' officers and directors?

A    That doesn't surprise me.  That's fairly standard language.

Page 234

Q   And do you also understand that the class is
defined to exclude the judges in this case and
their family members and their court staff?

A   I think I remember seeing that.

Q   Did you check whether any of those excluded
individuals were in the CHAMP database?

A   I did not.

Q   It's possible some of them were, correct?

A   Yeah.  That was beyond the scope of what I did.

Q   So you didn't make any effort to ensure that
your calculations excluded individuals who
should not be part of the class, correct?

        MR. MOORE:  Object to form.

        THE WITNESS:  I did not.

BY MS. SULTANIAN:

Q   Are you aware that there are some instances in
the CHAMP database of a single record
containing personal information associated with
two different people?

A   I do recall reading that.

Q   Okay.  I'm going to use an example.  On the
Quest Optum track, one of the named plaintiffs
is John Briley.  Do you remember that name?

A   I do not.  It was not one that I used as an
example, I don't think.

Page 235

Q    Okay.  If you need to look in Ms. Worley's
report at page 5, there's a listing of the
plaintiffs.

A    Okay.  Of her original declaration or the
supplement?

Q    No.  The supplemental.

A    Okay.  Could you repeat the name, please?

Q    Yes.  ███████████

A    Okay.  ███████████████

Q    Yup.  And if you look at Ms. Worley's criteria,
she assigned him ███████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

Is that fair?

A    Okay.  And you got that from her original
report?

Q    No.  If you look at page 4 of her report, you
can see the criteria she sets out.

A    Okay.

Q    All right?  Now, I'm going to represent to you
that ███████████████████

███████████████████████████████

███████████████  ███████████████

Page 236

A    I am not.

Q    And that he testified that ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮

A    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

Q    I don't think he testified to that, but I -- I
think that's a pretty fair inference, don't
you?

          MR. MOORE:  Object to form.
Foundation.
BY MS. SULTANIAN:

Q    Okay.  Well, ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

A    Okay.

Q    So --

A    I'm taking your word for it here.

Q    Yeah.  So I'm -- I'll represent that to you.

A    Okay.

Q    You can assume that to be true, and we'll take
your answers on the basis of that assumption.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

Page 237

MR. MOORE:  Object to form.

THE WITNESS:  I mean, I don't -- I don't know that with certainty, but it's a mixture of information for him and something that's inaccurate for him, it sounds like.

BY MS. SULTANIAN:

Q  ██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████, that was based on an incorrect birth date, correct?

MR. MOORE:  Object to form.

THE WITNESS:  Again, I'm accepting your premise here, but if he -- if he was older than what was in Dr. Lee's data that I incorporated in my model, then his probabilities of survival would have been modestly lower and so the damages would be modestly less for him.  But, as I mentioned, it's kind of surprising that changing the age or changing the mortality doesn't have a huge impact on the damages.

BY MS. SULTANIAN:

Q  But it has some impact, correct?

A  That -- you're right, on the direction.  It

Page 238

would be less.

Q    Okay.  And this is the kind of data error that could arise frequently in the CHAMP database, correct?

MR. MOORE:  Object to form. Foundation.

THE WITNESS:  No idea about the frequency of it.

BY MS. SULTANIAN:

Q    Did you make any effort to ensure that your damages calculations corrected for this kind of data error?

A    Until you just mentioned it to me, I wasn't aware that there was an error for ████████

Q    Okay.  Now, I want to talk for a few minutes about the -- the age assumptions that are reflected in your report.  Did you assume that all of the people who have data in the CHAMP database are still alive as of the date of your analysis?

A    I believe that's essentially what my analysis does because that -- that data was provided as of November 1, 2024.  And I made no allowance. Now, there automatically incorporated in that is a probability of survival.  So there is an

Page 239

allowance for people dying automatically built into the present value calculations.  Does that make sense?

Q    I think you lost me.  So let me try a different question.  As of November 1, 2024, does your model assume that every single person who had data in the CHAMP database was alive on that date?

A    Yes.

Q    Okay.  Would you agree with me that at least some of the people who in the CHAMP database must have died in the six-year period between -- or I'm sorry -- five-and-a-half-year period between then and the breach?

              MR. MOORE:  Object to form.

              THE WITNESS:  That seems likely.

BY MS. SULTANIAN:

Q    Matter of common sense, right?

A    Yeah.

Q    So those people should have been excluded from your analysis, correct?

              MR. MOORE:  Object to form.

              THE WITNESS:  I think that's a question for the lawyers.  I don't know if there -- like I've been involved in other cases

Page 240

where there is still concerns about damages even though the individual has passed away. So I don't know if there's -- I don't know enough about this to know if there's still concerns about identity theft even after a person has passed away, if there's still access to accounts and things of that nature.

BY MS. SULTANIAN:

Q   So you did not do anything to adjust for possible deaths between the date of the breach and your analysis, correct?

A   I had no way of ascertaining if these individuals were still alive.

Q   Well, you could have applied a mortality table, correct?

A   True.

Q   But you didn't?

A   I did not.

Q   And I know we discussed at length earlier your assumption that anyone who was over 100 at the time of your analysis, you assumed that they were instead middle-aged, call it, correct?

A   I don't remember that.

Q   40-somethings?

A   I do, yes.

Page 241

Q    Okay.  Not pejorative at all.  I think we're
all circling that.

And I think you said that you assumed that
if anyone was over 100 it was an error; is that
fair?

A    That's, in essence, what my model assumes.
There are multiple plausible explanations, one
of which is that somebody just put in a
two-year year code and that a computer filled
in 19 as opposed to filling in 20.  That can
lead to the age being 100 years off.  So that
was one plausible explanation that I
considered.  I thought that would be overly
aggressive to assume that a 102-year-old was a
2-year-old and has almost no chance of
mortality then.  So I thought all things
considered it would be most reasonable to
assume that everybody over 100 was the average
age.  It was a different age for each of the
three defendants, but it was somewhere in the
mid 40s.

Q    Okay.  Now, the dates -- the two-digit date
assumption, that can't be possible for the
people who are 101, 102, 103, 104, correct?

A    It can't?

Page 242

Q    It cannot?

A    Oh, I see what you're saying.  Yeah, that's a
     good point.

Q    Because those people would not even have been
     born at the time of the breach, correct?

A    Right.

Q    Okay.  And the -- the ages at the time of your
     analysis in 2024, those people were younger at
     the time of the breach, correct?

A    Correct.

Q    And --

A    Which is -- again, makes my damages a little
     bit conservative because if I were to redo my
     model I'd have to subtract five years, let's
     say, or six years from everybody's age, and so
     their probabilities of survival would have been
     even higher if I'm doing the calculation back
     as of 2019.

Q    Sorry.  Just give me one moment.  And so if a
     person was, say, 108 today but 98 when their
     data was sent to AMCA, the assumption that
     their date of birth was in error is not
     correct; is that fair?

            MR. MOORE:  Object to form.

     BY MS. SULTANIAN:

Page 243

Q    Or it may not be correct?

A    You're saying they were 98 in 2019?

Q    Or at the time their data was sent to AMCA.  So let me back up.

          Is it your understanding that the data in the CHAMP database, it wasn't all sent in 2019, correct?

A    I don't have an understanding of that.

Q    Okay.

A    I have a very limited understanding of the dates of birth issue.  I was relying on Dr. Lee's expertise.  He was the one that was working with the data and, you know, we saw his footnote about what he assumed was a reasonable cutoff age.  I don't find that to be reasonable given, I mean, if you saw the U.S. life table, the probability of death at the U.S. life table assumes when you get to age 100 is 100 percent. They literally assume you're not going to live an additional year once you're at age 100. Now, that's a little aggressive.  But, nonetheless, there are not many people that are above 100.

Q    I'm asking something just slightly different.

A    Okay.

Page 244

Q   So let me -- let me try again.  So I'll represent to you that the data that was contained in the CHAMP database was sent to AMCA by the defendants over a period of years before the breach.

A   Okay.

Q   So hypothetically I have a 95-year-old whose data was sent to AMCA in 2014.

A   Okay.

Q   Under your analysis in 2024, they're 105.  Is that -- are you following?

A   Yup.

Q   So your assumption, you put them back to mid 40s, because you assumed it to be an error; is that fair?

A   Yes.

Q   Does the fact that the data may have been sent ten years ago affect your assumption that the data was erroneous?

A   Potentially, if you're saying that the data was sent in when the person was in their 90s and it was sent many years before 2019 and now that person would have been 105 but they died a long time ago, that's one explanation for how we have a 105-year-old.  My understanding -- and I

Page 245

didn't put this in my report -- but my understanding is we're at the early stages of class certification here.  If this ultimately proceeded to a settlement or a trial with a judgment, my assumption is the people that have died or have no standing will not receive any damages, and so that's sort of a self-correcting mechanism.  So if I'm off in my assumption and those people end up getting excluded from the class anyway, that will sort of take care of itself.

Q    And I -- I believe I already asked you, it's possible that some people have passed away in the interim between the breach and your analysis, and you agreed with me as a matter of common sense, correct?

A    I agree that that's likely.

Q    Okay.  Is it also likely that some of the people whose personal information was in the CHAMP database had passed away even before the breach?

        MR. MOORE:  Object to form. Foundation.

        THE WITNESS:  I don't -- I don't know how to answer that question.  I don't -- I

Page 246

don't have enough information to know if that's possible or not.

BY MS. SULTANIAN:

Q   Well, let's go back to the hypothetical we were just using if someone -- a 95-year-old whose data was sent in 2014.

A   Okay.

Q   Do you agree it's possible that person died before 2019?

A   I agree that it's possible.  What I don't know is whether or not they would still show up in the -- in the data.

Q   Understood.  By the way, I think you said it's not possible for you to determine whether a particular individual from the CHAMP database is still living or not.  Is that what you testified?

A   That's my understanding.

Q   Okay.  Are you familiar with the Social Security Administration's death master file?

A   Vaguely.

Q   Life insurance companies use that data to identify policyholders who have passed away; is that fair?

A   But I think you have to have a Social Security

Page 247

number to access it.  I'm not sure how it works.  That's purely speculation.

Q   Okay.  But are you -- back to my question.  Are you agreeing that life insurance companies use that data to determine whether individual policyholders have passed away?

A   Often in the context of annuities.  They don't want to keep making payments to dead people.

Q   So they do, yes?

A   Yes.

Q   Yes.  Okay.  And are you aware that states and counties maintain vital records offices that contain records of individuals' deaths?

A   I'm generally aware of that, yes.

Q   Okay.  It's possible to search the Internet and public newspaper archives for obituaries, correct?

A   In theory, yes.

Q   So there are ways to verify which specific individuals with personal information in the CHAMP database have already passed away, correct?

A   I think from a practical standpoint with 11 million class members that if one were to undertake that exercise, some kind of

Page 248

simplifying assumption would need to be made as opposed to searching the Internet individually for 11 million different names.

Q   It would be very burdensome to do that, correct?

A   Correct.

Q   But it is possible?

A   Agreed.

Q   Okay.

A   You'd have to worry about duplicate -- duplicate names and do you have the right person and...

Q   So it would be a very individualized analysis, person by person, running searches, correct?

A   Yes.

Q   Would it have been possible for you to build a model that statistically takes into account deaths of people with personal information in the CHAMP database by the time of your analysis?

A   That takes --

Q   Let me try --

A   I'm not tracking.

Q   Yeah.  Let me try asking that a different way. Would it have been possible for you to build a

Page 249

model that adjusts the punitive class size using mortality assumptions about who might have died between the time of the breach and your analysis?

A    It would be possible. I'd have to -- I'd have to recalculate or have Dr. Lee recalculate everybody's age as of the date of the breach. If we're going to go through that exercise, I would really want to know am I dealing with people that are alive at that point at the time of the breach as well. Assuming I'm dealing with a subset of people that are alive as of the time of the breach, then I could apply some sort of assumption based on a mortality table assumption as to a number of people that have passed away between 2019 and today or whatever age I'm running the calculation for. So it's hypothetically possible.

Q    But you did not do that, correct?

A    I did not.

Q    Okay. I don't have any further questions at this time. Do any of the other defense counsel on the line? Hearing nothing, passing the witness.

MR. MOORE:  No questions.

Page 250

THE VIDEOGRAPHER:  Then this concludes the deposition.  We are off the record at 4:14 p.m.  This is the end of Media Unit Number 5.

(Proceedings concluded at 4:14 p.m.)

_____

SCOTT WITT

Subscribed and sworn to before me

this ___ day of _____, 2025.


_____

Notary public

Page 251

STATE OF WISCONSIN     )

                       ) ss.

COUNTY OF MILWAUKEE    )

        I, ANNICK M. JAQUET, RMR, CRR, Notary
Public in and for the State of Wisconsin, do
hereby certify that the preceding deposition
was recorded by me and reduced to writing under
my personal direction.

        I further certify that said deposition
was taken before me at FOLEY & LARDNER, LLP,
Milwaukee, Wisconsin, on the 9th day of July,
2025, commencing at 9:28 a.m. and concluding at
4:14 p.m.

        I further certify that I am not a
relative or employee or attorney or counsel of
any of the parties, nor a relative or employee
of such attorney or counsel, or financially
interested directly or indirectly in this
action.

        In witness whereof, I have hereunto set
my hand at Milwaukee, Wisconsin, this
23rd day of July, 2025.

        ANNICK M. JAQUET, RMR, CRR

        Notary Public

        in and for the State of Wisconsin

My commission expires September 29, 2025.

Page 252

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: In Re: American Medical Collection Agency - QUEST v.
DATE OF DEPOSITION: 7/9/2025
WITNESSES' NAME: Mr. Scott Witt

PAGE    LINE (S)        CHANGE                  REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                              _____
                                Mr. Scott Witt

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20___.


_____          _____
(NOTARY PUBLIC)                   MY COMMISSION EXPIRES:

**[& - 17]** Page 1

| & | | | |
|---|---|---|---|
| **&**  1:18 2:7,17 5:24 6:6 169:19 251:9 | 100:25 182:16 182:18 206:19 | **104**  111:11 241:24 | 154:2 |

**1**

**1**  2:14 5:4 64:19 87:2 94:13 102:5 103:12 105:8 107:5 109:19 110:6 111:11 112:5,19,24 113:12,12 134:11,24 144:4 146:19 147:11,19 148:16,22 149:23,23 152:21,22 153:9,21 156:19 163:17 163:21 216:4 217:7,9,17,20 217:22 219:1,1 231:19,20 235:9,11 238:23 239:5

**1,140**  102:4,8 102:12,25

**10**  24:19,22,23 24:23,24,24 27:8 33:25 34:4 67:21,23

**100**  21:13 104:18,22,25 105:9 106:9,12 106:17,20,24 107:5,13 108:9 109:1,22,24 110:11 112:11 112:16,19,24 113:10,21 114:12,14 115:9,12,15,21 116:16 128:19 207:4 240:20 241:4,11,18 243:18,18,20 243:23

**100,000**  27:7 30:1

**10007-2140**  2:9

**100s**  111:18

**101**  105:6 107:14 110:4 112:20 113:2 113:12,21 115:16,21 241:24

**102**  107:14 113:13 241:14 241:24

**103**  107:14 241:24

**105**  107:18 109:2,14 244:10,23,25

**108**  242:20

**10:48**  64:18

**11**  66:17,23 67:19 101:1 247:23 248:3

**11/1/2024** 146:24

**11/1/24**  4:13

**110**  107:19 108:16 109:4

**111**  108:16

**114**  107:8 109:17 110:23 112:1 115:9,16 115:21 129:2,5 129:23 132:10 132:14 165:8

**115**  128:7,24 129:3 130:17 132:9

**11:06**  64:22

**11th**  2:9

**12**  66:23 147:16 149:13 150:4,21 151:2 151:7 154:2 209:25

**12.27**  150:6,12 150:21 151:1,7

154:2

**12.27.**  150:10 175:12

**1201**  2:18

**12:34**  127:15

**13**  66:23 160:23 161:2

**13th**  3:4

**14**  93:7,9 143:18

**14.6**  217:21

**144**  150:14,16 150:19 151:1,9 153:25 154:6

**145**  4:12

**146**  4:13

**15**  33:25 34:4 40:22,23 41:4 42:2 48:7 72:24 147:15 149:13,25 150:12 153:17 217:8 223:1 232:24

**150**  223:19

**159**  4:15

**16**  160:2

**167**  107:7 109:18 129:1,4 129:22 132:10 132:13

**169**  4:17

**17**  38:21 160:2

Veritext Legal Solutions

800-227-8440 973-410-4040

**[175 - 3:50]**　　　　　　　　　　　　　　　　　　　　　Page 2

**175** 223:20
**18** 160:4 165:22
**19** 1:12 17:3 116:22 160:4 236:2 241:10
**1909** 128:8
**1910** 110:20,22 128:8 129:14 132:18,24 133:15
**196,000** 103:14
**196,226** 103:12
**1964** 236:2
**1980** 222:15
**1993** 13:2
**1994** 13:6
**1995** 14:23 17:3
**1999** 212:7
**1:14** 127:19

**2**

**2** 64:23 87:3 94:13 110:7 127:16 134:10 144:6 146:1,19 147:12,15,25 148:3 149:15 149:23 153:10 153:22,24 161:25 218:8 241:15

**2,000** 118:20,21
**20** 11:4 131:11 212:8 241:10 252:22
**200** 2:3 223:20
**2000** 16:25 177:24 235:25 236:7,14 237:8
**20004-1109** 3:4
**2001** 4:20 216:13 222:16
**2002** 177:24
**2005** 15:1 16:25 36:7
**2006** 39:9 40:2
**2007** 38:9
**2010** 73:6
**2014** 4:20 216:13 244:8 246:6
**2019** 85:5 86:9 89:17 188:19 212:8,9 225:4 225:16,25 233:11 242:18 243:2,6 244:22 246:9 249:16
**202** 3:5
**2020** 123:20
**2021** 4:15 225:1,12,14
**2022** 225:3,9,11
**2023** 4:4 52:7

**2024** 128:7 134:24 225:18 225:22 231:19 231:20 232:22 233:16 238:23 239:5 242:8 244:10
**2025** 1:20 5:4 16:25 68:18 166:5,13 250:11 251:11 251:21,25
**2026** 233:12
**2029** 233:12
**2049** 251:22
**21** 128:1
**210** 3:17
**216** 4:20
**219** 5:10
**22** 13:16 16:15
**23** 13:16 16:15
**23rd** 251:21
**25** 11:3,4 40:11 40:13 42:23 43:5 228:4
**250** 2:9
**29** 251:25
**2904** 1:12 5:10
**296** 154:25
**296.22.** 155:10
**2:10** 165:11
**2:17** 165:19

**3**

**3** 110:7 127:20 161:25 165:15 180:1,4,6,19 181:1,2,6 199:23 201:1 204:24
**30** 11:3 31:9 40:11,13 42:23 43:5 152:5 181:25
**30,000** 227:21 228:4
**30309-3466** 2:19
**31** 100:21 101:16
**312** 2:15
**32.9** 158:8
**32.94** 155:13
**32.94.** 158:5
**32.94946** 156:8 156:14
**33** 104:16
**35** 103:12
**36** 128:2,4 155:22 156:1,3 156:17,18 158:3
**3:04** 204:15
**3:15** 204:18
**3:50** 231:1

**[3:51 - abc]**

| | | | |
|---|---|---|---|
| **3:51**  231:5 | 179:3,17,20 181:14 182:6 183:3,6 184:23 185:2 197:24 200:12,23,24 201:1 203:22 231:6 235:2 250:4 | **68,449**  115:4 | 199:5 |

**4**

**4**  110:7 165:20
201:1 231:2
235:19
**4.06**  166:15
**4/11/2025**  66:9
**4/11/25**  4:6
**40**  106:17
110:8 114:7
217:19 240:24
**404**  2:19
**40s**  241:21
244:14
**42**  133:20
**45**  64:14
117:11
**460**  2:3
**464**  154:25
**4900**  2:18
**4:14**  1:21 250:3
250:5 251:12

**5**

**5**  35:19 145:14
150:23 151:2,8
151:10,11,19
151:20,21
152:9 156:2,10
157:5,25
158:11 160:21
163:11 166:1
170:16 172:25
174:18 177:13

179:3,17,20
181:14 182:6
183:3,6 184:23
185:2 197:24
200:12,23,24
201:1 203:22
231:6 235:2
250:4
**50**  163:19
**500**  4:17 169:2
169:22 170:2
170:11,25
177:23 178:4,7
178:12 183:16
184:25
**52**  4:4
**555**  3:4
**57**  58:13,16
**58**  158:21,23,24
163:2,16,19

**6**

**6**  3:16 102:4,8
154:21 157:1
162:4
**60**  114:6
**60603-2323**
2:14
**61**  158:24
**612**  154:25
**637-5600**  3:5
**64112-2003**  2:4
**66**  4:6

**68,449**  115:4

**7**

**7**  2:8 35:17
116:19 200:14
223:1
**7/9/2025**  252:3
**70**  72:4
**714-7105**  2:4
**72.7**  217:19
**73**  62:9 147:10
147:24
**74**  4:8 148:15
**75**  11:2 72:4
**754**  111:9
**777**  1:18 5:12
**79**  147:14
149:11
**799**  154:25
172:17 173:1

**8**

**8**  35:17
**8.99**  147:19
155:21 161:23
171:15 173:3
175:11 209:9
209:11
**8.99.**  155:14
**80**  11:2 147:19
**800**  172:17,19
172:21 173:8
173:11,12,20
173:21 174:3,8
174:9,14,16

199:5
**816**  2:4
**85**  33:21
**853-7883**  2:15
**87.3**  217:21
**881-7806**  2:19

**9**

**9**  1:20 5:4
100:18,20,21
**9.48**  170:3
184:25
**90**  33:21
**900**  2:14
**90s**  244:21
**94**  13:7
**95**  13:8 244:7
246:5
**97**  224:20
**98**  224:20
242:20 243:2
**99**  4:10 112:5
**99.9**  157:19
**9:28**  1:21 5:3
251:11
**9th**  251:10

**a**

**a.m.**  1:21 5:3
64:18,22
251:11
**aarp**  80:12
**abc**  128:15
130:16

**[ability - adam.a.cooke]**                                          Page 4

| | | | |
|---|---|---|---|
| **ability** 7:18 9:14 70:11 | 136:9 139:23 148:6 156:2,9 156:9,19 | **acknowledge** 110:6 | 38:8 58:19 71:11 75:6 |
| **able** 12:3 76:14 130:7 153:20 177:11 203:22 228:18 | 158:22 160:19 161:22 183:11 184:10 187:22 188:14 189:2,6 | **acquaintances** 191:23,25 192:19,19,20 | 76:24 77:11 78:3 96:25 97:6,14 109:12 111:16,16 |
| **above** 44:22 53:9 107:5,13 109:1 113:21 115:21 116:16 116:22,22 207:4 243:23 | 189:6 204:1 205:13 208:8 248:17 | **acquire** 237:9 **action** 90:6,10 251:18 **actions** 1:8 **activities** 12:2,4 28:5 220:21 | 116:10,14 130:9 142:21 161:3 171:13 182:7 205:5 207:6,10 208:7 208:7 211:24 |
| **absolute** 227:4 | **accounted** 91:18 | **activity** 193:21 | 213:22 216:19 |
| **absolutely** 113:17 | **accounting** 34:21 189:5 | **actual** 22:24 29:21 106:25 | **actuarially** 150:24 172:24 |
| **academy** 14:7 | **accounts** 152:25 153:1 | 107:3 120:5 122:4 124:21 | 173:2 |
| **accept** 194:10 196:22 198:15 202:17 | 192:6,7 193:1 193:21 196:4 240:7 | 125:4,8 206:1 222:19 **actually** 37:11 | **actuaries** 13:12 13:24 14:7,10 18:2 39:2 205:9 222:23 |
| **acceptable** 39:22 | **accruing** 181:5 | 49:14 50:4,7 104:17 107:6 | 222:25 |
| **accepting** 237:13 | **accumulated** 71:23 | 107:13,16,18 110:9 115:20 | **actuary** 10:12 15:4 16:19 |
| **access** 28:4,5 64:1 92:10 121:7 209:22 218:23 240:6 | **accurate** 9:10 112:7,25 129:23 170:9 | 121:1 140:7 147:17 156:12 200:25 203:15 | 17:9 35:7 38:22 62:19 68:9 74:22 |
| 247:1 | **accurately** 74:21 75:15 | 209:6 211:6,14 223:22 236:24 | 75:9,16 130:3 205:8 206:22 |
| **accommodate** 109:6 | **accused** 48:19 49:22 | **actuarial** 10:20 11:11,15 14:3 | 207:1 **actuary's** 70:24 |
| **accordance** 155:1 | **achieve** 12:4 170:15 200:12 | 14:13 16:13,20 16:22 18:5,8 | **adam** 3:3 6:11 6:15 |
| **account** 58:23 77:3 122:25 | **achieved** 170:11 | 18:11 19:11,20 20:1 37:21 | **adam.a.cooke** 3:6 |

**[add - agreement]**

| | | | |
|---|---|---|---|
| **add** 122:5 156:17,18 162:25 | **advocate** 75:10 75:18 76:8 | 132:19 133:16 134:24 160:14 | **aggregate** 9:21 140:19 194:12 204:2 |
| **adding** 94:14 | **affect** 55:8 59:25 60:1 | 162:25 163:4,6 163:9,10,14 | **aggressive** 168:22 241:14 |
| **additional** 30:3 108:23,24 152:4 178:19 178:23 196:5 230:10 243:20 | 214:7 215:20 223:22 244:18 **affected** 117:25 **affects** 26:12 55:10 118:4,8 163:5 | 207:4,4 217:18 217:19,21 225:19 237:20 238:16 241:11 241:19,19 242:15 243:15 243:18,20 | 243:21 **aggressively** 167:21 168:8 **ago** 14:1 43:13 51:23 60:19 72:17,24 84:6 |
| **address** 148:20 235:12 | **affirms** 132:6 | 249:7,17 | 122:22 123:25 |
| **adjust** 122:24 221:4 240:9 | **affluent** 62:22 63:12,21 121:2 | **aged** 102:4 103:12 104:18 | 165:1 210:24 233:15 244:18 |
| **adjusted** 153:16,18 | **afford** 141:8 142:7 168:16 | 104:25 129:23 240:22 | 244:24 |
| **adjustment** 116:15 153:19 | **age** 23:2 54:1 58:20 61:2 | **agency** 1:6 5:7 89:21,25 92:3 | **agree** 30:7 33:11 44:13 59:16 118:16 |
| **adjusts** 249:1 | 71:8 94:25 98:17 100:21 | 252:2 | 119:2 130:23 |
| **administratio...** 246:20 | 100:23 102:2 104:22 105:1,5 | **agent** 41:12,13 41:19 48:18 | 131:23 132:4 132:16 137:15 |
| **admit** 191:15 | 105:8,14,19,21 | 49:6,11,12,21 | 139:19 157:11 |
| **advanced** 15:21 111:17 111:18 | 105:25,25 106:3,4,14 107:5,11,13,16 | 79:14 **ages** 88:4 94:22 96:20,21 105:8 | 161:18 172:1 192:11 211:4 211:19 233:1 |
| **advances** 62:16 | 108:9 109:10 109:14,17 | 106:25 107:3,5 107:24 111:18 | 233:12 239:10 245:17 246:8 |
| **advantage** 150:2 | 112:16 113:16 113:21,23 | 112:19,24 113:18,19 | 246:10 |
| **advice** 37:2,22 48:4 74:24 76:19 | 114:1,12,13,15 114:15 115:21 116:14,16 | 114:1 115:20 116:1 134:20 142:23 160:9 | **agreed** 102:21 118:17 211:13 245:15 248:8 |
| **advisor** 36:22 37:15 46:5,7 47:9 | 121:7 128:9 129:2,15,22 | 162:25 205:22 215:25 242:7 | **agreeing** 247:4 **agreement** 195:6 |

