## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### (Newark Vicinage)

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br><br>This Document Relates To:<br>All Tracks | Civil No. 2:19-md-02904-JKS-MAH<br><br>Judge Jamel K. Semper |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERTS MARY FRANTZ, AMY WORLEY, SCOTT WITT, AND SHARON ANOLIK

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.  FRANTZ'S EXFILTRATION AND DARK WEB OPINION SHOULD BE EXCLUDED. ...................................................................................................2

    A.  Plaintiffs' Effort to Recast Frantz's Opinion and Their Own Risk-of-Injury Theory Should Be Rejected. .................................................4

    B.  Frantz's Exfiltration and Dark Web Opinion Is Not Grounded in Reliable Facts or Methodologies. ..............................................................5

        1.  Plaintiffs Have No Defense of Frantz's Methodologically Unsound Dark Web Searches. ....................................................6

        2.  Frantz's Analysis of Third-Party Documents Is Unreliable and Not a Proper Subject of Expert Testimony. ...............................12

    C.  Frantz's Opinion Does Not "Fit" This Case Because ██████████ ████████████████████████████████ ................18

    D.  Frantz's Reply Report Is Improper Bolstering Rather Than Rebuttal. ..........................................................................................19

    E.  Plaintiffs' Defense of Frantz's Merits Opinions, Which Defendants Do Not Challenge at This Stage, Should Be Disregarded. ...................................................................................21

II.  WORLEY'S OPINIONS SHOULD BE EXCLUDED ...................................22

    A.  Worley's "Experience"-Based Opinions Do Not Satisfy the Requirements of Rule 702. .....................................................................23

    B.  Worley's Risk of Harm Opinion Is Unreliable and Does Not Fit. ..........25

        1.  Worley's Risk of Harm Opinion Does Not Fit the Case. ...............25

        2.  Worley's Risk of Harm Opinion Is Not Based on Reliable Facts or Methodology. ..........................................................27

    C.  Worley's Duration of Risk Opinion Is Not Reliable. ...............................31

D.    Worley's Mitigation Products Opinion Is Not Reliable or Helpful.........34

    1.    Worley Did Not Use a Reliable Methodology to Form Her Mitigation Products Opinion. .......................34

    2.    Worley's Mitigation Products Opinion Does Not Require Specialized Expertise and Is Not Helpful. .......................36

E.    Worley's Opinions Do Not "Fit" the Facts of the Case. .........37

III.    WITT'S DAMAGES OPINION SHOULD BE EXCLUDED. .......................37

A.    Witt's Opinion Should Be Excluded Because It Relies on Inadmissible Inputs. .......................37

B.    Witt's Assumptions on Mortality, Discount Rates, and Duration are Arbitrary and Unreliable.......................39

C.    Witt's Opinion Rests on Simple Arithmetic that Requires No Specialized Knowledge to Perform.......................42

IV.    ANOLIK'S OPINIONS SHOULD BE EXCLUDED.......................43

A.    Anolik's Opinions Are Impermissible Legal Opinions that Must Be Excluded.......................43

B.    Anolik's Opinions Lack Any Reliable Methodology.......................47

C.    Anolik's Opinion that ███████████████ ███████████████ Should Be Excluded. ...........50

CONCLUSION .......................50

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Allen v. Int'l Bus. Machs. Corp.*,
 1997 WL 34501372 (D. Del. Dec. 18, 1997)......................................................25, 30, 35

*Bally v. State Farm Life Ins. Co.*,
 335 F.R.D. 288 (N.D. Cal. 2020) ........................................................................ 38, 40

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
 455 F.3d 195 (3d Cir. 2006) ...............................................................................43, 45, 47

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
 2019 WL 4751883 (E.D. Pa. Sept. 30, 2019)..........................................................45

*Callas v. Callas*,
 2020 WL 3468084 (D.N.J. June 25, 2020)..............................................................42

*Chopourian v. Cath. Healthcare W.*,
 2011 WL 6396500 (E.D. Cal. Dec. 20, 2011)..........................................................48

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ...................................................................................................26

*Deficcio v. Winnebago Indus., Inc.*,
 2014 WL 4211274 (D.N.J. Aug. 25, 2014) ........................................................ 34, 35

*Duling v. Domino's Pizza, LLC*,
 2015 WL 3407602 (N.D. Ga. Jan. 14, 2015) ..........................................................48

*Dzielak v. Whirlpool Corp.*,
 2017 WL 1034197 (D.N.J. Mar. 17, 2017)..............................................................9

*Ellison v. United States*,
 753 F. Supp. 2d 468 (E.D. Pa. 2010) .....................................................................49

*Equinox Props., LLC v. Hartford Mut. Ins. Co.*,
 2023 WL 5447279 (D.N.J. Aug. 24, 2023) ............................................................48

*States v. Fernwood Hotel & Resort*,
 2014 WL 198568 (M.D. Pa. Jan. 15, 2014) ...........................................................48

*First Nat'l State Bank of N.J. v. Reliance Elec. Co.*,
    668 F.2d 725 (3d Cir. 1981) ............................................................... 13, 45

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
    609 F.3d 1183 (11th Cir. 2010)..................................................................24

*Gopalratnam v. Hewlett-Packard Co.*,
    877 F.3d 771 (7th Cir. 2017) ....................................................................29

*Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan & Tr. Agreement*,
    812 F. Supp. 1376 (E.D. Pa. 1992) ....................................................... 44, 47

*Holman Enters. v. Fid. & Gaur. Ins. Co.*,
    563 F. Supp. 2d 467 (D.N.J. 2008) .............................................................31

*Huang v. TriNet HR III, Inc.*,
    2023 WL 3092626 (M.D. Fla. Apr. 26, 2023).............................................32

*Hughes v. Kia Motors Corp.*,
    766 F.3d 1317 (11th Cir. 2014).................................................................32

*Jaunich v. State Farm Life Ins. Co.*,
    569 F. Supp. 3d 912 (D. Minn. 2021)........................................................40

*Johnstown Heart & Vascular Ctr., Inc. v. AVR Mgmt., LLC*,
    2019 WL 3573663 (W.D. Pa. Aug. 6, 2019) ..............................................19

*Kolokowski v. Crown Equip. Corp.*,
    2009 WL 2857957 (D.N.J. Aug. 27, 2009) .................................................35

*Kuhar v. Petzl Co.*,
    2018 WL 7571319 (D.N.J. Nov. 27, 2018)..................................................50

*Larson v. John Hancock Life Ins. Co.*,
    2017 WL 4284163 (Cal. Super. Mar. 23, 2017) ..........................................40

*MacGlashan v. ABS Lincs KY, Inc..*,
    2015 WL 403067 (W.D. Ky. Jan. 28, 2015)................................................48

*Wolfe v. McNeil-PPC, Inc.*,
    881 F. Supp. 2d 650 (E.D. Pa. 2012) .........................................................45

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002) ...........................................................24

*Maude v. City of Philadelphia*,
    507 F. Supp. 3d 593 (E.D. Pa. 2020) ......................................................... 46, 48

*McClure v. State Farm Life Ins. Co.*,
    341 F.R.D. 242 (D. Ariz. 2022) ............................................................... 39, 42

*Mendler v. Aztec Motel Corp.*,
    2011 WL 6132188 (D.N.J. Dec. 7, 2011)........................................................49

*Miller v. N.J. Dep't of Corrs.*,
    2018 WL 3574876 (D.N.J. July 25, 2018) ....................................................31

*Murray v. Marina Dist. Dev. Co.*,
    311 F. App'x 521 (3d Cir. 2008)..................................................................48

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) .............................................................13, 31, 48

*Ortiz v. Yale Materials Handling Corp.*,
    2005 WL 2044923 (D.N.J. Aug. 24, 2005) ..................................................37

*Player v. Motiva Enters., LLC*,
    240 F. App'x 513 (3d Cir. 2007)..................................................................30

*Schneider ex rel. Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003) ........................................................................49

*Spegele v. USAA Life Ins. Co.*,
    336 F.R.D. 537 (W.D. Tex. 2020)................................................................39

*State Farm Fire & Cas. Co. v. Holmes Prods.*,
    165 F. App'x 182 (3d Cir. 2006)............................................................ 25, 30

*Swartzendruber v. Sentara RMH Med. Ctr.*,
    2025 WL 2655986 (W.D. Va. Sept. 16, 2025)..............................................45

*In re: Tylenol (Acetaminophen) Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    2016 WL 4039324 (E.D. Pa. July 27, 2016).................................................46

*United States v. Leo*,
    941 F.2d 181 (3d Cir. 1991) ..................................................................... 43, 45

*United States v. Universal Rehab. Servs., Inc.*,
    1996 WL 297575 (E.D. Pa. May 31, 1996).................................................46

*In re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*,
  2025 WL 3141002 (D.N.J. Nov. 10, 2025) ............................................................ 23, 30

*In re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*,
  2025 WL 1024048 (D.N.J. Apr. 7, 2025) ............................................................... 11, 28

*Vitamin Energy, Inc. v. Evanston Ins. Co.*,
  2023 WL 5608394 (E.D. Pa. Aug. 29, 2023) ............................................................ 46

*Vogt v. State Farm Life Ins. Co.*,
  2018 WL 4937330 (W.D. Mo. Oct. 11, 2018) .......................................................... 40

*Warner Chilcott Labs. Ireland Ltd. v. Impax Labs., Inc.*,
  2012 WL 1551709 (D.N.J. Apr. 30, 2012) ................................................................ 25

*Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*,
  299 F. Supp. 2d 400 (D.N.J. 2003) ........................................................................... 30

*In re Wellbutrin SR Antitrust Litig.*,
  2010 WL 8425189 (E.D. Pa. Mar. 31, 2010) ............................................................ 46

*Whitman v. State Farm Life Ins. Co.*,
  2021 WL 4264271 (W.D. Wash. Sept. 20, 2021) ..................................................... 40

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
  858 F.3d 787 (3d Cir. 2017) ...................................................................................... 23

**Statutes**

N.J. Stat. Ann. § 56:8-163(b) ........................................................................................ 33

**Rules and Regulations**

Fed. R. Civ. P. 23 ............................................................................................................. 3

Fed. R. Evid. 702 .................................................................................................... *passim*

**Other Authorities**

Aura, Pricing, https://www.aura.com/pricing#all-features (last visited
  Dec. 15, 2025) ............................................................................................................ 36

CyEx, Identity Defense, https://cyex.com/identity-defense (last visited
  Dec. 15, 2025) ............................................................................................................ 36

# INTRODUCTION

Every one of Plaintiffs' experts offered opinions that should be excluded as unreliable, lacking any "fit" to the facts in this case, or beyond the scope of proper expert testimony. Among other issues:

- Frantz concluded that ██████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████

- Worley opined tha█ ████████████████████████████████ ██████████████████████████████████ though this Court previously ruled that Plaintiffs do not have standing to pursue an injury theory based only on such a *risk* of harm.

