**LEWIS BRISBOIS BIGAARD & SMITH LLP**
*Attorneys for Defendants Sonic Healthcare USA, Clinical Pathology Laboratories, Inc., Aurora Diagnostics LLC, and Austin Pathology Associates*
One Riverfront Plaza, Suite 800
Newark, NJ 07102
(973) 577-6260

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To: Other Labs Track | Civil Action No. 19-md-2904 (MCA) (MAH) |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT .......................................................................................................................... 4

    I.   LEGAL STANDARD FOR CLASS CERTIFICATION ............................................. 4

    II.  PLAINTIFFS FAIL TO DEMONSTRATE ARTICLE III STANDING FOR THEMSELVES AND EACH CLASS MEMBER ........................................................ 5

        A.  The Class Representative Plaintiffs Lack Standing ................................................ 7

            (i)  Injury-in-fact ...................................................................................................... 9

            (ii) Traceability ....................................................................................................... 11

                  a.  No Evidence Links Anderson's Alleged Harms to the Breach ........... 13

                  b.  No Evidence Links Tate's Alleged Harms to the Breach ................... 15

        B.  Plaintiffs Do Not Have Standing To Sue Non-Party Labs ................................... 16

        C.  Plaintiffs Lack Class-Wide Evidence That Can Be Used to Prove Article III Standing For Absent Class Members ..................................................................... 19

            (i)  Injury-in-fact ...................................................................................................... 19

            (ii) Traceability ....................................................................................................... 21

    III. PLAINTIFFS FAIL TO DEMONSTRATE THAT THE TWO CLASSES THEY PROPOSE TO CERTIFY ARE ASCERTAINABLE ............................................... 24

    IV. PLAINTIFFS CANNOT DEMONSTRATE PREDOMINANCE ............................ 26

        A.  Choice of Law Rules Require Different State Laws Be Applied ......................... 27

        B.  Individual Questions of Fact Predominate, Precluding this Court From Arriving At Common Answers ......................................................................................... 32

            (i)  Duty of Care ...................................................................................................... 32

            (ii) Causation ........................................................................................................... 35

            (iii)Damages ........................................................................................................... 41

    V.  PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES .................. 44

    VI. THERE IS NO BASIS TO CERTIFY A CLASS FOR INJUNCTIVE RELIEF ....... 48

    VII.   CONCLUSION ................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins.*,
 938 F.3d 1170 (11th Cir. 2019) ...................................................................................49

*Acreman v. Sledge*,
 2003 WL 103203 (Tex. App. Jan. 10, 2003) ...............................................................41, 42

*Allison v. Citgo Petrol. Corp.*,
 151 F.3d 402 (5th Cir. 1998) .......................................................................................48

*Am. Express Co. v. Italian Colors Rest.*,
 570 U.S. 228 (2013)........................................................................................................4

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
 2021 WL 5937742 (D.N.J. Dec. 16, 2021)..........................................................8, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)........................................................................................................4

*Arbitrage Fund v. Toronto-Dominion Bank*,
 2023 WL 5550198 (D.N.J. Aug. 29, 2023) .................................................................37, 42

*Arch v. Am. Tobacco Co.*,
 175 F.R.D. 469 (E.D. Pa. 1997), *aff'd sub nom. Barnes v. Am. Tobacco Co.,*
 161 F.3d 127 (3d Cir. 1998)........................................................................................36

*Attias v. CareFirst, Inc.*,
 344 F.R.D. 38 (D.D.C. 2023)........................................................................................43

*Bang v. BMW of N. Am., LLC*,
 2016 WL 7042071 (D.N.J. Dec. 1, 2016) ...................................................................41

*Beck v. Maximus, Inc.*,
 457 F.3d 291 (3d Cir. 2006)........................................................................................45

*Beck v. McDonald*,
 848 F.3d 262 (4th Cir. 2017) .....................................................................................49

*Bidwell ex rel. Bidwell v. Strait*,
 618 S.W.3d 309 (2021).................................................................................................29

*Blood v. Labette Cnty. Med. Ctr.*,
 2022 WL 11745549 (D. Kan. Oct. 20, 2022) .............................................................22

*Bull v. UPS*,
 665 F.3d 68 (3d Cir. 2012)...........................................................................................47

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013)................................................................................5, 25

*Cassese v. Washington Mut., Inc.*,
262 F.R.D. 179 (E.D.N.Y. 2009)...............................................................................18

*City of L.A. v. Lyons*,
461 U.S. 95 (1983)....................................................................................................49

*City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*,
867 F.3d 434 (3d Cir. 2017)......................................................................................24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................................................................................................9

*Clark v. McDonald's Corp.*,
213 F.R.D. 198 (D.N.J. 2003)..............................................................................17, 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................4, 5, 26

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975)..................................................................................................34

*Culpepper v. Daniel Industries, Inc.*,
500 S.W.2d 958 (1973)..............................................................................................30

*Curtiss-Wright Corp. v. Rodney Hunt Co.*,
1 F. Supp. 3d 277 (D.N.J. 2014) ........................................................................27, 28

*DaimlerChrysler Motors Co., LLC v. Manuel*,
362 S.W.3d 160 (Tex. App. 2012)............................................................................42

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
432 F.3d 286 (3d Cir. 2005)........................................................................................9

*Davis v. St. Joseph's Children's Servs.*,
472 N.Y.S.3d 655 (App. Div. 1984), *aff'd,* 64 N.Y.2d 794 (N.Y. 1985)................30

*Deloitte & Touche v. Weller*,
976 S.W.2d 212 (Tex. App. 1998)............................................................................42

*Doe v. Poritz*,
662 A.2d 367 (N.J. 1995)..........................................................................................34

*Dolmage v. Combined Ins. Co. of Am.*,
2017 WL 1754772 (N.D. Ill. May 3, 2017) .............................................................43

*Duncan v. Governor of Virgin Islands*,
    48 F.4th 195 (3d Cir. 2022) ..................................................................................................7

*Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*,
    872 F. Supp. 2d 369 (D.N.J. 2012) .....................................................................................33

*Falcon v. Philips Elecs. N. Am. Corp.*,
    304 F. App'x 896 (2d Cir. 2008) .........................................................................................47

*Francis v. Herrin Transp. Co.*,
    432 S.W.2d 710 (1968) ........................................................................................................30

*Garrett v Young*,
    109 Cal. App. 4th 1393 (2003) ............................................................................................34

*Gayle v. Warden Monmouth Cnty. Corr. Inst.*,
    838 F.3d 297 (3d Cir. 2016) ................................................................................................48

*Georgine v. Amchem Prod., Inc.*,
    83 F.3d 610 (3d Cir. 1996) ..................................................................................................36

*Ginsberg ex rel. Ginsberg v. Quest Diagnostics*, Inc.,
    441 N.J. Super. 198, 230, 245 (App. Div. 2015) .................................................................29

*Green-Cooper v. Brinker Int'l, Inc.*,
    73 F.4th 883 (11th Cir. 2023) ..................................................................................6, 40, 42

*Hayes v. Wal–Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013) ............................................................................................5, 24

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
    213 F.3d 124 (3d Cir. 2000) ...................................................................................16, 17, 18

*Huber v. Simon's Agency, Inc.*,
    84 F.4th 132 (3d Cir. 2023) ...........................................................................5, 19, 27, 35

*In re Hum. Tissue Prods. Liab. Litig.*,
    255 F.R.D. 151 (D.N.J. 2008) ...............................................................................................9

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) .............................................................................................4, 26

*Independent Bank v. Fred's, Inc.*,
    2019 WL 1179396 (M.D. Ala. Mar. 13, 2019) ...................................................................32

*Ironburg Inventions Ltd. v. Valve Corp.*,
    64 F.4th 1274 (Fed. Cir. 2023) ..............................................................................................9

*Estate of Jobe v. Berry*,
    428 S.W.3d 888 (Tx. 2014) ...................................................................................30

*Kruszka v. Toyota Motor Corp.*,
    2011 WL 9820198 (C.D. Cal. Aug. 2, 2011)........................................................43

*Lakeland Reg'l Med. Ctr. v. Astellas US, LLC*,
    763 F.3d 1280 (11th Cir. 2014) ...........................................................................48

*Lame v. U.S. Dep't of Just.*,
    654 F.2d 917 (3d Cir. 1981)..................................................................................34

*LAN/STV v. Martin K. Eby Const. Co., Inc.*,
    435 S.W.3d 234 (TX. 2014)..................................................................................30

*Leyva v. Smith*,
    557 S.W.2d 169 (TX. 1977)..................................................................................30

*Lindsey v. Am. Sec. Ins. Co.*,
    2010 WL 11640212 (E.D. Ky. Mar. 29, 2010).....................................................18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...........................................................................................9, 12

*Lyndon Prop. Ins. Co. v. Duke Levy & Assocs., LLC*,
    475 F.3d 268 (5th Cir. 2007) ...............................................................................31

*Manhattan Motorcars, Inc. v. Automobili Lamborghini*,
    244 F.R.D. 204 (S.D.N.Y. 2007) .........................................................................31

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012)...................................................................................5

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ...........................................................................31, 32

*McCombs v. Delta Grp. Elecs., Inc.*,
    676 F. Supp. 3d 1064 (D.N.M. 2023) ...................................................................21

*Mooradian v. FCA US, LLC*,
    286 F. Supp. 3d 865 (N.D. Ohio 2017)..................................................................47

*Murray v. Auslander*,
    244 F.3d 807 (11th Cir. 2001) ..............................................................................48

*N. J. Thoroughbred Horsemen's Ass'n, Inc. v. Alpen House U.L.C.*,
    2012 WL 893092 (D.N.J. Mar. 14, 2012)..............................................................26

*Ogrizovich v. CUNA Mut. Grp.*,
  2013 WL 12140983 (W.D. Pa. Sept. 4, 2013)........................................................................43

*On Air Ent. Corp. v. Nat'l Indem. Co.*,
  210 F.3d 146 (3d Cir. 2000)...................................................................................................28

*P.V. v. Camp Jaycee*,
  962 A.2d 453 (N.J. 2008)................................................................................................27, 28

*Putnam v. Leach*,
  572 S.W.3d 605 (2018)..........................................................................................................30

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011)...............................................................................................11, 21

*Reinig v. RBS Citizens, N.A.*,
  912 F.3d 115 (3d Cir. 2018)...................................................................................................27

*Reyes v. Netdeposit, LLC*,
  802 F.3d 469 (3d Cir. 2015).....................................................................................................5

*Rodriguez v. City of New York*,
  101 N.E.3d 366 (N.Y. 2018)..................................................................................................30

*In re Rhone-Poulenc Rorer, Inc.*,
  51 F.3d 1293 (7th Cir. 1995) .................................................................................................32

*Sacred Heart Health Sys. Inc. v. Humana Mil. Healthcare Servs., Inc.*,
  601 F.3d 1159 (11th Cir. 2010) .......................................................................................31, 32

*Samahon v. F.B.I.*,
  40 F. Supp. 3d 498 (E.D. Pa. 2014) .......................................................................................34

*In re Samsung Data Security Breach Litigation*,
  No. 1:23-MD-03055, 2025 WL 271059 (D.N.J. Jan. 3, 2025).................11, 13, 15, 16, 21, 22

*Savidge v. Pharm-Save, Inc.*,
  727 F. Supp. 3d 661 (W.D. Ky. 2024).........................................................................38, 39, 44

*S.C. v. New Jersey Department of Children and Families*,
  231 A.3d 576 (N.J. 2020).......................................................................................................45

*Smith v. Church Mutual Insurance Company*,
  254 So.3d 57 (MS. 2018).......................................................................................................30

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).................................................................................................................5

