**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**(Newark Vicinage)**

| | |
|---|---|
| IN RE: AMERICAN MEDICAL COLLECTION AGENCY, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates To:<br>All Actions Against Quest Diagnostics Incorporated and Optum360, LLC | Civil No. 2:19-md-02904-JKS-MAH<br><br>Judge Jamel K. Semper |

## QUEST DIAGNOSTICS INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................5

      A.    Quest, Optum360, and AMCA ....................................................................5

      B.    The AMCA Data Breach..............................................................................7

      C.    This Litigation ............................................................................................8

LEGAL STANDARD ........................................................................................................11

ARGUMENT.....................................................................................................................12

I.     Plaintiffs Fail to Satisfy Rule 23(a)........................................................................12

      A.    Named Plaintiffs Are Not Typical of the Putative Class..............................13

            1.    Payment Portal-Related Evidence Renders Named Plaintiffs Atypical to Represent the Putative Negligence Class. ...........................................................13

            2.    The Sole CMIA Named Plaintiff Is Subject to Unique Defenses......................14

      B.    Plaintiffs Are Inadequate Representatives Because They Abandoned Many Types of Recovery And Spoliated Evidence. .................................................16

      C.    Commonality Fails Due to Quest's Changed Relationship with AMCA Over Time..............................................................................................................17

II.    Plaintiffs Fail to Meet Rule 23(b)(3)'s Predominance Requirement. .........................19

      A.    Plaintiffs Fail to Demonstrate Predominance for the Negligence Claims Because of Variance in State Laws and Individualized Proofs Regarding Causation and Injury. ....................................................................................19

            1.    Variations in the Applicable State Negligence Laws Defeat Predominance.......20

            2.    Plaintiffs Cannot Prove Injury and Causation Using Common Evidence for Every Individual in the Class. ....................................................................................24

      B.    Plaintiffs' CMIA Claim Requires Individualized Evidence That Defeats Predominance.............................................................................................44

            1.    Plaintiffs Cannot Prove with Common Evidence that Any Unauthorized Person Actually "Viewed" Their Medical Information. ...............................................45

            2.    Plaintiffs Cannot Prove with Common Evidence that All Medical Information in the CHAMP Database Was "Confidential." .................................................48

III.   Plaintiffs Fail to Satisfy Rule 23(b)(2)....................................................................48

CONCLUSION..................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*,
2021 WL 3612155 (3d Cir. Aug. 16, 2021) ..................................................................50

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ................................................................ 36, 50

*Afzal v. BMW of N. Am., LLC*,
2020 WL 2786926 (D.N.J. May 29, 2020) ........................................................ 13, 15

*Akaosugi v. Benihana Nat'l Corp.*,
282 F.R.D. 241 (N.D. Cal. 2012) ...............................................................................17

*Allen v. Ollie's Bargain Outlet, Inc.*,
37 F.4th 890 (3d Cir. 2022) .........................................................................................25

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
2021 WL 5937742 (D.N.J. Dec. 16, 2021) (MTD I Op.) (ECF No. 283) ...............*passim*

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
2023 WL 6216542 (D.N.J. Sept. 21, 2023) (MTD II Op.) (ECF No. 578) ...............*passim*

*Anderson v. Commerce Consts. Servs., Inc.*,
531 F.3d 1190 (10th Cir. 2008) ..................................................................................21

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ...............................................................................17

*In re Asacol Antitrust Litig.*,
907 F. 3d 42 (1st Cir. 2018) ........................................................................................29

*Attias v. CareFirst, Inc.*,
344 F.R.D. 38 (D.D.C. 2023) ......................................................................................44

*Attias v. CareFirst, Inc.*,
346 F.R.D. 1 (D.D.C. 2024) ........................................................................................33

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) ........................................................................................48

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006) ................................................................................. 13, 14

*Berni v. Barilla S.P.A.*,
   964 F.3d 141 (2d Cir. 2022) ..................................................................................49

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
   2024 WL 5247287 (D.S.C. Dec. 30, 2024) ...........................................................50

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)..............................................................................................27

*In re Brinker Data Incident Litig.*,
   2021 WL 1405508 (M.D. Fla. Apr. 14, 2021), *vacated in part by Green-Cooper v.
   Brinker Int'l, Inc.*, 73 F.4th 883 (11th Cir. 2023)......................................................43

*Brown v. Am. Airlines, Inc.*,
   285 F.R.D. 546 (C.D. Cal. 2011) ..................................................................... 34, 35

*Chin v. Chrysler Corp.*,
   182 F.R.D. 448 (D.N.J. 1998)................................................................................24

*Clemens v. ExecuPharm Inc.*,
   48 F.4th 146 (3d Cir. 2022)............................................................................ 31, 36

*Cohen v. Subaru of Am., Inc.*,
   2022 WL 714795 (D.N.J. Mar. 10, 2022)..............................................................21

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ......................................................................................12, 19, 25

*Cornett v. Johnson & Johnson*,
   998 A.2d 543 (N.J. App. Div. 2010)......................................................................23

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006)..............................................................................................28

*Doe v. Regents of Univ. of Cal.*,
   672 F. Supp. 3d 813 (N.D. Cal. 2023)...................................................................46

*Drummond v. Progressive Specialty Ins. Co.*,
   142 F.4th 149 (3d Cir. 2025)........................................................................... 19, 32

*Dukich v. IKEA US Retail LLC*,
   343 F.R.D. 296 (E.D. Pa. 2022) ...........................................................................24

*Eisenhower Med. Ctr. v. Super. Ct.*,
   226 Cal. App. 4th 430 (2014)................................................................................15

*Ferraras v. Am. Airlines, Inc.*,
   946 F.3d 178 (3d Cir. 2019) .......................................................................19, 20, 25

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
   174 F.R.D. 332 (D.N.J. 1997) .................................................................................. 21

*Fu v. Fu*,
   733 A.2d 1133 (N.J. 1999) ......................................................................................... 22

*Garrett v. Young*,
   109 Cal. App. 4th 1393 (2003) ............................................................................ 15, 48

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011) ................................................................................ 48, 49

*Georgine v. Amchem Prods.*,
   83 F.3d 610 (3d Cir. 1996) ...............................................................................*passim*

*Gilbert v. Stewart*,
   255 A.3d 1101 (N.J. 2021) ......................................................................................... 41

*Grandalski v. Quest Diagnostics Inc.*,
   767 F.3d 175 (3d Cir. 2014) .......................................................................... 20, 21, 24

*Haney v. Charter Foods N., LLC*,
   2024 WL 4054361 (E.D. Tenn. Aug. 28, 2024) ....................................................... 23

*Harnish v. Widener Univ. Sch. of Law*,
   833 F.3d 298 (3d Cir. 2016) ................................................................................ 32, 40

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016) ..................................................................................... 27

*Huber v. Simon's Agency, Inc.*,
   84 F.4th 132 (3d Cir. 2023) .......................................................................... 25, 29, 30

*Huber v. Taylor*,
   469 F.3d 67 (3d Cir. 2006) ........................................................................................ 44

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) .............................................................................*passim*

*Jason v. AMTRAK*,
   2020 WL 5036187 (D.N.J. Aug. 25, 2020) .............................................................. 22

*Johnston v. HBO Film Mgmt.*,
   265 F.3d 178 (3d Cir. 2001) ...................................................................................... 16

*Krottner v. Starbucks Corp.*,
   406 F. App'x 129 (9th Cir. 2010) ............................................................................. 31

*Lab'y Corp. of Am. Holdings v. Davis*,
605 U.S. 327 (2025) (per curiam) ...................................................................................26

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ................................................................................. 12, 29

*Lebegern v. Forman*,
471 F.3d 424 (3d Cir. 2006) ...........................................................................................22

*In re LifeUSA Holding*,
242 F.3d 136 (3d Cir. 2001) ...........................................................................................20

*Longenecker-Wells v. BeneCard Servs., Inc.*,
2015 WL 5576753 (M.D. Pa. Sept. 22, 2015), *aff'd*, 658 F. App'x 659 (3d Cir.
2016)...................................................................................................................................32

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..........................................................................................................27

*Mackey v. Belden, Inc.*,
2021 WL 3363174 (E.D. Mo. Aug. 3, 2021) ...............................................................23

*Malik v. Cooper Tire & Rubber Co.*,
59 F. Supp. 3d 686 (D.N.J. 2014) ..................................................................................23

*Maniscalco v. Brother Int'l (USA) Corp.*,
709 F.3d 202 (3d Cir. 2013) ...........................................................................................24

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012)................................................................................. 12, 19

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
341 F.R.D. 128 (D. Md. 2022) .......................................................................................50

*McGlenn v. Driveline Retail Merch., Inc.*,
2021 WL 165121 (C.D. Ill. Jan. 19, 2021) ..................................................................44

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
209 F.R.D. 323 (S.D.N.Y. 2002)...................................................................................16

*Mielo v. Steak'n Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018).............................................................................................25

*Moore v. Centrelake Med. Grp., Inc.*,
83 Cal. App. 5th 515 (2022)............................................................................................32

*Mulder v. PCS Health Sys., Inc.*,
216 F.R.D. 307 (D.N.J. 2003).........................................................................................19

v

*Nafar v. Hollywood Tanning Sys.*,
  339 F. App'x 216 (3d Cir. 2009) ...................................................................................16

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*,
  477 A.2d 1224 (N.J. 1984) ...........................................................................................33

*Neale v. Volvo Cars of N. Am., LLC*,
  2021 WL 3013009 (D.N.J. July 15, 2021) ........................................................34, 41, 50

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015) .............................................................................25, 26, 30

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) ...........................................................................................32

*Oliver v. Raymark Indus., Inc.*,
  799 F.2d 95 (3d Cir. 1986) .......................................................................................31, 33

*Opperman v. Path, Inc.*,
  2016 WL 3844326 (N.D. Cal. July 15, 2016) ................................................................33

*Pagan v. Abbott Labs. Inc.*,
  287 F.R.D. 139 (E.D.N.Y. 2012) ...................................................................................17

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  2019 WL 3410382 (D. Or. July 29, 2019) .....................................................................23

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019) .......................................................................................29

*Regents of Univ. of Cal. v. Super. Ct.*,
  220 Cal. App. 4th 549 (2013), *as modified on denial of reh'g* (Nov. 13, 2013) .......................................48

*Reinig v. RBS Citizens, N.A.*,
  912 F.3d 115 (3d Cir. 2018) .....................................................................................41, 44

*Ruiz v. Gap, Inc.*,
  380 F. App'x 689 (9th Cir. 2010) ...................................................................................34

*Savidge v. Pharm-Save, Inc.*,
  727 F. Supp. 3d 661 (W.D. Ky. 2024) ...........................................................................43

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ...........................................................................................13

*Sutter Health v. Super. Ct.*,
  227 Cal. App. 4th 1546 (2014) .......................................................................................45

*P.V. ex rel. T.V. v. Camp Jaycee,*
  962 A.2d 453 (N.J. 2008) ...............................................................................21, 22, 23, 24

*Stasi v. Immediata Health Grp. Corp.,*
  501 F. Supp. 3d 898 (S.D. Cal. 2020) ...................................................................46

*In re Thalomid & Revlimid Antitrust Litig.,*
  2018 WL 6573118 (D.N.J. Oct. 30, 2018).............................................................25

*Thornburg v. Ford Motor Co.,*
  2022 WL 4348475 (W.D. Mo. Sept. 19, 2022).......................................................16

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021).....................................................................................26, 35, 36

*Tyson Foods, Inc. v. Bouaphakeo,*
  577 U.S. 442 (2016)...............................................................................................1, 12

*United States v. Thomas,*
  703 F. App'x 72 (3d Cir. 2017)...............................................................................48

*Uzuegbunam v. Preczewski,*
  592 U.S. 279 (2021)...................................................................................................33

*Verdicchio v. Ricca,*
  843 A.2d 1042 (N.J. 2004) ......................................................................................42

*Veridian Credit Union v. Eddie Bauer, LLC,*
  295 F. Supp. 3d 1140 (W.D. Wash. 2017) ............................................................23

*Vigil v. Muir Med. Grp. IPA, Inc.,*
  84 Cal. App. 5th 197 (2022)........................................................................45, 47, 48

*Viking River Cruises, Inc. v. Moriana,*
  596 U.S. 639 (2022)...................................................................................................16

*Voorhees v. Tolia,*
  2022 WL 18024216 (D.N.J. Dec. 31, 2022) ..........................................................33

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011)......................................................................................12, 18, 48

*Warriner v. Stanton,*
  475 F.3d 497 (3d Cir. 2007)....................................................................................22

*Weinberg v. Whatcom Cnty.,*
  241 F.3d 746 (9th Cir. 2001)...................................................................................34

*Yocham v. Novartis Pharms. Corp.*,
  736 F. Supp. 2d 875 (D.N.J. 2010) ................................................................................ 21, 22

**Statutes**

Confidentiality of Medical Information Act, Cal. Civ. Code § 56 *et seq.*...........................................*passim*

**Other Authorities**

45 C.F.R. § 160.103...........................................................................................................6

45 C.F.R. § 164.308...........................................................................................................18

Fed. R. Civ. P. 23 ...........................................................................................................*passim*

Restatement (Second) of Torts § 907 (1979) ...........................................................................34

**INTRODUCTION**

It has now been more than six years since the American Medical Collection Agency—a former debt collection vendor for Quest Diagnostics Incorporated ("Quest"), Quest's contractor Optum360, LLC ("Optum360"), and many other companies—experienced a data security incident (the "AMCA Cyberattack"). Plaintiffs now claim the AMCA Cyberattack led to the exposure of their personal information on the dark web, which they in turn claim created risks of future harms.