[ahead - answer]    Page 6

ahead 189:15
airplane 178:8
alicia 236:5
alive 128:6
  153:5 156:21
  164:1,16,20
  165:7 238:19
  239:7 240:13
  249:10,12
allegations
  41:11 50:17
  52:18 85:3
allege 86:8
  165:1
alleged 134:22
  215:10
alleging 39:16
allende 154:21
  155:20 161:20
  163:23 164:1,6
  172:14,16,19
  173:8 174:14
allow 193:16
allowance
  238:23 239:1
allowed 53:1
allows 213:6
alluding 46:8
  185:9
alston 2:17 6:6
alston.com
  2:20
alternative
  184:11

ambiguous
  101:11
amc 110:14
amca 66:8
  83:17 90:9
  102:13 111:1
  119:7 137:11
  137:21 145:5
  165:2 171:20
  187:25 188:16
  188:18 242:21
  243:3 244:4,8
amca's 135:21
amended 66:8
america 1:9
american 1:6
  5:6 14:7 89:21
  89:24 216:20
  252:2
amount 13:20
  28:22 29:8
  30:16,18
  163:22 168:3
  168:15 195:7
  196:2 198:11
  203:25 209:20
amounts 28:24
  53:9 176:23
  206:3
amy 4:11,13
  83:23 84:20
  87:13,20 88:12
  143:16 147:4
  163:17,21

  185:24 188:20
  209:5
analogy 139:15
analyses
  205:16
analysis 85:14
  86:25 88:1
  90:16 95:1
  96:7,18 101:4
  109:25 111:15
  118:2 132:2
  139:23 146:15
  147:14,17
  149:20 151:22
  152:16,19
  161:12 176:2
  179:11,16
  184:4 185:5
  186:6,23 187:7
  187:17,21
  189:1,11 195:2
  228:16 238:20
  238:21 239:21
  240:11,21
  242:8 244:10
  245:15 248:13
  248:20 249:4
analyzing
  15:17
anecdotally
  185:15
annick 1:25
  5:16 251:3,23

annual 35:9
  150:2,14
  153:18 154:4
  154:13 207:8
  207:15
annually
  147:16 149:14
  150:3,15,16,18
annuities 10:19
  10:22 11:1,8
  12:16,18,19
  37:3,16 42:19
  43:9 72:9 73:9
  75:4 76:12,20
  247:7
annuity 11:13
  71:19,22,24
  72:2,3,7
  115:22 155:13
  156:2,9 157:5
  157:9 158:3,12
  158:16 159:17
  161:6,15 162:1
  162:6,20,24
  163:3,6,13
  182:4
anomalous
  108:5
anomaly 110:5
answer 7:17
  8:5,13,16 9:2
  21:12 27:25
  34:25 56:18
  73:23 86:2

[answer - ascertain]                                                                            Page 7

91:5 107:17
126:5 131:3,8
190:4,6 198:15
202:3,17,19,21
212:15 214:12
214:18 245:25
**answered**
61:22 98:11
114:18 124:3
126:8 130:15
131:8,13
179:23 181:17
194:22 197:8
198:14 202:5
202:14
**answering**
24:10 28:16
76:7
**answers** 8:9
60:25 215:3
236:22
**anticipated**
124:7
**anybody** 76:10
108:8 109:16
192:2
**anyway** 7:14
245:10
**apparently**
18:13
**appealing**
36:16
**appear** 79:5
82:19

**appearance**
6:12
**appearances**
5:18
**appearing** 2:5
2:11,16,20 3:6
**appears** 102:3
103:11 128:17
147:24 148:15
**applicable**
151:15 152:6
182:2
**applicant** 25:9
**application**
17:11 18:7
**applications**
19:5
**applied** 44:7
157:24,25
179:6 229:12
240:14
**applies** 14:9
**apply** 50:15
142:21 148:7
153:21 157:16
158:4 159:17
249:13
**applying** 14:12
27:8 97:12
157:23 220:7
**appraisals**
11:14
**approach**
154:4

**approached**
36:12,15
**appropriate**
25:11,13 44:7
89:9 132:7
149:15 153:15
161:6,7 162:1
163:10 171:19
171:21,22
176:7,16 177:2
181:23 182:9
183:1 184:2
189:25 190:14
195:15 196:7
197:13,18
211:2 215:9
221:1 222:12
222:21 226:23
227:24 229:1
230:11
**appropriately**
120:2
**approve** 81:23
**approximately**
13:16 154:25
**aptitude** 18:11
**arbitration**
42:11
**archives**
247:16
**area** 10:15 11:9
19:4,7,10,21,25
20:2,17,19,23
21:6 178:5

188:24 215:12
225:13
**areas** 10:20
18:24 19:1
37:21,23 76:18
218:11
**arena** 10:19
**arguably**
152:22
**argue** 167:18
199:22 224:22
**ariadne** 2:7
5:23
**ariadne.pana...**
2:10
**arisen** 85:11
**arising** 73:12
**arrive** 155:10
155:15
**article** 4:19
67:22,23 69:1
69:23 70:23
71:16 72:13,16
78:17,22 79:4
80:23 83:3
130:17 216:11
**articles** 67:20
73:11,14,19
78:10,12 79:3
79:11 80:1,1,4
80:8,18 81:2,4
82:5
**ascertain** 138:4
166:20 175:19

**ascertaining** 134:22 206:3 240:12
**aside** 10:1 11:18 16:7 38:14 68:25 80:8 162:18 223:13
**asked** 12:13 26:4 46:15 53:18 61:17,22 80:16 97:4,20 98:10 114:17 124:2 126:8 130:14 131:12 146:3 179:22 181:16 194:15 201:22,25 202:4,21,24 226:2 245:12
**asking** 23:6 35:6 40:4 60:11,12 83:2 85:14,15,18 90:24 106:16 107:15 121:11 125:23 126:10 126:14 130:25 140:10 173:6 174:6 175:12 193:25 196:14 202:11,13,16 203:10 226:14 226:20 228:7

243:24 248:24
**aspect** 172:11 193:4
**aspects** 218:16
**assessing** 23:20 55:20
**asset** 178:18,21
**assets** 178:25
**assigned** 58:24 59:2,20 60:7 134:8 135:11 145:15 229:18 229:20,21,25 235:11
**assigning** 37:12
**assignment** 116:1,9
**associated** 25:12 30:12 31:25 49:23 53:21 59:4,22 83:16 85:6,7 86:18 107:9 118:11 120:13 121:9 138:6,16 140:3,4 178:20 178:23 181:1 188:10 193:17 218:15 219:5 219:20 220:14 220:21 226:9 227:18,22 234:18 236:23

**association** 4:19 216:12 218:9
**assume** 8:14 65:8 107:15 108:15 109:3 111:5 114:1 115:19 120:9 122:22 186:6 186:13 191:5 236:21 238:17 239:6 241:14 241:18 243:19
**assumed** 24:6 24:25 107:18 110:25 112:22 113:11,15 114:5 120:10 150:1 161:5 240:21 241:3 243:14 244:14
**assumes** 154:7 187:2,11 189:11 241:6 243:18
**assuming** 110:8 135:17 139:20 153:4 155:20 163:16 174:13 185:21 196:8 209:5 249:11
**assumption** 20:15 22:6,9 22:20 32:4

59:12 97:1,7,7 107:12 113:18 114:11 119:15 122:3,20 123:7 127:8 128:18 129:7,11,13 132:7 138:20 143:4,9 180:11 184:17 189:18 190:7 197:3 200:3 201:15 203:4 220:1 221:1 224:16 224:21,23 228:10,18,21 236:22 240:20 241:23 242:21 244:13,18 245:5,9 248:1 249:14,15
**assumptions** 20:21 21:8,10 22:17 24:24 97:9,13 141:18 205:20 206:11 206:15 209:16 215:13 221:5 222:4 223:25 238:16 249:2
**atlanta** 2:19
**attached** 4:22 4:22
**attacks** 26:25

**[attained - basic]**                                                    Page 9

| | | | |
|---|---|---|---|
| **attained** 90:9 | **avenue** 1:18 | 36:4 39:9 | 50:11 174:15 |
| **attempt** 201:5 | 5:13 | 42:21 50:15 | 174:17,25 |
| **attended** 13:5 | **average** 32:12 | 52:15 64:21,25 | 176:14 192:6 |
| **attention** 58:13 | 34:13 35:3 | 78:24 93:1 | **bartolomeo** 2:8 |
| 78:9 128:1 | 92:1 105:2,8,9 | 98:15 100:2 | 6:8,8 |
| **attest** 29:23 | 105:11,14,16 | 110:20 127:18 | **base** 18:24 |
| **attorney** 4:25 | 105:22,25 | 127:24 131:21 | **baseball** 72:8 |
| 6:25 9:1 | 106:5,14,23 | 142:18 143:12 | **based** 22:13 |
| 251:14,16 | 108:10,19 | 143:13 151:8 | 25:2 27:15 |
| **attorneys** 10:2 | 112:21 113:15 | 154:14 157:22 | 31:15 54:8 |
| **attributable** | 113:23 116:6 | 161:19 165:13 | 55:15 70:11 |
| 62:16 | 118:22,24 | 165:18 171:25 | 71:13 86:23,24 |
| **attributed** | 140:20 170:3 | 172:13 176:6 | 87:22 98:5 |
| 218:21 | 241:18 | 179:3,13 188:4 | 103:5 106:4,23 |
| **aura** 149:11 | **aware** 28:22,24 | 190:4,23 | 109:24 110:24 |
| 214:17 | 29:1 31:12 | 197:22 202:15 | 114:23 116:10 |
| **austin** 2:3,13 | 32:22 65:14 | 204:17,20 | 117:13 120:5 |
| 5:21 6:3 | 172:10 185:11 | 207:14 209:6 | 121:14 122:4 |
| **author** 66:15 | 185:14 214:1,5 | 215:3 231:4 | 151:12 152:19 |
| 74:14,15 | 222:2 223:14 | 242:17 243:4 | 153:24 157:4 |
| **authored** 73:10 | 223:23 230:18 | 244:13 246:4 | 158:13,18 |
| **automatically** | 232:5,8 234:16 | 247:3 | 167:1 175:9 |
| 56:25 163:21 | 235:25 238:14 | **background** | 180:14 199:14 |
| 208:23 238:24 | 247:11,14 | 7:5 10:11 | 200:3,5 201:14 |
| 239:1 | **b** | 12:24 16:21 | 201:20 203:4,9 |
| **available** 35:25 | | 17:11 70:18 | 209:16 212:23 |
| 83:5,7 87:4 | **b** 4:1,6 66:4,5 | 111:16 130:10 | 220:24 221:5 |
| 94:21,22 96:11 | 93:3,4,5 | **backwards** | 225:19 226:16 |
| 183:14 185:17 | 143:13,14 | 51:2 155:12 | 237:10 249:14 |
| 197:19 221:13 | 163:13 204:22 | **bag** 123:14 | **basic** 96:23 |
| 221:14,22 | **bachelor's** | **bailout** 79:14 | 97:9 182:7 |
| 223:14 225:6 | 12:25 13:3 | **balances** 192:9 | 206:9 213:22 |
| 226:13 | **back** 15:2 | **bank** 48:23,24 | 223:1 224:3 |
| | 19:20 31:7 | 49:7,24 50:1 | |

**[basically - blurry]**

**basically** 15:18 39:17 54:19 67:24 71:11 156:17 230:14

**basing** 212:18

**basis** 26:6 28:15 30:22 36:24 45:5 109:7,8 140:13 144:17 149:22 149:24 151:5 152:16,20,24 153:10,11,20 154:12,13 156:23 158:25 159:22 168:1 186:3 194:11 204:2 207:15 207:15 212:4 214:3,17 219:8 236:22

**basket** 70:5

**basketball** 38:20 69:25 70:3

**baskets** 70:4

**bear** 27:11 79:13 184:12

**becoming** 23:15 36:10 39:5

**began** 131:23

**beginning** 5:18 64:22 127:19

154:5 165:19 231:5

**behalf** 2:5,11 2:16,20 3:6 5:22 67:16 125:16

**behavior** 62:17 121:9

**belief** 107:4 168:1

**believe** 6:11,16 13:1 14:4 16:15 18:17 19:10,20,24 24:18 39:13,13 39:25 42:22 48:21 49:11 54:6 63:9 64:2 67:24 77:18 93:18 134:4 138:7 146:17 171:2 176:15 177:1 182:25 189:25 190:14 194:9 195:18 196:6 216:5,20 220:3 223:2 226:17 228:20 231:24 238:21 245:12

**belong** 102:24

**belth** 79:8

**beneficial** 173:25

**benefit** 75:25

**benefits** 12:5 51:3 193:17

**benzmiller** 2:13

**best** 7:17 30:6 50:4 51:22 71:14 75:23 76:14 81:15 117:17 125:5 201:16 203:6

**better** 17:8 28:4 30:5,7,17 64:1 71:24 76:2 80:16 105:23 129:20 173:20 212:11 215:24

**beware** 79:13

**beyond** 44:2,23 53:10 86:21 109:13 137:6 147:11 194:15 234:9

**bias** 120:6

**big** 170:13 171:1

**billed** 147:16 149:14 150:3,5 150:15,16,18 150:19 193:8

**billing** 150:14

**bird** 2:17 6:6

**birth** 110:18,19 110:22 113:10

117:12 128:7 132:24 133:3 134:12,16,18 134:21 229:9 229:12,24 230:2,12 231:24 235:13 235:24 236:2,7 236:15 237:8 237:11 242:22 243:11

**bisgaard** 2:7 5:24

**bit** 10:10 12:23 18:6 34:19 42:1 66:2 82:15 83:12 98:2 157:19 183:5 197:24 210:24 211:17 215:18 217:13 221:8 229:5 231:9 242:13

**blank** 80:14

**blend** 229:19

**blended** 162:8 162:17

**blindly** 132:13

**block** 22:10,25 121:23

**blood** 91:16 220:20

**blurry** 80:10

[board - calculating]

Page 11

**board** 183:6
**bond** 33:21,21
  166:11,14
**bonds** 168:7
  169:2 198:10
  199:16 200:5
**born** 242:5
**borrow** 174:24
  175:1 176:10
  176:14
**borrowed**
  176:9
**borrowing**
  166:18 175:6
  176:12
**bottom** 66:22
  81:14 82:1
  157:1 162:4
  217:7,17,22
  219:1
**bought** 77:2
**bounced**
  197:23
**bound** 128:9
  129:15,21
  132:19 133:16
**brackets**
  199:21
**brad** 6:8
**bradley** 2:8
**bradley.barto...**
  2:10
**brasch** 3:8

**breach** 1:7
  46:23 47:3,6
  73:12,15 83:17
  85:5,12 86:12
  87:2 89:16
  187:25 188:10
  188:14,15,16
  188:17,18,22
  191:9 206:13
  206:17 212:7,9
  213:11 225:15
  232:12,16,25
  233:3,11
  239:14 240:10
  242:5,9 244:5
  245:14,21
  249:3,7,11,13
**breached** 87:9
  89:19,23
**breaches** 73:17
  85:7 185:12
  187:24 188:23
**break** 9:5,6
  51:8 64:14,20
  69:9 104:5
  120:18 127:13
  127:15,17
  152:15 165:9
  165:12 204:8
  204:16 231:3
**briefly** 15:8
**briley** 234:23
  235:8,24,25
  236:24 237:9

  238:14
**bring** 18:1
**brisbois** 2:7
  5:24 6:9
**broad** 10:20
  18:24 33:16
  37:20 52:21
  71:1 96:10
  175:24
**broaden** 43:4
**broader** 224:12
**broadly** 19:2
  20:1 54:14
  56:14 60:13
  77:10 205:11
**broken** 160:13
**brush** 33:16
**bucket** 113:23
  118:23,24
  224:5
**build** 248:16,25
**built** 201:4,7
  239:1
**bulk** 10:17,17
  10:24 187:9
**bunch** 125:16
**burdensome**
  248:4
**business** 36:15
  38:7 121:23
**buy** 29:2,4,18
  29:24 30:1,21
  71:24 121:3
  178:8 183:14

  184:8 195:4
  196:10,24
  197:5 198:1
**buyer** 79:13
**buying** 72:6
  184:12
**buyout** 77:22
**buys** 189:16
**byline** 82:21

**c**

**c** 2:1 3:1 4:7
  73:25 74:3
  117:20 135:25
  136:25
**calculate** 52:23
  116:9 153:23
  155:2 159:20
  161:3 167:10
  210:25 215:1
  220:9
**calculated**
  44:16 97:24
  106:4 110:18
  134:18 153:9
  157:4 166:3
  187:6 194:12
  237:8
**calculating**
  44:19 71:11
  76:24,24,25
  104:21 162:22
  166:22 181:4
  201:13 203:3

208:7 212:19
213:1,7,12
214:3,8,18
222:8,12
231:14
**calculation**
  50:24 83:15
  105:24 107:11
  133:10 134:16
  135:2 159:18
  165:5 175:9
  189:19 190:8
  197:20 203:16
  206:8 225:17
  242:17 249:17
**calculations**
  11:11 42:10
  44:7 50:15
  51:16 53:16
  56:21 76:13
  87:22 102:24
  106:13,22
  114:9 133:17
  149:21 152:10
  181:3 206:12
  209:19 212:5
  225:19 231:11
  231:24 234:11
  238:11 239:2
**calculators**
  97:23
**call**  13:23
  19:12 39:18
  159:16 172:17

202:8,9 240:22
**called**  6:18 19:7
  31:21 38:16
  79:6 80:14
  81:14 145:5
  151:23
**calls**  9:18,20,23
  10:1 25:16
**cancer**  26:24
  60:7,20,20,23
  220:19
**candidate**  17:8
**capacity**  46:1,4
  46:6 47:9
  75:21 76:10
**capital**  34:22
  34:23 178:19
  178:24,25
**card**  193:7
**cards**  192:6
**care**  11:9,20,21
  11:23 12:6,9
  12:11,20 28:4
  37:16 64:1
  75:5 76:12,20
  92:20 121:7
  142:2 193:22
  218:24 245:11
**career**  16:18
  18:12,23 35:16
  35:18 36:14
  40:12 47:24
  179:15

**carlo**  39:19
**carried**  45:6
**case**  1:12 5:9
  7:4 9:1 10:2
  39:7,12,23
  40:25 42:8
  43:7,10,17
  45:16,19 46:11
  46:13,20,23
  48:16,20,22
  49:5,10,16
  51:23 52:10
  56:9,10,16
  60:11 65:14
  66:13 67:5,16
  77:16 82:16
  83:14 84:4,8
  84:14,17,22
  85:3 86:2 93:5
  94:8 96:4
  110:8 114:12
  120:19 131:15
  135:9 140:13
  140:13 141:4
  157:24 158:21
  176:17 179:18
  181:13 184:16
  185:23 198:8
  205:21,24
  212:23 213:11
  215:14 219:23
  220:5 221:10
  232:2 234:2
  252:2

**cases**  39:2 40:2
  40:4,6,6,14,15
  40:19,23,23
  41:5,6,16 42:2
  42:4,24 43:5
  44:4,14,16
  45:15 46:8
  48:7 56:19
  57:4,9,11
  64:25 65:10,11
  65:17 66:18,22
  67:1,9 122:9
  125:16 126:11
  126:14 179:8
  179:25 180:2,4
  206:13,17
  239:25
**cash**  68:23
**catching**  193:8
**categories**
  25:24 76:17
  77:9 104:5
  117:2,5,20
  137:2,3 220:24
**categorized**
  134:10
**category**  34:4
  77:10 102:1
  103:15 226:16
**caught**  17:23
**cease**  178:3
**cell**  104:7
**center**  2:8

| | | | |
|---|---|---|---|
| **central** 105:18 | **challenge** 55:2 | **charge** 53:1 | **cites** 130:12 |
| **cents** 157:19 | 57:19 144:11 | 174:25 193:7 | **city** 2:4 4:4 |
| **certain** 12:2,17 | **champ** 128:9 | **charged** 154:6 | 52:6,25 53:4,8 |
| 13:20 15:25 | 128:19 129:15 | **charges** 192:8 | 53:18,18 54:16 |
| 22:25 24:21 | 132:19 135:21 | **charging** | 58:4 61:6 |
| 28:1 29:9 | 137:11,21 | 123:25 | **civic** 42:8 |
| 31:20,24 44:22 | 138:16 146:6 | **chat** 52:7 | **claim** 85:19 |
| 49:19 82:17 | 226:4,8 234:6 | **cheaper** 187:10 | 161:8,17 |
| 92:13,18 | 234:17 235:23 | **check** 69:6 | 162:20 166:1 |
| 112:15 113:25 | 236:23 237:7 | 112:15,17 | **claims** 168:12 |
| 114:12 133:3,4 | 238:3,18 239:7 | 135:17 155:25 | **clarify** 47:9 |
| 134:5 135:13 | 239:11 243:6 | 208:19 234:5 | 56:15 76:3 |
| 135:18,19 | 244:3 245:20 | **chicago** 2:14 | 226:20 227:7 |
| 136:17,18,19 | 246:15 247:21 | **choice** 190:21 | **class** 30:7 54:1 |
| 144:2 160:9 | 248:19 | 207:3,3 | 54:5,15,20 |
| 168:15,25 | **chance** 43:2 | **choose** 119:21 | 55:3 58:20 |
| 182:12 191:10 | 218:4 241:15 | 121:24 122:11 | 61:3 63:2 94:4 |
| 195:7 197:23 | **change** 109:6 | 184:11 197:6 | 94:7,18 100:22 |
| 215:25 | 143:3,4,7,8,8 | 197:16,17 | 101:8,25 |
| **certainly** 122:2 | 145:22 163:12 | 198:9 231:20 | 108:20 116:10 |
| 126:20 141:23 | 189:1 197:18 | **chooses** 192:25 | 116:25 121:3 |
| 212:21,22 | 230:23 252:5 | **choosing** | 127:9 129:5 |
| 221:24 233:19 | **changed** 34:11 | 207:11,14 | 140:14 141:23 |
| **certainty** 29:16 | 78:23 | **chose** 90:18 | 148:3,18,22 |
| 207:22,25 | **changes** 13:14 | 142:8 150:18 | 154:16 162:22 |
| 227:5 232:14 | 62:17 143:1 | 152:10,15 | 194:7 198:8 |
| 237:3 | 192:8 | **chosen** 141:7 | 211:7,11 |
| **certification** | **changing** | 179:4 | 219:24 220:6 |
| 94:4 245:3 | 237:20,21 | **circling** 241:2 | 220:10,11 |
| **certify** 94:7,8 | **characteristics** | **circumstances** | 226:10 228:4 |
| 251:5,8,13 | 59:9 94:18 | 59:5 103:6,19 | 228:19 232:1 |
| **cetera** 103:20 | 103:6 144:3,5 | 230:18 | 232:23 233:4 |
| **cfo** 223:10 | **characterize** | **citation** 128:10 | 233:15,17,21 |
| | 213:22 | | 234:1,12 245:3 |

**[class - companies]**

245:10 247:24 249:1

**classes** 55:15 58:23 219:12 219:16,21 224:7 227:1 228:1

**classification** 25:17 31:5 32:2 56:19 61:25 221:2

**classifications** 24:15,17,20 31:13,14,24 54:17,21 55:3 57:14,20

**classified** 163:17,20 228:8

**classify** 27:15 226:25 228:1

**clean** 82:14

**clear** 8:24 9:3 27:2 30:24 56:3 73:10 81:1 82:7 111:8 112:3 126:24 174:2 177:4 183:7 195:1 214:19 215:13 228:3

**clearly** 107:10 107:11 108:15 217:13

**click** 128:16

**clicked** 130:11

**client** 19:19 43:16 49:13,19 49:19 50:4

**clients** 36:24 47:14 71:20 78:6 181:9

**close** 105:5 149:21 176:17

**closer** 35:19

**coach** 38:21

**code** 136:10,12 136:16 137:11 137:20 138:8 138:15,19 139:12,16 140:2 226:3,17 227:22 229:3,6 230:3,17 241:9

**coded** 132:10

**codes** 138:5,22 139:20 146:5,7 146:9,17 226:8 227:3,7,9,13,15 227:18 228:20 228:22 230:8

**coding** 113:9

**coherent** 113:20

**coherently** 114:20

**cold** 49:22

**colleague** 6:15 226:2

**collecting** 90:11

**collection** 1:6 5:7 89:21,25 92:3 172:11 252:2

**collector** 90:3

**college** 15:9

**column** 104:8 135:24 136:3

**columns** 104:6

**combat** 185:18

**combination** 157:13 235:12

**combined** 162:2

**combing** 206:5

**come** 20:20 47:15 74:17 82:18 88:9 96:1,24 97:5 97:13 117:14 119:22 120:4 122:10 123:23 125:17 126:14 126:20 181:13 197:12 203:17 209:5

**comes** 10:18 62:8 84:18,19 108:24 116:11 142:23 150:22

197:25 221:25

**comfortable** 230:12

**coming** 35:13 151:18

**commencing** 225:21 251:11

**commensurate** 196:4

**commission** 251:25 252:25

**commissioner** 222:16

**commissions** 37:2 50:2

**commit** 148:4

**common** 59:9 64:3 65:16 109:11 120:15 239:18 245:16

**commonly** 58:21 59:10

**community** 211:24

**companies** 19:16 32:17 57:20 61:12 67:1 121:24 122:9,11 123:24 125:1 125:18 126:15 126:20 127:4 139:4 168:5,11 168:21 170:13

**[companies - conservative]**

178:6 180:16 180:17,18 181:8 223:16 223:24,24 246:22 247:4

**company** 17:9 18:3,24 19:6,8 19:17,23 22:14 22:15,18 25:10 25:13 26:11 29:9 31:12 32:22 33:5 38:11,12,18 41:13 57:13 58:4 60:11 68:23 121:12 122:2 139:9,17 171:1 178:19 180:7,13 220:18,24