- Witt relied on Worley's inadmissible opinions for his own damages opinion, and then incomprehensibly assumed █████████████████ ██████████████████████████████████████████████████ ████████████████████████████

- Anolik offers only a legal opinion about ██████████████ , which is solely within the province of the Court, or an opinion about █████ ██████████████████████████

This summary only scratches the surface of the myriad flaws rendering each expert's factual assumptions and methodologies inherently unreliable. However, even on their face, these fundamental issues on their own warrant exclusion of these opinions.

Plaintiffs' Opposition offers no serious defense to any of the methodological and factual flaws infecting every one of their experts. Instead, they attempt to downplay

1

those reliability and fit issues as going to weight rather than admissibility. Sometimes, lacking even that shallow defense, Plaintiffs outright misrepresent the opinions their experts offered and the facts and methodology on which they were based.

The Third Circuit is clear that reliability and fit are both threshold requirements for admissibility under Rule 702. This Court should fulfill its role as a gatekeeper and exclude Plaintiffs' experts' unreliable, irrelevant, and impermissible opinions.

## **ARGUMENT**

### I.    **FRANTZ'S EXFILTRATION AND DARK WEB OPINION SHOULD BE EXCLUDED.**

Plaintiffs' sole remaining damages theory is that the putative classes deserve compensation for the risk of future harm resulting from the AMCA Cyberattack. Under their own theory, Plaintiffs must show that AMCA's entire CHAMP database (which held information pertaining to all members of the putative classes) was exfiltrated by threat actors. If it was not, and the AMCA Cyberattack involved only a much more limited theft of data from AMCA's online payment portal, then the proposed classes cannot be certified because they include an enormous number of people who never interacted with that portal and cannot be at risk of future harm.

Frantz's dark web searches purporting to establish exfiltration through proof that ██████████████████████████████████████████████ would have been the linchpin of Plaintiffs' class certification motion, had she been able to demonstrate full exfiltration of the CHAMP database. But Frantz testified that ██████████████ ████████████████████████████████████████

2

████████████████████████████████████████. Mot. Ex. 3, Frantz Dep. 129:17-20, 310:13-17, 310:22-311:6. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. Unable to defend Frantz's dark web search process, Plaintiffs misrepresent it to the Court. They falsely state that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████. In short, Frantz ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

Plaintiffs attempt to contain the damage caused by Frantz's failed efforts by claiming that her exfiltration and dark web opinion also is supported by the findings of third parties. This is untrue: no third party ever concluded that ████████████

████████████████████████████████████████████████████

████████ And there is no reason to admit "expert" testimony from Frantz summarizing her biased interpretation of those third parties' conclusions, when those third parties were (or could have been) deposed to explain the meaning of those documents and did not support Frantz's strained interpretation. Whether based on her own dark web

3

searches or her mischaracterization of third-party documents, Frantz's exfiltration and dark web opinion is inadmissible under Rule 702.

### A. Plaintiffs' Effort to Recast Frantz's Opinion and Their Own Risk-of-Injury Theory Should Be Rejected.

Across her two declarations, Frantz opined that  Mot. Ex. 1, Frantz Decl. ¶ 329; Mot. Ex. 2, Frantz Reply at 3 & ¶ 39. Defendants showed the myriad reasons why Frantz's exfiltration and dark web opinion is not reliable and does not "fit" the facts of this case. Mot. 7-26. Given these fundamental issues that render Frantz's opinion inadmissible, it is not surprising that Plaintiffs now attempt to back away from it altogether and instead argue that they need only show putative class members' "personal information was *accessed*." Opp. 10 (Plaintiffs' emphasis).

But Plaintiffs' own theory of their own path to show classwide injury—actually, only a *risk* of future injury—depends on more than just access. Worley, another of Plaintiffs' experts, claims that █████████████████████████ █████████████████████████████████████████ Mot. Ex. 4, Worley Decl. ¶¶ 4, 192. Plaintiffs' citation to *Accellion* confirms this point: hackers must "have the stolen information" and be able to "use it at any time" for such a risk of future harm to exist. Opp. 11. Therefore, mere "access" without exfiltration does not put any putative class member's data at a continuing risk of misuse such that

4

mitigation products would be required for years after the AMCA Cyberattack. This is Plaintiffs' sole theory—legally impermissible though it is. *See* Quest Class Cert. Opp. 34-44.

Despite Plaintiffs' efforts to recast Frantz's opinion as more limited in scope, Frantz opined that ███████████████████████████████████████ █████ It is that opinion—not an alternative opinion of mere access that Frantz did not offer (though she also has no evidence of even that more limited point)—that should be excluded.

## B. Frantz's Exfiltration and Dark Web Opinion Is Not Grounded in Reliable Facts or Methodologies.

Defendants explained at length why both prongs of Frantz's exfiltration and dark web opinion—her own dark web searches and her summaries of third-party documents—are unreliable and should be excluded. Mot. 7-26. Plaintiffs have no cogent response. As to Frantz's dark web searches, Plaintiffs do not even attempt to defend her actual search process. Instead, Plaintiffs misrepresent what Frantz did and downplay that those searches are necessary to support her opinion at all. Their attempt to defend her one-sided narrative of the record concerning third parties' findings fares no better, as Plaintiffs mischaracterize Frantz's analysis and the conclusions reflected in those materials as well. No part of Frantz's exfiltration and dark web opinion is based on reliable facts or methods, and it should be excluded under Rule 702.

5

## 1. Plaintiffs Have No Defense of Frantz's Methodologically Unsound Dark Web Searches.

In an attempt to downplay Defendants' challenge to Frantz's purported Plaintiff-by-Plaintiff dark web searches, Plaintiffs baldly assert that Defendants do not even argue Frantz's methodology was unreliable. Opp. 14. That is wrong. Defendants pointed out several fundamental methodological flaws infecting Frantz's dark web searches. *See* Mot. 7-17. Among other glaring problems, by Frantz's own admission:

- She searched the dark web ███████████████ ████████ *see* Mot. Ex. 3, Frantz Dep. 118:15-119:22, ████████████████████████████ *see* Mot. Ex. 13, Tomasini Decl. ¶¶ 183-87.

- ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ *See* Mot. Ex. 3, Frantz Dep. 114:9-116:15. This is an approach designed to ████████████████████████████████ *See* Mot. Ex. 13, Tomasini Decl. ¶¶ 84-87.

- ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ *See* Mot. Ex. 1, Frantz Decl. ¶ 360; *see also* Mot. Ex. 3, Frantz Dep. 81:11-25, 125:25-126:21; 129:17-130:7.

- Her searches were based on ████████████████ ████████████████████████████████████ rendering it useless for the purpose of determining whether the information was exfiltrated from AMCA. *See* Mot. Ex. 13, Tomasini Decl. ¶¶ 115-17; Mot. Ex. 14, Tomasini App. 3.

- ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████



██████████████████████ *See* Mot. Ex. 3, Frantz Dep. 73:2-23, 85:6-86:11.

- She ████████████████████████████████████████ ████████ rendering any "hits" polluted by subsequent data breaches and making it impossible for anyone to replicate or check her results. *See id.* 58:16-60:13, 105:10-16.

Each of these issues alone undermines the reliability of Frantz's opinion; together, they require exclusion. Plaintiffs offer no real defense.

First, Plaintiffs do not dispute that Frantz conducted only a ███████████ ████████████████████████████████████████████ ███████████████████████████ Opp. 14. The limitations Plaintiffs' counsel placed on her work—████████████████████████████████— fundamentally changed the methodology she ordinarily uses as a cybersecurity professional. For example, Frantz testified that she ordinarily uses █████████ ████████████████████████████████████████████ ████████████████████ . *See* Mot. Ex. 3, Frantz Dep. 129:19-130:7 (██████ ████████████████████████████████████████ ████████████████████ ); *id.* 58:16-19 ████████████ ████████████████████ ). But she did not do so here. Indeed, Frantz herself testified ███████████████████████████████████████████ ████████████ . *See id.* 129:19-130:7. In other words, contrary to Plaintiffs' repeated assertion that Frantz's opinion relied on "the same methodology she employs in her

industry," Opp. 9, Frantz ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

As Defendants showed, this violates Rule 702 and requires exclusion. Mot. 12-13.

Second, Plaintiffs do not dispute that Frantz's █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ Opp. 13; *see also* Mot. Ex. 13, Tomasini Decl. ¶¶ 115-17. As a result, these

searches, by design, could not have found evidence that the CHAMP database was

exfiltrated. This methodological flaw is more fundamental than an "error" that goes to

the "weight" of the opinion. Opp. 13. Frantz's failure to search for ████████

████████████████████████████████████████████████████

███████████████████████████ means she did not base her analysis on

"sufficient" facts to support a conclusion that data was exfiltrated from AMCA and

posted on the dark web. Fed. R. Evid. 702.