*Stewart v. Beam Glob. Spirits & Wine, Inc.*,
  2014 WL 2920806 (D.N.J. June 27, 2014) ................................................................24, 25

*In re Thalomid & Revlimid Antitrust Litig.*,
  2018 WL 6573118 (D.N.J. Oct. 30, 2018) (Arleo, J.) .....................................................32

*Thomas v. Kimpton Hotel & Rest. Grp., LLC*,
  2022 WL 1164229 (N.D. Cal. Apr. 20, 2022) .................................................................38

*In re TJX Cos. Retail Sec. Breach Litig.*,
  246 F.R.D. 389 (D. Mass. 2007)......................................................................................48

*Toll Bros. v. Twp. of Readington*,
  555 F.3d 131 (3d Cir. 2009)..............................................................................................21

*TransUnion v. Ramirez*,
  594 U.S. 413 (2021)........................................................................................................6, 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)...........................................................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..............................................................4, 5, 26, 27, 33, 45, 48

*Watson v. State Farm Fire and Cas. Ins. Co.*,
  469 So.2d 967 (LA. 1985) ..................................................................................................30

*Webb v. Injured Workers Pharm., LLC*,
  72 F.4th 365 (1st Cir. 2023)........................................................................................49, 50

*Weikel v. Tower Semiconductor Ltd.*,
  183 F.R.D. 377 (D.N.J. 1998)............................................................................................45

*Weiner v. Bank of King of Prussia*,
  358 F. Supp. 684 (E.D. Pa. 1973) .......................................................................................7

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
  247 F.3d 1262 (11th Cir. 2001) ........................................................................................49

*Yocham v. Novartis Pharmaceuticals Corporation*,
  736 F. Supp. 2d 875 (D.N.J. 2010) ...................................................................................28

**Constitutions**

Texas Const. Article 1, §   19.................................................................................................45

U.S. Constitution, 14th Amendment .....................................................................................45

**Rules**

CPLR 214(5).............................................................................................................................30

NY CPLR § 1411................................................................................................................30

Fed.R.Civ.P. Rule 23 ................................................................................................ *passim*

**Treatises**

Restatement of Conflict of Laws ......................................................................................28

Restatement (Second) of Conflict of Laws.......................................................................27

Defendants Sonic Healthcare USA ("SHUSA"), Clinical Pathology Laboratories, Inc. ("CPL"), Aurora Diagnostics LLC ("Aurora"), and Austin Pathology Associates ("Austin Pathology" and, collectively, "Defendants"), by their attorneys Lewis Brisbois Bisgaard & Smith LLP, respectfully submit this memorandum of law in opposition to Plaintiffs' motion for class certification.[1]

## PRELIMINARY STATEMENT

Named Plaintiffs Gwendolyn Anderson and Tonda Tate are former patients of Defendant CPL – and, in the case of Anderson, also Defendant Austin Pathology – who, in July 2019, received notices in the mail stating that their billing collections vendor AMCA suffered a data breach (hereinafter, "the Data Breach") that "may have involved" Plaintiffs' personal information and that "although we are unaware of the misuse of any of your personal information, out of an abundance of caution, we are notifying you about this incident".[2]

Anderson and Tate filed suit shortly thereafter. Fast forward to 2025, and it has become abundantly evident, through fact and expert discovery, that neither Plaintiff suffered any harm as a result of the AMCA data breach. Nevertheless, based on receipt of the notice, they now seek to certify a Rule 23 class with respect to their negligence claims comprised of individuals that received similar notices from CPL or Austin Pathology as well as from 10 other non-party laboratories affiliated with SHUSA and Aurora (hereinafter, "the Sonic-affiliated Entities") that Anderson and Tate undisputably never visited or obtained services from.

Throughout their class certification brief ("Pltfs. Memo."), Plaintiffs conveniently use the term "Sonic" to describe the fourteen Sonic-affiliated Entities, even though they proffer no

---

[1] All exhibits referenced herein are annexed to the Declaration of Bradley J. Bartolomeo ("Decl.").

[2] *See* Decl., Exs. 4 and 5.

1

evidence that their practices were uniform; to the contrary, the brief's "Background Section" concedes significant and important differences in these labs' practices. Nevertheless, Plaintiffs propose to certify in the alternative, the following classes:

> A nationwide class comprising of "[a]ll natural persons who were sent a letter from Clinical Pathology Laboratories, American Esoteric Laboratories, CBLPath, Inc., Sunrise Medical Laboratories, Inc., Austin Pathology Associates, Laboratory Medicine Consultants, Ltd., South Texas Dematology Lab, PLLC, Pathology Solutions, LLC, Seacoast Pathology, Inc. Arizona Dermatopathology, Western Pathology Consultants, Ltd, and Laboratory of Dermatology ADX, LLC notifying them of the Data Breach"; and alternatively

> A state-specific class comprising of "[a]ll natural persons who were residing in the States of Texas, New York, Nevada, Louisiana, Tennessee, and Mississippi who were sent a letter from Clinical Pathology Laboratories, American Esoteric Laboratories, CBLPath, Inc., Sunrise Medical Laboratories, Inc., Austin Pathology Associates, Laboratory Medicine Consultants, Ltd., South Texas Dermatology Lab, PLLC, Pathology Solutions, LLC, Seacoast Pathology, Inc. Arizona Dermatopathology, Western Pathology Consultants, Ltd, and Laboratory of Dermatology ADX, LLC notifying them of the Data Breach.

Pltfs. Memo. pp. 16-17.

As demonstrated below, Plaintiffs' motion should be denied because Plaintiffs cannot meet their burden on virtually every element for class treatment under Rule 23. Plaintiffs' effort to certify a damages class under Rule 23(b)(3) fails due to the predominance of individual answers to the purported common questions. Plaintiffs' request for injunctive relief under Rule 23(b)(2) fares no better; their laser focus on money damages underscores that now, six years post-incident, no injunctive relief could actually prevent alleged future harm for members of the putative class.

As a threshold matter, the Named Plaintiffs lack standing to sue and cannot represent a putative class. Anderson and Tate only squeaked through a second dismissal of their case based on the addition to the First Amended Complaint ("FAC") of now disproven, fictitious allegations of alleged harm. Discovery has shown that neither of the two Plaintiffs has suffered an injury-in-

2

fact traceable to Defendants. Additionally, Plaintiffs do not have standing to certify a class which involves claims against the non-party Sonic-affiliated entities with which they had no dealings.

Plaintiffs also fail to meet their burden to identify common evidence to establish the mandatory predominance of common questions and answers under Rule 23(b)(3). In fact, individualized inquiries are required as to each salient question, for which common answers do not exist. Indeed, Plaintiffs cannot adduce, and do not offer, definitive evidence that each putative class member's information in the CHAMP database was exfiltrated from AMCA and posted to the dark web. Moreover, Plaintiffs' proposed class definitions invite a slew of individualized liability-determinative questions, choice of law issues, and damages assessments, the answers to which necessarily differ for each putative class member. The myriad of individualized inquiries confirms Plaintiffs have not met their burden to show that common questions predominate.

Further fatal to their motion is that Plaintiffs' proposed class definitions are overbroad and not ascertainable since they encompass all individuals who received a data breach notification letter from any one of 12 Sonic-affiliated entities, without differentiation as to class members that may have actually experienced any injury from the Data Breach. As explained below, the mere fact that an individual received a breach notice does not confer standing to sue or the ability to recover damages. Plaintiffs propose no viable methodology that this Court may utilize to distinguish between any putative class members who suffered any cognizable injury as a result of the Data Breach and those who merely received a notice about a breach. It would be improper to certify a class consisting of everyone who received such a notice but whom was never harmed.

Class certification should also be denied because Plaintiffs are not adequate class representatives since they are subject to unique defenses that are not applicable to all class members. For example, because both named Plaintiffs admit that they visited Quest and Labcorp,

3

two other laboratories that utilized AMCA and which are defendants in this MDL, there is no way to pinpoint how that information made its way onto AMCA's databases. Additionally, both Plaintiffs admitted spoliation of evidence, rendering them inadequate as class representatives.

Finally, Plaintiffs cannot certify a class for the purposes of injunctive relief pursuant to Rule 23(b)(2) because (1) they lack Article III standing since they cannot show that they face a substantial likelihood of imminent harm, and (2) monetary damages predominate.

## **ARGUMENT**

### I.    **LEGAL STANDARD FOR CLASS CERTIFICATION**

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) ("*Dukes*"); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) ("*Comcast*"). To come within the exception, a party seeking to maintain a class action "must affirmatively demonstrate his compliance" with Fed.R.Civ.P. 23. *Comcast*, 569 U.S. 27, 33 (2013). That rule imposes "stringent requirements" for class certification. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). A plaintiff seeking class certification must *prove*—not merely plead—that the proposed class meets the requirements of Rule 23. *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 316 (3d Cir. 2008). Plaintiffs here fail to meet this heavy burden, and their claims can only be adjudicated on an individual basis.

A plaintiff seeking certification must satisfy Rule 23(a)'s four requirements: numerosity, commonality, typicality, and adequacy of representation. To obtain certification of a class action for money damages under Rule 23(b)(3), a putative class must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). "Class

certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013). "The Rule does not set forth a mere pleading standard. Rather, a party must be prepared to prove that there are in fact sufficiently numerous parties, common question of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23." *Comcast*, 569 U.S. at 33. Also, Plaintiffs must satisfy through evidentiary proof at least one of the provisions of Rule 23(b). *Id.* at 33. The court must perform a "rigorous analysis" to determine whether this exacting burden has been met before certifying a class. *Id.* at 35; *Dukes* at 350-51. *See also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015) (the Rule 23 inquiry may require the district court to "delve" behind the pleadings).

Additionally, plaintiffs seeking to certify a class in the Third Circuit must also meet the requirement of ascertainability, which mandates that (1) "a class must be defined with reference to objective criteria" and (2) "that there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal– Mart Stores, Inc.,* 725 F.3d 349, 354 (3d Cir. 2013). Where, as here, "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 593 (3d Cir. 2012).

## II.    PLAINTIFFS FAIL TO DEMONSTRATE ARTICLE III STANDING FOR THEMSELVES AND EACH CLASS MEMBER

A court cannot certify a class absent a named plaintiff who has Article III standing because standing is a "threshold matter" that must be established. *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 144 (3d Cir. 2023). Here, no such Plaintiff exists. To have Article III standing, a plaintiff "must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*

*v. Robins,* 578 U.S. 330, 338 (2016). At the class-certification stage, the Court "may review both the allegations in the complaint and evidence in the record so far to determine whether the named plaintiffs in this case have established Article III standing for class certification purposes." *Green-Cooper v. Brinker Int'l, Inc.,* 73 F.4th 883, 889 (11th Cir. 2023). When "the facts developed in discovery firmly contradict the allegation in the complaint, the District Court cannot rely on the complaint's factual allegation" and must "probe behind the pleadings to assess standing." *Id.* at 891 (citation omitted).

The Supreme Court has made clear that where class members seek damages, the plaintiff's burden is to demonstrate Article III standing for every class member. "To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. *No concrete harm, no standing." TransUnion v. Ramirez*, 594 U.S. 413, 417 (2021) (emphasis added). Not only is the rule that "[o]nly those plaintiffs who have been concretely harmed" by a defendant's conduct "may sue that private defendant over that violation in federal court" (*id*. at 427), "[e]very class member must have Article III standing in order to recover individual damages." *Id*. at 431. *See further* Section II(D), *infra*.