After fulsome discovery, Plaintiffs have abandoned the injury theories on which they survived dismissal as a basis for class certification, as those theories had no evidentiary support. Plaintiffs' newly embraced theories fare no better. The evidence does *not* show any classwide harm attributable to the AMCA Cyberattack. Plaintiffs' Motion therefore frames the case in the abstract, doing little more than reciting the elements of their claims. They fail to make the requisite *evidentiary* showing that those elements can be proven through common evidence (*i.e.*, "where 'the same evidence will suffice for each member'") rather than presenting "individual question[s] … where 'members of a proposed class will need to present evidence that varies from member to member.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). In fact, their Motion barely mentions evidence at all. This falls well short of what Supreme Court and Third Circuit precedent demand under Rule 23.

Plaintiffs seek certification of two separate classes. One is a roughly 11.5 million member nationwide class, defined to include all Quest patients who received notice of the AMCA Cyberattack, that pursues negligence and negligence per se causes of action. That class seeks either nominal damages (which negligence law does not allow) or damages in an amount allegedly necessary to buy ██████████████████████████ to protect against *future* harms (*i.e.*, harms that have not arisen in the years since the AMCA Cyberattack but purportedly might post-judgment). The second is a single state class—whose size Plaintiffs neglect to define—pursuing a California Confidentiality of Medical Information Act ("CMIA") cause of action, for which they seek statutory damages. Both

classes are premised on the same theory of alleged wrongdoing: that Quest's supposed negligent oversight of AMCA, the vendor of Quest's vendor (Optum360), proximately caused a cyberattack that (i) breached AMCA's computer systems, (ii) exfiltrated every class member's data from AMCA's call center database (called CHAMP), and (iii) then posted all that data for sale on the dark web.

At the pleading stage, Judge Arleo concluded that Plaintiffs had alleged a sufficiently concrete injury required for Article III standing and a cognizable injury required for state-law negligence solely as to (i) their allegations of "economic injuries" (resulting from identity theft or fraudulent charges, for example) or (ii) their allegations of injuries to their "privacy interests" (as allegedly reflected by attempted identify theft, phishing communications, or dark-web postings). The court explicitly held that a mere "risk of future harm" was not sufficient to meet the injury requirement for standing. But Plaintiffs' class certification Motion abandons the two injury theories on which they survived dismissal, and relies solely on the theory that supposed dark-web postings of putative class members' information create a risk of future harm. Class certification should not be granted on this basis for many reasons.

The most glaring of the Motion's many fatal flaws is its failure to meet the predominance requirement of Rule 23(b)(3). Plaintiffs must be able to prove on a classwide basis through common evidence each element of each cause of action on which they seek certification. If a "rigorous analysis" of Plaintiffs' evidence shows that they need to resort to individualized inquiries to prove an element, then predominance fails. As to the essential elements of injury and causation (required both for standing and negligence), Plaintiffs have no common evidence and would need individualized evidence to try to prove them. Rule 23 thus bars class certification. *See infra* § II.A.2.

*First*, under the theory that Plaintiffs advance in their Motion, proving injury (for standing or negligence) requires evidence that the Plaintiffs' and class members' information in AMCA's CHAMP database was (i) accessed by the attackers and (ii) exfiltrated outside AMCA's systems. Plaintiffs failed

to identify a shred of evidence (let alone the type of common evidence critical to certification) that *any* named Plaintiff or individual in the 11.5 million member putative class of Quest patients actually had *their* personal information accessed and exfiltrated. Individualized inquiries are needed to make those determinations. Even Plaintiffs' expert's opinions and methodology confirm that any analysis of whether an individual's information was accessed and exfiltrated is specific to each individual, not common to the class.

Only two pieces of evidence remotely bear on whether any data was exfiltrated from AMCA. A report from forensic investigation firm Charles River Associates ("CRA") found, ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ And "flash alerts" published by cyber-threat intelligence firm Gemini Advisory ("Gemini") concluded that ██ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Neither piece of evidence is common proof that the entire CHAMP database, or any part of it, was exfiltrated.

*Second*, Plaintiffs lack common evidence that putative class members' information from the CHAMP database, even if exfiltrated, was actually posted to the dark web. Again, they point to only two pieces of evidence that *any* information about putative class members wound up on the dark web. Plaintiffs invoke the same Gemini alerts ████████████████████████████████ ████████████████████████████████, thus necessitating individualized inquiry into which of the 11.5 million members of the putative class, if any, were even potentially affected. They also rely on ████████████████████████ of their expert, Mary Frantz, who searched the dark web for ████████████████████████████████████████████████████████████████ ████████████████████████. The flimsiness of Frantz's search ████████████████████████████

3

highlights the absence of common evidence to prove classwide dark-web posting. Frantz did not even confirm ███████████████████████████████████████████████████████ ███████████████████████████████████████; did not validate ████████ ████████████████████████████████████ and did not search for ████████ ███████████████████████████████████████████████

*Finally*, even if this evidence showed exfiltration and dark-web posting (and it does not), Plaintiffs have not shown any way to prove with common evidence *which* information pertaining to *which* putative class members is implicated. The evidence confirms the opposite: answering this threshold question would require an experienced investigator to search repositories of dark web postings on an individual-by-individual basis for all 11.5 million putative class members. No class has ever been certified on such a theory (if even attempted).

Aside from their inability to show predominance on the essential elements of injury and causation, Plaintiffs also fall short on many other Rule 23 requirements as to both putative classes.

As to Rule 23(a), Plaintiffs are neither *typical* nor *adequate* class representatives because they abandoned many types of recovery, spoliated evidence, and exposed their own purportedly "private" information on social media. *Infra* §§ I.A-B. *Commonality* also is lacking, as even the basic question of the scope of Quest's duty varies over time. *Infra* § I.C. Quest and AMCA's relationship changed years before the cyberattack when Quest hired Optum360 to take over its billing and debt-collection functions, which included Optum360 taking over Quest's contract with AMCA. Thus, Quest's alleged duty to monitor AMCA is different before and after that point, a variance that defeats commonality.

Plaintiffs also fail to meet the predominance requirement for reasons other than their inability to prove injury and causation with common evidence. As to the putative negligence class, the preliminary question of which state's law applies to each class member defeats predominance, as every individual's home state laws govern and vary in meaningful ways. *Infra* § II.A.1. And as to the putative

4

CMIA class, key inquiries on two elements lack common answers and require highly individualized evidence. A CMIA violation occurs only if an unauthorized person *actually views* confidential medical information, but Plaintiffs have no common way of proving that anyone viewed each individual's medical information. Additionally, the CMIA protects medical information only if it is *confidential* and has not voluntarily been disclosed by that individual. But individualized analysis is needed to determine whether each class member kept their medical information private or instead willingly exposed their diagnoses, tests, and symptoms to the public—as the sole CMIA class representative repeatedly did on social media. Thus, individualized issues defeat certification of a CMIA class as well. *Infra* § II.B.

Finally, Plaintiffs' last-ditch effort to salvage a class through Rule 23(b)(2) is baseless. Proving the elements of Plaintiffs' claims remains highly individualized, and Plaintiffs cannot show how the injunctive relief they propose would prevent alleged future harms for the entire putative class.

No court has ever certified a class like this. This Court should not be the first, particularly given the strictures of Third Circuit precedent under Rule 23. Plaintiffs' Motion should be denied.

## BACKGROUND

### A. Quest, Optum360, and AMCA

Quest is a provider of diagnostic and clinical laboratory services. When Quest provides services, patient personal and medical information may be provided to Quest by the patients' medical providers (when ordering the tests) or by the patients themselves (when they visit a Quest facility). *See, e.g.*, Ex. 19, Jairam Dep. 152-55; Ex. 26, Smith Dep. 242-43. But the information provided to Quest varies. For some patients, Quest received ███████████████████████████████████████████; for others, Quest received ███████████████████. Ex. 33 at 7, 13, 19. Any health-related information Quest received varied too, █████████████████████████████████████████████████████████████████████████████████████████████. *Id.* 5, 31, 37.

5

Prior to 2016, Quest contracted with AMCA to provide debt collection services for patients with past-due bills that Quest had been unable to collect. The Quest-AMCA contract had a "Business Associate Agreement" ("BAA"), a HIPAA-required contract to define and limit how a vendor may use protected information. *See* 45 C.F.R. § 160.103. That BAA required AMCA to ███████████ ███████████████████████████████████████████ ███████████████████████████████████████████ Ex. 27, Service Agreement, Schedule 9.3. ██████████████████ Ex. 3, Miller Decl. ¶¶ 28-39. But Quest went further and obligated AMCA to ██████████████████████ as well. Ex. 27, Service Agreement, "IT Security Contract Exhibit."

Quest's direct contractual relationship with AMCA ended in late 2016, when Quest hired Optum360, a healthcare technology company, to handle all of Quest's billing and collections functions. Quest's existing contract with AMCA (including the BAA) was assigned to Optum360, effective December 1, 2016. Ex. 28. Optum360 and AMCA entered into a new BAA, effective December 1, 2016, which required AMCA to ████████████████████████. Ex. 29.

AMCA held a range of data—including ████████████████ ███████████████████—pertaining to individuals with overdue accounts referred to AMCA by all of the largest medical labs in the country (including other Defendants in this MDL) and many other companies. ████████████ ████████████████ Ex. 16, Fuchs Dep. 56-58.[1]

---

[1] For each Plaintiff, the specific kinds of information AMCA stored in CHAMP varied. *See* Ex. 1, Hitt Decl., Workbook 10. For example, CHAMP held Hollway's ██████████████████ ████████████████████████████████████ *Id.* CHAMP also stored Klein's █████████████ *Id.* Others, like Jairam, had █████████████ in CHAMP. *Id.* For many Plaintiffs, the data stored in the CHAMP database reflected sometimes more or sometimes less data than what Quest had provided

### B. The AMCA Data Breach

On May 14, 2019, AMCA informed clients, including Optum360 (which then informed Quest), that it had sustained a cyberattack that *potentially* affected the information of individuals who had been referred to it for debt collection and whose information had been stored in its CHAMP database, which included up to 11.5 million Quest patients. AMCA had *not* confirmed whether any information in CHAMP had actually been accessed, viewed, or exfiltrated by the attackers. Ex. 16, Fuchs Dep. 106-07. AMCA provided notice of the cyberattack to the potentially-affected individuals for whom notice was legally required; out of an abundance of caution, Quest and Optum360 notified all remaining potentially-affected Quest patients. Ex. 24, Quest Dep. 384-90.[2]

Two months earlier, Gemini, an independent cyberthreat intelligence firm, had found evidence suggesting that

*See* Ex. 30; Ex. 31. Those records encompassed *all* AMCA clients, not solely Quest patients. *Id.*

Neither Quest nor Optum360 provided any patient payment information to AMCA, which is not surprising given that AMCA's function was to collect *un*paid bills. Ex. 33. Thus,

could have come only from individuals who provided it directly to AMCA.

Ex. 17, Gemini Dep. 115-16, 131-32.

because AMCA

*Compare id. with* Ex. 33.

---

[2] Quest and Optum360 also offered free credit monitoring to Quest patients who had certain categories of data in CHAMP. Roughly ▮▮▮ accepted the offer. Ex. 1, Hitt Decl. ¶ 58.

███████████████████████████████████████████, Gemini ███████████████████████████████████████████ ████████████████████████████████████. *Id.* 134.

In March 2019, after learning of the cyberattack, AMCA commissioned CRA, a cybersecurity incident response firm, to █████████████████████████████████ ████████████████████. That investigation was █████████████. CRA found that only a ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████. Ex. 32, CRA Rep. at 3; Ex. 15, CRA Dep. 84-85. In fact, there is *no evidence* at all indicating that ███████████████ █████████████████████. *See* Ex. 2, Tomasini Decl. ¶ 39. CRA found █████████ ████████████████████████████████████████████ ███████████████████████████████████████ *Id.* ¶ 41. And ██████████ ████████████████████████████████████████████ ████████████████████. *Id.* ¶ 40. After completing its investigation, CRA concluded ██████ ████████████████████████████████████████████ █████████████████████████████████ Ex. 15, CRA Dep. 105; *see also id.* 230 ████████████████████████████████.

## C. This Litigation

After the AMCA Cyberattack was announced, lawsuits naming both AMCA and its clients flooded the courts. AMCA quickly declared bankruptcy, and the lawsuits were transferred to this MDL. With AMCA in bankruptcy, the litigation focused on Quest, Optum360, and others that had used AMCA for debt collection, such as Labcorp, Sonic, and CareCentrix. Plaintiffs base their claims against all Defendants on the theory that the full CHAMP database—rather than any more limited

8

source—was exfiltrated and posted on the dark web. *See*, *e.g.*, ECF No. 317 ¶¶ 357-58.

Quest and Optum360 moved to dismiss, including for failure to allege standing under Article III and the essential element of injury under the state negligence laws governing the claims. Judge Arleo partially granted the motion, allowed Plaintiffs to replead, and partially granted Quest and Optum360's renewed motion to dismiss. The Court held that Plaintiffs adequately pleaded standing and state-law injury only if they alleged that, as a result of the AMCA Cyberattack, (i) they had incurred economic harms as a result of fraudulent charges or identity theft, or (ii) they had incurred "an injury to their privacy interests" as a result of increased spam or phishing attempts or their data being posted on the dark web. Judge Arleo held that Plaintiffs who alleged injury based only on a risk of future harm had not adequately pleaded standing or state-law injury. *See In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2023 WL 6216542, at *1, 3 (D.N.J. Sept. 21, 2023) ("MTD II Op.") (ECF No. 578); *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at *6-11 (D.N.J. Dec. 16, 2021) ("MTD I Op.") (ECF No. 283).