**company's** 27:9 59:6

**compare** 64:8 106:17 160:9 224:9

**compared** 62:23 63:24 121:3 179:14 225:12

**compares** 105:25

**compensate** 198:12 215:9

**compensated** 167:23 168:1 198:4

**compensates** 213:7

**compensating** 215:5

**compensation** 43:20 212:3

**competition** 19:13

**competitors** 19:14

**complaint** 84:3 93:20,22

**completely** 112:25 113:2 143:23

**complicated** 21:12,13 23:13 23:15 29:14 98:2 178:16 218:12 228:23

**component** 124:16 127:11

**components** 180:23

**comprehensive** 68:14 69:4 78:13,16 79:1 93:16 149:12

**compromised** 148:19

**computer** 13:4 241:9

**concept** 185:6 189:19,19 190:8,9 195:5 197:11 198:2 211:20

**conceptually** 203:14,19

**concern** 82:1

**concerns** 240:1 240:4

**concierge** 3:8 52:8 66:6,10 74:5,7 216:4

**conclude** 152:8

**concluded** 250:5

**concludes** 250:2

**concluding** 251:11

**conclusion** 30:22 212:19

**conclusions** 53:3,8 140:12 144:18 206:20 207:21

**condition** 139:14,22 140:5,8,25 141:1 142:25 195:19 227:4,6 227:23

**conditions** 24:2 59:23 136:20 139:21 180:14 220:13 226:9 227:19

**conduct** 41:12 41:20 152:10 198:19,20

**confirm** 161:25 216:21

**conflict** 76:15

**confusing** 24:20 34:19 86:14 89:6

**conjunction** 21:5 88:6 96:14 143:24 144:7 203:24

**consequences** 73:15

**conservatism** 121:24 122:1 127:7 160:8 183:5 201:4,7 225:13

**conservative** 90:21 110:9 119:16,19 120:12 127:1 150:1 151:13 152:9 153:19 154:13 166:2 167:8,19 198:10 221:19

**[conservative - correct]**                                    Page 16

| | | | |
|---|---|---|---|
| 221:24 222:11 242:13 | **consistent** 59:3 113:20 135:1 149:22 150:13 151:21 206:20 | **continued** 36:17 | 47:10,12,21,25 50:18 54:6,9 57:5 61:5 |
| **conservatively** 113:14 165:25 183:23 197:24 199:6 | **constant** 152:2 166:4,12 183:25 | **continuously** 170:10 | 63:13 66:23 67:7,8,18 69:12 73:12,13 |
| **conserve** 126:25 | **constitutes** 68:8 | **contractual** 52:24 | 76:5 80:3,6 84:20 87:22 |
| **consider** 34:8 90:25 91:6 95:13 96:6,10 117:6 128:11 133:15,22 142:24 143:21 163:7 207:5,16 | **constructed** 184:22 | **contradicts** 128:18 130:24 131:24 | 89:17,18 92:3 92:14,16,21 93:24 94:15,16 96:2,5 98:12 |
| | **constructing** 23:24 | **contrast** 128:25 150:11 | 98:18,19 102:6 102:19 103:7 |
| | **consult** 151:18 151:22 204:9 | **conversations** 84:24 212:24 | 103:16,17,21 103:24 104:12 |
| **consideration** 23:19 24:1 55:20 56:25 61:4 125:1 149:19 185:6 | **consumer** 49:22 75:10,18 76:7 80:15 | **converting** 207:8 | 104:14,22 105:3 106:6,7 |
| | | **convey** 208:10 | 106:9 108:1,11 |
| | | **cooke** 3:3 6:15 | 109:24 111:2 |
| | **consumers** 19:18 37:4 87:9 185:17 | **copies** 4:22,23 | 112:7 114:7,8 |
| **considerations** 61:11 121:15 160:18 | **contain** 247:13 | **copy** 145:4 | 114:25 118:5 |
| | **contained** 244:3 | **corporate** 19:21 | 123:10 128:20 |
| **considered** 56:5 79:17 93:12,17,23 95:3,9,10,18 100:3 101:19 105:13 116:5 134:13 143:15 153:8 241:13 241:17 | **containing** 234:18 | **corporation** 1:8 | 129:12 130:13 133:10,18,21 |
| | **contents** 8:16 | **correct** 7:8 10:13,23 16:6 17:25 18:18 21:18 29:11 31:1,10,11 32:8,17,18 33:9 36:8,9 37:15 38:19 39:4 40:15 41:21 43:3 44:10 45:12 | 134:23 135:5,6 137:12 147:25 148:11,16,17 149:2 150:20 155:7,17,19,24 158:1 161:24 162:5,23 163:15 165:3,4 165:7 168:8,10 |
| | **context** 60:10 95:6 190:20 205:11 221:22 247:7 | | |
| | **continue** 27:4 126:22 186:24 202:8 | | |
| **consistency** 21:7 | | | |

**[correct - current]**                                              Page 17

168:13,14,17
169:3 175:2,23
178:1 180:9
181:12 186:12
187:10,20
189:10 191:7
200:2 211:5
219:17,22
221:6,10 224:7
226:11 227:1
229:7,9,13,18
230:1,4,20
231:16,17
232:18,25
233:6 234:8,12
236:15,25
237:11,24
238:4 239:21
240:11,15,22
241:24 242:5,9
242:10,23
243:1,7 245:16
247:17,22
248:5,6,14
249:19
**corrected**
238:11
**correcting**
245:8
**correctly**  60:5
111:10
**correlate**  28:17
28:18,22

**correlation**
28:12 29:6,23
30:19,25
**correspond**
146:10
**corresponded**
112:24
**cost**  20:9,13,14
21:4,8 41:8,17
41:22 44:5,15
44:19,21,24
45:1,19 53:1,4
53:5,8 56:18
57:4 65:17
73:11 83:16
86:18 87:1,6
88:6 124:5,11
124:13,20
126:11 145:22
147:15 150:11
153:4 155:22
161:14,23
164:13 166:17
167:2 171:14
171:20 176:12
180:1 183:11
185:23 186:21
187:13 189:22
190:12 197:21
201:18 203:8
207:8,9,12
208:14,21
211:1 213:2,15
214:2,16 222:9

231:14
**costs**  47:5 85:6
85:8 87:5
96:17 124:1
125:2 143:16
144:9,14 153:3
176:22 196:1
205:23 212:13
**counsel**  5:17,19
9:19 51:7
64:13 84:25
88:17 97:3,10
97:20 98:6
130:25 145:3
197:7 198:17
202:15 204:10
209:17 212:24
249:22 251:14
251:16
**counties**  247:12
**counts**  88:4
94:10 96:21
**county**  251:2
**couple**  15:10
16:8 24:20
49:21 52:14
70:4 81:14
82:10,23 143:5
**course**  18:20
26:25 38:18
40:12 50:12
51:3,11 86:1
90:11 167:14
172:21 173:22

179:15 201:19
203:8
**court**  1:1 5:8
5:16 8:19
202:8,9 234:3
**courtney**  3:3
6:13
**courtney.helt**
3:5
**cover**  181:15
**coverage**
167:24 196:16
196:19,25
**covers**  37:20
**covid**  123:18
123:19
**cowrote**  72:18
72:22
**credentialed**
75:9
**credit**  47:17
48:5 73:22
87:6 148:8
188:11 191:12
191:18,25
192:6 193:7
**criteria**  235:10
235:20
**critical**  101:4
**crr**  1:25 251:3
251:23
**cso**  222:15,16
**current**  151:12
164:4 179:10

[customer - daughter]                                    Page 18

| | | | |
|---|---|---|---|
| **customer** 1:7 | 104:21 106:25 | 112:23 113:1,6 | 238:3,19 239:7 |
| **cut** 27:24 | 107:1,17,22 | 113:8 116:17 | 239:11 243:6 |
| 131:22 141:22 | 114:25 115:23 | 119:15 122:12 | 244:3 245:20 |
| 142:4,6 215:22 | 116:9 132:1 | 122:16 128:18 | 246:15 247:21 |
| 218:18 | 134:23 135:5 | 128:25 132:11 | 248:19 |
| **cutoff** 98:4 | 139:24 143:1 | 132:23 143:15 | **databases** |
| 104:22 243:15 | 143:10 149:19 | 151:24 164:3 | 102:13 |
| **cutoff's** 109:2 | 152:19 153:9 | 164:19,22 | **date** 5:3 17:24 |
| **cuts** 120:3 | 154:3,16,24 | 166:6 185:12 | 45:8,9 110:22 |
| **cyex** 214:17 | 155:2 159:18 | 187:24,25 | 117:12 134:12 |

| **d** | 161:4,13 | 188:16,16,18 | 134:15,17 |
|---|---|---|---|
| **d** 3:13 4:9 66:4 | 162:22 163:22 | 191:8 192:12 | 136:10 229:8 |
| 99:1,4,5 | 166:3 167:1,2 | 205:1,25 206:5 | 229:12,23 |
| 127:25 | 175:13,15 | 206:13,17 | 230:2,12 |
| **d.c.** 3:4 | 181:4 183:7 | 213:11 215:15 | 231:18,23,24 |
| **daily** 12:3,5 | 184:4 185:2 | 226:17,24 | 231:25 232:12 |
| **damage** 45:20 | 188:10 194:12 | 229:11,16,17 | 233:3,10 |
| 83:15 114:9 | 194:13 195:1 | 237:15 238:2 | 235:12,24 |
| 155:14 161:5 | 198:11 200:1 | 238:12,18,22 | 236:1,7,15 |
| 162:20 181:3 | 203:18 209:14 | 239:7 242:21 | 237:8,11 |
| 203:16 205:11 | 211:18,18,19 | 243:3,5,13 | 238:19 239:8 |
| 206:8 209:20 | 212:1,5,20 | 244:2,8,17,19 | 240:10 241:22 |
| 213:24 | 213:2,12 214:4 | 244:20 246:6 | 242:22 249:7 |
| **damages** 41:10 | 214:8,18,20,23 | 246:12,22 | 252:3 |
| 41:15 44:16 | 215:1,4 237:18 | 247:5 | **dates** 110:18,19 |
| 45:14,17 46:16 | 237:22 238:11 | **data's** 110:4 | 113:10 132:24 |
| 51:15,17 52:23 | 240:1 242:12 | **database** 119:7 | 133:2 134:18 |
| 73:11 85:7,11 | 245:7 | 128:9,19 | 134:21 241:22 |
| 85:19 86:8 | **data** 1:7 46:23 | 129:15 132:19 | 243:11 |
| 87:10 88:10 | 47:2,6 73:12 | 135:21 137:11 | **daubert** 65:4,6 |
| 96:2,7 97:21 | 73:15,17 87:2 | 137:21 138:16 | 65:11,15 |
| 97:24 103:2,9 | 87:3,9 89:16 | 146:6 165:2 | **daughter** 236:4 |
| 103:16 104:9 | 96:10,15 98:17 | 234:6,17 | 236:25 |
| | 109:10,18 | 235:23 237:7 | |

**[day - deposition]**

**day** 10:18,18 26:6,6 70:21 193:5,6 250:11 251:10,21 252:22
**days** 225:8
**de** 224:25
**dead** 164:16 247:8
**deal** 11:18 49:22 69:11
**dealing** 43:7 49:25 50:1,13 67:1 249:9,11
**dearborn** 2:14
**death** 12:9 26:13,19 28:6 51:3 59:21,24 217:19,21 243:17 246:20
**deaths** 240:10 247:13 248:18
**debatable** 221:21
**debated** 218:24
**debating** 144:17
**debt** 90:3 91:1 92:14 142:8 172:7,11 174:23 175:21 175:22
**debts** 90:11 91:13

**deceased** 164:19,23
**december** 13:7
**decent** 195:18
**decide** 85:22
**decided** 108:8
**decision** 108:17 109:8,9 119:14 153:13
**decisions** 19:24 78:7
**declaration** 235:4
**decrease** 107:1 185:3,4
**dedicate** 192:25
**deemed** 25:13
**defendant** 6:3,6 48:14 67:11,17 96:22 105:3 106:6 108:11 134:2,7 135:11 182:17
**defendant's** 52:18
**defendants** 2:11 5:25 6:10 7:1 52:1 57:24 66:4 73:25 83:18 93:2 94:11 99:3 101:9 127:25 144:25 146:20

159:6 167:13 169:11 177:4,8 179:1 184:5,11 187:8 190:2,16 195:3 196:10 198:9 210:5 215:9 233:22 241:20 244:4
**defense** 15:14 15:21 16:9 48:9,24 65:18 186:15 249:22
**defenses** 52:19
**defies** 109:14
**define** 96:14 210:10
**defined** 143:23 232:1 233:16 233:21 234:2
**definition** 122:16 126:19 136:25 140:23 142:17 143:15 143:22,23 147:25 148:16 225:20 233:17
**definitions** 88:2 117:25 144:12 147:12 206:4
**definitively** 28:9
**defy** 111:19
**degree** 13:7 16:6,19 18:8

207:22,25
**degrees** 12:25 13:3,3 18:5
**delay** 71:9
**delaying** 69:16 70:24 71:10
**deliberately** 221:18 222:10
**delivered** 4:24
**demand** 185:6 195:21
**demonstrate** 50:3
**demonstrating** 49:13
**demonstration** 203:21
**denied** 65:15
**department** 15:14,15,21 16:8,9 19:11 19:20 20:1,2
**depend** 60:19
**depending** 13:14 60:24 77:24 179:15
**depends** 179:9 186:14
**deposed** 7:7 43:2
**deposition** 1:16 5:5,5,11 7:6 9:17 10:4 40:5 40:17,21 46:15

51:23 66:18
67:15 84:10
198:19,20
214:13 236:1
250:2 251:5,8
252:3
**depositions**
7:11
**depression**
26:20
**depth** 28:1
**describe** 74:21
75:15 81:15
157:12 158:16
158:17 210:10
233:20
**described**
20:20 22:4
96:12 114:19
137:7 196:7
**describing**
133:5
**description** 4:2
**designed** 188:8
188:9,21
208:20,20
**despite** 18:10
127:9
**destroy** 50:9
**details** 43:14
44:2
**detected** 60:23
**determination**
41:7 111:22

115:3 153:14
**determine** 20:9
25:23 44:5
50:14 58:21
118:9 146:4
158:7,12
209:20 226:10
246:14 247:5
**determined**
21:4 113:2
124:11 154:24
**determining**
20:3,15 22:11
32:24 44:4
56:6 57:14
125:2 154:16
159:16
**develop** 21:3
178:11
**developed**
58:23 152:18
**developing**
15:22 20:3
**development**
13:18,23
**deviate** 125:7
**diabetes** 59:1
59:19,22
227:17,19,23
228:11,13
229:2
**diagnosis** 226:3
227:7,8,15,18

**diagnostic**
136:10,12,15
137:10,20
138:5,8,15,19
138:22 139:12
139:16,20
140:2 146:5,7
146:16 226:8
226:17 227:3
227:13,22
228:20,22
229:3,6 230:3
230:8,16
**diagnostics** 1:9
2:16 6:4
210:21
**die** 59:10 68:24
77:24
**died** 77:25
153:7 239:12
244:23 245:6
246:8 249:3
**difference**
197:14 203:16
219:2
**differences**
218:23
**different** 15:5
16:1 18:21,23
23:3 24:5,6,9
24:19,21,22,23
24:24,24 32:13
32:13,16 34:24
36:5 41:15

50:25 52:14
54:17 55:8
56:23 71:12
77:7,13,18,25
77:25 82:10
83:18 86:17
87:1 94:10
101:25 109:1
117:2,15
118:12 119:21
131:7 162:24
162:25 163:4,4
172:1,2 173:6
174:6 176:24
176:24 180:23
192:11,12
195:14 197:14
205:22,22,22
205:24 208:13
208:16 209:2
209:20 216:1
219:16,19
220:2,10,23
228:11,13,15
231:9 234:19
239:4 241:19
243:24 248:3
248:24
**differential**
45:12
**differentials**
163:7,8
**differentiate**
92:13,18,24

**[differentiate - documents]**

| | | | |
|---|---|---|---|
| 164:11,15 | **disclosed** 84:13 | **discuss** 73:19 | **district** 1:1,2 |
| **differentiation** | **discount** 97:4 | 108:4 | 5:8,9 |
| 103:5 152:11 | 150:2,23 151:2 | **discussed** | **diversified** 34:6 |
| **differently** 42:2 | 151:6,8,10,19 | 240:19 | 34:9 168:17 |
| 50:17 138:18 | 153:18 156:3 | **discussion** | 178:13 |
| 157:12 | 156:10 157:5 | 127:22 165:17 | **dividend** 20:4 |
| **digit** 177:17 | 157:20,22,24 | **disease** 140:8 | 20:17,20,22 |
| 241:22 | 157:25 158:11 | 220:20 | 21:11 35:23 |
| **diligent** 193:20 | 160:22 161:16 | **disparity** 63:11 | 36:2 |
| **dim** 180:18 | 163:11 165:25 | **dispute** 43:19 | **diving** 26:15 |
| **dipping** 20:25 | 166:2,23 | 43:23 44:15 | **division** 19:13 |
| **direct** 62:9 | 167:19 168:2 | 50:10 54:24 | **divorce** 42:10 |
| 128:1,17 | 171:21 172:25 | 186:4 194:5 | **divvied** 77:1 |
| 217:12 | 173:1 175:13 | 217:25 218:25 | **dob** 148:20 |
| **directed** 225:24 | 176:16 179:4,5 | 219:9 220:17 | **doctor** 136:11 |
| **direction** | 179:20 181:14 | **disqualified** | 136:11 141:24 |
| 117:14 120:6 | 181:24 183:1 | 65:21 | 142:7 |
| 169:6 222:3 | 184:18,24 | **disregard** | **doctor's** 142:2 |
| 223:15 237:25 | 190:22,23 | 122:11 | **document** 4:4 |
| 251:7 | 195:15,22 | **dissertation** | 63:15 73:2,5 |
| **directions** 28:2 | 196:3 197:19 | 17:22 | 78:10 83:25 |
| **directly** 11:7 | 199:22 201:2 | **distinction** | 99:14,18 |
| 24:10 27:13,18 | 207:3,9 213:20 | 63:21 | 117:10 129:17 |
| 117:9,16,22 | **discounted** | **distribute** 82:5 | 145:5,8 147:1 |
| 144:10 186:18 | 71:6 147:18 | **distributed** | 159:12,15 |
| 251:17 | 156:18 157:21 | 68:12,16 77:20 | 169:17,22 |
| **directors** | **discounting** | 80:19 82:4 | 170:5 |
| 233:23 | 176:2 186:14 | **distribution** | **documented** |
| **disability** 12:14 | 197:22 203:19 | 81:19 100:22 | 152:3 |
| **disadvantage** | 213:19 224:24 | 101:8 217:7,10 | **documents** 4:7 |
| 18:7 | **discovered** | 217:18 | 74:1,5,9,12,15 |
| **disagree** 89:14 | 225:7 | **distributions** | 74:19,21 83:24 |
| **disastrous** | **discovery** | 109:10 | 151:18 181:22 |
| 69:19 71:18 | 84:14 | | 205:16 |

**[dog - either]**

dog 99:1

doing 11:10
37:11,12 71:22
89:25 108:2,25
132:12 154:8
154:11,13
169:22 179:11
182:5 202:10
202:12 206:1,8
208:6 225:6
228:25 242:17

dollar 29:24
157:14,17

double 177:17
193:8 208:19
223:20

downs 169:25

downward
107:22

dr 4:9 10:6
83:22 84:16,19
88:3,14 96:12
96:14,15,19
97:10 98:21
99:19 102:9
108:1,3,4
110:13,17,25
111:10 112:4,6
112:23 114:23
116:2,15,19
117:9 118:1
119:6 127:24
128:5 129:10
129:19 130:1,5

132:16 133:20
134:16 135:1
137:9,18
143:24 144:2,8
145:17 146:3
146:18 147:13
164:3 212:25
215:16 227:20
231:23 237:15
243:12 249:6

draft 82:19

drafting 83:20
91:19 93:23
111:23 112:7

drag 178:23

drawing 80:14
140:12

drawn 139:15

drill 211:17

driving 26:16
26:16

drop 52:7

dropped 72:21
180:2

drops 158:5

dry 215:23

dual 13:3

due 168:12

duly 6:19

duplicate
248:10,11

duration 54:2
58:20 161:8,17

durations
162:21 166:1
166:13

dwarfed
113:17

dying 130:17
153:1 160:10
160:11 239:1

**e**

e 2:1,1 3:1,1,3
3:13 4:1,11
6:21 144:22,25
145:1 210:16

earlier 42:21
90:20 139:3
215:18,19
219:14 220:12
221:9 226:4
227:17 240:19

early 18:23
26:13 35:15
71:6 93:25
245:2

earmarked
183:11

earn 203:22

earned 182:16
200:23

earning 201:1

earnings 61:19
203:24

easily 108:25
109:4,6 208:15

209:1

east 1:18 5:13

easy 225:25

economic
103:19 151:24
166:6 218:22

edge 17:15

editor 68:6

educated
108:17 109:8

education 13:9
62:18 206:21

educational
12:24

edwards 2:18
6:5,5

effect 62:6
68:22 201:5

effectiveness
87:12

effects 123:19

efficient 210:22

effort 234:10
238:10

eight 232:16

either 11:1
22:13 36:25
41:13 46:14
67:15 77:21
101:11 123:1
148:21 149:9
196:22 208:25
209:17

**[electronic - exactly]** <span style="float:right">Page 23</span>

electronic
  100:19
electronically
  101:7
element   207:10
elements   135:3
elevated   154:1
eligible   14:13
  16:11
embedded
  20:14
employ   17:14
  24:14 57:13
employed   15:7
  16:5,16 38:2
  38:10,19 63:25
employee
  251:14,15
employer   32:1
employing
  44:20
employment
  15:3 31:8
  36:21 37:25
  38:15,15
employments
  36:5
encompassed
  123:1
encompasses
  10:19
encountered
  36:13 223:10

endeavor
  228:23
ended   72:4
energy   15:15
  16:9
engaged   40:7
engagements
  75:2
engineer   19:14
engineering
  148:24 235:15
enhanced   50:9
enjoyed   37:4,6
enrolled   189:3
ensure   192:5
  234:10 238:10
enter   29:1
enters   27:5
entire   31:19
  45:24 50:23
  51:4 100:3
  105:22 128:24
  132:8,25
  192:15 218:4
entirety   66:15
entities   172:1
entitle   163:22
entitled   78:10
  131:3 135:25
  161:13 198:19
  198:21 202:3
  216:11
entity   89:19,23
  168:15 210:7

entrepreneur
  36:11 37:8
  38:6
environment
  35:15 151:16
  179:10
equal   171:15
equation   27:6
  29:1
equities   178:7
equity   33:25
  34:1 169:7
equivalency
  150:4
equivalent
  150:24,25
  151:3,4 154:8
  154:9 171:17
  172:25 173:2
  176:4 195:13
  196:2 197:1
era   13:14
erin   2:18 6:5
erin.edwards
  2:20
errata   252:1
erroneous
  244:19
error   107:6
  108:15 109:23
  111:1 113:9
  209:7 238:2,12
  238:14 241:4
  242:22 244:14

especially
  123:15 169:9
  179:12
essence   229:14
  241:6
essentially
  110:3 196:19
  226:14 232:23
  238:21
established
  118:3 139:3
et   103:20
ethically
  125:14
evaluate   47:1
evaluating
  143:21
everybody
  31:22 32:2
  49:23 106:23
  107:10 109:22
  109:23 112:3
  114:14,14
  229:20 241:18
everybody's
  242:15 249:7
evidence   127:9
evident   111:24
  129:22 209:23
exact   65:19
  186:8 209:7
exactly   11:21
  20:10 77:16
  103:1 123:7

**[exactly - expert]**

182:5 220:16 224:22 227:3
**exam** 13:16
**examination** 3:14
**examine** 10:10
**examined** 6:20 47:5
**example** 33:4 34:2 59:25 100:2 102:3 128:23 132:5,6 135:4,19 140:3 154:19,20 161:19 172:14 200:20 224:17 227:14,16 229:23 234:21 234:25
**examples** 81:9 133:25 134:3 146:4
**exams** 13:17,22 16:13,15,17,22 18:10 141:7
**excel** 97:23 98:3 208:12 209:22
**exception** 33:2
**exceptions** 123:22
**excess** 44:25 177:11

**excited** 70:20
**exclude** 65:6 233:22 234:2
**excluded** 65:2 234:5,11 239:20 245:10
**excluding** 214:24
**exclusively** 84:18
**excuse** 127:21 148:4 181:20
**executive** 218:13
**exercise** 105:14 197:12 208:7 213:23 222:21 226:19 230:19 247:25 249:8
**exhausted** 204:5
**exhibit** 4:2,4,6 4:7,9,11,13,15 4:17,19 22:8 29:18 51:24 52:1,2,6 57:25 66:4,4,5,7 73:25 74:3 93:2 99:4,5 127:25 143:13 143:14 144:21 144:25 145:1 146:21,22 155:25 156:13

159:7,8 162:13 169:12,15 204:22 216:4,6 216:8,9
**exhibited** 30:17
**exhibits** 4:22 66:9 159:3 162:14
**exist** 87:18 222:20
**existed** 134:3
**existing** 20:4 75:22 223:19
**expand** 26:8 75:19 82:16
**expect** 177:5
**expectancies** 64:5
**expectancy** 4:20 64:11 215:21 216:13 217:8,15 218:10,15 219:6 220:9,14 222:13 223:23
**expectations** 44:23 53:11,14 53:19 58:21 59:6 63:1 71:14 126:21
**expected** 56:22 56:24 59:11 62:15 217:19 217:21

**expense** 184:12
**expenses** 124:15
**expensive** 186:12
**experience** 14:6 18:25 19:3 20:18 21:6 22:13,16,21,23 22:24 23:21 27:19,21 28:12 30:10,15 53:20 58:10,22 59:7 61:9 62:18,24 76:1,3 120:5 121:18,22 122:4,7,18 124:8,13,21 125:5,8,15 139:5 142:1 192:24 206:21 213:6,12 215:7 215:11 220:25 222:20
**experiences** 192:21
**expert** 4:9 7:3 11:6 14:14 39:1,6 40:3,13 41:5,10 42:23 43:6 46:1,9,22 47:1 48:8,13 48:14,23 52:11 52:17 55:18

**[expert - fairly]** Page 25

56:4 57:12 62:5 65:22,24 66:18 67:5 75:1,10 99:7 99:19 102:16 122:8 146:24 179:7,19 205:5 209:21

**expert's** 85:22

**expertise** 10:15 17:14 26:2 47:22 102:15 116:11 144:16 188:25 192:17 205:8 206:2 213:6 215:7 216:23 226:18 226:22,23 227:25 232:19 243:12