Plaintiffs argue it does not matter that Frantz ███████████████

███████████████ because threat actors compile information across multiple breaches.

Opp. 13. That demonstrates the fundamental logical flaw in Frantz's approach. Even

assuming her searches found ████████████████████████ (although she provided

no evidence of it), if criminals could have obtained that information only from a source

other than AMCA—such as another breach or even a phone book—that discovery is

of zero value in showing that any data was exfiltrated from AMCA. This is true whether the ███████████████████████ appeared alone or in combination with other information, though Plaintiffs have provided no evidence either way.

Nor is it accurate for Plaintiffs to dismiss this fundamental flaw as merely a complaint that Frantz "could have searched for additional information." *See id.* The point is not that Frantz could have run additional searches; rather, Defendants pointed out that Frantz ran searches for ███████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████. Indeed, even the "examples" Frantz provided of ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████. *See* Mot. Ex. 13, Tomasini Decl. ¶ 85. Due to Frantz's ██████████████████████████████████████████ ████████████████████████████████████████ *see, e.g.,* Mot. Ex. 3, Frantz Dep. 73:4-23, 85:6-86:11; there is no basis for Frantz to conclude that ██ ████████████████████████████████████████████████ ███████████ This is a foundational logical error, not, as Plaintiffs claim, a "factual dispute among experts regarding the value and source of an input." *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *27 (D.N.J. Mar. 17, 2017). Put simply, Frantz's searches are useless for establishing exfiltration from AMCA.

9

Third, Plaintiffs do not deny that Frantz ███████████████████████████

████████████████████████████████████████████████████████████████. As

Defendants showed, the searches Frantz ran ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████. Mot. 13-15; *see also* Mot. Ex. 13, Tomasini Decl. ¶¶ 83-87. Without

some process to █████████████████████████████████████████████████████

███████████████████████████████████████████████, this methodology is

incapable of reliably supporting Frantz's opinion.

Finally, Plaintiffs cannot defend Frantz's █████████████████████████████.

Instead, they flatly misrepresent the handful of documents she produced as supposedly

preserving her precise search process. Opp. 15. Plaintiffs falsely assert that Frantz

████████████████████████████████████████████████████████████. *Id.*

When asked about █████████████ at her deposition, Frantz testified that █████

████████████████████████████████████████████████ Mot. Ex. 3, Frantz

Dep. 120:23-121:14. Instead, ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ *Id.* And ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████. *Id.* 153:24-154:24. Frantz even testified that ███████████████████████████████████████ ████████████████████████████████████████████ *Id.* 155:4-13. Thus, ███████████████████████████████████████████ ███████████████████████████████████████████. Ex. 3, Frantz Dep. 104:24-105:16.

Frantz's testimony could not be clearer: ███████████████████████ ████████████████████████████████████████████ ████████████████████████ *See id.* 74:17-77:8, 88:21-89:24. And, even if Frantz had ████████████████████████████████████, her methodology precludes any replication or validation. Mot. 15-16. Frantz conceded that, ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████. Mot. Ex. 3, Frantz Dep. 104:24-105:16.

Thus, Tomasini did not "deliberately cho[o]se not to look at the specific listings" Frantz purportedly found (because she did not identify any). Opp. 14. Nor did he "acknowledge[]" that Frantz provided sufficient information for him to find those results (because she did not). *Id.* 14-15. Tomasini ████████████████████ ████████████████████████████████████████████ ████████████████████████. *Id.* 15 n.6. Frantz's undocumented, unsupported, and unreproducible "trust me" approach to expert opinions runs afoul of Rule 702. *See In*

11

*re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*, 2025 WL 1024048, at \*19 (D.N.J. Apr. 7, 2025) (excluding expert from testifying "based on her own ipse dixit" where the expert "simply asserted" a conclusion with a "stark lack of scientific or economic basis for her methodology") (emphasis omitted).

Plaintiffs have no response to any of these inherent methodological flaws, each of which on their own undermine the reliability of her opinion. Individually and together, they render Frantz's opinion so unreliable that it should be excluded.

### 2. Frantz's Analysis of Third-Party Documents Is Unreliable and Not a Proper Subject of Expert Testimony.

Given the indefensibility of Frantz's search methodology, it is unsurprising that Plaintiffs back away and attempt to diminish its importance as "only one piece of evidence." Opp. 12. Instead, they put the weight of their defense into Frantz's surface-level summary of a handful of third-party documents, which they falsely claim are consistent with Frantz's findings and show ███████████████████████ ███████ Plaintiffs claim that Defendants were "[u]nable to respond to the substance of these third-party findings or to find an expert to explain why they are not damning." *Id.* 17. This is plainly false: ████████████████████████ ███████████████████████████████████████████ █████████████████████████████████. Mot. Ex. 13, Tomasini Decl. ¶¶ 25-65. This attempt at misdirection aside, Plaintiffs have no response to the many reasons that

12

Frantz's third-party analysis is unreliable and does not support her exfiltration and dark web opinion.

*First*, the Court has no need of Frantz's supposed expertise to summarize and put her gloss on reports from third parties who either investigated AMCA's systems or purported to find some limited data from AMCA on the dark web following the Cyberattack. Plaintiffs assert that Frantz's process for "piec[ing] together" this third-party evidence is reliable because that is what cybersecurity experts do with forensic evidence in the field. Opp. 11. But these documents are not "dense pieces of forensic evidence," *id.* 17, such as server logs or network artifacts, that require specialized cybersecurity expertise to interpret, whether in isolation or together. Rather, they are plain-English documents summarizing what those third parties found for a non-technical audience. *See* ECF 585 at 20; *see also* Mot. Ex. 19, CRA Dep. 127:18-133:25 (discussing that purpose of the CRA Report was to ███████████████). They are thus comprehensible without any need to be filtered through supposed "expert" analysis. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000) (expert testimony unnecessary if the fact-finder is "as capable of comprehending the primary facts and of drawing correct conclusions from them") (citation modified). Moreover, to the extent any further explanation of these documents would be helpful, the third parties

13

themselves can explain exactly what those documents mean.[1] Frantz should not be permitted in the guise of "expert" testimony to recast those documents in a manner inconsistent with what the third parties themselves intended.

*Second*, Plaintiffs also have no response to Defendants' showing that Frantz failed to apply her expertise to understand the data and methodology underlying the third-party documents. Mot. 18-19. That she read summary documents containing third-party conclusions and depositions of some of those third parties is a non-sequitur. Opp. 18. None of those sources described the underlying data or methodology the third parties used to reach their conclusions. She thus did not "evaluate the source of the information," *id.*, but rather uncritically relied on these third-party conclusions—even though it is well-known that advertisements on the dark web may refer to nonexistent or invalid data.[2] *See* Ex. 26, Nelms Dep. 114:16-117:18 (███████████████

██████████████████████████████████████).

---

[1] As discussed, Plaintiffs deposed both Gemini and CRA, who testified that ████████ ████████████████████████████████. *See* Ex. 18, Gemini Dep. 107:2-5, 115:24-116:23, 131:14-132:17; Ex. 19, CRA Dep. 105:13-106:12. To the contrary, Gemini found that ███████████████████████████ ██████████████████████████. Ex. 18, Gemini Dep. 134:14-16. Plaintiffs never even attempted to depose Conformance or any of the authors of the other third-party documents Frantz discusses, and they should not be permitted to use Frantz as a mouthpiece to rewrite those documents to say what they want.

[2] Plaintiffs' attempt to ride the coattails of the Secret Service's reliance on Gemini's flash alerts is misplaced. *See* Opp. 18-19. Gemini's findings merely prompted the Secret Service to ███████████████████████████████ ████████████████████████████████████ ███████████████████

14

*Finally*, these third-party materials simply do not provide a sufficient factual basis for Frantz's conclusion that ███████████████████████████████████████ ████████████████████ Most of the materials Frantz discusses ████████ ████████████████████████████████████████████████████████ ████████████████████████. *See* Mot. 19-23, 25 n.15 (addressing Gemini, Conformance, and FBI documents, all of which discussed ████████████████ ██). And, even for those few documents that touched upon ██████████, *see id.* 21-22 (discussing the CRA Report), the alleged ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████. Frantz does not identify a shred of evidence to support her speculative leap ██████████████████ ████████████████████████████████.

Plaintiffs play up the complexity of the third-party documents to create the impression that these very limited findings were in fact far broader. But Plaintiffs' Opposition confirms that there is not a sufficient factual basis to claim that data from the CHAMP database was exfiltrated. For example:

**Gemini.** Plaintiffs claim that Gemini ████████████████████████████ ████████████████ Opp. 7. That is untrue. Gemini found ████████████ ████████████████████████████████████████████████████████ ████████████████████████ *See* Mot. Ex. 18, Gemini Dep. 107:2-5, 115:24-116:23, 131:18-132:17. Those records could have come from ████████████████████



██████████████████████████████████████ And Gemini never attempted to ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

*Id.* Nor did Gemini ever attempt to ████████████████████████████████████

██████████████████████████████████████████████████████

████ *Id.* 105:19-107:5. Moreover, Gemini itself concluded that ████████████

██████████████████████████████████████████████████

████████ *Id.* 134:14-16. Frantz's testimony can shed no further light on Gemini's findings because she did not understand either the methodology or data on which Gemini relied. *See* Mot. Ex. 3, Frantz Dep. 16:1-20:23; *id.* at 23:12-19.

**Conformance.** Plaintiffs concede that the ████████ Conformance received

████████████████████████████████████████████████████████

████████████████████████████████ Opp. 8. Frantz herself conceded that ████

████████████████████████████████████ Mot. Ex. 3, Frantz Dep. 36:7-12. And, even if ██████████████████████████████, this limited finding does not establish that ████████████████████████████████████████████

████████████████████████████████. As Conformance itself indicated with its recommendation that ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████. Ex. 27, RMCB-AG-00000087.