Plaintiffs' motion fails to show that they, much less all class members, have Article III standing. Plaintiffs cannot make that showing because there is no record evidence that (1) the Named Plaintiffs suffered an injury-in-fact (2) traceable to any of the four Defendants, let alone to the additional 10 entities that they contend are liable. There is likewise no evidence that any of the putative class members satisfy these requirements. This lack of evidence dooms Plaintiffs' effort to certify a class.

### A. **The Class Representative Plaintiffs Lack Standing**

Before deciding whether to certify a proposed class, a court must consider whether the proposed class representatives have standing. *Duncan v. Governor of Virgin Islands*, 48 F.4th 195, 203 (3d Cir. 2022). "Standing to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made. Without standing, one cannot represent a class, but standing to sue does not, of itself, support the right to bring a class action." *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 694 (E.D. Pa. 1973) (class representative must establish personal standing to sue each defendant).

This Court had occasion *twice* to opine on the named Plaintiffs' standing, in ruling on the motions to dismiss Plaintiffs' initial and amended complaints, respectively. In its decision on Defendants' first motion to dismiss, decided in conjunction with the dismissal motions filed by defendants in other tracks of this MDL, this Court created a framework for analyzing standing by organizing plaintiffs into three groups: (1) those who had allegedly suffered economic injuries resulting from the misuse of their personal information (the "Group I Plaintiffs"); (2) those who did not experience direct economic harm, but who alleged facts sufficient to infer that an unauthorized user obtained their personal information in the Data Breach (the "Group II Plaintiffs"); and (3) those who alleged that their personal information was stored in the compromised AMCA systems but did not allege any other facts to suggest that their information was actually accessed, downloaded, or misused by an unauthorized party (the "Group III Plaintiffs"). The claims of Group I and Group II Plaintiffs were allowed to proceed, while the Group III Plaintiffs were dismissed for lack of standing because they did not allege an injury-in-fact. Plaintiff Tate was categorized as a "Group III Plaintiff" and dismissed for lack of standing, while Plaintiff Anderson, categorized as a Group II Plaintiff, was dismissed because she failed to

7

plead that any specific Sonic-affiliated entity owed her a duty of care. *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at *11 (D.N.J. Dec. 16, 2021) ("the 2021 Opinion").

Following the 2021 Opinion, Plaintiffs amended their complaint and advanced the new formulaic allegation that their "personal information was [] discovered for sale on a dark web marketplace along with other victims of the Data Breach" solely to avoid dismissal. FAC ¶¶ 26, 45.[3] Heeding the Court's warning as to the future challenges Plaintiffs would face, as well as recognizing those challenges they faced with any traceability argument, Plaintiffs abandoned their pursuit of the 10 Sonic-affiliated labs that Plaintiffs never visited. Accordingly, the FAC – which is now the operative pleading – eliminated those 10 labs as parties, and now names only SHUSA, Aurora, CPL, and Austin Pathology as Defendants.

The Court's subsequent decision, which addressed Defendants' motion to dismiss the FAC, held that since "every…Sonic Plaintiff now alleges that his or her information has been found on the Dark Web…every Plaintiff has sufficiently alleged injury-in-fact" and, on that basis alone, categorized both Plaintiffs Anderson and Tate as "Group II Plaintiffs" with standing to sue. 2023 WL 8540911, at *3 & fn. 9 (D.N.J. May 5, 2023) ("the 2023 Opinion"). The Court further held that the allegation that Plaintiffs "would not have had their Personal Information compromised by hackers 'but for' Defendants' choice to contract with AMCA without maintaining any oversight, was sufficient to establish causation for Article III standing" at the pleading stage. *Id*.

While Plaintiffs managed to meet the pleading standard at that time, now, after discovery, it is patent that they are unable to adduce sufficient evidence to support standing under the more

---

[3] That same formulaic allegation was added to the Amended Complaints in other MDL tracks. *See, e.g.*, LabCorp FAC ¶ 40.

onerous Rule 23 burden. Neither Plaintiff has Article III standing because neither suffered any legally cognizable injury fairly traceable to any Defendant's conduct.

### (i)     Injury-in-fact

Standing requires proof of an injury-in-fact, which is "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical". *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 290-91 (3d Cir. 2005). Standing cannot be based on speculation about a possible injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). For example, a plaintiff lacks standing when their alleged injury is dependent upon the perceived risk of future actions by third parties not before the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

Here, discovery unequivocally confirms that neither Plaintiff suffered an actual injury-in-fact and none is imminent. Despite Plaintiffs' conclusory allegations in the FAC that their personal information has been found on the dark web – which this Court relied upon in its 2023 Opinion holding that Plaintiffs had sufficiently alleged standing – when asked for Plaintiffs' proof during deposition, Plaintiffs' counsel objected, claiming such proof was in the sole possession of their expert. Tate Tr. 204:7-21; Anderson Tr. 250: 5-20 (Decl. Exs. 6 and 7). Unsurprisingly, neither Plaintiffs nor their expert have offered any competent evidence that their information can actually be found on the dark web.[4]

---

[4] Since Plaintiffs asserted privilege in their depositions relating to this critical topic, they are precluded from later offering testimony about it. *See In re Hum. Tissue Prods. Liab. Litig.,* 255 F.R.D. 151, 161 (D.N.J. 2008) (fairness considerations arise when the party attempts to use the privilege both as "a shield and a sword"); *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1294 (Fed. Cir. 2023) (district court did not abuse its discretion by excluding witness testimony at trial after the proponent of the testimony had prohibited the same witness from providing such testimony at his deposition, instead asserting privilege).

Belying counsel's overly optimistic projections, Plaintiffs' subsequently issued expert reports fail to demonstrate that Anderson or Tate's information was found anywhere on the dark web. Their dark web expert Mary Frantz's 100-page report conspicuously ███████████ ███████████████████████████████████████████████. *See* Cecchi Decl., Ex. 46, Declaration of Mary Frantz (hereinafter "Frantz Decl."). Conversely, Defendants' rebuttal dark web expert, Matteo Tomasini, explains in his report that ███████████ ███████████████████████████████████████████████. Decl., Ex. 2 ¶¶ 30, 47, 66, 73-75. In short, Anderson and Tate's claims survived dismissal solely based on Plaintiffs' unsubstantiated, conclusory allegations that their information was discovered for sale on the dark web. It is now clear that the predicate evidence never existed. As a result of this failure of proof, Anderson and Tate have not met their burden to show Article III standing, and consequently, they cannot represent the class they seek to certify.

Moreover, Plaintiffs' remaining damages expert Amy Worley implicitly confirms that Anderson and Tate suffered no injury-in-fact. Worley categorizes ███████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████ *See* Cecchi Decl., Ex. 4, Declaration of Amy Worley (hereinafter "Worley Decl.") pp. 74-76. Worley all but confirms ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████ *Id.* And now, more than six years removed from the data breach, the speculation about harm has not materialized.

10

Again, standing must be premised upon something more than a threat of future harm. As this Court recently observed, "Plaintiffs' argument that the information may be used for social engineering—like SIM swapping and port scanning—has been rejected by other courts" because it "depends on a highly attenuated chain of possibilities". On this basis, this Court held that "Plaintiffs' social engineering theory…does not establish Article III standing." *In re Samsung Data Security Breach Litigation* ("*Samsung*"), No. 1:23-MD-03055, 2025 WL 271059, at *9 (D.N.J. Jan. 3, 2025) (internal citations omitted). So too here, Plaintiffs' own expert reports establish that the Named Plaintiffs suffered no injury-in-fact.

The experts' failure to adduce actual evidence of tangible harm is unsurprising since no such evidence was produced during discovery. Specifically, no document or testimony from either Plaintiff evidences the type of harm recognized by this Court as necessary to confer standing. For example, while Tate alleges that ███████████████████████████████████ ███████████████████████████████████████████████████████████████" (FAC ¶ 45), she testified at her deposition that ███████████████████████████████████ ████████████████████████████████. Tate Tr. 147:1-20 (Decl., Ex. 6). Because damage to her credit is Tate's sole claim as to harm, there is no possible basis to conclude she suffered a legally actionable injury-in-fact. *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) ("allegations of hypothetical, future injury are insufficient to establish standing" and "[u]nless and until these conjectures come true, [plaintiffs] have not suffered any injury").

**(ii)    Traceability**

In addition to satisfying the injury-in-fact inquiry, Plaintiffs must also demonstrate "a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of

some third party not before the court." *Lujan*, 504 U.S. at 560. *Accord Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) (Plaintiffs must allege facts demonstrating "that the injury is indeed fairly traceable to the defendant's acts or omissions").

Plaintiffs here fail fatally short of satisfying their burden. Specifically, neither Anderson nor Tate have offered evidence to prove injury traceable to the Sonic Defendants. Plaintiffs' expert Frantz offers no evidence ███████████████████████████████████.[5] Critically, Frantz testified when deposed that ██████████████████████████████ ████████████████████████████. Frantz Tr. 129:17-130:7 (Decl., Ex. 8). Accordingly, even if Frantz had found Plaintiffs' PII on the dark web, there is no evidence that the presence of that PII can be traced to any data allegedly exfiltrated from AMCA's systems. Plaintiffs cannot make this showing because they were both involved in multiple prior data breaches, including the ████████ breach. Decl., Ex. 2, Appx. 46-A & 47-A. According to Tomasini, ██████████████████████████████████████████████████ ████████████████████████████████████████.[6]

Compromised records included ████████████████████████████ ████████████████ which were not stored in the CHAMP database. *Id.*, ¶¶ 172-174. Further, ██████████████████████████████████████████████████ ████. *Id.* ¶ 187.

---

[5] While Frantz includes a screenshot, ████████████████████ ███████████████████ Frantz testified in her deposition that ██████████ ██████. Frantz Tr. 121:6-14. Additionally, ████████████████████████ ██████████████████████████████████████████████. *See* Frantz Decl., Darkfox e2 screenshot.

[6] Both Plaintiffs received data breach notifications and letters from breached entities informing them that their information had been exposed. Tate Tr. 20:4-25; Anderson Tr. 217:1-8, 218:5-11; 219:18-21. (Decl., Exs. 6 and 7).

12

Plaintiffs also testified that they had visited other laboratories, including Quest and Labcorp. on numerous occasions – entities which both utilized AMCA as their collection agency. Anderson Tr. 276:15-16; Tate Tr. 211:23-213: 13 (Decl., Exs. 7 and 6).

All of the foregoing confirms that Plaintiffs cannot show traceability inasmuch as "courts have rejected traceability arguments when the information needed to commit the alleged identity theft was not obtained in the data breach." *Samsung,* at *11. Accordingly, even if the Court were to credit the unsupported assertion that Plaintiffs' PHI/PII was posted on the dark web, the evidence that such data was exposed in multiple prior data breaches precludes any inference that such posting is traceable to the AMCA data breach. Plaintiffs' inability to adduce evidence of any causal connection to Defendants' conduct is fatal to Plaintiffs' claim that they were harmed by Defendants' alleged negligence.

### a.   No Evidence Links Anderson's Alleged Harms to the Breach

Anderson's bankruptcy filings confirm ████████████████████████████████ ████████████████████████████████████████████████████████ ██████. Decl., Ex. 9. Anderson could not confirm what, if any, information she provided to any diagnostic laboratory (whether Sonic-affiliated, Labcorp. or another), further adding to her inability to provide concrete proof that any alleged injury is traceable to Defendants.

The findings of Plaintiffs' expert Jonathan F. Lee further demonstrate ███████████ ██████████████████████████████████████. For example, Plaintiffs allege that ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████. FAC ¶ 26. However, ██████████████████████████████████, Lee found only the following information



*See* Cecchi Decl., Ex. 84, Expert Report of Jonathan F. Lee (hereinafter "Lee Report") , p. 42; Lee Tr 305:11-25, 306:1 (testifying that ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Critically, the Lee Report makes abundantly clear that █████████████████████████████████████████████

██████████████████████████████████████ As a result, ██

████████████████████████ *Id.* It is therefore, █████████████████

████████████████████████████████████[7] *See* Decl., Exh. 1, Declaration of Expert Lorin Hitt ¶ 40.