Judge Arleo divided the Plaintiffs into three groups: (i) Group I Plaintiffs, who alleged that they had already sustained "concrete and particularized economic injuries arising from fraudulent charges and remedial measures taken to resolve charges and prevent further fraud," MTD I Op., 2021 WL 5937742, at *7-8; (ii) Group II Plaintiffs, who alleged a non-economic "injury to their privacy interests" based on "their Personal Information ha[ving] been misused in numerous ways," namely, (a) attempted identity theft, (b) increased spam or phishing calls, texts, or emails, or (c) posting of the Personal Information on the dark web, *id.* at *8-9; and (iii) Group III Plaintiffs, who lacked allegations to qualify them for Groups I or II and instead complained merely about *a risk of future harm*, *id.* at *9-11. Judge Arleo found Group I and II Plaintiffs adequately alleged standing and state-law injury, and

9

dismissed the Group III Plaintiffs for lack of standing. *Id.* at \*7-11.[3]

The Court found that Plaintiffs' negligence and negligence per se claims survived dismissal based on Plaintiffs' novel theory alleging a duty by Quest to oversee the data security practices of AMCA, even though it was Quest's vendor's vendor at the time of the cyberattack and Quest had not had a contract with AMCA for years. *Id.* at \*4; MTD I Op., 2021 WL 5537742, at \*15. The court dismissed the remaining claims other than single-state statutory claims on which Plaintiffs do not seek class certification and a CMIA claim. MTD II Op., 2023 WL 6216542, at \*7.

Following discovery, Plaintiffs have not come forward with any evidence that any Plaintiff's private information held by AMCA in the CHAMP database was exfiltrated or is on the dark web. Their expert *admitted* that she could not determine whether ███████████████████████ ████████████████████ Ex. 10, Frantz Dep. 310-11. That same expert concluded only that ████ ███████████████████████████████████████████████████ ███████████████████████████████████ *See* Ex. 5, Frantz Decl. ¶ 360; *see also* Optum360 Opp. 10-14 (detailing the baselessness of Frantz's opinion ██████████████████████████ ████. Similarly, Plaintiffs have come forward with no evidence that any data that came from AMCA was posted to the dark web, other than Gemini's findings relating ███████████████████ ████████████████ (which Quest and Optum360 did not provide to AMCA). And Defendants' expert found that ████████████████████████████████████████ ███████████████████████████████████████████████████

---

[3] The amended complaint repleaded for most of the Group III Plaintiffs, who alleged for the first time that they had been subjected to increased spam and phishing attempts or that that their information had been posted on the dark web, and thus that they suffered a privacy-interest harm—allegations that Judge Arleo found sufficient to place them into Group II. *See* MTD II Op., 2023 WL 6216542, at \*3. In denying dismissal of the negligence claims, Judge Arleo recognized that, once it determined choice-of-law, the Court would need to revisit whether Plaintiffs' negligence claims were precluded by the economic loss doctrine and, even if the economic loss doctrine did not apply, whether the "laws of particular states do not recognize some of the intangible injuries [*i.e.*, alleged privacy harms] claimed by the Group II Plaintiffs." MTD I Op., 2021 WL 5537742, at \*16 n.29.

██████████████████. *See* Ex. 2, Tomasini Decl. ¶¶ 164-68 & App'xs 27-A through 45-A.

Plaintiffs' motion primarily seeks to certify a nationwide class pursuing negligence and negligence per se claims predicated on the notion that Quest breached an alleged duty under HIPAA to supervise AMCA, the vendor of its vendor. *See* Mot. 4, 21-22. In doing so, Plaintiffs jettison all of the injury theories on which they survived dismissal for lack of standing and instead suggest either that they need not demonstrate injury at all, *see id.* 26-27 (seeking certification based on nominal damages), or that they can demonstrate injury solely with a strain of the "risk of future injury" theory that Judge Arleo held was insufficient on the pleadings, *id.* 13-14, 27-28. The cursory "Injury" section of Plaintiffs' Motion does not even state directly what their claimed injury is. *Id.* 22 (merely acknowledging that "injury"/"harm" is an element of a negligence claim). But it is perfectly clear that Plaintiffs do not seek to certify claims involving the "economic injuries" allegedly sustained by Group I Plaintiffs or the "harm to privacy interests" allegedly sustained by Group II Plaintiffs. Their Motion neither argues either theory, advances any evidence of such injuries, nor seeks any damages to compensate them for any supposed "economic injuries" or "privacy harms." Instead, the only thing resembling an injury theory in Plaintiffs' Motion is one Judge Arleo already rejected, namely that they face a *risk of future injury* (akin to the dismissed Group III Plaintiffs' injury theory) from the alleged posting of their information to the dark web. *See* Mot. 28. Based on this invalid theory, they now seek damages in the amount it would cost to obtain so-called "mitigation products" to protect against that risk going forward (and no Plaintiff seeks damages for already having purchased such products). *Id.* 27-28.

Plaintiffs' motion also seeks to certify a class of California residents asserting a claim for a negligent violation of the CMIA, for which Plaintiffs seek statutory damages. *Id.* 4, 23-27.

## **LEGAL STANDARD**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf

11

of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To fit the exception, Plaintiffs "must affirmatively demonstrate [their] compliance with the Rule—that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Tyson Foods*, 577 U.S. at 453 ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member … .'"). Plaintiffs have the burden to prove, by a preponderance of the evidence, that they have met the requirements of Rule 23(a) and Rule 23(b). *See*, *e.g.*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 312, 316 n.14, 320-21 (3d Cir. 2008).

Courts must conduct "a rigorous analysis" of the evidence, *id.* at 309, resulting in "findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met," *id.* at 307; *see id.* at 316-21 (detailing the "rigorous analysis" needed). *See also In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190-91 (3d Cir. 2020); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). The court "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *In re Hydrogen Peroxide*, 552 F.3d at 307; *id.* ("[t]he court's obligation to consider all relevant evidence and arguments extends to expert testimony"); *id.* at 324 ("Resolving expert disputes in order to determine whether a class certification requirement has been met is always a task for the court—no matter whether a dispute might appear to implicate the 'credibility' of one or more experts.").

## ARGUMENT

### I.  Plaintiffs Fail to Satisfy Rule 23(a).

Plaintiffs cannot meet their burden on three of Rule 23(a)'s four requirements: typicality, adequacy, and commonality.

**A.  Named Plaintiffs Are Not Typical of the Putative Class.**

Under Rule 23(a)(3), the named Plaintiffs' claims must be "typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006). Plaintiffs cannot satisfy that standard where they individually face "unique defenses"—*i.e.*, defenses not applicable to the entire class—that are likely to become a focus of litigation. *Id.* at 296; *accord In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-99 (3d Cir. 2009); *Afzal v. BMW of N. Am., LLC*, 2020 WL 2786926, at *6 (D.N.J. May 29, 2020) (denying certification on typicality grounds because "unique defenses" based on named plaintiffs' actions "prevent[ed] them from effectively pursuing the interests of the remainder of the … Class"). Here, various named Plaintiffs face powerful unique defenses as to their negligence claims, and the same is true of the lone representative for the putative CMIA class.

### 1.  *Payment Portal-Related Evidence Renders Named Plaintiffs Atypical to Represent the Putative Negligence Class.*

Nearly all named Plaintiffs are subject to a defense not shared by the entire class that threatens to become the focus of any trial on the negligence claims—namely, despite that they seek to rely on Gemini's findings ███████████████████████████, the named Plaintiffs' information was not transmitted through that portal. Thus, Plaintiffs' negligence theory falls apart to the detriment of absent class members whose information *was* in the portal. Plaintiffs' only potential negligence class theory hinges on their information having been exfiltrated from AMCA and then posted on the dark web, such that they now face risks of future harm that necessitate mitigation products. *See infra* § II.A.2.b.ii. A significant focus of the litigation thus has concerned whether only the payment portal was breached and, consequently, whether only information from the payment portal, and not the CHAMP database, was ever exfiltrated and offered for sale on the dark web. *Supra* 7-8.

The only evidence of AMCA-linked data being posted on the dark web is the Gemini evidence, which shows that, ███████████████████████████████████████████

███████████████. *Id.*[4] Yet, no named Plaintiff has come forward with evidence that *their* information was in that ████████████████████ that Gemini identified. And, obviously, it would be impossible for Plaintiffs to present evidence that the information of the entire class they seek to represent—nearly 11.5 million people—was within a tranche of ████████████████ ████. Significantly for typicality, even in CHAMP, AMCA possessed ██████████████ ████████████████████████████████ *See* Ex. 6, Lee Rep. 42.[5]

The named Plaintiffs' lack of payment portal data therefore creates a "unique defense" against their claims that stands to become the focus of trial and torpedo the claims of absent class members whose information *was* entered through the payment portal. *Beck*, 457 F.3d at 295-96. That is, even if a jury were to believe that the group of individuals whose information was exfiltrated from the payment portal and posted to the dark web had a viable claim based on a need for mitigation products, the litigation will focus on the fact that the overwhelming majority of Plaintiffs were not in that group.

### 2. The Sole CMIA Named Plaintiff Is Subject to Unique Defenses.

The lone CMIA class representative, Breanna Klein, also is not typical because she faces two significant defenses not shared by the rest of the CMIA class. *First*, by Plaintiffs' own analysis, Klein did not have any "medical information" stored in the CHAMP database that is covered by the CMIA.

---



[4] As discussed throughout, Plaintiffs' expert Frantz made no effort to ████████████████ ███████████████████████████████████████ She examined only ██████████████████████████████████████████████ Ex. 10, Frantz Dep. 139-41. Frantz did so notwithstanding that ████████████████████████ ████████████████████. Ex. 12, Worley Dep. 61, 73; Ex. 2, Tomasini Decl. ¶¶ 113-16 & App'x 3 ██████ And Defendants' expert found ██████████████ ██████████████████████████████████████████████ ██████████████████████ Ex. 2, Tomasini Decl. ¶¶ 147-56, 165.

[5] Many Plaintiffs testified that ████████████████████████. *See, e.g.*, Ex. 13, Buck Dep. 232; Ex. 23, Perry Dep. 91. And even for Petitta and Smith, there is no evidence that they ever used AMCA's payment portal, as opposed to providing payment card information by phone or AMCA obtaining that information in some other way. In fact, ████████████ *ever* paying AMCA, including through the online portal. Ex. 26, Smith Dep. 259-60.

Judge Arleo held that CMIA-protected medical information "must include 'a patient's medical history, mental or physical condition, or treatment.'" MTD I Op., 2021 WL 5937742, at *33 (citing *Eisenhower Med. Ctr. v. Super. Ct.*, 226 Cal. App. 4th 430, 434-35 (2014)). Information merely showing "dates of service and referring doctor … does not rise to the definition of 'medical information' under California law." *Id.* at 434. Of the categories of "health information" identified by Plaintiffs' expert Jonathan Lee—███████████████████████████████████████████████ Lee Rep. 42—only █████████ could potentially qualify as information *about a patient's medical condition* covered by the CMIA. But there are no ███████████████████ ███████████ Ex. 1, Hitt Decl., Workbook 10. Thus, Klein faces the unique defense that no CMIA-protected "medical information" about her was even arguably accessed because it did not exist in CHAMP. This threatens to bring down the claims of all CMIA class members, including those who may have stronger claims insofar as they had CMIA-protected "medical information" in CHAMP.

*Second*, Klein is not typical because ███████████████████████████. Thus, the very information she (wrongly) claims was released through the AMCA Cyberattack was not "confidential" at all. As discussed *infra* § II.B.2, because the CMIA protects only *confidential* medical information, an individual who has "openly discussed information about his or her medical condition with third parties" has no claim. *Garrett v. Young*, 109 Cal. App. 4th 1393, 1408 (2003). Klein ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 21, Klein Dep. 51-52, 54, 57-65, 69-70, 72-76 (Klein ███████████████████████████████████ ███████████████████████; *see also* Ex. 2, Tomasini Decl. ¶¶ 198-99. Klein's ███████████ ████████████ is a peculiar "habit[]" not "common to the class"—many of whom surely do not ████████████████████████████████—and creates the unique defense that her data was not CMIA-covered "confidential" information. *See Afzal*, 2020 WL 2786926, at *6.

**B. Plaintiffs Are Inadequate Representatives Because They Abandoned Many Types of Recovery And Spoliated Evidence.**

The adequacy requirement considers "whether the representatives' interests conflict with those of the class." *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 185 (3d Cir. 2001). Here, Plaintiffs are inadequate for two independent reasons: (i) their counsel jettisoned potentially significant categories of relief, and (ii) they engaged in sanctionable conduct.

*First*, "courts have repeatedly held that the failure to seek full recovery by splitting out [claims] creates a significant conflict of interest destroying adequacy of representation." *Thornburg v. Ford Motor Co.*, 2022 WL 4348475, at *7 (W.D. Mo. Sept. 19, 2022). In vacating class certification on adequacy grounds, the Third Circuit explained that "[b]y seeking only partial relief, [plaintiff] may be engaging in claim splitting, which is generally prohibited by the doctrine of *res judicata*." *Nafar v. Hollywood Tanning Sys.*, 339 F. App'x 216, 224 (3d Cir. 2009). This result follows from the fact that "class judgments bind absentees with respect to their individual claims for relief." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 654 (2022). So if class representatives abandon certain forms of relief and their claims proceed to judgment in a certified class action, they are not adequately representing absent class members who had claims for those forms of abandoned relief but can no longer pursue them.