**experts** 67:13 205:2,3,6,9,14 205:17 206:16 209:18

**expires** 251:25 252:25

**explain** 26:8

**explained** 30:2 116:21,22 152:23

**explanation** 27:10 89:12 113:9 241:12 244:24

**explanations** 88:18 241:7

**explicit** 189:18 190:7

**expressed** 149:24 224:2

**expressing** 166:11

**extension** 15:8

**extensive** 160:12

**extent** 13:9 84:15 86:15 91:21 94:9 117:24 125:5 130:6 133:24 136:13 146:16 164:18 187:15 191:6 207:2

**external** 68:4

**extrapolate** 118:18 230:5

**extrapolated** 229:11,17,24

**eye** 17:23

**f**

**f** 4:13 146:21 146:22

**face** 30:16,18 148:23

**faced** 166:18

**faces** 235:14

**facing** 19:19

**fact** 18:9 49:15 49:17 72:13 87:17 90:25 97:10 103:8,23 104:24 111:9 114:6 125:18 128:20 129:13 132:11 138:5 138:11 142:1 150:17 153:16 162:12 163:18 163:20 164:7 168:7,25 176:25 187:22 189:2,7 191:2 192:9 194:17 195:2 199:13 201:8 215:14 244:17

**factor** 21:17 55:9 56:20 61:19 139:4 155:13 156:2 156:14 158:3 161:6,15 162:1 162:20,21 163:3,6,13 180:19 186:10 199:19 200:15 215:20

**factored** 90:15 186:23 187:7 199:19,21

200:17

**factors** 22:11 22:22 23:3,5,8 25:22 28:2,25 31:16 33:6 44:25 53:23 55:8 60:19 61:3,8 96:6 115:22 158:8 161:12,25 162:7,18,24 163:3 196:6 218:22 221:6

**facts** 187:2,11 204:25

**failed** 126:21

**failure** 39:20

**fair** 8:16 21:19 21:21 31:7,8 33:8 61:15 66:25 95:17 100:7 106:11 115:18 118:25 139:19 166:16 172:5 193:23 207:19 209:15 211:3,8 215:21 220:8 230:6 235:16 236:9 241:5 242:23 244:15 246:24

**fairly** 37:20 65:16 198:12 213:13,18

**[fairly - following]**

233:24

**fall** 11:13 25:24 34:3 77:8 118:10 148:22 181:2 226:11

**falling** 183:18

**falls** 183:17

**familiar** 7:10 18:4 21:24 57:25 65:4 216:18 233:16 246:19

**family** 26:23 27:2 32:23 234:3

**famous** 70:6

**far** 20:10 39:25 105:7 125:22 142:14 230:14

**faster** 121:4

**faulty** 50:12

**favor** 114:10

**favorable** 29:3 31:5 61:25 62:1

**february** 16:24

**federal** 151:15 151:24 152:6 166:5,17 181:20 182:2 183:3

**fee** 36:22,24,25 36:25 37:14,22 46:5,7 74:24

**feel** 42:18 69:8 82:25 230:11 230:11

**fees** 87:5

**feet** 49:22

**fellow** 13:12,15 13:24

**fellowship** 10:16 14:24

**felt** 43:23 153:15 182:8

**female** 23:11 101:11 103:8 127:10 160:10

**females** 32:4 160:6

**fiduciary** 75:20 76:10

**field** 205:2,3,9 205:14,18

**fields** 117:17 117:20,21 143:25

**figure** 11:12 19:15 122:19 213:18

**figured** 70:12 74:1 143:24

**figuring** 16:3 71:14 206:5

**file** 246:20

**filed** 65:11,15 84:3 232:2

**files** 208:12

**filing** 84:7

**filled** 241:9

**filling** 241:10

**finance** 235:13

**finances** 148:22 149:9

**financial** 12:1 27:5 78:6 140:25 141:19 148:5 175:14 176:10 185:16 185:21 193:1 195:19

**financially** 175:17 251:16

**find** 53:3 80:4,7 104:4,6 128:8 146:12 163:10 243:15

**finding** 139:12 218:25

**findings** 108:5 114:23 217:25

**finish** 8:24 51:9

**finished** 19:24 218:18

**finishing** 16:7

**firms** 52:14

**first** 6:19 8:25 16:4 17:12 20:19 39:5,7 40:10 49:4 69:23 77:24

131:11 140:1,5 154:21 155:9,9 157:16

**fit** 37:13

**five** 13:17 16:17 18:9,21 69:9 89:1 95:20 97:2,11 97:16 98:5 122:18,22,24 123:4 134:4 152:1 155:3 165:9 167:4,14 167:24 171:16 179:13 195:9 195:10,21 204:3,7 225:20 231:16 239:13 242:14

**flag** 27:9

**flippant** 101:23

**flipped** 175:5

**floor** 2:9

**flow** 212:6

**focus** 154:20

**focused** 74:23 75:4

**foley** 1:18 5:12 251:9

**folks** 226:25

**follow** 200:20

**following** 65:24 88:19 116:23 146:4 190:5

**[following - free]**                                    Page 27

| | | | |
|---|---|---|---|
| 202:25 244:11 | 89:8,11 90:12 | 211:21 212:14 | **found** 37:8 |
| **follows** 6:20 | 90:17 91:3,20 | 213:9 219:7 | 102:12 112:4 |
| **foot** 75:23 | 92:4,15,22 | 228:2 233:7 | 135:20 146:5 |
| **footnote** 128:2 | 94:19 95:7,23 | 234:13 236:11 | 165:2 209:7 |
| 128:4,11 | 96:8 97:25 | 237:1,12 238:5 | 217:6 |
| 132:17 134:17 | 98:10 99:25 | 239:15,22 | **foundation** |
| 136:8 243:14 | 102:20 103:25 | 242:24 245:22 | 132:21 141:11 |
| **forecast** 59:8 | 104:10,13 | **format** 58:1 | 142:10 170:7 |
| 59:10 | 105:4 106:15 | 100:19 | 172:9 175:25 |
| **forensic** 130:7 | 107:2 108:12 | **former** 82:4 | 186:1 236:12 |
| 130:7 | 110:1 111:4,13 | **forming** 61:12 | 238:6 245:23 |
| **forever** 155:21 | 112:9 113:4 | 93:13 95:14 | **foundational** |
| **forget** 173:6 | 114:3 115:1,11 | 99:20 204:24 | 206:9 212:22 |
| 229:23 | 116:3,7 117:7 | **formula** 20:17 | **founded** 38:8 |
| **forgive** 121:11 | 118:6 119:1 | 43:21 | **four** 9:21 66:19 |
| **form** 24:3 25:5 | 121:17 122:14 | **formulas** | 67:4,14 73:25 |
| 25:25 27:12,23 | 123:13 124:2 | 208:11,12 | 74:5 76:17 |
| 28:14 29:12 | 125:20 128:21 | **formulate** | 161:11,17 |
| 30:13 31:17 | 129:17 130:2 | 145:13 | 162:18 179:13 |
| 32:9,25 33:10 | 131:16 132:20 | **formulating** | 197:8 233:5,13 |
| 33:19 34:7,15 | 133:11 136:21 | 93:17 98:21 | **frame** 231:10 |
| 35:4,12 42:6 | 137:5,13,22 | 101:19 117:22 | **frames** 98:9 |
| 44:11 46:17 | 138:25 139:7 | 119:11 130:13 | **framework** |
| 47:11,20 48:1 | 139:25 140:21 | 133:23 146:15 | 96:23 97:8 |
| 50:19 53:6,25 | 141:10 143:2 | 147:9 149:19 | **frankly** 228:24 |
| 54:10,22 55:4 | 152:13 155:6 | 160:19 179:7,7 | **fraud** 41:14 |
| 55:11,21 56:1 | 157:7 164:17 | **forth** 144:15 | 47:19 148:6,24 |
| 56:8 57:6,15 | 167:16 168:18 | **forum** 68:7 | 235:15 |
| 57:21 60:2,9 | 169:4 170:6,18 | 79:6,16,18 | **fraudulently** |
| 61:14,21 63:14 | 171:8,11 172:8 | 82:3,20 | 192:5 |
| 67:25 76:6 | 172:23 173:16 | **forward** 7:7 | **fred** 151:23 |
| 78:14 84:21 | 174:1 186:17 | 45:6,18 75:23 | **free** 166:25 |
| 85:13,25 86:13 | 193:24 196:12 | 122:20,25 | 167:6 176:13 |
| 87:23 88:18 | 197:7 200:9 | 132:13 233:6 | 176:17 177:1 |

**[free - go]**

182:9,23 183:24 189:8 196:6 197:23 209:8

**french** 48:23

**frequency** 238:8

**frequently** 205:13,17 238:3

**front** 42:12,12 74:10 145:9 147:1 159:13 184:5 196:3,21 197:4 213:18

**full** 9:10 71:8 154:7

**fully** 170:10

**function** 12:4 208:5

**fund** 186:20 204:3,5

**funds** 30:11 33:15 167:21 168:16 170:13 177:5

**further** 89:12 210:14 249:21 251:8,13

**future** 45:7,12 45:14,18 46:16 51:17 53:19 58:22 59:6 62:14 77:3

124:8 172:4 185:25

**g**

**g** 4:15 155:25 156:13 159:4,7 159:8 162:13

**gains** 34:22,23

**game** 8:8

**gap** 218:19

**gears** 83:12

**general** 52:21 62:14,23 63:24 64:5,7 90:18 91:10,22 92:1 92:6 119:14,18 119:20 120:10 120:12 121:5 123:11 140:22 141:5 142:13 142:15,17 151:16 173:18 221:9,11,17 222:5 224:1,10 225:1 228:14

**generalization** 175:25

**generally** 7:10 15:3 23:21 30:17 44:5 61:11 63:25 90:25 123:21 177:21 192:11 193:19 200:2

219:23 220:5 247:14

**generations** 77:18

**gentleman** 36:11 79:7

**georgia** 2:19

**gesture** 8:22

**getting** 17:2,4,6 17:21 167:23 175:18 176:4,5 176:20 183:8,9 183:10 196:17 196:18 200:14 245:9

**gina** 154:21 155:20 161:19 163:2,23,25 164:6 172:14 172:16,19 173:8 174:13 199:5 224:17

**gina's** 158:21

**give** 7:13 8:9 9:6 40:22 46:19 52:8 75:25 81:9 91:4 94:14 97:20 117:11 125:21 140:3 148:16 151:1 174:17 182:20 184:5 200:6,20 227:14 242:19

**given** 6:12 83:19 97:9 102:1,2,9 112:19 116:2 153:15 161:4 173:13,21 174:9 183:1 196:15 197:4 203:25 205:25 209:17 227:8 233:9 243:16

**gives** 18:6 208:13

**giving** 7:5

**glean** 159:19

**gleaned** 212:25

**global** 106:5

**go** 18:25 22:11 22:22 25:20 42:21 43:18 50:15 55:13 62:2 64:25 66:2 80:4 93:1 98:15 100:9 104:16 118:8 121:16 127:24 153:2 154:14 158:8 160:23 161:12 169:5,8 169:8 172:13 174:15,23 175:1 180:22 183:15 185:24 191:15 197:5

**[go - head]**                                                                Page 29

| | | | h |
|---|---|---|---|
| 197:15,15 200:1 204:20 215:17 228:24 230:22 246:4 249:8 | 186:16,17,20 186:22 195:7 195:10,20,24 200:21,22,24 202:7 204:12 205:24 207:14 208:5 210:21 213:20,20 215:3,24 218:2 218:3 219:24 220:5,9,19 222:3 228:21 232:4 234:21 235:22 243:19 249:8 | **graduating** 16:5 36:6 **granted** 87:21 87:24 102:19 **graphs** 169:21 **grasp** 44:2 **grateful** 17:19 **great** 38:24 175:16 212:15 **greater** 110:5 112:20 172:20 **greenwich** 2:9 **group** 22:7 102:25 103:10 105:3,7 113:17 142:16 229:2 | **h** 4:1,17 169:13 169:14,15 216:4 |
| **goes** 25:9 123:10 162:21 187:1 189:15 225:17 | | | **hairs** 145:16 |
| | | | **half** 160:10 239:13 |
| **going** 7:6,13 19:16 20:16 22:7 26:11,14 26:19,22 27:9 29:10,18,25 40:9 45:17,24 51:7 58:25 70:10 77:20,23 78:24 90:24 107:21,22 115:3 121:22 123:3 124:9,10 125:8,9 126:2 126:7 139:10 140:24 141:24 143:8,10,12,12 153:3 157:15 157:20 158:15 158:15 161:19 167:25 176:3,5 176:11 177:5 177:23 179:3 182:20,24 183:13,16,19 183:22 186:15 | | | **hand** 8:22 20:18,18 69:14 69:24 70:8,14 94:2 183:13 251:20 |
| | **good** 6:23,24 31:4,6 37:13 49:14 51:8,14 192:10 242:3 | | **handful** 16:13 16:22 18:2 21:2 123:15 |
| | | **guarantee** 180:7 181:1 | **handle** 108:14 |
| | | **guaranteed** 31:21 32:19 33:3 167:23 170:24 175:10 180:3,24 181:6 181:8 183:23 195:17,22 222:9 | **handles** 191:16 |
| | **gotten** 63:17 72:6 127:6 210:11 | | **hands** 150:8 |
| | **govern** 168:20 | | **hanson** 2:2 5:22 52:16 |
| | **governed** 77:19 | | **happened** 70:8 82:9,23 83:1 |
| | **government** 166:18 175:1 176:12,13 182:1 199:16 200:5 | **guess** 17:21 23:5 73:7 80:15 101:23 183:9 207:11 227:2 228:12 | **happy** 7:23 9:6 |
| | | | **hard** 70:15 176:1 |
| | **gradient** 218:20 | **guessing** 8:8 | **harm** 187:23 211:7,11,15 213:8 |
| | **graduated** 13:2 15:4 | **guest** 81:15,25 | **harms** 148:7 |
| | | | **head** 8:22 14:8 33:2 34:17 42:20 43:14 84:9 112:16 |

[head - huh]                                                      Page 30

223:7
**headed** 75:6
**heading** 177:19
  217:3
**headings** 58:8
**health** 12:20
  24:1,6,9 25:2
  27:2 28:4,9
  29:21 30:25
  31:1,4,6,16,23
  32:23,24 33:8
  54:8 55:9,16
  55:19,22,24
  56:6 58:24
  59:23 64:1
  103:19 118:4
  118:10 119:7
  135:24,25
  137:1 138:23
  140:12 141:1
  141:21 142:25
  148:21 149:9
  220:13 221:5
  226:9 235:13
**healthcare** 1:9
  2:11 6:1 7:2
**healthy** 55:24
  55:25 118:14
  118:20,21,23
**hear** 7:25 160:7
  202:19
**heard** 7:14 8:1
  191:24 192:2
  192:18 222:14

**hearing** 37:10
  249:23
**heart** 26:24
  220:19
**heather** 2:13
  6:2 204:9
  210:20
**heavily** 12:15
  12:18
**held** 15:6 36:5
  77:14 127:22
  165:17
**help** 19:23
  75:21,22 78:5
  87:8,9
**helped** 19:17
**helpful** 221:3
**helping** 11:11
**helt** 3:3 6:13,13
**hereunto**
  251:19
**hey** 47:15
  82:12 123:2
**hi** 210:18,19
**high** 19:22 28:5
  49:8 85:4
  96:25 97:5
  121:9 193:12
  220:20 222:17
**higher** 23:22
  27:21 28:3
  30:15,16 64:5
  64:10 106:12
  106:20 107:21

113:22 124:1
  153:3 154:4
  155:23 166:2
  167:7 168:21
  169:3 170:15
  174:25 176:15
  178:22 184:18
  208:3 217:22
  218:14 220:22
  222:4,18 223:6
  224:6 242:17
**highlighting**
  145:3
**hire** 75:20
  76:18
**hired** 41:10
  71:22 76:11,23
**hispanic**
  160:14,15
**historic** 170:1
**historical** 4:17
  22:23 184:24
**historically**
  169:23 179:12
**history** 26:20
  26:23,24 27:2
  138:23
**hit** 123:6
**hitting** 70:15
**hobbies** 26:15
**hogan** 3:2 6:14
  72:19,23
**hoganlovells....**
  3:5,6

**hold** 178:18,18
  178:24
**holding** 178:20
**holdings** 1:9
**home** 11:25
**honestly** 82:2
  123:15
**hope** 191:10
  220:25
**horizon** 177:22
  183:22
**hot** 69:14,24
  70:3,7,14
**hour** 51:8
  64:14
**hourly** 36:25
**hours** 9:22
  226:1
**hsultanian** 2:15
**huge** 237:21
**huh** 9:20 10:8
  12:12,20 16:4
  16:10 18:22
  30:24 33:24
  37:24 39:23
  44:1 50:14
  52:17 62:5
  64:12 68:25
  78:2 79:3
  82:22 83:19,24
  87:11 88:12
  100:24 101:13
  145:19 146:20
  159:1 160:12

**[huh - increments]**                                          Page 31

162:18 178:25 183:7 192:24 207:13 209:5 224:5
**hunch** 108:8
**hundred** 14:21
**hundreds** 129:1
**hypothesis** 130:24 131:24 132:1
**hypothetical** 246:4
**hypothetically** 244:7 249:18
**hypotheticals** 175:4

**i**

**idea** 49:14 146:9 238:7
**identification** 51:25 52:2 66:3,5 73:24 74:3 99:3,5 144:24 145:1 146:22 159:6,8 169:11,15 216:9
**identified** 86:16 111:10 162:19,19 212:10 213:4 213:15 214:17

**identify** 96:16 97:4 148:4 220:19 226:8 246:23
**identifying** 116:24
**identity** 47:18 148:5,6,7 186:25 188:11 192:20 240:5
**ignore** 33:3
**illinois** 2:14
**illustrations** 19:15
**immortal** 155:20
**impact** 33:8 139:23 224:23 237:22,24
**impacted** 232:16
**impair** 9:14
**impaired** 175:17
**impairments** 229:4
**implement** 24:15
**implemented** 118:2
**implementing** 86:20
**implication** 142:16

**implications** 193:15
**implicitly** 56:21
**important** 184:15
**improperly** 39:17
**improve** 62:15 123:12
**improved** 63:1 63:17 225:11
**improvement** 121:2 122:23
**improves** 123:10
**improving** 121:4
**inaccurate** 74:19 113:3 114:2 170:5 237:5
**inappropriate** 41:12,19 48:19 152:22
**incident** 26:17
**include** 40:6 43:1 53:9 78:16 124:16 124:17 140:24
**included** 44:22 112:12 133:2,4 133:6,8,10,12 133:13

**includes** 92:6 92:10 148:19 164:22
**including** 62:19 63:1 115:12
**income** 4:19 12:14 27:15,22 28:13,18 61:18 62:6 69:18 71:12,17,21,25 72:1,2,5 201:9 216:12 217:7,9 217:15,18 218:10,17
**incomes** 218:14
**inconsistent** 203:14
**incorporate** 81:7 108:25 184:17
**incorporated** 51:15 162:6 237:16 238:24
**incorrect** 148:11 149:2 155:19 237:11
**increase** 107:1 185:3
**increased** 59:3 59:21,24 63:10 71:10 123:21 148:23 235:15
**increments** 155:4

**independent**
  87:11 97:18
  207:17
**independently**
  102:10 144:6
  228:25
**index** 4:17
**indicate** 162:3
  227:3
**indicated** 106:3
  136:3 137:18
  142:22 144:1,2
  189:22 190:11
  229:3,4
**indicative**
  26:18 136:17
  136:19 151:16
  182:23 184:1
**indicator** 140:7
**indirect** 117:17
**indirectly**
  117:9,12,16,22
  147:13 251:17
**individual** 25:3
  29:18,22 36:21
  38:16 44:9
  45:23 63:25
  77:23 106:3
  118:14,15
  138:9 170:21
  171:3,23
  174:13,23
  176:8 193:15
  226:15 240:2

246:15 247:5
**individual's**
  54:8 56:5
  148:8
**individualized**
  248:13
**individually**
  248:2
**individuals**
  24:2 29:2 30:5
  30:6,11 59:19
  84:2 91:1,13
  102:24,25
  110:10,23
  115:7,8,9,20,23
  116:13 117:3
  118:20,21
  136:20 138:6
  141:23 142:6
  142:25 144:4,5
  164:5,11,16,19
  164:23,25
  165:6 172:1
  189:3 191:2
  192:5,12 234:6
  234:11 240:13
  247:13,20
**industry** 13:20
  14:1,2,12,17
  22:18 23:15
  31:10,19 36:23
  60:16 61:10
  62:20,25 64:4
  64:7 82:9

119:23 120:4,7
  120:15,16
  205:10 219:15
  221:25 222:7
**inequality**
  218:22
**inference** 236:9
**inflation**
  186:10
**influence** 9:13
  26:16
**information**
  83:21 88:9
  90:7,10 93:12
  95:2,13 96:13
  96:19 98:20
  100:25 101:2,7
  102:11 108:24
  117:3,13 119:8
  136:8 137:3
  138:23 140:11
  142:19 145:18
  148:3,19,21
  149:8 165:1
  205:6 206:10
  220:22 226:4
  226:13 227:25
  229:6,9 230:3
  230:4 234:18
  235:14 236:23
  236:24 237:4,7
  245:19 246:1
  247:20 248:18

**informed**
  108:17 109:8
  116:23 146:18
**inherent** 169:7
**inject** 121:24
  125:12
**injecting** 122:1
**injection** 127:7
**injury** 211:7,11
  211:15
**input** 125:3
  143:9 208:6
**inputs** 109:6
  143:6,7
**inserts** 132:16
**inside** 72:7
**instance** 24:7
  28:20 42:17
  43:6 54:16
  56:23 59:1
  68:18 79:12
  134:11 157:17
  222:1 223:4
  224:17
**instances** 82:24
  234:16
**institutions**
  185:17,22
**instruct** 86:1
  126:5
**instructed**
  109:2 184:18
  209:2 223:4

**[instructions - investing]** Page 33

| | | | |
|---|---|---|---|
| **instructions** | 65:17 67:1,2,6 | 221:13 224:5 | **interim** 245:14 |
| 7:6,13 98:6 | 68:7,23 69:12 | **insured's** 59:4 | **internal** 152:6 |
| **instruments** | 69:17,20,22 | **insureds** 58:22 | 182:2 |
| 33:22 34:1 | 70:16 74:24 | 59:8 220:23 | **internet** 247:15 |
| **insurance** | 75:4 76:4,11 | **insurers** 122:10 | 248:2 |
| 10:18,21,22 | 76:19 79:5,6 | **intended** 69:4 | **interns** 18:3 |
| 11:1,8,9,14,16 | 79:10,14,16,18 | 71:20 120:6 | **internship** 15:9 |
| 11:18,19,20,22 | 82:3,20 83:9,9 | 121:21 150:13 | 15:13 |
| 11:23,23 12:7 | 91:11 119:22 | 151:20 | **interpose** 9:2 |
| 12:12,14,16,20 | 120:16,23 | **intention** 73:1 | **interpretation** |
| 17:9,23,24 | 121:3,12 122:9 | **interest** 18:12 | 135:23 144:1 |
| 20:9,13 21:4,9 | 122:11 123:23 | 35:15,24 36:3 | **interview** 16:23 |
| 21:16 25:4,10 | 124:1,5,12,14 | 37:7 50:4 | 17:16 18:14 |
| 25:22 26:10,11 | 124:20 125:1,2 | 76:15,25 77:13 | 81:5 |
| 27:9,19 28:25 | 125:18 126:11 | 81:4 97:7,13 | **intoxicated** |
| 29:4,9 31:10 | 126:15 127:4 | 151:12,16 | 26:17 |
| 31:12 32:1,17 | 139:4,9,17 | 156:4,20 158:2 | **introduce** |
| 32:22 33:5 | 148:21 149:9 | 158:4 160:5 | 51:24 216:3 |
| 34:21 36:22 | 168:5,11 | 161:7,16 162:2 | **invest** 168:7,8 |
| 37:3,14,15,16 | 178:19 180:2,7 | 162:5,20 | 170:14,22 |
| 37:17,22 40:24 | 180:12,15,18 | 165:25 173:7 | 171:2,3,7 |
| 41:2,8,18,21,23 | 181:8 205:10 | 174:17,25 | 177:9,12 178:6 |
| 42:5,15 43:8 | 206:22,25 | 176:24 179:25 | 183:21,22 |
| 43:12,25 44:6 | 219:15 220:18 | 180:2,6,20,24 | 198:10 199:16 |
| 44:10,15,20,21 | 221:25 222:7,9 | 181:2,6,7 | 200:13 201:16 |
| 44:24 45:2,19 | 235:13 246:22 | 184:19 199:8 | 203:6,22 |
| 46:5,7 49:20 | 247:4 | 203:23 208:9 | **invested** 33:14 |
| 49:20,25 50:2 | **insure** 27:6 | 208:23 213:21 | 169:1,2 170:10 |
| 53:1,5,5,9 | **insured** 50:7 | **interested** | 182:16,18 |
| 56:19 57:4,20 | 58:24 59:1 | 26:11,14,20,23 | 199:3,6 |
| 58:4 59:5 60:6 | 63:23 64:4,9 | 36:10 54:18 | **investigate** |
| 60:10,16 61:10 | 64:10 90:22 | 70:17 251:17 | 111:25 223:5 |
| 61:12 62:19,22 | 91:11,23 120:7 | **interests** 76:14 | **investing** 77:14 |
| 62:24 64:3 | 120:9,14 | | 167:20 177:23 |

178:3,11 200:4
**investment**
  78:6 168:17
  169:8 171:20
  177:22 178:5
  178:22 199:22
**investments**
  34:6,14 35:10
  168:23
**involve** 11:8
  41:1,7,17 42:5
  42:15 67:6
**involved** 11:6
  11:10 12:15,18
  12:21 26:5
  42:3 43:12,25
  179:25 207:11
  239:25
**involving** 40:24
  57:4 213:11
**irrespective**
  103:18
**irs** 151:15
**issue** 27:10
  31:21 32:19
  33:3 194:21
  223:16 243:11
**issued** 54:3
  67:2
**issues** 24:21
  32:24 107:11
**issuing** 41:20
**it'll** 154:8

**j**

**j** 2:8
**jama** 216:15
**january** 13:8
  68:17 69:7
**jaquet** 1:25
  5:16 251:3,23
**jersey** 1:2 5:9
**job** 15:11,16
  17:12 50:3
  75:16 192:10
**jobs** 15:6
**joe** 79:8
**john** 3:8 5:14
  234:23 235:8
  235:24 236:24
  237:9
**join** 14:13
  36:15
**joined** 36:17
**jointly** 74:17
**jonathan** 4:9
  99:8
**joseph** 79:8
**journal** 80:12
  81:11 216:19
  216:20,22
**judge** 42:13
**judges** 234:2
**judgment** 45:9
  116:15 142:22
  206:22,25
  207:2,6,11,16

245:5
**judgments**
  207:17
**july** 1:20 5:4
  68:19 236:2
  251:10,21
**june** 68:19,19
  69:7
**justice** 105:17
**justify** 123:25
**juveniles** 110:7