16



**FBI.** Plaintiffs note that the FBI ███████████████████████████████

███████████████████████████████████████████████████████████, Opp.

16—but they omit that ██████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ Ex. 28, LC0158580. They also ignore that, when

Labcorp█████████████████████████████. *See* Ex. 26, Nelms Dep. 114:16-

117:18. This, again, is entirely consistent with Gemini's and Conformance's findings

that ████████████████████████████████████████████████████████

████████████████████████████████████

**CRA.** With respect to the CRA Report, Plaintiffs focus on how CRA supposedly

████████████████████████████████████████████████████████████

██████—and go on to claim that CRA ████████████████████████████

█████████████████████████ Opp. 16. That latter assertion is a fiction. CRA was

unable to ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ *See* Mot. 21-22 (citing CRA's testimony).

**Mandiant.** Finally, Plaintiffs claim that Mandiant concluded that ███████

██████████████████████████ Opp. 16 (emphasis altered). But Mandiant's ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

17

Whether taken together or on their own, at most, these third-party documents suggest only that ███████████████████████████████████████████ ██████████████████████████ They do not provide "sufficient" facts to support Frantz's conclusion that ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ Although Defendants and the third parties themselves have consistently pointed to this fact, Plaintiffs have never mustered any response or pointed to any evidence supporting Frantz's conclusion ████████████████ Frantz' *ipse dixit* conclusion is unsupported and lacks a sufficient factual basis to satisfy Rule 702.

**C.    Frantz's Opinion Does Not "Fit" This Case Because She Did Not Attempt to ███████████████████████████████████████**

In addition to the lack of reliability, Defendants also showed why Frantz's failure to ████████████████████████████████████████████████████████ means her opinion does not "fit" the case: the opinion simply cannot help to understand whether any data was *exfiltrated from AMCA* and on the dark web. Mot. 16-17. Plaintiffs' two-paragraph defense of the "fit" of Frantz's opinion fails to respond. *See* Opp. 10; *see also id.* 15-16. Plaintiffs merely state the legal standard, repeat Frantz's opinions, and baldly assert there is "fit," without any analysis of how Frantz's searches for ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ would assist in resolving any disputed fact. And, again, Frantz conceded that ███████████████████████████████████████████████

██████████████████████ Mot. Ex. 3, Frantz Dep. 129:17-130:7. As discussed above, Frantz's wildly speculative conclusion that ████████████████████ ███████████████████ rests on a confusing series of illogical leaps and incompatible methods and would, above all, cause confusion in connection with an already complex set of issues. *See Johnstown Heart & Vascular Ctr., Inc. v. AVR Mgmt., LLC*, 2019 WL 3573663, at *7 (W.D. Pa. Aug. 6, 2019) (excluding expert testimony that "distorts" key issues and creates substantial danger of confusion).

### D. Frantz's Reply Report Is Improper Bolstering Rather Than Rebuttal.

Defendants showed why Frantz's citation to additional third-party evidence of ███████████████████████████████████████ (which she could have cited in her original report, but did not) is plainly an effort to bolster her deficient original opinion and, in any case, does nothing to bridge the gap to supporting an inference that ████████████████████. Mot. 23-26. Indeed, as discussed above, several of the third parties Frantz relies upon came to the opposite conclusion: ████████████████████████████████ ████████████████████████████████ ████████████████████████████. *See supra* § I.B.2.

19

Plaintiffs' Opposition fails to defend Frantz's improper bolstering. Their primary argument that Frantz's reply declaration is "rebuttal" relies on conflating two of Tomasini's separate opinions. ████████████████████████████ ███████████████████████████ and it was solely a rebuttal to Frantz's own mischaracterization of those documents. ███████████████████████████████, and it spoke only to whether Tomasini ████████████████████████████ ████████████████████████████████. Plaintiffs' effort to reframe Frantz's reply declaration and its citation to additional third-party documents as a rebuttal to Tomasini's Opinion 2 fundamentally mischaracterizes that opinion. Put simply, pointing to documents about what other third parties purportedly found does not rebut Tomasini's more limited opinion that ███████████████████████ ████████████████████. *See* ECF 806, Ltr. Mot. to Strike 6-7 (discussing Strebe's improper bolstering based on the same mischaracterization). It serves only to bolster Frantz's deficient original opinion using evidence she could have cited but did not.

Nor can Plaintiffs explain away the contradiction between Frantz's reply declaration claiming ████████████████████████ and her earlier testimony that ██████████████████████████████████. *Compare* Mot. Ex. 2, Frantz Reply ¶ 39, *with* Mot. Ex. 3, Frantz Dep. 310:13-17, 311:5-6. Their effort to harmonize Frantz's inconsistent views is nonsensical. As Plaintiffs concede, Frantz clearly testified that ████████████████████████████ Opp. 21; that cannot be reconciled with her contradictory opinion on reply that she now

20

somehow has evidence showing ███████████████████████. Mot. Ex. 2, Frantz Reply at 3. Frantz's contradictory new opinion in her reply declaration should be excluded.

### E.    Plaintiffs' Defense of Frantz's Merits Opinions, Which Defendants Do Not Challenge at This Stage, Should Be Disregarded.

Finally, Plaintiffs spill much ink defending Frantz's opinions regarding ████ ████████████████████████████████████████████ ████████. *See* Opp. 4-10. But each of those opinions is relevant solely to the merits of Plaintiffs' claim that Defendants allegedly were negligent in overseeing AMCA's data security and that their allegedly negligent oversight led to the AMCA Cyberattack. Those opinions do nothing to establish that ███████████████████████ █████████████ or to support any other disputed class certification issue.

As Defendants explained, only one of Frantz's opinions has any bearing on disputed issues for class certification: her opinion that ████████████████████ ███████████████████████████████████. *See* Mot. 7 n.3. That opinion is the only one Defendants moved to exclude at this class certification stage. Defendants did not challenge Frantz's other opinions, not because they "could not find an expert" on those topics or because they have no response. Opp. 3-4. Rather, Defendants properly addressed the only opinion that warranted a response at this stage of the proceedings.[3]

---

[3] Oddly, Plaintiffs state that Defendants are "not entitled to a second bite at the apple" by reserving the right to move to exclude merits-based opinions later in the litigation.

Therefore, Plaintiffs' lengthy defense of both Frantz's qualifications to offer opinions on the issues encompassed by her other opinions and her methodology underlying those opinions is simply irrelevant to Defendants' Motion, and should be disregarded. *See id.* 4-5 (discussing Frantz's qualifications to ████████████████████████ ████████████████████████████████████ ); *id.* 6-7 (discussing Frantz's analysis of ████████████████████████████████ ).

It is not surprising that Plaintiffs try to shift focus to the merits, since Defendants demonstrated there are many individualized issues that will necessarily preclude class certification. But this litigation has not yet reached a stage where the Court must assess the merits, and Defendants have not asked the Court to wade into the admissibility of Frantz's merits-only opinions. Therefore, Plaintiffs' defense of any of Frantz's other opinions, aside from her exfiltration and dark web opinion, should be ignored.

## II.    WORLEY'S OPINIONS SHOULD BE EXCLUDED.

Worley provides a topline opinion that

████████████████████████████████ . *See* Mot. Ex. 4, Worley Decl. ¶¶ 1-2, 4, 192. These opinions are unreliable because, as Defendants explained, Worley reaches them without

---

Opp. 5 n.2. But the Scheduling Order explicitly called for only class certification expert opinions at this stage. ECF 776 at 2. If the case advances beyond class certification, there will be a separate set of expert reports on merits issues, and Defendants will respond to these merits opinions at that time, if necessary.

applying any methodology. *See* Mot. 28-34. She did not ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ . *Id.*

### A.     Worley's "Experience"-Based Opinions Do Not Satisfy the Requirements of Rule 702.

Plaintiffs acknowledge that Worley failed to perform any form of rigorous or testable analysis. Opp. 32 ("Worley's methodology is not based upon scientifically-tested data or statistical evidence."). But they argue that she was not required to do so because her opinions are non-scientific, and therefore they are reliable merely because she is relying on her experience. *See id.* 28-33. This argument fails for multiple reasons.

First, contrary to Plaintiffs' assertion, the opinions Worley offers here *are* squarely within the realm of expert testimony to which the scientific method must be applied. Just weeks ago, Chief Judge Bumb excluded a proffered expert who, like Worley, failed to provide "any scientific … basis" supporting her opinion that plaintiffs faced an increased risk of future harm. *See In re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*, 2025 WL 3141002, at *13 (D.N.J. Nov. 10, 2025). Indeed, courts routinely exclude proffered expert testimony purporting to assess the risk of future harm where the expert fails to perform precisely the type of scientific or statistical analysis that Plaintiffs claim is inapplicable here. *See, e.g.*, *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 797 (3d Cir. 2017) (affirming exclusion of products liability

23

expert who "qualitatively discussed the general trend in the data" regarding an increase in risk but refused to conduct a quantitative analysis); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 610 (D.N.J. 2002) (excluding expert opinion for failure to scientifically "evaluate the[] respective risks" of alternative causes of injury).

Moreover, even if her opinions were "non-scientific," Worley does not get a free pass to rely on her own *ipse dixit*. Experience in a particular subject area "does not automatically render every opinion and statement by that expert reliable." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1201 (11th Cir. 2010). Indeed, as the Advisory Committee notes to Rule 702 explain:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citation modified). Nothing about Worley's experience satisfies this standard.