Likewise, Anderson's claim that ████████, she "███████████████████

████████████████████████████████████████" (FAC ¶ 25) cannot satisfy the traceability requirement because that incident predated the Data Breach. *See* Pltfs. Memo. p. 13 ("the Data Breach appears to have begun at least as early as August 2018, lasting through March 2019").

Anderson further claims that "she constantly receives robocalls." FAC ¶ 26. However, the

████████████████████████████████████████████████████████

███████████████ (which is presumably Anderson's current phone number). Accordingly, the robocalls received on her current phone cannot be connected to the Data Breach ████████████

██████████████████. *See* Decl., Ex. 2, Appx. 3.

---

[7] *See also* Decl., Ex. 1, ¶ 39 ████████████████████████████████████

████████████████████████████████████.

Anderson's additional claim that ██████, her ███████████████

██████████████ (FAC ¶ 29) actually demonstrates that she cannot meet the traceability

standard. The Lee Report confirms that ████████████████████████████

████████████████████████████████████████████████████

████████████████████ Anderson Tr. 233:9-234:14 (Decl., Ex. 7).[8] That admission

precludes a finding that any claimed harm from the alleged hacking of her social media accounts

is traceable to these Defendants.[9]

### b. No Evidence Links Tate's Alleged Harms to the Breach

The same arguments hold true with respect to Tate. Tate asserts that ████████████

████████████████████████████████████████████████████

████████████████████ FAC ¶ 45. Tate also claims that she ████████████

████████████████████████████████████████████████████

████████████████████████████████████. Cecchi Decl., Ex. 2,

Declaration of Tonda Tate ¶¶ 8-9. But as with Anderson, Lee confirms that ████████

████████████████████████████████████████████████████

████████████████████. Lee Report, Table 13. Lee ████████████████

████████████████████████████████████████████████████

---



[8] *See Samsung*, 2025 WL 271059, at *7 (dismissing complaint for lack of standing and noting that even the few plaintiffs who were allegedly that their personal information was on the dark web "do so without specifying that it was the *specific information* that was obtained in this data breach versus information obtained elsewhere, *i.e.* social security numbers and credit card information, that was not a part of this breach") (emphasis in original).

[9] *See also* Decl., Ex. 1 ¶ 43: ████████████████████████████

15

██████████████████████████████████████. *Id.* Plaintiff fails to explain how the information stored on CHAMP could lead to this alleged fraudulent account[10]. *See* Decl., Ex. 1, Section IV.

Additionally, it is undisputed that Tate was involved in a data breach from █████████ where an "unauthorized individual" obtained her ████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████. *See* Decl., Ex. 12. The fraudulent charges that were reported in connection with ███████████████████████████████ all almost immediately *postdated* the █████████████████████████████.[11] Plaintiffs do nothing to disprove any connection between the Choice Health breach and the resulting Capital One and Discover credit card charges.

Accordingly, because Plaintiffs themselves lack Article III standing, they cannot adequately represent any class members who might theoretically have standing. *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 135 (3d Cir. 2000).

## B.  Plaintiffs Do Not Have Standing To Sue Non-Party Labs

"A plaintiff who lacks the personalized, redressable injury required for standing to assert claims on his own behalf would also lack standing to assert similar claims on behalf of a class." *Holmes,* 213 F.3d at 135 (3d Cir. 2000). *See also Samsung,* at *3 ("in the class action context, each named plaintiff ... must personally demonstrate standing independently of any claims brought on behalf of a putative class.") (internal citations omitted). Plaintiffs cannot assert class claims against the Non-Party Labs they never patronized.

---

[10] Moreover, when asked about this alleged fraudulent account, Plaintiff Tate testified that she did not know "what that is". Tate Tr. 203:21-204:6 (Decl., Ex. 6).

[11] *See* Decl., Ex. 13 ████████████████████████████████████████ ██████████████ and Decl., Ex. 14 ████████████████████ ██████████████████████████████████████████

16

It was for this exact reason Judge Arleo dismissed Plaintiffs' Complaint in this Court's 2021 Opinion. *See In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig*., 2021 WL 5937742, at *16 (dismissing Anderson's claims because she "failed to allege which of the fourteen named Sonic entities possessed her information"); *id*. at *17 ("the Sonic CCAC is devoid of any allegation that Sonic USA, as opposed to "one or more" of its subsidiaries, ever collected, maintained, or transmitted Anderson's Personal Information.")

Plaintiffs' initial complaint named 12 labs as defendants, in addition to SHUSA and Aurora (both of which are management services companies). Dkt. No. 1. Following the dismissal, Plaintiffs filed their FAC, dropping their claims against all Sonic-affiliated labs other than CPL and Austin Path. Now, in a vain attempt to inflate the size of the putative class, they seek to backdoor the dismissed entities back into the case by including them in their proposed Rule 23 class definition.

Because Plaintiffs never visited the dismissed entities, they cannot possibly demonstrate any injury traceable to the conduct of those labs they now seek to include in the alternative overbroad class definitions. *Holmes* is on point. There, the Court of Appeals affirmed the denial of class certification because the proposed class had been defined too broadly as plaintiffs "sought to assert claims on behalf of the proposed class that they had not, and could not, assert on their own behalf", and thus "were not qualified to represent the proposed class."213 F.3d at 135

*Clark v. McDonald's Corp.,* 213 F.R.D. 198 (D.N.J. 2003), is also instructive. There, a disabled individual, brought class action claims against McDonald's and a putative class of franchisees that owned restaurants all over the country, asserting that defendants' buildings contained architectural barriers discriminating against similarly-situated disabled persons in violation of the Americans with Disabilities Act (ADA). The Court struck the plaintiff's class

17

allegations as to each of the restaurants that he did not visit because he had no standing to assert such claims:

> Clark cannot maintain a 23(b)(3) damages action on behalf of a plaintiff class against a particular McDonald's franchisee at whose hands Clark suffered no injury, no matter how similar Clark's injury is to those of the absent class members he hopes to represent.

*Id*. at 223. The Court confirmed the prohibition against certification of a class against entities at whose hands the named plaintiff suffered no injury, explaining that the rule applies "not only when multiple defendants are sued individually, but also when multiple defendants are sued as members of a class." *Id*.[12]

Similarly here, the Court should reject Plaintiffs' misguided attempt to bootstrap claims against affiliate entities that these Plaintiffs had no connection with based on a theory of common collection practices. Other than CPL and, in the case of Anderson, Austin Pathology, Plaintiffs concede that they never visited any of the other labs included in the proposed class definition. Accordingly, Plaintiffs cannot meet their burden to demonstrate injury traceable to those labs. The averment that such labs may have had common ownership under an entity that is a non-party and also may have used AMCA as their collections vendor is not sufficient.

---

[12] District courts around the country have reached the same conclusion. In *Cassese v. Washington Mut., Inc.*, 262 F.R.D. 179 (E.D.N.Y. 2009), the court held that borrowers lacked standing to seek class certification against affiliated companies because they did not demonstrate a direct injury from those affiliated entities. In *Lindsey v. Am. Sec. Ins. Co.*, 2010 WL 11640212 (E.D. Ky. Mar. 29, 2010), plaintiffs claimed that they were harmed by the alleged unlawful collection of a premium tax by two defendant entities and asserted claims against affiliated entities even though neither Plaintiff alleged that they were harmed by the collection activity of any affiliate company. The court held that "Plaintiffs cannot satisfy the standing requirement because Plaintiffs specifically allege harm which stems from only two named entities, not the Affiliate Companies. Therefore, Plaintiffs have failed to allege standing as to the Affiliate Companies…any harm alleged is not fairly traceable to the Affiliate Companies." *Id*. at *4. Notably, the common ownership of the defendants and the affiliates, as well as uniform common practices, did not alter the court's assessment there.

18

C. **Plaintiffs Lack Class-Wide Evidence That Can Be Used to Prove Article III Standing For Absent Class Members**

"Every class member must have Article III standing in order to recover individual damages." *TransUnion v. Ramirez,* 594 U.S. 413, 426 (2021) (reversing damages award because certain class members had provided no evidence of injury-in-fact). *Huber* is illustrative of how this principle is applied. There, the Third Circuit held that "the possibility that some unnamed class members lack standing may prevent certification" and vacated the district court's decision granting class certification due to "the lack of evidence in the record indicating how many members of Huber's class are likely to have standing and how burdensome that showing will be for both the District Court and the parties." 84 F.4th at 155. This ruling was based on the Court's recognition "[t]he need for individualized inquiry to determine the standing of the unnamed class members thus stems…from Article III's requirement of a concrete injury to establish standing." *Id.* at 154.

The failure to demonstrate that class-wide evidence can be used to prove Article III standing for absent class members was fatal to the class claim for damages in *TransUnion* and is fatal to Plaintiffs' motion here. Specifically, there is no evidence to demonstrate that every class member (or even most class members) suffered an injury-in-fact traceable to a Sonic-affiliated lab. Moreover, to determine whether any person should be included in the proposed class would necessitate millions of individualized inquiries, undercutting the very purpose for which class treatment is intended.

(i)    **Injury-in-fact**

Plaintiffs have not established that all putative class members suffered a common injury; indeed, Plaintiffs' class definition sweeps in individuals who have suffered no injury at all. *See generally* Decl., Ex. 1, Section VII.B. Plaintiffs' proposed alternative classes are both defined as "all natural persons who were sent a letter" from Defendants and non-party Sonic-affiliated

19

laboratories. Pltfs. Memo., pp. 16, 17. It is critical that the notice issued by Defendants and the non-party labs did not state unequivocally that the recipient's information *was* impacted, but instead, cautioned them that their information *may* have been impacted. The notices also ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████[13] No subsequent evidence of misuse was identified. The possibility of impact is insufficient to demonstrate actual injury-in-fact.

Based on the record evidence, there is no confirmation that (1) ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████.[14] *See* Decl., Exs. 4 and

5.

Plaintiffs' experts were unable to provide such proof. Specifically, Plaintiffs' dark web expert Frantz could not ████████████████████████████████████████

██████████████████. Taking this to its logical conclusion, Frantz would similarly ███████

███████████████████████████████████████. Indeed, Frantz

claims ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████. Frantz Tr. 77:3-14, 89:19-22 (Decl., Ex. 8). She could

not ████████████████████████████████████████████

████████████████████████. No evidence exists to prove that all patients

---

[13] Decl., Exs. 4 and 5.

[14] On the contrary, after ██████████████████████████████

██████████████ CRA Tr. 105; *see also id.* 230 (CRA

███████ (Decl., Ex. 10).

of Sonic-affiliated labs who received a letter had their data actually exposed in the breach, let alone that such data was posted on a dark website or misused by a bad actor. Significantly, Lee determined ███████████████████████████████████████████████ ████████████████████████████. Lee Report. p. 6. As discussed above, █████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████ Worley Decl., pp. 74-76. Absent evidence of misuse of their PII, there is no injury-in-fact and no Article III standing.

*Reilly v. Ceridian Corp.* confirms that, given such facts, Plaintiffs have not been harmed "unless and until" the hacker has "read, copied, and understood [the plaintiffs'] personal information" and "is able to use such information to the[ir] detriment," "there has been no misuse of the information, and thus, no harm." 664 F.3d at 42.