Here, Plaintiffs have limited the relief they seek for the negligence claim to nominal damages or the supposed cost of obtaining mitigation products in the future. *See* Mot. 27-28. They have abandoned any relief for already-existing economic injuries sustained by members of the putative class, such as claims that the AMCA Cyberattack resulted in identity theft or fraudulent charges—even though the Group I Plaintiffs expressly relied on such injuries to survive dismissal, *see* MTD I Op., 2021 WL 5937742, at *7-8. Indeed, during discovery some of those Plaintiffs claimed hundreds of dollars in damages relating to those alleged injuries. *E.g.*, Ex. 18, Hollway Dep. 42-43. By forgoing an opportunity to obtain meaningful relief for actual harms certain putative class members may have sustained, Plaintiffs have shown themselves to be inadequate representatives. *See e.g.*, *In re Methyl*

16

*Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 339-40 (S.D.N.Y. 2002) (finding inadequacy because of "waiver or abandonment of personal injury and other claims by named plaintiffs").

*Second*, as detailed in Quest and Optum360's brief to this Court in a pending appeal from a Special Master ruling, the named Plaintiffs repeatedly and extensively spoliated evidence, notwithstanding purported instructions from their counsel to preserve it. *See* ECF No. 668. As noted, Judge Arleo held that among the reasons the Group II Plaintiffs withstood dismissal was that they alleged that they experienced an increase in spam or phishing communications after the AMCA Cyberattack. MTD II Op., 2023 WL 6216542, at *3 & nn.8, 10. Yet, named Plaintiffs repeatedly destroyed *during this litigation* the core evidence necessary to support those allegations—including by deleting spam and phishing emails, texts, voicemails, and call histories. *E.g.*, Ex. 20, Jaworowski Dep. 175-76, 207, 210; Ex. 14, Briley Dep. 60, 68. Though Plaintiffs abandoned their unsupported increased spam/phishing claims as a basis for certification, their conduct related to that evidence is nonetheless sanctionable. *See* ECF No. 475 at 14-15. And plaintiffs who engage in sanctionable conduct are not adequate class representatives, regardless of whether sanctions have actually been imposed. *See, e.g., In re Arris Cable Modem Consumer Litig.,* 327 F.R.D. 334, 358 (N.D. Cal. 2018) (denying certification on adequacy grounds where plaintiff did not maintain evidence that "he had a duty to preserve" because, "even in the absence of bad faith, the spoliation issue, which is unique to [plaintiff], risks becoming a focus in the litigation"); *Akaosugi v. Benihana Nat'l Corp.*, 282 F.R.D. 241, 257 (N.D. Cal. 2012) ("Defendant brought a motion for sanctions due to spoliation of evidence … [and, a]lthough the motion was denied, it has raised serious issues regarding plaintiff['s] conduct, which may be admissible at trial."); *Pagan v. Abbott Labs. Inc.*, 287 F.R.D. 139, 150 (E.D.N.Y. 2012) (finding inadequacy due to spoliation).

## C. Commonality Fails Due to Quest's Changed Relationship with AMCA Over Time.

Plaintiffs point to just three questions they contend are common: (i) whether Quest owed

17

them a duty, (ii) whether Quest breached that duty through its allegedly deficient oversight of AMCA, and (iii) whether that alleged breach harmed class members. *See* Mot. 15. The first is a critical gating item. For any of these questions to "drive the resolution of the litigation," *Dukes*, 564 U.S. at 350, Plaintiffs must be able to prove that a duty to monitor AMCA existed and remained the same throughout the entire period during which putative class members' information was sent to AMCA. Plaintiffs now rely on just one source for that supposed duty: HIPAA. Plaintiffs argue that HIPAA's requirement that "covered entities" like Quest obtain "satisfactory assurances" that their "business associates" comply with HIPAA security and privacy rules mandates that they do something more (though *what* more is not clear) than enter into a written contract requiring HIPAA compliance. Mot. 7. They cite no other statutory or common law basis for a duty to monitor contractors or subcontractors.[6]

As it pertains to Quest, this question is *not* common to the entire proposed class because Quest's relationship with AMCA, and any attendant HIPAA obligations, changed during the class period. HIPAA states that "[a] covered entity is *not* required to obtain … satisfactory assurances from a business associate that is a subcontractor." 45 C.F.R. § 164.308(b)(1) (emphasis added). Here, after Quest hired Optum360 in 2016 to handle collections, Optum360 took over the contract with AMCA and Quest had no contractual relationship with AMCA. Therefore, while Quest had an obligation under HIPAA to obtain satisfactory assurances from AMCA before late 2016, well before the breach occurred, it had no such obligation after that point. *See* Ex. 3, Miller Decl. ¶¶ 58-60. And Plaintiffs' proposed class includes many individuals whose data was sent to AMCA before *and* after AMCA became Quest's subcontractor, meaning that it had a different duty (if any) as to different class

---

[6] Plaintiffs' standard of care expert likewise confirmed that the only standards she contends Quest violated were ██████████ Ex. 9, Anolik Dep. 224-25; *see also id.* 222-23 (confirming Anolik has no opinion that ██████

members. Ex. 33 at 1-6 (showing Quest sending information pertaining to named Plaintiffs between 2011 and 2019). Thus, even under Plaintiffs' own incorrect interpretation of the law,[7] the question of Quest's duty is not common to the entire class. *See Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 316 (D.N.J. 2003) (commonality defeated where defendant's fiduciary status and obligations differed between class members).

## II. Plaintiffs Fail to Meet Rule 23(b)(3)'s Predominance Requirement.

Under Rule 23(b)(3), "[a] class action may be maintained if Rule 23(a) is satisfied *and* if … questions of law or fact common to class members *predominate* over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." (emphases added). The predominance showing is "far more demanding" than Rule 23(a)'s commonality requirement. *Ferraras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (cleaned up); *accord Comcast*, 569 U.S. at 34. "Issues common to the class must predominate over individual issues. … If proof of the essential elements of the cause of action *requires individual treatment*, then class certification is unsuitable." *In re Hydrogen Peroxide*, 552 F.3d at 311 (emphasis added; cleaned up); *see also Marcus*, 687 F.3d at 600. "This analysis will often resemble a merits determination, in that it relates to plaintiffs' ability to prove the elements of their claims." *Drummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149, 155 (3d Cir. 2025) (cleaned up).[8]

### A. Plaintiffs Fail to Demonstrate Predominance for the Negligence Claims Because of Variance in State Laws and Individualized Proofs Regarding Causation and Injury.

Plaintiffs' Motion is glib as to their burden to prove—*with evidence*—that predominance is met

---

[7] Plaintiffs are wrong as a matter of law that HIPAA requires covered entities like Quest to monitor their contractors or subcontractors. Instead, ███████████████████████████████████████ ██████████████████████████████████████████████████████████████. Ex. 3, Miller Decl. ¶¶ 28-39; *see also* MTD I Op., 2021 WL 5937742, at *28 (the *existence* of a duty is a purely legal question that is decided by the Court). Plaintiffs do not dispute that, at all times during which AMCA was Quest's contractor, it ███████████████████. Ex. 4, Anolik Decl. ¶¶ 92, 94.

[8] Plaintiffs' failure to prove predominance makes it unnecessary for this Court to address superiority, though it also provides ample grounds on which to deny certification. *See* Optum360 Opp. 41-43.

19

as to their negligence claims. *See* Mot. 21-23. They baldly assert that "all four elements of negligence (duty, breach, causation, and injury) will be answered with common proof," *id.* 21 (cleaned up, citation omitted), but do not *prove* any such thing. In fact, they cite *no evidence* in their Motion's entire (albeit curt) predominance section. That alone is a sufficient basis for denying certification. *See In re Hydrogen Peroxide*, 552 F.3d at 312 (requiring "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove [each element] at trial"). And given the commonality failing under Rule 23(a), *see supra* § I.C, it is necessarily true that Plaintiffs cannot satisfy the "far more demanding" predominance inquiry. *Ferraras*, 946 F.3d at 185.

There are several additional reasons why Plaintiffs fail to show predominance, each of which requires denial of their Motion. First, each Plaintiff's and class member's home-state law applies to their claims, which the Third Circuit has repeatedly held defeats certification. *Infra* § II.A.1. Second, individualized evidence is required for Plaintiffs to prove Article III standing. *Infra* § II.A.2.b.i. Third and most significantly, regardless of what state law applies and whether constitutional standing could be proven with common evidence, the record shows that individualized inquiries are necessary and rampant to prove state-law injury and causation, as Plaintiffs' experts make clear. *Infra* § II.A.2.b.ii-II.A.2.c.

### 1.   *Variations in the Applicable State Negligence Laws Defeat Predominance.*

"[T]he proliferation of disparate factual and legal issues is compounded exponentially" if different state laws apply to different class members' claims. *Georgine v. Amchem Prods.*, 83 F.3d 610, 627 (3d Cir. 1996); *see Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 180, 184 (3d Cir. 2014) (similar). Thus, a court "*must* apply an *individualized* choice of law analysis to each plaintiff's claims." *Georgine*, 83 F.3d at 627 (emphases added); *see In re LifeUSA Holding*, 242 F.3d 136, 147 (3d Cir. 2001) (vacating certification because court "failed to consider how individualized choice of law analysis of the forty-eight different jurisdictions would impact on Rule 23's predominance requirement").

Plaintiffs do not dispute that "there is a conflict between various state laws," including between New Jersey negligence law and other Plaintiffs' and class members' home states' negligence laws. Mot. 19 n.13. It is therefore Plaintiffs' "significant burden" to demonstrate that "state law variances" do not preclude a finding of predominance. *Grandalski*, 767 F.3d at 183-84 (cleaned up). Plaintiffs do not carry this significant burden. They try by claiming that New Jersey law applies to all class members' negligence claims. *See* Mot. 19-21; *Grandalski*, 767 F.3d at 183-84 (discussing this potential avenue). But they show no such thing; controlling law confirms that each individual's home state's law governs their negligence claim.

Because all but one Plaintiff in this consolidated complaint originally filed suit against Quest in New Jersey, New Jersey's "most significant relationship" choice-of-law rule governs.[9] *See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997); *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 455 (N.J. 2008); *supra* 10 n.3 (noting Judge Arleo deferred choice-of-law until after discovery). New Jersey courts principally look to the following factors: "(a) the place where the injury occurred[;] (b) the place where the conduct causing the injury occurred[;] (c) the domicile, residence, nationality, place of incorporation and place of business of the parties[;] and (d) the place where the relationship, if any, between the parties is centered." *P.V.*, 962 A.2d at 458 (cleaned up). Not all of these factors are equal. The New Jersey Supreme Court holds place of injury is presumptively dispositive: "[T]he law of the state of the injury is applicable unless another state has a more significant relationship to the parties and issues." *Id.* at 460; *see also, e.g., Cohen v. Subaru of Am., Inc.*, 2022 WL 714795, at *6 (D.N.J. Mar. 10, 2022) (giving dispositive weight to place of injury); *Yocham v. Novartis Pharms. Corp.*, 736 F. Supp. 2d 875, 880 (D.N.J. 2010) (same).

**Place of Injury.** Plaintiffs do not dispute that each of them allegedly sustained their so-called

---

[9] The sole exception is Ashley Finch, who originally filed in her home state of Kansas—which applies *lex loci delicti* for negligence claims, meaning her claims are also governed by the law of the place of her injury (Kansas). *See Anderson v. Commerce Consts. Servs., Inc.*, 531 F.3d 1190, 1194-96 (10th Cir. 2008).

"injury" at home. *See* Mot. 19 ("harm in every state"). Instead, Plaintiffs argue for the "fortuitous injury" exception to the place-of-injury presumption. *Id.* But Plaintiffs ignore New Jersey precedent governing the "fortuitous injury" exception, instead relying on other states' choice-of-law rules. The evasion is telling. The New Jersey cases show that the "fortuitous injury" exception has no place here.

The New Jersey Supreme Court has made clear that the exception applies when the place of injury "bears little relation to the occurrence and the parties with respect to the particular issue." *P.V.*, 962 A.2d at 462 (cleaned up). The exception's focus is on whether the plaintiff's contacts with the state of injury are *intentional*. For example, the New Jersey Supreme Court has explained that the "place of injury in air disaster" is a "fortuitous" injury, while the "place of a[] [car] accident … may be considered fortuitous only when the driver did not *intend or could not reasonably have anticipated being in that jurisdiction.*" *Fu v. Fu*, 733 A.2d 1133, 1149 (N.J. 1999). And in *P.V.*, the state Supreme Court rejected the notion that injuries sustained at a camp in Pennsylvania by a New Jersey resident were fortuitous because the plaintiff *intended* to attend the camp. 962 A.2d at 462 ("Pennsylvania was not an unanticipated detour on the way to another location"); *see also id.* (giving example of a "plaintiff's decision to vacation at Hershey Park" as rendering subsequent Pennsylvania injury non-fortuitous); *Warriner v. Stanton*, 475 F.3d 497, 503 (3d Cir. 2007) (applying New Jersey rules and assessing whether "contacts" with the state of injury were "intentionally initiated by the [plaintiff]").