**k**

**k** 43:16 117:21
**kansas** 2:4 4:4
  52:6,25 53:4,8
  53:17,18 54:16
  58:4 61:6
**katt** 36:11
  38:17,18 39:8
**keep** 70:21
  115:15 247:8
**keeping** 68:23
**keeps** 157:20
**kind** 22:4,15
  25:7 29:17
  32:13 43:20
  44:2 48:22
  49:20 60:20
  72:7,7 77:22
  100:4 145:16
  155:12 158:1
  176:12 205:19
  212:6 218:11

224:12 228:10
  228:15 230:19
  237:20 238:2
  238:11 247:25
**knew** 16:18
**know** 8:5,6,14
  8:19 9:6 13:7
  13:22 14:14
  15:24 17:16,17
  17:17 24:15
  25:15 26:16
  27:20,25 29:9
  29:22 30:4,18
  30:19 32:11
  33:14,17 34:11
  34:16,25 35:23
  36:1,2 40:25
  42:8,11 43:22
  45:9,20 47:15
  56:17 57:7
  62:20,24 65:10
  65:19 68:5,7
  70:10 71:5,13
  73:5 74:25
  77:3,8 79:23
  87:17 89:19,24
  94:12,17,20,21
  94:22 99:12
  101:5 105:15
  105:15 106:14
  107:7 109:15
  109:16 110:16
  111:8,9,17
  118:19 122:15

**[know - level]** Page 35

123:5 126:18
130:6 135:18
136:12 138:1
138:10,14
141:18,19,23
142:19 149:7
150:14,17
152:4,18
155:19 157:8
163:8,25 164:4
164:4,6,22
170:1 171:15
177:11 178:8
178:25 179:9
180:15 185:13
186:11,19,19
186:21 191:10
191:21,22
192:18 193:6,7
195:18 196:16
199:20 201:8,9
206:6,11,14,15
208:4 210:4,8
210:8,22
212:14 213:18
214:22 220:16
220:17 223:7
223:14 226:12
226:12 228:9
228:10,24
230:7,7,15
231:25 232:14
236:14 237:3
239:24 240:3,3

240:4,19
243:13 245:24
246:1,10 249:9
**knowing** 140:2
**knowledge**
7:17 8:10,15
26:3 62:19
74:20 76:1,4
89:22 109:11
191:11 216:17
**known** 56:20
167:2 196:1
197:21 211:23
213:15
**knows** 183:16
183:18

**l**

**labcorp** 3:6
6:15 100:21
107:9 129:4
**labeled** 4:4
74:6
**laboratories**
1:10
**laboratory** 1:8
**lack** 80:16
141:10 212:11
**lag** 122:25
**land** 178:9
**landmark**
48:22 70:12
**language** 52:25
233:25

**lardner** 1:18
5:12 251:9
**largely** 84:18
**larger** 29:2,15
30:21 32:11
61:24 105:7
**lasts** 198:5
**late** 13:6
**law** 52:14
**lawsuit** 45:8
50:11 54:24
**lawyers** 239:24
**layer** 201:4,6
**layperson**
232:19
**layperson's**
26:3
**lead** 28:6
241:11
**leading** 88:20
**leases** 178:8
**leave** 94:23
**leaving** 21:1
**led** 134:9,9
**lee** 4:9 83:22
84:19 88:3,14
96:12,14,15,19
97:10 98:16
99:8 102:9
108:1,3,4
110:13,17,25
111:10 112:4
112:23 116:2
117:9 118:1

119:6 129:19
130:1 132:16
134:16 137:9
143:24 144:2,8
146:3,18 164:3
212:25 215:16
231:23 249:6
**lee's** 10:6 84:16
98:21 99:19
112:6 114:23
116:15,19
127:24 128:5
129:10 130:5
133:20 135:1
137:18 145:17
147:13 210:12
227:20 237:15
243:12
**leeway** 125:21
**left** 8:20 36:7
**leg** 18:6
**legal** 5:15
211:20,20
232:1
**legalized** 23:14
**length** 240:19
**letter** 204:25
**level** 19:22
39:22 49:8
53:10 85:4
96:25 97:5
151:12 160:8
184:2 193:12
201:10 222:19

**[level - logistics]**                                                          Page 36

228:13,17
**levels** 24:6,9,25
  118:12 168:21
  180:3 217:15
  223:3 228:11
**lewis** 2:7 5:24
  6:9
**lewisbrisbois...**
  2:10,10
**lieu** 196:22,23
**life** 4:15,19
  10:16,18,22
  11:1,8,14,16,18
  12:7 17:8,23
  17:24 19:25
  20:5,11,11,12
  20:17,22,23
  21:3,9,11 25:3
  25:21 26:10,22
  27:19 31:10
  34:21 37:3,15
  37:16 39:15
  40:24 41:2,21
  42:5,15 43:8
  43:12,25 45:21
  45:22 50:5,6
  50:23 52:25
  53:18,18 54:16
  58:4 60:16
  61:6,10,12
  62:22,24 64:5
  64:11 67:2,2,6
  69:11,17,20,22
  70:15 75:4

76:4,11,19
79:9,10,13,14
79:19 83:9
107:19 119:22
120:16,23
127:2 139:17
140:25 158:13
158:18 159:10
160:5,13 163:9
180:23 205:10
215:20 216:12
217:8,15 218:9
218:15 219:6
219:15 220:9
220:14,18
221:19,23
222:7,13 223:6
223:22 225:9
243:16,17
246:22 247:4
**life's** 53:8
**lifetime** 45:25
  51:4 78:18
**light** 108:24
**liked** 37:11
**likelihood**
  70:10 77:4
  156:20 158:22
  160:10,11
**likely** 60:7 70:4
  105:19 110:10
  111:6 118:14
  118:22 170:23
  185:24 239:16

245:17,18
**likewise** 209:1
**limit** 88:17
**limited** 29:19
  31:21 89:20
  110:19 243:10
**line** 25:1 51:10
  80:10 81:14
  82:1 249:23
  252:5
**lines** 35:17
  148:8 193:9
**link** 130:11
  145:5
**linking** 81:18
**links** 80:24
**list** 40:25 67:21
  68:14 69:4
  78:12 79:3,4
  80:1 93:16
  94:9 145:14
  163:1 166:6
**listed** 66:22
  67:10 72:10
  80:18 83:5
**listing** 235:2
**lists** 117:2
  146:6
**literally** 109:3
  243:19
**litigation** 1:7
  58:3,3
**little** 10:10
  12:23 32:2

34:19 42:1
70:18 80:10
82:15 98:2
157:12,19
183:5 197:24
210:24 211:17
215:18 217:12
221:8 229:5
231:9 242:12
243:21
**live** 36:17
  111:17 118:14
  118:23 243:19
**lived** 109:17
  132:9 154:7
  155:21
**lives** 22:25
**living** 12:3,5,17
  246:16
**llc** 1:9 6:6,7
  252:1
**llp** 1:18 2:13
  3:2 6:14 251:9
**loaded** 124:14
**loan** 174:16,17
**located** 1:18
  5:12
**logic** 109:14
  111:19
**logical** 113:8
  194:4 209:12
  212:6
**logistics** 194:13

Veritext Legal Solutions

800-227-8440                                                                     973-410-4040

**[long - making]** Page 37

**long** 9:7,20 11:8,20,21,23 12:6,9,10,17 14:11,25 23:16 37:16,24 43:13 60:19 70:22 75:5 76:12,20 84:5 104:4,6 182:4 210:23 244:23

**longer** 19:25 37:9 79:8 118:15,23 208:18 218:15

**longevity** 71:13 218:17,19,21

**look** 30:4 32:20 50:22 51:1,2,2 53:14 64:7 76:14 120:19 122:19,21 123:2,4 136:8 155:9 163:2 170:1 181:19 181:21 189:25 190:15,18 224:11 225:10 226:23 235:1 235:10,19

**looked** 38:6 45:21,21,23 98:4 152:1,3,4 152:5,8 181:25 182:1 183:2

**looking** 23:6 45:18 64:2,6 71:2,5,11 75:3 129:1 138:1 139:11 170:20 171:10,12 181:19 193:5,6 217:11 224:18

**looks** 22:24 23:1 75:3 192:8 217:1

**losses** 34:23

**lost** 224:13 239:4

**lot** 19:17,21 60:19 141:17 191:16 223:22

**lots** 119:20 168:19 177:18 180:22 221:15

**louis** 151:23,23

**lovells** 3:2 6:14

**low** 35:14 168:3 179:12 179:13,14 180:1 195:21 196:3 203:19 224:14

**lower** 27:22 29:25 30:12 35:18 63:17,20 64:10 107:17 114:25 115:22 115:22 120:23

120:24 128:9 129:14 132:18 133:16 143:10 166:3 184:18 217:8 219:5,6 220:14 221:16 237:18

**lucky** 222:15 223:10

**lump** 113:20 167:12 186:16 196:18 213:18

**lumped** 113:23

**m**

**m** 1:25 6:21 43:16 210:16 251:3,23

**made** 16:11,23 17:8 19:9 44:9 48:11 49:15 51:5,21 65:6,8 70:4 71:3 84:8 87:21 88:24 107:12 108:17 109:7 110:17 119:14 132:1 152:8 157:3 180:8 181:22 201:5 206:12 206:16 207:18 209:6 238:23 248:1

**magazine** 81:20

**mah** 1:12

**mail** 191:16

**mainstream** 81:10

**maintain** 247:12

**make** 14:18 19:23 22:6 37:1 47:18 48:17,21 49:1 63:21 70:5 97:1 109:9 113:18 115:2 116:15 119:25 153:13 160:7 167:19 173:17 177:12 185:17 189:5,6,17 190:7 195:12 195:20 200:1,7 209:24 223:24 224:12 228:10 228:18,21 232:15 234:10 238:10 239:3

**makes** 129:25 160:12 203:15 220:2 224:3 242:12

**making** 19:7 22:10,22 27:7 41:7 111:22

126:25 127:7
129:7,10,13
138:20 180:16
247:8
**male** 23:11
101:10 103:1
119:15 127:8
160:11 224:21
229:20,22
**males** 32:4
**malls** 178:11
**manner** 33:16
108:18
**marathon**
25:14
**march** 166:5,13
**margin** 121:21
122:5
**marijuana**
23:14
**mark** 51:25
66:3 73:24
74:1 86:2 99:2
135:17 144:24
146:20 159:5
169:10
**marked** 52:2,6
57:24 66:5
74:3 93:2 99:5
145:1 146:22
159:8 169:15
216:9
**market** 12:7,8
12:9 79:14

177:18,20
178:2 180:10
180:14 183:18
**marketing**
19:10 74:16
**marks** 43:16
**master** 246:20
**master's** 12:25
13:6 16:6
**matching** 124:5
**material** 83:19
84:13 205:12
**materials**
227:20
**math** 16:21
18:12 78:4
151:6 208:4
**mathematical**
150:4
**mathematically**
150:25 156:14
**mathematics**
13:1,4
**matter** 5:6,7
62:14 70:8
97:12 99:19
102:15 184:19
205:7 208:17
209:18 226:1
239:18 245:15
**matters** 115:17
182:21
**maturity** 152:2
166:4,12 184:1

**maximize**
178:15
**maximizing**
178:17
**mca** 1:12
**md** 1:12 5:10
**mean** 14:1 26:1
31:18 35:21
37:15 38:20
58:8 68:6
74:16,23 76:23
77:13 78:21
79:5 92:6 95:6
98:1 100:1
120:3 122:16
123:8 125:3,14
125:21 127:11
157:10 160:4
162:24 163:8
164:25 167:9
168:19 169:18
177:15 179:12
180:15 183:9
186:14 188:15
190:19 205:24
207:1,8 208:1
211:23 212:21
223:21 237:2
243:16
**meaning** 136:5
**means** 64:10
77:14 122:1
137:1 212:2
235:14

**meant** 38:22
63:19 178:15
232:13 233:10
**measure**
105:17,23
225:15
**measures** 192:4
**mechanics**
153:21
**mechanism**
245:8
**media** 5:4
64:18,23
127:16,20
165:14,20
231:1,6 250:3
**median** 105:12
105:17,20,25
**mediation**
42:12
**medical** 1:6 5:7
89:21,24 91:14
91:16 92:11,20
121:7 139:13
139:21,22
140:5 141:7,7
142:8 148:6
216:20,22
218:23 252:2
**medications**
9:12
**medicine** 62:16
**meek** 4:4 52:6
58:3 120:19

**[meet - mix]**                                                                Page 39

| | | | |
|---|---|---|---|
| **meet** 13:21 | **messed** 70:13 | 238:15 | 86:23,24 96:17 |
| **meetings** 9:18 | **metal** 15:19,20 | **mis** 112:4 | 103:24 143:16 |
| 37:10 | **methodology** | **misclassified** | 144:8,14 |
| **melted** 15:24 | 104:12 154:15 | 114:6 | 145:22 147:15 |
| **melting** 15:19 | **michigan** 36:16 | **miscoded** | 149:12 155:22 |
| **member** 14:6 | **microphone** | 110:11,13 | 161:14,23 |
| 92:1 106:9 | 72:21 | **misrepresent...** | 164:8,12 167:3 |
| 108:19 140:13 | **mid** 182:3 | 41:14 | 171:14,15 |
| 154:17 162:23 | 241:21 244:13 | **misrepresenti...** | 175:11 176:21 |
| 198:8 228:19 | **middle** 153:2 | 63:15 | 183:12,15 |
| **members** | 195:9 240:22 | **missing** 25:8 | 184:8,12 |
| 100:22 101:9 | **midpoint** | 69:5 105:6,6 | 185:18,18 |
| 102:4,8,12 | 122:21 123:6 | 105:15 106:4 | 186:18,25 |
| 116:25 129:5 | **miller** 52:15 | 113:17,19,22 | 187:9,14 |
| 141:4 148:3,18 | **million** 27:8 | 115:4,8 116:17 | 188:14 189:4 |
| 148:23 153:9 | 29:24 228:4 | 229:8,16 230:9 | 189:23,24 |
| 153:10 194:7 | 247:24 248:3 | 230:13 | 190:12,13 |
| 211:7,12 228:4 | **milwaukee** | **missouri** 2:4 | 191:3 193:13 |
| 232:23 233:4 | 1:19 5:13 | **misstates** 110:2 | 194:8,14,18 |
| 234:3 247:24 | 14:21 251:2,10 | 112:10 115:12 | 195:4 197:5,16 |
| **men** 217:6,9,17 | 251:20 | 139:8 | 197:20 198:1,4 |
| 217:20 | **mind** 48:18 | **misstating** | 199:10,18 |
| **mention** 93:19 | 62:8 | 198:14 199:1 | 200:8,23 |
| **mentioned** | **minds** 17:18 | **mistake** 110:17 | 201:18 203:7 |
| 16:14 23:8 | **mine** 129:20 | **mitigate** 47:6 | 204:4 208:14 |
| 31:14 37:19 | **minimis** 224:25 | 87:10 188:10 | 208:21 209:8,9 |
| 38:25 41:25 | **minimum** 14:8 | 188:21 212:11 | 211:1,6 212:10 |
| 54:15 70:23 | 79:15 | **mitigated** | 213:3,14 214:2 |
| 71:17 76:17 | **minute** 14:1 | 176:21 | 214:16 215:8 |
| 80:9 89:9 | 31:8 165:9 | **mitigating** | 231:15,21 |
| 211:18 233:15 | 204:7 | 83:16 85:6 | 232:6,11,17 |
| 237:19 238:13 | **minutes** 64:15 | **mitigation** 47:1 | 233:5 237:10 |
| **mere** 163:18 | 184:20 208:24 | 47:5 73:19 | **mix** 236:24 |
| | 209:19 226:1 | 85:9 86:18,20 | |

**[mixed - moore]**                                          Page 40

| | | | |
|---|---|---|---|
| **mixed** 49:4 123:14 | **moment** 230:23 233:15 242:19 | 152:16,23,23 153:10,10,14 | 46:17 47:11,20 48:1 50:19 |
| **mixing** 124:4 | **money** 47:16 | 153:14 156:23 | 51:7,11 53:6 |
| **mixture** 48:10 237:4 | 72:6 77:14,19 | 156:23 157:15 | 53:25 54:10,22 |
| **model** 45:3,4 | 92:3 167:11,12 | 157:18 158:25 | 55:4,11,21 |
| 51:15 96:2 | 171:6 172:3,3 | 158:25 159:21 | 56:1,8,12,15 |
| 103:3,16 | 174:11,24,24 | 159:21 171:16 | 57:6,15,21 |
| 108:24 109:5,5 | 175:2,6,20,21 | 173:3 195:21 | 60:2,9,14 |
| 109:21 110:4 | 176:3,7,9,10 | 209:9,10 | 61:14,21 63:14 |
| 114:25 125:3 | 177:10 182:20 | **monthly** 71:6 | 64:13 76:6 |
| 134:23 135:5 | 183:9,10,13,17 | 147:18 149:22 | 78:14 84:21 |
| 139:24 143:1,4 | 183:19 184:5,7 | 149:24 150:5 | 85:13,21 86:10 |
| 143:5,6 152:19 | 195:7 196:3,5 | 150:11 151:25 | 86:13 87:23 |
| 152:24 153:3 | 196:18,21,24 | 152:25 153:20 | 88:21,25 89:5 |
| 153:21 162:16 | 197:4,6 198:9 | 154:12 155:14 | 89:8,14 90:12 |
| 163:23 164:10 | 199:5,7,15,17 | 155:22 161:5 | 90:17 91:3,20 |
| 183:8 184:16 | 200:4,6,21 | 161:23 162:19 | 92:4,15,22 |
| 184:22 196:16 | 201:14,16 | 163:2 166:4 | 94:19 95:7,23 |
| 199:14 200:3,6 | 203:3,5 204:3 | 171:14 182:11 | 96:8 97:25 |
| 201:13,13,14 | **monies** 169:1 | 186:21 195:25 | 98:10 99:25 |
| 203:2,2,4 | **monitor** 87:10 | 196:24 207:9 | 100:9,13 |
| 208:5,6 209:15 | **monitoring** | 207:12,14 | 102:20 103:25 |
| 237:16 239:6 | 48:5 73:22 | **months** 15:10 | 104:10,13 |
| 241:6 242:14 | 188:11 191:18 | 16:8 151:2,7 | 105:4 106:15 |
| 248:17 249:1 | 191:25 192:10 | 155:23 156:18 | 107:2 108:12 |
| **modeling** 19:21 | 193:1,21 | **moore** 2:3,5 | 110:1 111:4,13 |
| 19:22 208:2 | **monitors** 192:7 | 5:21,21 24:3 | 112:9 113:4 |
| **models** 15:18 | **montana** 13:2 | 25:5,25 27:12 | 114:3,17 115:1 |
| 15:23 45:20 | **monte** 39:18 | 27:23 28:14 | 115:11,15,17 |
| **modestly** | **month** 69:9 | 29:12 30:13 | 116:3,7 117:7 |
| 237:18,19 | 147:15,16,19 | 31:17 32:9,25 | 118:6 119:1 |
| **modify** 209:19 | 149:13,14,25 | 33:10,19 34:7 | 121:17 122:14 |
| | 150:5,12,13 | 34:15 35:4,12 | 123:13 124:2 |
| | 152:12,12,16 | 42:6 44:11 | 125:20 126:2,7 |

**[moore - mutual]**                                                    Page 41

| | | | |
|---|---|---|---|
| 126:17 128:21 | 237:1,12 238:5 | 106:12,21 | 224:22 225:11 |
| 129:17 130:2 | 239:15,22 | 107:20,20,21 | 229:1 237:21 |
| 130:14,21,25 | 242:24 245:22 | 118:5,8,12 | 240:14 241:16 |
| 131:4,7,11 | 249:25 | 119:21 120:23 | 249:2,14 |
| 132:3,20 | **morgan** 3:8 | 120:24 121:13 | **motion** 65:4,6 |
| 133:11 136:21 | **morning** 6:23 | 121:14,19,19 | 65:11,15 94:3 |
| 137:5,13,22 | 6:24 | 122:3,12,17,19 | **move** 28:2 36:4 |
| 138:25 139:7 | **mortality** 19:5 | 122:23 123:7 | 116:19 122:20 |
| 139:25 140:21 | 20:14,15,20 | 123:10,11,20 | 146:1 198:15 |
| 141:10,14 | 21:8,10,17,21 | 123:24 124:5,6 | 202:17 |
| 142:10 143:2 | 21:25 22:3,7 | 124:13,16,18 | **moved** 19:6,19 |
| 152:13 155:6 | 22:12,20,24 | 124:21,25 | 67:24 |
| 157:7 164:17 | 23:10,19,20,22 | 125:4,13,19 | **moving** 122:24 |
| 167:16 168:18 | 23:25 24:22,25 | 126:15,21 | 132:13 160:21 |
| 169:4 170:6,18 | 25:12 26:12 | 127:2,8 139:6 | **multiple** 28:25 |
| 171:8,11 172:8 | 27:11,20,22 | 140:12,23 | 41:16 43:19 |
| 172:23 173:15 | 28:13,17,18,23 | 142:1 143:9 | 65:20 77:17 |
| 173:23 174:1 | 29:3,7,17,25 | 152:25 154:10 | 114:18 212:8 |
| 174:19 175:3 | 30:5,7,12,17 | 154:10 156:4 | 220:1 223:3 |
| 175:24 179:22 | 31:1 32:3,24 | 157:20,21 | 241:7 |
| 181:16 186:1 | 33:9 44:23 | 158:3,4 159:19 | **multiplier** |
| 187:2,11 188:2 | 45:1 53:10,13 | 160:9 161:7 | 121:25 224:3 |
| 192:14 193:3 | 53:15,19,21,24 | 162:2,5 207:3 | **multipliers** |
| 193:24 194:19 | 55:8,10,20 | 208:9 209:1,3 | 220:7 |
| 194:22 196:12 | 56:6,22,24 | 213:21 215:24 | **multiply** |
| 197:7 198:13 | 57:14 58:22 | 219:12,20,24 | 150:21 155:15 |
| 198:17,21 | 59:3,7,9,11,12 | 219:25 220:7 | 155:21 156:7 |
| 199:1 200:9 | 60:1 61:5,13 | 220:22 221:1,5 | 161:5 223:18 |
| 201:21,25 | 61:20 62:1,7 | 221:9,12,14,15 | **multiplying** |
| 202:5,9,12 | 62:14,25 63:10 | 221:16,17,23 | 154:2 |
| 211:21 213:9 | 63:16,19 64:8 | 222:2,4,18,19 | **mutual** 14:20 |
| 218:2 219:7 | 64:9 90:19,21 | 222:20 223:6 | 14:23 15:1,7 |
| 228:2 233:7 | 91:10,12,22,23 | 223:15,21,25 | 15:11 16:4,12 |
| 234:13 236:11 | 97:1,6,13 | 224:14,15,21 | 16:16,24 17:13 |

[mutual - november]                                                   Page 42

18:16 20:6,10 20:24 21:21 24:13,14 25:16 25:21 28:19 30:10 32:18 33:13,14 34:14 35:9,22 36:7 36:14 37:6,9 38:14

**myth** 69:14,23 70:6,13

**n**

**n** 2:1 3:1,13 6:21,21 210:16 210:16

**n.w.** 3:4

**name** 5:14 43:15 66:6 117:9 134:7 136:11 148:8 148:20 210:20 234:23 235:7 235:12 252:2,3

**named** 36:11 72:18,23 79:7 117:10 133:25 135:9 137:9 145:14 154:18 162:14 234:22

**names** 248:3,11

**narrow** 100:13 219:9

**national** 217:14

**nature** 23:4 26:25 27:16 43:11 77:6 141:21 182:12 240:7

**near** 79:19

**necessarily** 32:10 34:17 37:21 40:14 77:9 92:2 177:14 195:5 197:10 214:21

**necessary** 232:7

**need** 9:5 13:19 22:6 39:2 77:2 77:3 80:4 82:14,15,16 89:11 97:6 115:2 123:4 125:10 165:9 174:24 183:14 189:17 190:4,7 191:2,5 204:7 204:8 213:20 228:9 233:4 235:1 248:1

**needed** 14:5 49:19,19,20 77:22 97:1,4 108:13 149:21 161:4 232:11

**needing** 12:10 232:17

**negative** 177:17

**neighborhood** 182:6

**neutral** 196:17

**never** 39:25 47:14,24 73:10 114:5 191:11

**nevertheless** 142:8

**new** 1:2 2:9,9 5:9 18:2 20:3 22:15 44:19 49:20 72:7 75:22 148:7 252:1

**news** 128:15 130:16

**newsletter** 68:15,15 70:19 72:14 79:21 80:15 82:3,10 82:13

**newsletters** 68:1,11 69:10 69:13 72:10

**newspaper** 247:16

**nichols** 2:3

**nodding** 162:9

**non** 160:15

**nonsmoker** 23:12,17,18 25:14 54:20

**nonsmokers** 23:23 56:24

**normal** 71:7

**normally** 157:11

**north** 34:13

**northwestern** 14:20,23 15:1 15:7,11 16:4 16:11,16,24 17:13 18:16 20:6,10,24 21:20 24:13,14 25:16,21 28:19 30:10 32:18 33:13,14 34:13 35:9,21 36:7 36:14 37:6,9 38:14 177:25 178:3

**notary** 250:14 251:3,23 252:25

**noted** 90:19 134:17

**notes** 10:5 110:20 119:6

**november** 134:24 225:18 231:19,20 232:22 233:16

[november - offer]

238:23 239:5
**number** 5:4,9
12:2 37:20
38:4 64:19,23
65:19 94:10,12
94:13 98:17
100:22 103:23
104:18 109:20
109:21,23
117:2 127:16
127:20 135:4
135:20,22
136:7,9,11
155:10,11,16
155:23 156:7
165:15,20
208:15 231:2,6
247:1 249:15
250:4
**numbers** 34:24
111:18 112:6
116:12,16
156:17,25
157:3 201:6
**numerical**
43:11
**numerous** 57:9
**nursing** 11:25
**nutshell** 88:8

**o**

**o** 6:21 210:16
**oath** 6:19

**obituaries**
247:16
**object** 24:3
25:5,25 27:12
27:23 28:14
29:12 30:13
31:17 32:9,25
33:10,19 34:7
34:15 35:4,12
42:6 44:11
46:17 47:11,20
48:1 50:19
53:6,25 54:10
54:22 55:4,11
55:21 56:1,8
57:6,15,21
60:2,9 61:14
61:21 63:14
76:6 78:14
84:21 85:13,21
85:25 86:10,13
87:23 89:8,11
90:12,17 91:3
91:20 92:4,15
92:22 94:19
95:7,23 96:8
97:25 98:10
99:25 102:20
103:25 104:10
104:13 105:4
106:15 107:2
108:12 110:1
111:4,4,13
112:9 113:4