Worley is a lawyer, consultant, and former data privacy officer with experience advising businesses on responding to data security incidents and complying with statutory notification obligations. Mot. Ex. 4, Worley Decl. ¶¶ 5-17. She does *not* have experience ███████████████████████████████████████████████████████████████████████████. Indeed, Plaintiffs do not even attempt to explain how Worley's experience advising *businesses* about their obligations to provide notice under a "no-fault statutory scheme" connects

24

to conclusions regarding ██████████████████████████████████

████████ Opp. 32. As discussed below, data breach notification statutes require businesses to notify even potentially affected individuals, regardless of whether those potentially impacted consumers face a risk of harm. *See infra* n.5. Nor do Plaintiffs claim Worley has *ever* performed this type of analysis outside of the litigation context. *See Warner Chilcott Labs. Ireland Ltd. v. Impax Labs., Inc.*, 2012 WL 1551709, at *38 (D.N.J. Apr. 30, 2012) (excluding expert because, among other reasons, his "method has never been used outside the context of litigation").

Plaintiffs have no explanation for how Worley's experience has any bearing on her opinions concerning individual risk of harm, and her opinions thus rest on nothing but *ipse dixit* and unsupported assumptions. *See State Farm Fire & Cas. Co. v. Holmes Prods.*, 165 F. App'x 182, 185-86 (3d Cir. 2006) (affirming exclusion of expert who relied on unsupported assumptions and did not support opinion with any scientific analysis); *Allen v. Int'l Bus. Machs. Corp.*, 1997 WL 34501372, at *1, 43 (D. Del. Dec. 18, 1997) (excluding expert opinion "premised on unsupported assumptions and speculation" rather than facts). This is precisely the type of "trust me" testimony that the Advisory Committee warned against.

### B.     Worley's Risk of Harm Opinion Is Unreliable and Does Not Fit.

#### 1.     Worley's Risk of Harm Opinion Does Not Fit the Case.

The court unambiguously held that Plaintiffs do not have Article III standing based solely on a risk of future harm. 2021 MTD Order 17. Yet Plaintiffs proffer Worley

in support of a damages model based on just that: ████████████████████████

████████████████████████████████████████████████████████████

███████████████████. Worley's opinion therefore is relevant only to an attempt to

recover damages that the prior ruling in this case and Supreme Court precedent do not

allow, and it should be excluded because it does not "fit" the case. *See Comcast Corp. v.*

*Behrend*, 569 U.S. 27, 35 (2013) (damages models must "measure only those damages

attributable to" permissible theories of liability).

Plaintiffs attempt to distract from this fundamental defect by rewriting the

court's standing analysis and pointing to evidence that they claim shows "actual misuse"

of data stolen from AMCA. *See* Opp. 23-24.[4] Putting aside the factual dispute over

whether there is evidence of misuse (and, as discussed above, there is *not* any evidence

that personal information of all of the millions of putative class members was even

exfiltrated, much less misused), Plaintiffs' damages theory does not attempt to

compensate for actual misuse. Rather, Worley's Risk of Harm Opinion is offered in

support of a damages theory that ██████████████████████████████

████████████████████████████████████████████. Indeed, Worley was

clear that her opinions ██████████████████████████████████

---

[4] Plaintiffs also point to Worley's assertion that ████████████████████████
██████████████████████████████████ Opp. 36. But that
is just another way of saying there is a *risk* that the information will be used against
putative class members in the future.

██████████. Mot. Ex. 7, Worley Dep. 146:2-7. As a result, Worley's Risk of Harm Opinion does not "fit" any permissible theory, and it should be excluded on that basis alone.

### 2. Worley's Risk of Harm Opinion Is Not Based on Reliable Facts or Methodology.

In response to Defendants' showing that Worley's Risk of Harm Opinion is unreliable, Plaintiffs mischaracterize Defendants' arguments as requiring that Worley "determine the exact degree by which" the putative class members' risk of harm increased as a result of the AMCA Cyberattack. Opp. 30. That is not the basis of Defendants' challenge. Rather, Defendants argued that Worley's opinion that ██████

████████████████████████████████████

███████████████████—is unreliable because it rests on a series of unsupported assumptions that the record shows are incorrect.

Plaintiffs first attempt to buttress Worley's opinion by claiming it is "based upon

████████████████████████████████████

████████████████████." *Id.* But Worley ████████████████

██████████████; instead, in the portion of her declaration Plaintiffs point to, she referenced only ████████████████████████

████████████████████████. Mot. Ex. 6, Worley Reply ¶¶ 14-15. Worley's ████████████████████████████████████—

and, as discussed above, does not even provide a sufficient basis to opine on the

27

purported increased risk of harm that putative class members supposedly face. She advises companies on how to provide notice of a breach, but that does not give her *any basis* to ███████████████████████████████████████████████████ ███████—████████████████████████████████████████████████████ ██████████████████████████████████████████. Indeed, the data breach notification statutes on which Worley advised set standards for providing notice that are entirely divorced from whether potentially affected consumers face any risk. *See infra* n.5.

Similarly, the fact that Worley is able to identify supposedly ████████████ ███████████████████████████████ in general, Mot. Ex. 6, Worley Reply ¶ 14 n.14, does not support that ███████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████. She simply has not identified any support for her assumption that ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████. Worley's unsupported claim is precisely the type of generic, 101-level opinion that cannot pass muster under *Daubert. See In re Valsartan*, 2025 WL 1024048, at *18 (excluding opinion based on "101"-level knowledge in a field as "too simplistic and too doctrinaire").

28

Plaintiffs have no cogent response to all the things Worley ignored in advancing the generic opinion that ████████████████████████████████████████ ██████████████████████████. For example, Defendants explained in detail why Worley's unsupported assumption that ████████████████████████████████ ████████████████████████████████████████████████████ ████████ is unreliable. Mot. 29-31; *see Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 788 (7th Cir. 2017) (affirming exclusion of expert opinion as unreliable where the expert "failed to account for other possible explanations in arriving at his conclusion"); Fed. R. Evid. 702 advisory committee's note to 2000 amendment (finding "[w]hether the expert has adequately accounted for obvious alternative explanations" to be "relevant in determining whether expert testimony is sufficiently reliable").

Rather than address this fundamental deficiency head-on, Plaintiffs bury a single-sentence conclusory response at the end of their discussion. They state only that Worley "explains at length" ████████████████████████████. *Id.* 34. She does no such thing: nothing in Worley's declaration explains, much less reliably supports, her assumption that ████████████████████████████████████████████ ████████████████████████████████████████████████████. She certainly does not identify any ████████████████████████████████ that supports that assumption. *Id.* 30.

Worley also waves away many other issues—such as the fact that ████ ████████████████████████████████████████████████████

29

██████████████████—in precisely the same way. She simply assumes that those facts do not affect her opinion. Opp. 33-34. Courts routinely exclude expert testimony based on unsupported assumptions like these. *See State Farm Fire & Cas. Co.*, 165 F. App'x at 185-86 (3d Cir. 2006) (affirming exclusion of expert who relied on unsupported assumptions rather than scientific analysis); *Allen*, 1997 WL 34501372, at *1, *43 (excluding expert opinion "premised on unsupported assumptions and speculation" rather than facts); *Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 299 F. Supp. 2d 400, 407 (D.N.J. 2003) ("[T]he Court may not abdicate its gatekeeping role merely because an expert relies on general experience or principles."). Worley's decision to ignore facts and data that are inconvenient to her ultimate conclusion is fatal. *In re Valsartan*, 2025 WL 3141002, at *13; *see also Player v. Motiva Enters., LLC*, 240 F. App'x 513, 520 (3d Cir. 2007) (affirming exclusion of "opinion evidence that [was] connected to existing data only by the *ipse dixit* of the expert") (citation modified).

Finally, in a sweeping footnote, Plaintiffs attempt to discredit the many cases Defendants cited showing Worley's opinion to be unreliable and inadmissible. Opp. 28 n.14. They argue these cases are irrelevant because they involved scientific expert testimony. But, as discussed above, Worley's opinions *are* subject to the scientific method, so these cases are directly on point. *See supra* § II.A. In any event, the authority Defendants cited does not turn on whether the proffered expert's testimony is scientific or non-scientific; the broader point is that testimony should be excluded where, as here, it is unsupported and unreliable. In fact, those cases explained that, even where the

30

expert grounds their opinion in experience, the expert still must do "more than the haphazard, intuitive inquiry that [Worley] engaged in." *Oddi*, 234 F.3d at 146, 156-58 (affirming exclusion of non-scientific expert for failure to conduct any tests or calculations because he "used little, if any, methodology beyond his own intuition"); *Miller v. N.J. Dep't of Corrs.*, 2018 WL 3574876, at *2-3 (D.N.J. July 25, 2018) (excluding non-scientific expert opinion as "not based on good grounds"); *Holman Enters. v. Fid. & Gaur. Ins. Co.*, 563 F. Supp. 2d 467, 472-73 (D.N.J. 2008) (excluding expert's opinions for failure to provide "any additional analysis or reference to industry standards"). Plaintiffs' own parentheticals describing those cases confirm this point. *See* Opp. 28-29 n.14 (citing *Kuhar v. Petzl Co.*, 2018 WL 7571319, at *10 (D.N.J. Nov. 27, 2018), as excluding an expert's opinion because, like Worley's, "there was no support for his conclusions, no facts or data to support his opinions, and they were unsupported by engineering standards").

## C.    Worley's Duration of Risk Opinion Is Not Reliable.

Defendants showed that Worley's Duration of Risk Opinion is unreliable because it is not based on any generally-accepted technique or framework, or on any scientific study, survey, or ██████████████████████████████ ████████████████. Mot. 32-34. Indeed, Worley does not offer *any* explanation as to how she selected ███████████████████████████. This range is based only on her subjective view of ██████████████████████ *Id.* 33 (quoting Mot. Ex. 7, Worley Dep. 164:7-8).