### (ii)    Traceability

Even if there was a way to determine which putative class members suffered an injury-in-fact sufficient to confer Article III standing, an individualized analysis would still be required to determine whether those injuries are "fairly traceable" to Defendants, the non-party affiliated entities they seek to include as part of the proposed class, another non-Sonic-affiliated defendant lab, or even Plaintiffs themselves, "and not the result of the independent action of some third party not before the court." *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 137–38 (3d Cir. 2009) (finding lack of standing precluded certification).

In *Samsung*, this Court held that the plaintiff could not show traceability because the information needed to commit the alleged identity theft was not obtained in the data breach. If the stolen data does not include critical information such as social security numbers, it is not plausible

to link the data breach to identity theft, "without engaging in a series of hypotheticals." 2025 WL 271059, at *12.[15] The same problem is present here.

Plaintiffs concede the data held by AMCA for the proposed class members in the Sonic track was not particularly sensitive. The Lee Report (pp. 12-13) notes that ██████████ ████████████████████████████████████████████████████████████████████████ ████████████████████ Given that fact, as well as the near-universal use of AMCA as a medical bill debt collector across the industry, it is impossible for class members to definitively trace any injury to the conduct of any Sonic-affiliated lab. *See Samsung,* at *9 (noting that "given the current frequency of data breaches, there is a surplus of caselaw involving non-sensitive information…that have been repeatedly dismissed as a matter of course.").

Moreover, as discussed *supra*, the Named Plaintiffs' PII/PHI was exposed in data breaches which long preceded the AMCA data breach, including the ██████ data breach, which exposed their ██████████████████████████████████████████████████████████████████████ ████████████████████████████████.[16] See Section II(A)(ii), *supra*.

Turning to the types of information at issue for the putative class, Lee concluded that ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████. Tellingly, the Lee Report did not find ██████████

---

[15] *See further McCombs v. Delta Grp. Elecs., Inc.,* 676 F. Supp. 3d 1064 (D.N.M. 2023) (no fair traceability when plaintiff "has not provided a nexus between the data breach and the listed unwanted communications"); *Blood v. Labette Cnty. Med. Ctr.,* 2022 WL 11745549, at *6 (D. Kan. Oct. 20, 2022) (no fair traceability when data elements required to cause harm were not stolen).

[16] *See* Federal Trade Commission website, https://www.ftc.gov/enforcement/refunds/equifax-data-breach-settlement.



████████████████████████████████████████████. Lee also did not ███████████████████████████████████████████. Lee Report, p. 13.

The ████████████ found by Lee for the putative class members ██████████ ████████████████████████████████████████████ ████████████████████████████. Decl., Ex. 2, Appx. 46B & 47B. As to as any other information Lee found on CHAMP, Plaintiffs make no attempt to describe how █████████ ████████████████████████ is confidential or of any significance to a hacker.

Importantly, Tomasini ████████████████████████████████ ████████████████████████. Id., ¶ 175. Given the innocuous nature of the information in the CHAMP database for members of Plaintiffs' proposed class in the Sonic track (as buttressed by the Lee Report), there is no evidence to support a finding that each class member will be able to show traceability between actual injury and the conduct of any Sonic-affiliated laboratory. Plaintiffs ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ Decl., Ex. 1, ¶ 26.

To summarize: there is no way for Plaintiffs to show – and Plaintiffs propose none – that (1) putative class members' information was exfiltrated by the AMCA hacker, (2) the particular data that was impacted for any individual, (3) such data was posted on the dark web, and (4) individuals suffered harm as a result of such disclosure. For these reasons, Plaintiffs have not met

23

their burden to show that class-wide evidence exists to show that putative class members have Article III standing.

### III.    PLAINTIFFS FAIL TO DEMONSTRATE THAT THE TWO CLASSES THEY PROPOSE TO CERTIFY ARE ASCERTAINABLE

Ascertainability of a proposed class is a "threshold issue the Court must address before moving to the requirements of Rule 23(a) and 23(b)(3)." *Stewart v. Beam Glob. Spirits & Wine, Inc.,* 2014 WL 2920806, at *14 (D.N.J. June 27, 2014). *See also Hayes v. Wal–Mart Stores, Inc.,* 725 F.3d at 359 (holding that it was unnecessary to "reach the question of whether [plaintiff] could satisfy Rule 23(b)(3) predominance" because "ascertaining the class is logically antecedent to determining whether issues common to the class predominate over individuals issues"). "Plaintiff has the burden of making this showing by a preponderance of the evidence, and the district court must undertake a rigorous analysis of the evidence to determine if the standard is met." *City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017). Although Plaintiffs "need not be able to identify all class members at class certification," they must prove that identifying class members will not require "individualized fact-finding." *Id.* at 439

Plaintiffs ask the Court to certify a nationwide damages class consisting of "all natural persons who were sent a letter from [any Sonic-affiliated entity] notifying them of the Data Breach". Pltfs. Memo. p. 16. "Alternatively", Plaintiffs propose a "multi-state negligence class" defined as "[a]ll natural persons who were residing in the States of Texas, New York, Nevada, Louisiana, Tennessee, and Mississippi who were sent a letter from [any Sonic-affiliated entity] notifying them of the Data Breach". *Id.* p. 17. Plaintiffs argue that these two proposed classes are ascertainable because they "can be defined by objective criteria: whether the person received a Data Breach notification letter from Sonic" and "Sonic's own records…easily answers that

24

question because Sonic knows the names and addresses of all the class members to whom it sent Data Breach notification letters." *Id*. p. 25.

This argument misses the mark. Receiving a Data Breach notification letter, by itself, is not enough to confer standing because such letters merely cautioned recipients that their information *may* have been impacted. *See* Section II(D), *supra*. Individual fact-finding inquiries as to actual injury caused by Defendants' supposed negligence are necessary. For example, it is undisputed that Tate received a Data Breach notice, yet this Court initially dismissed her claims for lack of standing in its 2021 Opinion. *See* Section II(B), *supra*. In the same way that this Court previously assessed Named Plaintiffs' particularized allegations to determine whether each had standing (and despite the fact that they all received Data Breach notice letters), the same inquiry would have to be conducted with respect to putative class members.

That Plaintiffs do not even attempt to propose an administratively feasible mechanism by which this Court could accomplish this is a fatal shortcoming. *Carrera v. Bayer Corp*., 727 F.3d 300, 307 (3d Cir. 2013), is instructive. Based on the importance to the certification analysis of ascertainability, which "ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action," the Third Circuit vacated a class certification order because the class could not be ascertained based on affidavits of class members alone. *See also Stewart v. Beam Glob. Spirits & Wine, Inc.,* 2014 WL 2920806, at *7 (D.N.J. June 27, 2014) (denying class certification where "Plaintiffs' only suggested method for ascertaining the putative class members…rests entirely on the submission of affidavits by individuals who claim that they purchased [defective products] during the Class Period in the states identified" (bracketed materials added)).

25

Here, nothing in Plaintiffs' motion or supporting evidence, including expert reports, suggests any method by which the parties can differentiate between individuals who suffered an injury-in-fact as a result of the Data Breach and those, like Plaintiffs, who have not. Plaintiffs' motion must be denied for lack of ascertainability because the Court cannot ascertain which class members have standing.

## IV.    PLAINTIFFS CANNOT DEMONSTRATE PREDOMINANCE[17]

Under Rule 23(b)(3), class certification is granted only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast* at 30. Plaintiffs are mistaken in presuming that postulating "common questions" that may exist without predominance as to common answers is enough.

> What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather, the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Dukes* at 350.

The mandatory predominance inquiry "subsumes the commonality inquiry," *N.J. Thoroughbred Horsemen's Ass'n, Inc. v. Alpen House U.L.C.,* 2012 WL 893092, at *4 (D.N.J. Mar. 14, 2012), and is "far more demanding." *In re Hydrogen Peroxide,* 552 F.3d at 311 (quoting *Amchem Prods,* 521 U.S. at 624). Engaging in this inquiry necessarily entails an analysis of the merits because the "nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *In re Hydrogen Peroxide,* 552 F.3d at 311 (citation

---

[17] The requirements of Rule 23(b) are "far more demanding" than the Rule 23(a) requirements of "typicality" and "commonality". *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). For the reasons set forth in this Section, Plaintiffs also fail to satisfy the Rule 23(a) requirements of commonality and typicality. Accordingly, Defendants do not address those separately.

and internal quotation marks omitted). *Accord Dukes,* at 351 (noting that analysis of class certification issues "overlap[s] with the merits of the plaintiff's underlying claim").

"Courts must look first to the elements of the plaintiffs' underlying claims ... through the prism of Rule 23" to assess whether the class members can prove their claims with "evidence that is common to the class rather than individual to its members." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127–28 (3d Cir. 2018). "Predominance concerns can arise when unnamed class members must submit individualized evidence to satisfy standing and recover damages." *Huber*, 84 F.4th at 156. The only claim Plaintiffs seek to certify is negligence. But Plaintiffs ask the Court to ignore that the elements of negligence and the limitations periods differ depending on which state's law applies, and the class members here may well reside in tens of different states, necessitating the application of myriad state laws. Thus, individual questions predominate when assessing (1) duty of care, (2) causation, and (3) damages.

## A. Choice of Law Rules Require Different State Laws Be Applied

Plaintiffs propose to certify a claim for negligence and argue that Texas law can be applied to all "since there are no material differences between the elements of a negligence claim for each state …" Pltfs. Memo. at 17. Plaintiffs are mistaken and Texas law cannot be applied to all class members.

When considering choice-of-law questions, "New Jersey courts apply the two-pronged 'most significant relationship' test of the Restatement (Second) of Conflict of Laws." *Curtiss-Wright Corp. v. Rodney Hunt Co.*, 1 F. Supp. 3d 277, 283 (D.N.J. 2014). Step one requires the court to determine whether there is an actual conflict between the law of the states with an interest in the claim. *P.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008). "That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between

27

them." *Id*. If there is a difference, then a conflict exists – but if the outcome of either state's law would be the same, there is no conflict and "a court may refer interchangeably to the laws of each state in discussing the applicable law to the case." *On Air Ent. Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000).

Where there is a conflict among the state laws, step two requires courts to "determine which jurisdiction has the 'most significant relationship' to the claim." *Curtiss-Wright Corp.*, 1 F. Supp. 3d at 283 (citing *P.V.,* 962 A.2d at 458). The Second Restatement of Conflict of Laws sets forth the relevant factors which should be analyzed depending on the type of claim asserted. *See P.V.*, 962 A.2d at 458. As to tort claims, the case will be "determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Restatement] § 6." Restatement § 145. Further, "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties." *Yocham v. Novartis Pharmaceuticals Corporation*, 736 F. Supp. 2d 875, 880 (D.N.J. 2010).

Here, the choice of law determination is likely straightforward as to the Named Plaintiffs, who are both Texas residents, received laboratory services in Texas where CPL and Austin Pathology are headquartered, and allegedly were injured in Texas, making Texas "the state with the most significant relationship to the occurrence and the parties." The same cannot be said with respect to the myriad of putative class members within the proposed class definitions. Indeed, determining which state law applies to each class member necessitates an individualized inquiry that would require this Court to examine, *inter alia*, each individual's domicile, the location and place of incorporation of the particular Sonic-affiliated in question, the location of the particular

28

lab they received services from, and the place in which any alleged injuries occurred. *See* Restatement § 145.

Perhaps recognizing the choice-of-law hurdles that doom Plaintiffs' nationwide class, Plaintiffs propose an alternative class comprised of individuals "who were residing in the States of Texas, New York, Nevada, Louisiana, Tennessee, and Mississippi" who received notice of the Data Breach. Pltfs. Memo. p. 17. Plaintiffs claim that "since there are no material differences between the elements of a negligence claim for each state, manageability issues will not arise." *Id*. This argument is materially flawed in two significant ways.