Applying these rules, the Third Circuit and judges in this District repeatedly reject arguments that injuries were "fortuitous" under New Jersey law merely because harm could have occurred in multiple states, even where plaintiffs had a far more tenuous connection to the places where their injuries were sustained than putative class members here.[10] In this case, the location of any injuries

---

[10] *E.g.*, *Lebegern v. Forman*, 471 F.3d 424, 433 (3d Cir. 2006) ("In this case, [plaintiffs'] trip to New Jersey was part of a planned shopping excursion and, thus, it cannot be considered a fortuity that they found themselves on New Jersey's roadways."); *Yocham*, 736 F. Supp. 3d at 882 ("[I]n order to be fortuitous, it must not only be the case that the conduct did not determine the location of the injury … but also

Plaintiffs allegedly sustained resulted from their own intentional choices: they chose to live in their home states (where they claim they are now at risk of future harms) and chose to seek medical services in their home states which resulted in Quest obtaining their information. The place of injury is not remotely fortuitous, and each individual's home state law presumptively applies.[11] *See, e.g., Malik v. Cooper Tire & Rubber Co.,* 59 F. Supp. 3d 686, 693-94 (D.N.J. 2014) ("[t]he location was not fortuitous simply because the [injury could have happened] somewhere else").

Even absent the place-of-injury presumption, New Jersey law would not apply across the board because Plaintiffs' analysis of the other relevant factors is flawed.

**Place of Conduct.** With respect to "the place where the conduct causing the injury occurred," *P.V.*, 962 A.2d at 455 (cleaned up), New York, not New Jersey, is most relevant. The potential compromise of Plaintiffs' data occurred on AMCA's systems in *New York, see* Mot. 13-14, and Plaintiffs admit that their claims hinge on the notion that "AMCA's cybersecurity" (which was in *New York)* was insufficient, *id.* 5; *see id.* 5-7, 13-14. Indeed, the cases Plaintiffs cite confirm that the location of the data breach is relevant to this factor. *See* Mot. 19 n.13 (citing *Haney v. Charter Foods N., LLC,* 2024 WL 4054361, at *6 (E.D. Tenn. Aug. 28, 2024); *Mackey v. Belden, Inc.*, 2021 WL 3363174, at *2 (E.D. Mo. Aug. 3, 2021)). To the extent that Plaintiffs try to pivot away from this immediate and most

---

that the *intentions and decisions of the parties* also did not determine it.") (emphasis added); *Jason v. AMTRAK*, 2020 WL 5036187, at *3-4 (D.N.J. Aug. 25, 2020) (though the "injury could have occurred in any of the five states through which the [train] travels," given the "planned route," the location was not fortuitous); *see also Cornett v. Johnson & Johnson*, 998 A.2d 543, 552 (N.J. App. Div. 2010) (plaintiff who "received all medical care relating to his condition and the device" in Kentucky was not "injured in Kentucky by pure happen-stance so the place of injury could not be discounted as a fortuity").

[11] Ignoring the New Jersey choice-of-law cases, Plaintiffs cite cases from other circuits applying different state choice-of-law rules that found places of injury fortuitous simply because the defendant "caused injury [to plaintiffs] in a variety of states throughout the country." *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1153 (W.D. Wash. 2017); *see also In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2019 WL 3410382, at *13 (D. Or. July 29, 2019) (same). This analysis cannot be reconciled with the New Jersey precedents previously discussed. Nor would these cases pass muster under Third Circuit law on class certification: their determination of choice-of-law for a class member based on where *other* class members were injured contravenes the command that courts "must apply an *individualized* choice of law analysis." *E.g., Georgine*, 83 F.3d at 627 (emphasis added).

23

proximate—if not completely superseding—cause of the breach and instead focus on Quest's supervision and decision-making, the maneuver falls flat. There are two Defendants here: Optum360 is based in *Minnesota*, and only Optum360 had direct oversight of AMCA at the time of the cyberattack. Thus, under the place of conduct factor, this case has an especially tenuous connection to New Jersey.

**Place of Domicile.** Plaintiffs admit that this factor is "neutral." Mot. 20.

**Place of Relationship.** "The place where the relationship, if any, between the parties is centered," *P.V.*, 962 A.2d at 455 (cleaned up), obviously points to the states where each putative class member received medical services that caused them or their provider to send Quest their information.

**Interests of the Jurisdictions.** Finally, Plaintiffs claim "the interests and policies of the potentially concerned jurisdictions" is a tiebreaker, which they assert (based solely on out-of-state cases) favors New Jersey. Mot. 20. But binding precedent holds that "the interest of [the home state] in having its law apply to its own consumers outweighs the interests of New Jersey in protecting out-of-state consumers." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 210 (3d Cir. 2013).

Under these factors, the home state law of each Plaintiff and putative class member applies. The Third Circuit and its district courts routinely deny certification in such cases. *E.g.*, *Grandalski*, 767 F.3d at 183-84 (affirming denial because "variations in state law may swamp any common issues and defeat predominance") (cleaned up); *Georgine*, 83 F.3d at 627 (denying certification because "different rules govern[] the whole range of issues raised by the plaintiffs' claims," including "fear of future injury; causation; … and comparative/contributory negligence"); *Dukich v. IKEA US Retail LLC*, 343 F.R.D. 296, 310 (E.D. Pa. 2022) (same, "[s]tate negligence laws … have significant differences"); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 459 (D.N.J. 1998) (similar). This Court should hold likewise.

### 2.  *Plaintiffs Cannot Prove Injury and Causation Using Common Evidence for Every Individual in the Class.*

Plaintiffs spend only two paragraphs arguing that there are common questions as to injury and causation. Mot. 21-22. Their generic examples of purportedly common questions with common

24

answers illustrates their argument's superficiality. *See id.* 22 (asserting only that "[w]hether Defendants' inadequate security and oversight caused the Breach and harmed Plaintiffs is a common question with a common answer"). And, critically, those two paragraphs cite *no* evidence at all. This alone is enough to foreclose certification, because Rule 23 "'does not set forth a mere pleading standard'" and plaintiffs must "satisfy through evidentiary proof" Rule 23(b)'s requirements. *Comcast*, 569 U.S. at 33; *see, e.g.*, *Mielo v. Steak'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (reversing certification where plaintiffs "have presented no evidence" on a contested element of certification); *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 903 (3d Cir. 2022) (rejecting certification where there was "no evidence" on a contested causation issue); *Ferraras*, 946 F.3d at 183-84 (similar).

Moreover, as discussed *infra*, courts routinely hold that individualized issues pertaining to injury and causation are fatal to certification of data breach class actions. Here, what the *evidence* actually shows is that proof of injury—including under Article III and state law—requires "individual treatment," foreclosing predominance. *In re Hydrogen Peroxide*, 552 F.3d at 311 (cleaned up).

### a.  Individualized Inquiries Are Needed to Prove Article III Standing.

The Third Circuit has emphasized that "a properly formulated Rule 23 class should not raise standing issues." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 368 (3d Cir. 2015). It has reiterated that "predominance concerns can arise when unnamed class members must submit individualized evidence to satisfy standing." *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 156 (3d Cir. 2023); *see also Neale*, 794 F.3d at 368. A court must deny certification if, as here, "it will be extraordinarily difficult to identify those who [can prove standing]." *Huber*, 84 F.4th at 157 (cleaned up); *see In re Thalomid & Revlimid Antitrust Litig.*, 2018 WL 6573118, at *14 (D.N.J. Oct. 30, 2018) (denying certification because "there are potentially uninjured class members remaining in the class … [and] identifying these

25

members would require extensive individualized inquiry").[12] These principles are fatal to certification here—as to both injury-in-fact and whether any injury is fairly traceable to Quest's conduct.

At the pleadings stage, Judge Arleo properly recognized that "a mere risk of future harm, divorced from actual harm is insufficient to support standing in a suit for damages," and thus dismissed the Group III Plaintiffs who had merely alleged a risk of future harm. MTD Op. I, 2021 WL 5937742, at *6 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)). The court then interpreted *TransUnion* and Third Circuit law to allow a data breach plaintiff to satisfy the Article III injury requirement through "allegations tending to show that his or her individual information has *actually* been accessed, disseminated, or misused by an unauthorized party." *Id.* at *7 (emphasis added). Yet, Judge Arleo cautioned that "the fact that *some* plaintiffs' Personal Information may have been accessed and misused does not necessarily create a particularized injury as to *all* Plaintiffs whose data was in AMCA's possession." *Id.* (dismissing Plaintiffs who sought to proceed based on a risk of future injury); *see also* MTD II Op., 2023 WL 6216542, at *3.

As discussed *supra* 9-11, Judge Arleo found standing sufficiently pleaded for Group I Plaintiffs, who allege that they already had sustained "concrete and particularized economic injuries arising from fraudulent charges and remedial measures taken to resolve charges and prevent further fraud," and Group II Plaintiffs, who pleaded concrete injury "to their privacy interests" based on "their Personal Information ha[ving] been misused in numerous ways," including (i) attempted identity theft, (ii)

---

[12] While standing issues within the class may defeat certification, the Third Circuit (in acknowledged conflict with "some of our sister circuits") presently holds that plaintiffs need not prove that *all* class members have standing at this stage. *See Neale*, 794 F.3d at 362, 365. The Supreme Court recently granted certiorari on the issue but did not resolve it. *See Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327 (2025) (per curiam) (dismissing writ); *id.* at 333-34 (Kavanaugh, J., dissenting) ("I would hold that federal courts may not certify a damages class pursuant to Rule 23 when the class includes both injured and uninjured class members."). As discussed further *infra* 29, even if not every absent class member must prove standing at this stage, the difficulty of proving standing from individual-to-individual and the fact that more than 10% of the named Plaintiffs lack standing under even the broadest interpretation of Plaintiffs' theory means that standing defeats predominance.

increased spam or phishing communications, and (iii) posting of their personal information on the dark web. MTD I Op., 2021 WL 5937742, at *8-9.

That the Court found these allegations sufficient at the pleading stage does not mean that standing for even the named Plaintiffs still exists, now that this case has completed fact discovery. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation"). Plaintiffs must now prove, with *common—not individualized—evidence* that the class has suffered "concrete" injury, either from particularized economic injury (Group I) or misuse of their information (Group II).

Plaintiffs do neither. They abandon the Group I "economic injuries" theory, since they proffer no basis on which to show that all class members—never mind all Plaintiffs—have already suffered concrete and particularized economic injuries. They also abandon their Group II theories, failing to pursue any claim of "injury to their privacy interests" and making no effort to show that attempted identity theft or increased spam or phishing communications can be proven across the class. MTD II Op., 2023 WL 6216542, at *8-9 ("Article III allows [Plaintiffs] to seek relief for that harm").

Instead, Plaintiffs' sole injury theory in their Motion appears to be that named Plaintiffs and other class members have *a risk of future injury* because their personal information was purportedly exfiltrated from AMCA and posted on the dark web. *See* Mot. 13-14; *id.* 22 (referring to "injury" as to their negligence claims without defining any such injury); *id.* 27-28 (discussing mitigation products to protect against risk of future injury as the sole measure of damages sought for any injury). Plaintiffs do *not* seek relief for harm to a "privacy interest[]," the injury that Judge Arleo found sufficient to confer standing on Group II Plaintiffs who alleged their information had been posted on the dark web. Plaintiffs' shift is improper because they can pursue relief for injuries *only* of the type that gave rise to Article III standing: "Suffering one species of injury does not confer standing on a plaintiff to

27

press claims based on another species of injury, even if the injuries share a common genus." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016); *see, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press.").

Moreover, Plaintiffs present no *evidence*—let alone *common* evidence applicable across the class—showing that any named Plaintiff or putative class member had their data exfiltrated from AMCA and then posted on the dark web. To the contrary, the record shows that individualized evidence is necessary to answer even the preliminary inquiry that the Court's motion to dismiss decision made central: whether each individual's personal information is (i) available on the dark web (ii) because of the AMCA Cyberattack. For starters, although Plaintiffs say *nothing* of it in the negligence section of their Motion, their expert's only attempt to show that any named Plaintiffs' personal information has been posted on the dark web hinges on individualized inquiries. *See* Ex. 5, Frantz Decl. ¶¶ 344-63 (*cited in* Mot. 24, which discusses dark web evidence in the CMIA context). Frantz conducted dark web searches individual-by-individual for each named Plaintiff, and she identified no alternative way to assess dark web exposure for all 11.5 million putative class members on a common basis. *See id.* ¶¶ 360-61. This proves the point that individualized evidence is necessary for Plaintiffs to prove what has become their sole theory of injury.

Rather than searching for the type of Personal Information on which Plaintiffs' theories now depend, *see* Ex. 8, Supp. Worley Rep. ¶¶ 6-7 ████████████████████████, or those on which the Court found standing, *see* MTD I Op., 2021 WL 5937742, at *7-9, Frantz searched only ████████████████████████████████████████. Again, she did so individual-by-individual with no evidence common to all of them. Even

28

with these individualized inquiries, all Frantz could say was that ███████████████

███████████████████████████████████████████████████████████████

█████████████████████. Ex. 5, Frantz Decl. ¶ 360 (emphasis added). Amazingly, she

cannot even identify ██████████████████████████ discovered. Ex. 10,

Frantz Dep. 89.