114:3,17 115:1
115:11 116:3,7
117:7 118:6
119:1 121:17
122:14 123:13
124:2 125:20
128:21 129:17
130:2,14,21
132:3,20
133:11 136:21
137:5,13,22
138:25 139:7
139:25 140:21
141:10 152:13
155:6 157:7
164:17 167:16
168:18 169:4
170:6,18 171:8
171:11 172:8
172:23 173:16
173:23 174:1
174:19 175:3
175:24 179:22
181:16 186:1
187:2,11 188:2
193:24 194:19
194:22 196:12
197:7 200:9
201:21 211:21
213:9 218:2
219:7 228:2
233:7 234:13
236:11 237:1
237:12 238:5

239:15,22
242:24 245:22
**objected** 88:25
89:3,5
**objecting**
141:14
**objection** 85:25
88:24 126:3
131:16 142:10
143:2 192:14
193:3 198:13
**objections** 9:1
88:18,19
115:14 126:17
141:13 201:24
**obligation**
168:12
**observation**
61:24
**obtain** 187:10
231:15
**obtained** 13:6
14:24 230:9
236:5
**obvious** 213:19
**occasionally**
12:13 80:21
**occupation**
61:19
**occurred** 85:5
212:7,9
**offer** 88:18
185:22 191:1

**[offered - okay]**                                                                           Page 44

| | | | |
|---|---|---|---|
| **offered** 189:7 | 42:1,17,21 | 109:20 110:16 | 163:16,25 |
| 189:14 191:13 | 43:4 45:16 | 111:8,21 112:3 | 164:6,15 165:5 |
| 194:8,14 196:2 | 46:13 47:24 | 112:14,22 | 165:9,23 |
| **offering** 184:13 | 48:4,7,25 49:3 | 113:25 114:22 | 166:20 168:5 |
| 196:11 | 51:6,15,19 | 115:16,18,25 | 168:11,15,25 |
| **offers** 149:12 | 53:3,13,23 | 116:20,21 | 169:21,25 |
| 232:23 | 54:21 55:2,7 | 117:5,20 118:3 | 170:13 171:25 |
| **officers** 233:22 | 55:18 56:12 | 118:14,18 | 172:6,15,16,18 |
| **offices** 5:12 | 57:11,19,24 | 119:5,10 | 172:19 173:10 |
| 247:12 | 58:6,12,14 | 121:11 122:7 | 173:17,20 |
| **official** 217:1 | 59:19,23 60:14 | 123:23 125:25 | 174:2,8,13 |
| **officially** 5:2 | 60:18 61:9,17 | 126:9,24 | 177:8,24 178:2 |
| **offshooted** | 62:11 63:9 | 127:24 128:3 | 179:3,18 |
| 37:23 | 64:16 65:10,14 | 129:25 130:23 | 180:10 181:7 |
| **oh** 41:9 45:19 | 65:21 66:3,25 | 131:2 133:8,15 | 181:13 183:20 |
| 48:20 72:22 | 68:5 69:11 | 133:19 134:5 | 184:10,21 |
| 80:14 99:13 | 70:1 71:16 | 134:12,19,25 | 185:8,16,20,21 |
| 171:5 190:23 | 75:8,12 78:5,9 | 135:7,12,19,24 | 186:6 187:6,17 |
| 216:7 217:16 | 78:11 81:9 | 136:19,24 | 188:4 189:1,11 |
| 225:5 242:2 | 83:7 84:17 | 137:9 138:1,20 | 191:1,8,14,24 |
| **okay** 7:13,24 | 85:2 89:7,16 | 139:3 140:16 | 192:4 193:11 |
| 8:3,7,18 9:9,23 | 90:2,5,15 92:1 | 140:19 141:3 | 193:19 194:2,7 |
| 10:1,10,21 | 92:12 93:1,11 | 142:21 143:12 | 194:16 195:1 |
| 12:23 14:11,17 | 93:22 94:3,6 | 144:11,19,23 | 198:7 199:13 |
| 15:2,12 19:3 | 95:2,17,22 | 145:8 146:2 | 199:25 201:8 |
| 21:20,24 22:11 | 96:1,6 97:20 | 147:7,20,23 | 201:12 202:7 |
| 23:5,7 25:19 | 98:8,15 99:23 | 149:7,11 | 202:18 204:7 |
| 27:4,18 32:7 | 101:3,16,17 | 150:17 152:18 | 205:12 206:15 |
| 32:20 33:18 | 102:3,10,17,23 | 153:23 154:22 | 206:25 207:20 |
| 34:5,11 36:20 | 103:4,10,22 | 155:9,18 | 208:11 209:24 |
| 37:18 38:2,14 | 104:4,21,24 | 156:16 158:7 | 210:2,15 211:5 |
| 38:25 39:5,11 | 105:11 106:2 | 158:10,20 | 211:10,17 |
| 40:2,11,19 | 106:11,22 | 160:21,25 | 212:17 213:5 |
| 41:4,19,24 | 107:24 108:4,7 | 161:1,9 163:12 | 214:14,21 |

**[okay - owed]**                                                              Page 45

215:7 216:23
216:25 217:16
217:16,17
219:23 220:4
223:12 225:23
227:11 230:22
230:24 231:12
232:10 234:21
235:1,4,7,9,17
235:21 236:14
236:16,20
238:2,15
239:10 241:1
241:22 242:7
243:9,25 244:6
244:9 245:18
246:7,19 247:3
247:11,15
248:9 249:21
**old** 102:8
104:18 106:9
106:12,20
107:8,18,19
108:16 109:4
109:22 110:8
110:23 111:11
112:5,6 113:12
113:13,13
114:6,7 115:10
126:22 128:20
158:21,23
163:2,16,19,19
241:14,15
244:7,25 246:5

**older** 105:1
106:24 113:2
114:11 132:24
237:14
**oldest** 128:6
130:17
**olds** 112:1
113:12 132:14
165:8
**once** 243:20
**ones** 189:12
**opine** 46:15
49:9 52:22
62:5 129:21
130:1 218:3
232:10
**opined** 211:2
232:6
**opining** 73:14
211:5 214:2,20
214:23
**opinion** 45:11
61:18 87:11
97:18 98:13
104:1 113:7
116:11 148:10
191:1 194:11
194:16 197:14
211:9,10,14
232:5 233:2
**opinions** 55:18
149:1 204:25
206:20 207:20
212:20

**opportunities**
38:6
**opposed** 105:12
127:3 134:10
153:25 188:23
207:15 221:20
225:3 241:10
248:2
**optimal** 16:3
**optimize** 71:3
**option** 120:8
189:15
**options** 11:12
119:17
**optum** 234:22
**optum360** 1:9
2:20 6:7
**order** 39:22
96:24 176:20
193:16 195:12
200:11 203:17
**ordered** 141:20
**ordinary**
222:16
**oregon** 13:5
**origin** 160:15
**original** 4:22
4:22,24 50:8
145:23 235:4
235:17
**outcome** 69:19
71:18 76:2
**outcomes** 60:24

**outdated** 78:23
122:12,16
123:8,25
125:18 126:15
126:19
**outlined** 88:7
**outlives** 77:5
**output** 143:8
208:5
**outputs** 143:7
**outside** 19:11
26:2 47:22
85:21 102:14
125:22 144:16
188:24,24
192:17 194:1
205:8
**overall** 107:1
185:2
**overcharged**
53:4
**overly** 241:13
**overmitigate**
187:23
**oversight** 69:5
**overstates**
153:6
**overvalued**
177:19
**overview** 49:8
52:22
**owed** 43:23
154:24

[owing - paragraph]                                            Page 46

owing 92:2
own 18:10 38:7
  38:10,10,18
  71:2,13 86:17
  99:20 103:24
  108:7,7 130:13
  219:24,25
  220:6
owns 62:22

p

p 2:1,1 3:1,1
  4:8,10,12,15
p.m. 1:21
  127:15,19
  165:11,14,16
  165:19 204:15
  204:18 231:1,5
  250:3,5 251:12
page 3:14 4:2
  66:17,22,23,23
  67:19 75:6
  93:7 100:20
  101:5,16
  104:16 116:19
  128:1 133:19
  133:20 143:17
  143:18 145:14
  146:1 147:14
  147:14,19,24
  148:15 149:11
  154:21 157:1
  159:23 160:2
  162:4 217:2

218:8 235:2,19
  252:5
pages 99:23
  147:20 160:4
paid 153:5
  157:15 167:13
  194:13
panagopoulou
  2:7 3:16 4:25
  5:23,24 6:11
  6:22 24:12
  25:18 26:7
  27:17 28:11,21
  30:9,23 32:6
  32:15 33:7,12
  33:23 34:10
  35:1,5,20
  42:16 44:17
  46:21 47:13,23
  48:3 50:20
  51:9,12 52:3,9
  53:12 54:4,13
  55:1,6,17,23
  56:2,11,13,16
  57:2,10,18,23
  60:3,12,15
  61:1,16 62:4
  63:18 64:16,24
  66:8,11 73:4
  74:4,8 76:16
  78:19 85:1,17
  85:24 86:6,11
  86:22 88:11,16
  88:23 89:2,7

89:10,15 90:14
  90:23 91:8,25
  92:8,17,25
  93:6 94:24
  95:12,25 97:15
  98:7,14,25
  99:2,6,11
  100:6,11,15
  102:22 104:3
  104:11,15
  105:10 106:18
  107:23 108:21
  110:12 111:7
  111:20 112:13
  113:24 114:4
  114:21 115:5
  115:13,16,18
  115:24 116:4
  116:18 117:19
  118:13 119:4
  122:6 123:9,17
  124:24 125:25
  126:4,9,13,23
  127:23 129:6
  129:24 130:4
  130:18,22
  131:2,5,9,14,20
  131:25 132:15
  133:7,14
  136:23 137:8
  137:17,25
  139:2,18
  140:15 141:2
  141:12,15

142:5,20
  143:11 144:20
  144:23 145:2,7
  146:23,25
  152:14 155:8
  158:6 159:2,5
  159:9,11
  164:21 165:21
  168:4,24
  169:10,14,16
  170:12 171:4,9
  171:24 172:12
  173:5,17,19,24
  174:5,22 175:7
  177:3 180:5
  181:18 186:5
  187:5,16 188:3
  190:3,17
  192:23 193:10
  194:2,6,20,25
  197:2 198:6,16
  198:18,23
  199:12 200:16
  201:23 202:2,7
  202:10,18,23
  203:12 204:19
paper 17:22
  79:21 82:3
papers 68:1
paragraph
  58:13,16,17
  62:9,12 100:9
  100:10,11,12
  116:22 160:23

**[paragraph - percent]**                                      Page 47

| | | | |
|---|---|---|---|
| 161:1 165:22 165:24 204:24 206:19 209:25 | **partitions** 25:10 | 195:10,12 199:17 200:24 | 104:4,6,18 107:7,8,13,25 |
| **paragraphs** 80:22 | **parts** 134:5 147:8 160:3 | **paying** 29:10 167:13 191:25 | 109:1,3,13,18 110:6 111:9 |
| **part** 20:8 36:20 55:15 75:16 84:1 146:14 161:10 174:12 191:8 234:12 | **pass** 13:22 232:16 | **payment** 71:7,8 71:10 156:19 156:21 | 113:1,6,21,25 120:22 121:3 128:19 129:2 |
| **partial** 148:20 149:8 | **passed** 13:17 16:13,15,17,22 18:9 23:2 240:2,6 245:13 245:20 246:23 247:6,21 249:16 | **payments** 44:10 45:11 78:1 136:10 157:22 180:8 182:11 195:17 195:20,23 247:8 | 129:22 132:10 133:1,2,5,8,9 133:13 140:24 142:13,14 146:23 150:1 153:1,7 159:9 |
| **particular** 14:17 16:10 25:3 46:11 59:4 77:17 83:13 91:13 121:23 141:6 143:20 154:16 159:23 169:19 175:20 176:25 188:22 205:12 215:11 246:15 | **passes** 185:12 **passing** 249:23 **past** 26:18 31:9 41:6 45:17 46:25 56:4 66:19 67:4,14 67:23 69:2 | **peachtree** 2:18 **peer** 68:5,8 72:11,15 73:3 79:4,17 **pejorative** 241:1 | 175:14 176:19 177:18 192:18 193:19,22,25 197:15,15,17 201:9 215:23 216:2 227:21 228:1,4,7 229:2,5,12,15 |
| **particularly** 26:13 | **path** 65:18 **paths** 197:14 **patient** 136:9 **pattern** 49:15 49:17 153:16 177:1 215:14 | **pending** 5:8 9:7 **pension** 11:12 42:10,14 43:9 76:12,19 | 230:2 234:19 238:18 239:1 239:11,20 241:24 242:4,8 |
| **particulars** 42:19 43:17 49:10 | **paula** 72:18,23 | **people** 11:11,24 12:1,8 23:1,2 27:21 28:2 29:4 30:20 37:11 75:20 76:18 79:23 92:10 94:10,12 94:13 98:18 99:6 102:1 103:12,14,23 | 243:22 245:5,9 245:13,19 247:8 248:18 249:10,12,15 |
| **parties** 251:15 **partition** 55:14 226:16 | **pay** 91:17 92:21 141:8 142:7 166:14 167:13 168:12 176:11 186:15 186:21 191:18 191:23 195:7 | | **percent** 11:2,4 11:4 21:14 33:21,25 34:4 35:17,19 72:4 150:23 151:3,8 |
| **partitioned** 23:3,11 77:7 | | | |

**[percent - plaintiffs]**                                                     Page 48

151:10,11,19 151:20,21 152:9 156:3,4 156:10 157:5 157:25 158:11 160:21 163:11 166:1,15 170:3 170:16 172:25 174:18 177:13 179:4,17,20 180:1,4,6,19 181:1,3,6,14 182:6,16,18 183:4,6 184:23 185:1,2 197:24 199:23 200:12 200:14,23,25 201:1,2 203:23 217:7,9,18,20 217:22 219:1,1 223:19,20,20 224:20 243:18

**percentage** 10:25

**perception** 70:2 175:14

**perfectly** 124:7

**perform** 39:16

**performance** 4:17 170:2 184:25

**performed** 71:23 230:20

**performing** 53:15

**period** 13:17 97:12,16,22 122:19 123:6 166:15 167:4 167:25 169:9 170:11 173:13 174:4,9 176:6 176:22 177:15 177:16,20 181:5 182:12 182:25 189:21 190:11 196:25 197:21 199:11 199:18 204:6 213:16 224:15 224:19,25 231:18,21 233:13 239:12 239:14 244:4

**periods** 97:3 225:21

**permissible** 89:13

**permission** 82:14

**person** 38:5 43:23 74:17 118:22,24 128:6,24 129:3 130:17 132:8 149:13,13,25 150:4,12 153:5

153:17 154:5 163:19 167:22 205:25 227:9 227:10 239:6 240:5 242:20 244:21,23 246:8 248:12 248:14,14

**personal** 70:25 71:2 87:3 103:6,18 148:2 148:19 192:24 234:18 245:19 247:20 248:18 251:7

**personally** 192:4

**perspective** 58:19 70:25 135:10 167:22 170:20,21 171:6 177:8 182:10 184:3 189:20 190:1,2 190:10,15,16 190:19 195:16 195:25 221:22

**perspectives** 195:14

**peter** 36:11,13 36:22 38:16,17 38:18 39:8

**phrase** 13:25 60:4 87:8

**phrased** 138:12

**pi** 116:24,25

**pick** 103:10 134:1 195:8

**picked** 17:18 133:24 134:4

**piece** 25:8 81:8 212:22

**pieces** 15:19 77:8 88:9

**pioneers** 36:23

**place** 16:5 172:2 192:12 217:11

**placing** 189:23 190:13

**plaintiff** 39:14 41:12 52:20,21 67:12 137:10 137:20 138:14 154:24 161:13 163:13,13 173:16 175:21 180:8 182:14 182:20,21,22 189:14 198:7 199:4

**plaintiff's** 39:14 44:21 48:9,12 50:17 52:18,24 135:20

**plaintiffs** 2:5 5:19,22 84:4

**[plaintiffs - possible]**                                    Page 49

85:3,19 86:8 90:6,10 93:19 93:22 94:3,7 117:10 122:8 125:16 133:25 134:21 135:9 135:14 141:4 145:14 150:18 154:18 162:15 164:25 167:1 170:21 171:3,5 171:23 172:6,6 175:21 182:10 183:8 184:3,6 184:7,13 187:23 189:12 189:20 190:1,9 190:15,19 194:17 195:3 195:25 196:9 196:14,15 197:3 199:15 200:4 201:15 203:5,22 205:21 233:17 234:22 235:3

**plausible** 219:3 219:4 241:7,12

**play** 21:17 45:24 230:16

**playing** 70:3

**please** 5:17 54:12 58:12 62:10,12 85:24

86:5 93:7 99:8 115:13,13 131:19 133:19 141:12 161:1 201:23 204:20 205:15 218:7 235:7

**plug** 125:9

**plugged** 20:16 45:2 97:22

**plummeted** 180:25

**plus** 31:9 109:4 232:24

**pocket** 172:20 173:9,11,21 174:14

**point** 16:14,17 22:20 40:8 51:1,8 67:9 88:1 111:15 113:16 116:12 125:23 133:3,4 142:12 147:7 156:22 159:23 166:14 176:13 184:14 206:7 218:11 224:12 232:3 233:6,19 242:3 249:10

**pointed** 136:24

**pointing** 200:19

**points** 98:4

**policies** 11:16 17:23 21:16 22:10 29:3,5 29:15 30:16,16 30:18,21 31:20 31:24 32:7,19 32:21 33:3,4 50:25 61:24 180:25 181:9 183:15 223:17

**policy** 12:6 25:22 26:10 27:8,10 29:19 29:24 30:1 31:22 32:3,12 32:16 39:15,17 39:20,21 45:22 49:25 50:2,5,6 50:7,8 58:20 67:7 180:23 228:17,17

**policy's** 54:2

**policyholders** 19:18 22:7,25 246:23 247:6

**poor** 141:25 142:25

**poorer** 63:12

**population** 62:17,22,23 63:22,23,24 64:4,6,8,9 90:19,22 91:10

91:22,23 92:2 92:6,14,19 105:2,3 106:5 107:19 108:10 118:19 119:14 119:18,20 120:10,11,12 120:14 121:5 133:5,6,9 140:23 141:5,6 142:13,15,17 221:9,12,17 222:5 224:1,10 225:2 228:14 229:7 230:5

**populations** 63:12,12 221:13

**portfolio** 34:9 168:17 178:13

**portion** 74:24 142:24 190:5 202:25

**portions** 100:4 100:7

**position** 129:20 174:16,21

**positive** 140:7

**possibility** 108:5 186:11 186:24 187:8 214:25

**possible** 78:22 125:6 137:19

Case 2:19-md-02904-JKS-MAH   Document 883-2   Filed 04/23/26   Page 302 of 327
PageID: 42110

**[possible - probably]**                                              Page 50

137:23 191:17 221:4 222:22 226:7 234:8 240:10 241:23 245:13 246:2,8 246:10,14 247:15 248:7 248:16,25 249:5,18

**possibly** 113:8

**post** 123:18

**potential** 85:6

**potentially** 153:1 167:17 244:20

**practical** 224:23 247:23

**practice** 10:18 37:19 74:25

**pre** 123:20

**preceding** 251:5

**prediction** 29:17

**preexisting** 24:1 81:2

**preferred** 24:7 24:16 31:15

**premature** 26:19 28:6

**prematurely** 26:22

**premier** 25:16

**premise** 44:13 119:3 158:1 237:14

**premised** 195:2

**premiums** 29:10

**prepare** 9:17 10:3

**prepared** 43:18 58:2

**present** 3:8 11:15 43:21 71:12 76:25 96:25 97:6,14 119:7 137:11 137:20 144:3,5 146:17 156:18 161:3 167:11 168:1 171:13 171:17,19,21 175:19 176:6 182:4,13,19 189:23 190:13 197:12,12,25 201:14 203:3 203:18 206:1 208:8 210:25 212:14 213:2 213:22 230:17 230:17 231:14 237:9 239:2

**presentations** 206:2

**press** 229:5

**pressure** 220:20

**presume** 134:8

**presumed** 229:18

**pretty** 34:6 38:4 209:23,23 236:9

**prevalent** 185:13

**prevent** 230:19

**preventing** 45:4

**previous** 70:9 89:3 202:22

**previously** 16:14 18:4 31:14 38:25 55:7 61:17 96:11 118:3 136:25 168:6 179:6

**price** 22:5 120:4 121:13 123:3 186:8 187:10

**priced** 63:3 152:23

**pricing** 19:25 20:6,17,23 21:25 22:4,9 22:20 121:19 122:3 125:3

187:18

**primarily** 19:4 54:7 62:16 80:2 148:23

**principal** 199:8 203:24

**principle** 174:10

**principles** 14:13 182:8

**prior** 17:24

**private** 178:7

**proactively** 142:2

**probabilistic** 59:8,10

**probabilities** 77:4,23 159:21 222:13 237:17 242:16

**probability** 39:19 157:9,16 158:17,23 204:1 224:19 238:25 243:17

**probably** 7:14 9:21 11:2 18:20 27:9 29:25 35:16,16 35:19 40:11,11 41:2 82:23 93:25 162:25 200:13 208:2,3 223:25

Veritext Legal Solutions

800-227-8440                                              973-410-4040

**[problem - provisions]**

**problem** 37:7
  78:4
**procedure**
  227:9
**proceed** 7:7
**proceeded**
  40:17 41:17
  46:10 245:4
**proceedings**
  5:1 250:5
**process** 13:16
  16:23 17:16
  18:7,14 25:7,9
  31:3,3 55:14
  58:25 184:9
  190:4 220:18
**processes**
  226:25
**produce** 166:3
**produced** 88:3
  206:13
**product** 20:12
  22:5,15,16
  25:1 41:21
  71:25 123:3
  124:19 125:11
  149:12 155:13
  161:14 164:8
  164:13 185:22
  186:7,25 198:2
  208:14
**product's**
  124:9

**products** 19:14
  20:3,4,11,12,24
  21:3,9,11 37:1
  40:24 47:2,6
  47:17 53:22
  63:2 67:2
  69:12 73:20,22
  75:22,22 83:9
  83:10 87:12,15
  87:17 103:24
  119:24 121:14
  144:15 183:12
  184:8,13
  185:18,24
  187:9,18,22
  188:6,21 189:4
  189:8,13,15
  191:3 193:14
  193:17 194:8
  194:18 195:4
  196:10,11
  197:5 199:18
  200:8,23
  201:18 203:8
  209:8,9 211:1
  211:6 214:3,16
  215:8 231:15
  231:21 232:6
  232:11,18
  233:5 237:10
**profession**
  109:12
**professional**
  10:11 13:18,23

**professor** 79:10
  82:4,7,8,8
**profit** 119:25
  124:15 125:10
  125:12 127:3
  180:16,19
**profitability**
  124:19
**profitable**
  124:10
**profits** 121:16
**program** 18:11
**programming**
  15:16,17
**project** 36:25
**projected** 51:3
**projection**
  123:5
**projections**
  51:16
**promised**
  195:17,19
**promises** 19:9
**promulgates**
  222:25
**pronounced**
  62:21
**proper** 19:8
**properly** 12:4
**proposed**
  185:24 233:18
**proposing**
  214:15

**proposition**
  132:17
**prospective**
  45:5 50:24
**protect** 11:24
  47:16,16
**protecting** 12:8
**protection**
  12:10 232:24
**proved** 70:6
**provide** 8:12
  9:9 32:17
  45:10 50:11
  52:11,13 74:22
  76:18 83:15
  138:22
**provided** 7:4
  32:21 40:5
  46:14 48:4
  50:8 53:17,20
  66:13 83:22
  96:19 100:18
  101:6 112:23
  113:1 143:16
  177:10 196:19
  238:22
**provides** 11:25
**providing**
  12:10 40:14
  55:18 89:12
  177:5
**provisions**
  77:19

[public - questions]                                                    Page 52

public   247:16
  250:14 251:4
  251:23 252:25
publication
  68:4 72:14
  79:6 81:16
  128:14
publications
  80:11 81:11
publicly   35:25
  36:1
publish   81:3
  82:13
published
  34:18,19 35:6
  67:21,23 68:3
  69:1,2 72:13
  72:25 79:7,15
  80:2,22 82:6
  216:15 225:9
publishing
  67:25
pull   96:16
  98:24 99:7
  145:4 159:10
punitive   162:22
  211:11 232:23
  233:4 249:1
purchase   187:8
  189:15 197:16
  199:9 200:7,22
  201:18 203:7
purchased
  39:15 44:9

120:22 164:7
  164:12
purchasing
  186:17 189:13
purely   247:2
purportedly
  235:14
purpose   102:23
  165:5 188:6
purposes   11:17
  45:7 51:25
  66:4 73:25
  99:3 144:24
  159:6 169:11
  186:14
pursue   16:18
  65:18
pursued   119:17
push   153:3
pushed   107:22
pushing   142:18
put   52:5,5
  68:18,19 73:1
  75:23,24 77:6
  77:10 80:17
  81:21 91:1
  108:18 114:10
  114:22 122:12
  125:10 132:22
  143:6 144:15
  150:7 153:19
  233:12 241:8
  244:13 245:1

puts   121:13
putting   11:15
  43:21 61:4
  79:20 90:16
  96:7 117:6
  120:16 128:7
  128:11 139:5

q

qual   14:14
qualifications
  10:11 58:10
  130:5,9 134:9
qualified   14:19
  129:25
qualify   12:1,5
  30:6 61:25
quantified
  59:11 86:19
  212:12
quantify   77:22
  196:20
quantifying
  41:15 45:14,17
  85:8 212:13
quantity   85:16
quest   1:9 2:16
  6:4 101:1
  210:21 234:22
  235:9 236:6
  252:2
question   7:20
  7:21,22,25 8:4
  8:12,15,25 9:7

21:12 24:11
  25:3 28:1
  32:20 34:25
  42:1 43:4 44:9
  44:13 45:23
  53:22 54:12
  56:18 57:13
  60:4 76:7 86:5
  89:3 96:10
  100:3,14
  107:14 131:13
  131:19,21,22
  171:23 174:7
  188:1 197:8
  198:15 201:22
  201:25 202:3
  202:11,13,16
  202:19,20,23
  203:1 205:15
  214:12,15
  219:9 227:23
  228:12 239:5
  239:24 245:25
  247:3
questioning
  51:10
questions   7:3
  7:16 19:18
  25:23 60:25
  82:17 89:1
  125:23 131:1,8
  131:11 198:22
  204:13 210:22
  226:3 249:21

**[questions - recalculate]**                                           Page 53

249:25
**quick** 155:25
  209:3
**quickly** 38:4
  150:8
**quite** 97:8
  179:14 215:22
  219:13 229:8
**quotations** 81:1
**quote** 59:2,6
  81:24 128:17
  132:18
**quoted** 80:11