31

Plaintiffs attempt to defend this *ipse dixit* opinion by claiming that it is based on Worley's "professional experience assessing the risk of harm from data processing activities to consumers, including in her daily practice as a Data Privacy Officer for entities around the world." Opp. 31. This bald proclamation of "experience" is not enough. As discussed above, Plaintiffs offer no explanation for how Worley's experience was applied to the facts here and led to her opinion, or why her experience advising companies on data breach notifications is a sufficient basis for this opinion ███████████████████████. *See Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014) (affirming exclusion of expert who "never explained *how* his experience or [sources] supported his opinion"); *Huang v. TriNet HR III, Inc.*, 2023 WL 3092626, at *8 (M.D. Fla. Apr. 26, 2023) (rejecting expert's "conclusory statement of applied knowledge of the industry's practices" as insufficient and excluding expert opinion for failure to "detail how his knowledge and experience" led to his conclusions).

In fact, Worley could *not* have relied upon her professional experience consulting for businesses on data breach notifications because that experience leads to a very different result: ████████████████████████████████████ ████████████. Mot. Ex. 16, Hitt Decl. ¶¶ 174-80. Plaintiffs attempt to dismiss this fact by asserting that the "common practices of breached entities … does not reliably measure how long the harm actually persists because such actions are based upon a no-

fault statutory scheme." Opp. 31-32.[5] But that concession means that Worley's experience—which is limited to the *practices of breached entities*—does not provide a sufficient basis for her opinion. Mot. Ex. 7, Worley Dep. 287:12-290:18 (describing her experience ████████████████████████████████████████ ██████████████████████████████████████████). Plaintiffs' own argument thus confirms that Worley's supposed "experience" cannot support her opinion.

Apart from Worley's inapplicable experience, Plaintiffs argue her Duration of Risk Opinion is supported by "extensive research and literature … including the work of data privacy experts." Opp. 31. But, as Defendants explained, Worley did not describe any methodology for identifying and selecting the sources she relies upon or explain why she believes them to be credible. Mot. 33. Plaintiffs do not even attempt to respond. Nor could they, ████████████████████████████ ██████ that, as Worley conceded at her deposition, █████████████████. Mot. Ex. 7, Worley Dep. 225:4-226:6, 241:23-242:1, 246:17-247:2; Mot. Ex. 4, Worley Decl.

---

[5] Worley's assertion that data breach notification statutes require notification ████ ██████████████ conflicts with Plaintiffs' argument that ██████████████ ██████—in addition to being entirely unsupported and demonstrably false. Mot. Ex. 6, Worley Reply ¶ 14 (emphasis added). Worley does not cite a single statute in support of this assertion. And many data breach notification statutes, on their face, are triggered by the mere *potential* of unauthorized access, meaning notification is required even when there may not be any risk of harm at all. *See, e.g.*, N.J. Stat. Ann. § 56:8-163(b) (requiring notification of any security breach "if the personal information was, or is reasonably believed to have been, accessed by an unauthorized person").

¶¶ 124-31. Nor do these cherry-picked materials even provide a "sufficient basis," Fed. R. Evid. 702, since most ███████████████████████████████████████ Ex. 16, Hitt Decl. ¶¶ 162-70. None of these materials come close to offering a generally accepted principle or methodology that would support a ████████████████████ ██

### D.    Worley's Mitigation Products Opinion Is Not Reliable or Helpful.

### 1.    Worley Did Not Use a Reliable Methodology to Form Her Mitigation Products Opinion.

Defendants established that Worley's dependence on unsupported assumptions, failure to ████████████████████████████, and use of ████████████████ render her Mitigation Products Opinion unreliable. Mot. 35-37. Plaintiffs' responses do nothing to rehabilitate her analysis.

First, Plaintiffs fail to justify Worley's use of unsupported assumptions that she admits were incorrect. For example, Worley's Mitigation Products Opinion assumes

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████. *See* Ex. 7, Worley Dep. 175:19-176:5. And Worley did not perform any analysis to ████████████████████████████████████████ ████████████████████████████████████████ *Id.* 174:16-25. She just *assumes* (incorrectly) ██████████████████████████████████. Worley's

34

opinion should be excluded for this reliance on "inaccurate assumptions of fact." *See Deficcio v. Winnebago Indus., Inc.*, 2014 WL 4211274, at *3, *6 (D.N.J. Aug. 25, 2014).

Plaintiffs' only response to this glaring issue is nonsensical: they declare it is "irrelevant" because "mitigation *damages* incurred by those who take measures to protect themselves are recoverable." Opp. 34-35 (emphasis added). But there is no basis to assume that █████████████████████████████████████████████████████

███████████████████████████████. There are many other reasons a ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████.

Worley's opinion built on these unsupported assumptions is simply not reliable. *See Deficcio*, 2014 WL 4211274, at *3, *6; *Allen*, 1997 WL 34501372, at *43 (excluding opinion "premised on unsupported assumptions and speculation").

Second, Plaintiffs fail to show that Worley's haphazard selection of mitigation products rests on a reliable methodology. They assert that she "used her substantial experience" advising *businesses* on the selection of identity theft products during breach response, Opp. 32, but cannot explain how that experience provides sufficient support for her conclusions ████████████████████████████. Moreover, any supposed "experience" cannot paper over Worley's failure to ████████████████████████████

███████████████████████████████████████████████████████████. *See* Mot. 35-36; *see also Kolokowski v. Crown Equip. Corp.*, 2009 WL 2857957, at *11-12 (D.N.J.

Aug. 27, 2009) (excluding expert opinion that "lack[ed] … good grounds or analytical rigor sufficient to validate his conclusions").

Finally, Plaintiffs assert that Worley's methodology is testable because anyone with Worley's experience can ███████████████████████████████ ██████. Opp. 33. In other words, ███████████████████████████████

██████████████████████████████████████████████████████████

██████. This is hardly the type of reliable methodology capable of clearing the bar set by Rule 702 and *Daubert*.

### 2. Worley's Mitigation Products Opinion Does Not Require Specialized Expertise and Is Not Helpful.

Defendants explained that Worley's process for identifying and recommending mitigation products is within the capability of any untrained layman, and therefore not helpful. Mot. 38-39. Plaintiffs respond that Worley used specialized knowledge to ████████████████████████████████████████████████████. Opp. 36-37. But the websites ████████████████████████████ are clearly geared toward individual consumers, and they contain detailed descriptions of ████████ ████████████████ offered by those products that any consumer can understand.[6]

No specialized knowledge is required to navigate consumer-facing websites advertising

---

[6] *See* ██████████████████████████████████ (last visited Dec. 15, 2025); ████████████████████████████ (last visited Dec. 15, 2025).

products and services to protect against potential risks that are easily understood by any lay person, and the Court should reject Plaintiffs' argument to the contrary.

### E.  Worley's Opinions Do Not "Fit" the Facts of the Case.

Finally, Defendants established that Worley's opinions do not "fit" the case because of her failure to account for the facts and evidence showing why her blanket, class-wide risk assumptions are wrong. Mot. 39-40. Plaintiffs attempt to brush away these issues as going to the weight and not the admissibility of her opinions. Opp. 36. But fit is an essential element of the *Daubert* analysis, as opinions that are not shaped to the facts of the case are not relevant or helpful. Courts routinely exclude proffered testimony where fit is lacking under similar circumstances. *See, e.g.*, *Ortiz v. Yale Materials Handling Corp.*, 2005 WL 2044923, at *10 (D.N.J. Aug. 24, 2005).

## III.  WITT'S DAMAGES OPINION SHOULD BE EXCLUDED.

Witt's opinion should be excluded because it is wholly derived from Worley's inadmissible opinions, rests on unreliable and arbitrary assumptions as to mortality and discount rates, and amounts to a multiplication exercise rather than expert testimony. Each of these deficiencies warrants exclusion.

### A.  Witt's Opinion Should Be Excluded Because It Relies on Inadmissible Inputs.

Plaintiffs mischaracterize Defendants' argument that Witt should be excluded because he relied on Worley's Mitigation Products Opinion as an input to his calculations. Defendants did not argue that Witt cannot use another expert's opinions as assumptions for his own analysis, as Plaintiffs claim. Opp. 39-40. The problem

37

instead is that the "inputs" Witt relied upon—namely, Worley's conclusions regarding ███████████████████████████████████—are themselves inadmissible. *See supra* § II.

This cannot be solved by simply substituting "whatever alternative inputs the evidence supports" or swapping in a "bulk rate," which by its nature *cannot* be incorporated into Witt's cost-per-plaintiff model. Opp. 40, 42. Witt's entire model is built on the false premise (put forward by Worley) that ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████. Relying on Worley's inadmissible assumptions means that the damages model itself is both unreliable and fails to fit the facts of the case. *Cf. Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 299 (N.D. Cal. 2020) (cited in Opp. 40; denying motion to exclude Witt because there was "a factual dispute over the correct input that Witt should have used in his model, rather than a criticism of the model itself").

Plaintiffs assert that ███████████████████████████████████ ████████ "is the correct measure of individual harm" because the bulk rate Defendants might secure "says nothing about what Plaintiffs lost." Opp. 42. This illustrates the absurdity of Plaintiffs' damages theory: no individual "lost" anything when ████████ ████████████████████████████████████████████████████ ████████████████████. Assuming, *arguendo*, that Plaintiffs are entitled to mitigation products to protect against the risk of future harm (though that theory has been

rejected, *see supra* § II.B.1), then there is no reason they would need to individually purchase those products rather than enroll in the *same* products obtained at a far lower bulk rate. Because his model is fundamentally flawed, Witt's opinion should be excluded.

**B.    Witt's Assumptions on Mortality, Discount Rates, and Duration are Arbitrary and Unreliable.**

Defendants showed that Witt's assumptions as to the putative class members' mortality rates, the "discount rate" utilized to calculate the present value of purchasing mitigation products, and the duration of those mitigation products all rest on factual and methodological errors. Mot. 42-45. Plaintiffs have no response.