First, Plaintiffs assume but do not show why the laws of those six states would apply simply because a class member resided there when they received notice of the Data Breach. Those laws would not necessarily apply and the Court would be called upon to assess the various factors identified in Restatement § 145, including: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Indeed, Plaintiffs' own FAC alleges that the Sonic-affiliated entities provide services to patients in 26 different states. FAC ¶ 67. By ignoring *in toto* the location of all Sonic-affiliated entities, Plaintiffs misapply New Jersey's rules, which require choice of law to be determined on a "defendant-by-defendant" basis. *Ginsberg ex rel. Ginsberg v. Quest Diagnostics*, Inc., 441 N.J. Super. 198, 230, 245 (App. Div. 2015) ("[I]mposing the law of [one state] across the board to all of the defendants . . . indiscriminately would not be a sound or fair result.").

Second, even assuming that the laws of these six states were applicable solely by virtue of class members' residence there, there are material differences in how states deals with negligence

29

claims. Some states' statutes of limitations are one or three years,[18] while Texas has a two-year statute. *Culpepper v. Daniel Industries, Inc.*, 500 S.W.2d 958 (1973). Similarly, unlike other states such as Tennessee,[19] under Texas law, the statute of limitations generally begins to accrue "when a wrongful act causes a legal injury, regardless of when the plaintiff learns of the injury or if all resulting damages have yet to occur". *Estate of Jobe v. Berry*, 428 S.W.3d 888 (Tx. 2014). To determine which class members' claims are stale under the uniquely applicable law would require a time-consuming individualized inquiry.

Plaintiffs conveniently overlook the variations in the laws of different states as to comparative fault. Texas employs a "modified" comparative negligence system under which a plaintiff can recover damages in a negligence claim only if their percentage of fault is not greater than the defendant's. *Leyva v. Smith*, 557 S.W.2d 169 (TX. 1977). That is far different than Louisiana, Mississippi, and New York, all of which follow a "pure" comparative fault system, where a plaintiff's negligence will only diminish, not defeat, their recovery as long as their negligence is less than 100%. *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So.2d 967 (LA. 1985); *Smith v. Church Mutual Insurance Company*, 254 So.3d 57 (MS. 2018) ; *Rodriguez v. City of New York,* 101 N.E.3d 366 (N.Y. 2018), citing NY CPLR § 1411.

It is also critical that the elements of recoverable damages vary from state to state. For example, the economic loss doctrine barring recovery in tort for economic losses when the harm consists only of the economic loss of a contractual expectancy is applicable in Texas (*LAN/STV v.*

---

[18] For example, New York has a three-year statute of limitations for negligence actions. CPLR 214(5); *Davis v. St. Joseph's Children's Servs.*, 472 N.Y.S.3d 655, 656 (App. Div. 1984), *aff'd,* 64 N.Y.2d 794 (N.Y. 1985)). Louisiana has a one-year statute of limitations. *Francis v. Herrin Transp. Co.*, 432 S.W.2d 710 (1968).

[19] Tennessee has a one-year statute (*Bidwell ex rel. Bidwell v. Strait*, 618 S.W.3d 309 (2021)), which accrues when "the plaintiff discovers, or reasonably should have discovered, the injury" (*Putnam v. Leach*, 572 S.W.3d 605 (2018)).

*Martin K. Eby Const. Co., Inc.*, 435 S.W.3d 234, 236 (TX. 2014)) and New York (*Manhattan Motorcars, Inc. v. Automobili Lamborghini*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007)), but not in Mississippi. *See Lyndon Prop. Ins. Co. v. Duke Levy & Assocs., LLC*, 475 F.3d 268, 274 (5th Cir. 2007) (economic loss doctrine is inapplicable to negligence actions not involving products liability).

Here, Plaintiffs aver two types of damages – "increased future risk damages" arising from identity theft or fraud, and "the cost of reasonably required mitigation products to protect all Class members" – both of which are purely economic in nature. Because the negligence claims of the putative class collectively implicate the laws of dozens of States, it was Plaintiffs' burden to "provide an *extensive analysis* of state law variations to reveal whether these pose insuperable obstacles" to class certification. *Sacred Heart Health Sys. Inc. v. Humana Mil. Healthcare Servs., Inc.,* 601 F.3d 1159, 1180 (11th Cir. 2010) (emphasis in original; citations omitted). Plaintiffs have not performed any such analysis. It is fatal to Plaintiffs' motion they ignore important choice of law issues even though there are significant variations even within the laws of the six states included in Plaintiffs' proposed alternative class.

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012), is instructive. The Ninth Circuit Court of Appeals held there that the district court erred when it certified a class because it erroneously concluded that California law could apply to the entire nationwide class and that all class members could be presumed to have relied on the defendant's allegedly misleading advertisements. Because multiple jurisdictions' laws applied, variances in state law overwhelmed any common issues and precluded finding predominance for a single nationwide class.

Similarly, in *In re Thalomid & Revlimid Antitrust Litig.*, 2018 WL 6573118, (D.N.J. Oct. 30, 2018) (Arleo, J.), this Court, citing *Mazza*, denied class certification based on the "significant differences between the states' consumer protection statutes and plaintiffs' causes of action" which "lessen the predominance of common legal issues" and "would demand significant attention from this Court, not the least of which would be instructing the jury or juries consistent with the law of each relevant states." *Id.* at *18.[20]

*Independent Bank v. Fred's, Inc.,* 2019 WL 1179396 (M.D. Ala. Mar. 13, 2019), is also on point. There, the court declined to certify a nationwide class asserting negligence claims in a data-breach case because "[t]here are too many differences in state law to certify this case as a class action." *Id.* at *19. "While all fifty states recognize the tort of negligence and its elements of duty, breach, causation, and damages, each jurisdiction 'sing[s] negligence with a different pitch.' And the court has a constitutional obligation to recognize, and not gloss over, variations in common-law tort rules across the fifty states." *Id.* at *13 (quoting *In re Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293, 1301 (7th Cir. 1995)).

In sum, the variances in state laws applicable to Plaintiffs' negligence claim preclude certification of either of Plaintiffs' putative classes.

## B. Individual Questions of Fact Predominate, Precluding this Court From Arriving At Common Answers

### (i)    Duty of Care

Plaintiffs' motion argues that "Sonic's liability is based upon several common and core issues that can be answered for the entire class." Pltfs. Memo. p. 1 Again, their superficial

---

[20] *See also Sacred Heart Health Sys. Inc. v. Humana Mil. Healthcare Servs., Inc.,* 601 F.3d 1159, 1183 (11th Cir. 2010) (finding that "substantial variations among the six bodies of state law" were great enough to defeat predominance).

treatment of this critical step ignores that the critical issue is not whether common questions can be identified, but whether common answers exist. *Dukes* at 350. Plaintiffs pose this supposedly common question: whether "Sonic ha[d] a duty to safeguard its patients' personal information." Pltfs. Memo. p. 1. There can be no common answer to that question. In other words, whether a duty exists, and if it does, the scope of such duty owed to an individual, will differ from person to person, based not only the information at issue, but also, among other things, the state in which that person lives. As this Court has acknowledged, "courts differ dramatically" in their approach as to whether an individual has a reasonable expectation of privacy over information they shared publicly. *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.,* 872 F. Supp. 2d 369, 373 (D.N.J. 2012) (citing cases from different jurisdictions).[21] In sum, it is not viable to treat all class members the same, without regard to the privacy protection offered by the laws of their home states, and without regard to what information that person has publicly published.

Additionally, Plaintiffs ignore significant differences in the patient information provided to AMCA by Defendants, yet concede in their own brief that the types of information provided varied. For example, ██████████████████████████████████████████████████████████████[22] Plaintiffs also concede that for some putative class members, ████████████████████████████████████████████████████████." Pltfs. Memo. p. 6. Plaintiffs' expert Frantz goes as far as to explicitly state that ████████████

---

[21] Thus, a consumer who lists their phone number and address in a local directory has no expectation of privacy as to that information and there is no duty to protect it and a social media user who posts their birthdate or a cancer diagnosis has waived any privacy protection as to such information. On the other hand, most jurisdictions find a duty to protect certain information (e.g., social security numbers) that has been kept private.

[22] ████████████████████████████████████████████████████████████ Pltfs. Memo. p. 5.

[REDACTED]

[REDACTED]

Frantz Decl., p. 90 (emphasis added). Assuming Frantz is correct, individualized inquiries would be required to identify the information transmitted for each class member. Such inquiries would necessarily predominate, precluding class treatment.

Second, it is pertinent that an individual waives their privacy rights by publicly disclosing what would otherwise be private information because "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494 (1975). The Third Circuit adheres to that principle, explaining that evidence that information has previously been released publicly "may indicate that the individual's privacy interest is substantially less compelling than might otherwise be assumed." *Lame v. U.S. Dep't of Just.*, 654 F.2d 917, 923 (3d Cir. 1981).[23] Whether there has been a waiver by voluntary disclosure presents an individual-specific issue for which there is no class-wide answer. As to the Named Plaintiffs, [REDACTED]

[REDACTED]. See Decl., Ex. 11. However, the availability of this information in the public domain predated the Data Breach because Plaintiffs were part of prior data breaches which [REDACTED]. *See* Section II(B)(ii), *supra*. Plaintiffs

---

[23] So too have other courts. *See also Garrett v Young*, 109 Cal. App. 4th 1393, 1408-9 (2003) ("The fact that the patient has openly discussed information about his or her medical condition with third parties is appropriately seen as a waiver of rights in a lawsuit against a medical provider for violation of the CMIA [a statute protecting consumer medical information]"); *Doe v. Poritz*, 662 A.2d 367 (N.J. 1995) (a person "cannot have a reasonable expectation of privacy" in information "readily available through public records"); *Samahon v. F.B.I.*, 40 F. Supp. 3d 498 (E.D. Pa. 2014) (prior disclosure of information affects the significance of the privacy rights at stake, and one cannot be said to have "disclosed" a fact which is already known).

[24] Tate's [REDACTED]. Lee Report, p. 42.

do not, because they cannot, offer any method to protect Defendants' right to offer evidence of any such individual-specific waivers in the context of a certified class action.

Third, different duties of care are applicable depending on whether a plaintiff/class member reviewed and relied on a particular lab's policies regarding confidentiality of patient information, prior to agreeing to engaging their services. *Fidelity & Guaranty Life Ins. Co.,* 165 S.W. 3d 416, 423 (Tex. App. 2005), is instructive. There, the Texas Court of Appeals held that receipt by class members of the same representation is insufficient to establish reliance on a classwide basis because reliance "can be shown only by demonstrating [each] person's thought processes in reaching the decision," and, consequently, "proof of reliance or lack of reliance necessarily requires an *individualized* determination because, under all the same facts and circumstances, one person may have relied on the misrepresentation in reaching a decision while another did not rely on it in reaching the same decision." (citation omitted; emphasis in original). *See also Huber,* 84 F.4th at 152 (not all recipients of misleading information from a collection agency could assert FDCPA claims because they viewed this information in different ways).

Accordingly, certification is precluded based on the need for individualized determinations pertaining to (1) the particular Sonic-affiliated entity a class member visited, (2) whether the individual in question relied upon the entity's privacy policies, (3) the information, if any, provided by such entity to AMCA, (4) the extent to which the individual waived their privacy rights by independently disclosing such information in a public forum, and (5) the difference in treatment depending on which state law applies.

**(ii)    Causation**

As demonstrated in Section II(B)(ii), *supra*, the damage for any Plaintiff or class member in a data breach case must be tied to the specific information disclosed by a particular defendant.