Thus, even assuming that finding an individual's ████████████████ were evidence

sufficient to allow an individual to remain in the case as a "Group II" Plaintiff,[13] at least 13% of even

the named Plaintiffs lack standing under their own theory. And Plaintiffs have made no showing how

this same phenomenon would affect absent class members, let alone how common evidence could be

used to separate individuals with standing from those without. Class certification should fail on that

basis alone. *See, e.g., Huber*, 84 F.4th at 157-58 (requiring district court to consider on remand what

proportion of class members have standing, and recognizing that the presence of uninjured class

members may defeat certification). The Third Circuit and other courts have repeatedly rejected

certification on predominance grounds where plaintiffs' theories raise a prospect that more than a *de*

*minimis* number of class members lack standing. *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957

F.3d 184, 193-94 (3d Cir. 2020) (rejecting class where 25 of 33 purchasers paid lower prices than they

would have but for defendant's alleged misconduct); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934

F.3d 619, 625 (D.C. Cir. 2019) (denying certification where 12.7% of the class would be uninjured); *In*

---

[13] Plaintiffs have abandoned their "privacy harm" injury theory, but even if they had not, the proposition that ████████████████████████ constitutes Article III injury in the form of harm to privacy interests is absurd. Judge Arleo defined Group II as those Plaintiffs who "plead facts suggesting that their individual *private* information was wrongfully accessed and distributed." MTD I Op., 2021 WL 5937742, at *8 (emphasis added). ██████████████████████████████ ███████████, *see* Ex. 2, Tomasini Decl. ¶ 183 & App'xs 27-B through 45-B, and do not indicate that information *stolen from AMCA* appeared on the dark web. Indeed, Plaintiffs' putative expert Amy Worley admitted that ████████████████████████████████████████ ████████. *See* Ex. 12, Worley Dep. 61 ████████████████████████ *id.* 73 ████████████.

*re Asacol Antitrust Litig.*, 907 F. 3d 42, 46-47, 54-56 (1st Cir. 2018) (same, 10%).

The "traceability," or causation, aspect of standing also defeats certification because Frantz's analysis ████████████████████████████████████████████████████ ██████████████████████████████. Frantz's individualized inquiries did nothing to confirm that ██ ███████████████████████████████████████████████████████████ █████████████████. Indeed, many of the ████████ Frantz searched for ██████████████ ████████████████████████████████████████████████████ ███████████████████████████. *See, e.g.*, Ex. 2, Tomasini Decl., App'x 3. And Frantz does not even attempt to ███████████████████████████████████████████████████████. *See* Ex. 10, Frantz Dep. 129-30. In contrast, Defendants' expert's ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████. *See* Ex. 2, Tomasini Decl. ¶ 112 ██████████████████████████████████████████████████ ██████████████████████████████████████████████.

Thus, even if this Court ignored Judge Arleo's rejection of Plaintiffs' "risk of future injury" theory at the motion to dismiss stage, Plaintiffs failed to develop evidence, let alone *common evidence*, that private information was exfiltrated from AMCA and posted to the dark web. Thus, this case presents the *opposite* of a "properly formulated Rule 23 class," *i.e.*, one that "should not raise standing issues," *Neale*, 794 F.3d at 36, and will instead require Plaintiffs and absent class members to "submit individualized evidence"—and grasp at straws—"to satisfy standing," *Huber*, 84 F.4th at 156.

The result is no different to the extent Plaintiffs attempt to rely on the analyses from Gemini and CRA, which simply *confirm* the highly individualized nature of a standing theory based on dark web postings. *Cf.* Mot. 24-25. As discussed, Gemini found █████████████████████████ █████████████████████████████████████████████████. Even imagining

30

(counterfactually) that ███████████████████████████████████████████████████

███████ *See* Ex. 17, Gemini Dep. 134-35. This is nothing like common proof that Plaintiffs'

information was available on the dark web. Rather, as Judge Arleo explained, "the fact that *some*

plaintiffs' Personal Information may have been accessed and misused does not necessarily create a

particularized injury as to *all* Plaintiffs whose data was in AMCA's possession." MTD I Op., 2021 WL

5937742, at *7; *see Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 153 n.4 (3d Cir. 2022) (standing inquiry

"should focus on the misuse of information particular to the *plaintiff*—not other class members").



Similarly, the CRA report does not conclude that ██████████████████████████████

███████████████████████████████████. Far from it. As Plaintiffs acknowledge, that report

was inconclusive as to ████████████████████████████████████████████████████. *See* Mot.

14 ███████████████; *see also* Ex. 15, CRA Dep. 105 (CRA ████████████████████████

█████████████████████████████; *id.* 78 (testifying only that ██████████████████████

████████████████████████. CRA said nothing about, and did not attempt to analyze, ██████

███████████████████████████████████████████. Ex. 15, CRA Dep. 65. There

is no standing when a plaintiff's information is only "potentially accessed." *Clemens*, 48 F.4th at 153.

Thus, Plaintiffs have no common evidence through which they can prove that the class (or

even a large, identifiable portion of it) had their information posted to the dark web. Instead, whether

there is any evidentiary basis to support standing for the named Plaintiffs and absent class members

necessarily will turn on fact-intensive inquiries about each individual's particular personal information.

### b. Plaintiffs Have No Common Evidence to Prove State-Law Injury; Individualized Evidence is Essential and Extensive.

The essential element of injury under state negligence law provides an even greater obstacle

to class certification than Article III injury. *See, e.g., Krottner v. Starbucks Corp.*, 406 F. App'x 129, 131

(9th Cir. 2010) (state law imposes higher injury requirement than Article III). Negligence laws of

various states, including New Jersey, require actual injury in the form of pecuniary loss as a liability

element. *See*, *e.g.*, *Oliver v. Raymark Indus., Inc.*, 799 F.2d 95, 97 (3d Cir. 1986).

Where injury is an element of the cause of action, that element routinely forecloses certification. The Third Circuit holds that, "'[w]hile obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss'—that is, the *fact of damage*—'on a common basis.'" *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 306 (3d Cir. 2016) (emphasis added) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 189 (3d Cir. 2001)); *see Newton*, 259 F.3d at 188 ("'Where proof of fact of damage requires evidence concerning individual class members, the common questions of fact become subordinate to the individual issues, thereby rendering class certification problematic.'") (quoting district court with approval); *Drummond*, 142 F.4th at 156 (reversing certification when "the existence of individual injury" was not "capable of proof at trial through evidence common to the class") (cleaned up). Plaintiffs cannot do so here.

To begin, there is no common evidence proving that classwide information was actually exfiltrated during the AMCA Cyberattack, and there can be no cognizable injury under Plaintiffs' theories if their information never left AMCA. *See supra* § II.A.2.a. Plaintiffs and their experts cite no evidence showing that the CHAMP database as a whole (or even in significant part) was exfiltrated. Thus, the only way to establish that any information in CHAMP moved from AMCA to the dark web is through individualized searches. That *alone* precludes class certification, and the Court need go no further. *In re Hydrogen Peroxide*, 552 F.3d at 307; *Newton*, 259 F.3d at 187 (no predominance when defendants' allegedly improper conduct "did not necessarily injure each class member").

Next, consistent with the choice-of-law problem discussed *supra* § II.A.1, various state negligence laws applicable here have the economic loss doctrine, which requires Plaintiffs to show harm to person or property. *See*, *e.g.*, *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 534-37 (2022) (affirming dismissal of data breach-related negligence claims under California economic loss rule); *Longenecker-Wells v. BeneCard Servs., Inc.*, 2015 WL 5576753, at *5-6 (M.D. Pa. Sept. 22, 2015)

32

(same, Pennsylvania law), *aff'd*, 658 F. App'x 659 (3d Cir. 2016). Given those laws, Plaintiffs face an insurmountable individualized issue that defeats their nationwide class.

Economic loss rule aside, Plaintiffs fail even to articulate what their cognizable classwide economic state law injury supposedly is—let alone provide common evidence of it—in their discussion of injury and causation. *See* Mot. 22-23.

### (i) Nominal Damages Do Not Save Plaintiffs' Putative Class.

In the damages section of their Motion, Plaintiffs hint that if any class member can show a breach of duty, then that individual could automatically recover nominal damages—somehow obviating the need to prove economic loss. *See* Mot. 27. This is wrong. Tellingly, Plaintiffs point to no cases where a court found nominal damages sufficient to satisfy the liability requirement for a negligence claim.[14] Rather, even under the New Jersey negligence law that Plaintiffs say applies to the entire class, the existence of actual out-of-pocket harm must be shown. *See, e.g.*, *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1228 (N.J. 1984) ("It is well established that the plaintiff must show a breach of duty *and* resulting damage to prevail in a negligence action," as opposed to other torts where "in the absence of actual damages, the law vindicates the right by awarding nominal damages."); *Oliver*, 799 F.2d at 97 ("compensatory damages are [] required to establish a valid [negligence] cause of action" under New Jersey law). That is a signature difference between contract and negligence claims: "The New Jersey Supreme Court has distinguished a claim for breach of contract—a cause of action that does not require proof of actual damages—from the tort of negligence, which requires showing both a breach of duty and resulting damage to prevail." *Voorhees v. Tolia*, 2022 WL 18024216, at *5 (D.N.J. Dec. 31, 2022) (cleaned up). Other states' laws are similar; as the Restatement summarizes, "[i]f actual damage is necessary to the cause of action, as in negligence,

---

[14] Plaintiffs' cases address nominal damages in other contexts. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 289 (2021) (Article III standing); *Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 12 (D.D.C. 2024) (contract breach); *Opperman v. Path, Inc.*, 2016 WL 3844326, at *15-16 (N.D. Cal. July 15, 2016) (intentional tort).

nominal damages are not awarded." Restatement (Second) of Torts § 907 cmt. a (1979).[15]

### (ii) Plaintiffs' Risk of Harm and Mitigation Products Theory Does Not Satisfy the Predominance Requirement.

In their Motion's damages section, Plaintiffs posit what is essentially the "Group III" Plaintiff theory: that the risk of future harm they allegedly face as a result of the AMCA Cyberattack entitles each class member to receive damages in the amount that it would cost them to obtain "commercially available" credit monitoring and insurance products in the future to protect against that risk.[16] *See* Mot. 28. Plaintiffs assert that the class is entitled to the "market value" of those products regardless of whether a class member has purchased or will ever purchase them. *Id.* For many reasons, this alternative theory again confirms that individualized issues abound and defeat predominance.

### (a) An Unpleaded Theory Cannot Support Certification, Particularly One That Does Not Demonstrate Article III Standing Or State-Law Injury.

At the threshold, any effort to save certification on the basis of a "market value" of mitigation products theory must fail because it was unpled. *See, e.g.*, *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011) ("Class certification is not a time for asserting new legal theories that were not pleaded in the complaint."). The operative complaint did not allege state-law injury based on a risk of future harm, and Judge Arleo expressly held that the risk of future harm did *not* confer standing. *See* MTD I Op., 2021 WL 5937742, at *9-10. The governing complaint sought damages—on behalf of

---

[15] *See also, e.g.*, *Ruiz v. Gap, Inc.*, 380 F. App'x 689, 691 (9th Cir. 2010) ("California also holds that nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred.") (cleaned up); *Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751-52 (9th Cir. 2001) (affirming summary judgment on Washington-law negligence claim because plaintiff did not prove actual damages). Judge Arleo's denial of certification on the parallel NJCFA claims in *Neale v. Volvo Cars of N. Am., LLC*, 2021 WL 3013009, at *12 (D.N.J. July 15, 2021), also is instructive. Plaintiffs there argued that "individualized damage calculations are insufficient to preclude class certification," but Judge Arleo recognized that "[t]his argument conflates two distinct issues: the presence of an ascertainable loss—an essential element of Plaintiffs' claim—and the specific amount of damages." *Id.*; *see id.* ("[E]ach class member must separately demonstrate that [they] suffered an actual and quantifiable loss attributed to the [complained-of defect]. Such individualized questions preclude predominance."). The same is true here.

[16] This theory is peculiar insofar as ███████████████████████████████████ ██████████████████████████████, and we are now six years and counting on. Ex. 1, Hitt Decl. ¶ 58.

certain Plaintiffs—only for "economic loss and other *actual* harm" they had *already* incurred, such as "*spent* time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit protection." ECF No. 317 ¶¶ 429, 441 (emphasis added). Only one Plaintiff alleged such out-of-pocket expenditures, *see id.* ¶ 308, and she voluntarily dismissed her claims, *see* ECF No. 459.

Perhaps because of that, the Motion does not seek any relief for monies Plaintiffs or absent class members have actually expended. Instead, Plaintiffs swivel to an unpleaded theory that the exfiltration of data during the AMCA Cyberattack and subsequent posting to the dark web created a risk of future harm that entitles the putative class to monetary damages equal to the *prospective* cost of obtaining mitigation products for seven to ten years into the future. Mot. 28.[17] In other words, these products allegedly are necessary to protect against never-materialized risks that purportedly would still be in the air ▮▮▮▮▮ after the cyberattack and, by the time of judgment would protect from risks of future harms that supposedly would arise up to ▮▮▮▮ after the incident. Beyond being an improper new theory, this is illogical and inconsistent with Plaintiffs' expert's own opinion that ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 7, Worley Decl. ¶ 64.

Not only is it improper to grant certification on an unpleaded theory, *see Brown*, 285 F.R.D. at 560, but permitting certification on this particular theory would be extremely prejudicial to Defendants given that, among other things, claims based on the mere "risk of future injuries" would have been dismissed on the pleadings. *First*, there is no Article III standing for this type of injury theory. After *TransUnion*, it is clear that "where the plaintiff seeks only damages, something more is required" than

---

[17] At points during her deposition, Worley suggested that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 12, Worley Dep. 287–88, 292. Beyond being an even more frontal attack on Judge Arleo's holding (consistent with Third Circuit precedent) that a *risk* of harm alone is insufficient for Article III standing, this testimony cannot be squared with the foundation of Worley's opinion: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 7, Worley Decl. ¶ 64 (emphasis added).