**r**

**r** 2:1 3:1 43:16
**race** 160:15
**random** 103:10
  230:14
**range** 60:24
  92:5
**ranges** 140:25
**rare** 109:13
  111:17
**rate** 35:15,24
  36:3 56:22,24
  59:11,20 97:5
  97:7,13 121:1
  122:22 147:18
  150:23 151:2
  151:11,13,15
  152:6,9 154:1
  156:3,5,10,20
  157:5,24,25

158:11 160:22
161:16 163:11
166:1,15,23,25
167:6,19 168:2
170:16 171:22
172:25 173:1,7
174:18,25
176:13,14,15
176:16,17
177:1 179:4,5
179:10,21
180:2,20 181:2
181:6,11,14,23
181:24 182:1,2
182:9,23 183:1
184:19,24
190:22 195:15
195:22 196:3,6
197:19,23
199:22 200:12
200:14 201:2,3
201:5 203:20
203:23 207:4
208:14,23
229:2
**rates** 20:9 21:4
21:9,17 22:12
27:20 28:13,23
29:3 30:1 41:8
44:6,24 45:2
53:2,5,9 57:5
57:14 60:1
62:14 63:10,16
63:20 77:13

107:21 120:24
123:20 124:6
124:12,14
127:2,3,8
151:12,14,25
153:24 159:19
166:2,6,16,17
176:24 179:11
179:14 180:1,6
180:24 181:7
181:20 183:2
183:25 190:24
222:10,18
**rather** 37:12
  72:1 120:13
  153:16 174:8
  190:1,16
  208:24
**rating** 31:5
  58:24 59:2
  60:8
**reached** 82:12
  207:22
**read** 58:15
  62:12 84:3
  90:20 94:3
  110:24 128:4
  128:14 130:19
  131:21 132:25
  136:13 161:1
  161:10 165:24
  190:3,5 202:15
  202:25 214:12
  218:4

**readily** 34:18
  225:5
**reading** 84:7
  214:22 234:20
**ready** 99:12,13
**real** 155:25
**realistic** 116:12
**realized** 34:23
  38:4
**really** 12:15
  19:22 24:4
  26:2 37:4 38:5
  44:12 61:23
  70:13,14 73:7
  78:24 127:6
  141:25 178:6
  188:12,12,24
  192:16 214:19
  222:11 249:9
**reason** 9:9
  138:11 194:4,9
  217:25 252:5
**reasonable**
  128:8 129:14
  129:21 132:18
  133:16 151:11
  170:14 207:22
  207:25 232:20
  241:17 243:14
  243:15
**reasonably**
  205:1 230:12
**recalculate**
  249:6,6

**[recalculated - relevant]**                                        Page 54

| | | | |
|---|---|---|---|
| **recalculated** 105:1 | **recollection** 14:5 43:10 51:18,22 57:22 72:3 133:1 | **red** 27:8 | **regarded** 166:24 |
| **recall** 39:7,18 42:4,7,19 43:17 45:13 46:13 53:17 54:18,25 62:8 72:24 73:7 81:13 83:4 84:7 94:5 109:16 145:12 232:9 234:20 | **recommend** 47:17 | **redo** 242:13 | **regarding** 48:5 52:24 55:7 |
| | **recommendat...** 50:3,12 51:5 | **redress** 211:6 | **regardless** 31:23 176:10 224:15 |
| | **recommended** 49:12,21 50:6 50:7 164:8 179:20 186:7 | **reduced** 251:6 | |
| | | **reference** 160:4 160:7,16 209:24 | **regulations** 168:20 |
| **receipt** 175:9 | **recommends** 188:7 | **referenced** 158:14 | **regurgitated** 84:15 |
| **receive** 91:16 92:20 156:21 189:4 245:6 | **reconfigure** 109:4 | **references** 128:15 160:13 | **reinsurance** 22:17 |
| **received** 31:4 35:9 83:25 91:15 199:4,5 | **record** 5:3 8:24 9:3 58:15 62:13 64:18,22 127:15,19,22 128:4 165:11 165:14,15,17 165:19,24 190:5 202:15 202:25 204:15 204:18 216:11 230:22 231:1,5 234:17 235:23 235:25 250:3 | **referencing** 73:17 | **rejected** 189:8 |
| | | **referring** 88:21 88:23 190:23 205:4 | **related** 1:10 124:18 139:20 227:19,23 |
| **receiving** 173:3 175:6 176:19 200:4 | | **refers** 149:7 | **relating** 73:11 98:17 148:21 149:8 236:25 |
| | | **reflect** 24:8 91:9 168:2 207:9 224:6 227:8,9 | **relationship** 218:16 219:11 |
| **recent** 35:19 66:12 122:4 124:7 223:2 | | **reflected** 91:6 95:1 125:5 127:2 147:17 154:10,11 161:7 162:1 238:17 | **relative** 19:16 119:16 123:1 124:12 151:14 223:3 251:14 251:15 |
| **recently** 84:6 225:7 | | **reflecting** 187:14 | **relatively** 62:21 121:2 168:3 197:22 |
| **reclassified** 114:13,16 | **recorded** 251:6 | **reflective** 107:6 124:7 | **relevant** 63:22 94:1 116:24 134:22 135:5 135:10 143:25 |
| **reclassify** 108:8 116:1 | **records** 110:13 110:15 247:12 247:13 | **reflects** 171:22 | |
| **recognize** 58:11 74:9 147:1 159:12 | | **regard** 98:15 | |

**[relevant - represented]**                                          Page 55

166:22 171:1,2
**relied**  83:21,21
  83:23 84:23
  93:13 95:3,10
  95:16,18 96:13
  99:24 100:4,8
  102:15 119:10
  130:12 134:5,7
  145:23 146:14
  147:8 164:3
  204:25 205:1
  205:13,17
  215:1
**relief**  12:1
**rely**  95:14
  98:20 133:23
  147:13 205:6
  206:8
**relying**  100:17
  101:14 145:12
  145:17 187:12
  215:14,15
  243:11
**remain**  186:8
  186:13 187:18
  218:17,20,24
**remained**  165:7
**remaining**  11:3
**remains**  114:15
**remember**
  15:12 39:11
  41:6 43:6,15
  43:15 45:16
  49:10,16 68:21

81:13 82:2,11
  84:10 100:17
  101:13 179:18
  226:4 234:4,23
  240:23
**remotely**  2:8,20
  3:6 36:17
**remove**  78:22
**repeat**  54:11
  86:4 205:15
  214:9 235:7
**repeated**  160:7
**repeating**
  131:12
**repeats**  145:24
**rephrase**  7:23
  8:2 56:3 60:5
  90:8 112:14
  133:22
**replacement**
  48:19 49:12,14
**replicate**
  139:11
**report**  4:6,9,11
  4:13 7:3 10:5,7
  36:1 40:16
  52:11,13,17
  57:1 58:13,16
  62:10 65:25
  66:2,9,12,15,17
  83:20 85:23
  87:21 88:5,10
  90:16 91:2,19
  92:12 93:1,8

93:13,17,24
  95:15 98:16,21
  98:22 99:8,19
  99:21,24 100:3
  100:8,16 101:6
  101:14,19
  104:25 107:25
  110:24 111:23
  112:7 114:10
  114:22,24
  116:19 117:6
  117:18,23
  119:11 125:22
  127:24 128:1,5
  128:12 129:10
  129:19 130:12
  130:13 132:2
  132:25 133:20
  133:23 134:14
  136:14 137:19
  143:12,13
  145:6,12,13,17
  145:17,21,23
  146:1,15,24
  147:4,8,9,10
  150:7 152:3
  154:14,23
  158:14 160:1
  160:12,19,24
  162:4,15 163:5
  165:22 170:17
  181:21 191:1
  194:1 200:18
  204:20 206:19

207:21 208:12
  208:17,20
  209:24 210:1
  210:12 213:4
  225:6,8 235:2
  235:18,19
  238:17 245:1
**reported**  1:25
  112:5
**reporter**  5:16
  5:19 8:20
  127:21 131:22
  159:4 169:13
  202:20 216:6
**reporting**
  191:12 252:1
**reports**  10:6
  43:19 84:1,16
  84:19,24 179:7
  206:13 212:25
**represent**  5:18
  5:25 6:3,6
  166:9,10,17
  210:20 214:6
  227:20 235:22
  236:19 244:2
**representation**
  170:9
**representative**
  105:21 120:11
  134:3 167:6
  228:14
**represented**
  67:10 135:13

**[represented - right]**                                        Page 56

| | | | |
|---|---|---|---|
| 137:4 183:25 | **responsible** 20:2 | **returns** 169:3 170:15 177:17 177:20 178:22 | 87:7 93:20 94:18 97:24 101:19 102:5,7 |
| **representing** 6:9,15 7:1 122:8 | **rest** 11:3 | **revealed** 31:3 | 102:19 103:1 |
| **repriced** 63:3 | **result** 47:2 59:24 86:9 208:16 | **revenue** 152:7 182:3 | 103:14 104:19 109:25 110:25 |
| **reputable** 216:17 | **results** 15:17 16:1,2 217:3 217:13 | **reverse** 19:14 | 111:12,23 |
| **request** 8:18 | | **review** 40:25 68:8,9 79:11 81:3 83:19 84:13 109:9 | 112:8 113:3 114:2 119:24 120:20,25 |
| **required** 207:2 207:6 | **retained** 39:1,6 39:24 40:3,13 42:23 43:5 44:5 45:10 46:22,25 48:13 49:8 52:11,13 52:22,23 56:4 57:12 78:5 83:15 179:19 | | 123:21 125:2 129:8,15 |
| **requirement** 14:9 | | **reviewed** 10:5 10:5,6 68:5,6 72:11,15 73:3 79:4,17 99:20 111:21 130:5 147:5 | 133:17 134:6 134:12 137:19 137:21 138:2,6 138:24 139:6 140:17,20 141:9 143:16 148:13 149:5 150:19,22 |
| **requirements** 13:11,13,19 14:15 | | | |
| **research** 229:1 230:10 | | **reviewing** 78:24 84:10,19 193:20 | 151:1 152:12 |
| **reserve** 33:15 120:2,2 151:24 166:5 168:16 183:3 | **retention** 83:13 | **revised** 82:18 | 152:20 153:11 154:14 155:4 155:16,24 |
| | **retired** 79:9,10 82:8 | **rider** 69:18 71:17,21 72:1 72:2 | 157:4,6 158:14 161:17 163:6 163:14 164:13 167:9 168:9 |
| **reserves** 19:8 177:11 222:8 | **retirement** 71:8 | | |
| **respect** 22:6 41:20 42:14 75:1 91:14 96:20 190:21 193:13 232:2 | **retroactive** 45:3 51:16 122:17 | **right** 7:11 10:12,22 13:1 13:8 18:17 22:4 29:6 35:22 38:12 39:3 40:16 42:24 44:3,8 48:12 50:21 55:10 76:20 80:2 81:19 | 172:7,14,16,20 172:22 173:9 173:11,14,21 174:11,15 175:22 177:6 177:13,19,25 |
| | **retroactively** 44:8 50:15 | | |
| **respected** 82:8 | **return** 34:13 35:3,9 170:3 177:13 178:15 178:17 184:25 200:12,14 203:23 | | |
| **respective** 103:22 | | | |
| **responses** 8:18 | | | |
| **responsibility** 196:9 | | | |

[right - science]                                                    Page 57

178:10,13,15
179:1 180:8,21
181:9 183:12
185:1 187:1
189:9,13,16
191:3 193:2
199:14 201:10
201:20 203:9
205:10 209:11
209:14,25
210:14,18
217:2,11 219:6
220:15 227:17
229:15,22
231:8,9 235:22
237:25 239:18
242:6 248:11
**rising** 183:17
**risk** 11:24 12:9
 23:20,22 24:19
 25:11,16 26:12
 26:13,18 27:11
 27:22 28:1,5
 29:8 30:12
 31:1 32:24
 33:9 39:22
 47:6 53:15
 54:1,5,15,17
 55:2,8,10,20
 56:7,19 57:13
 57:19 58:20,23
 59:3,21,24
 61:3,5,8,20,25
 62:7 106:13,21

118:5,8,10,12
120:24 166:25
167:3,6 168:3
169:7 176:13
176:15,17,18
177:1 182:9,23
183:24 184:2
186:25 189:22
189:24 190:12
190:13 196:5,6
197:23 198:4
199:10 203:19
213:3,14
219:12,16,20
219:23 220:6
220:23 221:1,6
223:3,21 224:6
224:13 226:10
226:16 227:1
228:1
**risks** 21:21
 83:16 176:20
 185:19 188:22
 212:12 216:1
**risky** 26:14
 121:8 178:18
 178:21 220:20
**rmr** 1:25 251:3
 251:23
**road** 2:3
**role** 16:11
 18:19 20:8,8
 85:22 210:25

**rotate** 18:23
**rotation** 19:11
 20:19
**rotations** 18:21
 37:5
**roughly** 10:25
 15:12 38:9
 39:10,11,13
 151:13
**rounded** 183:5
**row** 104:8
 177:18 202:1
**rows** 135:13
**rules** 168:20
**ruling** 86:3
**runner** 25:14
**running** 248:14
 249:17

**s**

**s** 2:1 3:1 4:1
 43:16 252:5
**s&p** 4:17 169:2
 169:22 170:2
 170:10,25
 177:16,23
 178:4,7,12
 183:16 184:25
**safe** 7:15
**sake** 162:15
 183:4
**saw** 93:25
 98:16 102:18
 117:10 243:13

243:16
**saying** 51:17
 63:9 109:20
 115:15 126:25
 129:16 146:3
 148:15 149:11
 151:4 156:11
 161:24 166:21
 167:9 171:5
 173:7 176:23
 194:3 197:10
 198:1,2,7
 214:23 218:14
 242:2 243:2
 244:20
**says** 13:7 63:15
 75:9 116:21
 137:24 148:2
 149:8 150:11
 170:2 186:20
 217:6,17 218:8
 218:19
**scale** 20:4,22
 21:11 35:23
 36:2
**scams** 148:24
**scenario** 161:4
 184:11
**scenarios**
 125:17
**schirger** 52:15
**school** 13:9
**science** 10:20
 13:4 16:20

**[science - serving]** Page 58

18:5,8,11
130:9
**scope** 26:2
47:22 83:13
85:22 102:14
116:1,8 125:22
144:16 192:17
194:1,15 205:8
226:21 234:9
**scott** 1:16 5:5
6:18 250:8
252:3,21
**scuba** 26:15
**se** 223:18
**search** 247:15
**searches**
248:14
**searching**
248:2
**second** 8:25
36:4 52:8
98:24 108:23
157:18,18
173:7
**seconds** 208:18
208:25 209:19
**section** 13:23
**sections** 147:21
**sector** 20:6
25:20 76:4
**security** 1:7
69:16 70:24
71:4,6 135:4
135:20,22

192:13 246:20
246:25
**see** 45:22 50:16
58:6 66:19,22
67:19 68:12
69:3,6 75:13
78:12 79:12
93:13 95:3
101:10 103:13
104:17 116:21
116:25 117:4
119:5,8 128:22
135:12,24
136:2 140:9
141:24 145:25
146:8 147:14
148:9,25
149:16 154:23
156:6 160:15
160:16,16
161:22 184:4
184:10 206:23
207:23 212:16
216:14 217:3
217:10,12,16
217:23 218:8
218:13,13
223:5 225:11
235:9,20 242:2
**seeing** 232:9
234:4
**seek** 25:21 55:2
94:7,7

**seeking** 25:3
142:3
**seeks** 60:6
**seem** 57:25
**seemed** 142:16
215:18
**seems** 175:12
213:13 239:16
**seen** 28:16 58:9
84:6 99:14
125:18 130:8
145:8 169:17
169:18,20,21
**segment** 92:13
92:19 100:16
141:6 159:24
**segments**
145:11
**self** 13:11 50:1
50:13 67:25
111:24 129:22
209:23 245:8
**sell** 37:1 81:20
119:24
**selling** 75:24
76:13
**semantics**
100:5
**sense** 51:4,5
71:4 105:24
167:19 213:13
220:2 224:4,9
232:15 239:3
239:18 245:16

**sensitive** 146:5
**sent** 216:3
242:21 243:3,6
244:3,8,17,21
244:22 246:6
**sentences** 80:21
**separate** 49:1
77:21 127:11
144:7
**separately**
20:22
**separates**
101:24
**september**
251:25
**series** 7:16
44:14 53:20
227:18
**serious** 60:20
139:21,21
140:4
**serve** 75:20
**service** 79:22
81:19 136:10
152:7 176:4
182:3 191:19
**services** 38:8
48:5 74:22
75:7 77:11
87:7,8 91:14
91:16 192:1
236:5
**serving** 76:10

**[set - situation]** Page 59

set 19:8 59:9 98:9 105:22 109:18 124:11 128:25 132:11 142:14 146:6 164:19,22 180:12 205:21 228:7 251:19
sets 235:20
settled 40:1,7 43:1 46:12
settlement 45:8 176:19 213:17 245:4
seven 97:2,11 97:16 98:5 152:1 155:3 167:4,14,24 171:16 204:3 225:21 231:16 232:7,11,21 233:2,10
seventh 217:2
several 9:18 36:13 41:15 69:21 80:21,22 137:1 211:18 218:16
severe 87:2,3
sex 23:4,9 54:1 58:20 61:3 94:25 98:17 101:8 160:14 229:15,18

sexes 94:23 96:20,21
shake 8:22
shape 25:15
sharing 59:8
sheet 252:1
shelf 71:25
shifting 221:8
shocking 107:9
shoes 75:25
shooting 69:14 69:24 70:7,11 70:14
shop 38:5
short 38:15,15 64:20 127:17 165:12 169:9 182:3 183:21 204:16 231:3
shorten 82:15
shot 18:15 70:9
shots 70:9
show 39:19 50:5 102:4 135:8 156:13 156:14 246:11
showed 18:11 237:7
showing 110:21 110:22
shown 23:22 31:2 101:21 107:25

shows 62:25 100:21,25 101:1,25 227:21
shuffle 224:13
sibling 77:5,5
siblings 77:17
sic 103:22 183:15
side 7:15 39:14 43:22 48:9,9 48:12,24 209:21
sidley 2:13 6:3
sidley.com 2:15
siegel 2:2 5:22 52:16
signature 251:22
significant 104:17 127:6 219:2
significantly 124:17
similar 12:7 22:16 49:17 82:24 135:17 169:20
similarly 100:25
simple 97:8 151:6
simplicity 183:4

simplify 25:19
simplifying 107:12 205:19 248:1
simply 8:6 44:20 108:9 121:21 139:11 140:6 141:4
simulations 39:19
single 78:16 106:2 109:20 109:21,23 112:23,25 131:12 136:2,2 137:20 138:9 138:14,18 139:16 140:13 153:5 154:5 157:15 165:6 173:3 189:14 193:6 195:20 202:11 213:17 226:15 228:19 234:17 239:6
sir 72:20
sit 46:19
sitting 41:4 42:4 59:16 63:6
situation 50:16 71:3 166:25 167:18 172:13 196:7

**[situations - specifically]**                                    Page 60

situations 11:7
  11:10 28:8
  29:2 41:10
  108:14 121:20
  122:10 176:25
  213:24
six 18:21 69:9
  134:2 165:1
  239:12 242:15
size 249:1
skills 14:4
skydiving
  26:15
slight 225:13
slightly 154:12
  243:24
slotted 29:16
small 22:14
  29:4,19 30:18
  32:7
smaller 32:11
smith 2:7 5:25
smoker 23:12
  23:16,18 54:19
smokers 23:22
  56:23
smoking 23:4,9
  23:11,24 27:1
  220:20
social 69:16
  70:24 71:4,5
  135:4,20,22
  148:24 218:22
  235:15 246:19

246:25
society 13:12
  13:24 14:9
  222:23,24,25
socioeconomic
  28:3 121:10
  215:19 218:20
  219:5
sold 39:17
solution 71:25
solutions 5:15
solving 37:7
somebody
  25:14,19 31:4
  31:6 37:13
  60:6,15 72:18
  80:23 106:11
  106:13 139:12
  140:7 163:4
  170:9 206:7
  208:13 215:1
  226:22 227:4
  241:8
somebody's
  55:24 77:2
  138:23
somethings
  240:24
sonic 1:9 2:11
  6:1,9 7:1 101:2
  209:25 210:3,6
  210:10
sophisticated
  108:3 152:24

sorry 9:23 11:4
  16:25 38:22
  52:4 59:25
  60:4 63:19
  90:7 93:9
  99:13 100:21
  134:20 145:2,4
  160:22 162:11
  165:9 190:3,18
  212:7 216:7
  217:13 239:13
  242:19
sort 17:22
  22:21 37:23
  53:15,23
  101:24 111:1
  137:3 139:13
  147:12 156:12
  158:12 175:15
  177:9 188:13
  192:9 205:16
  245:7,10
  249:14
sought 91:15
  92:19
sound 101:23
  184:16
sounds 107:14
  194:4 209:12
  223:21 232:20
  237:5
source 216:17
sources 95:20
  218:19

south 2:14
southern
  169:19
spark 81:4
speak 30:14
  31:18 88:12,14
  192:14 196:13
  233:8
speaker 75:11
speaking 75:2
  85:25 115:14
  141:13 177:21
  200:2
speaks 101:24
  129:18 205:19
special 34:20
specific 10:15
  15:16 46:20
  65:14 94:18
  99:23 100:12
  100:16 132:5
  145:11 220:13
  247:19
specifically
  14:2,18 19:12
  26:24 28:24
  46:8 81:6,10
  83:3 111:15
  126:11 147:7
  148:2 179:18
  188:16,21
  192:2 213:10
  222:8

| | | | |
|---|---|---|---|
| **specifics** 33:17 54:19 | **staff** 234:3 | **statement** 42:22 57:8 | **steadily** 35:14 |
| **spectrum** 32:21 118:10,11 142:15 170:24 170:25 | **stage** 184:15 | 59:17 63:7 130:23 131:24 148:11 214:7 | **stenographic** 127:22 |
| | **stages** 94:1 245:2 | | **step** 15:2 162:13,13 171:25 188:4 |
| **speculation** 142:11 172:9 175:25 186:2 247:2 | **stand** 63:6 216:18 | **states** 1:1 4:15 4:20 5:8 109:17 112:2 128:6,24 129:4 132:9 148:18 216:13 247:11 | **steps** 138:4 208:24 |
| | **standard** 24:8 31:15 208:6 222:16 233:25 | | **stick** 229:23 |
| | | | **stocks** 34:2 |
| **speculative** 141:11 | **standing** 126:3 245:6 | **stating** 155:19 212:4 | **stolen** 192:20 |
| **spend** 193:16 | **standpoint** 70:16 176:18 208:3 247:23 | **statistical** 15:18,23 17:14 19:22 69:15,15 | **stop** 201:23,24 |
| **spent** 21:20 | | | **straight** 78:3 121:25 175:3 |
| **spins** 199:8 | **start** 38:7 39:5 40:10 153:6 231:18 232:17 232:21 | **statistically** 248:17 | **straightforward** 213:13 |
| **split** 8:25 38:7 162:12 | | | **strain** 178:20 |
| **splitting** 145:16 | **started** 16:24 19:3 | **statistics** 13:6 16:21 17:11 70:17 111:22 | **strategic** 19:23 |
| **spohnholtz** 3:8 5:14 | **starting** 14:22 21:2 22:19 23:12 58:9 88:1 158:1 | **status** 23:4,9,12 27:1,15 28:3 31:1,23 32:23 54:8 55:24 56:6 103:19,19 121:10 141:19 164:5 176:11 215:20 219:5 221:5 | **strategies** 85:9 86:20 186:18 194:14 212:10 213:3,14 |
| **sponsored** 32:1 | | | **strategy** 86:18 86:23,24 167:3 175:11 176:21 188:14 189:23 189:24 190:12 190:14 197:16 198:4 199:10 204:4 |
| **spot** 125:6 218:8 | **state** 5:17 13:5 131:16 170:14 181:21 204:24 206:19 251:1,4 251:24 | | |
| **spots** 81:15,25 | | | |
| **spray** 15:25 | | | |
| **spraying** 15:19 | | | |
| **spreadsheet** 98:4 104:8 208:21 | | | |
| **spreadsheets** 97:23 209:22 | **stated** 42:22 58:16 155:24 170:16 207:12 207:21 | **stay** 19:25 37:24 | **stratify** 220:23 |
| **ss** 251:1 | | | **stream** 151:7 157:21 176:3 |
| **st** 151:23,23 | | **stayed** 37:9 | |

**[streams - sure]** Page 62

| | | | |
|---|---|---|---|
| **streams** 71:12 151:3 195:13 | 216:1,2 | 199:17 226:18 226:18 | **supplement** 235:5 |
| **street** 2:9,18 3:4 80:12 81:11 | **submission** 65:25 | **suggest** 196:16 | **supplemental** 4:11 145:6,21 235:6 |
| **stress** 218:23 | **subscribed** 79:23 250:10 252:22 | **suggesting** 127:9 | **supplied** 164:3 |
| **stressful** 28:7 | **subscription** 79:22 | **suggests** 130:9 | **supply** 185:6 205:6 206:9 |
| **strikes** 58:6 219:3 | **subsequently** 91:17 | **suicidal** 26:21 | **support** 52:17 52:23 132:17 |
| **stripping** 44:24 | **subset** 249:12 | **suing** 41:13 | **supported** 64:6 |
| **studied** 17:7 | **subsidiaries** 1:10 | **sultanian** 2:13 3:17 6:2,2,16 93:5 99:1 | **supporting** 152:7 |
| **studies** 19:4 20:18 21:6 23:21 28:17,22 122:17 | **substance** 9:13 | 144:22 204:12 210:15,17,20 211:25 213:25 | **supportive** 132:12 |
| **study** 13:11 17:24 22:23 70:6,12 122:21 123:1 216:14 217:6 218:1,3 218:5 | **substandard** 24:16 31:15 59:2,20 60:8 223:16 | 216:7,10 218:6 219:10 223:9 228:6 231:7 233:14 234:15 236:13 237:6 237:23 238:9 239:17 240:8 242:25 246:3 | **supports** 218:11 |
| | **substantially** 218:10 | | **suppose** 78:21 228:9 |
| | **substitute** 208:15 209:10 | | **suppressed** 177:21 |
| **studying** 19:4 21:21 27:20 | **subtract** 242:14 | **sum** 167:12 169:1 176:6 186:16 196:18 196:20,24 199:4,7 200:21 213:18 | **sure** 14:18 17:1 17:1,21 19:8 21:13 41:1,9 45:19 47:18 49:2 51:11 58:18 87:7 95:24 112:18 123:8 136:22 138:21 154:20 159:16,25 169:24 174:12 178:14 180:15 185:9,11 188:4 |
| **stueve** 2:2 5:21 52:16 | **successful** 65:9 | | |
| **stuevesiegel....** 2:5 | **suddenly** 232:17 | | |
| **stuff** 191:17 | **sued** 49:13 | | |
| **subcontractor** 15:15 16:9 | **suffer** 136:20 | **summary** 218:13 | |
| **subheading** 217:14 | **suffered** 85:20 86:9 187:24 211:12,15 | **sums** 177:9 197:1 | |
| **subject** 47:18 102:15 205:7 | **sufficient** 140:11 199:9 | **super** 24:7 | |