As to mortality rates, Plaintiffs do not cite a single authority to support their contention that usage of the 2021 U.S. Life Table to calculate annuity values is appropriate *in this case*. That those documents may be "admissible" in some circumstances, *see* Opp. 40, does not mean they were reliable inputs for Plaintiffs' damages calculation here. To the contrary, the authorities Plaintiffs cite, most of which concern Witt's prior testimony in insurance matters, reveal that Witt relied on *specifically-tailored* mortality tables constructed by the defendant insurers, instead of a generic mortality table like the 2021 U.S. Life Table.[7] *See e.g.*, *McClure v. State Farm Life Ins. Co.*,

---

[7] For this reason, Plaintiffs' assertion that "courts across the country" have denied motions to exclude Witt on the "same arguments" Defendants raised is untrue. Opp. 37. All of those cases concerned life insurance matters, such as the calculation of a "COI Charge," for which Witt had unique qualifications because of his "extensive

341 F.R.D. 242, 256 (D. Ariz. 2022) (calculating a rate "based solely on mortality factors by using State Farm's mortality tables"); *Vogt v. State Farm Life Ins. Co.*, 2018 WL 4937330, at *4 (W.D. Mo. Oct. 11, 2018), *aff'd*, 963 F.3d 753 (8th Cir. 2020) ("Plaintiffs' model used the proprietary pricing mortality rates that … reflected State Farm's mortality expectations"); *Bally*, 335 F.R.D. at 298 (taking "rates from State Farm's own mortality assumptions").

Moreover, Witt testified that there are separate mortality tables or adjustments to general mortality tables that could account for the unique sub-population reflected in the classes here. He conceded that health history and socioeconomic status both affect mortality rates, and that the putative class members reflect a subset of the population who required medical testing but could not afford to pay for it. Ex. 9, Witt Dep. 26:10-25; 27; 28:1-9; 30:3-8; 31:2-6. He also testified that, from his experience in the insurance field, he is aware of mortality table adjustments for subsets of the population with better or worse health than average. *See id.* 219:11-221:7. And courts that have admitted Witt's expert opinions noted they were reliable *precisely because* they

---

experience in the insurance industry." *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 545 (W.D. Tex. 2020); *see also, e.g.*, *McClure*, 341 F.R.D. at 256 (opining on "whether State Farm overcharged Plaintiff for his COI Charge and expenses"); *Whitman v. State Farm Life Ins. Co.*, 2021 WL 4264271, at *9 (W.D. Wash. Sept. 20, 2021) ("Witt provides a model that purports to reliably calculate the allegedly improper COI charges for each Policy using State Farm's own documentation and data."); *Jaunich v. State Farm Life Ins. Co.*, 569 F. Supp. 3d 912, 918 (D. Minn. 2021) (noting "no court has found that his damages model regarding *this [insurance] policy* is lacking") (emphasis added). Witt's life insurance expertise is not relevant in this data breach case.

accounted for such factors. *See e.g.*, *Larson v. John Hancock Life Ins. Co.*, 2017 WL 4284163, at *8 (Cal. Super. Mar. 23, 2017) (admitting opinion relying on "expectations of future mortality experience," which could be calculated based on "sex, issue age and premium class, including smoker status," data maintained by the defendants). Plaintiffs have no justification for his failure to do so when calculating mortality rates here.

In addition to unreliable mortality rate assumptions, Witt also used an arbitrary discount rate. Plaintiffs cite no authority for the proposition that a 5% discount rate is appropriate, or that U.S. Treasury maturity yields should be utilized as a source to calculate such rate.[8] Nor is it Defendants' onus to offer an "authoritative source" as to the appropriate discount rate to be utilized in Plaintiffs' calculations. Opp. 42. Plaintiffs bear the burden of showing that Witt used a reliable methodology based on "sufficient" facts and data to generate inputs for his damages calculation. Fed. R. Evid. 702. They failed to meet that burden.

Finally, Plaintiffs also abandon the duration assumptions Witt used as merely a "demonstrat[ion]" that his model can accommodate different durations. Opp. 43. This ignores that Plaintiffs' counsel instructed Witt to use ███████████████████ ███████████████████████████—but then he inexplicably ran those

---

[8] Discount rate assumptions were not addressed (and therefore not approved) in any of the string of cases Plaintiffs cite concerning Witt's prior expert opinions, as those cases all concerned retroactive damages up to the point of judgment. *See also* Mot. Ex. 9, Witt Dep. 45:10-46:20 (no experience opining on post-judgment, future damages).

41

durations starting more than five years after the AMCA Cyberattack. And, regardless of the specific duration chosen to "demonstrate," Witt's model will have no application at all by the time it is presented to a jury well after even the outer bounds of the ███████ ██████ risk duration Plaintiffs claim.

Witt failed to use any reliable methodology to generate the inputs to his damages calculations, and his opinion should be excluded.

### C.    Witt's Opinion Rests on Simple Arithmetic that Requires No Specialized Knowledge to Perform.

Finally, Witt's opinion should be excluded because a fact-finder can readily perform the multiplication required for Plaintiffs' damages model. At heart, Witt's model relies on the multiplication of four figures: the monthly cost of the mitigation product, the number of months it will be needed, the rate to discount to present value, and the mortality rate provided by a simple life table. As Plaintiffs' own cases hold: "[t]o the extent that [the expert's] opinion … is premised upon such simple multiplication, such an opinion would neither implicate matters requiring scientific, technical or specialized knowledge nor would assist the trier of fact." *Callas v. Callas*, 2020 WL 3468084, at *5 (D.N.J. June 25, 2020) (citation modified).[9]

---

[9] The only other case Plaintiffs cite, *McClure,* is inapposite because it required specialized knowledge of a "COI Charge," which is a figure used in the insurance industry, and "a normal juror would not understand the calculations necessary to quantify the COI Charge." 341 F.R.D. at 256 (cited in Opp. 44).

## IV.    ANOLIK'S OPINIONS SHOULD BE EXCLUDED.

### A.    Anolik's Opinions Are Impermissible Legal Opinions that Must Be Excluded.

An expert cannot offer testimony on "what the law require[s]," let alone whether a party complied with the law. *See United States v. Leo*, 941 F.2d 181, 197 (3d Cir. 1991); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) (excluding testimony "as to whether [appellee] complied with legal duties that arose under the [law]"). Plaintiffs admit that Anolik does precisely that: she ███████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ *See* Plaintiffs' Mot. to Excl. Miller 2-3 (citation modified).

Plaintiffs try to escape the consequences of their own admission by asserting that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley*, 455 F.3d at 218;[10] Opp. 51 n.23. They attempt to exploit that "blurred" line by recasting

---

[10] Notably, in *Berckeley*, the court *excluded* expert testimony regarding industry practice to the extent it concerned legal duties. *See Berckeley*, 455 F.3d at 218 ("[T]he portion of … the affidavit, opining that in light of the apparent routine industry practice it was reasonable for Berckeley to have believed that it was entitled to the Section 4(1) exemption, is inadmissible because it concerns Berckeley's legal duties resulting from the various SEC pronouncements.").

Anolik's legal opinions as commentary on industry customs. *See, e.g.*, Opp. 46, 51. But no amount of wordplay changes the baseline fact that Anolik offers opinions on

███████████████████████████████████████████████████████████████████

Indeed, the Opposition's opening paragraph with respect to Anolik removes any doubt:

> Plaintiffs' *negligence per se claims for violating HIPAA* are premised on Defendants' failure to oversee AMCA, their 'Business Associate,' and thus breaching the duty that they owed uniformly to Class members. In support, Plaintiffs offer expert testimony from Sharon Anolik … who opines on: ████████████████████████████████████████████
> ████████████████████████████████████████████
> ████████████████████████████████████████████

Opp. 44-45 (emphases added).

In short, Plaintiffs admit their claim is grounded on alleged violations of HIPAA and that Anolik's role is to ███████████████████████████████████.[11] Anolik's ████████████████████████, offered solely to opine on legal requirements that, in her view, ████████████████ is improper. *See* Mot. Ex. 12, Anolik Dep. 25:4-5 █████████████████████████████████ *see also Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan & Tr. Agreement*, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992) (excluding testimony about standard pension plan administrative practice because

---

[11] Plaintiffs attempt to sidestep Anolik's clear deposition testimony that ████████ ████████████████████████████████████ arguing that Defendants "cite a fragment of one answer she gave in her deposition." Opp. 53-54. But Plaintiffs do not contend that Defendants mischaracterized that testimony, and their quibbling does not change her core admission that her opinion concerned ████████████ ████████████ Mot. Ex. 12, Anolik Dep. 23:12-23.

44

"whether Defendants … followed the standard practice of employers … when distributing pension benefits is not the real issue. The real issue is whether this practice violates ERISA"—which was a legal question for the court); *Berckeley*, 455 F.3d at 218.

The cases cited by Plaintiffs regarding expert testimony on industry practices do not help them because such testimony was allowed only for purposes other than establishing legal obligations or opining on compliance with the law. *See, e.g.*, *Leo*, 941 F.2d at 197 (affirming admission of testimony regarding industry customs to establish what someone with defendant's background was likely to have known and exclusion of testimony on requirements under the law); *First Nat'l State Bank of N.J. v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (admitting testimony on bank customs that would help jury but affirming exclusion of testimony regarding any legal duties arising from such customs); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 2019 WL 4751883, at *5 (E.D. Pa. Sept. 30, 2019) (excluding expert testimony "on what constitutes a material impact" because it is a "legal issue in [the] case"). Indeed, Plaintiffs acknowledge as much in reference to *Wolfe v. McNeil-PPC, Inc.*, where the court excluded "legal conclusions" such as that "'defendants' conduct was negligent.'" 881 F. Supp. 2d 650, 662 (E.D. Pa. 2012). The cases Plaintiffs rely on exclude the very type of testimony that Anolik purports to offer here.[12]

---

[12] The laundry list of cases Plaintiffs cite for the proposition that "[n]umerous other courts permit testimony from industry experts," Opp. 51 & n.24, are distinguishable or similarly exclude industry experts' testimony on legal requirements and compliance with

Plaintiffs' assertion that Anolik "does not cross such lines," Opp. 51, is irreconcilable with her own testimony. Anolik's declaration is replete with conclusions about what the law requires and whether Defendants met those requirements, including but not limited to the following opinions:



- ████████████████████████████████████████████████████████ x. 10, Anolik Decl. ¶ 52.