*See generally Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 488 (E.D. Pa. 1997), *aff'd sub nom. Barnes v. Am. Tobacco Co.,* 161 F.3d 127 (3d Cir. 1998) (denying motion for class certification based on lack of predominance because, to prevail on their negligence claims, "plaintiffs [would] have to prove "causation," which the Court finds is not capable of determination on a class-wide basis in this case.")

Because causation and damages are elements of Plaintiffs' negligence claim under all state laws, the Court must assess whether the putative class members' alleged injury resulted from something other than this Data Breach *See Georgine v. Amchem Prod., Inc.,* 83 F.3d 610, 624 (3d Cir. 1996) (no predominance in personal injury case when each putative class member had "a different history of cigarette smoking, a factor that complicated the causation inquiry".) Here, the need to assess such other factors necessitates thousands of individualized factual inquiries.

Whether a particular class member can demonstrate causation depends on what information, if any, was misused as to that individual and whether disclosure and ultimate misuse of that information traces back to the Data Breach or was more likely than not caused by something else. Adjudicating causation and resulting damage necessitates individual inquiries with respect to each class member. As Hitt explains, ███████████████████

███████████████████████████████

███████████████████████████████

████████████████████████ Decl., Ex. 1, ¶ 64(a).

He continues:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

36



*Id.* (b)-(d).

Thus, *assuming* a Sonic-affiliated laboratory transmitted a class member's PII to AMCA, such information was exfiltrated and that class member suffered a cognizable injury, this Court would still need to make an individualized assessment as to whether such injury can be linked to that specific Sonic-affiliated lab (as opposed to another lab that the individual visited that also used AMCA as its billing collector), or to another source altogether (e.g. another non-Sonic lab or a separate data breach). This is not merely a theoretical concern because both Named Plaintiffs visited other non-Sonic-affiliated laboratories which are defendants in other tracks and thus, ███

███████████████████████████████████████████████████████████████████

██████████████████████████. Given the nationwide presence of Quest and Labcorp (and their use of AMCA as a debt collector), individualized inquiries would need to be made to determine whether class members' information was provided to AMCA by plaintiffs, by Defendants, by another MDL defendant, or by another lab unaffiliated with SHUSA. As important is that both Anderson and Tate (and presumably a large percentage of the putative class) were victims of various data breaches that pre-dated the AMCA Data Breach, and, as a result, ███████

█████████████████████████████████████████████████. As such, they cannot possibly establish on a class basis that their injuries and those of the class members were "a result of the same course of conduct by defendants." *Arbitrage Fund v. Toronto-Dominion Bank*, 2023 WL 5550198 at *4 (D.N.J. Aug. 29, 2023). Given how ubiquitous data breaches have become, such as the ████████ that exposed the information of ████████

37

█████ (*see* Section II(D)(ii)), individualized inquiries would need to be made regarding the extent of which a particular class member's information was already in the public domain. Hence, to determine causation requires individualized inquiries such that class certification is improper.

Moreover, Plaintiffs' own allegations undercut ability to establish causation on a class-wide basis are their own allegations. Anderson allegedly "provided Personal Information to AMCA". FAC ¶ 20. Plaintiffs would have to prove, but cannot prove, that all class members similarly either (1) called AMCA and voluntarily provided PHI/PII, (2) provided PHI/PII only to the Sonic-affiliated lab itself or (3) did a combination of both. Understanding whether a class member's PHI/PII found its way into AMCA's database through the first, second or third, scenarios requires a person-by-person inquiry.

Courts will deny class certification based on such insurmountable causation concerns. For example, in *Thomas v. Kimpton Hotel & Rest. Grp., LLC,* 2022 WL 1164229, *5 (N.D. Cal. Apr. 20, 2022), the district court denied class certification when "it was plaintiffs themselves, as well as all members of the putative class, that provided their PII to [a third party payment agency], whose system was compromised by an unknown hacker".

Plaintiffs' reliance on *Savidge v. Pharm-Save, Inc.,* 727 F. Supp. 3d 661, 697 (W.D. Ky. 2024), for the proposition that causation questions predominate when the defendant's systems "caused the data breach, leading to the issuance of the alerts and actions by the plaintiffs to limit or reimburse harms" (Pltfs. Memo. p. 31) is misplaced. There, the court addressed whether a class could be certified consisting of employees of a Kentucky entity which suffered a data breach leading to the exposure of sensitive information contained in employee W-2 forms and tax statements. As Plaintiffs concede, there the defendant entity suffered the breach, not a third-party vendor. The release of the information came from within: posing as company executives, the

38

cybercriminals convinced "one or more employees" employed at defendant entity to release the plaintiffs' PII. *Id.* at 670. Importantly, the individuals in question were "known and easily identifiable" since "the parties [did] not dispute that the [company employee] emailed W-2s for three-hundred and forty-three individuals during the data breach" to the cybercriminals. *Id.* at 697. And causation was not an issue: "based on the definition of the class…*every* class member had their highly sensitive PII disclosed in the [] data breach and *every* class member suffered a cognizable injury in fact." *Id.* at 701 (emphasis in original).

As such, that case is starkly dissimilar to the case at bar for a number of reasons. In *Savidge*, there was no dispute over *whether* and *how* the cybercriminals obtained class members' PII – the class members gave such information to the defendant entity in the course of their employment, and a company representative, who was implicated in a phishing scam, emailed that information to the cybercriminals. Here, Defendants' systems were not breached; the breach affected only the systems of AMCA, a third-party entity. Whether or not the information ultimately contained in AMCA's systems originated from any Defendant is questionable, since Anderson and Tate visited other labs that utilized AMCA, including Quest and Labcorp. The same holds true for the class members who would each have to demonstrate how their information was obtained by AMCA in the first place. More importantly, Plaintiffs have not even shown that Anderson's and Tate's information was actually exfiltrated, let alone that such exfiltration occurred for the information of the millions of putative class members they seek to represent. This remains an individualized inquiry. In addition, there were no conflict of laws issues in *Savidge* since all class members resided and worked in Kentucky, where the breach occurred. Finally, as explained below (Section IV(B)(iii), both the type of damages suffered by the class members in *Savidge*, as well as the *source* of such harm was identical – namely the hacker's emailing of the employee's W-2 forms.

39

*Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883 (11th Cir. 2023), cited in Pltfs. Memo. (p. 31) is also distinguishable and actually supports Defendants' position. There, plaintiffs sought to certify a class of individuals who made a credit or debit card purchase at a Chili's restaurant, owned by defendant, who experienced a data breach when hackers obtained their credit and debit card information and posted it on Joker Stash, a site for selling stolen payment data—affecting approximately 4.5 million cards. While the district court identified common questions in granting certification, the Eleventh Circuit reversed.

Specifically, the Eleventh Circuit found the class definition, which included the term "accessed by cybercriminals", overly broad, likely including individuals who incurred no actual harm as to whom causation could not be proven. *Id.* at 892. It remanded for the District Court to either narrow the definition to those who actually experienced fraudulent charges or had data posted on the dark web, or reanalyze the existing class under the recognition that some class members may lack injury. *Id.*

This is the exact issue that Plaintiffs face here: because their overbroad class definition (i.e. all individuals who received a data breach notice) encompasses individuals whose information was never actually exfiltrated or posted on a dark website, individual inquiries as to causation and damages will necessarily predominate.

In sum, a myriad of questions arise with respect to causation, each of which dictates a different answer depending on the class member in question:

a.  Did the individual in question visit another laboratory who used AMCA as their billings collector?

b.  Did the individual voluntarily provide their information to AMCA?

c.  To what extent did a Sonic-affiliated lab-provide data duplicative of what was already in the AMCA database?

d.  What information did each individual provide?

40

e.      Was such data ultimately stored in the CHAMP database?

f.      Is there evidence that this specific information was viewed by an unauthorized person?

g.      To what extent was the individual's information on the CHAMP database already in the public domain?

h.      And, ultimately, to what extent is the individual's alleged injury linked to the Sonic-affiliated entity they visited?

Because there cannot be a single common answer to any of these questions, class certification should be denied.

**(iii)    Damages**

It is also fatal to the instant motion that the damages a putative class member would be entitled to recover can only be determined through individualized inquiries. Plaintiffs allegedly sustained two types of damages: (1) "increased future risk damages", and (2) "the cost of reasonably required mitigation products to protect all Class members". Pltfs. Memo. p. 21. The Court held previously that "an increased risk of future identity theft" and "expenses incurred to prevent future identity theft" are, by themselves, not cognizable injuries-in-fact absent a showing that a plaintiff's "particular information was accessed, stolen, or misused". 2021 Opinion at *9. Notably, Plaintiffs' motion omits any request for damages caused by any actual, unauthorized access to PHI/PII.

Even assuming some class members would have standing to sue, which Defendants dispute, that does mean that they have cognizable "damages" under the negligence law of their applicable home state. The Court must analyze the injury component of the negligence claims separately because satisfaction of the injury-in-fact element in establishing Article III standing does not mean that they have a valid claim for relief sounding in negligence. As explained in *Bang v. BMW of N. Am., LLC*, 2016 WL 7042071, at *4 (D.N.J. Dec. 1, 2016), "an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law" (citation omitted).

41

Texas law requires a plaintiff to "show actual damage to maintain a negligence action." *Deloitte & Touche v. Weller*, 976 S.W.2d 212, 215 (Tex. App. 1998). Absent proof of actual money damages, a negligence claim cannot lie. *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 185 n.25 (Tex. App. 2012); *Acreman v. Sledge,* 2003 WL 103203, at *2 (Tex. App. Jan. 10, 2003) (dismissal of negligence claims arising from incorrect blood test results that necessitated retesting because the plaintiff "must have sustained actual damages" to proceed with his negligence claims).

Assuming one or more Plaintiffs have standing to pursue *their* negligence claim, they have not demonstrated, and cannot demonstrate, that every class member suffered cognizable damages or the measure of such damages without an individualized inquiry. Hence, Plaintiffs' motion should be denied because Plaintiffs cannot establish that "they suffered the same injuries as the absent class members." *Arbitrage Fund v. Toronto-Dominion Bank*, 2023 WL 5550198 at *4.

Both of Plaintiffs' alternative class-definitions include a vast array of individuals "who were sent a letter" from a number of Sonic-affiliated labs. Pltfs. Memo. pp. 16-17. However, as shown above (Section II(D)), the mere fact that an individual's information could have been implicated in a data breach is not enough to confer standing, let alone prove that damages were sustained. *See Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th at 889 (denying class certification and holding: "we typically require misuse of the data cybercriminals acquire from a data breach because such misuse constitutes both a 'present' injury and a 'substantial risk' of harm in the future").

Notably in this regard, as to the few instances in which the Named Plaintiffs allegedly experienced adverse incidents, for example their ███████████████████

███████████████████████████████████████████

42

█████████████████████████████████████, they cannot link such incidents to the AMCA Data Breach. *See* Section II(B) above.

Indeed, Plaintiffs' proposed class definition is improper as it would sweep in all individuals "whose personal information was put at risk in the data breach." *Attias v. CareFirst, Inc.,* 344 F.R.D. 38, 53 (D.D.C. 2023). That does not pass muster as such a broad class definition "would yield a high number of 'false positives'"—i.e., individuals who had not experienced any misuse of their PII or PHI as a result of the data breach. *Id.* Just as in *Attias*, class certification must be denied here because Plaintiffs' proposed class definitions are so overbroad that they sweep in individuals who may not have "even [been] aware of the data breach." *Id.* (bracketed content added). Because Plaintiffs' "briefing . . . does not grapple . . . with the logistical hurdles of identifying class members who were injured," Plaintiffs have not carried their burden of establishing that "common issues predominate over individualized inquiries." *Id.* at 55.