"a risk of future harm," specifically that "'the exposure to the risk of future harm itself causes a *separate* concrete harm.'" *Clemens*, 48 F.4th at 155 (quoting *TransUnion*, 594 U.S. at 436). Accordingly, "if the plaintiff's knowledge of the substantial risk of identity theft causes him to … *spend money* on mitigation measures like credit monitoring services, the plaintiff has alleged a concrete injury." *Id.* at 156 (emphasis added). Under Plaintiffs' theory, however, class members would be compensated simply for having a risk of future harm without the "*separate* concrete harm" of actually incurring the cost of the mitigation product. *Id.* (cleaned up). That is exactly what *Clemens* and *TransUnion* forbid.

*Second*, damages for un-incurred costs also are not cognizable under state law. Courts distinguish plaintiffs who can show "costs already incurred, including costs associated with credit monitoring," from those who only "may incur expenses in the future," and decline class certification for the latter. *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 696 (N.D. Cal. 2019) (cleaned up). That is not surprising because, as Plaintiffs acknowledge, the goal of negligence damages is to "restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred"—and compensating a party for un-incurred costs obviously fails to do this. Mot. 28.

Plaintiffs cannot meet the predominance standard on a "risk of future harm" theory of injury that has already been rejected by Judge Arleo, is unpled, would not suffice for standing or cognizable injury under state negligence laws, and could not be proven without resort to individualized evidence.

### (b) Individualized Inquires Are Intrinsic to Plaintiffs' Mitigation Products Theory.

Even if all these failings are set aside, the mitigation products theory of injury is still not subject to classwide proof. Worley conceded that ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████ Her concessions only scratch the surface of all the individualized inquiries implicated here.

*Mitigation Products from Alternative Sources.* Worley admitted that ████████████



. *See* Ex. 12, Worley Dep. 174-75. Yet, her analysis did not attempt to address this issue. Individualized inquiry is necessary to determine whether a particular class member obtained or could have obtained free mitigation products and whether those products were sufficiently protective, such that no further mitigation product would be required.

*Particular Data in CHAMP.* ████████████████████████████ ████████████████████████████, as Worley essentially conceded. ████████████ ████████████████████████████████████████████████████████████, she repeatedly conceded at her deposition that ████████████████████████ ████████████████████████████████████████████████.

The foundation for Worley's opinion is ████████████████████████ ████████████████████████████████████████████████. Ex. 7, Worley Decl. ¶¶ 166-70. She claims that ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████. Ex. 12, Worley Dep. 94. But membership in each tranche can be triggered by wildly different data. ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 8, Supp. Worley Rep. ¶ 7.

This scheme creates wildly varying risk levels in the same tranche. For example, Worley classifies ████████████████████████████████████████████████



██████████. This defies common sense, as Worley's testimony makes plain. She admitted that ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████ Ex. 12, Worley Dep. 96-97; *see also* Ex. 7, Worley Decl. ¶ 43. Worley further acknowledged that ████████

████████████████████████████████████

██████████ *See* Ex. 12, Worley Dep. 56-60 ████████████████

████████████████████████; *id.* 86 ████████████████; *id.* 236, 289 ████████████████████████████

████████████████████████; *id.* 96-97 (similar); *id.* 295-96 (similar). That is significant here because the AMCA Cyberattack occurred *six years* ago, and payment card or other financial information, insurance information, and other information subject to change, expiration, or cancelation may have been sent to AMCA *years* before that.

Despite Worley's attempt to lump these disparate data elements together, they create markedly different individualized inquiries about future risk and, in turn, whether any product would be needed to mitigate such risk.

Worley also does not account ████████████████████████████

████████████████████████████████. For example, thousands of putative classes members ████████████████

████████████████████████████████████

██████████. Ex. 1, Hitt Decl. ¶ 82. Yet, Worley's tranche-based analysis would ████████

38



████████. Other errors are less obvious and require even more rigorous individualized inquiry to analyze. For example, ████████████████████████████████ ████████████████████. *Id.* ¶ 83. ████████████████████████████

████████████████████████████████████████

████ As another example, Plaintiffs' expert Lee testified that ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████. Ex. 11, Lee Dep. 231. Disclosure of incorrect data would pose no threat at all, and therefore require no mitigation product. Worley's attempt to smooth over the massive variations and numerous inaccuracies across CHAMP data fails. Determining if the AMCA Cyberattack necessitates paid mitigation products would require individualized inquiries into the particular data elements potentially at issue, their characteristics, and their accuracy to make a holistic determination of whether and to what extent disclosure of that individual's data would create a risk of harm.

**Baseline Risk.** Worley also did not ████████████████████████████

████████████████████████████████, *see* Ex. 12, Worley Dep. 122, 128, despite that individualized assessment of such risk is critical to determining the effect the AMCA Cyberattack had on each class member (even assuming their information was posted to the dark web). This would require consideration of ████████████████████████████

████████████████████████████████████████

████████████████████████. *See* Ex. 2, Tomasini Decl. ¶¶ 157-202. In fact, Worley *conceded* that

████████████████████████████████████. Ex. 12, Worley Dep. 119 ████

████████████████████. An individual whose information in the CHAMP database had already been posted for sale on the dark web before the AMCA Cyberattack (perhaps because of a different

data breach) would face a much smaller increased risk (if any) as compared to someone whose data had never been posted to the dark web. Worley also conceded that ███████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████ *See id.* 79.

Having chosen to advance a mitigation products theory, Plaintiffs cannot escape from the reality that individualized consideration of baseline risk is essential to assessing whether a particular individual actually requires a mitigation product.

***Differences in Dark Web Sources.*** After assuming (without factual basis) that every putative class member's AMCA-held information was taken and posted to the dark web, Worley further assumes that ██████████████████████████████████████████████████. But that is not so. Worley testified, for example, that █████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████ . *See id.* 199-200. This also necessitates individualized inquiries. An individual's information posted to ██████████████████████████████ ████████ , whereas an individual's information posted to ██████████████████████ ███████████████████████████ . *See* Ex. 2, Tomasini Decl. ¶ 206. This variation in risk exacerbates the need for individualized inquiries regarding *where* on the dark web information taken from AMCA, and from any other data breaches involving Plaintiffs and absent class members, supposedly exists.

For all these reasons, because Plaintiffs cannot "demonstrate economic loss—that is, the *fact of damage*—on a common basis," common question do not predominate and class certification must be denied. *Harnish*, 833 F.3d at 306 (cleaned up, emphasis added).

    **c. Causation Issues Are Individualized and Critical.**

Individualized issues of causation independently preclude predominance. Courts deny class certification in the face of individualized issues when, as is true for negligence, causation is an

"essential element[]" of the claim. *See Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127-28 (3d Cir. 2018); *Neale*, 2021 WL 3013009, at *10 (denying certification because of "a potentially complex analysis of individual cases to determine whether a particular loss was caused by" the alleged defect "or something entirely different"). The fact that all the named Plaintiffs and many proposed class members have had their personal information exposed in other data breaches—and posted on the dark web as a result of those breaches—means that individualized evidence is required to prove causation.

*First*, putative class members relying on evidence that some of their data was found on the dark web would have to show that this data came from AMCA, and not some other data breach or alternative source. Plaintiffs lack common proof on this front. Instead, they rely on Frantz's individual-by-individual ███████ searches; but Frantz ███████████████████████████████████ ██████████████████████ Ex. 10, Frantz Dep. 129. And there is ample evidence that ████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ *See* Ex. 2, Tomasini Decl. ¶¶ 164-65 & App'xs 27-A through 45-A. Ultimately, the factfinder would have to engage in a plaintiff-by-plaintiff assessment of evidence unique to each putative class member, including ██████████████████████████ █████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ , to determine whether any dark-web posting was caused by the AMCA Cyberattack.

*Second*, individualized inquiry would be needed to determine proximate cause—*i.e.*, whether the AMCA Cyberattack was a "substantial factor" in creating the degree of risk that supposedly necessitates mitigation products. *See, e.g.*, *Gilbert v. Stewart*, 255 A.3d 1101, 1114 (N.J. 2021) ("When there are concurrent causes potentially capable of producing the harm or injury, this Court applies the 'substantial factor' test to evaluate proximate cause.") (cleaned up). If a particular putative class

41

member's data, for example, was exposed in numerous other data breaches, then those other breaches would "dilute" any risk arising from the AMCA Cyberattack, which would be just one potential exposure among many. *See Verdicchio v. Ricca*, 843 A.2d 1042, 1057 (N.J. 2004) ("Although no one of the contributing factors may have such a predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor.") (cleaned up). Notably, this "substantial factor" analysis would have to include data breaches both *preceding* and *subsequent to* the AMCA Cyberattack, given that Plaintiffs' mitigation products theory is based on prospective harm and six years have now elapsed since the incident. Indeed, Worley admitted that ███

████████████████████████████████████████████████████████

██████████████████████████████████████. Ex. 12, Worley Dep. 197-98.

To illustrate, consider two of the named Plaintiffs: LaTease Rikard and Naomi Jaworowski. Rikard has received notices that she was involved in at least ██ other data breaches. Ex. 25, Rikard Dep. 159-60, 187-88. Consistent with that, Defendants' expert found ██████████████████

██████████████████████████████████████████████████. Ex. 2, Tomasini Decl. ¶ 166. Similarly, Defendants' expert identified ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* ¶ 168.

Notably, many of these dark web postings for both Plaintiffs identified the data as having specifically come from a *different* data breach (including the ████████████████████████████ breaches), as having been posted to the dark web *before* the AMCA Cyberattack, or as containing only data elements that were *not* stored in the CHAMP database.[18] *See, e.g. id.* ¶¶ 166-68.

For *each* of the data breaches affecting Plaintiffs, factors such as the data elements, timing, the

---

[18] The named Plaintiff data Defendants' expert ████████████████████

████████████████████████ Ex. 2, Tomasini Decl. ¶¶ 149-56.

sophistication of the attackers, their motive, where exfiltrated information was posted or sold, and reported instances of associated misuse will need to be considered to determine whether the six-year-old AMCA Cyberattack is a "substantial factor" in any risk they may face. This process would need to be repeated for *each* of 11.5 million putative class members, with additional discovery into the data breaches each may have been affected by over the past few years (the named Plaintiffs' depositions took place years ago), followed by individualized expert searches for each individual's information on the dark web. This is an anathema to predominance.

Plaintiffs try to steamroll this flagrant problem by arguing that whether a different data breach proximately caused a class member's injuries pertains only to the amount of damages rather than the element of causation. *See* Mot. 23 n.15. That is absurd. By Plaintiffs' lights, for example, personal injury cases alleging asbestosis or cancer—which courts have held are virtually impossible to certify, *see, e.g.*, *Georgine*, 83 F.3d at 628 (collecting authority)—would suddenly become certifiable because the myriad individualized causation questions would be swept aside as affecting only damages, not liability.

Nothing supports this radical reworking of class certification law, including the cases Plaintiffs cite. Each involved a class for which causation was baked into the class definition. *See Savidge v. Pharm-Save, Inc.*, 727 F. Supp. 3d 661, 696, 706 (W.D. Ky. 2024) (defining the class as individuals who "incurred costs or lost time mitigating the risk of future harm *resulting from* that data breach," and noting that the "the *fact* of damages is a question common to the class, *as it is defined herein*") (first and third emphases added); *id.* at 705 (causation is a liability issue, critical to certification); *In re Brinker Data Incident Litig.*, 2021 WL 1405508, at *10 (M.D. Fla. Apr. 14, 2021) ("The Court has narrowed Plaintiffs' class definition to include only those individuals who … have 'incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach.' These additions eliminate concerns of a lack of predominance."), *vacated in part by Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883 (11th Cir.

2023).[19] Because causation was a given for all class members under those definitions, the prospect of other data breaches could only reduce but not eliminate class members' recoveries. That is not the case here.

Courts that have assessed putative classes *without* causation embedded in the definition routinely deny certification due to individualized causation issues raised by multiple data breaches. *See, e.g.*, *Attias v. CareFirst, Inc.*, 344 F.R.D. 38, 53-54 (D.D.C. 2023) (noting that "it is unclear whether there is a classwide source of proof that could readily show … which potential class members acted in response to the CareFirst breach in particular, *as opposed to any number of other data breaches in recent years*," which "would therefore raise individualized inquiries as to the causation elements") (emphasis added); *McGlenn v. Driveline Retail Merch., Inc.*, 2021 WL 165121, at *9 (C.D. Ill. Jan. 19, 2021) (denying certification given "several Driveline employees likely *had been involved in other data breaches* in the two to four years prior to the Disclosure") (emphasis added). The Third Circuit has explained that this is consistent with the tort law on causation more broadly. *See, e.g.*, *Georgine*, 83 F.3d at 627-28; *Huber v. Taylor*, 469 F.3d 67, 73 (3d Cir. 2006).

The essential element of causation must be "capable of proof at trial through evidence that is common to the class," *Reinig*, 912 F.3d at 127 (cleaned up), and without individualized evidence, *In re Hydrogen Peroxide*, 552 F.3d at 311. Plaintiffs have no such common evidence here.