**[sure - talking]** Page 63

200:7 204:21 219:13 247:1
**surface** 209:12
**surplus** 168:22
**surprise** 78:25 90:2,4 233:24
**surprising** 237:20
**survival** 77:4 157:10,16 158:18,23 159:21 204:1 222:13 224:19 237:17 238:25 242:16
**survive** 109:13
**survived** 23:1 121:8
**survives** 173:4
**surviving** 116:14
**suspect** 14:8 65:19 232:13
**suspicion** 108:7
**swear** 5:20 79:1
**swinging** 178:22
**switch** 83:12
**sworn** 6:19 42:8 48:21 250:10 252:22
**symptoms** 60:22

**synonymous** 124:23
**synthetic** 148:5
**system** 110:21 110:21 111:1

**t**

**t** 4:1 6:21 210:16
**tab** 216:4
**table** 21:25 22:3,18,21,22 22:23 24:7,8 25:12 53:15 59:11 64:8,9 64:10 90:19,21 91:10,12,22,24 100:18,20,21 100:25 101:1 101:18,22 102:3,18 107:20,20 119:18 120:5,8 120:13,13 121:13,15,19 121:19 122:24 124:6 125:13 126:22 127:3 133:23 134:6 135:3,8 138:2 140:23 158:13 158:18 159:10 159:24 160:6 163:9 209:1,3

219:24 220:2 221:10,17,20 221:23,24 223:1,7,11,18 223:19 224:1,3 225:2,9,14,25 240:14 243:16 243:17 249:14
**tables** 4:15 23:10,25 24:5 24:22 53:21,24 61:5,7,13 64:7 119:21 120:14 120:17 122:13 123:24 124:5 124:22,25 125:19 126:16 139:6 160:13 219:12,20 221:12,14,15 221:23 222:2,6 222:17,20 223:5,13,15 224:5,6,9
**tail** 147:10
**take** 8:21 15:2 18:15 23:25 28:8 40:22 64:13 71:4,5,7 77:3 81:2 117:11 121:25 127:12,14 138:4 147:23 148:13 150:2,9

154:21 156:8 171:25 174:15 187:21 188:4 189:2,6 192:4 199:15 201:16 203:5 208:18 208:24 218:7 224:11 225:10 226:7 227:25 228:16 230:4 233:9 236:21 245:11
**taken** 1:18 5:6 5:11 55:19 56:25 61:4 64:20 127:17 139:22 161:22 165:12 185:5 204:16 231:3 251:9
**takes** 8:20 156:2,9,19 208:8,23 248:17,21
**talk** 17:5 33:18 61:2 195:11 231:8,10 238:15
**talked** 54:5 55:7 77:12 205:20 221:8 227:16
**talking** 21:17 44:14 48:25

**[talking - things]**    Page 64

49:5 56:9,9,13
60:10 69:25
70:21 115:6,8
123:18,19,20
124:19,20
161:20 213:17
226:22 227:12
228:15
**talks** 147:11
**tangentially**
26:5
**tapes** 230:23
**task** 94:2
**tax** 199:20
201:3,5 203:23
**taxable** 201:10
**taxes** 199:19,20
199:21 200:15
200:17,24
**tech** 13:2
**technically**
20:13
**technique**
65:16
**technology**
15:22
**tell** 7:21 8:1,6
12:23 15:5
31:19 48:16
49:4,7 70:20
90:3 99:23
100:7
**telling** 180:20

**temperature**
15:25 16:2
**ten** 18:17,20
35:7 68:3,11
69:2 97:2,11
97:16 98:5
122:18 123:3,5
123:25 152:2
155:3,4 166:7
167:4,15,25
171:17 172:21
173:4,13,22
174:4,9 175:10
176:5,22
177:15,22
182:11,25
183:22 186:8
186:22 187:19
189:21 190:10
195:8 196:1,25
197:21 198:5
199:6,10,18
201:19 203:8
204:4 213:16
224:14,24
225:21 231:16
232:7,12,21
233:3,10
244:18
**tendency**
105:18
**term** 11:8,20,21
11:23 12:6,9
12:10 21:24

37:16 75:5
76:12,20 182:3
182:3,4 211:20
211:23 222:14
**terminate**
26:21
**terminology**
232:1
**terms** 71:1 88:3
166:11,11
**test** 139:13
227:5,10
**testified** 6:20
18:17 41:5
48:8 51:19
57:3 65:1 67:5
168:6 214:1,7
215:17 219:14
220:13 231:13
236:1,4,8
246:17
**testify** 9:14
40:1 43:2
67:15 193:25
**testifying** 39:24
40:20 42:3,13
43:18 122:7
125:15 126:12
205:11
**testimony** 9:10
29:7 40:5,15
42:9 46:11,14
48:11,17,22
65:1,7 66:18

75:2 110:2
118:4 120:19
139:8 198:14
199:2
**testing** 15:23
92:11 140:6,9
142:3,9
**tests** 91:17
136:18 141:8
141:20
**text** 74:14,15
**thank** 17:1,5
74:7 115:25
204:7 216:8
220:12 221:3
**theft** 47:19
148:5,5,6,7
186:25 188:12
240:5
**themself** 104:7
**theories** 41:16
218:24
**theory** 44:21
52:24 167:2
228:9 247:18
**thing** 34:21
69:16 70:7
72:8 80:20
106:8 140:5
163:5,12
191:12 230:2
**things** 11:6
17:10 23:4,14
25:19 26:4,25

**[things - times]** Page 65

37:2 44:22
45:24 49:1
67:25 74:18
77:6 79:20
80:12 96:18
119:6 124:15
124:17,22
136:7 138:13
138:13 152:8
157:4,13 163:1
168:7 178:9
180:22 205:23
207:5 220:21
222:9,12
228:16 240:7
241:16
**think** 10:9
16:14,17 17:10
20:7 21:15
24:11,16 30:20
33:2,4 43:11
43:12,13,24,24
46:10,11 48:11
48:12,25 49:6
49:24 50:22,22
51:21,22 52:15
54:17 55:12
57:3,16 65:16
68:2,2,17,19
72:16,16,17
74:25 79:19
80:13,17,18,20
81:12,13,17,22
83:25 93:1

98:2,23 105:16
110:9 112:11
114:19 118:3
121:1,22 125:8
125:9 127:25
131:15 132:22
136:17 138:17
139:14 140:10
141:22 142:3
143:5,13
145:20,24
147:22 154:3
156:1 157:13
166:19 170:4,8
176:1,7 177:18
181:22 183:24
189:17 190:6
196:3 197:9
204:8,22
207:19 209:15
210:24 211:22
214:24 215:3
215:22 218:3
219:14 220:12
221:11 222:23
222:24 223:25
224:18 231:13
234:4,25 236:8
236:9 239:4,23
241:1,3 246:13
246:25 247:23
**thinking** 17:17
46:12 77:16
180:25

**third** 83:2
**thirds** 127:10
**thorough**
139:10
**thought** 48:20
52:4 70:18
89:6 108:15
113:19 150:7
184:9 225:7
241:13,16
**thoughts** 26:21
**threat** 148:23
235:15
**three** 9:21,25
14:6 20:7 83:1
83:1,17 88:8
97:2,11,16
98:5 152:1
155:2 158:24
161:16 167:3
167:14,24
171:16 175:10
176:5,22
177:14,16,17
177:22 182:11
182:24 183:21
189:21 190:10
195:8 196:1,15
196:25 197:21
198:5 202:1
204:3 210:4
213:16 224:14
224:19,24
225:8,20

231:15 241:20
**threshold** 14:5
**thresholds**
13:21
**timber** 178:8
**time** 9:5 13:8
16:15 21:1,20
22:8 23:16
37:4 44:8 46:6
51:1 62:15
63:1,2,11,17,20
76:23,23 78:21
78:21,25 82:11
82:25 84:5
89:25 97:3,22
98:9 122:25
123:10 150:9
156:22 157:23
167:10 169:9
174:10 177:20
179:10 181:5
185:12 192:25
193:14 196:5
202:6,16
210:23 218:7
225:6 231:10
240:21 242:5,7
242:9 243:3
244:24 248:19
249:3,10,13,22
**times** 19:19
36:13 82:23
83:1 114:18
143:5 150:21

**[times - try]** Page 66

154:2 157:23 197:8 202:1 211:19 212:9
**tiptop** 25:15
**title** 22:5 68:21
**titled** 4:19 217:3
**tm** 149:12
**tobacco** 23:13
**today** 7:2 9:10 9:15 41:4 42:4 59:16 63:6 123:2 151:8 173:2,9,12 174:8 176:7 187:19,19 195:12 212:9 242:20 249:16
**today's** 5:3 10:3
**toes** 20:25
**together** 61:5 73:1 74:2 90:16 91:1 96:7 113:21 114:10,22 117:6 120:17 121:13 122:12 128:12 139:5 162:2,8,17
**told** 54:6 55:9
**toll** 28:9
**took** 15:11 87:21,23,25

102:9,18 112:6 149:4,18 160:18
**top** 14:8 33:2 34:17 42:20 43:14 67:19 84:9 112:16 217:9,20 219:1 223:7
**topic** 54:24 81:6 215:17
**topics** 221:8
**total** 42:23 94:14
**towards** 29:8 44:10
**track** 2:11 6:1 7:2 10:16 234:22
**tracking** 248:23
**trade** 2:8
**tradeoff** 178:21
**training** 62:18 206:21
**tranche** 87:1,2 94:10,13,13 96:22 98:18 100:23 101:8 102:2,4 103:12 109:18 111:11 116:25 117:25 134:1,8,10,11 135:11 143:15

143:21 144:4,6 144:12 145:15 146:18,19 147:11,12,15 147:19,25 148:3,16,22 149:15,23,23 149:23 152:21 152:22 153:9 153:10,21,22 153:24 163:17 163:20 205:23 206:3,4,6 235:9,11
**tranches** 86:17 87:1 88:2,5,8 96:15 101:25 113:7 117:15 144:9 205:22
**transaction** 50:13
**transcript** 4:22 4:23,24 5:1 131:17
**transcripts** 84:11
**treasuries** 166:7
**treasury** 151:14 152:5 166:4,11,24 181:25 184:1
**treat** 108:18 110:4,5 164:14

**treated** 112:20 164:20
**treatment** 60:21 62:2 91:16 207:4
**trend** 62:20 123:11
**trends** 62:20
**trial** 40:5,18,21 41:17 46:14 51:20,21 65:1 65:2 66:19 67:16 245:4
**tried** 21:7 133:25 146:12
**trigger** 71:20 77:25
**triggered** 72:2
**triggering** 69:18 71:17 72:1
**trouble** 175:15
**true** 57:8 70:11 113:8 229:7 236:21 240:16
**trust** 49:23 77:1,1,7,13,15 77:19 78:1
**trustee** 49:24
**truthful** 9:10
**truthfully** 9:14
**try** 19:15 28:17 114:20 137:2 210:22 220:19

Veritext Legal Solutions

**[try - understanding]**

239:4 244:1 248:22,24

**trying** 8:8 17:5 71:3 80:13 105:18,19 114:24 125:7 125:21 156:6 158:7 166:8 167:10 175:19 196:20 198:25 201:12 203:1 208:10 213:5 225:15

**turn** 58:12 66:17 83:22 93:7 133:19 165:22 196:23 203:20 217:2

**turned** 50:16

**turning** 78:9 101:16

**two** 9:25 20:7 36:18 38:1,4,5 38:8 41:3 48:25 54:17 79:15 80:8 83:1,7 84:2 86:16 87:1 88:7 101:25 102:24 104:4,6 113:13 124:22 127:10 151:3 155:15 157:4 157:13 161:15

196:17 208:23 228:15 234:19 241:9,22

**type** 14:12 23:5 26:17 32:16 133:9 169:7 183:23 205:1 213:23 230:14

**types** 11:16,19 12:12,17 15:3 26:4 31:20 36:5 50:25 85:18 86:7,17 116:24 136:17 136:18 205:7 211:11 216:1

**typical** 22:19 64:1 206:7,12

**typically** 33:20 62:1 105:13 124:18 168:21

**typo** 95:22

**u**

**u.s.** 127:2 158:13,18 159:10 163:9 166:4,10 221:19,23 223:6 224:10 225:9 243:16 243:17

**uh** 9:20 10:8 12:12,20 16:4

16:10 18:22 30:24 33:24 37:24 39:23 44:1 50:14 52:17 62:5 64:12 68:25 78:2 79:3 82:22 83:19,24 87:11 88:12 100:24 101:13 145:19 146:20 159:1 160:12 162:18 178:25 183:7 192:24 207:13 209:5 224:5

**ultimately** 95:14 96:17,20 180:16 229:20 229:21 245:3

**umbrella** 11:14

**uncertainty** 29:21 167:5

**unclear** 218:17 218:20 227:2

**under** 9:12 11:13 26:16 41:15 75:6 77:9 103:16 104:12 134:23 135:22,24,24 136:25 142:2 183:3,7 217:14 233:2 244:10

251:6

**undergoes** 227:12

**underlying** 53:10 124:12 222:19

**understand** 7:20,22 21:15 29:7 30:4 36:6 58:19 59:5 90:9,13 98:16 114:23 120:18 125:14 137:2 141:3 161:11 166:8 174:6 188:1 193:14 198:24,24 201:12 203:2 212:18 221:21 229:21 230:15 232:10 233:21 234:1

**understanding** 14:16 35:2,8 64:3 84:17,22 85:2,4,10,18 86:7,16 87:4 89:17,20 90:5 94:6 99:17 101:21 104:24 135:7,16 136:5 136:15 138:7 155:18 184:6 188:5,6,9,18,20

**[understanding - utilize]**

| | | | |
|---|---|---|---|
| 188:25 210:6 212:1,23 213:1 215:4 232:4 243:5,8,10 244:25 245:2 246:18 | **united** 1:1 4:15 4:20 5:8 109:16 112:2 128:6,24 129:4 132:8 216:13 | **ups** 169:25 **usa** 1:9 2:11 6:1 7:2 **usage** 117:17 **use** 20:16 32:23 | 105:9 107:19 112:19 116:14 117:9,12,15 124:22 127:1,3 134:16,17 |
| **understood** 7:19 8:5,11,14 8:23 9:4,8 219:13 226:2 246:13 | **universal** 20:11 20:23 21:3,9 39:15 79:13 180:23 | 33:5 34:22 96:21 105:11 117:16,21 119:14,15 120:12 122:11 | 143:23 144:9 148:4 149:25 150:10 151:21 154:4 158:19 159:20 160:22 |
| **undertake** 141:7 142:8 247:25 | **university** 13:5 15:5 17:7 36:6 | 123:24 125:1 125:18 126:15 126:22 139:5 | 165:25 179:25 181:5 183:6 213:23 219:16 |
| **underwriting** 25:7,9 27:5 29:14,20 30:3 31:2,3,22 32:14 55:14,16 58:25 62:3 118:7,8,9 139:10,16 220:18 226:15 226:25 | **unknown** 101:12 **unlikelihood** 116:13 **unpaid** 90:11 **unquote** 59:2,7 81:24 132:18 **unrealized** 34:23 **unrelated** 187:25 | 140:22 153:17 154:18 159:19 163:9,10 181:23 183:1 184:7,24 185:1 186:24 196:23 196:24 197:6 207:12 209:2 214:16 220:22 221:11,18 | 221:2,10 222:6 222:8 224:2 226:24 231:23 234:24 **uses** 117:11,13 117:13 182:3 **using** 14:3 44:25,25 90:21 91:11 108:7 167:5,7 180:4 |
| **unedited** 81:7 **unfair** 49:25 **unhealthy** 118:15,24 | **unsure** 215:19 **unusual** 122:2 192:8 193:21 205:5 | 225:1,16,25 234:21 246:22 247:4 **used** 13:25 | 184:23 192:6 201:1 214:25 221:19 224:21 225:5,13,18,18 |
| **unique** 17:10 **unit** 5:4 64:19 64:23 127:16 127:20 165:15 165:20 231:2,6 250:4 | **update** 126:21 208:17,22 225:10 **updated** 208:22 **updates** 151:25 **updating** 209:4 **upload** 66:7 | 20:21 21:8,10 22:3 45:5 56:21 57:20 58:21 61:11 87:12 88:5,9 91:10,22 96:18 96:19 98:3 | 246:5 249:2 **usually** 12:2 18:1,1 22:13 23:10,10 27:5 81:4,4 120:23 **utilize** 159:15 194:17 |

**[utilized - want]** Page 69

utilized   160:1
utilizing   61:7

**v**

v   252:2
vague   43:10
  55:21 84:21
  86:13
vaguely   246:21
valid   23:19
  54:21
validate   156:12
validation
  162:13
valuable
  138:22
valuation   19:7
  198:3 222:6,17
  222:25 223:13
value   11:15
  43:22 46:16
  50:8,9,10
  68:24 71:23
  77:6 86:19
  96:25 97:6
  156:19 158:8
  158:12,16
  159:17 161:3
  167:10,12
  168:1 171:13
  171:19,21
  172:2,19
  174:10 175:19
  182:19 186:7

189:24 190:13
192:12 196:5
197:12,13,25
201:14 203:3
203:18 206:1
208:8 210:25
212:14 213:23
231:14 237:9
239:2
values   71:12
  76:25 97:14
  149:18 157:5,9
  162:3 166:8,21
  175:21
valuing   42:13
  171:18 176:6
  182:4,13 213:2
variable   39:15
  79:13 230:14
varied   25:2
  218:10
variety   11:6
various   11:16
  11:17 15:23
  19:5 53:21
  55:15 88:4
  101:8 166:12
  183:2
variously
  218:21
varsity   38:20
vehicle   183:24
verbal   8:19

verbally   8:21
verge   71:21
verify   102:7,11
  102:11 164:2
  247:19
veritext   5:15
  252:1
version   169:19
  225:1,12,16
versions   45:1
  169:20
versus   23:11,12
  23:18 48:23
  52:6 58:3
  172:3 230:17
vet   87:15
  107:24 144:11
videographer
  3:8 5:2,15
  64:17,21 72:20
  99:9 127:14,18
  165:10,13,18
  204:10,14,17
  230:25 231:4
  250:1
videotaped
  1:16
view   171:18
  180:18 182:14
vigilantly   192:7
virtue   103:15
vital   247:12
vs   4:4

**w**

wachovia   48:23
  48:24 49:7,16
  50:11
wait   8:25
walk   154:15
walks   140:24
wall   80:12
  81:11
want   10:10
  11:24 15:2
  18:25 27:6
  47:16,16 49:1
  51:24 56:15
  58:17 64:25
  66:2,7 69:6
  73:24 81:17
  86:1 112:15,17
  119:24,25
  120:1,2 125:4
  125:4 126:1,4
  131:7 154:18
  160:23 161:10
  167:12,20
  198:18,20,23
  198:24 202:15
  202:21 208:19
  211:17 214:19
  215:17 218:18
  219:11 224:11
  228:16 231:8
  231:10 238:15
  247:8 249:9

wanted  15:21 16:18 77:20 96:1 97:11 105:20 149:22 149:25 153:11 166:13 174:14 174:15
wants  172:16 173:8 175:1
washington  3:4
water  20:25
way  28:10 38:24 81:15 97:24 108:2 110:20 114:9 128:23 129:2,4 140:2 142:22 150:15 152:11 156:12 162:16 163:25 166:22 177:12 184:22 186:4,20 191:22 193:25 197:6 198:10 198:19 203:21 208:21 215:21 216:23 240:12 246:13 248:24
ways  27:24 82:10 120:3 141:22 142:4,6 247:19
we've  35:14 51:7 54:5 55:7

64:14 157:21 162:19 179:25
wealth  28:23 30:20
wealthier  30:5 30:6 215:23
wealthy  30:21 216:2
web  79:20
website  4:7 68:1 69:6 74:6 74:12 75:1 79:18 80:2,5 80:25 81:18,22 82:6 83:6,8 151:25
weeds  188:13
weighted  105:9 105:11 106:5 106:14,23 108:10 113:15 116:5 140:20
weird  123:22
went  13:15 19:10 43:20 53:23 79:22 105:7 176:9 179:13 192:22
west  2:18
western  169:19
whatsoever 73:15 122:5
whereof  251:19

white  68:1
wide  60:24 92:5 142:15
wife  191:16 192:7,25 193:20
willing  18:14 196:21
wisconsin  1:18 1:19 5:13,13 36:18 251:1,4 251:10,20,24
wisely  200:5
withdrawn 65:24
witness  5:20 6:18 11:7 24:4 25:6 26:1 27:13,24 28:15 29:13 30:14 31:18 32:10 33:1,11,20 34:8,16 35:13 39:2,6,24 40:3 40:20 42:3,7 44:12 46:2,9 46:18,23 47:1 47:12,21 48:2 48:8 53:7 54:1 54:11,23 55:5 55:12,19 56:5 56:17 57:7,12 57:16,22 60:18 61:15,23 62:6

63:16 67:6 72:22 75:2,10 76:9 78:15 84:23 85:15 86:4,15 87:25 88:20 90:13,18 91:4,21 92:5 92:16,23 94:20 95:8,24 96:9 98:1,12 100:1 102:21 104:1 104:14 105:5 106:16 107:4 108:13 110:3 111:5,14 112:11 113:5 114:19 115:2 115:19 116:8 117:8 118:7 119:2 121:18 122:15 123:14 124:4 126:10 126:18 128:22 129:19 130:3 130:16 131:18 132:4,22 133:12 136:22 137:6,15,23 139:1,9 140:1 140:22 141:17 142:12 143:3 155:7 157:8 164:18 167:17 168:19 169:5

**[witness - yeah]**

170:8,19 171:12 172:10 172:24 174:2 174:20 175:5 176:1 179:19 179:24 186:3 187:3,12 192:16 193:4 194:3,24 196:13 197:9 199:3 200:10 203:10 211:22 213:10 219:8 228:3 233:8 234:14 237:2 237:13 238:7 239:16,23 245:24 249:24 251:19

**witnesses'** 252:3

**witt** 1:16 5:5 6:18,23 38:8 52:10 66:8,12 74:6,9 75:6 99:9,14 210:18 216:14 231:8 250:8 252:3,21

**witt's** 4:6,7

**woman** 72:23

**word** 64:2 80:16 89:5,9 212:11 221:19 236:18

**words** 47:14 58:1 67:4,14 87:20 91:15 92:12 102:17 103:4 112:22 114:5 152:15 153:13 164:10 167:11 209:16

**work** 7:11 10:17,24,25 14:25 17:8 20:5 25:20 35:21 37:11,12 74:17 130:7 155:12

**worked** 15:1,10 15:14 19:1 31:10 35:7 36:12,18,24 60:16 61:9 96:14 160:6 168:5

**working** 13:20 13:25 14:11,18 14:20,22 15:22 21:5 24:13 27:19 33:13 37:4 39:8 78:17 109:12 110:19,21 177:24 179:15 243:13

**works** 20:18 247:2

**world** 2:8 192:15

**worley** 4:11,13 83:23 84:20 86:16 87:13,20 88:7,12 96:12 96:13,16 97:10 116:23 118:1 143:16 145:6 146:24 147:4 147:11,24 163:17,21 164:8 185:24 186:7 187:13 188:7 189:21 190:11 209:5 211:2 212:10 212:24 213:4 214:1 215:15 232:6 233:9

**worley's** 10:6 84:16 86:25 88:2 117:14 143:21 146:14 188:20 212:20 232:5 233:2 235:1,10

**worry** 248:10

**worse** 142:14 142:17 143:9 224:1

**worsening** 122:23

**worst** 192:21

**worth** 173:12 182:22

**write** 17:22 70:18 80:17,21 81:5,25 83:3

**writes** 80:23

**writing** 251:6

**written** 58:7 59:13 73:14 78:17 81:21 138:17

**wrong** 17:3 54:7 128:20 222:4

**wrongdoing** 212:3 213:8 215:5,10

**wrongly** 48:19

**wrote** 63:4

**x**

**x** 3:13 4:1 6:21 94:12,13 135:17,21 136:3 210:16

**xs** 135:12 137:4 138:12

**y**

**yards** 14:21

**yeah** 15:14 23:10,21 25:6 34:3,8 35:11 41:9,9,22

**[yeah - zoom]**                                                Page 72

| | | | |
|---|---|---|---|
| 45:10 54:14 64:16 70:21 72:16 74:4,16 81:12 89:23 92:9 98:1 120:1 126:22 134:24 143:14 145:20,24 150:10 153:15 158:15 166:19 170:19 174:12 175:8 190:25 192:16 193:13 200:10 203:13 205:16 214:10 214:19 215:6 217:12 219:8 222:24 226:20 227:7 229:19 234:9 236:19 239:19 242:2 248:24 | 158:23 163:2 163:16,19,19 165:8 166:7,14 166:15 167:4 167:24,25 174:4,9 176:5 176:22 177:13 177:15,16 181:25 182:11 182:25 183:22 189:21 190:10 196:15,25 197:21 199:10 199:18 204:4 213:16 224:14 224:19,24 225:21 233:13 239:12,13 241:9,9,14,15 243:20 244:7 244:25 246:5 | 98:5 102:8 104:18,22 106:9,12,24 107:8,18,19 108:16 109:4 109:22,24 110:8,11,23 111:11 112:5,6 113:10,12,13 113:13 115:9 122:7,22,24 123:4,4,16,25 128:19 158:21 158:24 165:1 167:15 171:17 172:21 173:4 173:13,22 175:10 177:17 177:22 178:2 179:13 186:9 186:22 187:19 195:8,9,10,21 196:2 198:5 | **yields** 152:2 166:5,24 184:1 **york** 2:9,9 252:1 **younger** 109:24 114:13,14 242:8 **yup** 27:3 120:21 160:16 235:10 244:12 |
| **year** 13:17 18:2 27:7 34:12,12 73:5 97:11,16 106:20 112:1 113:12,12 114:6,7 122:18 123:5 128:7 132:14 150:19 152:2,5,20,20 153:2,6,7,11,11 153:25 154:6,7 155:2,3,3,3,4 | **yearly** 153:2,24 **years** 13:21 14:6 17:3 18:17,20 20:5 20:7 21:2 31:9 35:8,19 36:19 38:1,8,21 49:21 51:23 54:2 60:17,22 61:11 66:19 67:4,15,21,23 68:3,11 69:2 72:17,24 97:3 | 199:7 201:19 203:8 212:8 217:8,20,21,21 223:1,2 231:16 232:7,12,16,21 232:24 233:3,5 233:10 241:11 242:14,15 244:4,18,22 **yield** 169:3 | **z** **zero** 156:4 157:23 209:10 209:11 **zoom** 9:18 99:7 145:5 146:24 159:10 |

Veritext Legal Solutions

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.