- ████████████████████████████████████████████████████████ Id. ¶ 96.

- ████████████████████████████████████████████████████████ Id. ¶ 99.

---

the law. *See, e.g., Swartzendruber v. Sentara RMH Med. Ctr.*, 2025 WL 2655986, at *9 (W.D. Va. Sept. 16, 2025) (bench trial where risk of confusing or improperly influencing a jury was inapplicable); *Vitamin Energy, Inc. v. Evanston Ins. Co.*, 2023 WL 5608394, at *4 (E.D. Pa. Aug. 29, 2023) (expert must not "testify that [defendant] breached its duty") (citation modified); *Maude v. City of Philadelphia*, 507 F. Supp. 3d 593, 605 (E.D. Pa. 2020) (excluding expert's opinions that defendants violated confidentiality policies "including its obligations under the HIPAA regulations") (citation modified); *In re: Tylenol (Acetaminophen) Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2016 WL 4039324, at *4-5 (E.D. Pa. July 27, 2016) (expert permitted to testify about the history of statutory framework but may not provide legal conclusion regarding whether acetaminophen has been approved as generally recognized as safe and effective); *In re Wellbutrin SR Antitrust Litig.*, 2010 WL 8425189, at *6-7 (E.D. Pa. Mar. 31, 2010) (excluding testimony regarding "conclusions of law" because "[i]t is the province of this court, and not the experts, to educate the jury on those specific areas of the law relevant to plaintiffs'" claim); *United States v. Universal Rehab. Servs., Inc.*, 1996 WL 297575, *10 (E.D. Pa. May 31, 1996) (expert "did not opine on the ultimate legal issue of whether a fraud had been committed" but rather about how the Medicare reimbursement system functioned).



- ██████████████████████████████████████ *Id.* ¶ 138.

- ████████████████████████████████████ *Id.* ¶ 209.

- ██████████████████████████████ *Id.* ¶ 222.

- ████████████████████████████ *Id.* ¶ 231.

Each of these opinions boils down to ████████████████████ ████████████████████████████ That is improper. And allowing an expert to cloak legal conclusions in the language of ████████████████ does not make them admissible. Anolik's testimony is not offered for *any* relevant purpose other than to opine on ██████████████████████████████████, and it should be excluded. *See Berckeley*, 455 F.3d at 218; *Haberern*, 812 F. Supp. at 1378.

## B.    Anolik's Opinions Lack Any Reliable Methodology.

Anolik's testimony also should be excluded because she offers no discernible methodology for her opinions on ████████████████████████ ████████████ Indeed, she ignores authoritative ████████████████ ████████████ that contradict her views in favor of biased, non-reliable sources. *See* Mot. 49-55. Plaintiffs' Opposition does nothing to cure these defects. Instead, Plaintiffs claim *Daubert*'s reliability factors are inapplicable simply because her opinions are "based on practical experience." Opp. 48.

47

Plaintiffs' reliance on cases like *States v. Fernwood Hotel & Resort* and *Equinox Props., LLC v. Harford Mut. Ins. Co.* is misplaced. Those decisions involved experts whose opinions could not, for example, be peer-reviewed or published and were grounded in decades of specialized experience and direct inspection of the subject property. *See Fernwood Hotel & Resort*, 2014 WL 198568, *3-4 (M.D. Pa. Jan. 15, 2014) (expert's testimony about structural integrity of glass enclosure was reliable because it was based on specialized experience in the glass field and examination of glass in question); *Equinox Props., LLC v. Hartford Mut. Ins. Co.*, 2023 WL 5447279, at *4 (D.N.J. Aug. 24, 2023) (expert's personal inspection of damage to property in question combined with decades of experience as contractor rendered opinion about property damage reliable). Put differently, these cases show that practical experience alone does not relieve Plaintiffs of their burden to "provide the methodology [s]he used to arrive at [her] opinions." *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d Cir. 2008).[13] Plaintiffs' suggestion that these defects go only to the "weight" and not the admissibility

---

[13] Plaintiffs state that "[o]ther courts have permitted ████████████," Opp. 48— which further cements that Anolik is opining on ████████████, *see supra* § IV.A. But those cases do not support Plaintiffs. In *Maude v. City of Philadelphia*, the court excluded the expert's conclusion that a defendant violated its ███████████ ████████████, as an improper legal opinion. 507 F. Supp. 3d 593, 605 (E.D. Pa. 2020); *see, e.g.*, Mot. Ex. 10, Anolik Decl. ¶ 252. Plaintiffs' other out-of-circuit cases did not address Rule 702 methodology challenges. *See* Opp. 49 n.21 (citing *MacGlashan v. ABS Lincs KY, Inc.*, 2015 WL 403067 (W.D. Ky. Jan. 28, 2015); *Duling v. Domino's Pizza, LLC*, 2015 WL 3407602 (N.D. Ga. Jan. 14, 2015); and *Chopourian v. Cath. Healthcare W.*, 2011 WL 6396500 (E.D. Cal. Dec. 20, 2011)).

of Anolik's opinions, Opp. 55-56, ignores that reliability is a threshold requirement of Rule 702. *See Oddi*, 234 F.3d at 146 ("A court may conclude that there is simply too great a gap between the data and the opinion proffered.") (citation modified).

The same lack of methodology dooms Anolik's ███████████████████████. "When expert testimony is offered to prove the existence of an industry standard, an expert must offer evidence of actual customary practices." *Mendler v. Aztec Motel Corp.*, 2011 WL 6132188, at *3 (D.N.J. Dec. 7, 2011) (citation modified). In *Mendler*, the court excluded testimony where an expert relied only on written guidelines and general safety recommendations, not recognized by law, as opposed to "factual evidence of an actual industry standard." *Id.* at *3-4. Here, Anolik does exactly the same thing. She offers no evidence in her report that ████████████████████████████████████████

████████████████████████████████████████—and Plaintiffs cite no such evidence in their Opposition. Indeed, although Anolik has "experience working for and advising healthcare entities regarding their privacy practices," she says nothing about ██████████████████████████████████████████ Opp. 49; *see* Ex. 10, Anolik Decl. ¶ 1. And she neither conducted nor cited any ███████████

██████████████████████████████████ Mot. 56-57. Her opinions are bereft of evidence of any █████████████ and should be excluded.[14]

---

[14] Plaintiffs' citations to cases involving the standard of care for medical treatment are inapposite. *See* Opp. 58. In these cases, the proffered experts routinely personally participated in the medical procedures on which they opined, and taught medical

**C.     Anolik's Opinion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Should Be Excluded.**

As detailed in Defendants' Motion, Anolik's single, unsupported, conclusion that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 10, Anolik Decl. ¶

253, is based on nothing other than her say-so. *See* Mot. 58-59. In response, Plaintiffs

assert that this opinion is "supported fully by the preceding 250 paragraphs" of the

declaration where she ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Opp. 58. That does not solve for the fact that Anolik cites nothing regarding ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, her conclusory opinion

is not based on any evidence, lacks a reliable methodology, and must be excluded. *See*

*Kuhar*, 2018 WL 6331682, at *4.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court

exclude the opinions of Plaintiffs' experts Mary Frantz, Amy Worley, Scott Witt, and

Sharon Anolik.

---

students on those issues. *Ellison v. United States*, 753 F. Supp. 2d 468, 482 (E.D. Pa. 2010); *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 399, 407 (3d Cir. 2003). Here, by contrast, Anolik does not testify that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

Dated:  December 17, 2025

Respectfully submitted,

By: */s/ David H. Hoffman*

David H. Hoffman
Daniel C. Craig
Heather Benzmiller Sultanian
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Tel.: (312) 853-7000
david.hoffman@sidley.com
dcraig@sidley.com
hsultanian@sidley.com

Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
Tel.: (212) 839-8555
ejoyce@sidley.com

Ricardo Solano, Jr.
GIBBONS P.C.
One Gateway Center
Newark, NJ  07102
Tel.: (973) 596-4500
rsolano@gibbonslaw.com

*Attorneys for Defendant Quest Diagnostics Incorporated*

By: */s/ Reade W. Seligmann*

Reade W. Seligmann
ALSTON & BIRD LLP
90 Park Avenue, 12th Floor

51

New York, NY  10016
Tel.: (212) 210-9453
reade.seligmann@alston.com

Kristine M. Brown
Donald M. Houser
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309
Tel.: (404) 881-7000
kristy.brown@alston.com
donald.houser@alston.com

Thomas P. Scrivo
Young Yu
O'TOOLE SCRIVO, LLC
14 Village Park Road
Cedar Grove, NJ  07009
Tel.: (973) 239-5700
tscrivo@oslaw.com
yyu@oslaw.com

*Attorneys for Defendant Optum360, LLC*

By: */s/  Bradley J. Bartolomeo*

Bradley J. Bartolomeo
Jeffrey Y. Spiegel
Ariadne Panagopoulou
Abaigeal D. Franson
LEWIS BRISBOIS BISGAARD &
SMITH LLP
One Riverfront Plaza, Suite 800
Newark, NJ  07102
Tel.: (973) 577-6260
bradley.bartolomeo@lewisbrisbois.com
jeffrey.spiegel@lewisbrisbois.com
ariadne.panagopoulou@lewisbrisbois.com
Abaigeal.franson@lewisbrisbois.com

52

*Attorneys for Defendants Sonic Healthcare USA, Clinical Pathology Laboratories, Inc., Aurora Diagnostics LLC, and Austin Pathology Associates*