Further, class certification should be denied because Plaintiffs have not corroborated (and cannot corroborate) their factual assumption that each class member's data was compromised in the same way. Their commonality and predominance arguments, based on that assumption, therefore fail. *Kruszka v. Toyota Motor Corp.,* 2011 WL 9820198, at *3 (C.D. Cal. Aug. 2, 2011) ("because Plaintiff does not provide sufficient evidence that the class suffered the same injury, Plaintiff's Motion . . . fails to meet the requirements of commonality under Rule 23(a)(2)"); *Ogrizovich v. CUNA Mut. Grp.,* 2013 WL 12140983, at *7 & n.4 (W.D. Pa. Sept. 4, 2013) (finding no commonality when "the defined class [was] so broad that there [were] members subsumed by the definition that suffered no injury at all"); *Dolmage v. Combined Ins. Co. of Am.,* 2017 WL 1754772, at *7 (N.D. Ill. May 3, 2017) (no commonality because "determining whether each class member suffered a 'resulting injury' would require a highly individualized inquiry").

It is patent here that individualized questions predominate regarding if, and to what extent, a class member has suffered any cognizable damages. It is indisputable is that Plaintiffs' proposed class definition would result in a myriad of people, who received a data breach notice but have otherwise not been harmed, receiving a windfall benefit based on Plaintiffs' overbroad class definition.

Plaintiffs' experts Scott Witt and Amy Worley would have

. *See, generally*, Worley Decl., and Cecchi Decl., Ex. 80, Declaration of Scott J. Witt (hereinafter "Witt Decl.") In sum, Plaintiffs' failure to account for differentiations in the injuries experienced (if any) by putative class members, and failure to propose any method by which such injuries can be assessed and fairly compensated in a class-wide manner, dooms their motion.

Plaintiffs' reliance on the *Savidge* decision (Pltfs. Memo. p. 31) for the proposition that damages inquiries predominate is misplaced. In *Savidge*, the cybercriminals in question had successfully obtained the same type of information with respect to all class members – namely information contained in W-2 forms and tax statements submitted to the defendant employer. The harm suffered by all class members was, *ipso facto*, identical. Not so here as different PII may have been exposed for different class members, or in some cases not exposed at all.

## V. PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES

"A named plaintiff is not a proper class representative if it is predictable a major focus of the litigation will involve an arguable defense unique to the named plaintiff or a small subclass."

44

*Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 392 (D.N.J. 1998). In *Beck v. Maximus, Inc.,* 457 F.3d 291 (3d Cir. 2006), the Third Circuit emphasized that unique defenses impact both the typicality and adequacy of a class representative since "the challenge presented by a defense unique to a class representative [means that] the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Id.* at 297. The Court denied class certification as to claimed violations of the FDCPA based on, *inter alia,* the debt collector's alleged bona fide error defense, which was unique to the named plaintiff's claims.

Additionally, class treatment is not appropriate where certification would deny a defendant its constitutional right to present every available defense to individual claims. *Dukes,* 564 U.S. at 2561 (citing U.S. Constitution, 14th Amendment). State Constitutions provide similar protection – e.g., Texas Const. Art. 1, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities…except by the due course of the law of the land"); N.J.S.A. Const. Art. 1, ¶ 1 as interpreted by *S.C. v. New Jersey Department of Children and Families*, 231 A.3d 576 (N.J. 2020).

Here, given the unique defenses to the claims of the Named Plaintiffs as to traceability, causation, and damages, class certification should be denied because these defenses likely do not apply to all or most class members. Plaintiffs' assertion that they "are not subject to any unique defenses" (Pltfs. Memo. p. 24) is unfounded. Anderson's bankruptcy filings, for example, ███████. Decl., Ex. 9. Both Plaintiffs testified that they had visited Labcorp. and/or Quest before visiting CPL, ███████. Tate Tr. 53:16-22, 212:6-20 and Anderson Tr. 276:15-22 (Decl., Exs. 6 and 7). Plaintiffs' ███████

██████████████████████████████████████████████████████████

████████████████████████████████. Decl., Ex. 2, Appx. 46A & 47A. Notably, Anderson's

damage claims are particularly spurious since ████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.*, Appx. 3.

Plaintiffs' expert Worley argues that ██████████████████████████

████████████████████████████████████. Worley Decl., p. 57. Even assuming

Worley is correct, that does not support class certification here because the Named Plaintiffs'

██████████████████████████████████████████████████████████

████████████████████████████████. Anderson Tr. 12:24-13:5 (testifying that █████████

█████████████████████████████████████████████████) (Decl.,

Ex. 7); *see also* Decl., Ex. 1, ¶ 75 ████████████████████████████████

████████████████████████████████████. Because these defenses may

apply to Named Plaintiffs and perhaps some, but not all, class members, individualized inquiries

would be required.

As demonstrated in Sections II(B) and IV(A)(ii)(4), *supra*, Defendants have Plaintiff-

specific defenses with respect to the Named Plaintiffs' damages claims which, according to

Plaintiffs' expert, ████████████████████████████████████████

██████████████████████████████████████████████████. Worley

Decl., pp. 74-76. Plaintiffs ask the Court to treat everyone in the putative class the same despite

overwhelming evidence that not all class members can be treated the same.

It bears noting that Worley's ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ *Id*. p. 74. CPL's

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ " Decl., Ex. 11. But other class members may have had protected

information disclosed and utilized with resulting harm. Plaintiffs are not adequate representatives

of a class including such persons.

Additionally, Defendants' meritorious spoliation motion (Dkt. No. 711)[25] provides a

defense as against the Named Plaintiffs that would not be applicable to all class members. Both

Plaintiffs destroyed evidence relevant to this case about hospitals they visited (which are relevant

to traceability and causation) and fraud notices/spam calls, despite their counsel's explicit

instructions not to do so. Tate Tr. 26:11-27:15, 119:13-17, 156:15-23 and Anderson Tr. 97:25,

118:24-25, 119: 1-5, 24-25, 120:4-7, 18-22 (Decl., Exs. 6 and 7). It would prejudice other class

members (and their potential claims) if the Court was to provide an adverse inference charge to

the jury that might bar recovery by the Named Plaintiffs, thereby potentially impairing recovery

on behalf of the class even though class members may not have engaged in such contumacious

conduct.

---

[25] Spoliation of evidence occurs where "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. UPS*, 665 F.3d 68, 73 (3d Cir. 2012). Spoliation can render a putative class representative inadequate because it introduces unique defenses that could become the focus of the litigation, thereby distracting from the common issues that are supposed to predominate in a class action. See *Falcon v. Philips Elecs. N. Am. Corp.*, 304 F. App'x 896 (2d Cir. 2008) (holding that the plaintiff was not an adequate class representative because his disposal of the allegedly defective television set presented a danger that the conduct would become the focus of the litigation, both in hindering proof of a design defect and defending against a charge of spoliation of evidence); *Mooradian v. FCA US, LLC*, 286 F. Supp. 3d 865 (N.D. Ohio 2017) (disqualifying plaintiff from serving as a class representative due to spoliation).

## VI. THERE IS NO BASIS TO CERTIFY A CLASS FOR INJUNCTIVE RELIEF

Plaintiffs also move to certify a class under Rule 23(b)(2). Pltfs. Memo. pp. 34-36. That relief should be denied because Plaintiffs cannot show that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 301 (3d Cir. 2016).

Monetary relief may be obtained in a Rule 23(b)(2) class action so long as the predominant relief sought is injunctive or declaratory. Generally, the rule "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes,* 564 U.S. at 360-61. Monetary relief—and not injunctive relief—necessarily predominates "unless it is incidental to requested injunctive or declaratory relief." *Allison v. Citgo Petrol. Corp.,* 151 F.3d 402, 415 (5th Cir. 1998).[26]

Monetary relief is not incidental here. The FAC seeks "statutory damages, trebles, and punitive or exemplary damages" as well as "disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of its unlawful acts, omissions, and practices". FAC, pp. 86-87. Witt, Plaintiffs' actuarial expert, calculates aggregate damages for the class members in the Sonic track as anywhere from $0.85 billion to $2.33 billion, depending on whether calculated over a ███████████. Witt Decl., p. 4.

Fatally, Plaintiffs have not met their burden to identify "exactly what injunctive . . . relief' they seek." *Lakeland Reg'l Med. Ctr. v. Astellas US, LLC*, 763 F.3d 1280, 1291 (11th Cir. 2014).

---

[26] *Accord Murray v. Auslander,* 244 F.3d 807, 812 (11th Cir. 2001). *See also, e.g., In re TJX Cos. Retail Sec. Breach Litig.,* 246 F.R.D. 389, 400 (D. Mass. 2007) ("Because the predominate motive behind this suit is financial, class certification pursuant to Rule 23(b)(2) is not justified.")

Injunctions "must be geared toward preventing future harm." *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins.,* 938 F.3d 1170, 1175 (11th Cir. 2019). Because Plaintiffs' focus on improving Defendants' data security, the only "future harm" Plaintiffs could seek to avoid is a separate, future incident, not to mitigate any alleged ongoing effects of what happened in 2019. *See Webb v. Injured Workers Pharm., LLC*, 72 F.4th 365, 378 (1st Cir. 2023) ("Naturally, an injunction requiring [a defendant] to improve its cybersecurity systems cannot protect the plaintiffs from future misuse of their PII by the individuals they allege now possess it. Any such relief would safeguard only against a future breach.")

It is pertinent that Plaintiffs' expert Sharon Anolik concedes that ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ *See* Cecchi Decl., Ex. 47, Declaration of Sharon Anolik (hereinafter "Anolik Decl."), p. 82. Given that concession, no need for injunctive relief has, or can be, established.

Moreover, Plaintiffs lack Article III standing to seek injunctive relief related to data security. To have such standing to seek prospective relief, "a plaintiff must show that he faces a substantial likelihood of injury in the future" that is "real and immediate," not "conjectural or hypothetical." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001). Past harm can be used as evidence, but "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). *See also Beck v. McDonald,* 848 F.3d 262, 277 (4th Cir. 2017) (finding lack of standing for injunctive relief in data breach case). Defendants continue to stay vigilant in their cybersecurity controls and thus, they are no more at risk of a future successful cyberattack than any other entity

49

that possesses PII or PHI. "If that risk were deemed sufficiently imminent to justify injunctive relief, virtually every company and government agency might be exposed to requests for injunctive relief like the one [Plaintiffs] seek here." *Webb,* 72 F.4th at 378 (holding plaintiffs lacked Article III standing to seek an injunction to improve data security). Based on the foregoing, the Court should reject Plaintiffs' request that this Court spend judicial resources to appoint an independent monitor to "examine and monitor Sonic's vendor risk management policies and data protection measures". Pltfs. Memo. p. 35.

## VII.    CONCLUSION

For all the reasons set forth above, Plaintiffs have not met their burden of proving Rule 23's requirements by a preponderance of the evidence. The Court should deny Plaintiffs' Motion.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: /s/ Bradley J. Bartolomeo
Bradley J. Bartolomeo
Jeffrey Y. Spiegel
Ariadne Panagopoulou
Abaigeal D. Franson
*Attorneys for Defendants Sonic Healthcare USA, Clinical Pathology Laboratories, Inc., Aurora Diagnostics LLC, and Austin Pathology Associates*
One Riverfront Plaza, Suite 800
Newark, NJ 07102
(973) 577-6260
Bradley.Bartolomeo@lewisbrisbois.com
Jeffrey.Spiegel@lewisbrisbois.com
Ariadne.Panagopoulou@lewisbrisbois.com
Abaigeal.Franson@lewisbrisbois.com

Dated: September 2, 2025

50