## B. Plaintiffs' CMIA Claim Requires Individualized Evidence That Defeats Predominance.

Plaintiffs also fail to meet the predominance requirement as to the putative CMIA class. To start, as shown *supra* § I.A.2, Plaintiffs' overly-broad view of confidential "medical information" is at odds with the CMIA itself, which limits this term to "medical history, mental or physical condition, or treatment." MTD I Op., 2021 WL 5937742, at *33. The only type of "health" data identified by

---

[19] Because the class definitions included an element of the claim, these were inappropriate "fail-safe" classes, an issue defendants in those cases apparently never raised.

Plaintiffs that constitutes "medical information" under the CMIA is ███████████ so Plaintiffs must be limited to the small percentage of individuals who had ███████████ information in the CHAMP database.[20] Not every California patient fits that category—indeed, the sole class representative, Klein, does not—and individualized inquiry is required to determine who does.

### 1. Plaintiffs Cannot Prove with Common Evidence that Any Unauthorized Person Actually "Viewed" Their Medical Information.

Under the CMIA, "[a] breach of confidentiality … entails more than mere loss of possession and does not 'take[] place until an unauthorized person *views* the medical information.'" *Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 213-14 (2022) (emphasis added) (citation omitted); *see also Sutter Health v. Super. Ct.*, 227 Cal. App. 4th 1546, 1553, 1557 (2014) (similar). This requirement is fatal to certification, as *Vigil* held in denying class certification under California's rules paralleling Rule 23(b)(3)'s predominance requirement.

In *Vigil*, a former employee took without authorization a spreadsheet containing medical information for thousands of patients. The court recognized that unauthorized *access* alone was insufficient to support a CMIA claim. The court explained: "[A] party that downloads or copies electronic files, as [the former employee] allegedly did in this case, does not necessarily breach confidentiality if the party has not *actually viewed* the confidential information included in the file." 84 Cal. App. 5th at 206, 217 (emphasis added). Thus, the court held that the "actually viewed" requirement created an individualized issue that defeated class certification, since "*each class member* would have to show that his or her medical information was viewed by an unauthorized party to recover under the CMIA." *Id.* at 220 (emphasis added). So too here.

Plaintiffs do not contest this requirement. Instead, they attempt to distinguish *Vigil* because

---

[20] Plaintiffs have never attempted to calculate the size of the putative CMIA subclass, but Plaintiffs' expert calculated that ███████████████████████████████████████████████████████. Ex. 6, Lee Rep., Table 7 (Lee identifying ███████████████████████████████).

the unauthorized "release" there was to a rogue employee, rather than allegedly to the dark web where criminal actors *might* view it. This is a distinction without a difference: in both situations, the information was "available for viewing," Mot. 25, by the unauthorized thief (setting aside the absence of evidence that medical information was posted on the dark web). That is not sufficient to show that any stolen information was *actually viewed* by the attacker, much less by a downstream bad actor who may have hypothetically seen the advertisement for the data on the dark web, which would still have required the bad actor to purchase the data set before he could view the information it contained.[21]

In any event, Plaintiffs have no common evidence that class members' medical information from the CHAMP database *was* either advertised for sale or "available for viewing in a public, criminal forum." Mot. 25. Rather, as explained *supra* § II.A.2.a, there isn't even common evidence of exfiltration of the CMIA class's data. The four "indicia" Plaintiffs point to are unavailing. *See* Mot. 24-26.

**(1) Gemini.** Plaintiffs' reference to Gemini's findings is misleading, at best. Though Gemini found █████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ . Ex. 17, Gemini Dep. 128, 141; Ex. 31, Flash Alert.

**(2) Conformance.** Plaintiffs do not even pretend that the analysis of Conformance (a fraud monitoring company on which they rely) pertains to medical information, conceding that Conformance noted only that ███████████████████████████████████████

---

[21] This case is distinguishable from *Stasi v. Immediata Health Grp. Corp.*, cited by Plaintiffs, where the court permitted a pleading-stage *inference* (accepting all plaintiff's allegations as true) that someone actually viewed data that had been posted "on the internet, making it searchable, findable, viewable, printable, copiable, and downloadable by anyone in the world with an internet connection." 501 F. Supp. 3d 898, 923-24 (S.D. Cal. 2020). Here, on the other hand, Plaintiffs argue (though they have no evidence) that "their PHI was published for sale" on the dark web, Mot. 24—meaning that criminal actors with dark web credentials could find an *advertisement* for the data, not that the medical information itself was available to the world to view. Regardless, at the class certification stage, Plaintiffs can no longer rely on pleading-stage inferences; the lack of any evidence of actual viewing, after years of discovery, is "fatal." *Stasi*, 501 F. Supp. 3d at 909-910; *see also Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 819 (N.D. Cal. 2023) (allowing a pleading-stage inference of viewing because "to require more would place the burden on [plaintiff] … without the benefit of discovery").



██████████████████████████████████████ Mot. 24 (emphasis added). Plaintiffs' expert also conceded that Conformance ████████████████████████████████████████ ██████████████████████████████████████. *See* Ex. 10, Frantz Dep. 46-47.

**(3) CRA.** Plaintiffs mischaracterize CRA's analysis, which ██████████████████ ████████████████████████████████████████ Mot. 24; *see* Ex. 2, Tomasini Decl. ¶¶ 34-41. In fact, CRA ████████████████████████████ ████████ Ex. 15, CRA Dep. 65. ████████████████████████████████ ████████████████████████████████████████, there is no evidence that ████ ████████████████████████████████████, as Plaintiffs' expert conceded. *Supra* 8; Ex. 10, Frantz Dep. 287-89; 302-03, 305-08; Ex. 2, Tomasini Decl. ¶¶ 39-41.

**(4) Frantz.** Finally, Plaintiffs stretch beyond recognition Frantz's analysis. Mot. 24. She did not even search for, much less find, ████████████████████████████████ ████████████████████. Ex. 10, Frantz Dep. 211; *see also* Ex. 5, Frantz Decl. ¶ 362 ████████ ████████████████████████████████████. Frantz admittedly ████████ ████████████████████████████████████████████████ ████████ Ex. 10, Frantz Dep. 310-311 ████████████████████████

In short, there is no common evidence to support any step in the chain of events Plaintiffs imagine: nothing suggests that medical information was exfiltrated from the CHAMP database, was analyzed by hackers, was advertised for sale on the dark web, or was actually sold to criminals; and— critically for class certification purposes—no common evidence that *any* medical information was *viewed* by an unauthorized third party. *See* Mot. 26. Accordingly, Plaintiffs cannot rely on an "inference" that all putative class members' confidential medical information was actually viewed "once available on the internet," Mot. 25, and *Vigil* squarely forecloses certification of the CMIA class.

47

### 2. Plaintiffs Cannot Prove with Common Evidence that All Medical Information in the CHAMP Database Was "Confidential."

Under the CMIA, Plaintiffs also must show that "the *confidential* nature of [their] medical information was breached." *Vigil*, 84 Cal. App. 5th at 206, 219 (emphasis added); *see also Regents of Univ. of Cal. v. Super. Ct.*, 220 Cal. App. 4th 549, 570 (2013), *as modified on denial of reh'g* (Nov. 13, 2013). An individual who has "openly discussed information about his or her medical condition with third parties" has relinquished the confidential nature of that information and, consequently, waived any potential CMIA claim based on its release. *Garrett*, 109 Cal. App. 4th at 1408; *see also United States v. Thomas*, 703 F. App'x 72, 78 (3d Cir. 2017) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.") (cleaned up). Predominance fails due to the laborious individualized inquiries necessary to comb through each putative class member's online postings and real-world communications with third parties to determine whether the particular medical information stored in the CHAMP database was actually confidential and not voluntarily publicized by that individual. *See supra* § I.A.2 (discussing Klein's public posts on social media accounts, sites seeking aid with medical expenses, and online reviews of doctors); Ex. 18, Hollway Dep. 78 (social media posts about medical condition); Ex. 19, Jairam Dep. 50 (same).

### III. Plaintiffs Fail to Satisfy Rule 23(b)(2).

Finally, Plaintiffs make a half-hearted argument for injunctive relief under Rule 23(b)(2). Mot. 30-31. The bar for a (b)(2) class is high—more "stringent" than for a (b)(3) class. *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 269 (3d Cir. 2011); *see Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998). A (b)(2) class may be certified only if the requested injunctive relief is "appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), and would "benefit[] all [class] members at once," *Dukes*, 564 U.S. at 362. A court should deny (b)(2) certification "in the presence of disparate factual circumstances." *Barnes*, 161 F.3d at 143 (cleaned up). Plaintiffs fall well short of this standard.

*First*, this case presents myriad individualized issues that destroy the cohesiveness of the

48

putative class here—not least of which is the need for each individual to prove, with unique evidence, that they *personally* suffered harm because their *particular* personal information was exfiltrated during the AMCA Cyberattack and subsequently misused. *See supra* § II. Thus, for the same reasons that common issues do not predominate, the proposed class is not sufficiently cohesive. *See Gates*, 655 F.3d at 264 ("The disparate factual circumstances of class members may prevent a class from being cohesive and, therefore, make the class unable to be certified under Rule 23(b)(2).") (cleaned up).

*Second*, Plaintiffs cannot show that all members of the putative class would benefit from the proposed injunction. Plaintiffs demand that Quest "build and implement an effective risk management program with independent third-party oversight" purportedly to prevent speculative future data breaches of the vendors of Quest's vendors that might someday occur and compromise Quest patient data held by those vendors' vendors. Mot. 31. But Plaintiffs have not shown that the requested relief would protect *all* members of the putative class from future harm. As to information previously provided to Quest, Plaintiffs' bald assertion that Defendants "continue to maintain Class Members' Personal Information" and provide such information relating to *every* putative class member to vendors—more than *six years* after collecting it—is totally unsupported. Mot. 31. And, as to information that may be provided to Quest in the future, there is no reason to expect that every member of the putative class, as "past purchasers" of Quest's services, will continue to use Quest in the future. *See, e.g.*, *Berni v. Barilla S.P.A.*, 964 F.3d 141, 146, 147 (2d Cir. 2022) (rejecting Rule 23(b)(2) certification because "past purchasers of a product … are not likely to encounter future harm of the kind that makes injunctive relief appropriate"). In fact, multiple Plaintiffs testified that they have *not* used Quest's services in years and do not intend to in the future. *See, e.g.*, Ex. 22, Parker Dep. 100; Ex. 19, Jairam Dep. 153-54; Ex. 14, Briley Dep. 132. Even for the subset of putative class members who will continue to use Quest's services, there is no evidence that all (or even many) of them will again fail to pay their bills and be referred to a debt collector, or any other vendor. Far from providing

49

"indivisible" relief, the proposed injunction would have no benefit for many putative class members.[22]

Plaintiffs also have not shown that the vague relief they request would redress *any* alleged future harm. To start, the only "evidence" Plaintiffs present of the need for such an injunction is a *single, conclusory sentence* in Sharon Anolik's expert report, unsupported by any analysis or even a review of evidence ███████████████████████████████████. Ex. 4, Anolik Decl. ¶ 253. Lack of evidence aside, Plaintiffs have not identified any action Quest could take that would protect putative class members "from the threat of future identity theft based on the information allegedly taken during the [2019] data breach." *In re Blackbaud, Inc., Customer Data Breach Litig.*, 2024 WL 5247287, at *12 (D.S.C. Dec. 30, 2024) (changes to current security practices cannot protect against alleged harms from data breach four years earlier). Nor do Plaintiffs have evidence showing that "putative class members' personal data is being collected or housed by" any Quest vendor with deficient data security. *Id.* at *11; *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 171 (D. Md. 2022) (certification denied where breached database had been "retired and [was] now safely offline").

Plaintiffs' wispy arguments and dearth of evidence concerning their proposed injunctive class confirm that the relief they seek "relates primarily to money damages," and not to an injunction that would benefit the putative class as a whole. *Neale*, 2021 WL 3013009, at *22; *see Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, 2021 WL 3612155, at *5 (3d Cir. Aug. 16, 2021) (denying certification of injunctive class where plaintiffs sought "primarily individualized monetary relief"). Their request to certify a (b)(2) class should be rejected.

## CONCLUSION

For all these reasons and those stated by Optum360, which Quest incorporates herein, Plaintiffs' Motion for class certification should be denied.

---

[22] Plaintiffs' citation to *Adkins* confirms their failure to meet (b)(2) requirements: that injunctive class was limited to *current* users whose data was affected by a breach of Facebook's *own systems*—meaning that additional security monitoring would actually benefit the whole class. 424 F. Supp. 3d at 698.

Dated:  September 2, 2025                    Respectfully submitted,


                                            By: */s/ Eamon P. Joyce*

                                            David H. Hoffman
                                            Daniel C. Craig
                                            Heather Benzmiller Sultanian
                                            SIDLEY AUSTIN LLP
                                            One South Dearborn
                                            Chicago, IL  60603
                                            Tel.: (312) 853-7000
                                            david.hoffman@sidley.com
                                            dcraig@sidley.com
                                            hsultanian@sidley.com

                                            Eamon P. Joyce
                                            SIDLEY AUSTIN LLP
                                            787 Seventh Avenue
                                            New York, NY  10019
                                            Tel.: (212) 839-8555
                                            ejoyce@sidley.com

                                            Ricardo Solano
                                            GIBBONS P.C.
                                            One Gateway Center
                                            Newark, NJ  07102
                                            Tel.: (973) 596-4500
                                            rsolano@gibbonslaw.com

                                            *Attorneys for Defendant Quest Diagnostics Incorporated*